1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF PUERTO RICO

2

3    :_____:

4    THE ESTATE OF ANGEL BERGANZO-COLON,          :
     EFRAIN BERGANZO, RUBEN BERGANZO,             :
5    THE ESTATE OF ANTONIO                        :
     RODRIGUEZ-MORALES,                           :
6    NOEMI RODRIGUEZ-ROBLES,                      :
     ELIEZER RODRIGUEZ-ROBLES,                    :
7    ANGEL M. RODRIGUEZ-ROBLES,                   :
     MARIA M. RODRIGUEZ-ROBLES,                   :
8    RUTH D. RODRIGUEZ-ROBLES,                    :
                                                  :
9              Plaintiffs,          : Case No: 10-CV-1044
                                                  :
10            vs.                                 :
                                                  :
11   JOSHUA M. AMBUSH                             :
               Defendant.                        :
12   :_____:

13              EXCERPT OF DAY 3
14      TESTIMONY OF MICHAEL ENGLEBERG, M.D.
                  HELD BEFORE
15         THE HONORABLE GUSTAVO A. GELPI
     Wednesday, September 21, 2011, beginning at 11:26 a.m.
16   :_____:

17

18   A P P E A R A N C E S:

19            LAW OFFICES OF DAVID EFRON
              BY DAVID EFRON, ESQUIRE and
20            BY JOANNE V. GONZALEZ-VARON, ESQUIRE
              P.O. Box 29314
21            San Juan, Puerto Rico 00929
              For the Plaintiffs

22            McCONNELL VALDES, LLC
23            BY HENRY O. FREESE-SOUFFRONT, ESQUIRE and
              BY RAUL M. ARIAS-MARXUACH, ESQUIRE
24            270 Munoz Rivera Avenue
              Hato Rey, Puerto Rico 00918
25            For the Defendant

*ORIGINAL*

INDEX TO WITNESS

WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

MICHAEL ENGLEBERG, M.D.

    By Mr. Efron..........3.............111...........

    By Mr. Arias-Marxuach.......81.................118

INDEX TO EXHIBITS

PLAINTIFFS'                                       FOR   IN
EXHIBIT NO.                                       I.D.  EVD.

1-A to 1CC...Compilation of Copies of Checks...48...48

---

*Exhibits not provided to the reporter.

1          (Jury enters the room.)

2          THE COURT:  Please be seated.  Call your

3   next witness.  We're going to go until about 12:00,

4   12:10 and then I'll let you know when we're about to

5   recess.

6          MR. EFRON:  Plaintiffs call Dr. Michael

7   Engleberg and he's already made his affirmation for

8   testimony.

9          THE COURT:  Okay.  You may proceed,

10  Mr. Efron.

11                       ---

12          MICHAEL ENGLEBERG, M.D., a witness called on

13  behalf of the Plaintiffs, having been affirmed by The

14  Court to tell the truth, was examined and testified

15  as follows:

16                  DIRECT EXAMINATION

17  BY MR. EFRON:

18  Q.      Witness, please state your name for the

19  record.

20  A.      My name is Michael Engleberg.

21  Q.      And is it Dr. Michael Engleberg?

22  A.      That is correct.  I am a physician.

23  Q.      What's your specialty?

24  A.      In pediatrics.

25  Q.      You're a pediatrician?

Michael Engleberg, M.D. - Direct

1   A.       That is correct.  I take care of children,

2   babies, infants.

3   Q.       Since when?

4   A.       Since 19 -- I became a physician, I

5   graduated medical school in 1979.  I went into

6   practice in 1984.

7   Q.       Where do you reside?

8   A.       I reside in 75 Woodmere Boulevard.

9   Q.       Where is that?

10  A.       That's in Woodmere, New York.

11  Q.       So you've come a long way for this?

12  A.       Yes, I did.

13  Q.       I also note that it was difficult for you to

14  come, we were expecting you yesterday.  Could you

15  tell us what your --

16          MR. ARIAS-MARXUACH:  Objection.  Side bar.

17          MR. EFRON:  Your Honor, it's an

18  introductory --

19          MR. ARIAS-MARXUACH:  I know where he's going

20  with this.

21          THE COURT:  Okay, please approach.

22          (Side bar discussion begins.)

23          MR. ARIAS-MARXUACH:  He wants to put on the

24  record that this man is under cancer treatment as an

25  obvious plea for sympathy.  It is irrelevant.  And

Michael Engleberg, M.D. - Direct

1    this is --

2    THE COURT:  Okay.  Whether he's here

3    yesterday or tomorrow it doesn't matter.  He's your

4    witness and --

5    MR. EFRON:  I just wanted to explain because

6    he might need some water or -- but that's something

7    for the court to -- if he needs any --

8    MR. ARIAS-MARXUACH:  It's the same thing as

9    the whole schtick about his being a pediatrician.  He

10   devotes 40 hours a week to The Center so I don't know

11   how --

12   THE COURT:  Let's move on to another

13   question.

14   MR. ARIAS-MARXUACH:  But the whole issue

15   about --

16   MR. EFRON:  And Mr. Arias knows this because

17   I anticipated it and I told him this, I want them to

18   know under what difficulties he came to Puerto Rico

19   to testify.

20   MR. ARIAS-MARXUACH:  No, it's irrelevant.

21   It's a play for sympathy.

22   MR. EFRON:  No, it's not a play for

23   sympathy.

24   MR. ARIAS-MARXUACH:  It's a play for

25   sympathy.

Michael Engleberg, M.D. - Direct

1    THE COURT:  But he's here, I'm not going to

2    allow it.  He's here, he's going to testify.  Let's

3    move on.

4              (Side bar discussion ends.)

5    BY MR. EFRON:

6    Q.        Okay.  Do you still practice pediatrics?

7    A.        Only as a consultant.

8    Q.        What do you do that occupies most of your

9    time now?

10   A.        Most of my time is functioning as the

11   president of the American Center for Civil Justice.

12   At this point I volunteer for the American Center for

13   Civil Justice.

14   Q.        What is the American Center for Civil

15   Justice?

16   A.        The American Center for Civil Justice is a

17   not for profit organization that advocates for

18   victims of terrorism and specifically in using the

19   court system by which we're able to hold governments

20   and organizations responsible for their acts of

21   terrorism.

22   Q.        Since when have you -- since when has the

23   American Center existed?

24   A.        The American Center was originally founded

25   on a different name in 1996 as the Raoul Wallenberg

Michael Engleberg, M.D. - Direct

1   Center For Civil Justice.  That's when it was first

2   incorporated.  It was changed a few years later to

3   the American Center for Civil Justice.

4   Q.        And that was when approximately?

5   A.        I don't recall the timing but probably

6   around 1998, 1999.

7   Q.        And who had been the principals of the

8   American Center?

9   A.        Okay.  Uhm, the original founders were

10  myself and a Rabbi Perr.

11  Q.        Who is Rabbi Perr?

12  A.        Rabbi Perr.

13  Q.        Is he a congregational rabbi?

14  A.        Both.  He's an individual that was a

15  congregational rabbi, he was a dean of a learning

16  institution, he was also -- he had a school for

17  children with disabilities and learning problems.

18  Q.        And of course a rabbi is a Jewish religious

19  leader?

20  A.        That is correct.

21  Q.        He -- so what was your position at the

22  American Center?

23  A.        My position in the American Center was

24  basically doing research, preparing the narratives

25  for the attorneys, making sure that we would be able

Michael Engleberg, M.D. - Direct

1    to bring on the claimants.  We felt that -- that they

2    were victims of these acts of terrorism.  I mean,

3    there are many, many responsibilities in which I had.

4    Q.        How did you decide what cases to give your

5    time and resources to?  When I say "your," I mean The

6    Center's.

7    A.        Well, we had discussed it certainly after

8    the law went into effect.  There was a law that was

9    passed in 1996 that allowed American citizens who had

10   become victims of terrorism, both who were killed or

11   injured, to bring civil action against governments

12   that sponsored terrorism.  There was seven countries

13   that were listed as governments that sponsored

14   terrorism, and there was what's called a waiver of

15   foreign sovereign immunity.

16        Originally governments were not held

17   responsible for any acts of terrorism.  The United

18   States government created through legislation a law

19   that held these governments responsible for these

20   killings, for hostage taking, for causing injuries to

21   American citizens.

22   Q.        I understand that that law had a window of

23   time, do you know what it was?

24   A.        Yes.  Well, there are two components of it.

25   One was in 1996 when it went into effect and then

Michael Engleberg, M.D. - Direct

1    there was an additional bill that was passed a year

2    later that described what those damages were.  There

3    was a ten-year statute of limitations from that point

4    that aims -- the legislation, the law was passed in

5    1996, it gave us ten years by which we could find

6    different claimants that had occurred before, and

7    that would allow us until 2006 to bring these

8    actions, to file a complaint on behalf of different

9    claimants.

10   Q.       How many different cases or -- or give us an

11   idea of the volume of that kind of work that the

12   American Center would undertake.

13   A.       Well, first of all, we had to identify the

14   different cases.  We did have a number of different

15   experts that we had consulted with.  But basically

16   defined who -- the different cases, as well as the

17   different claimants.  We paid some investigative

18   reporters, individuals that were expert in this area,

19   in terms of letting us to know which cases we should

20   undertake or which one of them was the Lod Airport

21   Massacre.

22   Q.       The Lod Airport Massacre in Israel?

23   A.       That is correct.  I mean, a lot of

24   individuals would described this as the Kozo or

25   Okamoto Massacre.  Basically it occurred at Lod

Michael Engleberg, M.D. - Direct

1   Airport --

2   Q.        Before we go into Lod Airport, besides Lod

3   Airport there were other --

4   A.        Yes, there were multiple cases.  In total

5   basically with all the cases at this point in time,

6   rather than to belabor all the different cases, we

7   have judgments in excess of two and a half billion

8   dollars.  The Center through their efforts have been

9   able to collect for a number of the victims in excess

10  of $150 million.

11  Q.        So it was not just the Puerto Ricans -- the

12  Puerto Rican victims in Israel?

13  A.        That is correct.

14  Q.        There were other cases as well?

15  A.        That is correct.

16  Q.        And who would handle -- before we go into

17  Lod, who would handle those other cases?

18  A.        Well, we actually -- first of all, in terms

19  of the investigation, I was involved in the

20  investigation.

21  Q.        By the way, how does a pediatrician get

22  involved with going after terrorists?

23  A.        Well, I always described -- people ask me,

24  how does a pediatrician get involved?  And I always

25  say that I was convinced by two pediatricians that I

Michael Engleberg, M.D. - Direct

1   should get involved.   One was the name of Shikaki.

2   Shikaki was a founder of a Palestinian Jihad.   And

3   the other one was Ranticci.   Ranticci likewise was a

4   pediatrician who founded Hamas.   And of course there

5   are many, many cases of which Hamas was responsible

6   for the killings not only of Israeli citizens and

7   foreign citizens but many American citizens.

8           Uhm, by being a pediatrician it allows me to

9   be able to organize, to be able to deal with the

10  narrative of the cases, to be able to put these cases

11  together for the attorneys.

12          The American Center has only hired the top

13  attorneys to litigate these cases.   If you take a

14  look at the different law firms on which we have

15  engaged, they are very, very experienced, they have

16  the knowledge, they have the skills, they have the

17  resources by which they're able to move these cases

18  along.   We've taken a tremendous risk in most of

19  these cases.

20  Q.        Because you haven't collected most of the

21  money?

22  A.        That is correct.   But even when we --

23  beforehand many attorneys did not want to take these

24  cases.   Why?   Because they never believed it was

25  doable.   Many attorneys turned it down.   We're very

Michael Engleberg, M.D. - Direct

1    fortunate that we're able to obtain attorneys because

2    of the risk.

3    Q.        How would these attorneys be paid?

4    A.        There are different -- there are different

5    agreements.  With some of them, certainly starting

6    off with the American Center, we made sure that

7    everything would be discounted.  We always had an

8    agreement, first of all, with the claimants, the

9    20 percent, and then we would go -- that means

10   20 percent would be the total amount including the

11   litigation fees, unlike most attorneys that request

12   33 and a third percent.

13          We didn't want this to be perceived as an

14   enterprise for attorneys, that this is nothing about

15   just being mercenary and making a lot of money.  A

16   lot of the attorneys will charge 33 and a third

17   percent plus expenses.  It's very important for us to

18   limit the amount that the claimants would be paying

19   to 20 percent, including all attorney fees, including

20   all expenses.

21   Q.        Are there --

22   A.        We -- we --

23   Q.        I'm sorry, I didn't mean to interrupt.

24   A.        Again, we hired the attorneys.  We let them

25   know that it was done because we felt that these

Michael Engleberg, M.D. - Direct

1   individuals deserved to be represented, that they

2   suffered a lot, they were victimized.  And most of

3   these big law firms understood that, they were

4   willing to work with us.

5          And we made -- we had, uhm, -- we had --

6   again, I'll have to explain a little bit later in

7   terms of powers of attorney, that I was able to

8   engage these law firms on different types of

9   agreements.  The Center put out a lot of money -- in

10  many cases The Center put out, in certain cases, over

11  half a million dollars to be able to move these cases

12  forward.  In other cases the attorneys would get paid

13  only at the time that there would be a collection.

14  But, again, the attorneys were willing to work with

15  us because they recognized the importance of

16  representing individuals who were victims of acts of

17  terrorism.

18  Q.        So did you have situations on any of the

19  cases where The Center actually lost money because of

20  their expenses and their legal fees and not

21  collected?

22  A.        I mean, at this point in time we put out for

23  many of these cases close to $2 million which The

24  Center has not collected.

25  Q.        Which is a risk for The Center?

Michael Engleberg, M.D. - Direct

1    A.        Which is a risk, yes.

2    Q.        And when The Center does collect money, what

3    happens to that money?  When you do collect the

4    20 percent, what do you do besides pay the lawyers?

5    A.        Well, it usually goes back in terms of

6    investigating additional cases.  The American Center

7    also contributes to many other organizations that

8    have very similar goals.  The Center has donated to

9    other organizations that are responsible in teaching

10   the intelligence community acts of terrorism, how to

11   deal with first respondents, if there is a terrorist

12   act, exactly how they should respond to it.

13           We've given money to other organizations

14   that are not for profit organizations in addition to

15   the attorneys that are persuing additional claims.

16   Q.        As an executive, as the president of the

17   American Center, do you get paid for your time and

18   for your expenses?

19   A.        Yes, I do.  I'm on a salary.  Well, at this

20   point in time I'm no longer on a salary, it's purely

21   volunteer.  Uhm, I do work for another organization

22   that does research.

23   Q.        And what is the name of that organization?

24   A.        That organization is called the New York

25   Center For Civil Justice.

Michael Engleberg, M.D. - Direct

1    Q.        What is the relationship between that one

2    and the American Center?

3    A.        Well, they're two separate organizations

4    that deal with different responsibilities.

5    Q.        Is the New York City also a nonprofit?

6    A.        Yes, it is.  It's a --

7    Q.        And you are also the president?

8    A.        That's correct.

9    Q.        Is Rabbi Perr involved in that one as well?

10   A.        No, he is not.

11   Q.        So what is the relationship between one and

12   the other?

13   A.        Well, originally when the American Center,

14   okay, collected funds from two of our very success --

15   a successful judgment and a collection, we were able

16   to donate to many other organizations.  And

17   originally they were giving money to the New York

18   Center to be able to fulfill its particular goals and

19   missions.

20          The New York Center is responsible for --

21   specifically for doing research on Islamic terrorism.

22   It's also responsible for providing civil rights

23   education on college campuses -- letting the students

24   know what the civil rights are.  It deals with --

25   with questions of religious tolerance on college

Michael Engleberg, M.D. - Direct

1    campuses.

2           So even though they're very similar -- also,

3    the New York Center does have a goal of advocating

4    for victims of terrorism.  It actually helps to

5    finance individuals who were victims and donates to

6    them to help them out personally.

7           MR. FREESE-SOUFFRONT:  Your Honor, I move to

8    strike as nonresponsive.  The question was, what was

9    the relationship between the American Center and the

10   New York Center?

11          MR. EFRON:  We're going to get to that.  He

12   had to explain --

13          THE COURT:  I'll allow the question.  Let's

14   continue.

15          MR. EFRON:  It's an introductory question.

16          THE COURT:  Okay.

17   BY MR. EFRON:

18   Q.     That being said, what is the relationship --

19   and thank you for the introduction.

20          What is the relationship and what is the --

21   what economic relationship, if any, is there between

22   the two organizations?

23   A.     Yes.  Well, the American Center over the

24   years from -- certainly from the time that it had its

25   original collection, that was in 2000 basically, over

Michael Engleberg, M.D. - Direct

1    the years, because their expenses were extremely

2    high, really ended up using most of their money.  And

3    certainly by 2005/2006 the American Center, in terms

4    of its own financing, did not have the funds to be

5    able to pay directly the attorneys' other expenses,

6    because there is a similar goal that the both centers

7    do have.  The New York Center was able to help

8    finance many of the bills of the American Center.

9         So, yes, the New York Center paid many of

10   the bills in the later years, okay, on behalf of the

11   American Center.

12   Q.      Was that accounted for as a -- as a --

13           MR. ARIAS-MARXUACH:  Objection.  Leading.

14           MR. EFRON:  I haven't asked the question

15   yet.

16           MR. ARIAS-MARXUACH:  Ask how it was

17   accounted.

18           THE COURT:  Continue, Counsel.

19   BY MR. EFRON:

20   Q.      How was that accounted?

21   A.      It was accounted -- basically it was given

22   as a loan.

23   Q.      As a loan?

24   A.      As a loan to the American Center, yes.

25   Q.      And has the American Center ever -- with

Michael Engleberg, M.D. - Direct

1    what frequency would the American Center help the

2    New York Center?

3    A.        I mean, since --

4    Q.        Financially.

5    A.        From which time?

6    Q.        Since its inception.

7    A.        Well, initially it was helping them.  You

8    know, again, we're not talking about major moneys but

9    probably to the tune of 100,000, $200,000, to see

10    that their goals could be fulfilled.

11    Q.        Before you gave us this explanation you were

12    going to start telling us about the case that most

13    relates to our claim here, the Lod Airport Massacre.

14            Can you give us a background on that?  Who

15    thought of it?  How did it begin?  Who did what?

16    A.        Well, prior to 2000, as I said, we had to

17    create a list of all the different terror attacks

18    that was sponsored by governments that sponsored

19    these attacks.  We listed many different cases.

20    There was a Higgins case, there was a Stethem case,

21    the Khobar Towers case, a Welch case.  There were

22    many cases including the Lod Airport.

23            We had consulted with many experts on this.

24    One was the name of Yosef Bodansky.  He was -- became

25    the director of the congressional task force for

Michael Engleberg, M.D. - Direct

1    uncongressional warfare and counterterrorism.  For

2    about ten years he had been doing investigation on

3    all of these particular attacks that affected

4    Americans.  We had consulted him, he gave us the list

5    of all the different cases out there including the

6    Lod Airport Massacre.

7            We had also consulted with an investigative

8    journalist in Israel by the name of David Haley to be

9    able, to help us in terms of gathering information.

10   Between the two of them they were able to put us in

11   touch with -- it's called the Shim Bet in Israel,

12   that happens to be their intelligence agency, to be

13   able to gather information.

14           On a few occasions I and other attorneys had

15   gone to Israel to gather information specifically on

16   the Lod Airport Massacre.

17   Q.      Since what year had you been considering

18   filing a complaint or a claim for the Lod Airport

19   Massacre?

20   A.      Well, beginning in the year probably 2000,

21   you know, we had discussed that possibility in terms

22   of bringing such an action on behalf of the Puerto

23   Rican claimants who were victimized in these acts of

24   terrorism.

25   Q.      So what did The Center do?

Michael Engleberg, M.D. - Direct

1  A.        Well, at that point in time we had discussed

2  in terms of -- we had been in touch with Mr. Ambush.

3  Q.        How was that?  How do you -- who is Joshua

4  Ambush?

5  A.        Okay.  Well, Joshua Ambush, okay, through

6  his father became a very good friend of Rabbi Perr.

7  Rabbi Perr over the years again had befriended the

8  father, met him many, many years ago while they were

9  living in Baltimore.  Through a congregational rabbi,

10  he met the father.  The father confided in Rabbi Perr

11  the difficulties that he was having with Joshua

12  Ambush in school.  Rabbi Perr --

13         MR. ARIAS-MARXUACH:  Objection.  Hearsay.

14         THE COURT:  Don't -- don't make any

15  statements that third persons may have told you, just

16  based on your own personal knowledge of the facts.

17  BY MR. EFRON:

18  Q.        Based on your personal knowledge, what is

19  the relationship and how did the relationship between

20  Ambush and The Center begin?

21  A.        Okay.  The Center hired Mr. Ambush in 2001

22  to do different works for The Center.  He had just

23  graduated law school.  We had asked him -- because he

24  had told us that he had lived in Puerto Rico and he

25  had a cousin by the name of Leo Garcia that lived in

Michael Engleberg, M.D. - Direct

1    Puerto Rico, he said would we mind if he would be the

2    agent for The Center.  And that was one of his tasks,

3    to be an agent, to go to Puerto Rico -- or through

4    his cousin Leo Garcia, to sign up potential claimants

5    for this particular claim.  And we tasked him to be

6    that -- the agent and to be the liaison on behalf of

7    the center, to go there and to sign them up for The

8    Center.

9    Q.      You had identified the victims' families

10   already; is that correct?

11   A.      No.

12           MR. ARIAS-MARXUACH:  Objection.  Leading.

13           THE COURT:  Rephrase the question.  Rephrase

14   the question.

15   BY MR. EFRON:

16   Q.      Who was Leo Garcia -- where was Leo Garcia

17   supposed to go?

18   A.      Okay.  Mr. Ambush basically assured us,

19   because of his relationship to Puerto Rico, that he

20   would be able to identify who the claimants were.

21   And, therefore, he said through Leo Garcia, who was

22   very well-known here, he would be able to contact the

23   individuals.  We had a list of all the different

24   claimants because, again, through our investigation

25   there are a number of different newspapers that had

Michael Engleberg, M.D. - Direct

1    already identified who all those claimants were.

2              And Mr. Ambush --

3    Q.        You mean claimants or victims?

4    A.        Well, I should say at that time they were

5    victims.

6    Q.        Exactly.

7    A.        All those that were -- there was an entire

8    list that was reported in the newspapers in 1972,

9    that identified who all of those victims were.  And

10   Mr. Ambush assured us through Leo Garcia likewise

11   would be able to reach out to them and to bring them

12   on board as claimants for this action.

13   Q.        When you say that Ambush was -- I'm trying

14   to think of the word you used.  You said "tasked"?

15   A.        Tasked, that's correct.

16   Q.        In what capacity?

17   A.        To just be a liaison for The Center.  He was

18   not an attorney for these victims.  He was going down

19   there to bring them on board, to -- basically to sign

20   them on for The Center.

21             There were two agreements that we had

22   between the -- these potential claimants and the

23   American Center for Civil Justice.  One was The

24   Center and claimant agreement and the other was a

25   power of attorney.

Michael Engleberg, M.D. - Direct

Q.       Where were those redacted, those documents?

A.       What do you mean by "redacted"?

Q.       Who wrote those documents out?

A.       Okay.  They had been used for a number of years and they continue to be used.  They were designed by other attorneys, American attorneys. They told us exactly that we should have two specific agreements:  One was in terms of the American Center For Civil Justice that basically defined the financial terms of the relationship, as well as our responsibilities; and there was a power of attorney that was executed that authorized me as an individual to represent the different claimants directly.  And that was very important because in terms of engaging an attorney, it's the claimants themselves that have to engage the attorney.

        And through the power of attorney that authorizes me on behalf of many individuals, whether it's two individuals or 45 claimants, to be able to engage the attorney on behalf of all of these individuals.

Q.       But when you tasked Mr. Ambush with that job, he was an attorney already?

A.       But in 2001 The Center at this point in time, okay, was just about -- just wanted to sign

Michael Engleberg, M.D. - Direct

1    them up.    We had yet to determine who the law firm

2    was going to be in terms of representing these

3    individuals.

4    Q.        Was it not -- it was not the intention of

5    The Center that Mr. Ambush be the lawyer?

6                MR. ARIAS-MARXUACH:    Objection.    Leading.

7                THE COURT:    It's leading.    Rephrase the

8    question.

9                MR. EFRON:    I'll rephrase it.

10   BY MR. EFRON:

11   Q.        Which law firm or which lawyer did The

12   Center intend to have represent the claimants?

13   A.        Initially we had wanted to have a very large

14   law firm, a very prestigious law firm, by the name of

15   Covington, Burling to represent the claimants in

16   this -- in the lawsuit because we needed skilled

17   lawyers who were going to litigate this particular

18   case.

19              Again, this was a very difficult case,

20   there's no assurance that it was going to be

21   successful.    We were willing to work with attorneys

22   but, again, we only hired prominent law firms or

23   prominent attorneys to represent them who were

24   skilled in litigating.

25              These cases against Libya, unlike the

Michael Engleberg, M.D. - Direct

```
 1    Iranian cases, were going to be defended.  We had

 2    other cases out there too that were represented by

 3    prominent lawyers.  One of the other cases was a

 4    Collet, Alec Collet.  Al Collet was abducted by a

 5    terrorist organization that was sponsored by Libya --

 6    Q.       Could you spell that out, please?

 7    A.       Al Collet?

 8    Q.       How would you spell that?

 9    A.       C-o-l-l-e-t-e.

10    Q.       Is the word before that --

11    A.       I mean, l-e-t.

12    Q.       Is there a word before that?

13    A.       Alec, A-l-e-c.

14    Q.       Like Alec?

15    A.       That is correct.

16    Q.       That's a first name.

17             And the last name?

18    A.       C-o-l-l-e-t.

19    Q.       And what was that about?

20    A.       That was about an individual who was a

21    British citizen, who married an American who was

22    working for the U.N. and he was abducted when he was

23    in Lebanon by Abu Nidal, and that was a terrorist

24    organization that tortured him and eventually killed

25    him.  We brought an action against Libya.  We had
```

Michael Engleberg, M.D. - Direct

1    done all the investigation regarding him.  We had

2    hired Paul Gaston to represent that particular case

3    and it was against Libya.

4    Q.      Who is Paul Gaston?

5    A.      Paul Gaston is a highly skillful lawyer,

6    he's an attorney that has major credentials.  Paul

7    Gaston graduated from Yale Law School.  People know,

8    in terms of the different universities, Yale is

9    perhaps at the top with Harvard University.  He had

10   25 years of experience.  He actually represented a

11   number of our other cases in litigating antiterrorism

12   cases.  So this is an individual who's very skillful,

13   who, again, was very experienced and also had

14   litigated prior cases on behalf of The Center.

15   Q.      So the lead -- in what measure, if any, do

16   you think that the lead to think of or do the Lod

17   Airport Massacre for the Puerto Rican victims was

18   thought of or designed by Ambush?  In other words,

19   if --

20   A.      It was never thought of by Mr. Ambush.

21   Q.      But when you tasked him with this job he was

22   a lawyer and he was reporting to The Center; is that

23   correct?

24   A.      That is correct.  He was responsible for

25   basically doing research as a paralegal would do in

Michael Engleberg, M.D. - Direct

1  terms of researching, going to the library of

2  Congress, obtaining the information for us,

3  presenting it to us and for me then to determine

4  whether we had enough information by which the

5  lawyers were able to proceed with this case.

6  Q.      In what way would The Center, the American

7  Center, compensate Mr. Ambush for his work?

8  A.      Well, Mr. Ambush was -- continues being

9  compensated, certainly in the initial stages by the

10  American Center.  From 2001 through 2003, he was

11  employed by The Center, he was paid quite generously

12  during that period of time.  Later on from 2006 and

13  onwards he would submit bills to the American Center

14  by which the American Center paid him for his time.

15  And Mr. Ambush, again, presented it at $50 an hour;

16  he was satisfied with this -- with this compensation.

17  He never showed any disappointment with it.

18      In addition to that, certainly from 2008

19  during that period of time The Center advanced him

20  $20,000 by which he would be able to continue his

21  work and to be able to pay for additional items.  A

22  check was issued to him in June for $10,000 and then

23  again in November for $10,000, which he had never

24  accounted for.

25  Q.      The payments, am I correct in thinking that

Michael Engleberg, M.D. - Direct

1   this case was not the only thing that Ambush was

2   working on for The Center?  Was he doing other work

3   for The Center as well?

4   A.        Yes, he was.

5   Q.        So how did you know what was being paid by

6   what and for what?

7   A.        Mr. Ambush would basically send us an

8   invoice by -- or call Rabbi Perr in terms of that he

9   needed so much money and, of course, Rabbi Perr would

10  tell me to issue a check to Mr. Ambush.

11  Q.        Now, this was prior to the billing; is that

12  correct?

13  A.        This is prior to this.  Well, even during

14  that period of time he would submit additional bills.

15  Q.        Fine.  But when Rabbi Perr would tell you,

16  make out a 10,000 dollar check to Joshua, you would

17  consider that an advance?

18  A.        Yes, we would.

19          THE COURT:  Okay.  Mr. Efron, I don't want

20  to cut your line of thought, but it's about 12:06.

21  Whenever you're going to move on or you think it's

22  appropriate to --

23          MR. EFRON:  Okay.  We can stop now, Your

24  Honor.

25          THE COURT:  Then the witness is under the

Michael Engleberg, M.D. - Direct

1  rules of the court.  Please do not discuss your

2  testimony with anyone until you finish testifying

3  today or tomorrow.  It's 1:06.  Let's be back here --

4  12:06.  Let's be back here at 1:20.

5          MR. EFRON:  Thank you, Your Honor.

6          THE COURT OFFICER:  All rise.

7          (Jury exits the room.)

8          THE COURT:  Everybody please be back here at

9  1:20.

10         (Jury Trial recessed for lunch at 12:04 p.m.

11  and resumed at 1:50 p.m.)

12         (Jury enters the room.)

13         THE COURT:  Please be seated.

14         And, Mr. Efron, you may continue your direct

15  examination.

16              DIRECT EXAMINATION CONTINUED

17  BY MR. EFRON:

18  Q.      I don't know, but I think my last question

19  to you and your last answer was related to advances

20  that The Center would give Joshua ambush; is that

21  correct?

22  A.      That is correct.

23  Q.      And what about those advances?  How would he

24  justify them or request them?

