IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

:_____:

THE ESTATE OF ANGEL BERGANZO COLON      :
represented by Efrain and Ruben Berganzo;
THE ESTATE OF ANTONIO RODRIGUEZ MORALES  :
represented by Noemi Rodriguez Robles,
Eliezer Rodriguez Robles, Angel M.      :
Rodriguez Robles, Maria M. Rodriguez
Robles and Ruth D. Rodriguez Robles,    :

                Plaintiffs,        :      CIVIL NO:
                                 10-1044 (GAG)(MEL)

     vs.                                :

JOSHUA M. AMBUSH                         :
              Defendant.
:_____:

DAY 1 OF THE JURY TRIAL
HELD BEFORE
THE HONORABLE GUSTAVO A. GELPI
Monday, September 19, 2011, beginning at 11:28 a.m.
:_____:

A P P E A R A N C E S :

                LAW OFFICES OF DAVID EFRON
                BY DAVID EFRON, ESQUIRE and
                BY JOANNE V. GONZALES-VARON, ESQUIRE
                P.O. Box 29314
                San Juan, Puerto Rico 00929
                For the Plaintiffs

                McCONNELL VALDES, LLC
                BY RAUL M. ARIAS-MARXUACH, ESQUIRE and
                BY HENRY O. FREESE-SOUFFRONT, ESQUIRE
                270 Munoz Rivera Avenue
                P.O. Box 364225
                San Juan, Puerto Rico 00936
                For the Defendant

OPENING STATEMENTS                                          PAGE

   By Mr. Efron......................................7

   By Mr. Arias-Marxuach...........................20


INDEX TO WITNESS

PLAINTIFF WITNESS                              DIRECT   CROSS

EFRAIN BERGANZO-CRUZ

   By Mr. Efron............................57.........

   By Mr. Freese-Souffront.........................89


INDEX TO EXHIBITS

PLAINTIFFS'                                              IN
EXHIBIT NO.                                             EVD.

1...Efrain Berganzo-Cruz's Claimant Agreement.......68


JOINT
EXHIBIT NO.


1-33.............................................126


---


*Exhibits not provided to the reporter.

1      (Jurors enter the room.)

2      THE COURT:  Please be seated.

3      Good morning, again, Ladies and Gentlemen of

4  the Jury.  I am now going to read to you several

5  stipulations that the parties have reached in this

6  case.  Stipulations simply mean that the parties --

7  there is no dispute about these particular facts,

8  some of these are historic facts.  But you there's no

9  dispute, so you may consider all these facts as

10  evidence.  And they need not be questioned, you need

11  not weigh them one way or the other because they are

12  agreed upon by the parties.

13      So these are the joint stipulations, and

14  what I will do -- and the parties should remind me

15  when the case is ready for jury deliberations.  I

16  will photocopy these, these joint stipulations, and I

17  will give them to you so that you have them.

18      These are the stipulations in this case:

19  Number one, the Lod Airport Massacre -- and LOD is

20  spelled capital L-O-D, took place in the State of

21  Israel on May 30, 1972.  Japanese Red Army terrorists

22  opened fire on a group of Puerto Rican Americans,

23  pilgrims, killing and wounding many people.

24      Number two, Angel Berganzo-Colon and Antonio

25  Rodriguez-Morales were among those killed at the Lod

1  Airport Massacre.

2        Number three, the estate -- and in Spanish

3  estate is *sucesion* -- of Angel Berganzo-Colon is

4  comprised by Efrain Berganzo-Colon and Ruben

5  Berganzo-Colon.

6        Number four, the Estate of Antonio

7  Rodriguez-Morales is comprised by Noemi

8  Rodriguez-Robles, Eliezer Rodriguez-Robles, Angel

9  Rodriguez-Robles, and Ruth D. Rodriguez-Robles, as

10 well as Maria M. Rodriguez-Robles.

11        Number five, Mr. Joshua M. Ambush is an

12 attorney and member of the Maryland bar and maintains

13 an office in Baltimore, Maryland.

14        Number six, on April 21, 2006 Mr. Ambush

15 filed a case captioned Franqui, F-r-a-n-q-u-i, et

16 al., et al. means and others -- versus Syria,

17 S-y-r-i-a, et al.  This case is 06-734.  This will be

18 referred to by the parties as the Franqui complaint,

19 and that case was filed before the United States

20 District Court for the District of Columbia and it

21 sought damages for multiple wrongful deaths and

22 personal injuries arising out of the Lod Airport

23 Massacre.

24        Number seven, Mr. Ambush filed the Franqui

25 complaint on behalf of, among others, the Estate of

1 Angel Berganzo-Colon, Efrain Berganzo-Cruz, Ruben

2 Berganzo-Cruz, as well as the Estate of Antonio

3 Rodriguez-Morales, Noemi Rodriguez-Robles, Eliezer

4 Rodriguez-Robles, Maria Rodriguez-Robles, Angel

5 Rodriguez-Robles, and Ruth D. Rodriguez-Robles.

6 Number eight, The Great Socialist People

7 Libyan Arab Jamahiriya; that is, Libya, was a

8 defendant in the Franqui complaint.

9 Number nine, on July 31, 2008 the United

10 States Congress passed and on August 4, 2008 the

11 United States president -- that was President Bush

12 back then -- signed the Libyan Claims Resolution Act.

13 This is Public Law No. 110-301.

14 The purpose of this act or law, because it

15 came to -- it is a law, was to provide fair

16 compensation to all nationals of the United States,

17 including those nationals of the United States who

18 were from Puerto Rico, who had terrorism related

19 claim against Libya.  And this was through a

20 comprehensive settlement of claims pursuant to an

21 international agreement reached between the United

22 States and Libya.

23 Number ten, on August 14, 2008 the United

24 States and Libya executed a claims settlement

25 agreement.  On October 13 --

1       Eleven, on October 13, 2008 the United

2   States Secretary of State issued the certification

3   required under Section 5(a)(2) of the Libyan Claims

4   Resolution Act to the effect that the United States

5   had received funds from Libya sufficient to ensure

6   their compensation of claims of nationals of the

7   United States in cases pending on the date of the

8   enactment of said act.

9       Number twelve, on October 13, 2008 President

10  Bush issued an executive order regarding the

11  settlement of claims against Libya.  On

12  December 31 --

13      Number thirteen, on December 31, 2008 the

14  plaintiffs in the Franqui litigation voluntarily

15  dismissed their claims against Libya with prejudice

16  as a result of the Libyan Claims Resolution Act.

17      Number fourteen, on April 17, 2009, after

18  receipt of payment in Puerto Rico in the amount of

19  $7 million, Efrain Berganzo-Cruz, individually and as

20  authorized representative of the Estate of Angel

21  Berganzo-Colon, executed a document entitled

22  "Acknowledgment" before Notary Public Carlos

23  Gonzalez-Alonzo.  The acknowledgement was written in

24  Spanish and English.

25      Number fifteen, Efrain Berganzo-Cruz had a

1  power of attorney and was authorized to execute the

2  April 29, 2009 acknowledgment on Ruben Berganzo's

3  behalf.

4  Number sixteen, Noemi Rodriguez-Robles had a

5  power of attorney and was authorized to execute the

6  April 29, 2009 acknowledgment on behalf of Eliezer

7  Rodriguez-Robles, Maria Rodriguez-Robles, Angel

8  Rodriguez-Robles, and Ruth Rodriguez-Robles.

9  And these are the stipulation that the

10  parties have reached at this time.  You already know

11  the general nature of the claim, why we're here in

12  court, and now each party represented by counsel is

13  going to have an opportunity to tell you in their

14  opening statements what they understand their clients

15  will prove or what will not be proven in this case.

16  So beginning with Mr. Efron, you may

17  proceed.

18  MR. EFRON:  Yes, your Honor, may it please

19  the court.

20  THE COURT:  You may.

21  MR. EFRON:  First of all, Ladies and

22  Gentlemen of the Jury, thank you for serving on this

23  jury and helping the administration of justice in

24  this court.  We believe that this is a very clear

25  case.  It's an interesting case, and I will try to

1  make it as quickly and as efficient as possible for

2  you.

3        MR. ARIAS-MARXUACH:  Objection, Your Honor.

4  Move to strike.  Counsel cannot express his personal

5  opinion.

6        THE COURT:  Tell them what your

7  understanding will be proven.  That's it.

8        MR. EFRON:  As the court said, the facts in

9  this case originated almost 408 years ago.  It was an

10  act of terror.  It was not the first time that

11  American citizens were pointed out as victims of

12  terror.  It brings to mind that last week we

13  celebrated the 10th anniversary of 9/11 and really

14  ten years ago there was already a lot of terrorism.

15  It was the first time that it was done inside the

16  United States.  And, of course, with the magnitude

17  and the tremendous loss it became, you know, a very

18  big -- a very big event in the historic memory of

19  America.

20        But there's always been terrorism against

21  Americans.  They hate -- they hate our freedom, they

22  hate that we believe or choose to not believe

23  whatever we want.  And because -- because they feel

24  that we are not like them and we have freedoms,

25  they target American citizens as victims of terror.

1        MR. ARIAS-MARXUACH:  Objection, Your Honor.

2   This is irrelevant.  This case is not against the

3   states' sponsor of terrorism.

4        THE COURT:  You can discuss that in your

5   opening.

6        But, Mr. Efron, proceed with your opening

7   statements.

8        MR. EFRON:  My brother counsel is right.

9   This is not what this case is about now.  What this

10  case is about now is a lawyer's greed, greed and

11  deceit, and what he did to his former clients.  The

12  evidence in this case will prove, as you heard the

13  judge say, the facts leading to this case.

14        I'm proud to represent the two families

15  here.  Efrain Berganzo-Cruz, he's here representing

16  his brother Ruben as well, and they are the heirs of

17  their dad, Angel Berganzo, who did 39 and a half

18  years ago, almost 40 years ago at Lod Airport.  They

19  were -- you will hear that they were Christian

20  evangelical pilgrims going to the Holy Land.

21        And as well as the Estate of Antonio

22  Rodriguez, the person who has been empowered with

23  representing them is Dona Noemi right here, and her

24  brother Eliezer is here also.  There are three other

25  siblings that are part of the case, and their father

1   also died.

2        I'm proud to represent them because they're

3   honest, ethical, good human beings --

4        MR. ARIAS-MARXUACH:  Objection, Your Honor.

5   These are irrelevant assertions meant to produce --

6        THE COURT:  Rephrase.  Rephrase your

7   characterization.

8        MR. EFRON:  Yes, your Honor.

9        You will see from their testimony that

10   they're people from humble beginnings.  You will see

11   that they're from the north part of the island; Vega

12   Baja, Manati.  That will be their testimony.  And you

13   will hear them on this stand right here testifying in

14   front of you and you will be able to perceive that

15   they are not highly sophisticated or educated people.

16        Their testimony will show that they trusted

17   the lawyer that was representing them on behalf of

18   the American Center For Civil Justice.  This lawyer

19   at the time worked and was sent as an agent in 2002

20   by the Center to try get some kind of compensation

21   for the murder of their fathers.

22        That was in 2002.  The suit was not filed

23   until 2006.  They will testify that they never heard

24   from the lawyer again until December of 2008.  They

25   never heard what was happening to the case nor what

1   diplomatic negotiations were going on between Libya

2   and the United States.  They didn't know about the

3   compensation of U.S. citizens that were victims of

4   Libyan terrorism like themselves.  No information, no

5   communication, no contact from the lawyer for over

6   six years.

7        What happens in 2008?  You will -- when

8   you -- at the end of this case you will take certain

9   documents with you to deliberate.  These documents

10  will definitely be in because these are joint

11  exhibits that both sides agreed the jury should

12  examine, just as the judge earlier mentioned

13  stipulations that we both agree you should know.

14  These are documents that you will be able to see in

15  the jury room when the case is over.  And it shows

16  you -- it shows you and the way it's organized, what

17  happened in 2008.

18       Something must have happened where their

19  long-lost absent lawyer, who they hadn't heard from

20  in six years, shows up at the end of that year.  What

21  happened was in January -- you will see this

22  document, which is joint Exhibit 1, you will see an

23  act of Congress.  The United States Congress passed a

24  Libyan Claims Resolution Act pursuant to the

25  negotiations between the United States Department of

1    State and the Republic of Libya.

2           The next document, Document 2, takes us to

3    August of 2008.  In August of 2008 the United States

4    Department of State and the Republic of Libya -- I

5    don't want to -- I can't pronounce that long name

6    that the judge attempted to either -- and they signed

7    a claims settlement agreement based on the fact that

8    all lawsuits against Libya were to be dismissed.  So

9    Defendant Ambush knew that the case was going

10   nowhere; he was obligated to dismiss it.

11          This document was signed in Tripoli, Libya,

12   the capitol of Libya at the time.  Now we don't know

13   what the capitol will be with everything going on in

14   Libya, but that was what was signed in August

15   of 2008.

16          In October of 2008 Secretary of State -- and

17   you'll see this document also.  In October of 2008

18   Secretary of State Condoleezza Rice certified that

19   the Department of State had received 1.5 billion --

20   not million, billion dollars from Libya, and on that

21   same day President Bush signed the required executive

22   order, which you will also see with the president's

23   at the time signature.

24          On or about December 9 -- and on this you

25   will see both documentary evidence and testimonial

1     evidence.  On December 9 more or less, give or take a

2     day, the Center, the American Center For Civil

3     Justice dispenses of defendant's services.  By now

4     the case was going to be dismissed, they knew the

5     case wasn't going anywhere.

6           And they had an experienced litigator as

7     lead counsel, his name was Paul Gaston.  You will

8     hear this name throughout this case.  This defendant

9     had no trial experience, never been to court.  This

10     was a big case and he had recently graduated law

11     school just before he signed up these victims.  So

12     the Center saw no need to pay two lawyers on a dead

13     case.

14           You will hear testimony that plaintiffs had

15     no way, by the way, of knowing any of the above.

16     They had no way of knowing what was going on with

17     Congress, with the Department of State.  None of this

18     was public knowledge, none of this was in the news.

19     I don't know what they read, but it doesn't seem like

20     they had any knowledge or notice of what was going

21     on.  Their lawyer certainly didn't tell them.

22           And now that he was dismissed from the

23     Center, Defendant Ambush called his relative Leo

24     Garcia, who is an investigator, and asked Leo, who

25     speaks Spanish of course, to set up meetings for the

first time in over six years with familes of the

victims that he was representing.  One of these

meetings included two families, the two families that

I'm representing today.  The two families met at Don

Efrain Berganzo's home in Manati on December 15,

2008.

The evidence will show and the testimony

will show that defendant came with his investigator,

Leo, and a lawyer from a -- a Puerto Rican lawyer, a

lawyer from here, that could notarize the documents.

He can't, he's not a lawyer here, doesn't speak

Spanish.  So he brought another lawyer who would

serve as a notary and notarize documents on the spot.

And I say "on the spot" because the clients

when they testify will say that they had no time to

think about it, they had no time to sleep on it, they

had no time to consult anybody, not even their

pillow.  And it was just -- the documents that they

had to sign and notarize were just crammed down their

throats for them to sign on the spot, by deceiving

them and not giving them the information that the

lawyer knew and threatening to withhold or delay

their compensation.  That's going to be the nature of

the testimony of the plaintiffs in this case.

Now this is part of what the judge said was

Dolo, which is fraud, intrinsic fraud.  Now, we will

prove this with a standard of clear, convincing

evidence.  Now, clear and convincing evidence is more

than what is normally required in a civil case,

because in a civil case it's normally burden of

proof.

The burden of proof is going to be the

preponderance of the evidence.  It's something more

likely than not, 51 percent to 49 percent, and that's

normally enough.  Because Dolo is a very serious

allegation and a very serious situation, the law

requires that we go a step beyond.  And I'm certain

that we will find with clear and convincing evidence

that Dolo was -- that fraud, this type of fraud, was

committed here.

Now, I also have to tell you that the clear

and convincing evidence is also not as high as in a

criminal case.  This is not beyond a reasonable

doubt.  It's higher than the normal civil standard

but nowhere near the beyond a reasonable doubt

standard that criminal cases have when you're -- when

one of the parties may lose their liberty.  So, and

you will hear testimony as to this.

You will see in Exhibits, I think it's 11 to

24 of the joint exhibits, that when the lawyer came

1   with his two other cronies to Don Efrain's house, you

2   will see that they came with forms that were prepared

3   for them to sign and be notarized.  All they had to

4   do was fill in their name and where they lived and

5   sign these documents in order for them to be

6   notarized.

7        These forms, as you will see in the

8   evidence, have the intention and the purpose of

9   revoking the power of attorney that was given to the

10   Center, to Defendant Ambush's employer, revoking

11   their power of attorney to represent them and

12   giving -- another document giving this authority to

13   Ambush, and giving him an additional 10 percent

14   compensation.  That's $1 million per claim because

15   that was compensated by Libya in the amount of

16   $10 million.  So 10 percent additional means that he

17   took $1 million from each family.