25  A.      Basically he would basically say that he

Michael Engleberg, M.D. - Direct

1    needed so much money for -- to be able to carry on,

2    to pay other individuals.  And basically I signed a

3    check and sent it to Mr. Ambush.

4    Q.        And, but was it only to pay other

5    individuals and other expenses or was it also for his

6    own use?

7              MR. ARIAS-MARXUACH:  Objection.  Leading.

8              THE COURT:  Sustained.

9              Rephrase.  You have to rephrase the

10   question.

11   BY MR. EFRON:

12   Q.        What was that money used for, if you know?

13   A.        Well, it had yet to be determined.

14   Q.        Okay.  Now, what did he ask -- who at The

15   Center did he ask for the advances?

16   A.        He would ask Rabbi Perr.

17   Q.        And then what would Rabbi Perr do?

18   A.        He would basically say to me that we needed

19   to pay Mr. Ambush.

20   Q.        On what grounds?

21   A.        Well, that was the relationship that Rabbi

22   Perr had with Joshua Ambush.

23   Q.        So was this a salary or was it charity?

24   What was this?

25   A.        Well, in a way if you want to say it was a

Michael Engleberg, M.D. - Direct

1  combination.  Throughout all the years Rabbi Perr

2  felt a certain personal obligation to Mr. Ambush that

3  he expressed to me in terms of how he helped to

4  support him over the years.  And basically it was

5  built on a certain trust and loyalty that existed

6  between the two of them.

7  Q.      Was the -- in your opinion was that trust

8  reciprocal among both sides?

9  A.      Yes, it was.  Well, at least we thought so.

10 Q.      Who prepared -- no -- as 2006 what you said

11 was the statute of limitations was approaching, what

12 measures did The Center take in order to preserve the

13 rights of the Berganzo and the Rodriguez families?

14 A.      I'd like to back up a little bit.  As I had

15 mentioned --

16         MR. ARIAS-MARXUACH:  Objection.  Not

17 responsive.

18         THE COURT:  Sustained.

19         You have to answer the question posed.

20 A.      Okay.

21         MR. EFRON:  I'll go back.  I think I know

22 what he wants to say.

23 BY MR. EFRON:

24 Q.      At what point did Paul Gaston get involved

25 in this litigation?  And when I say "this

Michael Engleberg, M.D. - Direct

1    litigation," I mean in the Lod Airport Massacre.

2    A.        Well, that was much later.  Other than that

3    at the time -- well --

4    Q.        So let's go back to my --

5              MR. ARIAS-MARXUACH:  Asked and answered.

6    BY MR. EFRON:

7    Q.        Let's go back to my original question.

8              What measures did The Center take in order

9    to protect the rights of these two families?

10   A.        In 2006 as the time frame by which we were

11   allowed to bring this complaint -- as I had mentioned

12   earlier, there's what's called a statute of

13   limitation of ten years.  It was now 2006.

14   Covington, Burling had -- basically did not have

15   enough evidence by which they were willing to take on

16   this case, and we had to preserve and protect this

17   claim.

18             We asked basically The Center; that is,

19   Joshua Ambush, to -- basically to file this in order

20   to preserve it and to protect the case.  The

21   complaint at that point in time had been prepared not

22   only by Joshua Ambush himself but with the assistance

23   of another attorney by the name of Danny Scher.  And

24   in 2006 we asked Mr. Ambush to file the complaint

25   that now was on record as being filed.

Michael Engleberg, M.D. - Direct

1      It was through my power of attorney okay,

2   that authorized me to engage Mr. Ambush to do this.

3   This is the only time in which, again, Mr. Ambush --

4   or the first time in which he actually became the

5   attorney for the claimants.

6        As I said previously, he was only an agent

7   in terms of signing them up previously to this, but

8   at this point, okay, The Center is responsible for

9   engaging attorneys.  We used the power of attorney by

10  which we do that just so basically the claimants --

11  so at this point in time -- they did become claimants

12  at this point in time -- or the victims became

13  claimants, and we hired Mr. Ambush to file the

14  complaint.  Now, it was on record and we were able to

15  preserve this particular -- all of their claims.

16  Q.      Did Ambush participate in drafting the

17  complaint?

18          MR. ARIAS-MARXUACH:  Asked and answered.

19          THE COURT:  Rephrase the question.  That's a

20  leading question.  I'll allow the question but

21  rephrase.

22  BY MR. EFRON:

23  Q.      Who participated in the drafting -- what

24  attorneys, name all of them, participated in the

25  drafting of the complaint?

Michael Engleberg, M.D. - Direct

1          MR. ARIAS-MARXUACH:    Asked and answered.

2          THE COURT:    I'll allow the question.

3     A.          I stated this before.    Basically Ambush had

4     the help of Danny Scher, who was also counsel for The

5     Center at that point in time, he was willing to help,

6     again, to help Mr. Ambush prepare it.

7          Also, Paul Gaston had assisted him.    As I

8     mentioned, Paul Gaston was the attorney for another

9     case, the Alec Collet case.    They were also bringing

10    a lawsuit against Libya.    So because he was already

11    involved in this particular types of case, he was

12    able to assist Mr. Ambush in his particular case.

13    Q.          In your previous answer you said that this

14    was the only time where Ambush was rather than an

15    agent an attorney in the case; why do you say the

16    only time?    What happened subsequently?    What

17    happened afterwards that he would not have been?

18    A.          Well, Mr. Ambush, again -- we have to take a

19    look in terms of going toward litigation.    Mr. Ambush

20    does not have the skills to be able to litigate.    As

21    a matter of fact, in all the other cases where the

22    attorneys would ask me does he have the skills to

23    interview the claimants, I would say he does not have

24    the skills to do that either.

25          MR. ARIAS-MARXUACH:    Objection.

Michael Engleberg, M.D. - Direct

1        THE COURT:  You cannot refer to anything any

2   third party may have told you.

3        So that last statement about other attorneys

4   talking about Mr. Ambush is stricken at this time.

5        MR. ARIAS-MARXUACH:  And the same as the

6   testimony as to whether Mr. Ambush has litigation

7   skills is an opinion by a lay witness about a

8   professional from a different field.  He has no

9   personal knowledge.

10        THE COURT:  I won't strike that.

11        Mr. Efron, you can lay a background as to

12   Mr. Ambush's professional skills, otherwise I'll

13   revisit the objection.

14   BY MR. EFRON:

15   Q.        Why did The Center hire Paul Gaston for this

16   case?

17   A.        Paul Gaston was engaged by The Center in

18   2008.  I have to give credit to Mr. Ambush that he

19   recognized that he was no longer capable of moving

20   this case forward and he basically asked that Paul

21   Gaston should come on and to assume the case.

22        As I mentioned earlier that Paul Gaston had

23   litigated many of the other cases on behalf of The

24   Center or for The Center, litigated for the

25   claimants, and he had 25 years of experience.  He

Michael Engleberg, M.D. - Direct

1    knew exactly what to do.  And at this point in time

2    we felt that he was the superior attorney to be able

3    to move this forward and The Center did indeed,

4    through the power of attorney, engage Mr. Gaston.

5    We --

6    Q.        I'm sorry, go ahead.  I didn't mean to

7    interrupt you.  Finish.

8    A.        We actually created an agreement with

9    Mr. Gaston and it was with his -- on his

10   recommendation also, it was a mutually acceptable

11   agreement, in which he would be paid $250 an hour

12   plus it would be a five percent contingency fee with

13   a cap at 250,000.  Ultimately Paul Gaston was paid by

14   The Center over $300,000 for representing and being

15   the attorney for all the different claimants on this

16   case.

17              At this point in time there was really no --

18   we were not -- we were doubtful whether we would ever

19   get a payment.  The Center was willing to pay out

20   Mr. Gaston and, of course, he wanted this particular

21   type of fee arrangement because we had assumed that

22   we were going to go to litigation, and the amount of

23   time that he would be putting into it would be

24   substantial.

25   Q.        As it turns out, the case was over fairly

                    Michael Engleberg, M.D. - Direct
1    quickly was it not?

2                MR. ARIAS-MARXUACH:  Objection.  Leading.

3                THE COURT:  Rephrase the question.

4    BY MR. EFRON:

5    Q.        After your fee agreement with Mr. Gaston,

6    how much time transpired between that point and the

7    settlement or the end of the case?

8    A.        Well, it's very interesting because we

9    engaged Mr. Gaston through the power of attorney in

10   June of 2008.  Unexpectedly to all of us, including

11   to Mr. Gaston, Mr. Ambush, that in August

12   unexpectedly Libya basically came to a settlement and

13   was willing to put in, with the United States

14   government, a certain amount of money to be able to

15   settle all outstanding claims.

16              One of the particular claims was the Pan Am

17   103 -- I don't know if people remember that, but it

18   became certainly an issue in the press --

19   Q.        That's the Lockerbie Massacre?

20   A.        With the Lockerbie Massacre, exactly.  That

21   was the Pan Am 103 that the -- there was an explosion

22   on board the Pan Am 103 and all those aboard that

23   particular flight were killed.

24              And as a result of that Libya wanted to

25   settle that claim, as well as all the other

Michael Engleberg, M.D. - Direct

1   outstanding claims and wanted to continue to do

2   business with the United States government, as well

3   as with the oil companies.  They wanted to be taken

4   off the terrorist list.  So they were willing to put

5   in a certain amount of money into the United States

6   government, and now there was a definite amount of

7   money.

8           And the U.S. government basically set up a

9   program in which the moneys would be distributed by

10  the Federal Government.  It would be administered by

11  the Federal Government.

12  Q.        And that was in August of '08, correct?

13  A.        That is correct.

14  Q.        We have all the documents to show that, but

15  I want to move this along.  I know you came in for

16  this, so let me try to move this along.

17          THE COURT:  And let me note for purposes of

18  the jury, that agreement between the Government of

19  Libya and the United States, that was one of the

20  stipulated facts.  I gave that to you and you're

21  going to have that at the end of the case so --

22          MR. EFRON:  I just don't think it's

23  necessary for him to identify that right now.

24          THE COURT:  You need not go into that.

25          MR. EFRON:  Yes, Your Honor.

Michael Engleberg, M.D. - Direct

1    THE COURT:   The witnesses is advised the

2    jury knows about that agreement, they've been

3    informed.   Okay.

4    BY MR. EFRON:

5    Q.       If you know, what were the requirements to

6    the claimants or the plaintiffs against Libya based

7    on the August '08 settlement between United States

8    Department of State and Libya?

9    A.       Well, the instructions first came down in

10   November.   Certainly there were discussions,

11   everybody knew there was going to be moneys being put

12   into the U.S. government.   But we didn't -- no

13   instructions were given in terms of what were going

14   to be done, what had to be done.

15           In November the instructions came down that

16   all claims against Libya had to be dismissed prior to

17   them being part of this program by which the Federal

18   Government would be giving out the money,

19   distributing the money.

20   Q.       But you certainly knew by August of '08 that

21   the claims were going to be settled?

22   A.       Well --

23           MR. ARIAS-MARXUACH:   Objection.   Assumes

24   facts not evidence.

25           THE COURT:   Sustained.

Michael Engleberg, M.D. - Direct

1      MR. EFRON:  I'll rephrase it, Your Honor.

2   BY MR. EFRON:

3   Q.      What exactly did you learn in August of '08?

4   A.      That -- in August of '08 that there was

5   negotiations that were taking place between Libya and

6   the U.S. government.  Again, it wasn't determined how

7   much money was going to be put in.  That had yet to

8   be determined.  Only by November did we know that

9   $1.6 billion were going to be given over to

10  compensate all outstanding claims.  And it wasn't

11  determined how it was going to be distributed,

12  whether it was going to be through the claimants or

13  the states.  Only in November did we know how that

14  program was going to be administered.

15  Q.      Now, your fee agreement with Paul Gaston,

16  was that in writing?

17  A.      Yes, that was.

18  Q.      Did you have a -- and of course when I say

19  "you," I mean The Center.  Did The Center have a fee

20  agreement with Ambush?

21  A.      No, it did not.

22  Q.      What do you understand was the fee agreement

23  relationship between The Center and Ambush, as

24  president of The Center?

25          MR. ARIAS-MARXUACH:  Objection.  Asked and

Michael Engleberg, M.D. - Direct

1    answered.  He said no fee agreement.

2            THE COURT:  Sustained.  You can rephrase or

3    expand.

4    BY MR. EFRON:

5    Q.      Was there any agreement with Mr. Ambush

6    other than what you said before regarding the

7    advanced checks?

8    A.      There was -- basically Mr. Ambush submitted

9    bills according to his -- basically in terms of what

10   he was charging in all other cases in terms of

11   what -- aside from The Center.  Because, as I said,

12   that his billable hours were at $50 an hour.  We paid

13   all of his bills.  Every bill that he submitted, The

14   Center paid.  There was no outstanding bills owed to

15   Mr. Ambush.  Anything aside from that, whether there

16   was an oral agreement, I really don't -- I personally

17   don't know.

18           In terms of my understanding, there may have

19   been, but it would have been a bonus.  I mean, that

20   was something that Mr. Ambush --

21           MR. ARIAS-MARXUACH:  Objection.  Lack of

22   personal knowledge.  Move to strike.

23           THE COURT:  Sustained.  The bonus matter is

24   stricken and let's continue.  It has to be based your

25   answers on your own personal knowledge.

Michael Engleberg, M.D. - Direct

1    A.       Okay, then I can't answer that.  I can't

2    answer that.  I can answer that there was no --

3             MR. EFRON:  I'm going to rephrase it.

4    BY MR. EFRON:

5    Q.       In your own personal knowledge, did you ever

6    hear anybody, and tell us whom, state that there

7    might have been a bonus for Mr. Ambush at the end of

8    this case?

9    A.       Rabbi Perr mentioned to me that --

10            MR. ARIAS-MARXUACH:  Objection.  Hearsay.

11   BY MR. EFRON:

12   Q.       No, no, no.  What did yo hear Rabbi Perr --

13            THE COURT:  Sustained.  That's hearsay.

14   BY MR. EFRON:

15   Q.       What you perceived, not what he said.

16            What do you understand from what he told

17   you?

18   A.       All I can say is that I'm the only one,

19   okay, that's capable of signing off on any additional

20   payment that goes to any of the attorneys.  I mean,

21   whether there were discussions of any oral additional

22   compensation, I can't answer for that, but it would

23   have to be approved by me in writing that there would

24   be additional compensation to Mr. Ambush.

25   Q.       How would that be determined?

Michael Engleberg, M.D. - Direct

1    A.        Well, unfortunately it was never determined.

2              MR. ARIAS-MARXUACH:  Objection.

3    BY MR. EFRON:

4    Q.        How would a bonus or additional compensation

5    be determined by you?

6              MR. ARIAS-MARXUACH:  Objection.  Calls

7    for --

8              THE COURT:  Overruled.

9              MR. EFRON:  He was the president of The

10   Center, your Honor.

11             THE COURT:  I'll allow the question.

12   BY MR. EFRON:

13   Q.        Did you hear the question?

14   A.        No, I did not.

15             THE COURT:  How did you determine any bonus

16   or addition compensation, if any were to be provided

17   to Mr. Ambush or anybody else?

18   A.        Well, Mr. Ambush had the ability to come to

19   The Center and to sit down with us and basically so

20   to speak to plead his case.  Say, look, I helped

21   spear the case, I was the one who preserved it, you

22   know, I would like additional -- you know, additional

23   moneys because of my involvement.  And at no point

24   did Mr. Ambush ever come to The Center asking for

25   additional money.  He never sat down with us, he

Michael Engleberg, M.D. - Direct

1    never spoke to us about it.

2    Q.      What would have determined any additional

3    compensation?

4    A.      Ultimately it would have been I.

5    Q.      And how would you do that?

6    A.      We would sit down because, again, it would

7    be coming from the American Center.

8    Q.      Why was there no agreement -- why was there

9    no fee agreement with Mr. Ambush as compared to other

10   lawyers that worked for The Center?

11          In other words, you had a fee agreement with

12   Mr. Gaston but you did not have one with Mr. Ambush,

13   why was that?

14   A.      Because we assumed that when we start the

15   case we have to prepare for litigation.  As I said,

16   I'm a pediatrician, I have to deal with facts.  We

17   have to have all the information beforehand.  We

18   don't want to go to litigation not having the

19   knowledge, not having these facts.  And we need

20   attorneys that are skillful, that know how to prepare

21   the briefs properly, that know how to litigate.  And,

22   therefore, all the attorneys in which we hired in

23   terms of going to litigation were attorneys with

24   credentials that were qualified to move the case

25   forward.

Michael Engleberg, M.D. - Direct

1    Mr. Ambush under any of these cases had

2    never litigated one case.  And, therefore, in terms

3    of our relationship with him was more in terms of one

4    of trust, of helping The Center out as more or less

5    in terms of doing paralegal work rather than actually

6    litigation work.

7    Q.        So as you sit there today, and regarding

8    only to the representation of these two families, how

9    much money did The Center wind up owing Mr. Ambush

10   for his services?

11   A.        The Center did not owe Mr. Ambush anything.

12   They basically -- whatever Mr. Ambush requested from

13   The Center we paid him.  He was paid in full.  Not

14   only was he paid in full, he was given advanced

15   moneys.

16   Q.        And how were these payments forwarded to

17   him?

18   A.        I signed the checks.

19   Q.        We'd like to have Plaintiff's Exhibit 7

20   shown --

21            THE COURT:  For identification.

22            MR. EFRON:  For identification, sorry, shown

23   to the witness, please.

24   BY MR. EFRON:

25   Q.        Now, before you look at them,

Michael Engleberg, M.D. - Direct

1   Dr. Engleberg --

2   A.        Yes.

3   Q.        -- were you able to locate any checks that

4   was paid by The Center -- on behalf of The Center to

5   Mr. Ambush?

6   A.        Well, I think that these are the checks that

7   were submitted.

8   Q.        How did you locate them?  Where were they

9   stored or put away?

10  A.        Well, basically I kept -- you know, I kept

11  the records, you know, for the New York Center and

12  basically I went back over all the checks, okay, that

13  I had signed over, you know, that -- to Mr. Ambush on

14  behalf of the American Center.

15  Q.        And what were you handed?

16  A.        Here was the check --

17            THE COURT:  Copies of.

18  A.        A copy of a check dated November 13.

19  BY MR. EFRON:

20  Q.        Before you go into them, are these the

21  checks that you were making reference to earlier?

22            MR. ARIAS-MARXUACH:  Objection.  Vague.

23  BY MR. EFRON:

24  Q.        Are these the checks that you located and

25  sent to me?

Michael Engleberg, M.D. - Direct

1    A.        Yes, they were.

2    Q.        And who signed these checks?

3    A.        I signed these checks.

4    Q.        And who did you issue these checks to?

5    A.        I issued them to Mr. Ambush.

6    Q.        Is that your handwriting?

7    A.        Yes, it is.

8    Q.        And is that your signature?

9    A.        Yes, it is.

10            MR. EFRON:  We'll move that they be admitted

11   into evidence as Exhibit number -- an exhibit, Your

12   Honor.

13            THE COURT:  Admitted.  Exhibit 7.

14   BY MR. EFRON:

15   Q.        I'd like -- if I can impose on you for a

16   couple of more minutes, Dr. Engleberg, I'd like to --

17   I'd like you to review the checks with me.  They're

18   not that many of them.  I'd like to review them one

19   by one but in reverse chronological order.

20            THE COURT:  It's admitted as an exhibit.

21   Let me mark it as an exhibit and then what I will

22   do --

23            MR. EFRON:  Because it's in block anyway.

24   It's one exhibit in block.

25            THE COURT:  But let's mark each individual

Michael Engleberg, M.D. - Direct

1   check like 7-A, 7-B, 7-C so whenever there's cross,

2   each one will be -- let's just take a few minutes for

3   that.  This will be Plaintiffs' Exhibit 1.  So for

4   purposes of the record identification 7 is admitted

5   in evidence as Plaintiffs' Exhibit 1 and then each

6   check individually and I know it's got -- both sides

7   will be great check beginning 7-A, 7-B, 7-C, 7-D.  I

8   believe there's 10, 12 checks there.

9           MR. EFRON:  Yes, your Honor.

10          THE COURT:  Okay.  The witness needs to take

11  a short break so the jury can stay here.  Let's

12  excuse the witness for a few minutes and we'll resume

13  in two or three minutes.

14          (Jury Trial recessed at 2:18 p.m. and

15  resumed at 2:20 p.m.)

16          (Compilation of Copies of Checks were marked

17  for identification by the Clerk as Plaintiffs'

18  Exhibit Nos. 1-A through 1-CC.)

19          THE COURT:  Just so counsel knows, the way

20  we're going, what Exhibit 1 is referred to, the first

21  check will be 1-A, the back of that check will be

22  1-B.  So each sheet of paper will -- so they're

23  numbered 1-A, 1-B, the next check is 1-C, the back is

24  1-D and it goes all the way.  When we get to the

25  letter Z, we got on beyond Z, and it's 1 double A,

Michael Engleberg, M.D. - Direct

1  the back of that check 1 double B the next check and

2  then we end with 1 double C which is the last.

3        MR. EFRON:  Okay.  And the Court lined it up

4  in regular chronological order?

5        THE CLERK:  Well, in the order that --

6        THE COURT:  In the order in which --

7        MR. EFRON:  That's fine because we need to

8  do it the other way.  That's fine.

9        THE COURT:  Okay, but if you're referring to

10  the last check, you're probably referring to 1 double

11  D.

12        MR. EFRON:  Okay, thank you.

13        THE COURT:  Let me just show it very briefly

14  to defense and plaintiffs' counsel just so they see

15  how it's been numbered.

16        And perhaps you very quickly want to do the

17  same exercise.

18        MR. ARIAS-MARXUACH:  I want a copy of the

19  sequence.  Thank you.

20        THE COURT:  Let me do this, let's very

21  briefly -- I'll have them photocopied so you have the

22  sequence the Court has.  That's okay?  Okay.  So you

23  know.

24        What we will do is, Mr. Efron, whenever you

25  refer to a particular check also, even though you

Michael Engleberg, M.D. - Direct

1   have the number -- or the witness -- refer to the

2   back of that check.  Let's wait one minute.

3           MR. EFRON:  Okay.  When you do we're going

4   to start with Exhibit 1 double B which is going to be

5   the August 8, 2008 check front and back and we're

6   going to identify them one by one as quickly as

7   possible.

8           THE COURT:  And all the checks have been

9   admitted as Exhibit 1 -- 1-A all the way to 1 double

10  D or 1 double C.  So you don't need to identify them

11  again, you can go directly and show the check and you

12  can ask him any questions about any particular check.

13          MR. EFRON:  Can I go to another line of

14  questioning while that's done?

15          THE COURT:  If you want to ask some and you

16  can come back if you want to.

17          MR. EFRON:  Yeah, I'll come back to it.

18  BY MR. EFRON:

19  Q.      In order to save time, Dr. Engleberg, in

20  December sometime in the middle of December of '08

21  you received a letter from Joshua Ambush, did you

22  not?

23  A.      Yes, we did.

24  Q.      And when was the -- what was the -- what did

25  that letter contain?  I'm sorry, let me rephrase it.

Michael Engleberg, M.D. - Direct

1    Besides the letter, did you receive any

2    other documents and anything else?

3    A.       Mr. Ambush somewhere in mid-December --

4    sometime after about December 16, December 17,

5    Mr. Ambush basically sent a letter myself, the

6    American Center revoking my power of attorney.

7    Q.       And who was that signed by?

8    A.       Basically he had signed it -- he had -- all

9    the claimants had signed this document revoking my

10   power of attorney.

11   Q.       And I'll show you the letter in a minute

12   when we get the court officer back.  But in the

13   meantime, what was the gist of the letter?  What do

14   you remember about that letter?  What did the letter

15   tell you besides receiving the document revoking your

16   power of attorney to represent these people in your

17   capacity as The Center?  What else -- what did the

18   letter tell you?

19   A.       I don't recall at this point in time.  If I

20   could see the letter it would refresh my mind.

21       MR. EFRON:  Could we have Joint Exhibit 8,

22   please.

23   BY MR. EFRON:

24   Q.       I'll get back to the checks after that.  I

25   don't want to lose --

Michael Engleberg, M.D. - Direct

1    A.        Oh, okay.

2    Q.        You were handed Joint Exhibit 8; is that a

3    copy or a document that reflects the contents of the

4    letter you received?

5    A.        Yes, it is.

6    Q.        Did you also receive the actual document

7    revoking your power of attorney or The Center's power

8    of attorney?

9    A.        Yes, we did.

10   Q.        How do you feel about that?

11   A.        Well, we were really shocked by this

12   particular letter, as well as the revocation.  The

13   Center had always been there for the interest of

14   every one of these claimants.  The Center had made

15   attempts to serve them in the best -- their best

16   interest.  That everything should be done properly.

17   We were shocked that here he was -- each of the

18   estate representatives has retained him directly to

19   represent them.

20            The case had already been concluded.  At

21   this point in time we were dealing with estates.  It

22   was very important that we had qualified individuals

23   to deal with the estates.  First of all, it was

24   federally administered funds.  These were estates.

25            Just prior to this I had come down to Puerto

Michael Engleberg, M.D. - Direct

1    Rico to engage another prominent law firm, O'Neill &

2    Borges, who does deal with estates.  Again, neither I

3    nor Mr. Ambush -- and certainly Mr. Ambush, who is an

4    attorney, is not an attorney in Puerto Rico, he does

5    not know estate law neither in the states or in

6    Puerto Rico --

7              MR. ARIAS-MARXUACH:  Objection.  Lack of

8    personal knowledge.  How does he know what

9    substantive fields of law Ambush knows or doesn't

10   know?

11             THE COURT:  I will allow the answer.  He

12   stated that Mr. Ambush is not an attorney admitted in

13   Puerto Rico.  Let's move on.

14   A.        And it was important for us to hire a law

15   firm that could handle all of these estates.  And I

16   came down here attempting to engage O'Neill &

17   Borges --

18   Q.        Approximately what month was that?

19   A.        This was literally just a few days prior to

20   this letter, I was down here approximately at this

21   exact same time.  I was down in Puerto Rico December

22   the 15th, the 16th, the 17th.

23   Q.        When you say you were "shocked," you had no

24   indication or no prior heads-up that this was going

25   to happen?

EVILYS E. BRATHWAITE, RPR
COURT REPORTER FOR THE U.S. DISTRICT COURT OF PUERTO RICO
(787) 772-3377

Michael Engleberg, M.D. - Direct

1   A.        Absolutely not.

2   Q.        You had no indication that Ambush was

3   uncomfortable that you were interviewing other law

4   firms?

5   A.        Well, Mr. Ambush had hidden a lot of this

6   information from The Center.  Both I and Rabbi Perr

7   had requested Mr. Ambush provide us with agreements

8   that he had the claimants sign up with him, but -- or

9   not with him, on behalf of The Center when he was

10  acting as an agent.

11            Rabbi Perr had a request from a year

12  previously to please forward us, to send us all

13  center and claimants agreements, as well as all

14  powers of attorney.

15            MR. ARIAS-MARXUACH:  Objection.  Lack of

16  personal knowledge.  He hasn't laid a foundation as

17  to what he knows, what Rabbi Perr may have done.

18            THE COURT:  Sustained.

19            Rephrase the question or lay a foundation.

20  A.        Okay.  In the beginning of December --

21            THE COURT:  Wait until Mr. Efron asks you.

22  BY MR. EFRON:

23  Q.        It's my turn.

24  A.        Okay.

25  Q.        What did you do after you received this

EVILYS E. BRATHWAITE, RPR
COURT REPORTER FOR THE U.S. DISTRICT COURT OF PUERTO RICO
(787) 772-3377

Michael Engleberg, M.D. - Direct

1   letter?

2   A.       Again, we were puzzled exactly what type of

3   relationship that he had.  Again, we didn't know

4   what -- whether this was regarding compensation, we

5   thought at this point in time he's trying to keep the

6   American Center at hostage to be able to negotiate

7   additional compensations.

8   Q.       Had he requested any additional compensation

9   before he sent this letter?

10  A.       Prior to this time, no.

11  Q.       So what did The Center do?  What did you as

12  the executor as the president of The Center?  What

13  did you do regarding this situation?

14  A.       Well, we were very, very concerned.  We

15  tried to be able to reach out to Mr. Ambush to sit

16  down with him, be able to discuss what this was all

17  about.

18  Q.       What amounts of funds in compensation, if

19  any, was Mr. Ambush holding for victims of the Lod

20  Massacre?

21           MR. ARIAS-MARXUACH:  Objection.  Assumes

22  facts not evidence.

23           THE COURT:  Sustained.

24           Rephrase.

25  BY MR. EFRON:

Michael Engleberg, M.D. - Direct

1    letter?

2    A.        Again, we were puzzled exactly what type of

3    relationship that he had.  Again, we didn't know

4    what -- whether this was regarding compensation, we

5    thought at this point in time he's trying to keep the

6    American Center at hostage to be able to negotiate

7    additional compensations.

8    Q.        Had he requested any additional compensation

9    before he sent this letter?

10   A.        Prior to this time, no.

11   Q.        So what did The Center do?  What did you as

12   the executor as the president of The Center?  What

13   did you do regarding this situation?

14   A.        Well, we were very, very concerned.  We

15   tried to be able to reach out to Mr. Ambush to sit

16   down with him, be able to discuss what this was all

17   about.

18   Q.        What amounts of funds in compensation, if

19   any, was Mr. Ambush holding for victims of the Lod

20   Massacre?

21           MR. ARIAS-MARXUACH:  Objection.  Assumes

22   facts not evidence.

23           THE COURT:  Sustained.

24           Rephrase.

25   BY MR. EFRON:

Michael Engleberg, M.D. - Direct

1    Q.         What was your main concern after you

2    received this letter?

3    A.         Okay.  Our main concern was that the money

4    would be distributed appropriately, that as per

5    estate law -- as I said, the claims were already

6    dismissed.  According to state law, as we had similar

7    experience with the Collet case, we had to have the

8    approval of the courts, how the money would be

9    distributed.  Even though there was an administrator

10   of the estate at that point in time, there were only

11   four parties to the estate --

12          MR. ARIAS-MARXUACH:  Objection.  Your Honor,

13   he's giving a legal opinion that a lay witness --

14   he's not an attorney admitted in Puerto Rico.  How is

15   this relevant?

16          THE WITNESS:  This is very relevant.

17          MR. ARIAS-MARXUACH:  Don't argue with the

18   lawyer.

19          MR. EFRON:  You're not to argue with the

20   lawyer.