18        And these people were never told of the

19   claims settlement agreement nor that the money was

20   paid to the Department of State already, nor that the

21   case was over and he had nothing else to do, of

22   course except the motion to voluntarily dismiss the

23   case against Libya.

24        That's also an exhibit here.  I think it's

25   Exhibit -- bear with me for a second because this is

1   important.  It's going to be Exhibit 5.  And when you

2   see Exhibit 5 you will see that's what he did in the

3   case, other than request the Department of State to

4   pay these people.

5           And we will -- what the defendant did was

6   what in Puerto Rico we call *una emboscada,* an ambush.

7   If our clients know English, they would know better

8   than to -- they would be more careful with a guy

9   named Ambush.

10          We will prove --

11          MR. ARIAS-MARXUACH:  Your Honor, objection.

12  Irrelevant.  It's meant to inflame the passions and

13  prejudices of the jury.

14          THE COURT:  Sustained.

15          Continue.

16          MR. EFRON:  We will prove with testimony

17  from the witness stand, clear and convincing again,

18  that plaintiffs were deceived.  Our civil code calls

19  it dolo or fraud by the nondisclosure or

20  misrepresentation, and of course the threats that

21  they will testify to, of not collecting their

22  compensation.

23          Again, you will see from the witness stand

24  that these are not young, highly sophisticated

25  people.  You will see that when I ask them the extent

1 of their education.  You will see that from the way

2 they answer the questions.  And you will be able to

3 see what kind of people they are and I trust you will

4 see what I see.

5   Ambush took advantage of their trust and

6 their lack of sophistication or education and forced

7 them to -- induced them to sign those documents.

8   You'll hear also testimony from a

9 Dr. Michael Engelberg.  Dr. Engelberg is a principal

10 at the Center; he's one of the people who started the

11 Center.  And he is the person whose power of attorney

12 was revoked.  He has no interest in this case.  He

13 has graciously agreed to come to Puerto Rico at his

14 own expense to testify.

15   Although he has no interest other than to

16 help the plaintiffs be reimbursed what he believes

17 was stolen from them -- and he will so testify from

18 the stand -- this witness will explain how the Center

19 paid Ambush over the years hundreds of thousands of

20 dollars, and how the Center had already paid his fees

21 and expenses in this case on behalf of the

22 plaintiffs.  When the plaintiffs signed the original

23 document in 2002, the 20 percent that the Center was

24 going to get, including all legal fees and expenses,

25 those were reimbursed to Defendant Ambush in this

1    case.

2           And, of course, you will also hear from

3    Defendant Ambush himself who will try to convince you

4    that he did nothing wrong and that he earned the

5    $2 million from these two families in just a few days

6    of work.

7           There are two issues here:  Liability and

8    damages.  The liability is how you apply the law, as

9    the judge will instruct you what the law is.  I think

10   that after hearing the evidence you'll know what to

11   do.  If you find liability, the responsibility -- if

12   you find liability the responsibility is the other

13   issue, damages.  There are two types of damages here.

14          That's not -- also not difficult.  Ambush

15   admits that he took $2 million.  That's one part of

16   the damages.  You may add to that plaintiffs' other

17   damages; the morale damages and the suffering that

18   they went through.  You will hear that testimony.

19          MR. ARIAS-MARXUACH:  Objection, Your Honor.

20   May we approach?

21          THE COURT:  Okay.  Let's --

22          MR. EFRON:  I'll go on to the next issue.

23          THE COURT:  Go on to the next issue.  Jury

24   is in the courtroom.  I will give specific damages

25   instructions at the end of the case, if you should

1  find for plaintiffs.

2          MR. EFRON:  In closing, I'd like to tell you

3  that I hope and I believe, I truly believe --

4          MR. ARIAS-MARXUACH:  Objection, Your Honor.

5  He may not state his personal opinion.

6          THE COURT:  Granted.

7          Rephrase.

8          MR. EFRON:  Okay, Your Honor.

9          You will hear testimony from the plaintiffs

10 that one of the reasons they trusted the lawyer was

11 because they believe most lawyers are honest.  And

12 there's 99 percent of lawyers are honest and work

13 hard on behalf of their client and this is what earns

14 us their trust and even creates a legal privilege in

15 the law.  But Defendant Ambush abused this trust and

16 took advantage of these families.  He's one of those

17 lawyers that gives us a bad name.

18          Thank you for your attention.  I did my

19 duty, I now leave you to do yours.  Thank you very

20 much.

21          THE COURT:  Mr. Arias or Mr. Freese?

22          MR. ARIAS-MARXUACH:  Good morning, Ladies

23 and Gentlemen of the Jury.  The central question that

24 you have to answer in this case is whether two

25 retainer agreements signed on December 15, 2008 by

1    members of the Rodriguez-Robles and Berganzo families

2    are valid.  And the evidence will show that the

3    answer to our question is yes.

4         The members of the Rodriguez-Robles and

5    Berganzo families signed these agreements when Joshua

6    Ambush came to Puerto Rico on December 15, 2008 and

7    explained his predicament.

8         What was Mr. Ambush's predicament?  He had

9    been working on their behalf for several years in

10   litigation before the United States District Court

11   for the District of Columbia since 2006, preparing

12   the case that became that litigation before the

13   District of Columbia since 2001.  So he had been

14   working for them for years when he came in December

15   of 2008 to explain his predicament.

16        And the evidence will show that Mr. Ambush's

17   predicament was that after seven years of hard work

18   the entity that had obligated itself to pay for the

19   attorney's fees and other expenses necessary to bring

20   the claims of these members of the Berganzo and

21   Rodriguez-Robles families against the state sponsors

22   of terrorism had reneged, had gone back on its

23   promise to pay Mr. Ambush substantial compensation if

24   the case was successful.

25        And as of December 15 of 2008 the case

1   indeed was going to be successful.  As of December 15

2   of 2008, the case was poised, was on the brink of

3   producing $10 million for each of these families.

4   And Mr. Ambush told them that was the case, a case

5   that they could participate because Mr. Ambush had

6   brought this lawsuit before the District of Columbia

7   claiming that Libya was one of the promoters of the

8   Lod Airport Attack.

9       Because Mr. Ambush brought that complaint, a

10  44-page complaint where -- he is the attorney, his

11  law firm is the only law firm that defended that case

12  for two years.  Because it brought that case and he

13  pinned Libya, he pinned the responsibility for

14  promoting the Lod Airport Massacre on Libya, then

15  their claims qualified for the Libyan claims

16  agreement.

17      So when they signed that document they knew

18  that 10 million was coming their way.  And they knew

19  that the reason that Mr. Ambush was asking for

20  compensation was because the Center, who in 2002 had

21  promised to them to advance the expenses necessary to

22  litigate their claims, had reneged on their promise.

23      You will have the opportunity to review

24  those retainer agreements; they're one per family.

25  Those agreements are in English and Spanish.  And a

1    retainer agreement is simply a document where an

2    attorney says, I will provide you these services and

3    you will pay me this money.  That's all -- as simple

4    as a retainer agreement can be.

5         So he explained his predicament, he

6    explained that $10 million could be coming their way.

7    He presented them the retainer in English and

8    Spanish.  There was a notary public in the room and

9    other attorneys.  They asked questions, they had the

10   opportunity to read the document, and they signed it.

11        Now to understand how Mr. Ambush came to be

12   in that position of working on a case for seven years

13   and having to come to Puerto Rico to beg his clients

14   to pay him, we have to go back to 2001.  In 2001

15   Joshua Ambush was a relatively recent law graduate,

16   but he had already identified since law school an

17   interest in pursuing cases that dealt with

18   International Law.  And he had already worked as a

19   law student on cases that dealt with International

20   Law but, more specifically, the subject matter of the

21   Franqui v. Syria case in the District of Columbia,

22   cases on behalf of victims of terrorism so that

23   governments that promote terrorism compensate those

24   victims.  So he already had that interest and he was

25   thinking of what case he could bring.

1     And the evidence will show that Joshua

2 Ambush had a preexisting connection to Puerto Rico.

3 His mother is half Puerto Rican and Joshua lived here

4 in 1972 went the Lod Airport Massacre attack

5 occurred.  So as he was looking for a terrorism

6 attack that he could build that case around, he

7 settled upon the Lod Airport Massacre.

8     Now, he was a relatively recent law graduate

9 building his law practice, like anyone else who is

10 starting out, so he knew that he needed resources to

11 bring these claims about.  And there is an entity

12 called the American Center For Civil Justice.  Its

13 principals are two persons:  Rabbi Eliezer Perr and

14 Dr. Michael Engelberg.  Mr. Ambush knew Rabbi Perr

15 since childhood.  And Mr. Perr gave Mr. Ambush his

16 first job in Mr. Ambush's first career, which was a

17 special education teacher.

18     So naturally and moreover, as Mr. Ambush was

19 building his law practice, he did collaborate with

20 the Center on cases involving terrorism because that

21 is one of the addresses of activity that the Center

22 pursues.  But he was building his own private

23 practice, working with another law firm, building his

24 own law firm.  He collaborated in their center, but

25 the evidence will show that he was not the Center's

1     employee.  He simply, like many others have, had

2     relationships that are long-going with certain

3     clients or certain organizations.  He had an ongoing

4     collaboration with the Center.

5              So when in 2001 Mr. Ambush settles upon the

6     Lod Airport Massacre as an incident around which to

7     build the case, he brings the idea to Rabbi Perr --

8     Rabbi Perr, again, long standing relationship, a

9     friend of Mr. Ambush's father.  And he asked Mr. Perr

10    whether they would promote a case or sponsor a case

11    arising out of the Lod Massacre matter, and the Rabbi

12    said yes.

13             Mr. Ambush then came to Puerto Rico, he met

14    with the Reverend Jose Vega-Franqui in 2001.  And who

15    is the Reverend Jose Vega-Franqui?  Jose Vega-Franqui

16    is a minister of a protestant faith who indeed was

17    one of the organizers who was escorting those Puerto

18    Rican American pilgrims to the Holy Land on a

19    pilgrimage when unfortunately just when they were

20    getting their luggage they suffered this hideous

21    attack.

22             And Mr. Ambush met with Reverend

23    Vega-Franqui, with his current wife, and he also met

24    with members of another family -- they're not here in

25    this case -- the Padillas.  The Padillas also lost a

1    loved one at Lod.  Mr. Vega-Franqui actually had been

2    very involved in the attack or affected by the attack

3    because he was personally injured, he lost his first

4    wife.  And his current wife, the lady that met with

5    Mr. Ambush and Vega-Franqui that summer, had been

6    injured.  She was a young pilgrim as well.

7         So when Mr. Ambush met with the

8    Vega-Franquis and the Padillas they signed a claimant

9    center agreement that Mr. Perr, Rabbi Perr, gave

10   Mr. Ambush to bring to Puerto Rico.  And that

11   document -- you're going to see in evidence the

12   claimant center agreement for the Berganzo family and

13   the Rodriguez family, that document obligated the

14   Center to -- to sponsor the litigation as I have

15   said:  Pay the attorney fees, pay the expenses.  And

16   in exchange, because the Center's not doing this for

17   free, the Center will take 20 percent of whatever the

18   claimant's would recover.

19        Now, having identified Vega-Franqui, because

20   the evidence will show it was Joshua Ambush who

21   selected the Lod Airport Massacre to build the case

22   around, it was Joshua Ambush who found these

23   claimants that became plaintiffs in the Franqui case.

24   He went back to the States, continued developing his

25   theories about who to sue and who else to bring on

board, who else was damaged by the Lod Airport

Massacre. And that's how he came across the

Berganzos and the Rodriguez-Robleses.

And in the summer of 2002, Leo Garcia, who

is Mr. Ambush's cousin on his mother's side, because

Leopoldo is Leopoldo Garcia-Viera, and Joshua

Ambush's mother is Sarah Borski-Viera, well, cousin

Leo went and presented the Berganzos and the

Rodriguez-Robleses with claimant and center

agreements. So in the summer of 2002, they signed

claimant and center agreements and so they signed up

for the case.

Now, the Franqui case, the complaint that

Mr. Ambush filed in 2006 in the United States

District Court for the District of Columbia is a

44-page complaint listing all the injured individuals

that were Mr. Ambush's clients, listing the foreign

governments that Mr. Ambush was charging promoted

this horrific attack, and the agents of those

governments that collaborated in the attack.

You might ask yourself, if Mr. Ambush signed

Vega-Franquis in 2001 and if Mr. Ambush signed the

Berganzos through Leo Garcia -- or the Center signed

the Berganzos and Rodriguez-Robleses in 2002, why did

it take four years to file the Franqui complaint in

1  the United States District Court for the District of
2  Columbia?

3          It is called the Franqui complaint because
4  if it were here in Puerto Rico it would have said the
5  Vega complaint or the Vega-Franqui complaint, but you
6  know how the English speakers switch the last names.

7          But anyway four years elapsed.  Why did four
8  years elapse?  Because the Center's going back on the
9  promise to pay Mr. Ambush as they did in 2008 was not
10 the first time that the Center went back on a
11 promise.

12         Mr. Ambush, the evidence will show, again,
13 knew that if you were going after a foreign
14 government who promoted terrorism, then that
15 government or governments could bring in law firms
16 with substantial resources to defend that lawsuit.
17 In other words, if you sue a state sponsor of
18 terrorism, a foreign government who sponsors
19 terrorism, they're not going to simply say, okay,
20 where do I pay up.  They're going to defend the case.

21         And the Center had undertaken, as requested
22 by Mr. Ambush and as the Center had done in other
23 terrorism cases, to bring in a major U.S. law firm to
24 collaborate on the case.  And the evidence will show
25 that there's a big U.S. law firm by the name of

Covington & Burling, and the Center tried to bring

Covington & Burling on board and it took two years

for Covington & Burling to say, no, I don't want this

case.  And that is how Joshua Ambush ends up being

the lonely Don Quixote who sues the government of

Syria and the Government of Libya on behalf of this

family and other families of Puerto Ricans who were

injured or killed at Lod.

Another reason for the delay is that

attorneys have ethical obligations, and attorneys who

take ethical obligations seriously have to research

their cases.  They have to research their cases as to

the facts and as to the law.  You cannot simply say,

Oh, I'm a recent law graduate, I'll file a complaint

and let's see how it goes.  That would be a gross

violation of ethical duties.

So part of the delay was also that

Mr. Ambush had to do his homework.  He had to go to

the National Archives in Washington, D.C. and dig up

documentation on the Lod Airport Massacre, on the

victims, on how he was going to connect Libya and

Syria to this attack, and that was part of the delay.

So in any event, in 2006 here comes Don Quixote,

Mr. Ambush, to charge Libya and Syria.

Now, why 2006?  Why am I mentioning 2006,

1    apart from the fact that there is some delay

2    attributable to Covington & Burling and some delay to

3    simply getting the job done -- and we have to

4    remember that Joshua Ambush was working other cases

5    at that time, so it was a challenging endeavor, and a

6    lot of homework, a lot of sitting down in a library

7    getting documents together.

8           Well, 2006 has an independent significance.

9    There's a concept in the law called a statute of

10   limitations.  And the statute of limitations is

11   simply a law that says if you want to bring X type of

12   claim, you have to do it by a certain date; because

13   if not, your client, the plaintiff, in whatever case

14   it maybe, is out of luck.  The court is going to say,

15   Hmm, you had ten years and you came here year in

16   2011.  That's pretty easy.  Throw this case away.

17          So on the case that became the Franqui v.

18   Syria case, the clock was ticking.  The clock was

19   ticking because the special federal law that allows

20   these suits, suits against state sponsors of

21   terrorism, had a ten-year statute of limitations

22   which Mr. Ambush understood -- and the evidence will

23   show this and was later confirmed and clarified.

24   Mr. Ambush understood that that was a ten-year

25   statute of limitations and that he had to be in court

1   by 2006 or these clients, their claims would be out

2   of luck.  It would be dismissed as untimely.  And so

3   with no major law firm to help him in this endeavor,

4   Joshua Ambush was the sole attorney who filed the

5   case in 2006.

6          Now, you file a complaint and that doesn't

7   mean that the case is over.  The evidence will show

8   that for two years Mr. Ambush was the lawyer and sole

9   lawyer, defending the -- you know, prosecuting,

10  bringing -- moving that case forward on behalf of the

11  plaintiffs in that case, which were members of the

12  Vega-Franqui family, members of the Berganzos,

13  members of the Rodriguez-Robleses, members of the

14  Padillas and others.

15         And once you file the complaint you have to

16  bring the defendant into court.  And bringing a

17  foreign defendant, a foreign government, into trial

18  court in the U.S. is a complicated endeavor.  You

19  have to translate that 44-page complaint into Arabic

20  and into Farsi, which are the languages at issue

21  here, and find a way in the law that allows you to

22  get those documents over to a foreign government and

23  that they cannot say no, no, no, this is

24  insufficient, I will not accept this notice.  So once

25  the case got filed, the first order of business is

1    bring those defendants into court.