21          THE COURT:  I'll sustain the objection.

22          Mr. Efron, you need to lay a foundation or

23   explain.

24   BY MR. EFRON:

25   Q.         How did The Center know how many claims were

Michael Engleberg, M.D. - Direct

1  pending in Puerto Rico?

2  A.        Well, The Center knew that there would have

3  been five estates that would have been compensated.

4  Each estate, as per this particular program, would be

5  receiving $10 million per estate.   There would be

6  $50 million come to those that were killed and then

7  there would be estates.

8  Q.        Ten million?

9  A.        $10 million for each one, but in total there

10  would be $50 million.

11  Q.        I thought you said 15, I'm sorry.

12  A.        No, $50 million.

13  Q.        Fifty, 5, 0?

14  A.        5, 0, yes.  There are an additional five

15  injured parties and for the injured parties each

16  individual would be entitled to $3 million.   In total

17  that would be $15 million.   And in total including

18  with the estates, as well as the injured party, in

19  total it would be $65 million.   We --

20  Q.        Go ahead, I don't want to interrupt.

21  A.        We wanted to assure that the claimants would

22  not be paying more than the 20 percent to the

23  American Center as per the original agreement.   And

24  we were uncomfortable exactly what Mr. Ambush's

25  agreement was between him and the different claimants

Michael Engleberg, M.D. - Direct

1  or administrators of the estate.

2  Q.        When did you find out what the compensation

3  was going to be per death or per injury?  When did

4  you find that out?

5  A.        We find that -- well, in terms of the -- in

6  November it had already been -- it was determined

7  that it would be $10 million per estate.

8  Q.        That's when you received the instructions

9  for the negotiation that was approved in August that

10  you mentioned earlier; is that correct?

11  A.        That is correct.

12  Q.        What other instructions did the November

13  document inform you as far as the requirements to

14  apply for those moneys?

15  A.        We had to determine who all the heirs of

16  that particular estate would be, even individuals

17  whose names were not on the original complaint.

18  Whatever happened before basically was no longer

19  going to be executed at this time.  So even an

20  individual whose name did not appear on the original

21  complaint as an heir to the estate, they were now

22  entitled to compensation.  And we had to identify

23  every single heir of that particular estate.  Nobody

24  could be left out.

25  Q.        And was this a window or statute of

Michael Engleberg, M.D. - Direct

1    limitations to do that from August or November

2    of 2008 on?

3    A.        I believe regarding the estates they said

4    they had until July to be able to produce the

5    documents, so at least to begin, you know, providing

6    that information.

7    Q.        When you say "July," of the following year?

8    A.        I believe so.

9    Q.        So if it would have been November --

10   actually, I thought our document was October 31, but

11   you say November, they would have had until July of

12   '09, of 2009, in order to --

13   A.        Yes.  That is correct, yes.

14   Q.        As president of The Center, what else did

15   you do to find out or try to investigate what

16   Mr. Ambush had done with the claimants in Puerto

17   Rico, if anything?

18   A.        Well, we kept on requesting -- again, we had

19   tried to be in contact with the claimants to find

20   out.

21   Q.        But the letter sort of warned you against

22   doing that; is that correct?

23   A.        That is correct.

24   Q.        Did you call Mr. Ambush?

25   A.        Yes, we did.

Michael Engleberg, M.D. - Direct

1  Q.        And what was the result of that phone call

2  or communication?

3  A.        He refused to speak to us.

4  Q.        I understand that in order to protect the

5  rights of victims or of claimants of other claimants,

6  The Center filed a legal action?

7          MR. ARIAS-MARXUACH:  Objection.  Assumes

8  facts not in evidence.  Mr. Efron is not on the

9  witness stand to ask open-ended questions.

10         THE COURT:  You have to rephrase it.

11 BY MR. EFRON:

12 Q.        What, if anything, did The Center do in

13 order to protect the rights and the compensation of

14 these victims, of these claimants?

15 A.        Because Mr. Ambush refused to communicate

16 with The Center, we were totally kept in the dark of

17 his conversations, his communications, his agreements

18 with the different claimants.  And we didn't know in

19 terms of his intentions towards the claimants; we

20 didn't know his intentions towards The Center.  We

21 were totally in the dark.

22         We were out to protect the interests of the

23 claimants, as well as the interests of The Center.

24 And in February we filed an action against

25 Mr. Ambush.

Michael Engleberg, M.D. - Direct

1    Q.         What kind of an action?

2               THE COURT:  February of what year?

3    A.         I'm sorry, in February of 2009.

4    BY MR. EFRON:

5    Q.         What kind of an action?

6    A.         Well, it was an action --

7    Q.         Was it a --

8    A.         An action to make sure that the money would

9    be distributed properly, that --

10   Q.         And what was the name of that action?

11              THE COURT:  Let the witness finish.

12              MR. EFRON:  Sorry.

13   BY MR. EFRON:

14   Q.         Go ahead.  What was the purpose of that

15   action?

16   A.         The purpose was an action to make sure that

17   the claimants, okay, would be getting 80 percent that

18   would be come together them.  As per The Center and

19   claimant agreement, it was determined that they would

20   be making a pledge to The Center of 20 percent and

21   that would be the total of which they would have to

22   pay.  And we wanted to make sure that their best

23   interest was served.

24              And, in addition, we filed -- we tried to

25   file an injunction that all the money that would be

Michael Engleberg, M.D. - Direct

1    coming through Mr. Ambush, that the entire 65 and at

2    that point in time -- again -- that all the moneys

3    that would be coming to all of the different

4    claimants would be put into a court registry in the

5    United States and that they will determine that the

6    money is distributed properly; that even The Center

7    would not be getting their fee; and that all the

8    moneys would be protected until it was assured that

9    all those who were entitled to money would be getting

10   it and it would be distributed appropriately.

11   Q.        Is that case still going on?

12   A.        Yes, it is.

13   Q.        And who are the parties in that case?  Is

14   it -- who against who?

15   A.        Okay.  It's the American Center that brought

16   the action against Mr. Ambush and Mr. Ambush in turn

17   filed an action against The Center.

18   Q.        Are any of the lawyers representing

19   Mr. Ambush in that case here today?

20   A.        Yes, he is.

21   Q.        And that would be Mr. Edwards?

22   A.        That is correct.

23             THE COURT:  Let me just ask one other quick

24   question.  In what court is this case --

25             MR. EFRON:  I was getting to that, yes.

Michael Engleberg, M.D. - Direct

1    BY MR. EFRON:

2    Q.        What court is it?

3    A.        That is in the District Court of

4    Washington, D.C.

5    Q.        That's U.S. District Court?

6    A.        That's the U.S. District Court, that's

7    correct.

8    Q.        How much of the money was put into the court

9    registry in the Washington, D.C. case, if you

10   remember?

11   A.        I believe there was 1 million --

12   Q.        The total originally?  What was the original

13   total that was in that account?

14   A.        Well, eventually that was put into registry

15   was because of the action that Mr. Ambush brought

16   against The Center.

17   Q.        What was the amount?  You already told us

18   that.  What was the amount?

19   A.        I believe it was $1.9 million.

20   Q.        That's what's there now?

21   A.        That's what's there now.

22   Q.        How much was already disbursed to the

23   claimants or was there no money that was already

24   disbursed to the claimants?

25   A.        No.  All the other moneys were disbursed to

Michael Engleberg, M.D. - Direct

1   the claimants.

2   Q.        And how much would that be, if you know?

3   A.        Well, at this point in time we do know that

4   basically $7 million were disbursed to the

5   individuals that are here, to the estates that are

6   here now.

7   Q.        Mm-hmm.

8   A.        And certainly that was not the intention of

9   The Center.  They should have received $8 million.

10  Q.        Each?

11  A.        Each.

12            THE COURT:  Let me ask just one question.

13  If you know, the 1.9 that is in the registry of the

14  U.S. District Court in D.C., was that 1.9 taken out

15  of an IOLTA account or where was it taken out from?

16            THE WITNESS:  It was taken out of the

17  20 percent of the America Center's fee.

18  BY MR. EFRON:

19  Q.        And that's still -- that amount is still in

20  litigation?

21  A.        That is correct.

22  Q.        Let's go back to the checks, if you would.

23            If you can find Plaintiffs' Exhibit 1-BB,

24  which is the check and the endorsed part of the check

25  of August 8, 2008, Check 1265 --

Michael Engleberg, M.D. - Direct

1   A.        Yes.

2   Q.        -- did you write that check?

3   A.        Yes, I did.

4   Q.        And that would be Check 1 --

5             THE COURT:  The back of the check 1-BB and

6   1-CC.  This is the last one, right?

7             MR. EFRON:  Yes.

8   BY MR. EFRON:

9   Q.        What does it say on the endorsement?  What

10  letters does it say?

11  A.        Advanced.

12  Q.        No, no, no.  It has to say Exhibit --

13  there's an exhibit tag there.  Does the exhibit tag

14  have a number?  It should say one.

15            THE COURT:  Yes.  The bottom one is 1-BB and

16  then 1265 is 1-AA.

17            MR. EFRON:  Yes, your Honor.

18  BY MR. EFRON:

19  Q.        So Check 1-AA that has the 1-BB

20  endorsement --

21            MR. FREESE-SOUFFRONT:  *Es que el endorsement*

22  *del 1-AA --*

23            MR. ARIAS-MARXUACH:  1-BB is Check 1273 and

24  you have 1265.

25            THE COURT:  Let's do this, it's ten minutes

Michael Engleberg, M.D. - Direct

1  to three.  The afternoon refreshments are here.

2  Let's take a ten-, fifteen-minute recess.  Be back at

3  three and we'll make sure everybody's on the same

4  page.

5          THE COURT OFFICER:  All rise.

6          (Jury Trial recessed at 2:47 p.m. and

7  resumed at 3:10 p.m.)

8          THE COURT:  Okay.  Please be seated.

9          Good afternoon ladies and gentlemen of the

10  jury.  That was quicker than I expected.  Good, we

11  have more time so Mr. Efron, let's --

12  BY MR. EFRON:

13  Q.      Witness, please lock at Exhibits 1-BB and

14  1-CC.  Locate them on -- in your original, please.

15  It's towards the end -- it's the last check and the

16  last endorsement.

17  A.      Yes.

18  Q.      Do you recognize that check?

19  A.      Yes, I do.

20  Q.      Did you write that check?

21  A.      Yes, I did.

22  Q.      Why?  Why did you write that check?

23  A.      Mr. Ambush requested that we give an

24  advancement.  It was at this point in time we wanted

25  to make sure that he would be able to -- make sure

Michael Engleberg, M.D. - Direct

1    that the moneys would be taken properly.  He claimed

2    that he had to go down to Puerto Rico, he had to let

3    them know that they were going to be a disbursements

4    to them.

5              And, again, at this point in time that he

6    was working for The Center, The Center was paying him

7    for all his work that he was doing.  And we knew that

8    he was going to be assisting Paul Gaston in terms of

9    providing him information.

10   Q.        By this date, November 7 of 2008, you

11   already knew about the settlement claims?

12   A.        That is correct.

13             MR. ARIAS-MARXUACH:  Objection.  Leading.

14             THE COURT:  I'll allow the testimony.  But

15   please no leading questions.

16             MR. EFRON:  Yes, Your Honor.

17   BY MR. EFRON:

18   Q.        How come although you knew that the case was

19   over you still gave him a check?

20   A.        Again, this was out of trust, you know, he

21   said that he needed money advancement --

22   Q.        At this time what other matters was he

23   handling for The Center besides representing the

24   Puerto Rican victims of the Lod Massacre?

25             THE COURT:  And this is November 2, '08?

Michael Engleberg, M.D. - Direct

1          MR. EFRON:  November 7, 2008.  I think it's

2     seven.

3     BY MR. EFRON:

4     Q.        Is that the way you write a seven or a two?

5     That's a seven, right?

6     A.        Yes.

7     Q.        And do you know if this check was cashed?

8     A.        Well, apparently it was cashed because we do

9     have the endorsement from Joshua Ambush.

10    Q.        Okay.  And what is the amount of that check

11    please for the record?

12    A.        $10,000.

13    Q.        Okay.

14              THE COURT:  The question that you had posed,

15    and I think it was left on the platter, what other

16    matters was Joshua Ambush handling at the time that

17    check was issued?  That was the question.

18    BY MR. EFRON:

19    Q.        Besides the Lod Massacre matter, what other

20    cases or businesses or matters was Mr. Ambush

21    handling for The Center, if you know, if you

22    remember?

23    A.        I don't recall any other cases that he was

24    handling for The Center.

25    Q.        So if we go to -- please go now to

Michael Engleberg, M.D. - Direct

1    Exhibit 1Z as in zebra and one double A.

2    A.        Z, okay.

3    Q.        Do you recognize that check?

4    A.        Yes, I do.

5    Q.        You wrote it?

6    A.        Yes, I did.

7    Q.        Now, this check is from the New York Center

8    for Civil Justice.  Is that pursuant to the

9    explanation you gave earlier, where the New York

10   Center for Civil Justice would sometimes lend and pay

11   some of the expenses of the American Center?

12   A.        That is correct.

13   Q.        And, again, you recognize the endorsement?

14   A.        Yes, I do.

15   Q.        And two days earlier Mr. Ambush received

16   another check from you; is that correct?

17   A.        That is correct.

18             MR. ARIAS-MARXUACH:   Objection.

19   BY MR. EFRON:

20   Q.        On what date?

21   A.        That's August 6, 2008.

22   Q.        And what amount?

23   A.        In the amount of $10,000.

24   Q.        And you wrote this check as well?

25   A.        That is correct.

Michael Engleberg, M.D. - Direct

1    Q.        For the same amount for $10,000 again?

2    A.        That is correct.

3    Q.        Thank you.

4              What is the date on this check, if you

5    recognize it?

6              THE COURT:    Identify the letter, please.

7              MR. EFRON:    I'm sorry, 1-T and 1-U.

8    Exhibit 1-T and Exhibit 1-U.

9    A.        Okay, this is 1-T.

10   BY MR. EFRON:

11   Q.        Okay.  Did you write that check?

12   A.        Yes, I did.

13   Q.        And what amount?

14   A.        $23,000.

15   Q.        To Mr. Ambush again?

16   A.        That is correct.

17   Q.        On April 11?

18   A.        That is correct.

19   Q.        And it's endorsed by the defendant, correct?

20   A.        Yes.  Joshua Ambush did endorse that.

21   Q.        Okay.  Thank you.

22             Please go to 1-R and 1-S, same situation?

23   A.        Yes.

24   Q.        You wrote it -- just tell us the date and

25   the amount.  We know you wrote it and we know it's

Michael Engleberg, M.D. - Direct

1    your signature.

2    A.         March 24, 2008.  The check in the amount of

3    $10,000 was issued to Mr. Ambush.  And as we see, it

4    was deposited by Mr. Ambush, Joshua Ambush.

5    Q.         Yes.

6                Again, what amount is this check for?

7                THE COURT:  That's 1-F and 1-G, correct.

8                MR. EFRON:  1-F and 1-G yes, your Honor.

9                MS. GONZALES-VARON:  It's cut off, Your

10   Honor.

11   A.         1-F, okay, and 1-G.

12   BY MR. EFRON:

13   Q.         1-G is the endorsement.

14   A.         I assume that's for --

15   Q.         Now, this is the first -- do you see the

16   check?

17   A.         I'm having difficulties.

18   Q.         It's Check No. 1320, it's 1-F.

19   A.         I have 1-F.  The 1-F has -- that's the

20   endorsement.  I have here as an endorsement on mine.

21               THE COURT:  If you look at the screen you

22   probably have what Mr. Efrain's referring to.

23   A.         Oh, it's 1-G apparently.  The numbers are

24   different.

25   BY MR. EFRON:

Michael Engleberg, M.D. - Direct

1    Q.        Okay.  The check -- the check --

2    A.        The one that I see on the screen is for

3    January the 28, 2008.

4            THE COURT:  That's 1-F?

5            THE WITNESS:  That's 1-F, according to this.

6            THE COURT:  Or it could be 1-H.  I don't

7    know if it's 1-F or 1-H.

8    A.        My 1-F on here is very different from his

9    1-F.

10            THE COURT:  So that's probably 1-H.  Just

11    check.

12    BY MR. EFRON:

13    Q.        Okay.  Dr. Engleberg, what letter appears

14    for Check 1320?

15            MR. ARIAS-MARXUACH:  Your Honor.  Just so

16    the record is clear, the checks on the screen are P

17    and Q.  They're just --

18            THE COURT:  Okay.  So it's P and Q.

19    A.        Oh.

20    BY MR. EFRON:

21    Q.        So let's go to P for the check and Q for the

22    endorsement.

23    A.        Okay.

24    Q.        Oh, did you sign that check?

25    A.        The 1-P, okay, that's January 28, 2008.  The

Michael Engleberg, M.D. - Direct

1    check was issued to Mr. Ambush for $1500, $1,500.    It

2    was signed by me.

3    Q.        It was the only one that has on the memo a

4    note; what does the note say?

5    A.        Cost of service.

6    Q.        So it's -- was he being reimbursed?    What is

7    the -- what do you suppose that is, if you remember?

8    A.        It probably was in terms of -- probably for

9    one of our other cases and serving in the state

10   department some of the papers.

11   Q.        And then on that same day you issued Check

12   1317 and that --

13   A.        Which check are you referring to?

14   Q.        Now we're going to 1-N.

15   A.        Okay.

16   Q.        For 5875; is that correct?

17   A.        That is correct.

18           THE COURT:    And it's not 5875, it's five

19   thousand --

20   BY MR. EFRON:

21   Q.        $5,875.

22           MR. EFRON:    We don't count pennies anymore.

23   A.        That's correct.

24   BY MR. EFRON:

25   Q.        It's Check 1340; what is the amount on that

Michael Engleberg, M.D. - Direct

1    check?

2    A.        Excuse me, in which number is that?

3    Q.        That's 1-L.

4    A.        Oh, okay.  Okay 1-L.  That's June 17, 2007

5    for $5,000.

6    Q.        Okay.  And has the memo say?

7    A.        It says advanced legal fees.

8    Q.        Do you know for what matters or for what

9    matter?

10   A.        I would assume that Mr. Ambush would have

11   kept a record in terms of where those moneys were

12   going to be distributed.

13   Q.        On that same date you wrote another check

14   for $4,000 which would be 1-J.

15   A.        That was June 17, 2007 for $4,000.

16   Q.        Can you make out what the memo means or

17   refers to on the check?

18   A.        My feeling is that Mr. Ambush was paying

19   basically through The Center these were legal fees

20   that were going to Paul Gaston.  And what I gather is

21   that was $3,971.04 going to Paul.

22   Q.        So you were --

23   A.        Excuse me?

24   Q.        So you rounded it off to 4,000?

25   A.        Probably, yes.

Michael Engleberg, M.D. - Direct

1   Q.     What was the amount on this check, on 1-I?

2   A.     That was April, 27, 2007 for $2,000.

3   Q.     And what does the memo say?

4   A.     It says legal fees.

5   Q.     We're almost done.  If you can go to 1-G.

6   A.     Yes.

7   Q.     The dated and amount, please.

8   A.     Okay, that was for February the 13th, 2007.

9   Q.     And, by the way, all of these checks have

10  been endorsed by Mr. Ambush or deposited in his

11  account?

12  A.     That is correct.

13  Q.     If you can go to 1-E --

14  A.     Yes.  That was dated January the 27th -- 29,

15  2007 in the amount of $5,000.  And it was signed by

16  me.

17  Q.     And what does the memo say?

18  A.     It says the money was to go into his escrow.

19  Q.     Do you know for what purpose?

20  A.     I don't recall.  I would assume that

21  Mr. Ambush would be keeping records of that how that

22  money would be distributed.

23  Q.     Now, we have 1-C, date and amount, please.

24  A.     C, yes.  And that was for November the 30th,

25  2006 in the amount of $3,000.  It was signed by me.

Michael Engleberg, M.D. - Direct

1    Q.        And lastly 1-A and 1-B for the endorsement.

2    A.        Okay.  1-A was November the 13th, 2006 in

3    the amount of $10,000.  That was to be put into his

4    escrow.  It was signed by me.

5    Q.        And endorsed by him?

6    A.        And endorsed by Joshua Ambush.

7    Q.        Thank you.  For your patience of going

8    through this.

9              Why did you decide to come to Puerto Rico to

10   testify here today?

11   A.        Well, I would assume that, at the time that

12   we had been deposed, that it was important that I do

13   come down to testify.

14   Q.        Why is that?

15             MR. ARIAS-MARXUACH:  Objection.  Irrelevant.

16             THE COURT:  Overruled.

17   BY MR. EFRON:

18   Q.        Go ahead.

19   A.        The Center felt both a moral and ethical

20   obligation to come down here to set the record

21   straight.  The Center was always here for the benefit

22   of the claimants.  Every decision that we made was

23   for their benefit.  I was very upset and sickened by

24   the fact that Mr. Ambush, who is an attorney, who has

25   an obligation to uphold the laws, to be able to

Michael Engleberg, M.D. - Direct

1    represent their clients and their interests and not

2    in his interest, I was upset that he took advantage

3    of individuals who did not understand what The Center

4    did, hid information from them regarding --

5            MR. ARIAS-MARXUACH:  Objection.  Move to

6    strike.  Lack of personal knowledge.  He has never

7    met the individuals.

8            THE COURT:  I'm not striking it.

9            Mr. Efron lay a foundation or if you have

10   something more specific.

11   BY MR. EFRON:

12   Q.       Without saying what you think the victims

13   perceived or didn't perceive, why did you think that

14   you should have come to Puerto Rico to help them?

15   A.       We believed that Mr. Ambush deceived these

16   individuals.

17           MR. ARIAS-MARXUACH:  Objection.  Lack of

18   personal knowledge.  Speculation.

19           THE COURT:  I'll allow him to explain.

20   A.       The Center had an agreement with these

21   claimants that they were not to pay more than

22   20 percent.  We had evidence that was provided us

23   regarding his agreement.  He signed an agreement with

24   them in December of 2008.  The American Center did

25   not know about this agreement, was not provided this

Michael Engleberg, M.D. - Direct

1  agreement until October of 2009.  We saw that he was

2  asking for an additional ten percent, another million

3  dollars after the case had already been dismissed.

4  To ask for a million dollars from each one of them,

5  we felt that this was unscrupulous; we felt that he

6  swindled an additional million dollars from each one

7  of them.

8       MR. ARIAS-MARXUACH:  Objection.

9       THE COURT:  Overruled.  That's his opinion.

10  A.       We were disturbed to -- as per our

11  particular agreement.  We were embarrassed that this

12  was our attorney that was supposed to be representing

13  our interests, who had seen hundreds of center and

14  claimants agreements, who had seen hundreds of powers

15  of attorney, who understood that this was not about

16  enriching attorneys, we felt that we had a moral

17  obligation to them.

18       These are individuals who suffered from the

19  original attack that had to deal with the dead

20  bodies, bringing them back, that were victimized by a

21  terrorist group.  And now we felt that they were

22  being victimized by an attorney.  And to us not only

23  was it an embarrassment for The Center, we felt that

24  he did not serve the claimants in their best

25  interest.  He did not follow the wording of The

Michael Engleberg, M.D. - Direct

1   Center in claimant agreement.  We felt that it was an

2   insult to those who had died.  And everything that

3   The Center stands for was just the opposite of what

4   Mr. Ambush was doing.

5          And we felt we had a moral and ethical

6   obligation, and certainly myself, to be here, to be

7   able to show the evidence and be able to show both in

8   terms of what The Center and claimant agreement meant

9   to us, how we intended to carry it out.  I was able

10  to utilize my power of attorney to be able to show

11  every decision that was made by me was in the best

12  interest of these individuals.

13         That when we hired Paul Gaston, Paul Gaston

14  is a Yale graduate, it was disturbing why these

15  individuals would allow themselves to have Mr. Ambush

16  continue to represent them --

17         MR. ARIAS-MARXUACH:  Objection.  Your Honor,

18  Mr. Gaston's opinions are hearsay.

19         THE COURT:  I don't think -- he's not giving

20  Mr. Gaston's opinion, he's giving his own opinion.

21  He just said that Mr. Gaston is a Yale graduate,

22  that's what he said.

23  A.        Mr. Gaston was hired by us to continue to

24  represent them.  It's flabbergasting why they would

25  want Mr. Ambush to continue to represent them when we

Michael Engleberg, M.D. - Direct

1   have chosen Gaston to do so, who is so much more

2   qualified.

3            And, again, The Center was always there

4   throughout the entire case, after the case was

5   dismissed, to ensure that they would get their

6   $8 million.  And in spite of our efforts Mr. Ambush

7   was able to succeed in gaining this additional

8   million dollars from each one of these claimants.

9   And I truly believe that Mr. Ambush hoodwinked them,

10  he duked them, he deceived them, and he swindled an

11  additional $1,000,000 from each of these estates.

12  BY MR. EFRON:

13  Q.       On behalf of the plaintiffs I thank you for

14  coming down for your testimony.  Thank you,

15  Dr. Engleberg.

16            THE COURT:  Okay.  Cross examination.

17            Okay.  Let's take a five-minute recess.

18  Anybody who needs restroom and then we'll come back

19  with the cross-examination.

20            THE COURT OFFICER:  All rise.

21            (Jury Trial recessed at 3:35 p.m. and

22  resumed at 3:47 p.m.)

23            THE COURT:  Please be seated.

24            You may proceed, Mr. Arias.

25                    CROSS-EXAMINATION

Michael Engleberg, M.D.

BY MR. ARIAS-MARXUACH:

1

2    Q.        Good afternoon, Dr. Berg.

3    A.        Good afternoon.

4    Q.        You are currently the president of the

5    American Center For Civil Justice?

6                  MR. EFRON:  It's Dr. Engleberg, not Berg.

7                  THE COURT:  Engleberg, not Berg.

8                  MR. ARIAS-MARXUACH:  Ah, sorry.

9                  MR. EFRON:  I didn't mean to interrupt you.

10   BY MR. ARIAS-MARXUACH:

11   Q.        Dr. Engleberg, you are currently the

12   president of the American Center For Civil Justice?

13   A.        That is correct.

14   Q.        And you are also the president of the New

15   York Center for Civil Justice, correct?

16   A.        That is correct.

17   Q.        Now, let's talk about the American Center

18   for Civil Justice and we might intersperse some

19   questions about the New York Center as well, okay?

20                  I understand that you and Rabbi Perr are

21   among the founders of the American Center for Civil

22   Justice; is that correct?

23   A.        That is correct.

24   Q.        And, in fact, your association to the

25   American Center for Civil Justice dates back to

Michael Engleberg, M.D. - Cross

1  before 2001?

2  A.        Could you please repeat that?

3  Q.        That you have been associated with the

4  American Center for Civil Justice, and maybe it's a

5  fancy way for saying that you have had roles in The

6  Center, since before 2001?

7  A.        That is correct.

8  Q.        And, in fact, you've been -- at different

9  times you may have been the executive director of The

10  Center at others the vice president at others the

11  director, correct?

12  A.        That's correct.

13  Q.        And that's since the center's inception?

14  A.        That is correct.

15  Q.        Okay.  Now, The Center, both the American

16  Center for Civil Justice and the New York Center for

17  Civil Justice are 501(C)(3) tax exempt corporations?

18  A.        That is correct.

19  Q.        And that is just a fancy way of saying that

20  they are both nonprofit corporations that enjoy a tax

21  exception from the Internal Revenue Service of the

22  United States?

23  A.        That is correct.

24  Q.        And that means that they do not pay taxes on

25  their income; is that correct?

Michael Engleberg, M.D. - Cross

1   A.        That is correct.

2   Q.        But it does mean that they have to file tax

3   returns with the Internal Revenue Service of the

4   United States; is that correct?

5   A.        That is correct.

6   Q.        And those tax returns have to list their

7   income and expenses; is that correct?

8   A.        That is correct.

9   Q.        And it also means that both the New York

10  Center for Civil Justice and the American Center for

11  Civil Justice are subject to audit or investigation

12  by the Internal Revenue Service of the United States;

13  is that correct?

14  A.        That is correct.

15  Q.        And for that reason, for all those reasons,

16  The Center has to be meticulous about its bookkeeping

17  because you don't know when uncle Sam might be

18  calling; is that correct?

19  A.        That is correct.

20  Q.        Now, you have told the jury that Mr. Ambush

21  was paid in full for any work that he did in

22  connection with the Franqui litigation, correct?

23  A.        That is correct.

24  Q.        But you have not shown to this jury an

25  accounting listing exactly what work Mr. Ambush did

Michael Engleberg, M.D. - Cross

1   on the Franqui case and how much The Center paid for

2   that work; such a document is not in evidence,

3   correct?

4   A.        That is correct.

5   Q.        Okay.  And, in fact, we went through

6   Plaintiffs' Exhibit 1 -- or Mr. Efron did and we were

7   just sitting along -- and that is a series of checks

8   from the New York Center for Civil Justice made out

9   to Mr. Ambush covering the time period between

10  November 13, 2006 and November 7, 2008, correct?

11  A.        That is correct.

12  Q.        And you would agree with me that if we go

13  through all of these checks, none of these checks say

14  Lod Airport litigation, correct?

15  A.        That is correct.

16  Q.        And you would agree with me that none of

17  these checks say work on behalf of the Berganzo

18  family, correct?

19  A.        Excuse me?

20  Q.        None of these checks say work on behalf of

21  the Berganzo family, correct?

22  A.        That is correct.

23  Q.        And none of these checks say work on behalf

24  of the Rodriguez-Robles family, correct?

25  A.        That is correct.

Michael Engleberg, M.D. - Cross

1  Q.        And we went through these checks and some of

2  these checks say escrow; and an escrow account is an

3  account that a lawyer has to keep to receive money

4  that comes from the clients or a court and then make

5  disbursements from that account to third parties,

6  correct?

7  A.        That is correct.

8  Q.        So the fact that a check may be deposited in

9  an escrow account of an attorney does not mean that

10 that check went to the attorney's pocket, correct,

11 because it could be used for other purposes?

12 A.        That is correct.

13 Q.        That account, the escrow account, is simply

14 a holding place, correct?

15 A.        That is correct.

16 Q.        We're not recording gestures so if you're in

17 agreement, in addition to nodding your head, just say

18 yes.  Thank you.

19 A.        Okay.

20 Q.        And some of these checks that we have here,

21 in addition to saying escrow, some of them don't even

22 say the concept; on some the part that says memo are

23 empty, correct?