2         Again, defendants foreign governments with a

3    lot of money don't roll over and die, they defend

4    their cases.  Libya entered an appearance on the case

5    when Mr. Ambush finally brought them into court.  And

6    they hired a big law firm.  A big law firm was not

7    available to help these people, but a big law firm

8    was available to help Libya.  Libya hired a law firm

9    called Eckert Seamans, which has offices throughout

10   several states in the U.S., and that was the law firm

11   that defended the case, the Franqui case, against

12   Mr. Ambush and against these families.  And

13   Mr. Ambush faced lawyers from two offices in two

14   separate states in the Franqui case.

15        Now, Libya filed a motion to dismiss -- a

16   first motion to dismiss.  A motion to dismiss is

17   simply a petition by the defendant claiming, this

18   case is frivolous, I shouldn't be forced to spend any

19   more money.  Your Honor, please throw this case out

20   of court.  So Mr. Ambush had to defend the first

21   motion to dismiss to keep that case alive.

22        Then came a second motion to dismiss after

23   Mr. Ambush amended the complaint and filed another

24   44-page complaint *solito*, alone, and he had to defend

25   that motion to dismiss.  He understood that this was

1    a significant challenge.  And he finally prevailed

2    upon the Center to bring another lawyer on board and

3    the Center, they brought Paul Gaston, who Mr. Ambush

4    knew and said, Well, why don't we bring Mr. Paul

5    Gaston on board?  Mr. Ambush and Gaston were to

6    oppose that motion to dismiss.  And they were, what

7    lawyers call, briefing; they were briefing the motion

8    to dismiss, which is simply a fancy word for saying

9    they were writing their arguments on paper and

10   submitting them to the Court.  So Libya and the

11   plaintiffs, represented by Mr. Ambush and Mr. Gaston,

12   were locked in that battle.

13          As luck would have it, as luck would have it

14   for the families injured by the Lod Airport

15   Massacre -- for the Center, because the Center

16   collected 4 million out of these families' award.

17   These families got 20 million total and the Center

18   took 4 million.  And for Mr. Ambush, yes, because

19   they signed the retainer agreements and he was able

20   to collect.  While that second motion to dismiss was

21   pending, the United States and Libya entered into a

22   claims settlement agreement.  And it is in evidence.

23          Now, the evidence will show that plaintiffs

24   were able to profit from the U.S./Libya settlement

25   agreement because they had the Franqui case pending,

1  because the Franqui case was a case against Libya and

2  Syria for promoting terrorism.  And the whole point

3  of the U.S./Libya settlement agreement was to have

4  those cases dismissed in favor of administrative

5  proceedings where the former plaintiffs, now

6  administrative claimants, could claim compensation.

7  Now, when Mr. Ambush came to Puerto Rico on December

8  15, 2008 he knew that the case, the best outcome for

9  his clients was to dismiss the case in favor of the

10 administrative proceedings.

11      Now, going back to his predicament.  The

12 predicament is that once the settlement agreement was

13 reached the Center woke up.  The Center, the entity

14 that didn't get a major law firm to work on the case,

15 that only brought Mr. Gaston in after two years of

16 litigation, the Center, the entity that said that it

17 would foot all the expenses for the Franqui

18 litigation, woke up and said, Mr. Ambush, give your

19 file to Paul Gaston, we don't need you anymore.  And

20 by the way, Rabbi Perr's promises throughout the

21 years that you will be substantially compensated for

22 your work in this case, those promises, forget about

23 them.  You have an ultimatum, take this minimal

24 amount we're willing to offer compared to the

25 settlement reached for all the plaintiffs or take

1     nothing.

2             And that was when Mr. Ambush said, They're

3     throwing me out of the case, they don't want to pay

4     me, what can I do?  I can go to my clients, explain

5     to them what I've been doing for them for seven

6     years, explain to them what I can still do for them

7     and see if they will pay me.  And that is what Joshua

8     Ambush did.

9             Now, the evidence will show that the

10    U.S./Libya claims settlement indeed, it was a

11    momentous development.  Because it turned this case

12    that was this uphill battle that Mr. Ambush started

13    into a case that could be dismissed in favor of an

14    administrative claim.  And we're going to talk about

15    that now.

16            The second -- and the evidence will show

17    that there was substantial work to be done after they

18    signed the retainer agreement.  One of the issues you

19    have to decide in this case, and we have talked about

20    the first issue, is whether the retainer agreements

21    were valid.  And the evidence will show that the

22    retainer agreements were valid because they knew that

23    Mr. Ambush had worked for them, that he was at risk

24    of not being paid, and that they were in line to get

25    10 million from the Libyan claims settlement if they

1  submitted their administrative claims and dismissed

2  the Franqui case.

3           Now, the second question you're going to

4  have to decide in this case is whether Mr. Ambush

5  breached any of his obligations, *no cumplio* with his

6  obligations under those retainer agreements.  And

7  those retainer agreements, again, they were meant to

8  compensate him for the work that he had done for

9  seven years -- and they say so in writing -- and they

10 were meant to compensate him for the work that

11 remained to be done.

12          And in terms of the work that remained to be

13 done, Mr. Ambush undertook two obligations:  First,

14 to prosecute the administrative claim and second to,

15 once he received the money, distribute it according

16 to the claimant and center agreement and, yes, the

17 retainer agreement.  And that is exactly what

18 Mr. Ambush did.

19          Between December of 2008 and December

20 of 2009, Mr. Ambush had submitted documentation to

21 the U.S. Department of State to prove that these

22 persons were indeed the members of the Rodriguez and

23 Berganzo families that we have here and were indeed

24 the heirs, *los herederos*, of the persons killed at

25 Lod.  As you can imagine, the government is not going

1  to hand out a million dollars to someone who cannot

2  prove that they are who they should be.

3          And the second thing that Mr. Ambush had to

4  do was assure the government that these were indeed

5  the heirs of two persons killed at Lod, killed in

6  1972, was to assure the U.S. Department of State that

7  they could issue a release.

8          Now, what's a release?  A release is a

9  document where a claimant or a plaintiff says, If you

10  give me the money that we have agreed to in the

11  settlement agreement, I will not sue you again for

12  the claims that are the subject of the agreement.

13          And Mr. Ambush had to prepare, and costly

14  prepare, the legal documents necessary to assure the

15  U.S. Department of State that they were in a position

16  to grant that release.  Because if they did not put

17  themselves in a position to grant that release

18  quickly, then they would not collect until they could

19  give that assurance to the government.  So between

20  December of 2008 and March of 2009, Mr. Ambush was

21  gathering and presenting that documentation.

22          In April the money came in.  And Mr. Ambush

23  then complied with his second obligation under the

24  retainer agreement.  He received the money, he wired

25  7 million to an account opened by Efrain Berganzo.

He wired $7 million to an account opened by Noemi
Rodriguez-Robles. So we have to account for 10
million per family; what happened to that? Two
million from the 10 million awarded to the Berganzo
family was sent to the Center and a little bit of
that 2 million was sent to the court in
Washington, D.C.

Why? Because by that time the Center was
suing, and to this day is suing, Mr. Ambush. So when
you listen to the testimony of Dr. Engelberg, you
have to take that into account.

Now, so Mr. Ambush took the 2 million due to
the Center and distributed it according to the
claimant and center agreement. He fulfilled his
obligation to the Center and to the Court, because if
you're under a court order, you have to do what the
Court tells you.

Same thing with the Rodriguez-Robles family.
A portion of the 2 million due to the Center from the
Rodriguez-Robles award was paid into court and the
rest paid to the Center. So the Center was paid
except for that part that the court controls. And,
yes, Mr. Ambush took his 10 percent.

Now, having done those distributions both
Efrain Berganzo and Noemi Rodriguez-Robles, as the

1    state representatives and representatives of their

2    siblings, *sus hermanos y hermanas*, signed a document

3    called an acknowledgment. And that is a document

4    where it says, Ambush has distributed the money in

5    this fashion, I agree and, by the way, I recognize

6    that I have a right to consult an independent

7    attorney. I have been advised of that. And they

8    signed that before another notary public in Puerto

9    Rico.

10          Now, this should have been a very

11    satisfactory ending for everyone. The plaintiffs got

12    $7 million per family, the Center got their sums due

13    under the claimant and center agreement, and

14    Mr. Ambush was compensated for seven years of work.

15    But the evidence will show that this outcome, this

16    outcome that was there in April of 2009, was not good

17    enough for the Center.

18          In November of 2009 the Center caused an

19    attorney by the name of Javier Lopez-Perez to publish

20    in *El Nuevo Dia* provocative ads claiming that a

21    lawyer from Maryland had deceived and taken advantage

22    of Lod Airport Massacre victims. But that's not all

23    he did. He gave an interview to *El Nuevo Dia* and

24    there he defamed Mr. Ambush and said that Mr. Ambush

25    had stolen from these people.

1          Now, intrigued -- because I imagine it's a

2     natural reaction.  Intrigued by those ads, intrigued

3     by that article, members of the Berganzo and

4     Rodriguez family met with Javier Lopez-Perez and this

5     case followed.  They met with Javier Lopez-Perez and

6     they didn't give Mr. Ambush, the lawyer who had

7     worked on their behalf for seven years and had gotten

8     them $10 million gross, 7 million net per family, the

9     chance to explain his side of the story.  And this

10    lawsuit ensued and that's why we're here today.

11         Now, a word that will proceed here.  You are

12    the sole judges of the facts.  And you have noticed

13    and you have been told by the Court, and Mr. Efron

14    has reminded you, that plaintiffs have the burden of

15    proof.  But because they have the burden of proof,

16    they have a certain advantage; they get to go first.

17         And so I will ask you that you give my

18    client the chance to heard and that you keep an open

19    mind throughout the proceedings so that you allow my

20    client the opportunity to be heard, to give his

21    testimony and present his evidence.

22         In sum, the evidence will show that the

23    members of the Berganzo and Rodriguez-Robles family

24    were given the facts that they needed to make a

25    decision on whether to compensate Mr. Ambush.  They

1    were explained what the retainer agreement meant.

2    They had the opportunity to present questions.  They

3    had a Puerto Rican attorney in the room, a notary

4    public -- because in Puerto Rico in the States.  In

5    the States a corporation can have a lot of its staff

6    be notaries for any affidavit they may need.  In

7    Puerto Rico you have to be a lawyer to be a notary

8    public.  So when they signed on November 15 -- I

9    mean, on December 15, 2008, they had another attorney

10   in the room.  And if they didn't like what Mr. Ambush

11   had to say, they simply could have said no.  But

12   knowing that $10 million was coming their way if they

13   continued, they chose to say yes.

14           I do want to address before I conclude the

15   issue of what the Center may or may not have paid

16   Mr. Ambush.  The evidence will show that Mr. Ambush

17   was an independent attorney working on the case.  And

18   there is not in evidence, and there will not be in

19   evidence, an accounting where the Center can tell you

20   we paid Ambush X amount of dollars to the dime on any

21   given case.

22           He had many cases with the Center that they

23   collaborated and, yes, they gave him money.  But they

24   will not show you, because it's not in evidence, an

25   accounting saying that we paid Ambush X for Franqui

1   v. Syria; and they cannot show you an accounting

2   saying we spent this amount of money on Franqui v.

3   Syria.

4          And, in fact, since we're talking about the

5   Center, plaintiffs never met Michael Engelberg.

6   Plaintiffs never met Rabbi Perr.  The only person

7   that was working in the trenches for them was Joshua

8   Ambush.

9          So to wrap up, we sustain that the evidence

10  will show that the retainer agreements are valid,

11  that Mr. Ambush complied with all of his obligations.

12  And we will ask you to return a verdict at the close

13  of the case for Joshua Ambush.

14          I thank you for your attention.  My name is

15  Raul Arias.  The gentleman with the striped blue tie

16  is Attorney Freese, and gentleman with the burgundy

17  tie is Joshua Ambush.  Again, thank you for your

18  attention and for your jury service.

19          THE COURT:  Thank you, Ladies and Gentlemen

20  of the Jury.

21          Thank you Mr. Arias, first of all, and Mr.

22  Efron for your opening statements.  We will now

23  recess for lunch.  It's 12:30.  Please be back in the

24  jury room at 1:30.  I have to discuss certain things

25  with counsel so we may come back to court a little

1 after 1:30, but if I haven't called you in it's for

2 attorneys to resolve some matters so that the case

3 will expedite in presentation.

4    So remember my instructions:  Do not discuss

5 this is case.  Continue to keep an open mind and

6 remember that opening arguments, they're only

7 arguments of counsel, they are not evidence, it's

8 just presentation of what each attorney understands

9 will be proven or not proven on behalf of his

10 representative clients.  So you're excused.  Thank

11 you very much.

12    THE COURT OFFICER:  All rise.

13    (Jury exits the room.)

14    THE COURT:  What I propose, give the jurors

15 five minutes to head up to the cafeteria.  I propose

16 we take a lunch break, let's meet back here around

17 1:30, and then I will discuss the matters that

18 Mr. Efron wants to revisit.

19    If you have copies of those, give them to

20 Mr. Arias and Mr. Freese, so they can over lunch look

21 at them and be able to respond.  Let's see if we can

22 take care of that before 2 p.m.  Okay, you're

23 excused.  Thank you.

24    (Jury Trial recessed at 12:30 p.m. and

25 resumed at 1:46 p.m.)

1          THE COURT OFFICER:  All rise.

2          THE COURT:  Before the jury comes in, there

3    are some matters which Mr. Efron or the plaintiffs

4    wanted the Court to reconsider and/or revisit.  And

5    when I granted the motions in limine I very much

6    suspected that counsel had not responded because, you

7    know, something like this happened.  So let's try to

8    be as brief as possible.

9          And also, if it's -- what I would like to do

10   is, if it's something that's not going to come up in

11   the direct for the first witness, we may want to

12   wait -- you may want to advance the issue instead of

13   a prolonged discussion, you may want to wait until

14   the end of the day so that way the jury doesn't waste

15   its time.

16          MR. EFRON:  None of it will be used with any

17   witness today.

18          THE COURT:  Then what I propose is --

19          MR. EFRON:  We can wait or do it now,

20   whatever Your Honor, prefers.

21          THE COURT:  Okay.  Then I suggest then that

22   perhaps we start with the testimony of the witnesses

23   and then I can excuse the jury a like a little bit

24   before five, and then we can discuss this issue,

25   we'll have more time so that way -- we'll won't waste

1    the jury's time.

2              MR. ARIAS-MARXUACH:  May it please the

3    Court, Raul Arias, on behalf of Joshua Ambush.  Your

4    Honor, we do have a matter that is preliminary and

5    has to be addressed before any witnesses is seated,

6    and Mr. Freese will address it.

7              THE COURT:  Okay.

8              MR. FREESE-SOUFFRONT:  May it please the

9    Court.

10             THE COURT:  Mr. Freese.

11             MR. FREESE-SOUFFRONT:  Attorney Henry Freese

12   on behalf of Joshua Ambush, Your Honor.  We have a

13   petition to make today.  It's that, as you heard

14   earlier this morning, the plaintiffs in this case,

15   through counsel Efron, are planning on calling as

16   part of their case in chief our client and sole

17   defendant in this case, Joshua Ambush.  And we

18   understand that this Court has ample discretion.

19             Under the case law for the First Circuit

20   Court of Appeals, as well as Federal Rule of Evidence

21   611, as well as 102, to ensure and govern those

22   proceedings concerning the order of the proof and

23   presentation of evidence, specifically stated in

24   Rule 611, this Honorable Court has the discretion to

25   ensure that the presentation of the proof and the

evidence made in such a way as to avoid, delay,
harassment of a witness, and to ensure that it's
presented in a way that fosters the assertion of
truth in this case.

And if we go to, Federal Rule of Evidence
102, it establishes that the general purposes behind
the rules of evidence and the way they should be
interpreted is to ensure that they are applied in a
fair manner.

And our position, Your Honor, is that we do
not concede anything that could be less fair and less
conductive to the ascertainment of truth than having
the jury in this case conceive their first impression
of Defendant Joshua Ambush through the picture that's
going to be painted through the direct examination of
brother counsel David Efron.

The First Circuit Court of Appeals has
already ruled in the case of Elgabri versus Lekas,
964 Federal Second 1255 from 1992, that there is
nothing in the rules -- in Rule 611 of the Federal
Rules of Evidence which imposes on the Court the
obligation to allow a plaintiff to call defendant to
conduct their direct examination as part of the case
in chief, and provides that the Court has ample
discretion to rule upon how the proceedings are going

1    to take place.

2           In this case in particular, Your Honor, in

3    view of the unfairness and the way that we think that

4    this will not foster the proper ascertainment of

5    truth and adequate presentation of evidence, we

6    suggest that this Honorable Court consider the

7    following:  Use its ample discretion to either

8    establish that plaintiffs should not be allowed to

9    call Defendant Ambush as part of their case in chief

10   but allow them, as part of the cross-examination of

11   that witness during our side of the case and after

12   our direct, to conduct a cross-examination that's not

13   limited by the scope of our direct examination.