24 A.        That's correct.

25 Q.        Okay.  And one of these checks actually says

Michael Engleberg, M.D. - Cross

1    specifically that it's for funds due to Paul Gaston,

2    correct?

3    A.        That is correct.

4    Q.        So these checks do not establish in any form

5    or fashion how much if anything Joshua Ambush was

6    paid for work on the LOD case, correct?

7    A.        That is correct.

8    Q.        And, in fact, when asked about what some of

9    these checks were for you said you have to ask

10   Mr. Ambush, correct?

11   A.        That is correct.

12   Q.        Okay.  Now let's talk about Joshua Ambush's

13   relationship with The Center, all right?

14            Joshua Ambush was not an employee of The

15   Center, correct?

16   A.        Incorrect.

17   Q.        Did The Center deduct payroll taxes -- well,

18   let me go back to your testimony.

19            I think you testified that Joshua Ambush was

20   an employee of The Center in the time period between

21   2001 and 2003, correct?

22   A.        I believe 2001 to 2004.

23   Q.        So which is it?

24   A.        I -- I don't recall.

25   Q.        So it could be between 2001 and 2004 or 2001

Michael Engleberg, M.D. - Cross

1    and 2003, you're just not sure right now?

2    A.      I'm not sure.

3    Q.      But in any event, whatever it is, did The

4    Center deduct payroll taxes on payments to Mr. Ambush

5    during that time period?

6    A.      Mr. Ambush claimed that because he was an

7    attorney that we didn't have to deduct, he was

8    considered as an outside agent so to speak.

9    Q.      An independent contractor?

10   A.      Yes, that's correct.

11   Q.      So I'm going to asking about a series of

12   obligations that an employer has with an employee

13   versus and independent contractor and you'll tell me

14   if in fact The Center complied with those

15   obligations.

16           Did The Center, deduct -- and for everybody.

17           THE COURT:  Mr. Arias go a little a slower

18   for everyone and for the court reporter.

19           MR. ARIAS-MARXUACH:  I know.

20           THE COURT:  We all go very fast but we need

21   to go slow.

22           MR. ARIAS-MARXUACH:  I'm glad you empathize.

23   BY MR. ARIAS-MARXUACH:

24   Q.      Did The Center deduct payroll taxes from

25   payments to Mr. Ambush?

Michael Engleberg, M.D. - Cross

1    A.        I don't recall.

2    Q.        Did The Center pay Social Security or

3    withhold Social Security on payments to Mr. Ambush?

4    A.        I don't recall.

5    Q.        You don't recall.

6              Did The Center provide Mr. Ambush with

7    medical insurance?

8    A.        No, we did not.

9    Q.        Did The Center provide Mr. Ambush with

10   disability insurance?

11   A.        I don't believe so.

12   Q.        In fact, you just told us that Mr. Ambush

13   told you that he was an independent contractor,

14   correct?

15   A.        That is correct.

16   Q.        And that is how you handled that

17   relationship, he was an independent contractor?

18   A.        That is correct.

19   Q.        Now, you mentioned that between Mr. Ambush

20   and Rabbi Perr there was a relationship of trust,

21   correct?

22   A.        That's correct.

23   Q.        And because there was a relationship of

24   trust, that meant that -- it meant several things,

25   but let's start with some of them.

Michael Engleberg, M.D. - Cross

1      Mr. Ambush worked on many matters for The

2   Center, correct?

3   A.        That's correct.

4   Q.        He worked on other terrorist cases besides

5   Lod Airport, correct?

6   A.        That's right.

7   Q.        He worked on, for example, the Stethem case?

8   A.        No, he did not.

9   Q.        Are you sure?

10  A.        Yes, I am.

11  Q.        But he did work on other terrorist cases,

12  correct?

13  A.        He did not.

14  Q.        He did not work on other terrorist cases

15  force The Center?

16  A.        Could you please rephrase that?

17  Q.        Did Mr. Ambush render services to The Center

18  in connection with other terrorist cases?

19  A.        He never represented any of those victims.

20  Q.        Did Mr. Ambush assist attorneys hired by The

21  Center in other terrorist cases?

22  A.        I don't recall.

23  Q.        You don't recall, okay.

24            And, in fact -- but the fact is that he was

25  doing other work for The Center and he would be paid

Michael Engleberg, M.D. - Cross

1   by The Center for that work, correct?

2   A.        That is correct.

3   Q.        And you were telling us that this was based

4   on a relationship of trust between him and the Rabbi?

5   A.        That is correct.

6   Q.        And it would be fair to say that it was a

7   flexible arrangement because of that trust?

8   A.        That is correct.

9   Q.        And, in fact, because of that relationship

10  between Mr. Ambush and the Rabbi, the decision maker

11  at the American Center for Civil Justice as to what

12  to pay Joshua Ambush was Rabbi Eliezer Perr?

13  A.        That is correct.

14  Q.        Thank you.

15            Now, has The Center provided either the

16  members of the Rodriguez-Robles or the Berganzos an

17  accounting of how much The Center spent on

18  prosecuting the Lod Airport case, the Franqui case?

19  A.        No, we did not.

20  Q.        In fact, you have never met with the

21  Berganzo family, correct?

22  A.        That is correct.

23  Q.        And you have never met with the

24  Rodriguez-Robles family?

25  A.        That is correct.

Michael Engleberg, M.D. - Cross

1    Q.         And you never communicated with these

2    families while the Franqui case was ongoing, correct?

3    A.         That is correct.

4    Q.         All right.  But you did take decisions on

5    their behalf based on the power of attorney?

6    A.         It's first based on The Center and claimant

7    agreements.

8    Q.         And the power of attorney, those two

9    documents?

10   A.         That is correct.

11   Q.         Now, Joshua Ambush was the sole attorney

12   that filed the Franqui complaint on April of 2006,

13   correct?

14   A.         That is correct.

15   Q.         And no other attorney joined plaintiffs'

16   representation until Paul Gaston entered his

17   appearance on June of 2008, correct?

18   A.         That is correct.

19   Q.         Now, Covington & Burling said no to the

20   Franqui case, correct?

21   A.         That is correct.

22   Q.         And no major law firm appeared on behalf of

23   the Puerto Ricans injured at Lod Airport in the

24   Franqui case, correct?

25   A.         That is correct.

Michael Engleberg, M.D. - Cross

1    Q.        And LOD -- and Paul Gaston didn't come until

2    the case was two years having been filed, correct?

3    A.        That is correct.

4    Q.        All right.  But The Center did have major

5    law firms in the case of the British worker who was

6    tortured and killed, correct?

7    A.        Paul Gaston represented that case.

8    Q.        Which you have labeled as a prominent

9    attorney, correct?

10   A.        That is correct.

11   Q.        And in the Khobar Towers case, the case of

12   the 17 Americans killed in Saudi Arabia, The Center

13   worked with Piper Rudnick, correct?

14   A.        DLA Piper.

15   Q.        Well, at the time it was called Piper

16   Rudnick, correct?

17   A.        Uhm, at that point in time it was called

18   Piper Rudnick at that time, yes.

19   Q.        And now it's called DLA Piper because

20   technically it is the biggest law firm in the world,

21   correct?

22   A.        That is correct.

23   Q.        And you worked with Piper Rudnick twice,

24   right?

25   A.        That is correct.

Michael Engleberg, M.D. - Cross

1    Q.        But Piper Rudnick did not enter an

2    appearance in the Lod Airport case?

3    A.        That is correct.

4    Q.        So no major law firm worked on behalf of

5    these plaintiffs in the Lod Airport case?

6    A.        That is correct.

7    Q.        And the case had been going on for two years

8    before Gaston entered?

9    A.        That is correct.

10   Q.        And you knew before filing that case that

11   Libya would put up a fight, correct?

12   A.        That is correct.

13   Q.        And so the fact is that for two years you

14   didn't see fit to invest in recruiting a major law

15   firm to work on the Franqui case?

16   A.        We had approached numerous law firms during

17   that period of time and they declined.

18   Q.        They all declined, okay.

19             Okay.  So if all these major law firms

20   declined it is because they did not want to risk

21   either their time or their fees on the Franqui case,

22   correct?

23   A.        At that point in time we still did not have

24   enough evidence to convince law firms to take on the

25   case.

Michael Engleberg, M.D. - Cross

1    Q.        But lawyers do things based on either

2    conviction or money or a combination; the fact is

3    that these major law firms did not sign on, correct?

4    A.        They did not sign on.

5    Q.        And they didn't sign on because the

6    information that The Center provided was not to their

7    satisfaction, correct?

8    A.        That is correct.

9    Q.        And you're the one who prepares the

10   narratives and tells the lawyers what to do; that is

11   your testimony here in court today, no?

12   A.        That is correct.

13   Q.        Now, in November of 2008 you did try to

14   remove Joshua Ambush as attorney for the

15   Rodriguez-Robles and Berganzo families, correct?

16   A.        We were considering at that time that Paul

17   Gaston, I think, was saying that he was already the

18   attorney of record.

19   Q.        Well, in fact you sent communication to

20   Joshua Ambush telling him to deliver the file to Paul

21   Gaston who would take over, correct?

22   A.        That was -- it was a letter of December the

23   10th that you are referring to.

24   Q.        So on December the 10th you decided to

25   remove Joshua Ambush from the case, correct?

Michael Engleberg, M.D. - Cross

1    A.        That's correct.

2    Q.        And as of December of 2008 you already knew

3    that because of the Libyan claims settlement process

4    each wrongful death estate would get 10 million,

5    correct?

6    A.        That is correct.

7    Q.        So you had that knowledge when you took that

8    decision?

9    A.        That is correct.

10   Q.        And you did not consult with the Berganzo

11   family before trying to remove Mr. Ambush from the

12   case, correct?

13   A.        I would like to -- could I please have the

14   claimant/center agreement?

15   Q.        It's a yes-or-no question whether you

16   consulted these families or not.

17              THE COURT:  Please answer yes or no.

18   Mr. Efron will have an opportunity to ask you

19   additional questions.

20   A.        No, we did not.

21   BY MR. ARIAS-MARXUACH:

22   Q.        And so to break it down, the record is clear

23   you did not consult the Berganzos, correct?

24   A.        That is correct.

25   Q.        And you did not consult the

Michael Engleberg, M.D. - Cross

1    Rodriguez-Robleses, correct?

2    A.        That is correct.

3    Q.        Now, you did not meet with these people

4    while the Franqui case was ongoing, correct?

5    A.        That is correct.

6    Q.        But you did have the time to come to Puerto

7    Rico to meet with O'Neill & Borges in 2008?

8             You met with a major law firm here in Puerto

9    Rico here in December of 2008, correct?

10   A.        That is correct.

11   Q.        But you did not look these people up to meet

12   with them?

13   A.        No, we did not.

14   Q.        Okay.

15            Now, you have alluded to the lawsuit that

16   the American Center for Civil Justice filed against

17   Mr. Ambush in Washington, D.C., correct?

18   A.        That is correct.

19   Q.        And that case is called the American Center

20   for Civil Justice v. Joshua Ambush in the United

21   States District Court for the District of Columbia,

22   correct?

23   A.        That's correct.

24   Q.        And one of the things that The Center asked

25   the Court in the District of Columbia was to prevent

Michael Engleberg, M.D. - Cross

1    that the funds from the estates in the Franqui case

2    be delivered to Joshua Ambush, correct?

3    A.        Could you repeat that?

4    Q.        That you requested an injunction from the

5    court in the D.C. case so that the moneys would flow

6    from the state department to the court instead of

7    from the state department to Joshua Ambush, correct?

8    A.        That is correct.

9    Q.        That is relief that you requested from the

10    D.C. court, correct?

11    A.        That is correct.

12    Q.        And the D.C. court denied that request?

13    A.        That is correct.

14    Q.        Now, going back to November of 2008, and

15    we'll get back to the injunction, you knew that each

16    estate would receive -- each wrongful death estate

17    would receive $10 million, correct?

18    A.        That is correct.

19    Q.        And you didn't communicate that to the

20    Rodriguez-Robleses, correct?

21    A.        We were unable to.  Mr. Ambush had all of

22    the addresses for all of the claimants and he refused

23    to provide that to The Center.

24    Q.        Mr. -- Dr. Engleberg, aren't you the one who

25    writes the narrative in these cases; you had the

Michael Engleberg, M.D. - Cross

1    names, you could not get their addresses?

2            In this age of the Internet you could not

3    get the names and the phone numbers of these persons

4    assuming that Joshua Ambush was denying to give you

5    the information?

6            You had the Franqui complaint, correct?

7    A.      We had the Franqui complaint --

8    Q.      So you had the names, correct?

9    A.      Mr. Ambush --

10   Q.      It's a yes-or-no question, sir.

11           Did you have the Franqui complaint?

12   A.      Yes, we did.

13   Q.      And if you had the Franqui complaint, you

14   had the names of these claimants, correct?

15   A.      Yes, we did.

16   Q.      And you could have searched the Internet for

17   their contact information or hired a private

18   investigator, you could have gotten in touch with

19   them if you wanted to, correct?

20   A.      Not true.

21   Q.      Not true?

22   A.      We attempted.  We actually had an

23   investigative reporter -- or an individual

24   investigative service, as well as looking on the

25   Internet.

Michael Engleberg, M.D. - Cross

1    Q.        Mm-hmm, okay.

2             Now, let's go back to the injunction.  And,

3    again, the injunction you sought was so that the

4    state department delivered the funds from the Libyan

5    claims that had been approved to the court in D.C.

6    rather than to Mr. Ambush, right, that was the

7    petition in the injunction request?

8    A.        That is correct.

9    Q.        And the court in D.C. denied that request,

10   correct?

11   A.        Yes, they did.

12   Q.        Okay.  And these claimants were not a party

13   in the case in D.C., correct?

14   A.        That is correct.

15   Q.        So The Center was requesting this relief

16   without their knowledge, correct?

17   A.        That is correct.

18   Q.        Okay.  Now, you would agree that because the

19   state -- the court in D.C. denied the center's

20   request Mr. Ambush did receive into his escrow

21   account the funds that were approved by the state

22   department on the claims, correct?

23   A.        That is correct.

24   Q.        And Mr. Ambush delivered -- as to these two

25   families delivered 1.6 million per family to The

EVILYS E. BRATHWAITE, RPR
COURT REPORTER FOR THE U.S. DISTRICT COURT OF PUERTO RICO
(787) 772-3377

Michael Engleberg, M.D. - Cross

1    Center -- so that's 3.2 million, correct?

2    A.        That is correct, yes.

3    Q.        -- and then the balance, the 800,000 --

4    A.        No, excuse me.  Could you -- $1.6 million to

5    where?

6    Q.        He delivered $1.6 million to The Center?

7    A.        Yes.  That's correct, yes.

8    Q.        And that's 1.6 million for the Berganzos and

9    1.6 million for the Rodriguez-Robleses that went to

10   The Center?

11   A.        That is correct.

12   Q.        And when you add that up that is

13   $3.2 million, right?

14   A.        That is correct.

15   Q.        Okay.  Because The Center had an agreement

16   to take 20 percent from the awards, that meant that

17   the total amount due to The Center under the

18   claimant/center agreements from these two families'

19   claims is $4 million right?

20   A.        That is correct, yes.

21   Q.        Thank you.

22             And so we're talking about 3.2 million going

23   directly to The Center, we have an 800,000 dollar

24   difference, right?

25   A.        Yes.

Michael Engleberg, M.D. - Cross

1   Q.        Four million minus 3.2 --

2   A.        Yes.

3   Q.        Thank you.

4             And that $800,000 Mr. Ambush paid into the

5   registry of the D.C. court; is that correct?

6   A.        That is correct.

7   Q.        Thank you.

8             Okay.  And it is The Center's position in

9   the D.C. litigation that it is entitled those

10  $800,000, not Mr. Ambush, so that if The Center

11  approves -- the court approves that petition, The

12  Center would receive its $2 million per family,

13  correct?

14  A.        That's correct.

15  Q.        And another petition that The Center is

16  making in the D.C. litigation is that whatever is

17  paid to Mr. Ambush for the Franqui case he should

18  give back; is that correct?

19  A.        Could you please repeat that?

20  Q.        That The Center is also asking the Court to

21  make him give back whatever he paid on -- whatever

22  The Center paid to him in the Franqui case?

23  A.        I'm not -- I don't recall.

24  Q.        You don't recall.

25            You are the president of the American Center

Michael Engleberg, M.D. - Cross

1    for Civil Justice and you don't recall what the

2    relief is that you're asking in court in D.C.?

3    A.        No, I don't recall.

4    Q.        And you're the one who writes narratives for

5    the lawyers and hires all these big, fancy lawyers

6    but you don't remember what your relief is or what

7    your request for relief is in the D.C. case?

8    A.        I don't recall.

9    Q.        You don't recall.

10            Now, let's talk about the claimant/center

11   agreement.  And in the interest of economy of time,

12   would you agree with me that the claimant/center

13   agreement is a standard form that The Center uses?

14   A.        That is correct.

15   Q.        That was drafted by U.S. attorneys?

16   A.        American attorneys.

17   Q.        Well, America spans from Alaska to Tierra

18   del Fuego.  We're talking about U.S. citizens.

19            MR. EFRON:  Not prosecutors.

20   BY MR. ARIAS-MARXUACH:

21   Q.        Ah, you didn't mean -- sorry.

22            Attorneys in the United States?

23   A.        Yes.

24   Q.        As opposed to United States attorneys?

25   A.        Yes.

Michael Engleberg, M.D. - Cross

1  Q.        All right.  But in any event the

2  claimant/center agreements were drafted by attorneys

3  in the mainland United States?

4  A.        Yes.

5  Q.        Now we're in the same song.

6           Okay.  I'm going to show you two of them and

7  I'm going represent to you these are the ones for

8  Efrain Berganzo-Cruz and Noemi Rodriguez-Robles, and

9  we'll work off of those two only, okay?

10  A.        Okay.

11  Q.        But I will represent to you that they are in

12  evidence all the claimant/center agreements signed by

13  members of these two families and they're all the

14  standard form; are you willing to accept the

15  representation?

16  A.        I don't understand the question.

17  Q.        Instead of showing you all the

18  claimant/center agreements that are in evidence, I am

19  asking you to kindly accept my representation that if

20  these good people signed claimant/center agreements

21  they're in the same form as these two examples that

22  I'm showing that are from two of them; could you

23  accept that representation?

24  A.        Yes.

25  Q.        And that is meant simply to avoid a parade

Michael Engleberg, M.D. - Cross

1   of needless paper.

2            All right.  The first one is Joint

3   Exhibit 21.

4   A.        Excuse me, could I have the -- I have

5   difficulty reading from the screen.

6            MR. ARIAS-MARXUACH:  Can he be provided

7   Joint Exhibit 21 and Joint 9?

8   BY MR. ARIAS-MARXUACH:

9   Q.        Let me know when you have finished examining

10  the documents, okay?

11  A.        Yes.

12  Q.        Are you finished?

13  A.        Yes, go ahead.

14  Q.        Now, if we look at the claimant/center

15  agreements on Joint Exhibit 21, that is the

16  claimant/center agreement between Efrain

17  Berganzo-Cruz and the American Center for Civil

18  Justice, correct?

19  A.        That is correct.

20  Q.        And it's signed by claimant Efrain

21  Berganzo-Cruz executed June 2002, correct?

22  A.        Yes, that is correct.

23  Q.        Now, you have seen hundreds of these

24  claimant/center agreements, correct?

25  A.        Yes, I have.

Michael Engleberg, M.D. - Cross

1   Q.       And you're examining this one, Joint

2   Exhibit 21, correct?

3   A.       Correct.

4   Q.       Can you tell me where does this agreement

5   have the name Joshua Ambush?

6   A.       It does not.

7   Q.       Can you tell me where in this agreement does

8   the attorney bind itself to do anything?

9   A.       It does not.  This is directly between The

10  Center and claimant -- between the American Center

11  and the individuals -- the individual claimants.

12  Q.       So Joshua Ambush was not a party to the

13  claimant/center agreement, correct?

14  A.       That is correct.

15  Q.       You were not present at the December 2,'08

16  meeting where the Berganzos and Rodriguez families

17  signed retainer agreements with Mr. Ambush, correct?

18  A.       That is correct.

19  Q.       And because you have never met these people,

20  you have never discussed with them the circumstances

21  in which the retainer agreements with Mr. Ambush were

22  executed, correct?

23  A.       That is correct.

24  Q.       So the truth is that you don't have any

25  personal knowledge of what transpired at the meeting

Michael Engleberg, M.D. - Cross

1    between Joshua Ambush and the members of the

2    Rodriguez-Robles and Berganzo families, correct?

3    A.        That is correct.

4    Q.        Okay.  Now, Mr. Engleberg, in November of --

5              MR. EFRON:  Doctor.

6    A.        Excuse me, that's Dr. --

7    BY MR. ARIAS-MARXUACH:

8    Q.        Oh, sorry, Doctor.  It's just a personal

9    thing.  I don't like people calling me *Licensiado*,

10   which is a common address of an attorney.

11   A.        You can call me Michael Engleberg.

12   Q.        Okay.  Well, I will go with Doctor, but

13   thank you for offering Michael.

14             Dr. Engleberg, in November of 2009 The

15   Center hired an attorney by the name of Javier

16   Lopez-Perez to run some advertisements in the press

17   in Puerto Rico, correct?

18   A.        That is correct.

19   Q.        And The Center obtained Javier Lopez-Perez's

20   name from a local Rabbi in the community in Puerto

21   Rico, correct?

22   A.        That is correct.

23   Q.        That is a Rabbi Zarchi?

24   A.        That is correct.

25   Q.        Okay.  And I'm glad I pronounced it

Michael Engleberg, M.D. - Cross

1    correctly apparently.

2              And at the time that The Center commissioned

3    Mr. Lopez-Perez, Javier Lopez-Perez, to run those

4    ads, the purpose of the ads was so that those persons

5    targeted by the ad would contact Attorney

6    Lopez-Perez, correct?

7    A.        It was to let them know that -- The Center

8    was afraid that because Mr. Ambush should have been

9    representing The Center, that the claimants should

10   know --

11   Q.        Let me rephrase the question, sir.

12   A.        Yes.

13   Q.        The ads meant for victims of the Lod Airport

14   Massacre to call Javier Lopez-Perez, right, that's

15   what the ad stated?

16   A.        To verify what The Center's position was as

17   per these claimant and center agreements.

18              MR. EFRON:  Your Honor, it's a Joint

19   Exhibit.  Why don't we just show it to him because

20   he's only reading part of it.

21   BY MR. ARIAS-MARXUACH:

22   Q.        Okay.  But in any event, Mr. Lopez Perez was

23   hired by The Center, correct?

24   A.        To place an ad in the paper in Puerto Rico,

25   yes.

Michael Engleberg, M.D. - Cross

1  Q.        And prior to that, to November of 2009,

2  Attorney Lopez-Perez had no prior involvement with

3  The Center, correct?

4  A.        That is correct.

5  Q.        And he also had no prior involvement with

6  the Franqui litigation, correct?

7  A.        That is correct.

8  Q.        Now, you are aware that Attorney Lopez-Perez

9  was the attorney who filed this lawsuit that brings

10  us here today, correct?

11  A.        That is correct.

12  Q.        And under the -- as a result of the ad, the

13  claimants contacted Javier Lopez-Perez directly,

14  correct?

15  A.        That is correct.

16  Q.        They did not contact The Center?

17  A.        No, they did not.

18  Q.        Now, when the time -- there came a time when

19  Attorney Lopez-Perez withdrew from this case; you

20  know that, right?

21  A.        Yes.

22  Q.        And at that time The Center found David

23  Efron to take Lopez-Perez's place, correct?

24  A.        Again, the name was provided to The Center

25  again by Rabbi Zarchi.

Michael Engleberg, M.D. - Cross

1   Q.          So Rabbi Zarchi gave you the name of

2   Mr. Efron and he came to represent the plaintiffs

3   after Lopez-Perez withdrew, correct?

4   A.          That's correct.

5   Q.          Okay.  Now, you have told us that you came

6   here because you understand that The Center has a

7   moral obligation to these claimants, correct?

8   A.          That is correct.

9   Q.          And that moral obligation stems from the

10  fact that you believe Joshua Ambush took $2 million

11  from them wrongfully?

12  A.          That is correct.

13  Q.          And now has The Center reimbursed these

14  claimants those $2 million based on that moral

15  obligation?  Shall I repeat it?

16  A.          Yes, please repeat that.

17  Q.          As a result of its moral obligation, has The

18  Center returned to these claimants their $2 million?

19  A.          No, it has not.

20  Q.          Okay.  As a result of this moral obligation,

21  has The Center paid these claimants their attorneys'

22  fees in this case?

23  A.          Could you please repeat that?

24  Q.          Very simple question.

25              The Center, you understand, has a moral

Michael Engleberg, M.D. - Cross

1    obligation to these claimants, correct?

2    A.      Mm-hmm.

3    Q.      And I'm asking you if as a practical

4    consequence of that obligation, if The Center has

5    paid their attorneys' fees in this case?

6    A.      Doesn't it bother you that --

7    Q.      Please answer yes or no.

8    A.      No, no.  Doesn't it bother you that you're

9    taking stolen money?

10          MR. ARIAS-MARXUACH:  I ask that --

11          THE COURT:  You need to answer yes or no.

12   Mr. Efron can ask you additional questions.

13          THE WITNESS:  Okay.

14   A.      Could you please repeat that?

15   BY MR. ARIAS-MARXUACH:

16   Q.      As a result of that moral obligation that

17   you have alluded to, has The Center paid for these

18   claimants' attorneys' fees?

19   A.      No, it has not.

20   Q.      Why do you smirk?

21   A.      Because I find it quite obscene -- you asked

22   me why do I smirk.

23          THE WITNESS:  Do I have a right to answer

24   that?

25          THE COURT:  Okay.  Answer the question.

Michael Engleberg, M.D. - Cross

1    A.        You asked me why do I smirk.  Because

2    doesn't it bother you that you're getting paid from

3    money that was stolen from these claimants?

4    Q.        Well, if it bothers you so much why not

5    reimburse it to them by The Center?  Because you have

6    labeled Mr. Ambush an agent, a paralegal, all these

7    things.

8              And so if you have this moral obligation,

9    why haven't you chosen to reimburse the 2 million and

10   then litigate with him in D.C.?

11   A.        The Center has not done anything illegal.

12   Mr. Ambush has done something illegal.

13              THE COURT:  Mr. Efron, any redirect?

14              MR. EFRON:  Is he done?

15              THE COURT:  Mr. Arias?

16              MR. ARIAS-MARXUACH:  I'm done.

17              MR. EFRON:  Redirect.  Very briefly.

18                    REDIRECT EXAMINATION

19   BY MR. EFRON:

20   Q.        Can we go to Exhibit 21, Joint Exhibit 21,

21   please?  I think you still have it.  Joint 21 on the

22   right-hand side on top?

23   A.        Oh, yes, yes.

24   Q.        Can we zoom in?

25              THE CLERK:  Yes.

Michael Engleberg, M.D. - Redirect

1    A.           Excuse me, can I take a quick break?

2           THE COURT:  Let's excuse him for two to

3    three minutes and we'll come back with redirect, and

4    everybody can stay here.

5           (Jury Trial recessed at 4:27 p.m. and

6    resumed at 4:28 p.m.)

7           THE COURT:  Okay.  Efron, let's briefly

8    conclude your redirect.

9           MR. EFRON:  I just have two or three --

10   the --

11          THE COURT:  I believe it's Joint Exhibit 21

12   you're referring to.

13   BY MR. EFRON:

14   Q.      Joint Exhibit 21.  I think Dr. Engleberg

15   that both you and Mr. Arias misspoke when you said

16   that --

17          THE COURT:  Don't -- ask the question,

18   don't --

19   BY MR. EFRON:

20   Q.      Do you see -- you mentioned that

21   Mr. Ambush -- Mr. Ambush's name was not on that

22   agreement; can you see the header on the fax machine,

23   on the top -- no, no, no, the name.  Can you make out

24   the name that's scratched out on the top of the -- on

25   the top of the document, on the top of the document?

Michael Engleberg, M.D. - Redirect

1    Do you see the fax header that indicates a

2   name that's scratched out; can you see that?

3   A.      I recognize it as a 4-1-1 number.

4   Q.      Does yours have that?

5           MR. EFRON:  May I approach for a second?

6   BY MR. EFRON:

7   Q.      Can you make out a name?  Does that not say

8   Joshua Ambush, Esquire?

9   A.      Yes, it does.

10  Q.      And it's scratched out, right?

11  A.      Yes.

12  Q.      So Mr. Ambush was a party or involved with

13  the claimant/center agreement, was he not?

14  A.      He was involved in terms of presenting The

15  Center and claimant agreement --

16  Q.      As an agent, as you have just said.

17  A.      -- as an agent for The Center, yes.

18  Q.      Thank you very much.

19          You stated you were asked -- you were asked

20  about trying to find -- by the way, who do I

21  represent in this case?  Am I representing The Center

22  in this case?

23  A.      No, you are not.

24  Q.      Who do I represent in this case?

25  A.      I assume that you're representing the

EVILYS E. BRATHWAITE, RPR
COURT REPORTER FOR THE U.S. DISTRICT COURT OF PUERTO RICO
(787) 772-3377

Michael Engleberg, M.D. - Redirect

1    Berganzo family, as well as the Antonio

2    Rodriguez-Morales family.

3    Q.        And The Center is not representing them?

4    A.        That is correct.

5    Q.        So would you have any authority to contact

6    my clients -- regardless of the fact that you

7    suggested to them that they retain me, did you have

8    any authority to talk to them without my -- without

9    my approving it?

10   A.        Absolutely not.

11   Q.        Now, in the municipalities in Puerto Rico

12   there are certain ways of getting around; do you know

13   what a *buzon* is?  *Buzon*?  *Buzon*?

14   A.        No, I do not.

15   Q.        Do you know what a *barrio* is?

16   A.        No, I do not.

17   Q.        Do you know what a *parcela* or a *ward* means?

18   A.        No, I do not.

19   Q.        And would you expect those to be found on

20   Google if you're trying to find somebody's address in

21   Puerto Rico?

22   A.        I don't believe so.

23   Q.        Okay.  Now of the --

24            MR. EFRON:  I'm just going over my notes,

25   because I want to do this very quickly, Your Honor.

115

Michael Engleberg, M.D. - Redirect

1    BY MR. EFRON:

2    Q.      You were asked if you knew exactly how much

3    The Center had spent on these cases; does it really

4    matter?  How does it matter how much The Center spent

5    on these cases?