14          In the alternative, and I think that it's

15   also a way to try to avoid this unfairness and

16   potential prejudice, is that this Honorable Court use

17   its discretion to then call Defendant Ambush out of

18   order and have the defendants conduct the direct

19   examination of Mr. Ambush as part of defendant's --

20   before plaintiffs have closed their case in chief and

21   allow the plaintiffs to then conduct their own

22   cross-examination dealing with all the other matters

23   that they feel that they want to cover as part of

24   their direct for the reasons that they wanted to call

25   Joshua Ambush as part of their case in chief.

1          THE COURT:  Okay.  The last alternative you

2     mentioned was to come out of order you would do the

3     direct and then Mr. Efron could do the cross, cross,

4     however, would not necessarily be limited to matters

5     under direct.

6          MR. FREESE-SOUFFRONT:  That's of course,

7     Your Honor.

8          The Court:  Okay.  What was the other

9     alternative you gave before that?

10          MR. FREESE-SOUFFRONT:  The first alternative

11     would be for Joshua Ambush to be called as part of

12     defendant's case in chief and to allow the plaintiffs

13     in this case --

14          THE COURT:  Without limiting --

15          MR. FREESE-SOUFFRONT:  Without limiting the

16     scope of the question to the direct examination.

17          THE COURT:  Okay.  I'll hear from Mr. Efron.

18     Let me note that this is not a unique problem to this

19     case; I've had it many other times dealing

20     particularly in political discrimination cases.  And

21     it does present a problem.  I -- you know, and

22     without ruling and I'll hear from Mr. Efron, the last

23     alternative might not be unwise, or a combination of

24     that.

25          But let me hear from Mr. Efron, if you

1  propose anything.

2         MR. EFRON:  First of all, this wasn't

3  something that was brought up last minute.

4  Mr. Ambush has been on our witness list, on our case

5  in chief since day one.  When we first met to do the

6  pretrial, when they first sent the interrogatories,

7  for the last year they've known that Mr. Ambush will

8  be a witness for the plaintiff.

9         This is not one of those political

10  discrimination cases where you don't want one witness

11  to testify in front of the other because it might

12  affect -- this is a one-defendant case.  This is not

13  a multiple defendant case where other defendants

14  might be prejudiced by that kind of chain, by that

15  kind of testimony.

16         You know, I assure you that my direct of

17  Mr. Ambush is going to be as brief as possible,

18  depending on how evasive or how cooperative he is.

19  It's going to be direct, it's not going to be

20  offensive.  It's going to be only to get certain

21  information and certain facts that -- you know, I

22  think it's a violation of our client's due process to

23  now say that they get to present their case with

24  Mr. Ambush before we do on our presentation of the

25  proof.

1          The defendant's can't decide how and -- how

2     plaintiffs are going to present their case.  We've

3     always -- and I don't want to be repetitive, but

4     we've always indicated that Mr. Ambush would be one

5     of our witnesses.  There's no surprise here, there's

6     nothing hidden here.  There's absolutely no reason to

7     vary the normal proceedings.

8          Defendants, especially in a one-defendant

9     case, defendants are called up as a witness for the

10    plaintiffs all the time; and that should not affect

11    the normal presentation of evidence.  What my brother

12    counsel was saying is an exception to the rule in

13    circumstances which we -- and I have not read the

14    case, but in circumstances that are not present in

15    this case, Your Honor.

16          THE COURT:  Okay.  Let me ask you, you

17    mentioned your direct was going to be brief of this

18    witness.  How brief?  You estimate again --

19          MR. EFRON:  Well, Your Honor, I don't know

20    if it's going to be -- I don't know -- as soon as I

21    get through my list of questions to him.  I have a

22    number of questions.  It depends really more on him

23    than on myself.  If he answers everything quickly, we

24    could be done in an hour and a half.  If he doesn't,

25    it might take longer.  After that they get to try to

1    cross-examine him if they feel he needs to be

2    rehabilitated.

3            And then they have the added -- they have

4    the added benefit that they have time to prepare him

5    on their turn at bat to then sit on that stand and

6    then explain away any mistakes that he might have

7    made on the plaintiffs' part of the case.  So really

8    they get two shots at the bat.  Mr. Ambush is not an

9    ignorant witness, he's an attorney.  He's testified

10   many times, he's testified before in this case.

11           There's no reason to vary or in any way

12   change the order of the proof in this case, Your

13   Honor.

14           MR. FREESE-SOUFFRONT:  Your Honor, if I may.

15           THE COURT:  Mr. Freese.

16           MR. FREESE-SOUFFRONT:  This is not an issue

17   of whether or not it was brought at the last second

18   or an issue of surprise, it's an issue of whether or

19   not under the Rules of Evidence this Honorable Court

20   has discretion to establish what's going to be the

21   order of proof.  And the issue is here whether or not

22   it's fair in a case -- as Brother Counsel Efron has

23   stated, we only have one defendant here -- for the

24   jury to get the first impression of the defendant by

25   way of the direct examination that's going to be

1    conducted by the plaintiffs in this case through a

2    leading questioning-and-answer process.

3         And in this case, Your Honor, as I said,

4    this is not trying to change the regular way of the

5    order of the proof.  As I said, and brother counsel

6    can verify, the regular way and the order of the

7    proof, as established by the First Circuit Court of

8    Appeals does not grant the plaintiff an absolute

9    right to call a defendant as part of their case in

10   chief, especially in circumstances where, as in this

11   case -- and we're arguing the jury is going to be in

12   a way completely affected by the fact that the first

13   impression that they're going to get of our sole

14   witness in this case, and only defendant, is going to

15   be the picture that is going to be presented by

16   Brother Counsel Efron through his direct examination.

17   He doesn't have and we're not taking out the due

18   process that his clients have to conduct the

19   cross-examination of our client in this case.  In

20   fact, plaintiff --

21        THE COURT:  The cross-examination is limited

22   to in scope to what you present.

23        MR. FREESE-SOUFFRONT:  But as I said, Your

24   Honor, this Honorable Court has discretion -- it was

25   established in the First Circuit in the case that I

1  cited.  The Court has discretion to allow for a

2  cross-examination that is not subject to the matters

3  that are dealt with in the direct examination.  So

4  it's not a matter of not having an opportunity --

5          THE COURT:  I also have discretion to allow

6  Mr. Efron to call him and then to expand your cross

7  to matters not covered in direct.

8          MR. FREESE-SOUFFRONT:  Of course you have

9  that discretion, Your Honor, but it would be an issue

10  of fairness:  Whether or not in a case where

11  plaintiffs have the burden of proof of proving

12  through their own witnesses what is going to be the

13  cause of action, whether it's fair for the jury to

14  first get the picture of what our client is and what

15  we will be testifying through the direct examination

16  of that plaintiff through plaintiffs' case in chief.

17          And, as I said, the First Circuit Court of

18  Appeals has, in this case from 1992, established that

19  the Court has ample discretion to limit that process

20  and to make sure that it's going to -- that the --

21  there is no unfairness on the defendant as a result

22  of calling him as part of plaintiffs' case in chief.

23  And in order to provide an equal treatment to all

24  parties, to allow for the plaintiffs to conduct its

25  cross-examination without limiting that to the scope

1   of the direct examination conducted by the

2   defendants.

3           THE COURT:  Let me ask something.

4   Mr. Freese --

5           MR. EFRON:  Last point, Your Honor, because

6   my brother counsel is -- makes reference to a case

7   where he has not given me a copy of the case, which

8   is customary.  In that case, I'm sure, that the

9   nonabsolute right that every party has to call

10  whichever witness they desire, I'm sure there are

11  exceptions.  And that case, I'm sure, has exceptions

12  and we have to see if any exception fits into this

13  case.

14          THE COURT:  Okay.  Let me ask, Mr. Efron,

15  was Mr. Ambush the first witness you were planning on

16  calling or you were planning on calling all the other

17  witnesses and then calling him last?  Because that

18  could also make a difference.

19          And I have some leeway as to -- and let me

20  say this:  I have -- since both parties are going to

21  come I could allow you to call all the other

22  witnesses and then inform the jury, this is a witness

23  of both parties so he will be called as both a

24  witness of the plaintiffs and defendant and anybody

25  can ask cross or non cross-related questions.

 1          MR. EFRON:  Yes, but we would have to start

 2     with direct with him.

 3          THE COURT:  But, again, what I'm saying is,

 4     you could do all your witnesses who are not Mr.

 5     Ambush, and then I will tell the witness -- excuse

 6     me, the jury, this is a witness that is going to be

 7     called by the defense -- I mean, the plaintiffs and

 8     also the defense.  And then you may go first perhaps

 9     and then the defense.  But it would -- again, what I

10     think could be an issue is calling him first at this

11     time, you know, rather than at another point in time.

12          MR. EFRON:  From what I've seen in the case

13     so far, the case says totally the opposite.  But

14     anyway, that being the case, it is for Your Honor's

15     discretion to rule on this.  I'm not intending on

16     calling him today.  I'm actually not intending -- I'm

17     intending on calling him probably as our last witness

18     unless something happens.  We're expecting after we

19     do the plaintiffs today, which I hope to get through

20     them today, we would have Dr. Engelberg tomorrow

21     morning and then Mr. Ambush.

22          You know, but really I -- you know, we want

23     to have some leeway in case we decide that

24     strategically we have to do it differently.

25          THE COURT:  Let me say this, since you're

1    not going to call him today --

2            MR. EFRON:  We're not going to call him

3    today.

4            THE COURT:  -- let's proceed with the

5    witnesses.  I'll keep this on the Bunsen burner, and

6    then we'll discuss it this afternoon.  So let's bring

7    in the jurors and then, Mr. Efron, you will have an

8    opportunity to review the case.

9            Okay.  Let me take a two-minute recess.

10   Everybody stay here and I'll come out when the jury

11   comes in.

12           (Jury Trial recessed at 2:01 p.m. and

13   resumed at 2:05 p.m.)

14           (Jury enters the room.)

15           THE COURT:  Please be seated.

16           Good afternoon, Ladies and Gentlemen of the

17   Jury.  We're now going to proceed with the

18   plaintiffs' presentation of evidence.  He gets to go

19   first.  Obviously plaintiff has the burden of proof.

20           So, first of all, we need to place under

21   oath the interpreter who will be translating the --

22           THE CLERK:  State your name for the record,

23   please.

24           MR. JOSE IRIZZARY:  Jose Irizzary.

25           (The Interpreter was duly sworn.)

1          MR. EFRON:  Your Honor, plaintiffs call

2     their first witness, Efrain Berganzo.

3          THE CLERK:  Raise your right hand, please.

4          THE WITNESS:  Yes, I do swear.

5          (Efrain Berganzo-Cruz was duly sworn.)

6          THE COURT:  Again, Counsel, please keep in

7     mind we have an interpreter so if there's any

8     objection, we need to first translate the question or

9     the answer in order to have the objection.

10          You may proceed, Mr. Efron.

11          MR. EFRON:  Yes, Your Honor.  May it please

12     the Court.

13                        ---

14          EFRAIN BERGANZO-CRUZ, a Plaintiff, having

15     been previously duly sworn, was examined and

16     testified as follows:

17                   DIRECT EXAMINATION

18     BY MR. EFRON:

19     Q.     Witness, please state your name.

20     A.     Efrain Berganzo-Cruz.

21     Q.     What was your father's name?

22     A.     Reverend Angel Berganzo-Colon.

23     Q.     Where do you live?

24     A.     In Manati, Puerto Rico.

25     Q.     How long have you lived there?

Efrain Berganzo-Cruz - Direct

1   A.      Since 2001.

2   Q.      Who do you live in that residence with?

3   A.      With my wife.

4   Q.      Do you have children?

5   A.      Correct; three.

6   Q.      I know this is the first time you've ever

7   testified.  If you feel you need a break or you're

8   nervous, it's normal, we can wait.

9           Where were you on May 30, 1972?

10  A.      At my home.

11  Q.      Who were you with?

12  A.      With my wife.

13  Q.      What happened that day?  The next day was

14  when you found --

15  A.      No, not that day, it was the next day.

16  Q.      What did you find out the next day?

17  A.      I visited my mother, she was alone, she had

18  traveled to Israel -- just a moment.  I found about

19  45 people together in my house.  After a while I

20  asked what happened and then -- then they told me

21  that my father was over there and he apparently

22  suffered an accident and they said that he was

23  injured.  We were all worried.

24  Q.      What did you find out next after that?

25          MR. FREESE-SOUFFRONT:  Your Honor, we object

Efrain Berganzo-Cruz - Direct

1  as to relevancy.  I think that it has been a

2  stipulated fact that this witness is testifying

3  today.  I don't think it's necessary for him to go

4  through that process given that the facts have been

5  stipulated that his father was murdered in the Lod

6  Massacre Airport and he's a member of that estate.

7         THE COURT:  I'll allow the question.  I

8  think obviously we're not going to be with this more

9  than two or three more minutes.

10        MR. EFRON:  Yes.  This is introductory.  It

11  will be another minute.

12        THE INTERPRETER:  Should the interpret

13  proceed?

14        THE COURT:  Yes.

15 A.        One of the deacons of the church that he

16 used to work as a preacher in Manati told me that it

17 was being said in the radio that there was a massacre

18 that happened in Israel.

19 BY MR. EFRON:

20 Q.        When did you find out about your father's

21 whereabouts?

22 A.        Well, he had left for Israel and I wasn't

23 there, I was expecting his call.  And then I heard on

24 the radio about the massacre and I heard the

25 information that was given by the government offering

Efrain Berganzo-Cruz - Direct

1    some emergency visas for the people that had

2    relatives that had been hurt, for them to visit.

3    Q.      What happened to your father?

4    A.      He was killed in Israel.

5    Q.      When did you find out?

6    A.      The next day.

7    Q.      Let me go back a little bit.

8            How many children do you have?

9    A.      Three children.  Three sons.

10   Q.      Were any of them alive in 1972?

11   A.      Correct, the three of them -- sorry, two of

12   them.

13   Q.      How old were you in '72?

14   A.      Around 27 years of age.

15   Q.      And you had two children?

16   A.      That is correct.

17   Q.      Tell us a little bit about yourself; what is

18   the extent of your education?

19   A.      High school.

20   Q.      What high school?

21   A.      Senior.

22           THE INTERPRETER:  The interpreter would like

23   to repeat that question, maybe the witness didn't

24   hear.

25   BY MR. EFRON:

Efrain Berganzo-Cruz - Direct

1  Q.        Which high school?

2  A.        Jose Severo Quinones, in Manati.

3  Q.        Did you finish high school?

4  A.        Correct.

5  Q.        Did you go to the university?

6  A.        Correct.

7  Q.        What did you study?

8  A.        I didn't finish.  It was three years that I

9  was in -- at the American University.

10  Q.        When you worked, what did you do during your

11  career?

12  A.        I worked for the service section of the

13  power authority, *Autoridad de Energia Electrica*.

14  Q.        And by how many years were you employed by

15  *Energia Electrica*?

16  A.        About 32 years.

17            THE COURT:  Sorry to interrupt.  You

18  mentioned you went three years to American

19  University; would that be American University here in

20  Bayamon, Puerto Rico or American University in Puerto

21  Rico at one of the other campuses?  If you could

22  explain.

23            THE WITNESS:  It's a subsidiary of American

24  University.

25  BY MR. EFRON:

Efrain Berganzo-Cruz - Direct

1  Q.        Where is it located?

2  A.        It's a graduate college and it disappeared.

3  It was located in Manati.

4           THE COURT:  But that's of American

5  University of Puerto Rico, correct?

6           THE WITNESS:  That is correct.

7           THE COURT:  And that was the Manati campus

8  now defunct?

9           THE WITNESS:  And in Bayamon, in both

10 places.

11          THE COURT:  Continue, Mr. Efron.

12          Ladies and Gentlemen of the Jury, I -- from

13 time to time I may ask additional questions, they are

14 not meant to benefit the plaintiff or the defendant

15 or detriment either of the parties.  They are meant

16 to bring out facts which perhaps were not asked and I

17 think they may be important to review.  But, again,

18 my questions are not evidence, they are just

19 additional questions.

20          Okay.  Continue, Mr. Efron.

21 BY MR. EFRON:

22 Q.        Just to clarify the last question based on

23 the judge's question, you took college courses at

24 American University; Manati, correct?

25 A.        That is correct.

Efrain Berganzo-Cruz - Direct

1    Q.      Who is Defendant Ambush?

2    A.      It's the attorney that arrived to my home

3    and in order to lodge a claim.

4    Q.      Do you see him in court today?

5    A.      Correct.

6    Q.      When was the last time you saw him?

7            MR. EFRON:  Or, I'll withdraw my question.

8    BY MR. EFRON:

9    Q.      How many times have you seen him before

10   today?