6    A.      It doesn't make a difference because the

7    total amount is 20 percent; that includes all

8    expenses and all fees.

9    Q.      And that's whether the amount spent by The

10   Center was more or less than the 20 percent; is that

11   correct?

12   A.      That is correct.

13   Q.      At the time that The Center terminated

14   Mr. Ambush's representation of these families, was

15   there anything pending, anything left to do that you

16   know of in the Franqui litigation against Libya?

17   A.      There was no further --

18   Q.      Proceedings?

19   A.      -- proceedings that were necessary.

20   Q.      Now, you mentioned that you came here, very

21   eloquently, with a moral obligation, yourself or The

22   Center; is there any legal obligation to make these

23   people whole under The Center's part?

24          MR. ARIAS-MARXUACH:  Objection.  Calls for a

25   legal opinion.

Michael Engleberg, M.D. - Redirect

1    THE COURT: Sustained. Sustained.

2    MR. EFRON:  I'll rephrase it.

3    BY MR. EFRON:

4    Q.      There's a, you said, $1.9 million of

5    undistributed money that's in litigation in

6    Washington, D.C. between The Center and Mr. Ambush,

7    correct?

8    A.      That is correct.

9    Q.      And of that there's about $800,000, $400,000

10   from each of these families, that The Center was not

11   paid to come up to the 20 percent that The Center was

12   supposed to receive; is that correct?

13   A.      That is correct.

14   Q.      So there's $800,000 that The Center is

15   requesting it get paid regarding this case and that

16   Mr. Ambush is basically opposing; is that correct?

17   A.      That is correct.

18   Q.      Now, and of course we never know what's

19   going to happen in court, but is it possible, could

20   that court determine that some of that money belongs

21   to Ambush?

22           MR. ARIAS-MARXUACH:  Objection.  Calls for

23   speculation.

24           THE COURT:  I'll sustain the objection.

25   I'll sustain the objection.  The court has not ruled

Michael Engleberg, M.D. - Redirect

1    one way or another.

2        MR. EFRON:  No, I'm not -- but it is

3    pending.

4        THE COURT:  The matter is pending, but

5    whatever can happen -- you might expect it --

6        MR. EFRON:  I'll rephrase it.

7        THE COURT:  -- but it's not what the Court

8    can do or not.  You can ask what The Center is

9    soliciting the Court.

10        MR. EFRON:  I'll ask him what the defendant

11    is soliciting.

12    BY MR. EFRON:

13    Q.        What is Mr. Ambush requesting of the Court

14    that they do with that money?

15    A.        He's requesting that $400,000 of the

16    Berganzos' fee to The Center should be paid to him.

17    Q.        That's per family?  400,000 each family?

18    A.        That is correct.

19    Q.        So he took a million dollars from each

20    family here and he's requesting an extra $400,000

21    from each family in Washington; is that correct?

22    A.        That is correct.

23    Q.        Thank you again for coming to Puerto Rico.

24        THE COURT:  Mr. Arias, any recross briefly?

25        MR. ARIAS-MARXUACH:  Very briefly.

Michael Engleberg, M.D. - Redirect

1    THE COURT:  Mr. Efron, have your next

2    witness ready.

3                    RECROSS EXAMINATION

4    BY MR. ARIAS-MARXUACH:

5    Q.        Now, Dr. Engleberg, going back to Joint

6    Exhibit 21 --

7    A.        Yes.

8    Q.        -- are you saying that because Joshua

9    Ambush's name is here on the fax stamp that he's a

10   party to the claim/center agreement?

11   A.        Excuse me?

12   Q.        Does the fact that a fax stamp from Joshua

13   Ambush is here crossed out in Joint Exhibit 21, does

14   that make Joshua Ambush a party to the

15   claimant/center agreement?

16   A.        No, he is not.

17             MR. ARIAS-MARXUACH:  That's it.

18             THE COURT:  You're excused, Doctor.  Thank

19   you very much, you're excused.

20             (Excerpt of jury trial concluded at 4:36

21   p.m.)

22                         ---

23

24

25

1    UNITED STATES DISTRICT COURT.    )

2              OF                    )ss.

3       PUERTO RICO                  )

4

5

6

7                    CERTIFICATE

8

9

10         I, EVILYS E. BRATHWAITE, hereby certify that

11    the proceedings and evidence are contained fully and

12    accurately, to the best of my ability, in the notes

13    recorded stenographically by me, at the jury trial in

14    the above matter; and that the foregoing is a true

15    and accurate transcript of the same.

16

17    _____

18    EVILYS E. BRATHWAITE, RPR
      Official Court Reporter

19    United States District Court
      Federal Building, Room 200

20    San Juan, Puerto Rico 00918
      787-772-3377

21

22    **ORIGINAL**

23

24

25

EVILYS E. BRATHWAITE, RPR
COURT REPORTER FOR THE U.S. DISTRICT COURT OF PUERTO RICO
(787) 772-3377

## $

$1,000,000 [1] - 80:12
$1,500 [1] - 73:2
$10 [4] - 57:6, 57:10, 58:8, 97:19
$10,000 [7] - 27:22, 27:23, 68:13, 69:24, 70:2, 71:4, 76:4
$15 [1] - 57:18
$150 [1] - 10:10
$1500 [1] - 73:2
$2,000 [1] - 75:3
$20,000 [1] - 27:20
$200,000 [1] - 18:9
$23,000 [1] - 70:15
$250 [1] - 36:11
$3,000 [1] - 76:1
$3,971.04 [1] - 74:22
$300,000 [1] - 36:14
$4,000 [2] - 74:15, 74:16
$400,000 [2] - 116:11, 117:17, 117:22
$5,000 [2] - 74:6, 75:16
$5,875 [1] - 73:22
$50 [5] - 27:15, 41:12, 57:7, 57:11, 57:13
$65 [1] - 57:20
$800,000 [4] - 101:6, 101:12, 116:11, 116:16

## '

'08 [6] - 38:12, 39:7, 39:20, 40:3, 40:4, 50:22
'09 [1] - 59:13

## 0

0 [2] - 57:14, 57:15
00918 [2] - 1:24, 119:20
00929 [1] - 1:21

## 1

1 [14] - 48:5, 48:7, 48:22, 49:2, 49:3, 49:4, 49:12, 50:6, 50:11, 50:12, 63:12, 65:5, 84:8
1-,f [1] - 71:12
1-,g [1] - 71:8
1-a [7] - 2:9, 48:20, 48:23, 48:25, 50:11, 76:2, 76:3
1-aa [3] - 65:17, 65:20, 65:23
1-b [3] - 48:24, 48:25, 76:2
1-bb [8] - 64:24, 65:6, 65:16, 65:20, 65:24, 66:14
1-c [2] - 48:25, 75:24
1-cc [3] - 48:20, 65:7, 66:15
1-d [1] - 49:1

1-e [1] - 75:14
1-f [10] - 71:8, 71:9, 71:19, 71:20, 72:5, 72:6, 72:8, 72:9, 72:10
1-g [5] - 71:9, 71:12, 71:14, 71:24, 75:6
1-h [3] - 72:7, 72:8, 72:11
1-i [1] - 75:2
1-j [1] - 74:15
1-l [2] - 74:4, 74:5
1-n [1] - 73:15
1-p [1] - 73:1
1-r [1] - 70:23
1-s [1] - 70:23
1-t [3] - 70:8, 70:9, 70:10
1-u [2] - 70:8, 70:9
1.6 [6] - 40:9, 100:2, 100:6, 100:8, 100:10, 100:11
1.9 [4] - 63:20, 64:14, 64:15, 116:6
10 [2] - 48:10, 95:6
10,000 [1] - 28:16
10-cv-1044 [1] - 1:9
100,000 [1] - 18:9
103 [3] - 37:17, 37:21, 37:22
10th [2] - 94:25, 95:1
11 [1] - 70:18
11:26 [1] - 1:15
12 [1] - 48:10
1265 [3] - 65:1, 65:17, 65:25
1273 [1] - 65:24
12:00 [1] - 3:3
12:04 [1] - 29:10
12:06 [2] - 28:20, 29:4
12:10 [1] - 3:4
13 [2] - 46:18, 84:12
1317 [1] - 73:13
1320 [2] - 71:19, 72:15
1340 [1] - 74:1
13th [2] - 75:9, 76:3
15 [1] - 57:12
15th [1] - 53:24
16 [1] - 51:6
16th [1] - 53:24
17 [4] - 51:6, 74:5, 74:16, 92:14
17th [1] - 53:24
19 [1] - 4:4
1972 [1] - 22:8
1979 [1] - 4:5
1984 [1] - 4:6
1996 [4] - 6:25, 8:9, 8:25, 9:5
1998 [1] - 7:6
1999 [1] - 7:6
1:06 [1] - 29:3
1:20 [2] - 29:4, 29:9

1:50 [1] - 29:11
1cc...compilation [1] - 2:9
1z [1] - 69:2

## 2

2 [6] - 13:23, 101:14, 109:12, 109:16, 109:20, 111:11
2,'08 [2] - 68:1, 105:17
20 [12] - 12:9, 12:10, 12:19, 14:4, 57:23, 61:21, 64:18, 77:23, 100:18, 115:9, 115:12, 116:13
200 [1] - 119:19
2000 [3] - 16:25, 18:16, 19:20
2001 [9] - 20:21, 23:24, 27:10, 82:2, 82:7, 86:23, 86:24, 87:2
2002 [1] - 104:23
2003 [3] - 27:10, 86:23, 87:3
2004 [2] - 86:24, 87:2
2005/2006 [1] - 17:3
2006 [10] - 9:7, 27:12, 31:10, 32:10, 32:13, 32:24, 76:1, 76:3, 84:12, 91:14
2007 [5] - 74:5, 74:16, 75:3, 75:9, 75:16
2008 [20] - 27:18, 35:18, 37:10, 50:7, 59:3, 65:1, 67:11, 68:2, 69:22, 71:3, 72:4, 73:1, 77:25, 84:12, 91:19, 94:15, 95:4, 96:9, 96:11, 97:16
2009 [5] - 59:13, 61:4, 78:2, 106:16, 108:3
2011 [1] - 1:15
21 [12] - 11:25, 104:5, 104:9, 104:17, 105:4, 111:22, 111:23, 112:13, 112:16, 118:8, 118:15
24 [1] - 71:3
25 [2] - 26:10, 35:25
250,000 [1] - 36:13
27 [1] - 75:3
270 [1] - 1:24
27th [1] - 75:15
28 [2] - 72:4, 73:1
29 [1] - 75:15
29314 [1] - 1:20
2:18 [1] - 48:16
2:20 [1] - 48:17
2:47 [1] - 66:7

## 3

3 [2] - 1:13, 57:17
3.2 [4] - 100:3, 100:15,

100:24, 101:3
30th [1] - 75:25
31 [1] - 59:11
33 [2] - 12:12, 12:16
3:10 [1] - 66:8
3:35 [1] - 80:22
3:47 [1] - 80:23

## 4

4 [1] - 100:21
4,000 [1] - 74:25
4-1-1 [1] - 113:5
40 [1] - 5:10
400,000 [1] - 117:19
45 [1] - 23:19
4:27 [1] - 112:7
4:28 [1] - 112:8
4:36 [1] - 118:22

## 5

5 [2] - 57:14, 57:15
501 [1] - 82:18
5875 [2] - 73:17, 73:19

## 6

6 [1] - 69:22
65 [1] - 62:2

## 7

7 [7] - 45:19, 47:13, 48:6, 64:5, 67:11, 68:2, 84:12
7-a [2] - 48:1, 48:9
7-b [1] - 48:9
7-b,7-c [1] - 48:1
7-c [1] - 48:9
7-d [1] - 48:9
75 [1] - 4:8
787-772-3377 [1] - 119:20

## 8

8 [6] - 50:7, 51:23, 52:4, 64:10, 65:1, 80:7
80 [1] - 61:18
800,000 [2] - 100:5, 100:25

## 9

9 [1] - 104:9

## A

abducted [2] - 25:4, 25:22
ability [2] - 43:18, 119:12
able [42] - 6:19, 7:25, 10:9, 11:9, 11:10, 11:17, 12:1, 13:7, 13:11, 15:15, 15:18, 17:5, 17:7, 19:9, 19:10,

19:13, 21:20, 21:22, 22:11, 23:19, 27:5, 27:20, 27:21, 30:1, 33:14, 34:12, 34:20, 36:2, 37:14, 46:3, 55:8, 55:17, 55:18, 59:5, 67:1, 77:1, 79:8, 79:10, 79:11, 80:8
 aboard [1] - 37:22
 Absolutely [2] - 54:3, 114:12
 Abu [1] - 25:23
 accept [3] - 103:16, 103:21, 103:25
 acceptable [1] - 36:10
 according [2] - 41:9, 72:6
 According [1] - 56:7
 account [10] - 63:14, 64:16, 75:12, 85:4, 85:5, 85:7, 85:11, 85:15, 99:23
 accounted [5] - 17:12, 17:17, 17:20, 17:21, 27:24
 accounting [2] - 84:2, 90:19
 accurate [1] - 119:15
 accurately [1] - 119:12
 act [1] - 14:12
 acting [1] - 54:12
 action [16] - 8:11, 19:22, 22:12, 25:25, 60:7, 60:25, 61:2, 61:6, 61:7, 61:9, 61:11, 61:16, 61:17, 62:17, 62:18, 63:16
 actions [1] - 9:8
 acts [6] - 6:20, 8:2, 8:17, 13:16, 14:10, 19:23
 actual [1] - 52:8
 ad [4] - 107:7, 107:17, 108:1, 108:14
 add [1] - 100:14
 addition [6] - 14:14, 27:18, 43:16, 61:25, 85:19, 85:23
 additional [22] - 9:1, 14:6, 14:15, 27:21, 28:14, 42:19, 42:21, 42:24, 43:4, 43:22, 43:25, 44:2, 55:9, 55:10, 57:15, 78:3, 78:7, 80:8, 80:12, 95:21, 110:14
 address [2] - 106:12, 114:22
 addresses [2] - 97:24, 98:3
 administered [3] - 38:10, 40:14, 53:1
 administrator [1] - 56:10
 administrators [1] - 58:2
 admitted [6] - 47:10, 47:20, 48:6, 50:11, 53:14, 56:15
 Admitted [1] - 47:13
 ads [3] - 107:6, 107:15
 advance [1] - 28:17
 Advanced [1] - 65:12

advanced [4] - 27:19, 41:7, 45:14, 74:8
 advancement [2] - 66:25, 67:22
 advances [3] - 29:19, 29:23, 30:15
 advantage [1] - 77:3
 advertisements [1] - 106:18
 advised [1] - 39:1
 advocates [1] - 6:17
 advocating [1] - 16:3
 affected [1] - 19:3
 affirmation [1] - 3:7
 affirmed [1] - 3:13
 afraid [1] - 107:10
 afternoon [4] - 66:2, 66:10, 81:3, 81:4
 afterwards [1] - 34:17
 age [1] - 98:4
 agency [1] - 19:12
 agent [10] - 21:2, 21:3, 21:6, 33:6, 34:15, 54:12, 87:10, 111:8, 113:18, 113:19
 ago [1] - 20:8
 agree [4] - 84:14, 84:18, 99:20, 102:14
 agreement [41] - 12:8, 22:24, 36:8, 36:11, 37:5, 38:18, 39:2, 40:15, 40:20, 40:22, 41:1, 41:5, 41:16, 44:8, 44:9, 44:11, 57:24, 58:1, 61:20, 77:21, 77:24, 78:1, 78:2, 78:12, 79:2, 79:9, 85:19, 95:16, 100:17, 102:13, 102:15, 104:18, 105:6, 105:9, 105:15, 112:24, 113:15, 113:17, 118:12, 118:17
 agreements [19] - 12:5, 13:9, 22:21, 23:8, 54:9, 54:15, 60:18, 78:15, 91:9, 100:20, 103:4, 103:14, 103:20, 103:22, 104:17, 105:1, 105:19, 105:23, 107:19
 ahead [5] - 36:6, 57:21, 61:15, 76:19, 104:15
 aims [1] - 9:4
 Airport [19] - 9:20, 9:22, 10:1, 10:2, 10:3, 18:13, 18:22, 19:6, 19:16, 19:18, 26:17, 32:1, 84:16, 89:7, 90:20, 91:25, 93:4, 93:7, 107:15
 Al [2] - 25:4, 25:7
 Alaska [1] - 102:19
 Alec [5] - 25:4, 25:13, 25:14, 34:9
 allow [10] - 6:2, 9:7, 16:13,

33:20, 34:2, 43:11, 53:13, 67:15, 77:20, 79:16
 allowed [2] - 8:9, 32:11
 allows [1] - 11:8
 alluded [2] - 96:17, 110:19
 almost [1] - 75:6
 ambush [1] - 29:20
 Ambush [162] - 1:11, 20:2, 20:4, 20:5, 20:12, 20:20, 20:21, 21:18, 22:2, 22:10, 22:13, 23:22, 24:5, 26:18, 26:20, 27:7, 27:8, 27:15, 28:1, 28:7, 28:10, 30:3, 30:19, 30:22, 31:2, 32:19, 32:22, 32:24, 33:2, 33:3, 33:13, 33:16, 34:3, 34:6, 34:12, 34:14, 34:18, 34:19, 35:4, 35:6, 35:18, 37:11, 40:20, 40:23, 41:5, 41:8, 41:15, 41:20, 42:7, 42:24, 43:17, 43:18, 43:24, 44:9, 44:12, 45:1, 45:9, 45:11, 45:12, 46:5, 46:13, 47:5, 50:23, 51:5, 51:7, 53:5, 53:11, 53:14, 54:4, 54:7, 54:9, 55:17, 55:20, 59:17, 59:25, 60:16, 61:1, 62:2, 62:17, 62:20, 63:16, 66:24, 68:10, 68:17, 68:21, 69:16, 70:16, 70:21, 71:4, 71:5, 73:2, 74:11, 74:19, 75:11, 75:22, 76:7, 76:25, 77:16, 79:5, 79:16, 80:1, 80:7, 80:10, 83:22, 84:2, 84:11, 86:7, 86:12, 86:16, 86:21, 87:6, 87:8, 88:2, 88:5, 88:8, 88:11, 88:14, 88:21, 89:3, 89:19, 89:22, 90:12, 90:14, 91:13, 94:16, 94:22, 95:2, 95:13, 96:19, 96:22, 97:4, 97:9, 97:23, 98:6, 98:11, 99:8, 99:22, 100:1, 101:6, 101:12, 101:19, 105:7, 105:14, 105:19, 105:23, 106:3, 107:10, 109:12, 111:8, 111:14, 112:23, 113:10, 113:14, 116:8, 116:18, 116:23, 117:15, 118:15, 118:16
 Ambush's [6] - 35:12, 57:25, 86:14, 112:23, 115:16, 118:11
 America [2] - 64:18, 102:19
 American [59] - 6:11, 6:12, 6:14, 6:16, 6:23, 6:24, 7:3, 7:8, 7:22, 7:23, 8:9, 8:21, 9:12, 11:7, 11:12, 12:6, 14:6, 14:17, 15:2, 15:13, 16:9, 16:23, 17:3, 17:8, 17:11, 17:24, 17:25, 18:1, 22:23,

23:6, 23:8, 25:21, 27:6, 27:10, 27:13, 27:14, 44:7, 46:14, 51:8, 55:8, 57:24, 62:16, 69:12, 77:25, 81:6, 81:13, 81:18, 81:22, 82:1, 82:5, 82:16, 83:12, 90:13, 96:18, 96:21, 102:2, 102:18, 104:19, 105:12
 Americans [2] - 19:4, 92:14
 amount [27] - 12:10, 12:18, 36:22, 37:14, 38:5, 38:6, 63:18, 63:19, 64:20, 68:11, 69:23, 69:24, 70:2, 70:14, 71:1, 71:3, 71:7, 74:1, 75:2, 75:8, 75:16, 75:24, 76:1, 76:4, 100:19, 115:9, 115:11
 amounts [1] - 55:19
 Angel [2] - 1:4, 1:7
 answer [12] - 29:19, 31:19, 34:13, 42:1, 42:2, 42:22, 53:13, 95:19, 110:9, 110:13, 110:25
 Answer [1] - 111:2
 answered [4] - 32:5, 33:18, 34:1, 41:1
 answers [1] - 41:25
 anticipated [1] - 5:17
 antiterrorism [1] - 26:11
 Antonio [2] - 1:5, 114:3
 anyway [1] - 47:23
 appear [1] - 58:21
 appearance [2] - 91:19, 93:4
 appeared [1] - 91:24
 apply [1] - 58:15
 approach [2] - 4:21, 113:7
 approached [1] - 93:18
 approaching [1] - 31:11
 appropriate [1] - 28:22
 appropriately [2] - 56:5, 62:11
 approval [1] - 56:9
 approved [4] - 42:23, 58:10, 99:7, 99:23
 approves [2] - 101:13
 approving [1] - 114:11
 April [3] - 70:18, 75:3, 91:14
 Arabia [1] - 92:14
 area [1] - 9:18
 argue [2] - 56:18, 56:20
 Arias [71] - 1:23, 2:5, 4:16, 4:19, 4:23, 5:8, 5:14, 5:16, 5:20, 5:24, 17:13, 17:16, 20:13, 21:12, 24:6, 30:7, 31:16, 32:5, 33:18, 34:1, 34:25, 35:5, 37:2, 39:23, 40:25, 41:21, 42:10, 43:2, 43:6, 46:22, 49:20, 53:9, 54:17, 55:22, 56:13, 56:18, 60:8, 65:24, 67:14, 69:19,

72:16, 76:16, 77:6, 77:18, 78:9, 79:18, 80:25, 81:2, 81:9, 81:11, 87:19, 87:21, 87:24, 87:25, 95:23, 102:22, 104:8, 104:10, 106:9, 107:23, 110:12, 110:17, 111:17, 111:18, 112:17, 116:1, 116:24, 118:1, 118:2, 118:6, 118:19

Arias-marxuach [64] - 1:23, 4:16, 4:19, 4:23, 5:8, 5:14, 5:20, 5:24, 17:13, 17:16, 20:13, 21:12, 24:6, 30:7, 31:16, 32:5, 33:18, 34:1, 34:25, 35:5, 37:2, 39:23, 40:25, 41:21, 42:10, 43:2, 43:6, 46:22, 49:20, 53:9, 54:17, 55:22, 56:13, 56:18, 60:8, 65:24, 67:14, 69:19, 72:16, 76:16, 77:6, 77:18, 78:9, 79:18, 81:2, 81:9, 81:11, 87:21, 87:24, 87:25, 95:23, 102:22, 104:8, 104:10, 106:9, 107:23, 110:12, 110:17, 111:18, 116:1, 116:24, 118:2, 118:6, 118:19

Arias-marxuach.......81.......
..........118 [1] - 2:5
arrangement [2] - 36:21, 90:9
aside [2] - 41:11, 41:15
assist [2] - 34:12, 89:22
assistance [1] - 32:22
assisted [1] - 34:7
assisting [1] - 67:9
associated [1] - 82:4
association [1] - 81:25
assume [6] - 35:21, 71:15, 74:11, 75:21, 76:12, 114:2
assumed [2] - 36:21, 44:14
Assumes [3] - 39:23, 55:22, 60:8
assuming [1] - 98:6
assurance [1] - 24:20
assure [1] - 57:22
assured [3] - 21:18, 22:10, 62:9
attack [1] - 78:20
attacks [3] - 18:17, 18:19, 19:3
attempted [1] - 98:24
attempting [1] - 53:18
attempts [1] - 52:17
attorney [49] - 12:19, 13:7, 22:18, 22:25, 23:11, 23:15, 23:16, 23:17, 23:20, 23:23, 26:6, 32:23, 33:1, 33:5, 33:9, 34:8, 34:15, 36:2, 36:4, 36:15, 37:9, 51:8, 51:12,

51:18, 52:9, 52:10, 53:6, 53:14, 54:16, 56:15, 76:25, 78:13, 78:16, 78:23, 79:11, 85:11, 87:9, 91:7, 91:10, 91:13, 91:17, 92:11, 94:16, 94:20, 105:10, 106:12, 106:17, 108:11
Attorney [4] - 107:7, 108:4, 108:10, 108:21
attorney's [1] - 85:12
attorneys [33] - 7:25, 11:11, 11:13, 11:23, 11:25, 12:1, 12:3, 12:11, 12:14, 12:16, 12:24, 13:12, 13:14, 14:15, 19:14, 23:6, 24:21, 24:23, 33:9, 33:24, 34:22, 35:3, 42:20, 44:20, 44:22, 44:23, 78:17, 89:22, 102:17, 102:18, 103:1, 103:4
Attorneys [1] - 102:24
attorneys' [4] - 17:5, 109:23, 110:7, 110:20
audit [1] - 83:13
August [11] - 37:11, 38:12, 39:7, 39:20, 40:3, 40:4, 50:7, 58:10, 59:2, 65:1, 69:22
authority [2] - 114:7, 114:10
authorized [2] - 23:12, 33:2
authorizes [1] - 23:18
Avenue [1] - 1:24
avoid [1] - 104:2
awards [1] - 100:18
aware [1] - 108:10

**B**

babies [1] - 4:2
background [2] - 18:14, 35:11
balance [1] - 100:5
Baltimore [1] - 20:9
bar [3] - 4:16, 4:22, 6:4
barrio [1] - 114:17
based [8] - 20:16, 39:6, 41:24, 90:5, 91:7, 91:8, 94:3, 109:16
Based [1] - 20:18
became [6] - 4:4, 18:24, 20:6, 33:4, 33:12, 37:18
become [2] - 8:10, 33:11
beforehand [2] - 11:23, 44:17
befriended [1] - 20:7
begin [3] - 18:15, 20:20, 59:6
beginning [4] - 1:15, 19:20, 48:9, 54:22
begins [1] - 4:22
behalf [19] - 3:13, 9:8,

17:10, 19:22, 21:6, 23:18, 23:20, 26:14, 35:23, 46:4, 46:14, 54:11, 80:14, 84:19, 84:22, 84:25, 91:7, 91:24, 93:6
belabor [1] - 10:6
belongs [1] - 116:22
benefit [2] - 76:22, 76:24
Berg [3] - 81:3, 81:7, 81:8
Berganzo [14] - 1:4, 1:4, 31:13, 84:19, 84:23, 90:23, 94:17, 95:12, 103:10, 104:19, 104:23, 106:4, 114:3
Berganzo-colon [1] - 1:4
Berganzo-cruz [3] - 103:10, 104:19, 104:23
Berganzos [4] - 90:18, 95:25, 100:10, 105:18
Berganzos' [1] - 117:18
best [6] - 52:17, 61:23, 78:25, 79:12, 119:12
Bet [1] - 19:11
between [24] - 15:1, 15:11, 16:9, 16:21, 20:19, 22:22, 31:6, 37:6, 38:18, 39:7, 40:5, 40:23, 58:1, 84:11, 86:22, 87:2, 88:21, 90:6, 90:12, 104:18, 105:11, 105:12, 106:3, 116:8
Between [1] - 19:10
beyond [1] - 49:2
big [2] - 13:3, 102:7
biggest [1] - 92:22
bill [2] - 9:1, 41:13
billable [1] - 41:12
billing [1] - 28:11
billion [2] - 10:7, 40:9
bills [7] - 17:8, 17:10, 27:13, 28:14, 41:9, 41:13, 41:14
bind [1] - 105:10
bit [2] - 13:6, 31:14
block [2] - 47:23, 47:24
board [3] - 22:12, 22:19, 37:22
Bodansky [1] - 18:24
bodies [1] - 78:21
bonus [5] - 41:19, 41:23, 42:7, 43:4, 43:15
bookkeeping [1] - 83:18
bore [1] - 96:9
Borges [2] - 53:4, 53:19
bother [3] - 110:8, 110:10, 111:4
bothers [1] - 111:6
bottom [1] - 65:16
Boulevard [1] - 4:8
Box [1] - 1:20
Brathwaite [1] - 119:18
Brathwatie [1] - 119:10

break [3] - 48:13, 95:24, 112:3
briefly [6] - 49:15, 49:23, 111:19, 112:9, 118:1, 118:2
briefs [1] - 44:21
bring [6] - 8:1, 8:11, 9:7, 22:11, 22:19, 32:11
bringing [3] - 19:22, 34:9, 78:21
brings [1] - 108:11
British [2] - 25:21, 92:7
brought [3] - 25:25, 62:16, 63:16
Building [1] - 119:19
built [1] - 31:5
Burling [3] - 24:15, 32:14, 91:21
business [1] - 38:2
businesses [1] - 68:21
buzon [1] - 114:15
Buzon [1] - 114:15

**C**

C3 [1] - 82:18
campuses [2] - 15:23, 16:1
cancer [1] - 4:24
cannot [1] - 35:1
cap [1] - 36:13
capable [2] - 35:19, 42:19
capacity [2] - 22:16, 51:19
care [1] - 4:1
carry [2] - 30:1, 79:10
Case [1] - 1:9
case [78] - 18:12, 18:20, 18:21, 24:18, 24:19, 26:2, 27:5, 28:1, 32:16, 32:20, 34:9, 34:11, 34:12, 34:15, 35:16, 35:20, 35:21, 36:16, 36:25, 37:7, 38:21, 42:8, 43:20, 43:21, 44:15, 44:24, 45:2, 52:22, 56:8, 62:12, 62:14, 62:20, 62:25, 63:10, 67:19, 78:4, 80:5, 84:3, 86:8, 89:9, 90:20, 91:4, 91:22, 92:1, 92:4, 92:7, 92:9, 92:13, 93:4, 93:7, 93:9, 93:12, 93:17, 93:23, 94:2, 95:2, 95:14, 96:6, 96:21, 97:3, 97:7, 99:15, 101:19, 101:24, 102:9, 108:21, 109:24, 110:7, 113:23, 113:24, 114:1, 116:17
cases [49] - 8:4, 9:10, 9:14, 9:16, 9:19, 10:4, 10:5, 10:6, 10:14, 10:17, 11:5, 11:10, 11:13, 11:17, 11:19, 11:24, 13:10, 13:11, 13:12, 13:19, 13:23, 14:6, 18:19, 18:22, 19:5, 24:25, 25:1, 25:2, 25:3,