11   A.      Once.

12   Q.      When?

13   A.      December -- around the 15th of December of

14   2009.

15   Q.      Could it have been 2008?

16   A.      I am not sure, I am not sure.

17   Q.      Thank you.

18           Who is Leopoldo Garcia?

19   A.      Mr. Leopoldo Garcia came as a representative

20   of Mr. Ambush.

21   Q.      When you say "representative," you don't

22   mean that he was a lawyer?

23   A.      No.

24   Q.      Is he here today, Mr. Garcia?

25   A.      He was here, not right now.

Efrain Berganzo-Cruz - Direct

1  Q.      Why was Leopoldo Garcia -- first of all, how

2  many times have you seen Leopoldo Garcia besides

3  today?

4  A.      Several times.

5  Q.      When you say he represented Mr. Ambush, what

6  do you mean by that?

7  A.      Because he spoke about him and he brought

8  some papers in his representation.

9  Q.      When did he bring those papers?

10  A.      About 2002 -- 2001, 2002, but I believe it's

11  2002.

12  Q.      What documents did he bring?

13  A.      Well, the claim pertaining to the case in

14  Israel.

15  Q.      What did they tell you or what did you

16  understand?  What did you understand that you were

17  signing?

18  A.      From the get-go he was doing a

19  representation only speaking about Dr. Michael.

20  Q.      Who is Michael?

21  A.      Well, I don't know who is he.  I've never

22  spoken or seen him.

23  Q.      Is Michael Dr. Michael Engelberg?

24  A.      That is correct.

25  Q.      What did you understand that the document

Efrain Berganzo-Cruz - Direct

1   you signed was going to be used for in 2002?

2   A.      A claim for some money that supposedly was

3   in existence.

4   Q.      Who signed the document?

5   A.      I signed it.

6   Q.      Who was the agreement between?  You and who

7   else?

8   A.      Dr. Michael and myself.

9   Q.      What was he going to do for you?

10  A.      Like I mentioned before, the claim and the

11  agreement for 20 percent.

12  Q.      What was he going to charge 20 percent for,

13  the Center?

14          THE INTERPRETER:  The interpret would need

15  repetition of that last portion after 20 percent.

16          MR. EFRON:  Center, the Center.

17          THE INTERPRETER:  Thank you.

18  A.      What were they going to give me for that

19  20 percent?

20  BY MR. EFRON:

21  Q.      No.  What were you going to get from them

22  for your 20 percent of the compensation?

23  A.      The claim for the money that they had, that

24  they were fighting for, that they were claiming for.

25  Q.      I'd like to show you the claimant agreement.

Efrain Berganzo-Cruz - Direct

1          MR. EFRON:  And I don't have it.  I think

2     the Court has -- the Court has in the joint exhibits

3     an original.  I'm just going to show him to identify

4     the signature.  We have it, I'm sorry.

5          THE COURT:  And that's a joint

6     identification exhibit?

7          MR. EFRON:  Yes, it is.

8          THE COURT:  What's the number?

9          MR. EFRON:  In ours it's out of order for

10    some reason.

11         THE COURT:  Well, we'll find it here because

12    the Court has a number for it.

13         MR. EFRON:  It's Composite Exhibit 9, Joint

14    Exhibit 9.  And it's supposed to be a number of the

15    agreements but his is missing.  And he's our first

16    witness so, you know -- I see everybody's else's.

17         THE COURT:  Let's go for Joint Exhibit 9.

18         MR. FREESE-SOUFFRONT:  Are you looking for

19    the claimant's --

20         THE COURT:  No, it's not Joint Exhibit 9.

21         MR. FREESE-SOUFFRONT:  Twenty-one.

22         THE COURT:  Joint Exhibit 21.

23         MR. EFRON:  May I approach the witness, Your

24    Honor.

25         THE COURT:  Let us show him the court's

Efrain Berganzo-Cruz - Direct

1  copy, which is the one that's stipulated to in this

2  case.

3          Okay.  The record will show I'm handing the

4  witness Joint Exhibit 21.

5  BY MR. EFRON:

6  Q.      Don Efrain, on the second page do you

7  recognize your signature?

8  A.      There is no signature here.  There's only a

9  number.

10 Q.      Let me see the second page?

11 A.      There's no second page.

12         THE COURT:  There is a second page.

13         MR. EFRON:  Okay, it was stuck.

14 A.      Yes.

15 BY MR. EFRON:

16 Q.      Is that your signature?

17 A.      Correct, that's right.

18 Q.      And what date does it say that you signed

19 that document?

20 A.      On February the 15th.

21 Q.      No.  On the second page.

22         MR. EFRON:  It doesn't have -- it doesn't

23 have --

24         THE COURT:  Okay.  Mr. Efron, in order to

25 expedite this, he's already identified his signature.

Efrain Berganzo-Cruz - Direct

1    I'll admit it as Joint Exhibit 21.  And then if you

2    want to publish it, then you can actually refer what

3    part of the document you're talking to.

4              MR. EFRON:  We'll move to admit the joint

5    exhibit as Joint Exhibit 1.

6    A.        June of 2002.

7              THE COURT:  Publish the original copy, put

8    it on the monitor.  Okay, it's on.

9              Can all the jury's monitors are working?

10   Yes, okay.  2002.

11             MR. FREESE-SOUFFRONT:  Your Honor, this

12   monitor is not working or I don't know how to turn it

13   on, one of the two.

14             MR. EFRON:  Housekeeping.  It will just be

15   one time during the whole trial.

16             THE COURT:  Okay, let's proceed.

17             MR. EFRON:  I hope the Court and the jury

18   can see this.

19   BY MR. EFRON:

20   Q.        Who was with you when you signed this

21   document?

22   A.        I do not recall.

23   Q.        Who brought this document to you?

24   A.        Leopoldo Garcia, judging from this document.

25   Q.        Did he tell you -- what do you understand,

Efrain Berganzo-Cruz - Direct

1   if anything, in the last paragraph of the first page?

2   A.      No, I do not understand.

3   Q.      Is that the paragraph that mentions the

4   20 percent?

5   A.      No.

6   Q.      The last paragraph, first page?

7           MR. FREESE-SOUFFRONT:  Your Honor, asked and

8   answered.

9           THE COURT:  Let me just clarify.  If you

10  don't understand what the agreement reads, that's

11  your own -- again, we have a document and it's clear

12  what the document is.  My question is, you don't

13  understand what the document purports to state?

14  Or -- is that what you're answering.

15          THE WITNESS:  That is correct.

16  BY MR. EFRON:

17  Q.      When they told you they would take

18  20 percent from your compensation, what did you

19  understand from that?

20  A.      That it was 20 percent and it was from

21  everything that would be recuperated.

22  Q.      And what did that 20 percent cover?

23  A.      The 20 percent of the total claim.

24  Q.      Did it cover expenses?

25          MR. FREESE-SOUFFRONT:  Leading.

Efrain Berganzo-Cruz - Direct

1    THE COURT:  Sustained.

2    Rephrase.

3    BY MR. EFRON:

4    Q.    What, if anything -- what items were

5    included in the 20 percent that you signed?

6    A.    The service for a total claim.

7    Q.    Does that include attorney's fees?

8    MR. FREESE-SOUFFRONT:  Objection.  Leading.

9    THE COURT:  Sustained.

10   BY MR. EFRON:

11   Q.    What services do you mean that you think are

12   necessary to set forth the claim?

13   MR. FREESE-SOUFFRONT:  Objection.  Leading.

14   THE COURT:  Overruled.

15   A.    A notary.

16   BY MR. EFRON:

17   Q.    Did the persons -- well, you say it was

18   Leopoldo Garcia; did he explain what you were

19   signing?

20   A.    Well, like I said before, it was for a claim

21   and that for the 20 percent in the case that would be

22   recuperated.

23   Q.    What happened after you signed that document

24   in 2002?

25   A.    I didn't heard about him anymore.

Efrain Berganzo-Cruz - Direct

1  Q.        When you say "him," who do you mean?

2  A.        Leopoldo Garcia-Viera.

3  Q.        Did Attorney Ambush call you after you

4  signed those documents?

5  A.        No.

6  Q.        Did Attorney Ambush give you periodic

7  updates about the pending case?

8  A.        No.

9  Q.        Regarding the case, what happened between

10  2002 and 2008, if you know?

11  A.        I'm not that clear on that matter, but I was

12  called by Mr. Leopoldo and he told me -- and I'm not

13  quite sure if it was at the same time that he called

14  me together with Mr. Ambush, but he informed me that

15  the case was closed.

16  Q.        And when was this approximately?

17  A.        I think around 2009.

18  Q.        Was it that meeting which you mentioned

19  before was the first time you saw Mr. Ambush, around

20  that time?

21  A.        No.  That was done over the phone.

22  Q.        Was it before the meeting?

23  A.        Yes, correct.

24  Q.        And that meeting, that was the December 15th

25  meeting?

Efrain Berganzo-Cruz - Direct

1    A.        That is correct.

2    Q.        What year, if you remember, on December 15?

3    A.        2009.

4    Q.        Could it be 2008?

5    A.        (No response.)

6    Q.        Was it before or after you were paid your

7    compensation from Libya?

8    A.        No, it was before.

9    Q.        And when did you receive payment from Libya?

10   A.        I'm not clear on that, I don't know.

11   Q.        Was it in May?

12   A.        That is correct, yes.

13   Q.        Of what year?

14   A.        2009.

15   Q.        So the December 15th meeting was before May

16   of 2009, correct?

17   A.        That is correct, yes.

18   Q.        So the correct date for the meeting is

19   December 15, 2008?

20   A.        Correct, yes.

21   Q.        What happened at that meeting?

22   A.        They came over to explain what happened with

23   the claim and either Counsel Berdecia or Counsel

24   Gonzalez, one of the two, came over with Leo and

25   Ambush.

Efrain Berganzo-Cruz - Direct

1    Q.        When you say "Leo" you mean Leopoldo Garcia?

2    A.        Correct.

3    Q.        What happened at that meeting?

4    A.        Well, at that meeting, which was attended by

5    Mr. Ambush, by Leo Garcia and one of the attorneys

6    that I mentioned, either Gonzalez or Berdecia, they

7    explained to us that they were so sorry, that they

8    were resentful -- pertaining to what happened and

9    they brought some papers to sign.

10   Q.        What did you understand those papers to be?

11   A.        The claim for the case of Israel.

12   Q.        But hadn't you already signed an agreement

13   in 2002 on that case?

14            MR. FREESE-SOUFFRONT:  Leading.

15            THE COURT:  Rephrase your question.

16   BY MR. EFRON:

17   Q.        How was this related to the document you

18   signed in 2002?

19   A.        Well, 'cause one was from Michael and the

20   other one was from Ambush.

21            MR. EFRON:  May we borrow the court's Joint

22   Exhibits 23 and 24?

23   BY MR. EFRON:

24   Q.        If we can go to Joint Exhibit 23, Revocation

25   of Power of Attorney; is that your signature?

Efrain Berganzo-Cruz - Direct

1    A.       That is correct.

2    Q.       Did you read this document before you signed

3    it?

4    A.       No.

5    Q.       Why did you sign it?

6    A.       Because it was being interpreted by the

7    attorney and Leopoldo Garcia repealing Dr. Michael's

8    decision.

9            THE COURT:  Let me just ask, what attorney

10   are you referring to?  You say Leo, Leopoldo Garcia,

11   and the attorney; what lawyer are you talking about?

12           THE WITNESS:  I'm talking about Dr. Michael.

13           THE COURT:  Okay.  But you said that

14   Leopoldo and the attorney told you that the power was

15   revoking Dr. Michael; so what attorney are you

16   referring to along with Leopoldo?

17           THE WITNESS:  (No response.)

18   BY MR. EFRON:

19   Q.       Who was there with you that day, at your

20   house?

21   A.       Leopoldo Garcia-Viera and Ambush.

22   Q.       But there also was a lawyer who was also a

23   notary public that was there?

24   A.       That is correct.

25   Q.       Do you remember his name?

Efrain Berganzo-Cruz - Direct

1  A.        I think it was Attorney Berdecia or

2  Gonzalez, one of the two because I don't know which

3  one came first.

4          THE COURT:  But my question was, Leopoldo

5  and an attorney told you that by signing this you're

6  revoking Dr. Michael's decision; so what attorney is

7  that, that you're referring to, that along with

8  Leopoldo told you this?

9          THE WITNESS:  No.  What happened is, they

10 both Licenciado Berdecia or Gonzalez, one of the two,

11 were translating and Leopoldo was there too; but

12 Leopoldo Garcia-Vera is not an attorney.

13 BY MR. EFRON:

14 Q.        So there were two attorneys there,

15 Mr. Ambush and Mr. Berdecia or Gonzalez, one of the

16 two?

17 A.        That is correct.

18          MR. EFRON:  That is the answer to your

19 question earlier.

20          THE COURT:  Yes.

21 BY MR. EFRON:

22 Q.        The other document you signed, if you can

23 look at Joint 24, this other one, do you recognize

24 that document?

25          MR. EFRON:  By the way, Your Honor, the

Efrain Berganzo-Cruz - Direct

1    other document he signed, we move it into evidence as

2    Plaintiffs' Exhibit 2.

3            MR. FREESE-SOUFFRONT:  It's a joint exhibit.

4            THE COURT:  It's Joint Exhibit 23 and it

5    will be Joint Exhibit 24.

6            MR. EFRON:  Okay.

7    A.      Correct, yes.

8    BY MR. EFRON:

9    Q.      Are those your initials on the left margin?

10   A.      Correct, correct.

11   Q.      On the second page of that document, are

12   those your initials on the margin on the left?

13   A.      Correct.

14   Q.      On the last page in that document, is that

15   your signature?

16   A.      Correct.  Initials, not my signature.

17   Q.      Okay.  On top of the page, the last page on

18   top, on the left --

19   A.      Correct, yes.

20   Q.      -- is that your signature?

21   A.      Correct.

22   Q.      And that signature was notarized by an

23   attorney?

24   A.      Correct.

25   Q.      And what is his name?

Efrain Berganzo-Cruz - Direct

1    A.        And now I found out that he's Berdecia.

2    Q.        Okay.  So that was your confusion; now we

3    know that it's Berdecia, correct?

4    A.        Correct.

5    Q.        And we also know it was on December 15,

6    2008, correct?

7    A.        Correct.

8    Q.        The notary says that it's -- he's signing in

9    San Juan, Puerto Rico; did you come to San Juan to

10   sign that document?

11   A.        No.

12   Q.        Why did you sign this document?

13   A.        Under Counsel Berdecia's instructions.

14   Q.        Did you ask Attorney Berdecia anything about

15   this retainer agreement?

16   A.        No.

17   Q.        So why did you sign the document?

18   A.        'Cause he told me so.

19   Q.        What did Ambush tell you either directly or

20   through a translator as to this document?

21             MR. FREESE-SOUFFRONT:  Objection.  Leading.

22             THE COURT:  Rephrase the question.

23   BY MR. EFRON:

24   Q.        What, if anything, did Mr. Ambush tell you

25   regarding this document?

Efrain Berganzo-Cruz - Direct

1    A.       He didn't told me anything.

2    Q.       What did he tell you would happen if you

3    didn't sign it?

4             MR. FREESE-SOUFFRONT:  Objection.

5             THE COURT:  Sustain the objection.

6             Ask another question or rephrase.

7             MR. EFRON:  Yes, Your Honor.

8    BY MR. EFRON:

9    Q.       Do you know what would happen if you

10   wouldn't sign that document?

11   A.       This is the document of legal

12   representation.  Without it the case wouldn't be

13   processed.

14   Q.       What do you mean when you say "*no se podia*

15   *salir el caso*"?

16            MR. EFRON:  *El.  El.  Eso fue lo que el*

17   *dijo.*

18            MR. FREESE-SOUFFRONT:  That's not what he

19   testified.

20            THE COURT:  Rephrase the question.

21   BY MR. EFRON:

22   Q.       What do you mean when you say "*que no podia*

23   *salir el caso*"?  What does that mean?

24            THE COURT:  He said the case --

25   A.       Yes, I do understand.  That the case

Efrain Berganzo-Cruz - Direct

1   wouldn't be able to be processed if I didn't sign

2   this document.

3   BY MR. EFRON:

4   Q.      What would that mean?  If the case would not

5   have been processed, what would have happened in your

6   mind?

7   A.      The claim wouldn't have had any value and I

8   wouldn't have gotten any money.

9   Q.      What did you understand Defendant Ambush's

10  relationship to be with you at the time that you

11  signed those documents?

12  A.      I trusted him as you would trust a counsel

13  that would be defending you in a case.

14  Q.      What happened after you signed those

15  documents at your house on December 15, what happened

16  after that?

17  A.      There was a telephone call.  Mr. Leo Garcia

18  was on the same line and they advised me that the

19  case was closed and that the amount -- or my share of

20  the amount.