26:11, 26:12, 26:14, 34:21, 35:23, 41:10, 45:1, 68:21, 68:24, 73:10, 89:6, 89:13, 89:16, 89:20, 89:23, 98:2, 115:5, 115:7
cashed [2] - 68:8, 68:9
causing [1] - 8:20
center [4] - 21:7, 54:15, 78:14, 107:19
Center[242] - 5:10, 6:11, 6:12, 6:14, 6:16, 6:23, 6:24, 7:1, 7:3, 7:8, 7:22, 7:23, 9:12, 10:8, 11:12, 12:6, 13:9, 13:10, 13:19, 13:24, 13:25, 14:2, 14:6, 14:8, 14:17, 14:25, 15:2, 15:13, 15:18, 15:20, 16:3, 16:9, 16:10, 16:23, 17:3, 17:7, 17:8, 17:9, 17:11, 17:24, 17:25, 18:1, 18:2, 19:25, 20:20, 20:21, 20:22, 21:2, 21:8, 22:17, 22:20, 22:23, 22:24, 23:8, 23:24, 24:5, 24:12, 26:14, 26:22, 27:6, 27:7, 27:10, 27:11, 27:13, 27:14, 27:19, 28:2, 28:3, 29:20, 30:15, 31:12, 32:8, 32:18, 33:8, 34:5, 35:15, 35:17, 35:24, 36:3, 36:14, 36:19, 40:19, 40:23, 40:24, 41:11, 41:14, 43:10, 43:19, 43:24, 44:7, 44:10, 45:4, 45:9, 45:11, 45:13, 46:4, 46:11, 46:14, 51:8, 51:19, 52:15, 52:16, 54:8, 54:11, 55:8, 55:13, 55:14, 57:1, 57:3, 57:24, 59:15, 60:7, 60:13, 60:17, 60:21, 60:24, 61:19, 61:21, 62:7, 62:16, 62:18, 63:17, 64:10, 67:7, 67:24, 68:22, 68:25, 69:8, 69:11, 69:12, 74:20, 76:20, 76:22, 77:4, 77:21, 77:25, 78:24, 79:2, 79:4, 79:9, 80:4, 81:6, 81:13, 81:16, 81:18, 81:20, 81:22, 82:1, 82:5, 82:7, 82:11, 82:16, 82:17, 83:12, 83:18, 84:3, 84:10, 86:15, 86:17, 86:19, 86:22, 87:6, 87:16, 87:18, 88:1, 88:4, 88:8, 88:11, 89:4, 89:17, 89:19, 89:23, 90:2, 90:3, 90:13, 90:17, 90:19, 91:8, 92:6, 92:14, 94:8, 96:18, 96:21, 97:1, 97:25, 99:17, 100:3, 100:8, 100:12, 100:17, 100:19, 100:25, 101:12, 101:14, 101:17, 101:22, 101:24, 102:2, 102:15, 104:19, 105:12, 106:17, 106:21, 107:4, 107:9,

107:11, 107:25, 108:5, 108:18, 108:24, 109:1, 109:8, 109:15, 109:20, 109:23, 110:2, 110:6, 110:19, 111:7, 111:13, 113:17, 113:19, 113:23, 114:5, 115:5, 115:6, 115:12, 115:15, 115:24, 116:8, 116:12, 116:13, 116:16, 117:10, 117:18
center's [2] - 82:14, 99:21
Center's [6] - 8:6, 52:9, 64:18, 101:10, 107:18, 115:25
centers [1] - 17:6
certain [6] - 13:10, 31:2, 31:5, 37:14, 38:5, 114:14
Certainly[1] - 39:10
certainly [11] - 8:7, 12:5, 16:24, 17:3, 27:9, 27:18, 37:18, 39:20, 53:5, 64:9, 79:7
Certificate[1] - 119:7
certify [1] - 119:10
changed [1] - 7:2
charge [1] - 12:16
charging [1] - 41:10
charity [1] - 30:23
check [54] - 27:22, 28:10, 28:16, 30:3, 46:16, 46:18, 48:1, 48:7, 48:9, 48:23, 48:25, 49:3, 49:12, 50:2, 50:4, 50:7, 50:13, 50:14, 64:25, 65:3, 65:6, 66:16, 66:19, 66:21, 66:23, 67:20, 68:8, 68:11, 68:18, 69:4, 69:8, 69:17, 69:25, 70:5, 70:12, 71:3, 71:7, 71:17, 72:2, 72:12, 72:22, 72:25, 73:2, 73:14, 74:2, 74:14, 74:18, 75:2, 85:10, 85:12
Check[8] - 65:1, 65:5, 65:20, 65:24, 71:19, 72:15, 73:12, 74:1
Checks[1] - 48:18
checks [29] - 41:7, 45:18, 46:3, 46:6, 46:12, 46:21, 46:24, 47:2, 47:3, 47:4, 47:17, 48:10, 50:10, 52:1, 64:23, 72:17, 75:10, 84:9, 84:15, 84:19, 84:22, 84:25, 85:3, 85:4, 85:22, 86:2, 86:6, 86:11
Checks..48...48 [1] - 2:9
children [2] - 4:1, 7:17
chosen [2] - 80:2, 111:11
chronological [2] - 47:19, 49:6
circumstances [1] - 105:22
citizen [1] - 25:21

citizens [6] - 8:9, 8:21, 11:6, 11:7, 102:20
City[1] - 15:5
Civil[28] - 6:11, 6:13, 6:14, 6:16, 7:1, 7:3, 14:25, 22:23, 23:9, 69:9, 69:11, 81:6, 81:13, 81:16, 81:19, 81:22, 82:1, 82:5, 82:17, 82:18, 83:12, 83:13, 84:10, 90:13, 96:18, 96:22, 102:3, 104:19
civil [3] - 8:11, 15:22, 15:24
claim [5] - 18:13, 19:18, 21:5, 32:17, 37:25
claim/center [1] - 118:12
claimant [9] - 22:24, 61:20, 79:2, 79:9, 91:8, 104:22, 105:12, 107:19, 113:17
claimant/center [14] - 95:16, 100:20, 102:12, 102:14, 103:4, 103:14, 103:20, 103:22, 104:16, 104:18, 105:1, 105:15, 113:15, 118:17
claimants [64] - 8:1, 9:6, 9:9, 9:17, 12:8, 12:18, 19:23, 21:4, 21:20, 21:24, 22:1, 22:3, 22:12, 22:22, 23:13, 23:15, 23:19, 24:12, 24:15, 33:5, 33:10, 33:11, 33:13, 34:23, 35:25, 36:15, 39:6, 40:12, 51:11, 52:16, 54:10, 54:15, 57:22, 58:1, 59:17, 59:20, 60:6, 60:15, 60:19, 60:20, 60:24, 61:18, 62:5, 63:24, 63:25, 64:2, 76:23, 77:22, 78:15, 78:25, 80:9, 97:24, 98:16, 99:14, 105:13, 107:11, 108:15, 109:9, 109:16, 109:20, 109:23, 110:3, 111:5
claimants' [1] - 110:20
claimed [2] - 67:2, 87:8
claims [15] - 14:15, 33:15, 37:15, 37:16, 38:1, 39:16, 39:21, 40:10, 56:6, 57:1, 67:12, 95:5, 99:7, 99:24, 100:21
clear [2] - 72:17, 95:24
Clerk[3] - 48:19, 49:7, 112:2
clients [3] - 77:2, 85:6, 114:8
close [1] - 13:23
collect [3] - 10:9, 14:2, 14:3
collected [4] - 11:20, 13:21, 13:24, 15:14
collection [3] - 13:13, 15:15, 16:25
college [2] - 15:23, 15:25
Collet [2] - 25:4, 25:7,

25:18, 34:9, 56:8
Collete[1] - 25:9
colon [1] - 1:4
Columbia[2] - 96:23, 97:2
combination [2] - 31:1, 94:4
coming [5] - 44:7, 62:2, 62:4, 80:15, 117:25
commissioned [1] - 107:4
common [1] - 106:12
communicate [2] - 60:16, 97:21
communicated [1] - 91:3
communication [2] - 60:3, 94:21
communications [1] - 60:18
community [2] - 14:10, 106:22
companies [1] - 38:3
compared [1] - 44:9
compensate [2] - 27:7, 40:10
compensated [2] - 27:9, 57:4
compensation [12] - 27:16, 42:22, 42:24, 43:4, 43:16, 44:3, 55:6, 55:10, 55:19, 58:3, 58:23, 60:14
compensations [1] - 55:9
Compilation[1] - 48:18
complaint [15] - 9:8, 19:18, 32:11, 32:21, 32:24, 33:14, 33:17, 33:25, 58:18, 58:22, 91:14, 98:8, 98:9, 98:13, 98:15
complied [1] - 87:16
components [1] - 8:24
concept [1] - 85:24
concern [2] - 56:2, 56:4
concerned [1] - 55:16
conclude [1] - 112:10
concluded [2] - 52:22, 118:22
confided [1] - 20:10
congregational [3] - 7:13, 7:15, 20:9
Congress[1] - 27:2
congressional [1] - 18:25
connection [2] - 83:24, 89:20
consequence [1] - 110:6
consider [1] - 28:17
considered [1] - 87:10
considering [2] - 19:17, 94:18
consult [3] - 95:12, 95:25, 96:2
consultant [1] - 6:7
consulted [5] - 9:15, 18:23,

19:4, 19:7, 95:18
  **contact** [6] - 21:22, 59:20, 98:19, 107:7, 108:18, 114:7
  **contacted** [1] - 108:15
  **contain** [1] - 51:2
  **contained** [1] - 119:11
  **contents** [1] - 52:5
  **contingency** [1] - 36:12
  **continue** [9] - 16:14, 23:5, 27:20, 29:14, 38:1, 41:24, 79:17, 79:24, 80:1
  **Continue** [1] - 17:18
  **Continued** [1] - 29:16
  **continues** [1] - 27:8
  **contractor** [4] - 87:11, 87:15, 88:15, 88:19
  **contributes** [1] - 14:7
  **conversations** [1] - 60:18
  **conviction** [1] - 94:4
  **convince** [1] - 94:1
  **convinced** [1] - 10:25
  **Copies** [3] - 2:9, 46:17, 48:18
  **copy** [3] - 46:18, 49:20, 52:5
  **corporations** [2] - 82:19, 82:22
  **correct** [241] - 3:22, 4:1, 7:20, 9:23, 10:13, 10:15, 11:22, 15:8, 21:10, 22:15, 25:15, 26:23, 26:24, 27:25, 28:12, 29:21, 29:22, 38:12, 38:13, 58:11, 58:12, 59:14, 59:23, 59:24, 62:23, 63:8, 64:22, 67:13, 69:13, 69:17, 69:18, 70:1, 70:3, 70:17, 70:19, 70:20, 71:8, 73:17, 73:18, 73:24, 75:13, 81:14, 81:16, 81:17, 81:23, 81:24, 82:8, 82:12, 82:13, 82:15, 82:20, 82:25, 83:2, 83:3, 83:6, 83:7, 83:9, 83:10, 83:15, 83:16, 83:20, 83:21, 83:24, 83:25, 84:5, 84:6, 84:12, 84:13, 84:16, 84:17, 84:20, 84:23, 84:24, 85:1, 85:2, 85:8, 85:9, 85:12, 85:14, 85:16, 85:17, 85:25, 86:1, 86:4, 86:5, 86:8, 86:9, 86:12, 86:13, 86:17, 86:23, 87:12, 88:16, 88:17, 88:20, 88:23, 88:24, 89:4, 89:5, 89:7, 89:14, 90:3, 90:4, 90:7, 90:10, 90:15, 90:23, 90:24, 91:2, 91:4, 91:5, 91:12, 91:15, 91:16, 91:19, 91:20, 91:22, 91:23, 92:1, 92:2, 92:4, 92:5, 92:8, 92:11, 92:12, 92:15, 92:18, 92:23, 92:24, 93:2, 93:5, 93:8,

93:11, 93:13, 93:14, 93:24, 94:5, 94:9, 94:10, 94:14, 94:17, 94:23, 95:2, 95:3, 95:7, 95:8, 95:11, 95:14, 95:25, 96:1, 96:3, 96:4, 96:6, 96:7, 96:11, 96:12, 96:19, 96:20, 96:24, 96:25, 97:4, 97:9, 97:10, 97:12, 97:13, 97:15, 97:19, 97:20, 97:22, 98:8, 98:10, 98:16, 98:21, 99:10, 99:12, 99:15, 99:16, 99:18, 99:19, 99:24, 99:25, 100:3, 100:4, 100:9, 100:13, 100:16, 100:22, 101:7, 101:8, 101:15, 101:16, 101:20, 102:16, 104:20, 104:21, 104:23, 104:24, 105:1, 105:4, 105:15, 105:16, 105:19, 105:20, 105:24, 105:25, 106:4, 106:5, 106:19, 106:20, 106:23, 106:24, 107:1, 107:8, 107:25, 108:5, 108:6, 108:8, 108:9, 108:12, 108:13, 108:16, 108:17, 108:25, 109:5, 109:6, 109:9, 109:10, 109:14, 110:3, 114:6, 115:13, 115:14, 116:9, 116:10, 116:14, 116:15, 116:18, 116:19, 117:20, 117:23, 117:24
  **Correct** [1] - 105:5
  **correctly** [1] - 107:3
  **Cost** [1] - 73:6
  **counsel** [3] - 34:4, 48:21, 49:16
  **Counsel** [1] - 17:18
  **count** [1] - 73:23
  **counterterrorism** [1] - 19:1
  **countries** [1] - 8:12
  **couple** [1] - 47:16
  **course** [6] - 7:18, 11:4, 28:9, 36:20, 40:18, 116:20
  **court** [24] - 5:7, 6:19, 29:1, 51:14, 62:5, 62:25, 63:3, 63:9, 85:6, 87:20, 94:13, 97:7, 97:8, 97:12, 97:14, 99:7, 99:11, 99:21, 101:7, 101:13, 102:4, 116:21, 116:22, 117:2
  **Court** [118] - 1:1, 3:2, 3:9, 3:14, 4:21, 5:2, 5:12, 6:1, 16:13, 16:16, 17:18, 20:14, 21:13, 24:7, 28:19, 28:25, 29:6, 29:8, 29:13, 30:8, 31:18, 33:19, 34:2, 35:1, 35:10, 37:3, 38:17, 38:24, 39:1, 39:25, 41:2, 41:23, 42:13, 43:8, 43:11, 43:15, 45:21, 46:17, 47:13, 47:20,

47:25, 48:4, 48:12, 48:21, 49:5, 49:8, 49:11, 49:15, 49:22, 49:24, 50:10, 50:17, 53:13, 54:20, 54:23, 55:24, 56:22, 60:11, 61:3, 61:12, 62:24, 63:4, 63:6, 63:7, 64:13, 64:15, 65:6, 65:16, 66:1, 66:6, 66:9, 67:15, 68:1, 68:15, 70:7, 71:8, 71:22, 72:5, 72:7, 72:11, 72:19, 73:19, 76:17, 77:9, 77:20, 78:10, 79:20, 80:17, 80:21, 80:24, 81:8, 87:19, 87:22, 95:19, 96:23, 97:2, 101:22, 110:13, 111:2, 111:15, 111:17, 112:4, 112:9, 112:13, 112:19, 116:3, 117:1, 117:6, 117:9, 117:11, 117:15, 118:1, 118:3, 118:20, 119:1, 119:18, 119:19
  **courts** [1] - 56:9
  **cousin** [2] - 20:25, 21:4
  **covering** [1] - 84:11
  **Covington** [3] - 24:15, 32:14, 91:21
  **create** [1] - 18:17
  **created** [2] - 8:18, 36:8
  **credentials** [2] - 26:6, 44:24
  **credit** [1] - 35:18
  **cross** [2] - 48:1, 80:20
  **Cross** [3] - 2:2, 80:17, 81:1
  **cross-examination** [1] - 80:20
  **Cross-examination** [1] - 81:1
  **crossed** [1] - 118:15
  **cruz** [3] - 103:10, 104:19, 104:23
  **cut** [2] - 28:20, 71:10

## D

  **damages** [1] - 9:2
  **Danny** [2] - 32:23, 34:4
  **dark** [2] - 60:17, 60:22
  **date** [6] - 67:11, 69:21, 70:5, 70:25, 74:14, 75:24
  **dated** [3] - 46:18, 75:8, 75:15
  **dates** [1] - 82:1
  **David** [4] - 1:19, 1:19, 19:8, 108:24
  **days** [2] - 53:21, 69:16
  **Dc** [18] - 63:5, 63:10, 64:15, 96:19, 97:7, 97:12, 97:14, 99:7, 99:11, 99:15, 99:21, 101:7, 101:11, 101:18, 102:4, 102:9, 111:12, 116:8

  **dead** [1] - 78:20
  **deal** [7] - 11:9, 14:11, 15:4, 44:16, 52:25, 53:4, 78:20
  **dealing** [1] - 52:23
  **deals** [1] - 15:24
  **dean** [1] - 7:15
  **death** [3] - 58:4, 95:6, 97:18
  **deceived** [2] - 77:16, 80:11
  **December** [12] - 50:22, 51:6, 53:23, 54:22, 77:25, 94:24, 95:1, 95:4, 96:11, 105:17
  **december** [1] - 51:5
  **decide** [2] - 8:4, 76:10
  **decided** [1] - 95:1
  **decision** [4] - 76:23, 79:12, 90:12, 95:10
  **decisions** [1] - 91:6
  **declined** [3] - 93:19, 93:20, 93:22
  **deduct** [5] - 86:19, 87:6, 87:9, 87:18, 88:1
  **Defendant** [2] - 1:11, 1:25
  **defendant** [2] - 70:20, 117:12
  **defended** [1] - 25:1
  **defense** [1] - 49:16
  **defined** [2] - 9:16, 23:9
  **definite** [1] - 38:6
  **del** [2] - 65:23, 102:20
  **deliver** [1] - 94:22
  **delivered** [5] - 97:4, 99:6, 100:1, 100:2, 100:8
  **denied** [3] - 97:14, 99:11, 99:21
  **denying** [1] - 98:6
  **Department** [1] - 39:8
  **department** [5] - 73:11, 97:8, 97:9, 99:6, 99:24
  **deposed** [1] - 76:13
  **deposited** [3] - 71:5, 75:11, 85:10
  **described** [3] - 9:2, 9:24, 10:23
  **deserved** [1] - 13:1
  **designed** [2] - 23:6, 26:18
  **determine** [6] - 24:1, 27:3, 43:15, 58:16, 62:6, 116:22
  **determined** [10] - 30:13, 40:6, 40:8, 40:11, 42:25, 43:1, 43:5, 44:2, 58:7, 61:20
  **devotes** [1] - 5:10
  **died** [1] - 79:3
  **difference** [2] - 101:1, 115:8
  **different** [30] - 6:25, 9:6, 9:8, 9:10, 9:14, 9:16, 9:17, 10:6, 11:14, 12:4, 13:8, 15:4, 18:17, 18:19, 19:5, 20:22, 21:23, 21:25, 23:13, 24:6,

35:8, 36:15, 58:1, 60:19,
62:4, 71:25, 72:9, 82:9
difficult [2] - 4:13, 24:19
difficulties [3] - 5:18,
20:11, 71:18
difficulty [1] - 104:7
Direct [3] - 2:2, 3:16, 29:16
direct [1] - 29:14
directly [7] - 17:5, 23:13,
50:13, 52:20, 100:25,
105:11, 108:15
director [3] - 18:25, 82:10,
82:12
disabilities [1] - 7:17
disability [1] - 88:12
disappointment [1] - 27:17
disbursed [4] - 63:23,
63:25, 64:1, 64:5
disbursements [2] - 67:4,
85:7
discounted [1] - 12:7
discuss [2] - 29:1, 55:18
discussed [4] - 8:7, 19:21,
20:1, 105:22
discussion [2] - 4:22, 6:4
discussions [2] - 39:10,
42:21
dismissed [4] - 39:16, 56:7,
78:4, 80:6
distributed [9] - 38:9,
40:11, 56:5, 56:10, 61:10,
62:7, 62:11, 74:13, 75:23
distributing [1] - 39:19
District [11] - 1:1, 1:1, 63:4,
63:6, 63:7, 64:15, 96:23,
97:2, 119:1, 119:19
disturbed [1] - 78:11
disturbing [1] - 79:15
Dla [2] - 92:16, 92:21
doable [1] - 11:25
Doctor [4] - 106:7, 106:10,
106:14, 118:20
document [9] - 51:11,
51:17, 52:5, 52:8, 58:14,
59:11, 84:4, 113:2
documents [7] - 23:1, 23:3,
38:14, 51:4, 59:6, 91:11,
104:12
dollar [2] - 28:16, 100:25
dollars [7] - 10:8, 13:11,
78:4, 78:5, 78:7, 80:9,
117:21
donate [1] - 15:16
donated [1] - 14:8
donates [1] - 16:5
done [13] - 12:25, 26:1,
39:14, 50:16, 52:18, 54:19,
59:17, 75:6, 111:13, 111:14,
111:16, 111:18
double [8] - 49:2, 49:3,

49:4, 49:12, 50:6, 50:11,
50:12, 69:2
doubtful [1] - 36:18
down [17] - 11:25, 22:18,
39:9, 39:15, 43:19, 43:25,
44:6, 53:2, 53:18, 53:22,
53:23, 55:17, 67:3, 76:14,
76:21, 80:15, 95:24
Dr [15] - 3:6, 3:21, 46:1,
47:16, 50:21, 72:14, 80:16,
81:3, 81:7, 81:12, 98:1,
106:8, 106:16, 112:16, 118:7
drafted [2] - 102:17, 103:4
drafting [3] - 33:16, 33:23,
33:25
due [2] - 86:3, 100:19
duked [1] - 80:11
during [5] - 27:12, 27:19,
28:13, 87:7, 93:18

E

economic [1] - 16:21
economy [1] - 102:13
education [1] - 15:23
Edwards [1] - 62:22
effect [2] - 8:8, 8:25
efforts [2] - 10:8, 80:7
Effron [1] - 65:8
Efrain [4] - 1:4, 103:10,
104:18, 104:22
Efrain's [1] - 71:23
Efron [131] - 1:19, 1:19, 3:6,
3:10, 3:17, 4:17, 5:5, 5:16,
5:22, 6:5, 16:11, 16:15,
16:17, 17:14, 17:19, 20:17,
21:15, 24:9, 24:10, 28:19,
28:23, 29:5, 29:14, 29:17,
30:11, 31:21, 31:23, 32:6,
33:22, 35:11, 35:14, 37:4,
38:22, 38:25, 39:4, 40:1,
40:2, 41:4, 42:3, 42:4, 42:11,
42:14, 43:3, 43:9, 43:12,
45:22, 45:24, 46:19, 46:23,
47:10, 47:14, 47:23, 48:11,
49:5, 49:9, 49:14, 50:1, 50:5,
50:15, 50:19, 50:20, 51:23,
51:25, 54:23, 54:24, 56:1,
56:20, 56:23, 56:25, 60:9,
60:12, 61:5, 61:13, 61:14,
63:1, 63:2, 64:19, 65:9,
65:18, 65:19, 66:12, 66:13,
67:17, 67:18, 68:2, 68:4,
68:19, 69:20, 70:8, 70:11,
71:9, 71:13, 72:1, 72:13,
72:21, 73:21, 73:23, 73:25,
76:18, 77:10, 77:12, 80:13,
81:7, 81:10, 84:8, 95:20,
102:21, 106:7, 107:20,
108:25, 109:4, 110:14,

111:15, 111:16, 111:19,
111:21, 112:9, 112:11,
112:15, 112:21, 113:7,
113:8, 115:1, 115:3, 116:4,
116:5, 117:4, 117:8, 117:12,
117:14, 118:3
Efron............3..............111
[1] - 2:4
either [4] - 34:24, 90:17,
93:23, 94:3
el [1] - 65:22
Eliezer [2] - 1:6, 90:14
eloquently [1] - 115:23
embarrassed [1] - 78:12
embarrassment [1] - 78:24
empathize [1] - 87:24
employed [1] - 27:11
employee [3] - 86:16,
86:22, 87:14
employer [1] - 87:14
empty [1] - 85:25
end [5] - 37:7, 38:21, 42:7,
49:4, 66:16
ended [2] - 17:2, 60:10
endorse [1] - 70:21
endorsed [5] - 64:25,
70:20, 75:11, 76:6, 76:7
endorsement [11] - 65:10,
65:21, 65:22, 66:17, 68:10,
69:14, 71:14, 71:21, 72:23,
76:2
ends [1] - 6:4
engage [7] - 13:8, 23:16,
23:20, 33:2, 36:4, 53:3,
53:18
engaged [3] - 11:15, 35:17,
37:9
engaging [2] - 23:14, 33:9
Engleberg [20] - 1:14, 2:3,
3:7, 3:12, 3:20, 3:21, 46:1,
47:16, 50:21, 72:14, 80:16,
81:7, 81:8, 81:12, 98:1,
106:6, 106:13, 106:16,
112:16, 118:7
enjoy [1] - 82:22
enriching [1] - 78:17
ensure [1] - 80:6
enter [1] - 93:3
entered [2] - 91:18, 93:10
enterprise [1] - 12:14
enters [2] - 3:1, 29:12
entire [3] - 22:7, 62:2, 80:5
entitled [4] - 57:17, 58:23,
62:10, 101:11
Es [1] - 65:22
escrow [8] - 75:19, 76:5,
85:4, 85:11, 85:15, 85:23,
99:22
Esquire [5] - 1:19, 1:20,
1:23, 1:23, 113:10

establish [1] - 86:6
estate [15] - 52:20, 53:7,
56:6, 56:11, 56:12, 57:5,
57:6, 58:2, 58:8, 58:17,
58:22, 58:24, 95:6, 97:18
Estate [2] - 1:4, 1:5
estates [12] - 52:23, 52:25,
53:1, 53:4, 53:17, 57:4, 57:8,
57:19, 59:4, 64:6, 80:12,
97:3
ethical [2] - 76:20, 79:6
Evd [1] - 2:8
event [3] - 87:5, 103:3,
107:24
eventually [2] - 25:24,
63:15
evidence [13] - 32:15,
39:24, 47:11, 48:6, 55:23,
60:9, 77:23, 79:8, 84:4, 94:1,
103:14, 103:20, 119:11
Evilys [2] - 119:10, 119:18
exact [1] - 53:23
exactly [9] - 14:12, 23:7,
36:1, 37:20, 40:3, 55:4,
57:25, 84:2, 115:4
Exactly [1] - 22:6
examination [4] - 29:15,
80:17, 80:20, 81:1
Examination [4] - 3:16,
29:16, 111:20, 118:5
examined [1] - 3:14
examining [2] - 104:11,
105:3
example [1] - 89:9
examples [1] - 103:23
exception [1] - 82:23
Excerpt [2] - 1:13, 118:22
excess [2] - 10:7, 10:9
excuse [3] - 48:14, 100:6,
112:4
Excuse [7] - 74:3, 74:24,
84:21, 104:6, 106:8, 112:3,
118:13
excused [2] - 118:20,
118:21
executed [4] - 23:12, 58:20,
104:23, 105:24
executive [2] - 14:16, 82:10
executor [1] - 55:14
exempt [1] - 82:18
exercise [1] - 49:19
exhibit [6] - 47:11, 47:20,
47:21, 47:24, 65:14
Exhibit [29] - 2:8, 45:19,
47:11, 47:13, 48:5, 48:7,
48:20, 48:22, 50:6, 50:11,
51:23, 52:4, 64:24, 65:13,
69:2, 70:9, 84:8, 104:5,
104:9, 104:17, 105:4,
107:21, 111:22, 112:13,

112:16, 118:8, 118:15
Exhibits [3] - 2:7, 2:13, 66:14
existed [2] - 6:23, 31:5
exits [1] - 29:7
expand [1] - 41:3
expect [2] - 114:21, 117:7
expected [1] - 66:11
expecting [1] - 4:14
expenses [10] - 12:17, 12:20, 13:20, 14:18, 17:1, 17:5, 30:5, 69:12, 83:9, 115:10
experience [3] - 26:10, 35:25, 56:8
experienced [2] - 11:15, 26:13
expert [1] - 9:18
experts [2] - 9:15, 18:23
explain [5] - 5:5, 13:6, 16:12, 56:24, 77:20
explanation [2] - 18:11, 69:10
explosion [1] - 37:21
expressed [1] - 31:3
extra [1] - 117:22
extremely [1] - 17:1

**F**

fact [19] - 34:21, 76:25, 81:25, 82:9, 84:7, 85:10, 86:10, 87:16, 88:14, 90:1, 90:11, 90:22, 93:15, 94:4, 94:21, 109:12, 114:8, 118:14
facts [7] - 20:16, 38:20, 39:24, 44:16, 44:19, 55:23, 60:9
fair [1] - 90:8
fairly [1] - 36:25
families [13] - 21:9, 31:13, 32:9, 45:8, 91:4, 94:17, 95:18, 100:2, 103:15, 105:18, 106:4, 115:16, 116:12
families' [1] - 100:20
family [14] - 84:20, 84:23, 85:1, 90:23, 91:1, 95:13, 100:2, 101:14, 114:3, 114:4, 117:19, 117:22, 117:23
fancy [3] - 82:6, 82:21, 102:7
far [1] - 58:14
fashion [1] - 86:7
fast [1] - 87:22
father [4] - 20:6, 20:8, 20:10
fax [4] - 112:24, 113:3, 118:11, 118:14
February [4] - 60:25, 61:3,