21  Q.      What was your share of the amount?

22  A.      $10 million.

23  Q.      Did you -- since when did you know --

24          MR. EFRON:  I'm sorry, I'll rephrase it.

25  BY MR. EFRON:

Efrain Berganzo-Cruz - Direct

1  Q.        Did you know before that telephone call that

2  you were -- that your estate was going to be entitled

3  to $10 million?

4  A.        No.

5  Q.        Before that phone call, did anybody tell you

6  how much money you were to receive?

7            Is the answer no, negative?

8  A.        No.

9            MR. EFRON:  Okay.

10 BY MR. EFRON:

11 Q.        How much money did the estate receive?

12 A.        $7 million.

13 Q.        Why?

14 A.        I did not receive them because they didn't

15 gave them to me.

16 Q.        So, but the estate received $7 million?

17 A.        Correct.

18 Q.        Now, when you signed those documents in your

19 house, the Attorney Ambush was there, correct?

20 A.        Correct.

21 Q.        Did he or anybody tell you that the money

22 had already been paid two months before to the

23 Department of State?

24            MR. FREESE-SOUFFRONT:  Objection.  Facts not

25 in evidence, Your Honor.

Efrain Berganzo-Cruz - Direct

1    THE COURT:  Sustained.

2         Rephrase the question.  You need to lay a

3    foundation.

4    BY MR. EFRON:

5    Q.         What did Attorney Ambush or anybody else

6    there tell you about how the claim was going?

7    A.         Never.  They never called me.

8    Q.         On that day, when you signed, did they tell

9    you anything about a federal law regarding claims

10   against Libya?

11        MR. FREESE-SOUFFRONT:  Objection, Your

12   Honor.  We request a side bar.

13   A.         No.

14        THE COURT:  Okay, please approach.

15        (Side Bar Discussion Begins.)

16        MR. ARIAS-MARXUACH:  Counsel Efron is

17   alluding to some federal regulation that is absent

18   from the pretrial.  He is trying to amend his legal

19   theories and the First Circuit case law is very

20   clear, that any allegation not developed through

21   argumentation in the pretrial is waived.

22        And we object to this line of questioning

23   and we request curative instruction, that the jury be

24   instructed to disregard the mention of any legal --

25   federal law on capping fees in this matter because he

Efrain Berganzo-Cruz - Direct

1  did not allude to it in the pretrial, the complaint,

2  or the proposed jury instructions.

3          THE COURT:  Mr. Efron?

4          MR. EFRON:  It doesn't need to be because in

5  the complaint there are general allegations of --

6          THE COURT:  Okay.  But that is governed by

7  the pretrial.

8          MR. EFRON:  What's not in the pretrial --

9  well, we have -- we have -- we have dolo in the

10 pretrial.  Dolo is fraudulent inducement.  It's

11 not -- it's not informing the clients of the real

12 situation.  It's certainly dolo when there's a

13 situation when the case has already been settled and

14 then they go to -- and then they go to the clients,

15 they don't say a word and they make them sign a new

16 contract as if the case had not been already

17 terminated.

18         THE COURT:  That law you're referring to I

19 mentioned it in the stipulating facts.  That's not

20 this law you're talking about.

21         MR. ARIAS-MARXUACH:  No.  Your Honor, he's

22 talking about some purported cap on fees.

23         MR. EFRON:  No, no.

24         MR. ARIAS-MARXUACH:  Your Honor, that's what

25 he was talking about and let the record be read back.

Efrain Berganzo-Cruz - Direct

1    MR. EFRON:  I did not -- the only thing I

2  was trying to put in, which I had to rephrase because

3  of your objection, was Congress' January settlement

4  act law with Libya.  That is the only -- that was --

5  anyway maybe --

6         MR. ARIAS-MARXUACH:  I request that the

7  record be read back to us.

8         MR. EFRON:  I never said anything about

9  caps.

10        MR. ARIAS-MARXUACH:  But you were talking

11  about dolo regarding fees.  That was where you were

12  going.  And the fact that you have a dolo claim is

13  not license to try to sandbag the defendant.

14        MR. EFRON:  Nobody's sandbagging anybody.

15        MR. ARIAS-MARXUACH:  I ask urge Your Honor

16  to try to find any law -- any allegation regarding a

17  law covering fees.

18        THE COURT:  But that's not in the pretrial.

19        MR. ARIAS-MARXUACH:  And that is where the

20  line of questioning was going.

21        MR. EFRON:  I'll strike it and move on to

22  the next question.

23        THE COURT:  Okay.  Then let me strike that.

24        MR. EFRON:  Of course.

25        THE COURT:  Okay, so I'll strike that

Efrain Berganzo-Cruz - Direct

1    question.

2              (Side Bar Discussion Ends.)

3              THE COURT:  Ladies and Gentlemen of the

4    Jury, the last question that was asked and the answer

5    that was given, that is stricken from the record.

6    You cannot consider that, it's not evidence in the

7    case.

8              Mr. Efron let's go back and start

9    asking some -- move on.

10             MR. EFRON:  Yes, Your Honor.

11   BY MR. EFRON:

12   Q.        Going back to the question before that, that

13   meeting on December 15, what, if anything, did

14   Mr. Ambush or Mr. Garcia or Attorney Berdecia, what

15   did any of them tell you about the status of your

16   case which you signed for in 2002?

17   A.        Regarding how the case was going, nothing.

18   They only told me that they had some documents here

19   and that they were removing or repealing Michael

20   Engelberg and to sign for the 10 percent.  And I

21   asked them, "Why do I have to sign for the

22   10 percent?"  And they told me that if I didn't sign

23   the document, they wouldn't be able to process my

24   complaint.

25   Q.        Let's go into another area.

Efrain Berganzo-Cruz - Direct

1    THE COURT:  If you're going go into another

2  area, then let me excuse the jury for 10, 15 minutes

3  to have their afternoon refreshments or coffee, then

4  we'll come back.  It's 3:05, so we will be back

5  around 3:15.  So let's excuse the jury.

6    The witness is under orders of the Court.

7  Please do not discuss your testimony during the

8  break.

9    (Jury exits the room.)

10    (Jury Trial recessed at 3:05 p.m. and

11  resumed at 3:30 p.m.)

12    (Jury enters the room.)

13    THE COURT:  Please be seated and let's bring

14  the witness back.

15    And, Mr. Efron, you may continue your direct

16  exam.

17    MR. EFRON:  Very briefly.  I just have one

18  more are to cover.  May it please the Court.

19  BY MR. EFRON:

20  Q.    Done Efrain, tell me -- are you ready?

21  A.    (In English)  I am ready.

22  Q.    Who is Javier Lopez?

23  A.    Javier Lopez is an attorney.  And he put an

24  ad in *El Nuevo Dia* or *El Vocero* -- I guess it was *El*

25  *Dia,* and he identified himself with an ad in Puerto

Efrain Berganzo-Cruz - Direct

1    Rico for people that were related to the Tel Aviv

2    Massacre.  And he put on a phone number and I called.

3    Q.      Did you speak to him?

4    A.      Correct.

5    Q.      What, if anything, did you learn?

6            THE COURT:  Don't answer:  Rephrase the

7    question so it does not call for hearsay.

8            MR. EFRON:  Yes, Your Honor.

9    BY MR. EFRON:

10   Q.      What did you hear him -- what did you --

11   after your conversation with him, what did you hear

12   him say?

13           MR. FREESE-SOUFFRONT:  Same objection.

14           THE COURT:  Sustained.

15   BY MR. EFRON:

16   Q.      After that conversation, what happened?

17   A.      After the telephone conversation I notified

18   the Rodriguez family and we agreed to meet, and he

19   offered us counseling.

20   Q.      What did he counsel you about?

21           MR. FREESE-SOUFFRONT:  Same objection.

22           THE COURT:  Sustained.

23   BY MR. EFRON:

24   Q.      What did you do based on his advise?

25   A.      Regarding the recommendations that he made

Efrain Berganzo-Cruz - Direct

1    to me, to put in a complaint, to put in a complaint.

2    Q.      Against whom?

3    A.      Against Mr. Ambush.

4    Q.      Why did you sue Mr. Ambush?

5            (Witness answers in Spanish.)

6            MR. EFRON:  Illegal collection?

7            THE INTERPRETER:  I was about to use for an

8    unlawful collection.

9    A.      For a collection of a 10 percent out of the

10   claim, which I considered illegal.

11   BY MR. EFRON:

12   Q.      Why do you think it was illegal?

13           MR. ARIAS-MARXUACH:  Objection.

14           THE COURT:  Sustained.

15           You can rephrase the question.

16   BY MR. EFRON:

17   Q.      What is the basis of your claim?

18   A.      Regarding my claim or complaint, it was

19   based on the counseling that I received from Attorney

20   Javier who told me that it was illegal for them to

21   collect from me 20 percent instead of 30 percent.

22           MR. EFRON:  The other way around.

23           THE INTERPRETER:  The interpreter will

24   rephrase.

25   A.      It was unlawful for them to collect from me

Efrain Berganzo-Cruz - Direct

1    30 percent instead of 20 percent.

2              MR. EFRON:  Thank you.

3    BY MR. EFRON:

4    Q.       When you realized what had happened, how do

5    you feel?

6    A.       Well, I felt resentful because when an

7    attorney is handling a case for you, you trust them.

8    And, well, I felt resentful.

9    Q.       Could we translate "resentful" as hurt

10   instead of *dolido*?

11             THE INTERPRETER:  The interpreter will read

12   the rendition once again.

13             MR. ARIAS-MARXUACH:  Your Honor, "resentful"

14   is *resentido* last time I checked the dictionary.  The

15   translation is correct and should not be altered.

16             MR. EFRON:  Fine.  I will ask him again.

17             THE COURT:  Okay.

18   BY MR. EFRON:

19   Q.       Don Efrain, what else did you feel besides

20   resentful?

21   A.       Not only me, my family and those close to

22   me.  How what I say, deceived.

23             MR. EFRON:  That would be the extent of our

24   direct, Your Honor.

25             THE COURT:  Okay.  Cross-examination?

Efrain Berganzo-Cruz

1    You may proceed, Mr. Freese.

2            MR. FREESE-SOUFFRONT:  May it please the

3    Court.

4                    CROSS-EXAMINATION

5    BY MR. FREESE-SOUFFRONT:

6    Q.       Good afternoon, Mr. Berganzo.

7    A.       Good afternoon.

8    Q.       Mr. Berganzo, you do speak some English,

9    right?

10   A.       Some, yes.

11   Q.       And, in fact, you can read English?

12   A.       That is correct.

13   Q.       And you can write in English also?

14   A.       It can be.

15   Q.       You went to the Army after graduating from

16   high school, right?

17   A.       Correct.

18   Q.       And, in fact, in the Army you stayed for two

19   years, right?

20   A.       Correct.

21   Q.       And you took some classes in the Army

22   Educational Center?

23   A.       Correct.

24   Q.       And those classes were in English, right?

25   A.       Correct.

Efrain Berganzo-Cruz - Cross

1  Q.        And you took exams in connection with those

2  classes?

3  A.        Yes, I would say so.

4  Q.        And you passed those exams, right?

5  A.        Well, I don't know if they gave me exams

6  because it's not a regular school, it's the Army

7  Educational Center.

8  Q.        But you did pass the classes at the Army

9  Educational Center, right?

10  A.        (In English)  Right.

11  Q.        And after the Army you went into the

12  commercial college that is affiliated with the

13  American University of Bayamon, right?

14  A.        Correct.

15  Q.        And you were there for about three years,

16  right?

17  A.        Correct.

18  Q.        And you also have a pilot's license,

19  right --

20  A.        Correct.

21  Q.        -- that you obtained approximately in 1989

22  from the Isla Grande Flying School?

23  A.        Correct.

24  Q.        Now, you mentioned that you had done some

25  work at the Puerto Rico Power Authority, right?

Efrain Berganzo-Cruz - Cross

1    A.        I worked for the Power Authority.

2    Q.        And you retired from the Power Authority in

3    1995, right?

4    A.        Yes.

5    Q.        And after retiring from the Puerto Rico

6    Power Authority you have not taken any other jobs in

7    any business, right?

8    A.        That's correct.

9    Q.        When you retired from the Puerto Rico Power

10   Authority you were entitled to full pension, right?

11   A.        Correct.

12   Q.        And you started receiving that pension since

13   your retirement in 1995?

14   A.        Correct.

15   Q.        And that pension, it's approximately $1,400

16   per month, right?

17   A.        Correct, correct.

18   Q.        And your wife also retired from the Puerto

19   Rico Power Authority that same year that you retired,

20   right?

21   A.        Correct.

22   Q.        In fact, if I'm not mistaken, she retired

23   the same day you did?

24   A.        Correct.

25   Q.        And she also receives a pension from the

Efrain Berganzo-Cruz - Cross

1    Puerto Rico Power Authority?

2    A.        Correct.

3    Q.        And it's about the same as yours but a

4    couple of dollars less, right?

5    A.        Correct.

6    Q.        And in addition to pension from the Puerto

7    Rico Power Authority you also receive Social Security

8    benefits?

9    A.        Correct.

10   Q.        And that is approximately $1,200 per month?

11   A.        That is correct, more or less.

12   Q.        Okay.  And in addition to that you also

13   receive a pension from the Veterans Administration?

14   A.        That is correct.

15   Q.        And you receive approximately $2,800 per

16   month, right?

17   A.        More or less, yes.

18   Q.        Okay.  Now, you said that you had some

19   children, right?

20   A.        Three sons.

21   Q.        And all of them are of legal age, right?

22   A.        Correct.

23   Q.        And in 2002, summer of 2002, those kids were

24   all grown up, right?

25   A.        Yes.

Efrain Berganzo-Cruz - Cross

1  Q.        So in 2002 you were not paying for any

2  educational expenses in connection with your kids?

3  A.        Negative, correct.

4  Q.        And as you sit here today, you don't have

5  any extraordinary medical expenses, correct?

6  A.        That's right.

7  Q.        You mentioned Javier Lopez-Perez, correct?

8  A.        Correct.

9  Q.        And you mentioned that he had been the

10 attorney that had placed an ad in a local newspaper

11 in connection with the Lod massacre, right?

12 A.        Correct.

13 Q.        And you did not know Javier Lopez-Perez

14 prior to seeing his name in that notice from the

15 newspaper?

16 A.        Correct.

17 Q.        And you read the article when it came out in

18 the *El Nuevo Dia*?

19 A.        Correct.

20 Q.        And the article had Javier Lopez's name and

21 phone number?

22 A.        Correct.

23 Q.        And as a result of that you met with Javier

24 Lopez-Perez, right?

25 A.        Correct.

Efrain Berganzo-Cruz - Cross

1  Q.        And Javier Lopez-Perez informed to you that

2  a notice had been placed by him on behalf of the

3  American Center For Civil Justice?

4           THE INTERPRETER:  The interpreter would need

5  repetition of the American --

6           MR. FREESE-SOUFFRONT:  Center For Civil

7  Justice.

8           THE INTERPRETER:  Center for?

9           MR. FREESE-SOUFFRONT:  Civil Justice.

10          THE INTERPRETER:  Thank you.

11          MR. FREESE-SOUFFRONT:  I have an objection

12  to the translation and I'm going to repeat the

13  question for the benefit of the translator.

14  BY MR. FREESE-SOUFFRONT:

15  Q.        My question was:  Javier Lopez told you that

16  he had placed that notice in the newspaper on behalf

17  of the American Center For Civil Justice?

18  A.        He didn't say that.

19  Q.        You remember, Mr. Berganzo, that on

20  February 15 of 2011 I took your deposition in this

21  case, right?

22  A.        I know you took my deposition, but I don't

23  know the date or the day.

24  Q.        And you recall that I was present during

25  that deposition, as well as your counsel and the

Efrain Berganzo-Cruz - Cross

1    interpreter, right?

2    A.        Correct.

3    Q.        And you remember that you were there and

4    were asked to answer some questions related to this

5    case?

6    A.        Correct.

7    Q.        And before you were asked those questions

8    you were asked to take an oath and you were placed

9    under that oath, right?

10   A.        Correct.

11   Q.        And there was an interpreter in that

12   deposition that allowed for me to ask the questions

13   in English and they be translated to you in Spanish

14   for your understanding?

15   A.        Correct.

16   Q.        And you answered my questions with the

17   truth, right?

18   A.        I believe so.

19        MR. FREESE-SOUFFRONT:  Okay.  I'm going to

20   ask that the Court provide Mr. Berganzo with a copy

21   of the transcript of his deposition.

22        THE CLERK:  Counsel, do you have a copy for

23   the defendant?

24        MR. FREESE-SOUFFRONT:  Yes.  (Handing).

25   BY MR. FREESE-SOUFFRONT:

Efrain Berganzo-Cruz - Cross

1  Q.        You have a copy of the deposition in front

2  of you.  Specifically I call your attention to Page

3  No. 49 of the deposition.

4         Now I'm going to read to you.  Okay, I'm

5  going to read and you let me know if I'm reading

6  correctly.  Line No. 8.