61:4, 75:9
Federal [4] - 38:10, 38:11, 39:17, 119:19
federally [1] - 53:1
fee [12] - 36:12, 36:21, 37:5, 40:15, 40:19, 40:22, 41:1, 44:9, 44:11, 62:8, 64:18, 117:18
fees [11] - 12:11, 12:19, 13:20, 74:8, 74:20, 75:5, 93:23, 109:24, 110:7, 110:20, 115:10
felt [12] - 8:1, 12:25, 31:2, 36:2, 76:20, 78:6, 78:17, 78:22, 78:24, 79:2, 79:6
few [7] - 7:2, 19:14, 48:2, 48:14, 53:21
field [1] - 35:8
fields [1] - 53:11
fifteen [1] - 66:3
fifteen-minute [1] - 66:3
Fifty [1] - 57:14
fight [1] - 93:13
file [3] - 32:19, 32:24, 33:13, 62:1, 83:4, 94:22
filed [3] - 32:25, 60:7, 60:25, 61:25, 62:18, 91:14, 92:4, 96:18, 108:11
filing [2] - 19:18, 93:12
finance [2] - 16:5, 17:8
financial [1] - 23:10
Financially [1] - 18:4
financing [1] - 17:4
Fine [1] - 28:15
fine [2] - 49:9, 49:10
Finish [1] - 36:7
finish [2] - 29:2, 61:12
finished [2] - 104:11, 104:14
firm [11] - 24:1, 24:11, 24:14, 53:3, 53:17, 91:24, 92:22, 93:6, 93:17, 96:10
firms [10] - 11:14, 13:3, 13:8, 24:22, 54:6, 92:7, 93:18, 93:21, 94:1, 94:5
First [1] - 52:25
first [12] - 7:1, 9:13, 10:18, 12:8, 14:11, 25:16, 33:4, 39:9, 48:22, 71:16, 91:8, 104:4
fit [1] - 93:16
five [5] - 36:12, 57:4, 57:15, 73:19, 80:18
five-minute [1] - 80:18
flabbergasting [1] - 79:25
flexible [1] - 90:9
flight [1] - 37:23
flow [1] - 97:7
follow [1] - 79:1
following [1] - 59:8

follows [1] - 3:15
force [2] - 18:25, 89:17
foregoing [1] - 119:14
foreign [2] - 8:15, 11:7
form [4] - 86:6, 102:15, 103:16, 103:23
fortunate [1] - 12:1
forward [5] - 13:12, 35:20, 36:3, 44:25, 54:14
forwarded [1] - 45:16
foundation [4] - 54:18, 54:21, 56:23, 77:10
founded [2] - 6:24, 11:4
founder [1] - 11:2
founders [2] - 7:9, 81:22
Four [1] - 101:3
four [1] - 56:12
frame [1] - 32:10
Franqui [19] - 83:24, 84:3, 90:20, 91:4, 91:14, 91:22, 92:1, 93:17, 93:23, 96:6, 97:3, 98:8, 98:9, 98:13, 98:15, 101:19, 101:24, 108:8, 115:18
Freese [3] - 1:23, 16:7, 65:22
Freesesouffront [3] - 1:23, 16:7, 65:22
frequency [1] - 18:1
friend [1] - 20:6
front [1] - 50:7
Fuego [1] - 102:20
fulfill [1] - 15:18
fulfilled [1] - 18:10
full [5] - 45:13, 45:14, 83:23
fully [1] - 119:11
functioning [1] - 6:10
funds [8] - 15:14, 17:4, 53:1, 55:19, 86:3, 97:3, 99:6, 99:23

**G**

gaining [1] - 80:8
Garcia [6] - 20:25, 21:4, 21:16, 21:21, 22:10
Gaston [34] - 26:2, 26:4, 26:5, 26:7, 31:24, 34:7, 34:8, 35:15, 35:17, 35:21, 35:22, 36:4, 36:9, 36:13, 36:20, 37:5, 37:9, 37:11, 40:15, 44:12, 67:9, 74:21, 79:14, 79:22, 79:24, 80:2, 86:3, 91:18, 92:3, 92:9, 93:10, 94:19, 94:23
Gaston's [2] - 79:19, 79:21
gather [3] - 19:13, 19:15, 74:21
gathering [1] - 19:9
Gelpi [1] - 1:15

gels [1] - 96:9
generously [1] - 27:11
gentlemen [1] - 66:10
gestures [1] - 85:18
gist [1] - 51:15
given [5] - 14:13, 17:21, 39:13, 40:9, 45:14
glad [2] - 87:24, 107:2
goal [2] - 16:3, 17:6
goals [3] - 14:8, 15:18, 18:10
Gonzales [1] - 71:10
Gonzales-varon [1] - 71:10
Gonzalex [1] - 1:20
Gonzalex-varon [1] - 1:20
Google [1] - 114:22
government [7] - 8:18, 37:14, 38:2, 38:6, 38:8, 39:12, 40:6
Government [4] - 38:10, 38:11, 38:18, 39:18
governments [6] - 6:19, 8:11, 8:13, 8:16, 8:19, 18:18
graduate [2] - 79:15, 79:22
graduated [3] - 4:5, 20:23, 26:7
great [1] - 48:9
grounds [1] - 30:20
group [1] - 78:22
Gustavo [1] - 1:15

**H**

Haley [1] - 19:8
half [2] - 10:7, 13:11
Hamas [2] - 11:4, 11:5
hand [1] - 111:24
handed [2] - 46:15, 52:4
handle [3] - 10:16, 10:17, 53:17
handled [1] - 88:18
handling [4] - 67:24, 68:17, 68:22, 68:25
handwriting [1] - 47:6
Harvard [1] - 26:9
Hato [1] - 1:24
head [34] - 85:19
header [2] - 112:24, 113:3
heads [1] - 54:1
heads-up [1] - 54:1
hear [3] - 42:6, 42:12, 43:13
Hearsay [2] - 20:13, 42:10
hearsay [2] - 42:13, 79:19
heir [2] - 58:22, 58:24
heirs [1] - 58:16
Held [1] - 1:14
held [2] - 8:16, 8:19
help [8] - 16:6, 17:7, 18:1, 19:9, 34:4, 34:5, 34:6, 77:15
helped [2] - 31:3, 43:20

helping [2] - 18:7, 45:4
helps [1] - 16:4
Henry [1] - 1:23
hereby [1] - 119:10
hid [1] - 77:5
hidden [1] - 54:7
Higgins [1] - 18:20
high [1] - 17:2
highly [1] - 26:5
himself [1] - 32:22
hire [2] - 35:15, 53:16
hired [13] - 11:12, 12:24,
20:21, 24:22, 26:2, 33:13,
44:22, 79:14, 79:24, 89:22,
98:19, 106:17, 107:25
hires [1] - 102:7
hmm [3] - 64:8, 99:3, 110:4
hold [1] - 6:19
holding [2] - 55:20, 85:16
Honor [18] - 4:17, 16:7,
28:24, 29:5, 38:25, 40:1,
43:10, 47:12, 48:11, 56:13,
65:18, 67:17, 71:9, 71:11,
72:16, 79:18, 107:20, 115:2
Honorable [1] - 1:15
hoodwinked [1] - 80:10
hostage [2] - 8:20, 55:8
hour [3] - 27:15, 36:11,
41:12
hours [2] - 5:10, 41:12
hundreds [3] - 78:14,
78:15, 104:25

**I**

Id [1] - 2:8
idea [1] - 9:11
identification [4] - 45:21,
45:22, 48:6, 48:19
identified [3] - 21:9, 22:1,
22:9
Identify [1] - 70:7
identify [6] - 9:13, 21:20,
38:23, 50:8, 50:12, 58:23
illegal [2] - 111:13, 111:14
immunity [1] - 8:15
importance [1] - 13:15
important [5] - 12:17,
23:14, 52:24, 53:16, 76:13
impose [1] - 47:15
inception [2] - 18:6, 82:14
includes [1] - 115:9
including [7] - 12:10,
12:19, 18:22, 19:5, 37:10,
57:18
income [2] - 83:2, 83:9
incorporated [1] - 7:2
Incorrect [1] - 86:18
indeed [1] - 36:3
independent [4] - 87:11,

87:15, 88:15, 88:19
Index [2] - 2:1, 2:7
indicates [1] - 113:3
indication [2] - 54:1, 54:4
indiviaul [1] - 47:25
individual [8] - 7:14, 23:12,
25:20, 26:12, 57:17, 58:21,
98:25, 105:13
individually [1] - 48:8
individuals [22] - 9:18,
9:24, 13:1, 13:16, 16:5,
21:23, 23:18, 23:19, 23:21,
24:3, 30:2, 30:5, 52:24,
58:17, 64:6, 77:4, 77:8,
77:17, 78:19, 79:13, 79:16,
105:13
infants [1] - 4:2
inform [1] - 58:14
information [13] - 19:9,
19:13, 19:15, 27:2, 27:4,
44:17, 54:8, 59:7, 67:10,
77:5, 94:8, 98:7, 98:19
informed [1] - 39:3
initial [1] - 27:9
injunction [6] - 62:1, 97:6,
97:17, 99:4, 99:5, 99:9
injured [5] - 8:11, 57:16,
57:19, 91:25
injuries [1] - 8:20
injury [1] - 58:4
Instead [1] - 103:19
instead [1] - 97:8
institution [1] - 7:16
instructions [5] - 39:9,
39:13, 39:15, 58:9, 58:13
insult [1] - 79:3
insurance [2] - 88:9, 88:12
intelligence [2] - 14:10,
19:12
intend [1] - 24:12
intended [1] - 79:10
intention [2] - 24:4, 64:9
intentions [2] - 60:20,
60:21
interest [7] - 52:15, 52:18,
61:24, 77:3, 79:1, 79:13,
102:13
interesting [1] - 37:8
interests [4] - 60:23, 60:24,
77:2, 78:14
Internal [3] - 82:23, 83:5,
83:14
Internet [4] - 82:18, 98:4,
98:18, 99:2
interrupt [4] - 12:23, 36:7,
57:21, 81:10
intersperse [1] - 81:19
interview [1] - 34:23
interviewing [1] - 54:5
introduction [1] - 16:19

introductory [2] - 4:18,
16:15
invest [1] - 93:16
investigate [1] - 59:16
investigating [1] - 14:6
investigation [6] - 10:19,
10:20, 19:2, 21:24, 26:1,
83:13
investigative [4] - 9:17,
19:7, 98:25, 99:1
investigator [1] - 98:20
invoice [1] - 28:8
involved [9] - 10:19, 10:22,
10:24, 11:1, 15:9, 31:24,
34:11, 113:14, 113:16
involvement [4] - 43:23,
108:4, 108:7
Iolta [1] - 64:16
Iranian [1] - 25:1
irrelevant [2] - 4:25, 5:20
Irrelevant [1] - 76:16
Islamic [1] - 15:21
Israel [5] - 9:22, 10:12,
19:8, 19:11, 19:15
Israeli [1] - 11:6
issue [4] - 5:14, 28:10,
37:18, 47:4
issued [6] - 27:22, 47:5,
68:18, 71:4, 73:2, 73:12
items [1] - 27:21
itself [1] - 105:10

**J**

January [3] - 72:4, 73:1,
75:15
Javier [4] - 106:17, 106:21,
107:5, 107:16, 108:15
Jewish [1] - 7:18
Jihad [1] - 11:2
Joanne [1] - 1:20
job [2] - 23:23, 26:21
joined [1] - 91:17
Joint [14] - 51:23, 52:4,
104:4, 104:9, 104:17, 105:3,
107:20, 111:22, 111:23,
112:13, 112:16, 118:7,
118:15
Joshua [36] - 1:11, 20:3,
20:5, 20:11, 28:16, 29:20,
30:22, 32:19, 32:22, 50:23,
68:10, 68:17, 70:21, 71:5,
76:7, 86:7, 86:14, 86:16,
86:21, 90:14, 91:13, 94:16,
94:22, 95:2, 96:22, 97:4,
97:9, 98:6, 105:7, 105:14,
106:3, 109:12, 113:10,
118:10, 118:14, 118:16
journalist [1] - 19:8
Juan [2] - 1:21, 119:20

judgment [1] - 15:15
judgments [1] - 10:7
July [3] - 59:5, 59:8, 59:12
June [6] - 27:22, 37:10,
74:5, 74:16, 91:19, 104:23
Jury [8] - 3:1, 29:7, 29:10,
29:12, 48:16, 66:7, 80:22,
112:7
jury [4] - 38:18, 39:2, 48:13,
66:11, 83:22, 84:1, 118:22,
119:13
Justice [28] - 6:11, 6:13,
6:15, 6:16, 7:1, 7:3, 14:25,
22:23, 23:9, 69:9, 69:11,
81:6, 81:13, 81:16, 81:19,
81:23, 82:1, 82:5, 82:17,
82:18, 83:12, 83:13, 84:10,
90:13, 96:18, 96:22, 102:3,
104:20
justify [1] - 29:24

**K**

keep [2] - 55:7, 85:5
keeping [1] - 75:22
kept [5] - 46:10, 59:19,
60:17, 74:12
Khobar [2] - 18:21, 92:13
killed [6] - 8:10, 25:24,
37:23, 57:7, 92:8, 92:14
killings [2] - 8:20, 11:6
kind [3] - 9:11, 61:2, 61:6
kindly [1] - 103:21
knowledge [15] - 11:16,
20:16, 20:18, 35:9, 41:22,
41:25, 42:5, 44:19, 53:10,
54:18, 77:7, 77:19, 95:9,
98:18, 106:2
known [1] - 21:22
knows [5] - 5:16, 39:2,
48:21, 53:11, 54:19
Kozo [1] - 9:24

**L**

labeled [2] - 92:10, 111:8
Lack [5] - 41:21, 53:9,
54:17, 77:7, 77:18
ladies [1] - 66:10
laid [1] - 54:18
large [1] - 24:13
last [9] - 25:17, 29:18,
29:19, 35:3, 49:4, 49:12,
65:7, 66:16, 66:17
lastly [1] - 76:2
Law [2] - 1:19, 26:7
law [31] - 8:8, 8:18, 8:22,
9:4, 11:14, 13:3, 13:8, 20:23,
24:1, 24:11, 24:14, 24:22,
53:3, 53:7, 53:11, 53:16,

54:5, 56:6, 56:7, 91:24, 92:7, 92:22, 93:6, 93:16, 93:18, 93:21, 94:1, 94:5, 96:10
**laws** [1] - 77:1
**lawsuit** [4] - 24:16, 34:10, 96:17, 108:11
**lawyer** [7] - 24:5, 24:11, 26:5, 26:22, 56:19, 56:21, 85:5
**lawyers** [10] - 14:4, 24:17, 25:3, 27:5, 44:10, 62:19, 94:3, 94:12, 102:7
**lay** [6] - 35:7, 35:11, 54:21, 56:14, 56:23, 77:10
**lead** [2] - 26:15, 26:16
**leader** [1] - 7:19
**Leading** [5] - 17:13, 21:12, 24:6, 30:7, 37:2, 67:14
**leading** [3] - 24:7, 33:20, 67:16
**learn** [1] - 40:3
**learning** [2] - 7:15, 7:17
**least** [2] - 31:9, 59:6
**Lebanon** [1] - 25:23
**left** [3] - 58:25, 68:16, 115:17
**legal** [8] - 13:20, 56:14, 60:7, 74:8, 74:20, 75:5, 115:24, 116:2
**legislation** [2] - 8:18, 9:4
**lend** [1] - 69:11
**Leq** [6] - 20:25, 21:4, 21:16, 21:21, 22:10
**less** [2] - 45:4, 115:12
**letter** [21] - 49:2, 50:23, 51:2, 51:3, 51:7, 51:13, 51:15, 51:16, 51:20, 51:22, 52:6, 52:14, 53:22, 55:3, 55:11, 56:3, 59:22, 70:7, 72:14, 94:24
**letters** [1] - 65:11
**letting** [2] - 9:19, 15:23
**liaison** [2] - 21:6, 22:17
**library** [1] - 27:1
**Libya** [14] - 24:25, 25:5, 25:25, 26:3, 34:10, 37:12, 37:24, 38:19, 39:6, 39:8, 39:16, 40:5, 93:13, 115:18
**Libyan** [2] - 95:5, 99:6
**Licensiado** [1] - 106:11
**likewise** [2] - 11:3, 22:10
**limit** [1] - 12:18
**limitation** [1] - 32:13
**limitations** [3] - 9:3, 31:11, 59:2
**line** [2] - 28:20, 50:15
**lined** [1] - 49:5
**list** [6] - 18:17, 19:4, 21:23, 22:8, 38:4, 83:8
   **listed** [2] - 8:13, 18:19

**listing** [1] - 84:2
**literally** [1] - 53:21
**litigate** [5] - 11:13, 24:17, 34:20, 44:21, 111:12
**litigated** [3] - 35:23, 35:24, 45:2
**litigateed** [1] - 26:14
**litigating** [2] - 24:24, 26:11
**litigation** [18] - 12:11, 31:25, 32:1, 34:19, 35:6, 36:22, 44:15, 44:18, 44:23, 45:6, 64:21, 83:24, 84:16, 101:11, 101:18, 108:8, 115:18, 116:7
**lived** [2] - 20:24, 20:25
**living** [1] - 20:9
**Llq** [1] - 1:22
**loan** [3] - 17:22, 17:23, 17:24
**local** [1] - 106:22
**Locate** [1] - 66:15
**locate** [2] - 46:3, 46:8
**located** [1] - 46:24
**lock** [1] - 66:14
**Lockerbie** [2] - 37:19, 37:20
**Lod** [25] - 9:20, 9:22, 9:25, 10:2, 10:17, 18:13, 18:22, 19:6, 19:16, 19:18, 26:16, 32:1, 55:20, 67:25, 68:20, 84:16, 86:8, 89:7, 90:20, 91:25, 92:3, 93:4, 93:7, 107:15
**look** [7] - 11:14, 34:19, 43:20, 45:25, 71:22, 96:13, 104:16
**looking** [1] - 99:1
**Lopez** [13] - 106:18, 106:21, 107:5, 107:8, 107:16, 107:24, 108:4, 108:10, 108:15, 108:21, 108:25, 109:5
**Lopezperez** [10] - 106:18, 107:5, 107:8, 107:16, 108:4, 108:10, 108:15, 108:21, 109:5
**Lopezperez's** [2] - 106:21, 108:25
**lose** [1] - 52:2
**lost** [1] - 13:19
**loyalty** [1] - 31:5
**lunch** [1] - 29:10

## M

**machine** [1] - 112:24
**main** [2] - 56:2, 56:4
**mainland** [1] - 103:5
**major** [9] - 18:8, 26:6, 91:24, 92:6, 93:6, 93:16, 93:21, 94:5, 96:10

**maker** [1] - 90:12
**man** [1] - 4:24
**March** [1] - 71:3
**Maria** [1] - 1:7
**mark** [2] - 47:21, 47:25
**marked** [1] - 48:18
**married** [1] - 25:21
**marxuach** [64] - 1:23, 4:16, 4:19, 4:23, 5:8, 5:14, 5:20, 5:24, 17:13, 17:16, 20:13, 21:12, 24:6, 30:7, 31:16, 32:5, 33:18, 34:1, 34:25, 35:5, 37:2, 39:23, 40:25, 41:21, 42:10, 43:2, 43:6, 46:22, 49:20, 53:9, 54:17, 55:22, 56:13, 56:18, 60:8, 65:24, 67:14, 69:19, 72:16, 76:16, 77:6, 77:18, 78:9, 79:18, 81:2, 81:9, 81:11, 87:21, 87:24, 87:25, 95:23, 102:22, 104:8, 104:10, 106:9, 107:23, 110:12, 110:17, 111:18, 116:1, 116:24, 118:2, 118:6, 118:19
   **marxuach........81...............
   ...118** [1] - 2:5
**Massacre** [15] - 9:21, 9:22, 9:25, 18:13, 19:6, 19:16, 19:19, 26:17, 32:1, 37:19, 37:20, 55:21, 67:25, 68:20, 107:16
**matter** [9] - 5:3, 34:21, 41:23, 68:20, 74:10, 115:6, 117:6, 119:14
**matters** [5] - 67:23, 68:17, 68:21, 74:9, 89:3
**Mcconnell** [1] - 1:22
**Md** [3] - 1:14, 2:3, 3:12
**mean** [18] - 8:2, 8:5, 9:23, 12:23, 13:22, 18:3, 22:3, 23:2, 25:11, 32:1, 36:6, 40:19, 41:19, 42:20, 81:10, 83:4, 85:11, 102:23
**means** [5] - 12:9, 74:17, 83:1, 83:11, 114:19
**meant** [6] - 79:9, 89:1, 100:18, 104:2, 107:15
**meantime** [1] - 51:15
**measure** [1] - 26:15
**measures** [2] - 31:12, 32:8
**medical** [2] - 4:5, 88:9
**meet** [3] - 96:5, 96:9, 96:13
**meeting** [2] - 105:18, 106:2
**members** [3] - 90:18, 103:15, 106:3
**memo** [5] - 73:4, 74:7, 74:17, 75:4, 75:18, 85:24
**mentioned** [9] - 31:15, 32:11, 34:8, 35:22, 42:9, 88:21, 112:22, 115:22

**mercenary** [1] - 12:15
**met** [7] - 20:8, 20:10, 77:8, 90:22, 90:25, 96:10, 105:21
**meticulous** [1] - 83:18
**Michael** [8] - 1:14, 2:3, 3:6, 3:12, 3:20, 3:21, 106:13, 106:15
**mid** [1] - 51:5
**mid-december** [1] - 51:5
**middle** [1] - 50:22
**might** [5] - 5:6, 42:7, 81:19, 83:19, 117:7
**million** [41] - 10:10, 13:11, 13:23, 57:6, 57:7, 57:9, 57:10, 57:11, 57:13, 57:17, 57:18, 57:20, 58:8, 63:12, 63:20, 64:5, 64:10, 78:3, 78:5, 78:7, 80:7, 80:9, 95:6, 97:19, 100:2, 100:3, 100:6, 100:8, 100:10, 100:11, 100:15, 100:21, 100:24, 101:3, 101:14, 109:12, 109:16, 109:20, 111:11, 116:6, 117:21
**mind** [2] - 21:1, 51:22
**mine** [1] - 71:21
**minus** [1] - 101:3
**minute** [4] - 50:4, 51:13, 66:3, 80:18
**minutes** [6] - 47:16, 48:2, 48:14, 48:15, 66:1, 112:5
**mispoke** [1] - 112:17
**missions** [1] - 15:19
**money** [38] - 11:21, 12:15, 13:9, 13:19, 14:2, 14:3, 14:13, 15:17, 17:2, 28:9, 30:1, 30:12, 37:14, 38:5, 38:7, 39:18, 39:19, 40:7, 43:25, 45:9, 56:4, 56:9, 61:9, 62:1, 62:7, 62:10, 63:9, 63:24, 67:22, 75:19, 75:23, 85:5, 94:4, 110:11, 111:5, 116:7, 116:22, 117:16
**moneys** [12] - 18:8, 38:9, 39:11, 43:23, 45:15, 58:15, 62:3, 62:9, 64:1, 67:2, 74:12, 97:7
**month** [1] - 53:20
**moral** [12] - 76:20, 78:17, 79:6, 109:9, 109:11, 109:16, 109:19, 109:22, 110:2, 110:18, 111:10, 115:23
**morales** [2] - 1:5, 114:4
**most** [7] - 6:8, 11:18, 11:20, 12:11, 13:2, 17:2, 18:12
   **Most** [1] - 6:10
**move** [12] - 5:12, 6:3, 11:17, 13:11, 16:7, 28:21, 36:3, 38:15, 38:16, 44:24, 47:10, 53:15

Move [2] - 41:22, 77:6
moving [1] - 35:19
multiple [1] - 10:4
municipalities [1] - 114:13
Munoz [1] - 1:24
mutually [1] - 36:10

## N

name [26] - 3:18, 3:20,
6:25, 11:1, 14:23, 18:24,
19:8, 20:25, 24:14, 25:16,
25:17, 32:23, 33:24, 58:21,
61:11, 105:7, 106:17,
106:22, 109:1, 109:3,
112:23, 112:25, 113:1,
113:4, 113:9, 118:11
names [5] - 58:18, 98:3,
98:5, 98:10, 98:16
narrative [2] - 11:10, 98:2
narratives [3] - 7:24, 94:12,
102:6
necessary [2] - 38:23,
115:21
need [8] - 5:6, 38:24, 44:19,
49:9, 50:12, 56:23, 87:22,
110:13
needed [5] - 24:16, 28:9,
30:1, 30:18, 67:22
needless [1] - 104:3
needs [3] - 5:7, 48:12,
80:19
negotiate [1] - 55:8
negotiation [1] - 58:10
negotiations [1] - 40:5
never [16] - 11:24, 26:20,
27:17, 27:23, 43:1, 43:25,
44:1, 45:2, 77:7, 89:21,
90:22, 90:25, 91:3, 105:21,
105:22, 116:20
New [18] - 4:10, 14:24, 15:5,
15:17, 15:20, 16:3, 16:10,
17:7, 17:9, 18:2, 46:11, 69:8,
69:10, 81:15, 81:20, 82:17,
83:11, 84:10
newspapers [2] - 21:25,
22:8
next [4] - 3:3, 48:25, 49:3,
118:3
Nidal [1] - 25:23
Nile [1] - 96:9
Nobody [1] - 58:24
Noemi [2] - 1:6, 103:10
none [3] - 84:15, 84:18,
84:25
None [1] - 84:22
nonprofit [2] - 15:5, 82:22
nonresponsive [1] - 16:8
Nos [1] - 48:20
note [4] - 4:13, 38:17, 73:5

notes [2] - 115:1, 119:12
nothing [1] - 12:14
November [23] - 27:23,
39:10, 39:15, 40:8, 40:13,
46:18, 58:7, 58:13, 59:2,
59:10, 59:12, 67:11, 68:1,
68:2, 75:25, 76:3, 84:12,
94:15, 97:16, 106:6, 106:16,
108:3
number [10] - 9:14, 10:9,
21:25, 23:4, 26:11, 47:11,
50:3, 65:15, 74:3, 113:5
numbered [4] - 48:25,
49:17
numbers [2] - 71:24, 98:5
numerous [1] - 93:18

## O

Oneil [1] - 96:9
Oneill [2] - 53:3, 53:18
Objection [30] - 4:16, 17:13,
20:13, 21:12, 24:6, 30:7,
31:16, 34:25, 37:2, 39:23,
40:25, 41:21, 42:10, 43:2,
43:6, 46:22, 53:9, 54:17,
55:22, 56:13, 60:8, 67:14,
69:19, 76:16, 77:6, 77:18,
78:9, 79:18, 116:1, 116:24
objection [4] - 35:13,
56:22, 117:1, 117:2
obligation [16] - 31:2,
76:21, 77:1, 78:18, 79:7,
109:9, 109:11, 109:17,
109:19, 109:22, 110:3,
110:6, 110:18, 111:10,
115:23, 115:24
obligations [2] - 87:14,
87:17
obscene [1] - 110:23
obtain [1] - 12:1
obtained [1] - 106:21
obtaining [1] - 27:2
obvious [1] - 4:25
occasions [1] - 19:14
occupies [1] - 6:8
occurred [2] - 9:6, 9:25
October [2] - 59:11, 78:2
offering [1] - 106:15
Officer [3] - 29:6, 66:6,
80:21
officer [1] - 51:14
Offices [1] - 1:19
Official [1] - 119:18
oil [1] - 38:3
Okamoto [1] - 9:25
One [7] - 8:25, 11:1, 18:24,
22:23, 23:8, 25:3, 37:16
one [41] - 9:20, 11:3, 15:1,
15:9, 15:11, 21:2, 38:19,

42:18, 43:21, 44:12, 45:2,
45:3, 47:18, 47:19, 47:24,
48:2, 50:4, 50:8, 52:16,
57:10, 62:24, 64:13, 65:7,
65:15, 65:16, 69:2, 72:3,
73:4, 73:10, 78:5, 78:7, 80:9,
86:2, 94:11, 97:1, 98:1,
102:6, 104:4, 105:3, 117:3
ones [1] - 103:9
ongoing [2] - 91:4, 96:6
onwards [1] - 27:13
open [1] - 60:10
open-ended [1] - 60:10
opinion [7] - 31:7, 35:7,
56:14, 78:10, 79:21, 116:2
opinions [1] - 79:19
opportunity [1] - 95:20
opposed [1] - 103:1
opposing [1] - 116:18
opposite [1] - 79:4
oral [2] - 41:16, 42:21
order [11] - 31:12, 32:8,
32:19, 47:19, 49:6, 49:7,
49:8, 50:21, 59:13, 60:5,
60:14
organization [6] - 6:17,
14:21, 14:23, 14:24, 25:5,
25:24
organizations [8] - 6:20,
14:7, 14:9, 14:13, 14:14,
15:3, 15:16, 16:22
organize [1] - 11:9
original [9] - 7:9, 16:25,
32:7, 57:24, 58:18, 58:21,
63:13, 66:15, 78:20
Originally [1] - 8:16
originally [4] - 6:24, 15:13,
15:17, 63:13
otherwise [1] - 35:12
outside [1] - 87:10
outstanding [4] - 37:15,
38:1, 40:10, 41:14
Overruled [3] - 43:8, 76:17,
78:10
owe [1] - 45:11
owed [1] - 41:14
owing [1] - 45:9
own [6] - 17:4, 20:16, 30:6,
41:25, 42:5, 79:21

## P

page [1] - 66:5
paid [31] - 9:17, 12:3,
13:12, 14:17, 17:9, 27:11,
27:14, 28:5, 36:11, 36:13,
41:12, 41:14, 45:13, 45:14,
46:4, 83:23, 84:3, 86:8, 90:2,
101:6, 101:19, 101:23,
101:24, 109:23, 110:7,

110:19, 111:4, 116:13,
116:17, 117:18
Palestinian [1] - 11:2
Pan [3] - 37:16, 37:21,
37:22
paper [3] - 48:24, 104:3,
108:1
papers [1] - 73:11
parade [1] - 104:2
paralegal [3] - 26:25, 45:5,
111:8
parcela [1] - 114:19
part [5] - 39:17, 64:25,
85:24, 107:22, 115:25
participate [1] - 33:16
participated [2] - 33:23,
33:24
particular [18] - 15:18,
19:3, 21:5, 24:17, 26:2,
33:15, 34:11, 34:12, 36:20,
37:16, 37:23, 50:2, 50:14,
52:14, 57:5, 58:17, 58:24,
78:12
parties [5] - 56:12, 57:16,
62:14, 85:7
party [7] - 35:2, 57:19,
99:14, 105:14, 113:14,
118:12, 118:16
passed [3] - 8:9, 9:1, 9:4
patience [1] - 76:8
Paul [24] - 26:2, 26:4, 26:5,
26:6, 31:24, 34:7, 34:8,
35:15, 35:17, 35:20, 35:22,
36:13, 40:15, 67:9, 74:21,
74:22, 79:14, 86:3, 91:18,
92:3, 92:9, 94:18, 94:22
pay [13] - 14:4, 17:5, 27:21,
30:2, 30:4, 30:19, 36:19,
61:23, 69:11, 77:22, 83:1,
88:4, 90:14
paying [4] - 12:18, 57:23,
67:7, 74:19
payment [2] - 36:19, 42:20
payments [5] - 27:25,
45:16, 87:6, 88:2, 88:5
payroll [3] - 86:19, 87:6,
88:1
pediatrician [7] - 3:25, 5:9,
10:21, 10:24, 11:4, 11:8,
44:16
pediatricians [1] - 10:25
pediatrics [2] - 3:24, 6:6
pending [4] - 57:2, 115:17,
117:5, 117:6
pennies [1] - 73:23
People [1] - 26:7
people [9] - 10:23, 37:17,
51:18, 96:5, 96:13, 103:22,
105:21, 106:11, 115:25
per [13] - 56:5, 57:5, 57:6,