7         "QUESTION:  During that meeting you had with

8  Javier Lopez, did he mention to you that he had been

9  hired by the American Center For Civil Justice?

10         "ANSWER:  That is correct."

11         Did I read that correctly?

12  A.        Correct.

13  Q.        Now I ask you, Mr. Berganzo, during that

14  meeting that you had with Javier Lopez-Perez were you

15  alone?

16  A.        Negative.

17  Q.        You were with your brother?

18  A.        No.

19  Q.        Your son?

20  A.        Yes.

21  Q.        Okay.  And also the members of the Rodriguez

22  family were there?

23  A.        Correct.

24  Q.        And Mr. Berganzo, is it correct that during

25  that meeting Javier Lopez-Perez advised you that

Efrain Berganzo-Cruz - Cross

1   Joshua Ambush had allegedly committed an illegal act?

2   A.        That is correct.

3   Q.        And before that meeting that you had with

4   Javier Lopez-Perez you had never met him, right?

5   A.        That is correct.

6   Q.        And during that meeting Javier Lopez-Perez

7   also told you that Joshua Ambush was an employee for

8   the American Center for Civil Justice, right?

9   A.        For that time?

10  Q.        During that meeting.

11  A.        I don't recall that.

12  Q.        Do you recall if during that meeting Javier

13  Lopez-Perez told you that Mr. Ambush had been paid

14  for his legal services on behalf of your father's

15  estate by the American Center For Civil Justice?

16  A.        I do not recall that.

17  Q.        And during that meeting you were not

18  informed either that Joshua Ambush had been working

19  for the Center throughout the course of the case he

20  filed on behalf of your father's estate?

21  A.        Yes.  He told me that he had worked for the

22  so-called center.

23  Q.        So now, in fact, you remember that

24  Mr. Javier Lopez-Perez told you during that meeting

25  that Ambush had been working for the Center?

Efrain Berganzo-Cruz - Cross

1    MR. FREESE-SOUFFRONT: Had worked for the

2    Center.

3    A.    Yes, he had worked for the Center.

4    BY MR. FREESE-SOUFFRONT:

5    Q.    And that he had worked for the Center during

6    the time that he had prosecuted the complaint on

7    behalf of your father's estate, right?

8    A.    We didn't went into those details, that I

9    know of.

10   Q.    During that meeting did you ever ask Javier

11   Lopez-Perez to provide you with any evidence that

12   Mr. Ambush had in fact ever worked for the American

13   Center For Civil Justice?

14   A.    We didn't went into those details.

15   Q.    And did you ever ask Javier Lopez-Perez

16   during that meeting to show you evidence of a

17   contract between Mr. Ambush and the American Center

18   For Civil Justice?

19   A.    No.

20   Q.    And you never asked Javier Lopez-Perez

21   either to show you evidence of any payment made by

22   the American Center For Civil Justice to Mr. Ambush?

23   A.    No.

24   Q.    And you said during your direct examination

25   that after meeting with Javier Lopez-Perez or as a

Efrain Berganzo-Cruz - Cross

1  result of that meeting you decided to file suit

2  against Joshua Ambush, right?

3  A.      No.

4  Q.      No?  Okay.

5          Did you ever seek the advise of independent

6  counsel apart from Javier Lopez-Perez?

7  A.      No.

8  Q.      Did you ever seek the advise or sought

9  confirmation from anyone else in connection with what

10 Javier Lopez-Perez had told you about Mr. Ambush

11 having worked for the American Center For Civil

12 Justice?

13 A.      No.

14 Q.      And did you ever call Joshua Ambush to ask

15 him to confirm the information that had been provided

16 by Javier Lopez-Perez?

17 A.      I've never called Mr. Ambush on the phone.

18 Q.      You've never spoken with Mr. Ambush over the

19 phone?

20         MR. FREESE-SOUFFRONT:  No.  You've never

21 spoken with Mr. Ambush over the phone?

22         MR. EFRON:  That's not what his answer was.

23         MR. FREESE-SOUFFRONT:  Well --

24         THE COURT:  Rephrase the question.  After

25 the Javier Lopez meeting or ever?

Efrain Berganzo-Cruz - Cross

1  BY MR. FREESE-SOUFFRONT:

2  Q.        What I want to know is, Mr. Berganzo, is it

3  your testimony that you've never spoken to Mr. Ambush

4  over the phone?

5           MR. EFRON:  That's a different question.

6           MR. FREESE-SOUFFRONT:  *Por eso*, that's my

7  question now.

8  A.        In combination with Leo Garcia.

9  BY MR. FREESE-SOUFFRONT:

10 Q.        Okay.  And since we're at that topic,

11 Mr. Berganzo, during the direct examination of

12 brother counsel you testified that you became aware

13 that your father's estate was entitled to receive

14 $10 million after the meeting that you had in

15 December of 2008?

16 A.        I don't know if that was the time, but at

17 that date Mr. Ambush, together with Leo Garcia-Viera,

18 told me that I was entitled to $10 million.

19 Q.        And, in fact, that telephone conversation

20 you had with Mr. Ambush and Leo Garcia and yourself

21 took place prior to the December meeting, right?

22           MR. FREESE-SOUFFRONT:  Prior to the

23 December 2008 meeting.

24 A.        No, no, no.  On December of 2008 is when

25 Mr. Ambush came to my home.

1  BY MR. FREESE-SOUFFRONT:

2  Q.       Okay.  So to be clear, what you're saying is

3  that that telephone conversation when Mr. Ambush told

4  you that you were entitled -- or your father's estate

5  was entitled to receive $10 million did not happen

6  prior to the December 2008 meeting?

7  A.       No.  That was afterwards.  The telephone

8  call was after December of '08.  Yes, that was the

9  call.

10  Q.       Okay.  Mr. Berganzo, I'm going to ask you

11  to -- you still have a copy of the deposition that I

12  took in this case.  I want to ask you to turn to

13  Page 91 of your deposition.

14  A.       I got it.

15          THE CLERK:  That is not in evidence.

16          MR. FREESE-SOUFFRONT:  Okay, no problem.

17  BY MR. FREESE-SOUFFRONT:

18  Q.       Mr. Berganzo, start on Page 89, please.  The

19  line that says --

20          THE INTERPRETER:  89 or 91?

21          MR. FREESE-SOUFFRONT:  89, Line 22nd.

22  Excuse me, my bad, not -- Page 90.  Page -- Line 21.

23  BY MR. FREESE-SOUFFRONT:

24  Q.       "QUESTION:  Okay.  There came a time where

25  the complaint that had been initiated against the

Efrain Berganzo-Cruz - Cross

1  Government of Libya prompted an administrative

2  proceeding wherein your father's estate received a

3  monetary compensation, correct?"

4          MR. FREESE-SOUFFRONT:  I'm going to read it

5  and then ask him to confirm whether I read it

6  correctly.

7          MR. EFRON:  Why don't you publish it?

8          MR. FREESE-SOUFFRONT:  I can't.  Both

9  parties are in agreement with publishing of the --

10          THE COURT:  If you can publish it for

11  purposes of the recollection, go ahead, and then take

12  it out.

13  BY MR. FREESE-SOUFFRONT:

14  Q.      "ANSWER:  Yes, it is correct.

15          "QUESTION:  Do you remember how much money

16  your father's estate was entitled to under that

17  settlement?

18          "ANSWER:  Yes.  $10 million.

19          "QUESTION:  And you were told of this by

20  Leopold and Ambush during the meeting?

21          "ANSWER:  No, on the phone.  What do you

22  call it when the three -- when three people are

23  talking on the phone at the same time?

24          "QUESTION:  Okay, a three-way conference.

25          "ANSWER:  Oh, I'm sorry.  Yes.

Efrain Berganzo-Cruz - Cross

1        "And that happened prior to the meeting?

2        "ANSWER:  Oh, yes, yes, yes."

3        I read that correctly?

4    A.        I don't know what you mean.  You mean say it

5    in Spanish and then I'll answer?

6        THE COURT:  The question is, in other words,

7    is that what you stated in your deposition?

8        THE WITNESS:  Yes, I stated that in my

9    deposition.

10        THE INTERPRETER:  The interpreter will need

11    clarification to that response, if the counsel

12    doesn't mind.

13        THE COURT:  Let me -- the question was, what

14    counsel Freese read to you from that transcript,

15    that's what you responded, those were the questions

16    and your answers in your deposition, correct.

17        THE WITNESS:  Well, I believe so.

18    BY MR. FREESE-SOUFFRONT:

19    Q.        Now, I had asked you prior to that whether

20    or not you had ever called Mr. Ambush over the phone

21    to ask him about the information that had been

22    provided to you by Javier Lopez-Perez concerning the

23    fact that he had allegedly worked for the Center.

24        MR. FREESE-SOUFFRONT:  Objection to the

25    translation.

Efrain Berganzo-Cruz - Cross

1  BY MR. FREESE-SOUFFRONT:

2  Q.       The question is:  I asked you, if you ever

3  called Attorney Joshua Ambush over the phone to ask

4  him to confirm the information that had been provided

5  to you by Javier Lopez-Perez concerning the

6  allegations that Ambush had worked for the Center.

7  A.       Like I told you before, I never called

8  Ambush, never.

9  Q.       Okay.  Now, during your direct examination

10  you mentioned an individual by the last name

11  Engelberg, right?

12  A.       That is correct.

13  Q.       The truth is that you do not know this

14  Mr. Engelberg, right?

15  A.       That's right.

16  Q.       And you have never met Mr. Engelberg?

17  A.       No.

18  Q.       And you have never spoken with Engelberg?

19  A.       No.

20  Q.       And you testified about a power of attorney

21  that you executed in 2002 which is the Joint Exhibit

22  No. --

23           THE COURT:  I believe we're up to 23 -- not

24  23 -- Joint Exhibit No. 22.

25           MR. FREESE-SOUFFRONT:  May Joint Exhibit

Efrain Berganzo-Cruz - Cross

1   No. 22 be made available to Mr. Berganzo?

2               THE COURT:  It's provided to him.

3   BY MR. FREESE-SOUFFRONT:

4   Q.          You have the Joint Exhibit before you?  You

5   have it?

6   A.          (In English)  Yeah, I have it.

7   Q.          Now, that's your signature in that document,

8   right?

9   A.          Correct.

10  Q.          Okay.  Now, there's reference to a Michael

11  Engelberg in this document, right, if you can see it?

12  A.          No, if it says so here.  I didn't sign it.

13  Q.          Did you see the reference to the name

14  Michael Engelberg?

15  A.          Where is it?

16              MR. FREESE-SOUFFRONT:  May I approach?

17              THE COURT:  You may approach or you may

18  indicate in the -- you may mark that if you want with

19  a -- actually, you have the pens, you can if you want

20  to use them.

21  A.          Oh, okay, yes.

22  BY MR. FREESE-SOUFFRONT:

23  Q.          Now I ask you, you do not know as you sit

24  here today whether or not Mr. Engelberg did anything

25  on behalf of your deceased father's estate in

Efrain Berganzo-Cruz - Cross

1   connection with this power of attorney, right?

2           THE INTERPRETER:  The interpreter will

3   require repetition.  My apologies, Counsel.

4   BY MR. FREESE-SOUFFRONT:

5   Q.      As you sit here today you do not know if

6   Mr. Engelberg did anything on behalf of your deceased

7   father's estate in connection with this power of

8   attorney?

9   A.      I never communicated with him.

10  Q.      So you do not know --

11          MR. EFRON:  Objection.  He was in the middle

12  of answering a question.

13          THE COURT:  Let him finish.

14          MR. FREESE-SOUFFRONT:  Okay.

15  A.      I never met him, never spoken with him.

16  BY MR. FREESE-SOUFFRONT:

17  Q.      Okay.  So the answer to my question is, yes,

18  you do not know if Engelberg did anything on behalf

19  of your deceased father's estate?

20  A.      Did or didn't do?

21  Q.      You do not know.

22  A.      No.

23  Q.      And let me ask you, Mr. Berganzo, did you

24  ever ask your son, Jose Berganzo, to call

25  Mr. Engelberg and ask about Ambush's alleged

Efrain Berganzo-Cruz - Cross

1  affiliation with the Center?

2  A.        If he had worked for the Center, yes,

3  correct.

4  Q.        And your son Jose in fact told you that he

5  had spoken with Engelberg and that Engelberg had said

6  that Ambush had been an employee of the Center?

7  A.        Correct.

8  Q.        And even though you said today that you

9  trusted Mr. Ambush, you did not call Mr. Ambush after

10  your son, Jose, spoke with Engelberg to confirm if

11  that information was true?

12  A.        I never called Ambush, never.

13  Q.        Now, how about this entity called the

14  American Center For Civil Justice?  Have you ever

15  heard of that entity other than in connection with

16  this litigation?

17  A.        Never.

18  Q.        So as you sit here today, you do not know

19  what the American Center For Civil Justice is?

20  A.        Now I know.

21  Q.        And do you know if the American Center For

22  Civil Justice did anything to prosecute the claim of

23  your deceased father's estate against Libya?

24  A.        No.

25  Q.        Okay.  And you do not know if the American

1  Center For Civil Justice paid any costs or expenses

2  related to the claim filed against Libya either,

3  right?

4  A.        No.

5  Q.        And other than the information that was

6  provided to you by Javier Lopez-Perez and by

7  Engelberg to your son, Jose Berganzo, you do not have

8  personal knowledge that Ambush in fact ever worked

9  for the American Center For Civil Justice?

10  A.        I asked my son to confirm with Engelberg.  I

11  don't know how he located him, but they spoke and he

12  said that yes, that he had worked for Engelberg.

13  Q.        Okay, but my question was different,

14  Mr. Berganzo.

15        My question was, other than what Engelberg

16  told your son, Jose, or what Javier Lopez-Perez told

17  you, do you personally have knowledge as to whether

18  or not Mr. Ambush ever worked for the American Center

19  For Civil Justice?

20  A.        No, no.

21  Q.        Now let's talk about the potential claim

22  against Libya.

23        Now, you first learned about the possibility

24  of filing a claim against Libya in on or about 2001

25  when Leo came and met with you at Casa Cantres,

Efrain Berganzo-Cruz - Cross

1  right?

2          THE INTERPRETER:  The interpreter will need

3  repetition of the date.

4          MR. FREESE-SOUFFRONT:  Strike that question.

5  BY MR. FREESE-SOUFFRONT:

6  Q.      You first learned about the potential claim

7  against Libya in 2002 when Leo Garcia met with you at

8  Casa Cantres, right?

9  A.      He didn't spoke to us about that.

10 Q.      Okay.  Turn to Page No. 73 of your

11 deposition, and I'm going to be reading from --

12 starting on Line No. 5.

13         "QUESTION:  Okay.  When did you first become

14 aware of the potential claims that could be filed

15 against the Government of Libya for the Lod Airport

16 Massacre?

17         "ANSWER:  It was around a thousand -- sorry,

18 2001 when Mr. Leo Garcia-Viera came to my house and

19 asked me if I could gather the people that, to my

20 understanding, had been affected."

21 A.      It wasn't in my house, it was in Casa

22 Cantres where we met.

23 Q.      But as you testified, that was when you

24 learned about the potential claim against Libya,

25 right?

Efrain Berganzo-Cruz - Cross

1    A.        That is correct, yes.

2    Q.        And that was an idea that was proposed to

3    you by Leopoldo Garcia, right?

4    A.        Correct.

5    Q.        It wasn't that you, yourself, Efrain

6    Berganzo, came to Leopoldo Garcia and told Leopoldo,

7    Leopoldo, I have this idea to sue the Government of

8    Libya and I want you to get people to represent me,

9    right?

10   A.        No, no.

11             MR. FREESE-SOUFFRONT:  Can the witness be

12   shown Joint Exhibit No. 21?

13             THE CLERK:  He has it, Counsel.

14             MR. FREESE-SOUFFRONT:  He has it, okay.

15   BY MR. FREESE-SOUFFRONT:

16   Q.        Mr. Berganzo, this is a document, Joint

17   Exhibit No. 21, that you testified during the course

18   of today's proceedings, and I call your attention to

19   the second page which has your signature.  Right?

20   A.        (In English)  Right.

21   Q.        And this was a document that was signed, as

22   you testified, at Casa Cantres on or around June

23   of 2002?

24   A.        Correct.

25   Q.        Okay.  Now, this is a document between

Efrain Berganzo-Cruz - Cross

1  yourself, Efrain Berganzo-Cruz, right --

2  A.        Correct.

3  Q.        -- and an entity that's described therein as

4  the American Center For Civil Justice, right?

5  A.        That is correct.

6  Q.        And you signed this document and you did not

7  ask anybody to explain to you the claim and center

8  agreement prior to signing?

9  A.        That's right.

10  Q.        And as you sit here today, you do not know

11  if the American Center For Civil Justice did anything

12  that it was obligated to perform in connection with

13  Joint Exhibit 21?

14        MR. FREESE-SOUFFRONT:  Objection to the

15  translation.