57:24, 58:4, 58:8, 61:19,
78:11, 100:2, 101:14,
107:19, 117:19
perceive [1] - 77:14
perceived [3] - 12:13,
42:15, 77:14
percent [17] - 12:9, 12:10,
12:12, 12:17, 12:19, 14:4,
36:12, 57:23, 61:18, 61:21,
64:18, 77:23, 78:3, 100:18,
115:9, 115:12, 116:13
Perez [1] - 107:24
perez [10] - 106:18, 107:5,
107:8, 107:16, 108:4,
108:10, 108:15, 108:21,
109:5
perez's [2] - 106:21, 108:25
perhaps [2] - 26:9, 49:18
period [7] - 27:12, 27:19,
28:14, 84:11, 86:22, 87:7,
93:19
Perr [23] - 7:10, 7:11, 7:12,
15:9, 20:6, 20:7, 20:10,
20:12, 28:8, 28:9, 28:15,
30:16, 30:17, 30:22, 31:1,
42:9, 42:12, 54:8, 54:13,
54:19, 81:21, 88:22, 90:14
personal [13] - 20:16,
20:18, 31:2, 35:9, 41:22,
41:25, 42:5, 53:10, 54:18,
77:7, 77:19, 106:2, 106:10
personally [2] - 16:6, 41:16
persons [3] - 20:15, 98:5,
107:6
persuing [1] - 14:15
petition [3] - 99:9, 101:13,
101:17
phone [2] - 60:2, 98:5
photocopied [1] - 49:23
physician [2] - 3:22, 4:4
Piper [7] - 92:15, 92:16,
92:17, 92:20, 92:21, 92:25,
93:3
place [4] - 40:5, 85:16,
108:1, 108:25
Plaintiff's [1] - 45:19
plaintiffs [4] - 39:6, 80:14,
93:7, 109:4
Plaintiffs [4] - 1:9, 1:21,
3:6, 3:13
plaintiffs' [2] - 49:16, 91:17
Plaintiffs' [6] - 2:8, 48:4,
48:7, 48:19, 64:24, 84:8
platter [1] - 68:16
play [3] - 5:21, 5:22, 5:24
plea [1] - 4:25
plead [1] - 43:20
pledge [1] - 61:21
plus [2] - 12:17, 36:12
Pm [11] - 29:10, 29:11,

48:16, 48:17, 66:7, 66:8,
80:22, 80:23, 112:7, 112:8,
118:23
Po [1] - 1:20
pocket [1] - 85:12
point [27] - 6:12, 9:3, 10:5,
13:22, 14:20, 20:1, 23:24,
31:24, 32:21, 33:8, 33:11,
33:12, 34:5, 36:1, 36:17,
37:6, 43:23, 51:21, 52:23,
55:7, 56:11, 62:3, 64:4,
66:25, 67:6, 92:19, 93:25
posed [2] - 31:19, 68:15
position [4] - 7:21, 7:23,
101:10, 107:18
possibility [1] - 19:21
possible [2] - 50:9, 116:21
potential [2] - 21:4, 22:22
power [15] - 22:25, 23:11,
23:17, 33:1, 33:9, 36:4, 37:9,
51:8, 51:12, 51:18, 52:9,
79:11, 91:7, 91:10
powers [3] - 13:7, 54:16,
78:15
practical [1] - 110:5
practice [2] - 4:6, 6:6
prepare [3] - 34:6, 44:15,
44:20
prepared [2] - 31:10, 32:21
prepares [1] - 94:11
preparing [1] - 7:24
present [1] - 105:17
presented [1] - 27:15
presenting [2] - 27:3,
113:16
preserve [4] - 31:12, 32:16,
32:20, 33:15
preserved [1] - 43:21
president [12] - 6:11, 14:16,
15:7, 40:24, 43:9, 55:14,
59:15, 81:5, 81:13, 81:15,
82:11, 102:2
press [2] - 37:18, 106:18
prestigious [1] - 24:14
prevent [1] - 97:2
previous [1] - 34:13
previously [3] - 33:6, 33:7,
54:14
principals [1] - 7:7
private [1] - 98:19
problems [1] - 7:17
proceed [3] - 3:9, 27:5,
80:25
Proceedings [1] - 115:20
proceedings [2] - 115:21,
119:11
process [1] - 95:5
produce [1] - 59:5
professional [2] - 35:8,
35:12

profit [2] - 6:17, 14:14
program [4] - 38:9, 39:17,
40:14, 57:5
prominent [5] - 24:22,
24:23, 25:3, 53:3, 92:10
pronounced [1] - 107:2
properly [5] - 44:21, 52:18,
61:10, 62:7, 67:2
prosecuting [1] - 90:20
prosecutors [1] - 102:21
protect [6] - 32:9, 32:16,
32:20, 60:5, 60:14, 60:23
protected [1] - 62:9
provide [4] - 54:9, 88:8,
88:11, 97:25
provided [8] - 2:13, 43:16,
77:23, 78:1, 90:17, 94:8,
104:8, 109:1
providing [3] - 15:22, 59:6,
67:10
Puerto [35] - 1:1, 1:21, 1:24,
5:18, 10:11, 10:12, 19:22,
20:24, 21:1, 21:3, 21:19,
26:17, 53:2, 53:6, 53:8,
53:15, 53:23, 56:15, 57:2,
59:17, 67:3, 67:25, 76:10,
77:15, 91:25, 96:8, 96:10,
106:19, 106:22, 108:1,
114:13, 114:23, 117:25,
119:3, 119:20
purely [1] - 14:20
purpose [4] - 61:15, 61:17,
75:20, 107:6
purposes [3] - 38:17, 48:5,
85:13
pursuant [1] - 69:9
put [16] - 4:23, 11:10, 13:9,
13:10, 13:22, 19:10, 37:13,
38:4, 39:11, 40:7, 46:9, 62:5,
63:9, 63:15, 76:4, 93:13
putting [1] - 36:23
puzzled [1] - 55:4

## Q

qualified [3] - 44:24, 52:24,
80:3
que [1] - 65:22
questioning [1] - 50:16
questions [7] - 15:25,
50:14, 60:10, 67:16, 81:20,
95:21, 110:14
quick [2] - 62:24, 112:3
quicker [1] - 66:11
quickly [4] - 37:1, 49:18,
50:8, 115:2
quite [2] - 27:11, 110:23

## R

Rabbi [29] - 7:10, 7:11, 7:12,
15:9, 20:6, 20:7, 20:10,
20:12, 28:8, 28:9, 28:15,
30:16, 30:17, 30:21, 31:1,
42:9, 42:12, 54:8, 54:13,
54:19, 81:21, 88:22, 90:6,
90:12, 90:14, 106:22,
106:25, 109:2, 109:3
rabbi [4] - 7:13, 7:15, 7:18,
20:9
Rantico [2] - 11:3
Raoul [1] - 6:25
rather [4] - 10:6, 34:14,
45:5, 99:8
Raul [1] - 1:23
reach [2] - 22:11, 55:17
reading [2] - 104:7, 107:22
ready [1] - 118:4
really [5] - 17:2, 36:17,
41:16, 52:13, 115:5
reason [1] - 83:17
reasons [1] - 83:17
receive [8] - 51:3, 52:8,
85:5, 97:18, 97:19, 99:22,
101:14, 116:14
received [7] - 50:23, 52:6,
55:2, 56:2, 58:9, 64:10,
69:16
receiving [2] - 51:17, 57:6
recess [3] - 3:5, 66:3, 80:18
recessed [5] - 29:10, 48:16,
66:7, 80:22, 112:7
reciprocal [1] - 31:8
recognize [5] - 66:19, 69:4,
69:14, 70:6, 113:5
recognized [2] - 13:15,
35:19
recommendation [1] -
36:10
record [11] - 3:19, 4:24,
32:25, 33:14, 48:5, 68:12,
72:17, 74:12, 76:21, 94:20,
95:24
recorded [1] - 119:13
recording [1] - 85:18
records [2] - 46:11, 75:22
recross [1] - 118:1
Recross [2] - 2:2, 118:5
recruiting [1] - 93:16
redacted [2] - 23:1, 23:2
redirect [1] - 111:15, 112:5,
112:10
Redirect [2] - 2:2, 111:19,
111:20
refer [3] - 35:1, 50:2, 50:3
reference [1] - 46:21
referred [1] - 48:22
referring [6] - 49:11, 49:12,

71:23, 73:14, 94:25, 112:14
**refers** [1] - 74:18
**reflects** [1] - 52:5
**refresh** [1] - 51:22
**refreshments** [1] - 66:2
**refused** [3] - 60:4, 60:16, 97:24
**regarding** [9] - 26:1, 41:6, 45:7, 55:6, 55:15, 59:4, 77:5, 77:24, 116:17
**regardless** [1] - 114:8
**registry** [5] - 62:5, 63:10, 63:15, 64:14, 101:7
**regular** [1] - 49:6
**reimburse** [2] - 111:7, 111:11
**reimbursed** [2] - 73:7, 109:15
**related** [1] - 29:19
**relates** [1] - 18:13
**relationship** [20] - 15:1, 15:11, 16:9, 16:18, 16:20, 16:21, 20:19, 21:19, 23:10, 30:21, 40:23, 45:3, 55:5, 86:15, 88:19, 88:22, 88:25, 90:6, 90:11
**relevant** [2] - 56:16, 56:17
**relief** [5] - 97:11, 99:17, 102:4, 102:8, 102:9
**religious** [2] - 7:18, 15:25
**remember** [6] - 37:17, 51:16, 63:11, 68:23, 73:8, 102:8
**remove** [3] - 94:16, 95:2, 95:13
**render** [1] - 89:19
**repeat** [7] - 82:3, 97:5, 101:21, 109:17, 109:18, 109:25, 110:16
**Rephrase** [5] - 21:13, 24:7, 30:9, 33:19, 37:3, 54:21, 55:25
**rephrase** [12] - 24:9, 30:9, 33:21, 40:1, 41:2, 42:3, 51:2, 60:11, 89:18, 107:13, 116:4, 117:8
**reported** [1] - 22:8
**reporter** [3] - 2:13, 87:20, 98:25
**Reporter** [1] - 119:18
**reporters** [1] - 9:18
**reporting** [1] - 26:22
**represent** [16] - 23:13, 24:12, 24:15, 24:23, 26:2, 51:18, 52:21, 77:2, 79:17, 79:25, 80:1, 103:9, 103:13, 109:4, 113:23, 114:1
**representation** [6] - 45:8, 91:18, 103:17, 103:21, 103:25, 115:16

**representatives** [1] - 52:20
**represented** [5] - 13:1, 25:2, 26:10, 89:21, 92:9
**representing** [10] - 13:16, 24:2, 36:14, 62:19, 67:24, 78:13, 107:11, 113:23, 114:2, 114:5
**request** [8] - 12:11, 29:24, 54:13, 97:14, 99:9, 99:11, 99:22, 102:9
**requested** [6] - 45:12, 54:9, 55:10, 66:24, 97:6, 97:11
**requesting** [6] - 59:19, 99:17, 116:17, 117:15, 117:17, 117:22
**requirements** [2] - 39:5, 58:14
**research** [4] - 7:24, 14:22, 15:21, 26:25
**researching** [1] - 27:1
**reside** [2] - 4:7, 4:8
**resources** [2] - 8:5, 11:17
**respond** [1] - 14:12
**respondents** [1] - 14:11
**responsibilities** [3] - 8:3, 15:4, 23:11
**responsible** [9] - 6:20, 8:17, 8:19, 11:5, 14:9, 15:20, 15:22, 26:24, 33:8
**responsive** [1] - 31:17
**restroom** [1] - 80:19
**result** [6] - 37:24, 60:2, 108:14, 109:19, 109:22, 110:18
**resume** [1] - 48:14
**resumed** [5] - 29:11, 48:17, 66:8, 80:23, 112:8
**retain** [1] - 114:9
**retained** [1] - 52:20
**retainer** [2] - 105:19, 105:23
**returned** [1] - 109:20
**returns** [2] - 83:5, 83:8
**Revenue** [3] - 82:23, 83:5, 83:14
**reverse** [1] - 47:19
**review** [2] - 47:17, 47:18
**revisit** [1] - 35:13
**revocation** [1] - 52:14
**revoking** [4] - 51:8, 51:11, 51:17, 52:9
**Rey** [1] - 1:24
**Ricar** [4] - 10:12, 19:23, 26:17, 67:25
**Ricans** [2] - 10:11, 91:25
**Rico** [29] - 1:1, 1:21, 1:24, 5:18, 20:24, 21:1, 21:3, 21:19, 53:3, 53:6, 53:8, 53:15, 53:23, 56:15, 57:2, 59:18, 67:3, 76:10, 77:15,

96:9, 96:11, 106:19, 106:23, 108:1, 114:13, 114:23, 117:25, 119:3, 119:20
**right-hand** [1] - 111:24
**rights** [6] - 15:22, 15:24, 31:13, 32:9, 60:6, 60:14
**rise** [3] - 29:6, 66:6, 80:21
**risk** [5] - 11:18, 12:2, 13:25, 14:1, 93:22
**Rivera** [1] - 1:24
**robles** [11] - 1:6, 1:6, 1:7, 1:7, 1:8, 85:1, 90:18, 91:1, 94:17, 103:10, 106:4
**robleses** [3] - 96:3, 97:22, 100:11
**Rodriguez** [18] - 1:5, 1:6, 1:6, 1:7, 1:7, 1:8, 31:13, 85:1, 90:18, 91:1, 94:17, 96:3, 97:22, 100:11, 103:10, 105:18, 106:4, 114:4
**Rodriguezmorales** [2] - 1:5, 114:4
**Rodriguezrobles** [11] - 1:6, 1:6, 1:7, 1:7, 1:8, 85:1, 90:18, 91:1, 94:17, 103:10, 106:4
**Rodriguezrobleses** [3] - 96:3, 97:22, 100:11
**roles** [1] - 82:6
**Room** [1] - 119:19
**room** [3] - 3:1, 29:7, 29:12
**rounded** [1] - 74:25
**Rpr** [1] - 119:18
**Ruben** [1] - 1:4
**Rudnick** [5] - 92:15, 92:18, 92:20, 92:25, 93:3
**ruled** [1] - 117:2
**rules** [1] - 29:1
**run** [2] - 106:18, 107:5
**Ruth** [1] - 1:8

## S

**salary** [3] - 14:19, 14:20, 30:23
**Sam** [1] - 83:19
**San** [2] - 1:21, 119:20
**sat** [1] - 43:25
**satisfaction** [1] - 94:9
**satisfied** [1] - 27:16
**Saudi** [1] - 92:14
**save** [1] - 50:21
**saw** [1] - 78:2
**Scher** [2] - 32:23, 34:4
**School** [1] - 26:7
**school** [4] - 4:5, 7:16, 20:12, 20:23
**schtick** [1] - 5:9
**scratched** [3] - 113:1, 113:4, 113:12

**screen** [4] - 71:22, 72:3, 72:17, 104:7
**searched** [1] - 98:18
**seated** [4] - 3:2, 29:13, 66:9, 80:24
**second** [1] - 113:7
**Security** [2] - 88:4, 88:5
**see** [11] - 18:9, 49:16, 51:22, 71:4, 71:16, 72:3, 93:16, 112:22, 112:24, 113:3, 113:4
**send** [2] - 28:7, 54:14
**sent** [5] - 30:3, 46:25, 51:7, 55:11, 94:21
**separate** [1] - 15:3
**September** [1] - 1:15
**sequence** [2] - 49:21, 49:24
**series** [2] - 84:9, 87:13
**serve** [2] - 52:17, 78:25
**served** [1] - 61:24
**service** [2] - 73:6, 99:1
**Service** [3] - 82:23, 83:5, 83:14
**services** [2] - 45:10, 89:19
**serving** [1] - 73:10
**set** [2] - 38:8, 76:21
**settle** [2] - 37:15, 37:25
**settled** [1] - 39:21
**settlement** [5] - 37:7, 37:12, 39:7, 67:12, 95:5
**seven** [4] - 8:12, 68:3, 68:5, 68:6
**several** [1] - 89:1
**Shall** [1] - 109:17
**sheet** [1] - 48:24
**Shikaki** [2] - 11:1, 11:2
**Shim** [1] - 19:11
**shocked** [3] - 52:13, 52:19, 53:25
**short** [1] - 48:13
**show** [9] - 38:14, 49:15, 50:13, 51:13, 79:8, 79:11, 103:8, 107:21
**showed** [1] - 27:17
**showing** [2] - 103:19, 103:24
**shown** [3] - 45:20, 45:22, 84:1
**sickened** [1] - 76:24
**side** [1] - 111:24
**Side** [3] - 4:16, 4:22, 6:4
**sides** [2] - 31:8, 48:8
**sign** [9] - 21:4, 21:7, 22:19, 23:25, 54:10, 72:25, 94:5, 94:6, 94:7
**signature** [2] - 47:8, 71:2
**signed** [17] - 30:2, 45:18, 46:13, 47:2, 47:3, 51:9, 51:10, 51:11, 73:3, 75:16,

76:1, 76:5, 77:24, 103:14, 103:22, 104:22, 105:19
**signing** [2] - 33:7, 42:19
**similar** [4] - 14:8, 16:2, 17:6, 56:7
**simple** [1] - 110:1
**simply** [2] - 85:15, 104:2
**single** [1] - 58:24
**sit** [4] - 43:19, 44:6, 45:7, 55:17
**sitting** [1] - 84:9
**situation** [2] - 55:15, 70:23
**situations** [1] - 13:18
**skilled** [2] - 24:16, 24:24
**skillful** [3] - 26:5, 26:12, 44:20
**skills** [6] - 11:16, 34:20, 34:22, 34:24, 35:7, 35:12
**slow** [1] - 87:23
**slower** [1] - 87:19
**smirk** [3] - 110:22, 110:24, 111:3
**Social** [2] - 88:4, 88:5
**sole** [1] - 91:13
**soliciting** [2] - 117:11, 117:13
**sometime** [2] - 50:22, 51:6
**sometimes** [1] - 69:11
**somewhere** [1] - 51:5
**song** [1] - 103:7
**sorry** [10] - 12:23, 36:6, 45:22, 51:2, 57:12, 61:4, 70:8, 81:9, 102:23, 106:10
**Sorry** [1] - 61:13
**sort** [1] - 59:22
**souffront** [3] - 1:23, 16:7, 65:22
**sought** [1] - 99:5
**sovereign** [1] - 8:15
**spans** [1] - 102:19
**spear** [1] - 43:21
**specialty** [1] - 3:23
**specific** [2] - 23:7, 77:11
**specifically** [4] - 6:18, 15:21, 19:15, 86:3
**speculation** [1] - 116:25
**Speculation** [1] - 77:19
**spell** [2] - 25:6, 25:8
**spent** [4] - 90:19, 115:5, 115:6, 115:11
**spite** [1] - 80:7
**sponsored** [5] - 8:12, 8:13, 18:18, 25:5
**ss** [1] - 119:2
**stages** [1] - 27:9
**stamp** [2] - 118:11, 118:14
**stand** [1] - 60:10
**standard** [2] - 102:15, 103:16

**stands** [1] - 79:4
**start** [4] - 18:12, 44:14, 50:6, 89:2
**starting** [1] - 12:5
**state** [9] - 3:18, 42:6, 56:7, 73:10, 97:8, 97:9, 99:6, 99:21, 99:23
**State** [1] - 39:8
**statement** [1] - 35:3
**statements** [1] - 20:15
**States** [17] - 1:1, 8:18, 37:13, 38:2, 38:5, 38:19, 39:7, 62:6, 82:24, 83:6, 83:14, 96:23, 102:24, 103:1, 103:5, 119:1, 119:19
**states** [2] - 40:13, 53:7
**statute** [4] - 9:3, 31:11, 32:12, 59:1
**stay** [2] - 48:13, 112:6
**stems** [1] - 109:11
**stenographically** [1] - 119:13
**Stethem** [2] - 18:20, 89:9
**still** [7] - 6:6, 62:12, 64:20, 67:20, 93:25, 111:23
**stipulated** [1] - 38:20
**stolen** [2] - 110:11, 111:5
**stop** [1] - 28:23
**stored** [1] - 46:9
**straight** [1] - 76:22
**stricken** [2] - 35:4, 41:24
**strike** [4] - 16:8, 35:10, 41:22, 77:7
**striking** [1] - 77:9
**students** [1] - 15:23
**subject** [1] - 83:13
**submit** [2] - 27:13, 28:14
**submitted** [3] - 41:8, 41:13, 46:7
**subsequently** [1] - 34:16
**substantial** [1] - 36:24
**substantive** [1] - 53:11
**succeed** [1] - 80:8
**success** [1] - 15:14
**successful** [2] - 15:15, 24:21
**suffered** [2] - 13:2, 78:19
**suggested** [1] - 114:9
**superior** [1] - 36:2
**support** [1] - 31:4
**suppose** [1] - 73:8
**supposed** [3] - 21:17, 78:13, 116:14
**sustain** [3] - 56:22, 117:1, 117:2
**Sustained** [10] - 30:8, 31:18, 39:25, 41:2, 41:23, 42:13, 54:20, 55:24, 116:3
**swindled** [2] - 78:7, 80:11

**sympathy** [4] - 4:25, 5:21, 5:23, 5:25
**system** [1] - 6:19

**T**

**tag** [2] - 65:14
**targeted** [1] - 107:7
**task** [1] - 18:25
**tasked** [4] - 21:5, 22:14, 23:22, 26:21
**Tasked** [1] - 22:15
**tasks** [1] - 21:2
**tax** [4] - 82:18, 82:22, 83:4, 83:8
**taxes** [4] - 83:1, 86:19, 87:6, 88:1
**teaching** [1] - 14:9
**technically** [1] - 92:22
**ten** [7] - 9:3, 9:5, 19:2, 32:13, 66:1, 66:3, 78:3
**Ten** [1] - 57:9
**ten-year** [1] - 9:3
**terminated** [1] - 115:15
**terms** [33] - 9:19, 10:18, 13:7, 14:5, 17:3, 19:9, 19:21, 20:2, 23:8, 23:10, 23:14, 24:2, 26:8, 27:1, 28:8, 31:3, 33:7, 34:19, 39:13, 41:9, 41:10, 41:18, 44:23, 45:2, 45:3, 45:5, 58:6, 60:20, 67:9, 73:9, 74:12, 79:9, 113:16
**terror** [1] - 18:17
**terrorism** [12] - 6:18, 6:21, 8:2, 8:10, 8:12, 8:14, 8:17, 13:17, 14:10, 15:21, 16:4, 19:24
**terrorist** [10] - 14:11, 25:5, 25:23, 38:4, 78:22, 89:6, 89:13, 89:16, 89:20, 89:23
**terrorists** [1] - 10:22
**testified** [2] - 3:14, 86:21
**testify** [4] - 5:19, 6:2, 76:11, 76:14
**testifying** [1] - 29:2
**testimony** [7] - 3:8, 29:2, 35:6, 67:15, 80:15, 86:20, 94:13
**Testimony** [1] - 1:14
**themselves** [2] - 23:15, 79:16
**therefore** [3] - 21:21, 44:22, 45:2
**they've** [1] - 39:2
**thinking** [1] - 27:25
**third** [5] - 12:12, 12:16, 20:15, 35:2, 85:7
**thousand** [1] - 73:20
**three** [5] - 48:15, 66:2, 66:4, 112:5, 112:11

**throughout** [1] - 80:5
**Throughout** [1] - 31:1
**Tierra** [1] - 102:19
**timing** [1] - 7:5
**today** [6] - 29:3, 45:7, 62:20, 76:11, 94:13, 108:12
**together** [2] - 11:11, 61:19
**tolerance** [1] - 15:25
**tomorrow** [2] - 5:3, 29:3
**took** [4] - 77:3, 95:9, 109:12, 117:21
**top** [7] - 11:12, 26:9, 111:24, 112:25, 113:1, 113:2
**tortured** [2] - 25:24, 92:8
**total** [11] - 10:4, 12:10, 57:10, 57:17, 57:18, 57:20, 61:22, 63:13, 63:14, 100:19, 115:9
**totally** [2] - 60:17, 60:22
**touch** [3] - 19:11, 20:2, 98:20
**toward** [1] - 34:19
**towards** [3] - 60:20, 60:21, 66:16
**Towers** [2] - 18:21, 92:13
**transcript** [1] - 119:15
**transpired** [2] - 37:6, 106:2
**treatment** [1] - 4:24
**tremendous** [1] - 11:18
**trial** [2] - 118:22, 119:13
**Trial** [5] - 29:10, 48:16, 66:7, 80:22, 112:7
**tried** [3] - 55:16, 59:20, 61:25
**true** [3] - 98:22, 98:23, 119:14
**truly** [1] - 80:10
**trust** [8] - 31:5, 31:7, 45:4, 67:21, 88:22, 89:1, 90:6, 90:9
**truth** [2] - 3:14, 106:1
**try** [3] - 38:16, 59:16, 94:15
**trying** [5] - 22:13, 55:7, 95:13, 113:22, 114:22
**tune** [1] - 18:9
**turn** [2] - 54:25, 62:17
**turned** [1] - 11:25
**turns** [1] - 36:25
**twice** [1] - 92:25
**two** [29] - 8:24, 10:7, 10:25, 15:3, 15:14, 16:22, 19:10, 22:21, 23:7, 23:19, 31:6, 32:9, 45:8, 48:15, 68:5, 69:16, 91:10, 92:4, 93:9, 93:15, 100:1, 100:20, 103:8, 103:11, 103:15, 103:23, 103:24, 112:4, 112:11
**type** [2] - 36:21, 55:4
**types** [2] - 13:8, 34:11

## U

Ultimately [2] - 36:13, 44:4
unable [1] - 97:23
uncle [1] - 83:19
uncomfortable [2] - 54:5, 57:25
uncongressional [1] - 19:1
under [7] - 4:24, 5:18, 28:25, 45:1, 100:19, 108:14, 115:25
understood [2] - 13:3, 78:16
undertake [2] - 9:12, 9:20
undistributed [1] - 116:7
Unexpectededly [1] - 37:10
unexpectedly [1] - 37:12
unfortunately [1] - 43:1
United [17] - 1:1, 8:17, 37:13, 38:2, 38:5, 38:19, 39:7, 62:6, 82:24, 83:6, 83:14, 96:22, 102:24, 103:1, 103:5, 119:1, 119:19
universities [1] - 26:8
University [1] - 26:9
unlike [2] - 12:11, 24:25
unscrupulous [1] - 78:6
up [15] - 17:2, 21:4, 21:7, 24:1, 31:14, 33:7, 38:8, 45:9, 49:5, 54:1, 54:10, 93:13, 96:13, 100:14, 116:13
uphold [1] - 77:1
upset [2] - 76:24, 77:3
uses [1] - 102:15
utilize [1] - 79:11

## V

Vague [1] - 46:22
Valdes [1] - 1:22
varon [2] - 1:20, 71:10
verify [1] - 107:18
versus [1] - 87:15
vice [1] - 82:11
victimized [4] - 13:2, 19:23, 78:21, 78:23
victims [21] - 6:18, 8:2, 8:10, 10:9, 10:12, 13:16, 16:4, 16:5, 22:3, 22:5, 22:9, 22:18, 26:17, 33:12, 55:20, 60:6, 60:15, 67:25, 77:13, 89:21, 107:15
victims' [1] - 21:9
volume [1] - 9:11
volunteer [2] - 6:12, 14:21
vs [1] - 1:10

## W

Wait [1] - 54:23

wait [1] - 50:4
waiver [1] - 8:14
Wallenberg [1] - 6:25
wants [2] - 4:23, 31:22
ward [1] - 114:19
warfare [1] - 19:1
warned [1] - 59:22
Washington [5] - 63:5, 63:10, 96:19, 116:8, 117:23
water [1] - 5:6
ways [1] - 114:14
Wednesday [1] - 1:15
week [1] - 5:10
Welch [1] - 18:21
well-known [1] - 21:22
Whatwas [1] - 56:2
whole [3] - 5:9, 5:14, 115:25
willing [9] - 13:4, 13:14, 24:21, 32:15, 34:5, 36:19, 37:13, 38:4, 103:16
wind [1] - 45:9
window [2] - 8:22, 59:1
withdrew [2] - 108:21, 109:5
withhold [1] - 88:5
Witness [9] - 2:1, 2:2, 3:18, 56:17, 64:17, 66:14, 72:6, 110:15, 110:25
witness [13] - 3:3, 3:12, 5:4, 28:25, 35:7, 45:23, 48:12, 48:14, 50:3, 56:14, 60:10, 61:12, 118:4
witnesses [1] - 39:1
Woodmere [2] - 4:8, 4:10
word [3] - 22:14, 25:10, 25:12
wording [1] - 79:1
words [2] - 26:18, 44:11
worker [1] - 92:7
works [1] - 20:22
world [1] - 92:22
write [5] - 65:3, 66:21, 66:23, 68:5, 70:12
writes [2] - 98:2, 102:6
writing [2] - 40:16, 42:23
wrongful [2] - 95:6, 97:18
wrongfully [1] - 109:13
wrote [6] - 23:3, 69:6, 69:25, 70:25, 71:1, 74:14

## Y

Yale [4] - 26:7, 26:8, 79:15, 79:22
year [7] - 9:1, 9:3, 19:17, 19:20, 54:13, 59:8, 61:3
years [17] - 7:2, 9:5, 16:24, 17:1, 17:10, 19:2, 20:7, 20:8, 23:5, 26:10, 31:1, 31:4,

32:13, 35:25, 92:4, 93:9, 93:15
yes-or-no [2] - 95:17, 98:12
yesterday [2] - 4:14, 5:3
yo [1] - 42:12
York [18] - 4:10, 14:24, 15:5, 15:17, 15:20, 16:3, 16:10, 17:7, 17:9, 18:2, 46:11, 69:8, 69:10, 81:16, 81:20, 82:17, 83:11, 84:10
Yosef [1] - 18:24
yourself [1] - 115:23

## Z

Zarchi [3] - 106:25, 109:2, 109:3
zebra [1] - 69:2
zoom [1] - 112:1