16  BY MR. FREESE-SOUFFRONT:

17  Q.        The question is:  As you sit here today, you

18  don't have any personal knowledge as to whether or

19  not the American Center For Civil Justice complied

20  with the obligations established in Joint Exhibit

21  No. 21?

22        THE COURT:  Actually, your question was

23  performed anything.

24        MR. FREESE-SOUFFRONT:  Or performed any of

25  the obligations set forth in Joint Exhibit No. 21.

Efrain Berganzo-Cruz - Cross

1    Veintiuno.

2    A.      No.

3    BY MR. FREESE-SOUFFRONT:

4    Q.      Now, Mr. Berganzo, let's talk about

5    Mr. Joshua Ambush.

6            The first time that you met Joshua Ambush in

7    person was in December of 2008, right --

8    A.      That's correct.

9    Q.      -- at a meeting that took place in your

10   house?

11   A.      Correct.

12   Q.      And in that meeting there were also present

13   Leopoldo Garcia, your wife, and the members of the

14   Rodriguez family and a notary public, right?

15   A.      Correct.

16   Q.      And you had testified that you had not heard

17   from Ambush prior to that meeting, but the reality is

18   that you had had conversations with Mr. Ambush over

19   the phone prior to that meeting?

20   A.      No.

21   Q.      Okay.  Let me ask you:  Isn't it true, as we

22   read in connection with your deposition testimony,

23   that you had a three-way conference where Leopoldo

24   Garcia and Mr. Ambush informed you that you stood

25   ready to receive or potentially could receive those

Efrain Berganzo-Cruz - Cross

1   $10 million and that that meeting took place -- and

2   that that telephone conference took place prior to

3   the December meeting?

4   A.        No.

5   Q.        Your answer is no?

6   A.        Look, ask the question again, please.

7   Q.        We went over your deposition testimony

8   wherein you testified that you had received a

9   three-way conference call from Leopoldo Garcia and

10  Joshua Ambush and that they had told you about the

11  $10 million and that that meeting took place -- that

12  that telephone conference took place prior to the

13  December meeting, right?

14  A.        No.  The meeting was first.

15  Q.        Okay.  So when you answered in your

16  deposition, you were not telling the truth?

17          MR. EFRON:  Objection to the

18  characterization.

19          THE COURT:  Overruled.  He can explain and

20  answer.

21  A.        Well, maybe I was mistaken, but I'm telling

22  the truth today.

23  BY MR. FREESE-SOUFFRONT:

24  Q.        Okay.  So you're telling the truth today?

25  A.        Correct, correct.

Efrain Berganzo-Cruz - Cross

1    Q.        And let me ask you:  Isn't it true that

2    prior to the December 2008 meeting you knew that

3    Mr. Ambush was the attorney that was handling the

4    case on behalf of your deceased father's estate, that

5    you were aware?

6    A.        Like I told you, I met Ambush by December

7    the 15th or the 8th.  I don't know what's written in

8    the slip.

9    Q.        So to be clear, what you're saying today is

10   that you did not have any knowledge that Mr. Ambush

11   was the attorney that was prosecuting the claim on

12   behalf of your father's estate prior to the December

13   2'08 meeting?

14   A.        No.

15   Q.        Okay.  Let's go to Page No. 88 of your

16   deposition and I'm going to be reading starting from

17   Line 11.

18            "QUESTION:  Did you ever communicate with

19   Leopoldo Garcia from the date of the meeting that you

20   had in 2002 up to the date of this meeting with

21   Joshua Ambush?

22            "ANSWER:  Yes, yes.

23            "QUESTION:  On how many occasions would you

24   say?

25            "ANSWER:  Several times.  Several times he

Efrain Berganzo-Cruz - Cross

1    would call me or I would call him.

2              "And what was the purpose of those calls?

3              "The status.

4              "Okay.  So you wanted to know the status of

5    the claim?

6              "That's correct.

7              "Okay.  And did you ever receive any written

8    reports from Mr. Ambush or Leopoldo Garcia concerning

9    the status of the case?

10             "No, on the telephone.

11             "Okay.  And during those conversations, did

12   Mr. Leopoldo advise to you that Mr. Ambush was the

13   one that was handling the case?

14             "ANSWER:  Correct."

15             MR. EFRON:  Is there a question, Counselor?

16             MR. FREESE-SOUFFRONT:  You can translate.

17   BY MR. FREESE-SOUFFRONT:

18   Q.        Did I read that correctly?  Yes or no?

19             Mr. Berganzo?

20             THE COURT:  The question should be, is that

21   what you stated in your deposition.

22   BY MR. FREESE-SOUFFRONT:

23   Q.        Is that what you stated in your deposition?

24   A.        You need to clarify.  If you can repeat the

25   question in Spanish.

Efrain Berganzo-Cruz - Cross

1    Q.       I'm asking this:  Having read from your

2    deposition transcript, and having heard the

3    translation of your deposition transcript by the

4    interpreter, what I want to know is if that is the

5    testimony that you gave during the course of your

6    deposition.  Yes or --

7              MR. EFRON:  Objection as to the translation.

8    A.       That's correct.

9              MR. EFRON:  Objection.

10             THE COURT:  What's the objection?

11             MR. EFRON:  Your Honor.  Mr. Freese --

12             MR. FREESE-SOUFFRONT:  Mr. Freese.

13             MR. EFRON:  Mr. Freese, sorry.

14             Mr. Freese is taking parts of the deposition

15   out of context without doing the entire line.  If he

16   did only -- instead of stopping where --

17             THE COURT:  Okay, but you have a very brief

18   opportunity to redirect.  So if you need to expand on

19   that deposition, you can do that yourself.

20   BY MR. FREESE-SOUFFRONT:

21   Q.       Your answer was, that's correct, right?

22   A.       That's correct.

23   Q.       Let's go to Joint Exhibit No. 24.  You have

24   the document in front of you, Mr. Berganzo?

25   A.       (In English)  Yes.

Efrain Berganzo-Cruz - Cross

1    Q.        You recognize this document, right?

2    A.        Correct.

3    Q.        This is a retainer agreement that you

4    executed in a meeting at your house on December of

5    2008, right?

6    A.        Yes, correct.

7    Q.        And during that meeting Mr. Ambush was

8    present, right?

9    A.        Yes.

10   Q.        And you were present, Leopoldo Garcia, and

11   in addition to the Rodriguez family members also a

12   notary public that you said was Mr. Berdecia, right?

13   A.        (In English)  Yeah, right.

14   Q.        Okay.  If we go to this document, Joint

15   Exhibit No. 24, we see that this consists of three

16   pages, right?

17   A.        Correct.

18   Q.        Now, the document in all of the pages has

19   initials; those are your initials, right?

20   A.        Correct.

21   Q.        And if we turn to the last page of this

22   document there is a signature on top and that's your

23   signature, right?

24   A.        Correct.

25   Q.        And this Joint Exhibit No. 24 is written in

Efrain Berganzo-Cruz - Cross

1    Spanish and English, right?

2    A.        Correct.

3    Q.        And you already testified that you can read

4    English, right?

5    A.        More or less.

6    Q.        And you can read Spanish, right?

7    A.        Correct.

8    Q.        Okay.  This document was explained to you

9    and the other persons in the meeting prior to

10   signing, right?

11   A.        Correct.

12   Q.        And someone -- and I think you said Leopoldo

13   Garcia read this document aloud to you and the others

14   prior to signing?

15   A.        Leopoldo Garcia was not, it was Licenciado

16   Berdecia.

17   Q.        Okay.  So your understanding is that it was

18   read aloud by Attorney Berdecia?

19   A.        Correct.

20   Q.        And as you sit here today you don't remember

21   having any questions in connection with the signing

22   of this Joint Exhibit No. 24, right?

23   A.        I might have asked, but I don't recall.

24   Q.        And you understood the agreement?  Yes or

25   no?

Efrain Berganzo-Cruz - Cross

1    A.      I would say no.

2    Q.      Let's go to Page No. 95 of your deposition.

3    A.      Go ahead.

4    Q.      And I'm going to represent to you that we're

5    going to be talking about Exhibit No. 3, and Exhibit

6    No. 3 to your deposition is this Joint Exhibit

7    No. 24.  Now I'm going to read starting from Line

8    No. 7.

9            "QUESTION:  Did you understand this Exhibit

10   No. 3?

11           "ANSWER:  Yes."

12           Was that your testimony?

13   A.      (In English)  Yes.

14   Q.      Now, let's go to the second page of Joint

15   Exhibit No. 24.  And I'm going to read in English

16   what's stated in the top first paragraph.

17           MR. FREESE-SOUFFRONT:  And the interpreter,

18   if you want, you could read the below part which is

19   in Spanish.

20   BY MR. FREESE-SOUFFRONT:

21   Q.      We agree to pay the attorney fees as

22   follows:  10 percent of whatever may be recovered

23   pursuant to the claims settlement agreement between

24   the United States and the Great Socialist People

25   Libyan Arab Jamahiriya, dated August 14, 2008.

Efrain Berganzo-Cruz - Cross

1          THE INTERPRETER:  Should the interpreter

2     proceed?

3          MR. FREESE-SOUFFRONT:  Yes, proceed.

4     BY MR. FREESE-SOUFFRONT:

5     Q.        And below that it says, 10 percent of

6     whatever is recovered from the remaining claim

7     against any defendant not released from the lawsuit

8     pursuant to the claim settlement agreement.

9          Okay.  Now, Mr. Berganzo, your initials are

10    just below the paragraph that I just read, right?

11    A.        Correct.

12    Q.        And this is an agreement, Joint Exhibit

13    No. 24, between yourself, Efrain Berganzo, and on

14    behalf of the estate of your father, and Joshua M.

15    Ambush, right?

16    A.        Correct.

17    Q.        And by executing this agreement you agreed

18    to pay Joshua M. Ambush that 10 percent set forth in

19    the agreement?

20    A.        Correct.

21    Q.        And as you said there was a notary present

22    at the time that you signed this Joint Exhibit 24?

23    A.        Correct.

24    Q.        Okay.  And as you sit here today, you do not

25    recall if you had any questions for the notary public

Efrain Berganzo-Cruz - Cross

1   prior to signing, right?

2   A.      That's right.

3   Q.      And prior to executing that Joint Exhibit

4   No. 24 Mr. Ambush did not tell you that he would stop

5   representing your father's estate if you did not sign

6   the agreement, right?

7   A.      That is not right.  I did not answer that.

8   Q.      I am not asking you if you answered that.

9           My question was, if Mr. Ambush ever said to

10  you prior to signing that Joint Exhibit 24 that if

11  you did not sign the Joint Exhibit that he would stop

12  representing your father's estate?

13          MR. FREESE-SOUFFRONT:  *En ningun momento le*

14  *dijo a usted.*

15  A.      No.

16  BY MR. FREESE-SOUFFRONT:

17  Q.      And Mr. Ambush did not tell you either that

18  if you did not sign this retainer agreement you would

19  not receive the moneys that your father's estate was

20  entitled to?

21  A.      That's right.

22  Q.      Let's go to Joint Exhibit No. 23.

23          THE COURT:  Mr. Freese, I just want to ask

24  you, I don't want to rush you, are you almost done

25  with your cross?  Or if it's going to continue for

Efrain Berganzo-Cruz - Cross

1   15, 20, 30 minutes maybe then we can recess until

2   tomorrow.  I don't want to --

3          MR. FREESE-SOUFFRONT:  It's going to

4   continue for at least 15, 20 minutes more.

5          THE COURT:  Okay.  So if you finish a

6   particular line of questioning and you wish to

7   continue tomorrow, let's do that because it's almost

8   five and --

9          MR. FREESE-SOUFFRONT:  Okay.  Let me confer

10  with my colleague.

11  BY MR. FREESE-SOUFFRONT:

12  Q.      Mr. Berganzo, let's go back to Exhibit --

13  Joint Exhibit No. 24.  Now I'm going to read to you

14  from the first page.

15          I, Efrain Berganzo-Cruz, individually and on

16  behalf of the Estate of Angel Berganzo-Colon retain

17  retroactively to July 23, 2001 Joshua Ambush Esquire,

18  of the Law Offices of Joshua M. Ambush, LLC, 1726

19  Reisterstown Road, Suite 206, Baltimore, Maryland

20  21208, to represent us in the pending proceeding with

21  the Government of Libya and other defendants known as

22  the Franqui, et al. Syrian Republic, DDC-06-CV-734

23  RBW, and in the pending spousal and settlement

24  process pursuant to the claim settlement agreement

25  between the United States and -- and I'm just going

Efrain Berganzo-Cruz - Cross

1    to read -- the Libya Arab government, dated August

2    14, 2008.

3            I know Mr. Berganzo that it's also in

4    Spanish and you could follow what I was just reading,

5    right?

6    A.       That is correct.

7    Q.       And you have your initials next to that

8    paragraph, right?

9    A.       Correct.

10   Q.       You understood that paragraph because

11   otherwise you wouldn't have signed this agreement,

12   right?

13   A.       Correct.

14   Q.       Okay.

15           MR. FREESE-SOUFFRONT:  Your Honor, I think

16   that we can recess for today.

17           THE COURT:  Let's recess for today.  The

18   witness is under rules of the Court; you are not to

19   discuss your testimony with anyone until you conclude

20   tomorrow.

21           The jury is excused.  I will see you all

22   tomorrow at 9:00 a.m.  Let's excuse the jury.

23           THE COURT OFFICER:  All rise for the jury.

24           (Jury exits the room.)

25           THE COURT:  Okay.  The witness is excused.

Efrain Berganzo-Cruz

1    Thank you.

2         Let's -- just a few housekeeping matters.

3    We'll start tomorrow at 9:00 a.m.  The other thing

4    is, when Mr. Freese is done, Mr. Efron -- and this is

5    the way I do it in all of my cases -- I will give you

6    a brief opportunity to redirect.  But, again,

7    redirect is extremely brief, three, four minutes, and

8    that's it.  And it's just to touch particular things

9    that may be necessary, not to be three, four hours.

10   I know some of my colleagues may allow it, but it's

11   important that everybody to the best direct and cross

12   they can because, again, recross is not an

13   opportunity to do that.

14        MR. EFRON:  I don't know that I can clarify

15   all of the misstatements and all of the -- the thing

16   about taking deposition testimony out of the record,

17   I don't know that I can do that in three or four

18   minutes.  I'll do it as quickly as I can but, you

19   know, he's gone over a whole deposition --

20        THE COURT:  Okay.  And as to the deposition,

21   if you have to show the deposition, I have no problem

22   but I do not want you to rehash arguments or ask --

23        MR. EFRON:  No, no.

24        THE COURT:  But normally, it may take a

25   little longer but, again, my --

1          MR. EFRON:  I promise you it will be within

2     the scope of the cross.

3          THE COURT:  Okay.  Now there are -- let me

4     see.  I do have some criminal matters I do have to

5     attend shortly, but what I would like to do is, if

6     you want to discuss the motions that you have -- I

7     don't know if you were able to show them to defense

8     counsel.

9          MR. EFRON:  We did.  Do you want to do that

10    now or tomorrow?

11         THE COURT:  We can do them now or we can do

12    them tomorrow, but then let's try to be here at 8:45

13    because I just don't want the jury waiting

14    extensively.

15         MR. EFRON:  Yes, Your Honor.

16         THE COURT:  What I will ask then, Mr. Efron,

17    if you can within the next half hour perhaps -- I

18    don't know if you can file them electronically so I

19    can print them out -- or give my courtroom deputy a

20    copy and then file them electronically within --

21         MR. EFRON:  We'll do that right now.

22         THE COURT:  And then we'll discuss the order

23    of the issue of Mr. Ambush testifying.

24         MR. EFRON:  Yes, Your Honor.

25         THE COURT:  The last thing is, all exhibits,

1   1 to 33, they're joint exhibits.  So I want to inform

2   the jury that 1 to 33, all those exhibits are

3   admitted into evidence.

4           MR. EFRON:  Even if we don't make reference

5   to them during the trial?

6           THE COURT:  They're admitted already.

7   That's part of the record.

8           You're excused and then I'll recess for five

9   minutes until the criminal defendants are here.

10          (Jury Trial adjourned at 5:00 p.m.)

11                              ---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT    )

2                OF                    )ss.

3         PUERTO RICO                  )

4

5

6

7                        CERTIFICATE

8

9

10        I, EVILYS E. BRATHWAITE, hereby certify that

11   the proceedings and evidence are contained fully and

12   accurately, to the best of my ability, in the notes

13   recorded stenographically by me, at the jury trial in

14   the above matter; and that the foregoing is a true

15   and accurate transcript of the same.

16

17                    _____/s/ Evilys E. Brathwaite____

18                    EVILYS E. BRATHWAITE, RPR
                      Official Court Reporter
19                    United States District Court
                      Federal Building, Room 200
20                    San Juan, Puerto Rico 00918
                      787-772-3377
21

22

23

24

25