IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO


:_____:

THE ESTATE OF ANGEL BERGANZO COLON            :
represented by Efrain and Ruben Berganzo;
THE ESTATE OF ANTONIO RODRIGUEZ MORALES        :
represented by Noemi Rodriguez Robles,
Eliezer Rodriguez Robles, Angel M.             :
Rodriguez Robles, Maria M. Rodriguez
Robles and Ruth D. Rodriguez Robles,           :

                    Plaintiffs,                 :     CIVIL NO:
                                                      10-1044 (GAG)(MEL)
          vs.                                   :

JOSHUA M. AMBUSH                                :
                    Defendant.
:_____:


                DAY 2 OF THE JURY TRIAL
                    HELD BEFORE
           THE HONORABLE GUSTAVO A. GELPI
     Tuesday, September 20, 2011, beginning at 9:48 a.m.
:_____:



A P P E A R A N C E S:

                    LAW OFFICES OF DAVID EFRON
                    BY DAVID EFRON, ESQUIRE and
                    BY JOANNE V. GONZALES-VARON, ESQUIRE
                    P.O. Box 29314
                    San Juan, Puerto Rico 00929
                    For the Plaintiffs

                    McCONNELL VALDES, LLC
                    BY RAUL M. ARIAS-MARXUACH, ESQUIRE and
                    BY HENRY O. FREESE-SOUFFRONT, ESQUIRE
                    270 Munoz Rivera Avenue
                    P.O. Box 364225
                    San Juan, Puerto Rico 00936
                    For the Defendant

1                  <u>INDEX TO WITNESSES</u>

| PLAINTIFF WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| EFRAIN BERGANZO-CRUZ | | | | |
| By Mr. Freese-Souffront.............221................... | | | | |
| By Mr. Efron..............................236............ | | | | |
| NOEMI RODRIGUEZ-ROBLES | | | | |
| By Mr. Efron...............246............290............ | | | | |
| By Mr. Arias-Marxuach..............270................294 | | | | |
| ELIEZER RODRIGUEZ-ROBLES | | | | |
| By Mr. Efron..............295............................ | | | | |
| By Mr. Arias-Marxuach.............308................... | | | | |

---

1           THE COURT:  Please be seated.  Good morning.

2           THE CLERK:  The Estate of Angel

3    Berganzo-Colon, et al. versus Joshua M. Ambush, Civil

4    Case, 10-1044.  Proceedings for jury trial.

5           On behalf of plaintiffs, Attorney David

6    Efron and Joanne Gonzales.  On behalf of the

7    defendant, Attorneys Henry Freese and Raul Arias.

8           THE COURT:  Good morning, Counsel, and good

9    morning to the parties.

10          Let me rule on the pending matters.  And I

11   might have a few questions pertaining to the motion

12   in limine, but the first matter I want to rule upon

13   is, Mr. Ambush, through Mr. Freese, made a motion

14   that I considered changing the order of proof

15   allowing the defense to call Mr. Ambush first.  I

16   considered that motion, and that motion I am going to

17   deny it.

18          I understand the plaintiff has a burden of

19   proof in this case and actually it's a bit higher

20   because of the dolo claim.  But what I will do, in

21   order to -- I do note the concern that the defense

22   has and what I'm going to do is I'm going to order

23   the plaintiff to call Mr. Ambush as its last witness.

24   Mr. Efron will be able to make the direct

25   examination.

1          MR. EFRON:  That was our intention, Your

2    Honor.

3          THE COURT:  But Mr. Efron will make the

4    direct examination and then that will be followed by

5    another direct examination by defense attorney,

6    redirect, and recross and those examinations will be

7    open not limited to mere cross-examination.

8          What I also proposes to do is, for purposes

9    of the jury, I am going to state to the jury that

10   Mr. Ambush is a witness that is going to be called by

11   both parties; therefore, I am basically going to have

12   him testify when the plaintiff has presented all its

13   other witnesses and before the defense presents any

14   other witnesses.  And in that sense I think I'm

15   giving a bit more leeway to the defense.

16         But -- I thought about it but, again, the

17   plaintiff has announced Mr. Ambush for a very long

18   time, and, again, he has the burden of proof.  So

19   that's the court's ruling as to that matter.

20         Now, the other issues that are pending are

21   the motions in limine.  And first we have Docket 137

22   and that is Joshua Ambush's motion in limine,

23   Exhibits 1 and 5 and related testimony.

24         MR. EFRON:  One through five?

25         THE COURT:  One through five and related

1   testimony.  And this pertains to dealings between

2   Mr. Ambush and Jose Ramon Figueroa and/or his estate.

3   My concern -- and, again, I am inclined to grant this

4   motion in limine.  Let me say why and then I'll hear

5   from Mr. Efron.

6         My concern is, number one, Mr. Ramos

7   Figueroa-Viera or -- or, excuse me, Ramon

8   Figueroa-Morales and the Estate of Ramon

9   Figueroa-Viera are not plaintiffs to this case.  To

10   the best of my knowledge there is no other parallel

11   civil action brought by the estate or these estate

12   members against Mr. Ambush.

13         I note that I've looked at some of the

14   documents.  They're very similar to the ones that

15   were signed by the Estate of Berganzo-Colon in this

16   case that were presented yesterday.  Of course,

17   they're very similar.  But my concern is there is no

18   claim by these individuals that Mr. Ambush acted with

19   dolo; that is, with deceit.  For all I know these

20   individuals could be extremely happy and pleased with

21   the work Mr. Ambush performed for them.  So I don't

22   have anything beyond the mere introduction of these

23   documents that would sort of put this evidence in a

24   ^  404(b) type exception category.  And that is as to

25   this evidence.  That is my concern.

And, again, these persons have not been announced as witnesses. I don't think the witnesses that -- Mr. Efron, that you have can testify that they were present there and they saw the way Mr. Ambush requested that they sign these documents, was it the same way as the ones presented here in evidence yesterday. For all I know there could have been more conversations, it could have been different. I don't know if these persons called Mr. Ambush first or how it happened.

Again, we -- you know, and let me analogize this to a criminal case. If this were a criminal case, for example, if the government were trying to introduce this evidence, it would probably have brought Mr. Ramon Figueroa-Viera here or whoever signed those documents, they would have made a proffer saying that Mr. Viera will testify that what happened to him was exactly the same thing that happened to the estate members in this case.

And I've seen this -- you know, you have this sometimes in bank fraud cases and other cases where there's an absence of mistake or anything. But, again, I don't have that proffer, I don't see Mr. Ramon Figueroa Viera is a witness here. And, again, he's not a plaintiff. And that's my

1    inclination.  And, again, my inclination would be to

2    grant this motion.

3           But now that you know how I'm thinking,

4    Mr. Efron, if you can convince me otherwise, please

5    go ahead.

6           MR. EFRON:  Well, I don't think I'm going to

7    convince you otherwise.  I just wanted to state for

8    the record --

9           THE COURT:  Well, for the record state

10   your --

11          MR. EFRON:  Yes.  I'd like to -- basically

12   these are like similar acts except it's a civil case,

13   not a criminal case.  And Rule 403 states that

14   evidence may be excluded only if the probative value

15   is substantially outweighed by danger of prejudice,

16   confusion or issues, and misleading the jury.  These

17   are not issues that are present here.  And in that

18   sense I think it should be --

19          THE COURT:  And let me say this, you very

20   well may be able to convince me it's relevant and

21   it's 403.  It's not 403, and it should be admitted

22   under 404(b), under one of the exceptions.  The

23   problem I have is, you have not announced Ramon

24   Figueroa-Viera or even made a proffer as to what he

25   would testify.  And, again, if there were a criminal

1 case, and the rule exactly the same, I would need to

2 have a least a proffer what the witness would

3 testify.  The way I have it now this would all be

4 inadmissible hearsay.

5 　　　　　　MR. EFRON:  So if we may go on to Exhibits 6

6 and 7, which are --

7 　　　　　　THE COURT:  Okay.  So that's the ruling of

8 the Court as Exhibits 1 through 5 of the plaintiffs.

9 They're excluded and they should be taken out of the

10 binder that was provided to the jury at the end of

11 the case.  What I will do, in an abundance -- so they

12 don't think, oh, exhibits were excluded, I will note

13 that there are no Exhibits 1 through 5.

14 　　　　　　MR. EFRON:  Well, they're not getting that

15 anyway, they would only get the joint exhibit --

16 　　　　　　THE COURT:  No, no, but you may have

17 other -- oh, okay, if I excluded all those exhibits,

18 okay.

19 　　　　　　MR. ARIAS-MARXUACH:  Wait, wait, wait.

20 Those exhibits are in a separate binder, which are

21 Plaintiffs' identifications, they were not

22 intertwined with the joint exhibits.  So you can take

23 them out.

24 　　　　　　THE COURT:  But these exhibits will not be

25 going to the jury.  And let me also say that aside

1   from the 404(b) issue, and I think -- the reason I'm

2   granting the motion, first of all, I don't have a

3   sufficient proffer as to what these individuals would

4   say, the Estate of Ramon Figueroa-Morales to make it

5   inadmissible under 404(b).  And, also, the way I have

6   it at this time.  Again, I don't even think I have to

7   go into a hearsay issue because I don't even have a

8   404(b).

9         MR. EFRON:  We're accepting your ruling,

10  your Honor.

11        THE COURT:  Okay.  That's 1 through 5,

12  Docket 177.  It's granted, the motion in limine, for

13  te reasons stated in open court.

14        MR. EFRON:  Now, our concern is on evidence

15  that is much more relevant and which goes to the core

16  of this case, which are shown in Exhibits 6 and 7.

17  This shows the relationship between the Center and

18  the defendant.  And this is -- it's on Page 4 of our

19  motion.

20        THE COURT:  Let me get the exhibits because

21  I have them here somewhere.  I located them

22  yesterday.

23        MR. EFRON:  I have them available.

24        THE COURT:  No, I have them here.  So let

25  me -- because I do note this is the letter from the

1    Center, 6 and 7.

2            MR. EFRON:  It's the checks basically.

3            THE COURT:  It's a check to Joshua Ambush.

4            MR. EFRON:  Checks.  It's an exhibit in

5    block.  It's a number of checks.

6            THE COURT:  Okay.  And first let me note,

7    Exhibit 6 is a letter from Reverend --

8            MR. ARIAS-MARXUACH:  No, it's a letter from

9    Michael Engelberg signed as attorney in fact to

10   Vega-Franqui.

11           THE COURT:  And then the Plaintiffs'

12   Exhibit 7, again, is the series of checks made

13   payable to Joshua Ambush from the New York Center for

14   Civil Justice.  And, I guess, there's a series of

15   checks.  Let me see:  One for $10,000 dated November

16   13, 2'06.  One for $3,000; November 30, 2'06.  One

17   for 5,000; January 29, 2'07.  And one for $2,000;

18   February 13, 2'07.  The next one, April 27, '07;

19   $2,000.  June 17, '07; $4,000.  June 12, 2'07,

20   $5,000.  January 28, 2'08; $5,875.  January 28, 2'08;

21   it appears $1,500.  March 24, '08; $10,000.

22   April 11, 20'8; I believe it's $23,000.  June 4, '08;

23   10,000.  August 6, '08; 10,000.  August 8, '08;

24   $7,271.91.  November 7, 2'08; $10,000.

25           And those are the checks at issue.  So let

1  me here from you, Mr. Efron.

2  　　　　MR. EFRON:  As we said in our motion, these

3  checks go to the -- are relevant because they go to

4  the nature of the relationship between the Center and

5  the defendant.  And it goes to the fact as to whether

6  Mr. Ambush was doing work for the Center and being

7  compensated for it.  If there was anything left over

8  unpaid, it goes to all of these issues.

9  　　　　The testimony for this would be through

10 Dr. Michael Engelberg who wrote the checks, I

11 believe, or who is familiar with the checks and --

12 　　　　THE COURT:  And he's a witness ?

13 　　　　MR. EFRON:  He's a witness.  And he will be

14 testifying probably tomorrow morning.

15 　　　　THE COURT:  Okay, but he would testify, if

16 he comes here, as to the letter which he signed and

17 also as to the checks that he himself made those

18 checks out.

19 　　　　MR. EFRON:  Yes.  Or because he's the

20 director of the Center he has personal knowledge as a

21 business -- as a business relationship.

22 　　　　THE COURT:  Just one second and then I'll

23 hear from Mr. Arias or Mr. Freese.

24 　　　　Let me ask, first of all, the hearsay issue,

25 Mr. Arias, if Mr. Engelberg comes and testifies I

1    signed this letter, for example, and I was the one

2    who signed these checks, why would that be hearsay?

3              MR. ARIAS-MARXUACH:  Your Honor, first of

4    all, let me start by the checks because I think it is

5    very -- a very important issue.  First of all, the

6    plaintiffs' contention is that the American Center

7    for Civil Justice has paid them in full.  And when

8    you look at the cavalcade of checks, and Your Honor

9    has those, they're all from an entity called the

10   New York Center For Civil Justice.  And they're

11   issued out of an account at Apple Bank in New York

12   that belongs to the New York Center For Civil

13   Justice, not the American Center for Civil Justice.

14             So the first thing is that these checks do

15   not come from the purported payer so they're not

16   probative that the American Center paid Mr. Ambush.

17             To add insult to injury, Your Honor, if you

18   look at the memos of these checks, none of these

19   checks say Franqui lawsuit.  None of these checks say

20   Rodriguez-Robles family.  None of these checks say

21   Berganzo family.  They don't even say Lod.  These

22   checks are work for other matters that Mr. Ambush

23   handled for entities in which Mr. Engelberg may have

24   his fingers.

25             THE COURT:  Let me ask, during the

1    deposition testimony, were these checks presented to

2    Dr. Engelberg.

3            MR. ARIAS-MARXUACH:  I believe they were.

4            THE COURT:  And what did he have to say

5    about them?

6            MR. ARIAS-MARXUACH:  He claimed that the

7    Center was strapped for cash.  But there are no

8    accounting records that tie these to any work on this

9    case.  It's Mr. Engelberg's self-serving

10   representation.

11           And that takes us to the letter, the letter

12   dated December 10, 2008.  That letter is inadmissible

13   because it is hearsay within hearsay, and it's

14   self-serving hearsay.  He's saying here that Paul

15   Gaston did the work on the motion to dismiss in the

16   Franqui case, that the Center has always paid

17   Mr. Ambush for his work.

18           But, again, it is self-serving hearsay and

19   could confuse the jury because it doesn't have really

20   probative value as to how much, if anything, Mr.

21   Ambush was paid for his work on the Franqui say.

22   This is self-serving hearsay from Michael Engelberg

23   when he tried to fire Mr. Ambush.  It does not prove

24   that he was paid.

25           And, also, he purports to be acting on

1  behalf of Jose Manuel Vega-Franqui, the reverend, who
2  last time we checked is not a ward of the court, he's
3  not mentally infirmed, but yet -- and this is a
4  letter actually signed by Eli Perr.  It's not even
5  signed by Engelberg.  It's even worse.  It has the
6  letterhead of --
7          THE COURT:  I believe Engelberg signs it
8  down here also.
9          MR. ARIAS-MARXUACH:  But Engelberg signs for
10 Vega-Franqui, sorry, Your Honor, you're correct,
11 absolutely correct.  So the problem with this is, it
12 would confuse the jury.  It doesn't have any
13 probative -- the probative value, which is
14 nonexistent is ^  by the probability of confusion and
15 it is hearsay within hearsay.
16         The fact is that Dr. Engelberg is not an
17 attorney, he was not handling the Franqui case, and
18 Franqui is not a witness.  Franqui is not here to
19 say, I authorize Engelberg to sign this for me and
20 fire Ambush.
21         THE COURT:  Let me ask, Mr. Efron, I do have
22 a concern because if Dr. Engelberg were an attorney
23 it might be different, but it's true, he's not an
24 attorney.  So isn't this hearsay?  And let's stick to
25 the letter, let's not talk checks.

1          MR. EFRON:  He's not writing the letter as

2     an attorney, he's writing the letter as the person

3     with a power of attorney, not as an attorney.  He's

4     never purported to be an attorney.  He's writing the

5     letter because he has a power of attorney as the head

6     of the American Center for these things, for any

7     decisions such as this one.

8          Now, as to the checks -- as to the checks --

9          THE COURT:  But let me stick to the letter.

10    The problem is, let's assume he were to try to

11    testify about this, he would be testifying, I

12    believe, probably based on hearsay.  That's one of

13    the issues.  And what the letter purports is, it's a

14    statement he's making but he's referring to

15    statements, either verbal or written statements,

16    pertaining to the relationship with Mr. Ambush.  But,

17    you know, it would appear to me it's hearsay.

18          MR. ARIAS-MARXUACH:  It's a multiple hearsay

19    issue.

20          THE COURT:  And it's not only hearsay of he

21    told me that, but it's also not necessarily an oral

22    statement, but it's also written statements or

23    actions on behalf of other persons at the Center.  So

24    I do -- and let me say this, I do have a concern with

25    the letter.  As to the checks, if Mr. Engelberg lays

1 a foundation, he may very well be able to testify

2 that -- because you know, that's him saying I gave

3 these to Mr. Ambush as part of the checks -- not

4 necessarily say it, but if he were to testify that

5 the checks were for --

6 　　　　MR. EFRON:　That was all clarified on

7 discovery.　At Mr. Ambush's deposition I asked him

8 and he said that Dr. Engelberg and Rabbi Perr have

9 several nonprofits, these two being two of them.

10 　　　　At Engelberg's deposition my colleagues

11 asked him and he explained that he was strapped for

12 cash and he didn't have enough money to make those

13 particular payments at that particular time so he

14 uses money from the other entity.　I don't know what

15 the relationship is, I don't know if one is the

16 subsidiary.　I don't know if the New York is a

17 subsidiary of the general one.　For whatever

18 reasons -- he will explain.

19 　　　　THE COURT:　The proffer would be that

20 Dr. Engelberg would testify I used checks from the

21 American Center for Civil Justice because the

22 American Center for Civil Justice was strapped for

23 cash and these checks that were issued by the

24 New York Center on behalf of the American Center to

25 Mr. Ambush were to compensate for work in the Franqui

1    litigation; would that be his testimony?

2         MR. EFRON:  That would be his testimony.  By

3    the way, it would be in the Franqui litigation and in

4    other matters that the Mr. Ambush was handling for

5    the Center.

6         MR. ARIAS-MARXUACH:  You see, the problem is

7    that they are going to try to introduce these

8    cavalcade of checks and say when you add them up,

9    they add X and that proves that Ambush was paid in

10   full and it will confuse the jury, because none of

11   these checks are tied to an accounting showing what,

12   if anything, was paid for Lod.

13        THE COURT:  If they're not tied to an

14   accounting, that would go to the weight of the

15   evidence.

16        MR. EFRON:  The problem is, Your Honor, that

17   despite of the fact that we requested in discovery

18   from defendant any communications between him and the

19   Center regarding payments and that kind of thing,

20   they withheld it from us and we didn't get it until a

21   couple of days ago.  But we now have invoices from

22   Mr. Ambush that shows that those checks certainly

23   partly paid for these invoices on the Lod Airport

24   case, which is how Mr. Ambush invoices this case.

25        THE COURT:  Let me say this, as to the

1    checks, I understand if you lay the proper

2    foundation --

3         MR. ARIAS-MARXUACH:  The invoices haven't

4    been shown to us, Your Honor, and they're not on the

5    witness list.  Who did you get them from?

6         MR. EFRON:  I got them from our next

7    witness.

8         THE COURT:  I'll deal with those purported

9    exhibits because if they haven't been part of

10   discovery --

11        MR. EFRON:  Well, it's not part of discovery

12   because it was withheld and it's newly discovered

13   evidence.  We'll deal with that --

14        THE COURT:  Let's forget about that for a

15   second.  As to the way it stands, Exhibit 7, at this

16   time I am not granting in reconsideration the motion

17   in limine but, again, it's conditional.  Before the

18   checks are ever published, he has to lay the proper

19   foundation as to everything.  And, again, I think

20   this would go to an issue of credibility.  We may

21   need to have one or more side bars when that is

22   happening.

23        But, again, Mr. Efron, you're not to -- he

24   has to lay the proper foundation as to, you know, how

25   the American -- the other center sent the checks and

1  how his accounting or lack of accounting, how he

2  would know and have personal knowledge that

3  particular checks were provided for the Lod Massacre

4  litigation, et cetera, et cetera.  So that's my

5  conditional ruling, again, subject to laying a

6  foundation.

7          MR. ARIAS-MARXUACH:  Your Honor, I want to

8  note something for the record before we go on -- the

9  letter is excluded, correct?

10         THE COURT:  The letter at this time I'm

11  excluding it.  It's double, triple quadruple hearsay,

12  and Exhibit 6 is excluded.  Exhibit 7 is not excluded

13  but, again, subject to the proper foundation being

14  laid out.  And you're free to challenge the

15  foundation in a side bar whenever that's presented.

16  But, again, I need to get a feel for where the doctor

17  is coming from.  Those are those particular issues.

18         MR. ARIAS-MARXUACH:  Okay.  Now I will want

19  to note for the record that the proposed pretrial

20  order in this case was submitted on July 15 of this

21  year.  And in Plaintiffs' Exhibit list there are no

22  invoices from Mr. Ambush to the Center listed.  And

23  we requested from the Center documents evidencing

24  their accounting of payments to Mr. Ambush, and we

25  certainly didn't get those documents.  And he cannot

1 add exhibits at this time.  The rules have to apply.

2       THE COURT:  That's the general rule.  What I

3 will hear is from Mr. Efron as to why that is newly

4 discovered evidence, how it came to be discovered.

5 But, again, it would have to fall under that

6 exception.

7       Before I hear from that, let me note that

8 today for purposes of lunch I'm going to be recessing

9 from 2:00 to 2:30 -- I mean, noon to 2:30 p.m. and

10 then I'm not going to take an afternoon break because

11 I have a matter to attend with other judges of the

12 court between that time.  So it's from noon to

13 2:30 p.m. that is the extended lunch break and then

14 there will be no after recess from 2:30 to 5:00.

15       Okay.  Let me hear Mr. Efron briefly.  Let's

16 try to --

17       MR. EFRON:  Two things:  Number one, how did

18 I obtain it?  I just got it by fax this weekend from

19 Dr. Michael Engelberg when he -- when I briefly

20 discussed the areas he was going to cover.  And I

21 asked him, did you pay these checks blindly and he

22 was just saying, no, they were invoices.  So he

23 located a couple of the invoice and he sent them to

24 me by fax.  Now --

25       THE COURT:  Wasn't discovery from

1    Dr. Engelberg or the Center sought before?

2          MR. EFRON:  Yes, it was, and it was not

3    provided before.  But, by the way --

4          THE COURT:  Not provided by Dr. Engelberg?

5          MR. EFRON:  Your Honor, these invoices

6    originated from Mr. Ambush's office.  He just paid

7    it.  He just --

8          THE COURT:  Okay.  Let me see the purported

9    documents.

10         MR. EFRON:  By the way, again, we will -- in

11   order to present this, if we decide to do it, it will

12   be with the proper foundation and it will be for a

13   relevant purpose.

14         THE COURT:  But I would need first to see

15   them myself and then Mr. Arias has to see it.

16         MR. ARIAS-MARXUACH:  *Es que* at some time,

17   Your Honor, at some time the deadlines have to apply

18   to these plaintiffs.

19         THE COURT:  I understand deadlines have

20   elapsed, so there has to be a good reason for --

21         MR. EFRON:  One clarification.  The header

22   under facts indicates that it was sent a couple of

23   days when it was actually sent, because I received

24   it, I believe, this weekend.

25         MR. ARIAS-MARXUACH:  So now he's contesting

1    the facts then.

2            MR. EFRON:  No, I'm not contesting it.  It's

3    a two-day difference, I think, from the reality and

4    what the header says.  And I have --

5            THE COURT:  Let me also ask this, Mr. Efron,

6    you have some witnesses now, because I need to recess

7    at noon, is this an issue that's going to come up in

8    the morning or this is not going to --

9            MR. EFRON:  It's not going to come up until

10   tomorrow.

11           THE COURT:  Okay.  So what I will do is

12   we'll copy them.  You're going to have a two-and-hour

13   lunch break.  So let's bring in the jury, let's

14   continue with what we're doing, and then copies of

15   these will be presented to the defense, Mr. Ambush

16   can review them.  And then at some point in the

17   afternoon we will discuss this matter or at the close

18   of the day.

19           MR. EFRON:  Thank you, Your Honor.

20           THE COURT:  So let me take a two-minute

21   recess and then we'll bring in the jury.

22           (Jury Trial recessed at 10:13 a.m. and

23   resumed at 10:21 a.m.)

24           (Jury enters the room.)

25           THE COURT:  Okay.  Let's be seated.

1          Good morning, Ladies and Gentlemen of the

2     Jury.  I apologize for the morning delay, but counsel

3     and myself were discussing various matters which

4     will, of course, expedited the case.  And that is

5     what sometimes happens when you're in the jury room

6     waiting.

7          We're now going to continue with the

8     cross-examination by Attorney Freese of the

9     plaintiffs in this case, one of the estate members,

10    and we're going to proceed.  As for lunch today I'm

11    going to take, it's sort of extended lunch from noon

12    to 2:30, and then from 2:30 to 5:00 we're going to go

13    nonstop.  So those of you who have lunch early, we're

14    going to have some refreshments and coffee at 2 p.m.,

15    but from 2:30 until 5:00 we're going to go for those

16    two and a half hours to compensate for the afternoon

17    break.

18         So that's the schedule for today.  The rest

19    of the week will be 9 to 5 with the regular breaks,

20    but today I have a matter to attend.

21         And I will note we have a new interpreter.

22    She's certified by the court, Carol Terry, and she's

23    advanced in her pregnancy.

24         So if you need any breaks, inform the court

25    you need it.

1          THE INTERPRETER:  Thank you, Your Honor.

2          THE COURT:  Okay.  Go ahead, Mr. Freese.

3          MR. FREESE-SOUFFRONT:  May it please the

4     court.

5               CROSS-EXAMINATION CONTINUED

6     BY MR. FREESE-SOUFFRONT:

7     Q.        Good morning, Mr. Berganzo.  Yesterday we

8     were talking about the execution of the retainer

9     agreement that you signed on December 15 of 2008.

10             Now, I had asked you two questions yesterday

11    which I believe there might be some confusion on the

12    record because you answered with a negative and it

13    was a negative question, which I'm going to ask you

14    just to clarify.

15             What I want to know is, before you executed

16    the retainer agreement, did Mr. Ambush ever say that

17    if you did not sign that agreement he would stop

18    representing you?

19    A.        Negative.

20    Q.        And by that you mean he did not say that?

21    A.        That's correct.

22    Q.        And Mr. Ambush did not say either that if

23    you did not sign that agreement you would not receive

24    the payment that your estate was entitled to, right?

25    A.        That is correct.

Efrain Berganzo-Cruz - Cross

1    Q.        Now, let's move to the next joint exhibit,

2    which would be Joint Exhibit No. 23.

3              MR. FREESE-SOUFFRONT:  And I will ask the

4    Court to hand over Joint Exhibit No. 23 to the

5    witness.

6    BY MR. FREESE-SOUFFRONT:

7    Q.        You have that exhibit before you?

8    A.        Correct.

9    Q.        Now, Mr. Berganzo, this is a document that

10   you also executed on December 15 of 2008, right?

11   A.        Correct.

12   Q.        And this document has your signature?

13   A.        Correct.

14   Q.        Okay.  And it has your initials in both

15   pages, right?

16   A.        Correct.

17   Q.        And this document is written in Spanish and

18   English?

19   A.        (In English)  Yes, sir.

20   Q.        Mr. Berganzo, you can understand me directly

21   without the interpreter?

22   A.        I would want the interpreter.

23   Q.        Okay.  And in this document it says that --

24             MR. FREESE-SOUFFRONT:  Strike that.

25   BY MR. FREESE-SOUFFRONT:

Efrain Berganzo-Cruz - Cross

1    Q.        When you executed this document, you read

2    and understood what it stated there, that's why you

3    signed it, right?

4    A.        Correct.

5    Q.        And you were in agreement with what was

6    stated in this Joint Exhibit No. 24 (sic), correct?

7    A.        Correct.

8    Q.        Okay.  Now, let's move to Joint Exhibit

9    No. 25.

10         MR. FREESE-SOUFFRONT:  I ask the Court to

11   hand over Joint Exhibit No. 25 to this witness.

12   BY MR. FREESE-SOUFFRONT:

13   Q.        You have Joint Exhibit No. 25 in front of

14   you, Mr. Berganzo?

15   A.        Correct.

16   Q.        This is a document that's entitled

17   "Acknowledgment" or *reconosimiento*, right?

18   A.        Correct.

19   Q.        And this document consists of five pages,

20   right?

21   A.        Correct.

22   Q.        And if we look at Page 1, let me know if

23   these are your initials.

24   A.        Correct.

25   Q.        And if we turn to the second page, those are

Efrain Berganzo-Cruz - Cross

1  also your initials, right?

2  A.        Correct.

3  Q.        And your initials are in every other page --

4  in every page of this document up to Page No. 5,

5  right?

6  A.        Correct.

7  Q.        And you signed this document on Page No. 4,

8  correct?

9  A.        Correct.

10  Q.       And this document was signed on April 17,

11  2009, right?

12  A.       (No response.)

13  Q.       Go to Page No. 4.

14  A.       Correct.

15  Q.       And this document was signed by you before a

16  notary public, right?

17  A.       Correct.

18  Q.       Now, this document is written in Spanish and

19  English, right?

20  A.       Correct.

21  Q.       And you understood what was stated in this

22  document, that's why you agreed to it and signed it,

23  right?

24  A.       Correct.

25  Q.       Now, if we go to the first page it says, I,

1 Efrain Berganzo, the lawful representative of the

2 estate of Angel Berganzo's estate as follows.

3         What I want to know is at the time that you

4 executed this Joint Exhibit 25 on April of 2009 you

5 were in fact the lawful representative of the estate

6 of Angel Berganzo, right?

7 A.      Correct.

8 Q.      And the estate of Angel Berganzo-Colon, as

9 of April of 2009, was comprised of yourself, Efrain

10 Berganzo, and your brother Ruben Berganzo, right?

11 A.      Correct.

12 Q.      And your brother Ruben Berganzo is one of

13 the plaintiffs in this case, right?

14 A.      Correct.

15 Q.      And on April 2009 when you signed Joint

16 Exhibit 25 you were especially empowered by your

17 brother Ruben to execute this document on his behalf

18 also correct?

19 A.      Correct.

20 Q.      Okay.  Let's go to the second page.  And I

21 want to read -- I'm going to be reading from the

22 third paragraph and I ask you to follow.

23         THE COURT:  And let me before, Mr. Freese,

24 you do that, I see that on the third paragraph

25 reference is made to I.O.L.T.A., IOLTA account.  Just

Efrain Berganzo-Cruz - Cross

1   for the benefit of the jury, IOLTA accounts, you

2   don't have it in Puerto Rico but those are accounts

3   that you have to have under the law of other states;

4   and that's where attorneys keep the funds belonging

5   to their clients in a separate interest-bearing

6   account.  And that's what an IOLTA account is; it's

7   just a regular account.  But I just wanted to explain

8   that for the benefit of the jury.

9           Mr. Freese, go ahead.

10  BY MR. FREESE-SOUFFRONT:

11  Q.      I'm going to be reading from Paragraph

12  No. 3, please follow:  Pursuant to a wire transfer

13  made from the IOLTA account to the estates bank

14  account on April 16, 2009, the estate received a sum

15  of $7 million, the net settlement proceeds

16  representing the net amount payable to the estate

17  after the deductions properly made from the

18  settlement process in the amount of $2 million for

19  attorney fees and costs and pursuant to a certain

20  claim and center agreement; the Center agreement

21  between the estate and the American Center For Civil

22  Justice, the Center, in the amount of $1 million

23  pursuant to a certain retainer agreement with

24  Joshua M. Ambush Esquire.

25          Made on or about December 15, 2008, in his

Efrain Berganzo-Cruz - Cross

1    capacity as my attorney, Mr. Ambush is instructed to

2    fulfill my pledge and obligation to the Center under

3    the -- and we're going to the next page -- center

4    agreement after paying costs and expenses -- cost,

5    expenses, and legal fees incurred in the litigation

6    in accordance with the terms of the Center

7    agreements.

8            Now, Mr. Berganzo, you were in agreement

9    with what was stated in that Paragraph No. 3 that I

10   just read and that's the reason that you executed

11   this acknowledgment, right?

12   A.       Correct.

13   Q.       Now, during that meeting where you signed

14   this acknowledgment, the person who was present

15   therein was the notary public, right?

16   A.       Correct.

17   Q.       Mr. Ambush was not present there?

18   A.       (No response.)

19   Q.       Now --

20           THE COURT:  He hasn't responded if

21   Mr. Ambush was not present.

22   A.       Correct.

23   BY MR. FREESE-SOUFFRONT:

24   Q.       He wasn't present?

25   A.       No, he was not present.

Efrain Berganzo-Cruz - Cross

1    Q.        Now, according to that Paragraph No. 3, the

2    amounts -- the 7 million amount was received in an

3    account of the estate of your father on April 16 of

4    2009, right?

5    A.        Correct.

6    Q.        And this acknowledgment was executed, as you

7    said, on April 17, 2009?

8    A.        That is correct.

9    Q.        And this acknowledgment was executed

10   approximately four months after the December 15

11   meeting, right?

12   A.        I don't remember, but if I signed it...

13   Q.        All right.  Now let's turn to Page No. 3 of

14   Joint Exhibit No. 25 and I'm going to be reading from

15   Paragraph No. 4.

16            I understand that I have the right to seek

17   the advice of independent counsel in connection with

18   the settlement of the litigation and the disposition

19   of the settlement proceeds, and I have knowingly and

20   voluntarily waived that right.  I further understand

21   that this is my responsibility to distribute the net

22   settlement proceeds of the settlement to the

23   beneficiaries of the estate as their interest appears

24   in accordance with the law.

25            Now, Mr. Berganzo, you read that in that

1  document, right?

2  A.      Correct.

3  Q.      And you understood that you had that right

4  but you chose not to exercise it?

5  A.      Correct.

6  Q.      Now, the $7 million that the estate of your

7  deceased father received was distributed evenly

8  between yourself and your brother Ruben, right?

9  A.      Correct.

10  Q.      You received $3.5 million?

11  A.      Correct.

12  Q.      And that amount is free of tax?

13  A.      Correct.

14  Q.      And as a result of that money your economic

15  condition was improved, correct?

16  A.      Correct.

17  Q.      Okay.  And the other $3.5 million that

18  belonged to your brother Ruben, you had an obligation

19  to deliver it to Ruben and you, in fact, delivered

20  those amounts to Ruben?

21  A.      Correct.

22  Q.      So when you signed this acknowledgment, the

23  Joint Exhibit No. 25, you were clear that you were

24  going to be receiving $7 million, that the Center was

25  going to be paid $2 million and that Joshua Ambush

Efrain Berganzo-Cruz - Cross

1    was going to be receiving $1 million, right?

2    A.       Negative.

3    Q.       Okay.  You were not aware?

4    A.       No.

5    Q.       Even though, as you have testified

6    previously, you read and understood Paragraph No. 3

7    of the acknowledgment?

8    A.       Negative.

9    Q.       All right.  Now, Mr. Berganzo, let me ask

10   you, would you agree with me that if in fact

11   Mr. Joshua Ambush was not working for the American

12   Center for Civil Justice and you had not been paid

13   the 10 percent provided under the retainer agreement

14   that you executed, that he would then be entitled to

15   receive that 10 percent under the retainer agreement

16   you executed?

17           MR. FREESE-SOUFFRONT:  I object to the

18   translation.  Let me ask the question again.  Strike

19   that and I'll ask the question again.

20   BY MR. FREESE-SOUFFRONT:

21   Q.       Would you agree with me, Mr. Berganzo --

22           MR. FREESE-SOUFFRONT:  And if you need to

23   make the translation in part, let me know and I'll --

24           THE INTERPRETER:  Okay.

25   BY MR. FREESE-SOUFFRONT:

Efrain Berganzo-Cruz - Cross

1  Q.        Would you agree with me, Mr. Berganzo, that

2  if Mr. Ambush in fact had not been working for the

3  American Center for Civil Justice and if in fact he

4  had not been paid the 10 percent provided under the

5  retainer agreement by the American Center for Civil

6  Justice you would have no objection to Mr. Ambush

7  collecting that 10 percent from you under the

8  retainer agreement?

9  A.        I would not be in agreement.

10  Q.        Okay.  Mr. Berganzo --

11         MR. FREESE-SOUFFRONT:  Can the Court please

12  provide a copy of the transcript to Mr. Berganzo.

13  BY MR. FREESE-SOUFFRONT:

14  Q.        You have the transcript.  Please go to

15  Page 129.

16         And I'm going to be reading from Line No. 22

17  starting on Page 129.

18         "QUESTION:  Okay.  But if, in fact, Joshua

19  Ambush was not paid a 10 percent by the Center then,

20  based on what you understood was the agreement with

21  him, would he then be entitled to receive the

22  10 percent from you?

23         "ANSWER:  That is what he told us.

24         "QUESTION:  Yes, but I want to understand --

25  but what I want to understand is if that was the

Efrain Berganzo-Cruz - Cross

1    agreement as you understood it.

2            "That is correct.

3            "QUESTION:  Okay.  So if in fact Mr. Ambush

4    was not paid 10 percent, you would have no objection

5    to him receiving 10 percent based on the retainer

6    agreement?

7            "ANSWER:  That is correct.  Yes, that is

8    so."

9            Was that your testimony during your

10   deposition?

11   A.       But that's not right.

12   Q.       And the question is, Mr. Berganzo, was that

13   your testimony during your deposition?

14   A.       That is correct, yes.

15   Q.       Now, Mr. Berganzo, yesterday we had gone

16   over some testimony related to whether not you had in

17   fact gained knowledge of the fact that you could be

18   entitled to receive $10 million prior to the meeting

19   of December 15, 2008, and I want to ask you some

20   questions related to that.

21           Isn't it a fact that you asked your son Jose

22   Berganzo to contact Joshua Ambush prior to that

23   meeting in December of 2008 to ask him questions

24   related to the procedure of how to obtain those

25   $10 million?

1    A.        Negative.

2    Q.        And isn't it a fact that your son Jose

3    Berganzo in fact sent e-mail communications to Joshua

4    Ambush dated prior to that meeting in December

5    of 2008 asking, on your behalf, questions concerning

6    the process related to how to obtain those

7    $10 million?

8    A.        I have no knowledge as to that.

9    Q.        Okay.  Mr. Berganzo, if I were to provide

10   you with some documents to refresh your recollection,

11   would that help you in responding to these questions?

12   A.        Correct.

13   Q.        Now, Mr. Berganzo, all I want you to do is

14   to review the documents, go over them, and after you

15   view them, put them aside and I'm going to ask you

16   some questions.  Review all of it and when you finish

17   let me know.

18   A.        They're in English.  They're in English.

19   Q.        So because they're in English you cannot

20   read them?

21   A.        It's not that I can't read them, it's that I

22   cannot understand them.

23            THE COURT:  Then what I would ask, I would

24   have the interpreter, obviously in a very low voice,

25   read them to, just for the benefit in Spanish,

1  Mr. Berganzo.  Then once she's done that Mr. Freese

2  can continue asking any questions.

3  BY MR. FREESE-SOUFFRONT:

4  Q.      Mr. Berganzo, having read those documents

5  and without going into anything discussed therein,

6  what I want to know is if that refreshes your

7  recollection that indeed your son Jose Berganzo was

8  having communications with Mr. Ambush regarding the

9  $10 million prior to the December 15 meeting.

10  A.      Well, do I have to say that this is correct

11  or what I mean is can I go in detail about this?

12  Q.      You cannot go into detail about this now.

13          What I want to know is whether that

14  refreshes your recollection as to those conversations

15  or communications taking place prior to the

16  December 15, 2008 meeting?

17  A.      I had knowledge.

18  Q.      Now, Mr. Berganzo, we were talking yesterday

19  about an individual called Javier Lopez-Perez, and

20  what I want to clarify is that Javier Lopez-Perez was

21  the attorney that originally filed this case against

22  Mr. Ambush, right?

23  A.      I would say that I do not know about that

24  actually.

25  Q.      So as you sit here today you do not know for

1  a fact whether or not in fact Javier Lopez-Perez was

2  the one that filed the originally complaint against

3  Mr. Ambush?

4  A.       That is correct.

5  Q.       But at some point in time another attorney

6  came on board and that was Brother Counsel David

7  Efron, right?

8  A.       Correct.

9  Q.       And before you engaged the services of

10  Counsel David Efron you asked Counsel Efron whether

11  or not he was working for the American Center for

12  Civil Justice, right?

13  A.       I did not ask him that, my son did.

14  Q.       Did your son Jose ask him that?

15  A.       No.  My son Efrain.

16  Q.       And Mr. Efron told your son Efrain that he

17  was not working for the American Center for Civil

18  Justice?

19  A.       That's correct, that's correct.

20  Q.       And as you sit here today, Mr. Berganzo, do

21  you know if counsel David Efron is doing any other

22  work for the American Center for Civil Justice?

23  A.       I do not know.

24  Q.       And you do not know whether or not the

25  American Center for Civil Justice is a client of

Efrain Berganzo-Cruz - Cross

1   counsel David Efron?

2   A.       I don't know.

3   Q.       But just because the American Center for

4   Civil Justice could be a client of Mr. Efron that

5   doesn't mean that Mr. Efron is an employee of the

6   American Center for Civil Justice, right?

7   A.       I don't know.

8   Q.       I don't have any further questions for you.

9   Thank you.

10          THE COURT:  Okay.  Mr. Efron, any redirect?

11          MR. EFRON:  Yes, your Honor.  I'll try to be

12   brief, Your Honor.

13                   REDIRECT EXAMINATION

14   BY MR. EFRON:

15   Q.       Do you still have the e-mail that --

16          THE COURT:  The documents to refresh your

17   recollection.

18   BY MR. EFRON:

19   Q.       You have it?

20   A.       (In English)  I have it.

21   Q.       Why did you have your son Jose -- by the

22   way, Jose Berganzo, he's here today?  This is this

23   young man here, correct?  This is your son Jose?

24   A.       No.

25   Q.       What's his name?

1  A.      (In English)  I don't know what's the name.

2  Q.      Oh, because he's with them, sorry.

3          Why did you have your son Jose contact

4  Dr. Engelberg?

5  A.      Why?

6  Q.      Why?

7  A.      Okay.  It was to see if Attorney Joshua

8  worked for the Center -- I mean, for Dr. Engelberg.

9  Q.      Why didn't you do this yourself instead of

10  asking your son Jose to do it?

11  A.      Because he has more preparation than me and

12  could communicate with him.

13  Q.      You and your brother received a total of

14  $7 million compensation; is that correct?

15  A.      Correct.

16  Q.      Why were you compensated?

17  A.      Because of my dad's death.

18  Q.      Okay we don't want to forget that.

19          December 15 of '08 at the meeting at your

20  house when you signed Ambush's retainer you stated to

21  questions of Mr. Freese that Ambush did not say that

22  he would quit; did Ambush say anything?  Does Ambush

23  speak Spanish?

24  A.      Negative.

25  Q.      Did anybody say that Ambush would quit the

Efrain Berganzo-Cruz - Redirect

1    case if you didn't sign the retainer?

2    A.        That it would not be processed.

3    Q.        Okay.  Thank you.

4              What, if anything, did you understand that

5    the Center had paid Ambush to work on your case?

6              MR. FREESE-SOUFFRONT:  Objection.  Lack of

7    personal knowledge.  He has already testified that he

8    doesn't know what the Center paid Ambush, if

9    anything.

10             THE COURT:  Sustained.

11             You can rephrase or then you have to lay a

12   foundation.

13             MR. EFRON:  No, I'll move onto the next one.

14             THE COURT:  Okay.

15   BY MR. EFRON:

16   Q.        If you had known what the Center did pay

17   Mr. Ambush for his legal services, what would you

18   have done differently?

19             MR. FREESE-SOUFFRONT:  Objection.  Calls for

20   speculation.

21             THE COURT:  Overruled.

22   A.        What would I have done?  I would not have

23   signed.

24             MR. EFRON:  I'm trying to go over the notes

25   quickly.

Efrain Berganzo-Cruz - Redirect

1          THE COURT:  Take your time.

2          MR. EFRON:  I don't want to start asking

3   every single area.  I just want to go to the areas

4   that really need to be clarified.

5          THE COURT:  Take your time.

6   BY MR. EFRON:

7   Q.       Deposition page -- when you would speak to

8   Leo Garcia, Leopoldo Garcia, you'd speak to him in

9   Spanish, correct?

10  A.       (In English.)  Yes, sir.

11  Q.       And you stated here and in your

12  deposition --

13         MR. FREESE-SOUFFRONT:  What page, Brother

14  Counsel?

15         MR. EFRON:  Page 88 of the deposition.

16         THE COURT:  Does he have the copy of the

17  deposition?  Okay.

18         MR. EFRON:  I don't need to publish it.

19         THE COURT:  He's got a copy so --

20  BY MR. EFRON:

21  Q.       Well, we don't need the deposition.

22         I just want to ask you, you mentioned that

23  you were calling Leo Garcia because you wanted to get

24  the status; what do you mean by the "status"?

25  A.       How the claim -- the case of the claim was

Efrain Berganzo-Cruz - Redirect

1   going.

2   Q.        Did Leo know?

3   A.        I don't know.

4   Q.        Did he tell you?

5   A.        No.

6   Q.        What would he tell you when you would call

7   him time and time and ask him what is the status of

8   the case?  What would he answer?

9             MR. FREESE-SOUFFRONT:  Objection.  Hearsay.

10            THE COURT:  Sustained.

11  BY MR. EFRON:

12  Q.        On how many occasions did you call Leopoldo

13  Garcia to find out the status of the case?

14  A.        I don't remember.

15  Q.        Did you ever hear him give you any

16  information regarding the status of the case?

17  A.        No.

18  Q.        Thank you.  Please turn to Page 89 of your

19  deposition.

20            How many times did you speak to Mr. Ambush

21  on the phone, on the telephone, in that three-way

22  call?

23  A.        (In English)  Just one.

24  Q.        How many times before this trial did you

25  physically see Mr. Ambush?

Efrain Berganzo-Cruz - Redirect

1    MR. FREESE-SOUFFRONT: Asked and answered.

2  A.        Once.

3  BY MR. EFRON:

4  Q.        On December 15, 2008 in your home, correct?

5  A.        That is correct.

6  Q.        And you got paid -- a few months after that

7  you were paid the compensation; is that correct?

8           MR. FREESE-SOUFFRONT: Asked and answered.

9           THE COURT: Sustained.

10          Move on.

11 BY MR. EFRON:

12 Q.        Approximately on what month were you paid

13 the compensation?

14          MR. FREESE-SOUFFRONT: Asked and answered.

15          THE COURT: I'll allow the question.

16          MR. EFRON: It's a --

17          THE COURT: I'll allow the question.

18 A.        May 2009.

19 BY MR. EFRON:

20 Q.        Okay. So at Page 89, Line -- the question

21 that starts on Line 17 --

22          MR. EFRON: May I publish it, Your Honor?

23          THE COURT: You may.

24          MR. FREESE-SOUFFRONT: Before he publishes

25 it, Your Honor, what is the question? Because if

Efrain Berganzo-Cruz - Redirect

1    this goes beyond my cross-examination --

2              THE COURT:  Ask the question first.

3              MR. FREESE-SOUFFRONT:  Before publishing,

4    Counsel.

5              THE COURT:  Ask the question --

6              MR. FREESE-SOUFFRONT:  Before publishing,

7    Counsel.  You're publishing the --

8              MR. EFRON:  Your Honor, this is the

9    beginning of the line of questioning that my brother

10   counsel confronted him with yesterday.

11             MR. FREESE-SOUFFRONT:  Ask a question.

12             THE COURT:  Lay a foundation as to what

13   Mr. Freese asked and then you may expound, if

14   necessary.

15   BY MR. EFRON:

16   Q.        Did you speak to Mr. Ambush before or after

17   December 15 at the meeting at your house?

18             MR. FREESE-SOUFFRONT:  Asked and answered.

19             THE COURT:  I'll allow the question.

20   A.        After.

21   BY MR. EFRON:

22   Q.        So and --

23             MR. EFRON:  I would like to show him --

24             THE COURT:  Show Mr. Freese what you're

25   going to be referring to beforehand.

Efrain Berganzo-Cruz - Redirect

1  BY MR. EFRON:

2  Q.        Line 17 -- in Line 17 --

3           "QUESTION:  --

4           MR. FREESE-SOUFFRONT:  Hey, hey, hey, hey.

5           THE COURT:  Remember, show Mr. Freese first.

6           MR. FREESE-SOUFFRONT:  So you already asked

7  that and he answered that.

8           MR. EFRON:  Yes, but you --

9           MR. FREESE-SOUFFRONT:  Your Honor, what I

10  have -- I have an objection.

11          THE COURT:  Let me ask Mr. Freese --

12          MR. FREESE-SOUFFRONT:  I have an objection

13  in the sense that he knows what the extent of his

14  redirect is.  If he wants to try to use depositions

15  to place testimony that he did not get through his

16  direct examination, that cannot be allowed because

17  that's beyond the scope of my cross-examination.

18          THE COURT:  It has to be to explain

19  something he has testified to in cross.

20          MR. EFRON:  And Mr. Freese at Page 91,

21  Line 13 asked this witness if this happened prior to

22  the meeting and he said yes, yes, yes.  And

23  neglected --

24          I'm not done.

25          And neglected to start the questions two

Efrain Berganzo-Cruz - Redirect

1    pages earlier where he clarified that it was after

2    the meeting.

3                MR. FREESE-SOUFFRONT:  Your Honor, first of

4    all, I didn't neglect anything.  Second of all, he

5    has already asked the question of this witness and

6    the witness has answered when that telephone

7    conference happened, according to his recollection,

8    here today.  So I don't think that we have to go

9    through testimony he gave at the deposition beyond

10   what he has already answered.

11               THE COURT:  I would allow Mr. Efron to ask

12   him, but you need to lay a foundation.

13               MR. EFRON:  I'm just correcting a mistake.

14               THE COURT:  Not a mistake.  If he remembers

15   he testified anything else in the deposition that

16   it's necessary for him to state, go ahead.

17               MR. EFRON:  Yes, your Honor.

18   BY MR. EFRON:

19   Q.       So we are clearly that the telephone

20   conversation with after the meeting at your house,

21   correct?

22               MR. FREESE-SOUFFRONT:  Asked and answered,

23   Your Honor.

24   A.       Correct.

25               THE COURT:  Continue.

Efrain Berganzo-Cruz - Redirect

1    MR. EFRON:  Yes, your Honor.  That would be

2    the extent of the redirect.

3    MR. FREESE-SOUFFRONT:  No further questions.

4    THE COURT:  No recross.  The witness is

5    excused.

6    Thank you very much.

7    Mr. Efron, call your next witness.

8    MR. EFRON:  Noemi Rodriguez.

9    THE CLERK:  Raise your right hand, please.

10   Do you solemnly swear that the testimony you're about

11   to give is the truth, the whole truth, and nothing

12   but the truth so help you God.

13   MS. NOEMI RODRIGUEZ-ROBLES:  Yes.

14   THE CLERK:  You may be seated.

15   THE COURT:  Okay.  Mr. Efron, it's 11:25.

16   We're going to go half hour.  When it's a little bit

17   before 12:00 and when you're moving to another area,

18   let me know, we may recess ten minutes to 12:00, five

19   to 12:00, but around that time I will let you know --

20   MR. EFRON:  I expect this testimony to be

21   very brief.

22   THE COURT:  Okay.

23   THE INTERPRETER:  The witness has asked me

24   to speak loudly to her just so you know.

25   MR. EFRON:  I know she has a hearing

1    problem.

2              THE COURT:  And slowly.

3                        ---

4              NOEMI RODRIGUEZ-ROBLES, a Plaintiff, having

5    been duly sworn by the Deputy, was examined and

6    testified as follows:

7                      DIRECT EXAMINATION

8    BY MR. EFRON:

9    Q.         Witness, please tell us your name and

10   introduce yourself to the Ladies and Gentlemen of the

11   Jury.

12   A.         Noemi Rodriguez-Robles.

13   Q.         Who was your father?

14   A.         Antonio Rodriguez-Morales.

15   Q.         Where do you live?

16   A.         Vega Baja.

17   Q.         Do you have a family?

18   A.         Yes; four children.

19   Q.         And a husband, Don Ruben?

20   A.         My husband Ruben Vivas.

21   Q.         Where were you on May 30, 1972?

22             MR. ARIAS-MARXUACH:  Objection, Your Honor.

23   This is cumulative.  There is no dispute that the

24   good lady's father was killed at Lod and it is not

25   material to the facts at issue in this case where she

Noemi Rodriguez-Robles - Direct

1    was when she --

2              THE COURT:  I'll sustain the objection.  And

3    I think as to all estate members they were here in

4    Puerto Rico when the deceased member was killed at

5    Lod so that's not an issue.  Let's move on.

6    BY MR. EFRON:

7    Q.       Okay.  Dona Noemi, please tell us the extent

8    of your education.

9    A.       Third year.

10   Q.       Of high school?

11   A.       Yes.

12   Q.       Where did you go to high school?

13   A.       No, just my 11th grade.

14   Q.       What's the name of the school?

15   A.       It was in Vega Baja, but I don't remember.

16   Q.       Who is Joshua Ambush?

17   A.       He was the -- an attorney.

18   Q.       Who is Leopoldo Garcia?

19   A.       The one who works for Ambush.

20   Q.       Have you met these two gentlemen?

21   A.       Just one.  Mr. Ambush.

22   Q.       Did you speak to him or just met him?

23   A.       No, we met.  As far as knowing him, no.

24   Q.       Do you recall -- by the way, do you have

25   brothers and sisters?

Noemi Rodriguez-Robles - Direct

1  A.        I have four others:  Eliezer

2  Rodriguez-Robles, Maria M. Rodriguez-Robles, Angel

3  Manuel Rodriguez-Robles, Ruth Delia Rodriguez-Robles.

4  Q.        Did your four siblings give you, empower

5  you, give you a power of attorney to represent them

6  in the claim against Libya?

7  A.        Yes.

8  Q.        And did they give you a power of attorney to

9  represent them in this case?

10          MR. ARIAS-MARXUACH:  Objection, Your Honor.

11          THE COURT:  I'll allow the question.

12          MR. ARIAS-MARXUACH:  Objection, Your Honor.

13  Side bar, please.

14          THE COURT:  Okay, please approach.

15          (Side bar discussions begin.)

16          MR. ARIAS-MARXUACH:  Raul Arias on behalf of

17  the defendant, Joshua Ambush.  There is not on

18  Plaintiffs' Exhibit list any power of attorney from

19  the rest of the Rodriguez family members to Ms. Noemi

20  Rodriguez-Robles to represent them in this case.

21  Such a document has never been produced to us, it is

22  not listed on the exhibit.  And how is it that they

23  are going prove a contract of the nature of a power

24  of attorney to represent living, competent,

25  individuals in litigation before this Court based on

Noemi Rodriguez-Robles - Direct

1  testimony, purely testimony?

2      THE COURT:  Let me ask this because, again,

3  she can testify to it even if she doesn't have a

4  document, and that may be something for purposes of

5  impeachment.

6      Let me ask Mr. Efron.  As an officer of the

7  court, is there any such power of attorney?  But

8  that's not a power of attorney.

9      MR. EFRON:  Of course that also happened,

10  but we understand that because this is a related

11  matter the power of attorney that they had for the

12  claim is also -- which they have, is also applicable

13  here.  Because this is really a continuation of the

14  same claim, it's a continuation of the same case in

15  the sense that this is the last part of the claim

16  that she has a power of attorney for.  You know, we

17  could come up -- we could have a power of attorney

18  done today or I could have the four siblings come and

19  testify each one at a time.

20      THE COURT:  That's not a power of attorney,

21  that's a representation and not an official power of

22  attorney.  And the thing is -- and if you want to

23  show me the power of attorney because the powers of

24  attorney can be very specific as to one incident or

25  they may -- -- let me see the power of attorney.  If

Noemi Rodriguez-Robles - Direct

1    you want to check your copy --

2              MR. ARIAS-MARXUACH:  First of all, Raul

3    Arias on behalf of defendant, we do not have any of

4    the parties -- none of the parties marked as an

5    exhibit, the power of attorney that Noemi

6    Rodriguez-Robles signed for the claim.  We have the

7    one for Ruben Berganzo, I think.

8              THE COURT:  No, this is the

9    Rodriguez-Robles.

10             MR. ARIAS-MARXUACH:  But this is an exhibit

11   to a deposition, it's not exhibiting evidence.  But

12   you can --

13             MR. EFRON:  Yeah, but that's --

14             THE COURT:  That's what's important because

15   our understanding the power of attorney can be for a

16   limited case or it can be a very broad power of

17   attorney.

18             MR. EFRON:  It is for this case.  Look at

19   the date.

20             THE COURT:  Let me just review.  Okay, let

21   me just review this one second.

22             MR. ARIAS-MARXUACH:  It was a very specific

23   power of attorney to settle the claim and issue a

24   release to Libya.

25             THE COURT:  Okay.  Let me note I'm

Noemi Rodriguez-Robles - Direct

1    looking -- this would be the actual power of

2    attorney.  And it says that the attorney in fact, and

3    that would be her, is authorized to settle the

4    referred case upon such term -- and this is referring

5    to the case against -- versus Libya -- upon such

6    terms and conditions as he may deem proper to

7    convey -- or she would deem proper to convey and

8    documents related to the settlement proceeds of the

9    case therein, including the receiving the moneys and

10   checks resulting from that settlement delivered as

11   instructed.

12          The issue is that that particular case is

13   dismissed so that Mr. Ambush can proceed in the

14   greater proceeding.

15          MR. EFRON:  In the settlement.

16          THE COURT:  So reading this power of

17   attorney, in light of the fact that they want to

18   obtain that settlement money, I -- at least it is the

19   Court's, you know, opinion that this would allow her

20   to continue within that power of attorney for

21   purposes of this case.  So that's my ruling in this

22   case.  If you want to include this document and you

23   object to my ruling --

24          MR. ARIAS-MARXUACH:  Your Honor, wait a

25   minute, are you saying that this power of attorney

Noemi Rodriguez-Robles - Direct

1   empowers her to represent her siblings in this case?

2   Because this is a very specific power of attorney to

3   settle the Franqui litigation, this is not the

4   Franqui litigation.

5            THE COURT:  What I'm saying is this, this

6   power of attorney allows her -- I understand.  Your

7   objection is?

8            MR. ARIAS-MARXUACH:  She doesn't have a

9   power of attorney to this.

10           THE COURT:  For this case today, but to

11  settle the Franqui litigation and obtain the moneys,

12  I understand this would --

13           MR. ARIAS-MARXUACH:  Not empower her to

14  represent her siblings in this case today.

15           MR. EFRON:  It's a related case.

16           THE COURT:  But this is -- okay.  Now, I

17  understand this does not foresee this case because

18  they received the money.  This is an issue about the

19  estate suing for something else.

20           MR. EFRON:  Exactly.

21           THE COURT:  So my question would be,

22  Mr. Efron, or if -- Mr. Efron, let's assume she

23  obtains a power of attorney today and it's

24  retroactively she could represent them here that

25  would not be an issue.

Noemi Rodriguez-Robles - Direct

1      MR. ARIAS-MARXUACH:  Yeah, but the problem

2  is that right now the questioning that was pending

3  before the court --

4      THE COURT:  We have to strike that question.

5      MR. ARIAS-MARXUACH:  -- we have to strike.

6      THE COURT:  We have to strike it at this

7  time.

8      MR. ARIAS-MARXUACH:  You don't have a power

9  of attorney today for this case.  You do not have a

10  power of attorney for this case.

11      THE COURT:  Right, for this particular case

12  she doesn't have it.

13      MR. ARIAS-MARXUACH:  And the jury is to

14  disregard -- I want a curative instruction from the

15  Court that the jury is instructed to disregard the

16  answer that she has a power of attorney to represent

17  her siblings in this case.

18      MR. EFRON:  At the moment.

19      THE COURT:  What I will do, I will give them

20  an instruction and say that she does have an attorney

21  for the purpose of all the family's case -- that the

22  jury has been selected, there's no power of attorney,

23  she's representing herself as an estate member at

24  this time.

25      MR. EFRON:  Thank you.  May I continue?

Noemi Rodriguez-Robles - Direct

1      THE COURT:  Yes.

2      (Side bar discussions end.)

3      THE COURT:  Ladies and Gentlemen of the

4  Jury, let me just clarify a matter.  This witness,

5  Noemi Rodriguez, in the Libya claim and in the case,

6  the administrative claim that ensued where the

7  families collected the money, she had a power of

8  attorney to represent her four siblings.  In this

9  case that is here before the Court, the dolo case

10  represented by Mr. Efron, she does not have the power

11  of attorney; she is here on her behalf on behalf as

12  an estate member as of today.

13      So that is -- I just want to clarify that

14  because she did have a power of attorney for all the

15  previous proceedings but not -- she does not have it

16  for this case that is being trying today.  So she's

17  here representing herself as an estate member and in

18  her personal capacity at this particular time and at

19  this particular moment on September 20, 2011.

20      Let's continue, Mr. Efron.

21      MR. EFRON:  Yes.

22  BY MR. EFRON:

23  Q.      Do you recall signing several documents in

24  2002?

25  A.      In 2002, just one.  In 2002 it was when I

Noemi Rodriguez-Robles - Direct

1    was summoned to Efrain Berganzo's house to sign a

2    document in 2002.

3    Q.        Are you thinking of this -- 2008?

4    A.        No, no, no.  I made a mistake.  In 2002 it

5    was at Casa Cantres.

6              MR. EFRON:  That's a last name.  Cantres

7    home.

8    A.        At Cantres home, okay.

9    BY MR. EFRON:

10   Q.        Who brought you those documents at the

11   Cantres home in 2002?

12   A.        They called Efrain and Efrain contacted me

13   and we met at Cantres' house.

14   Q.        Who was there?

15   A.        My siblings were there, Efrain was there, my

16   husband, Cantres, and I can't remember anybody else.

17   Q.        Who brought the documents?

18   A.        Leopoldo.

19   Q.        Was Mr. Ambush there?

20   A.        Not as far as I can remember.

21   Q.        What document did you sign that day at the

22   Cantres home in 2002?

23   A.        A claim there was for 20 percent.

24   Q.        A claim for what?

25   A.        For some money that they were going to give

1  us.

2          MR. EFRON:  If we could get her Joint

3  Exhibits 9 and 10, please.

4          THE COURT:  Okay, this is Joint Exhibit?

5          MR. EFRON:  It is, Your Honor.

6          THE COURT:  What number, 9 or 10?

7          MR. EFRON:  I'm doing 10 first just because

8  I think it works better with the questions.

9  BY MR. EFRON:

10  Q.      Dona Noemi, is that your signature on that

11  page?

12  A.      Yes.

13  Q.      Who filled out the blanks where it has your

14  father's name on top and your name?

15  A.      I believe it was Leopoldo.

16  Q.      Do you understand English?

17  A.      No.

18  Q.      Let's go to No. 9.  This document was also

19  given to you by Leopoldo; is that correct?

20  A.      Yes.

21  Q.      At the bottom --

22          MR. EFRON:  How did you do this, Henry?

23  BY MR. EFRON:

24  Q.      -- it talks about 20 percent; is that the

25  20 percent that you mentioned before?

Noemi Rodriguez-Robles - Direct

1   A.        Yes.

2   Q.        What was the 20 percent supposed to be for?

3   A.        To pay the attorneys.

4   Q.        And the Center as well?

5   A.        I believe so.

6   Q.        Is that your signature on the second page of

7   that exhibit?

8   A.        Yes.

9             MR. EFRON:  Thank you very much.

10  BY MR. EFRON:

11  Q.        After you signed those documents in 2002,

12  did you ever see or speak to Mr. Ambush?

13  A.        Never.

14  Q.        What happened with the case between 2002 and

15  2008?

16  A.        In 2008 they called Efrain and so we were

17  summoned to go to his house and we met at his house.

18  Q.        Before 2008 and after 2002, did anything

19  else happen regarding this case?

20  A.        No.

21  Q.        At the meeting at Berganzo's house on

22  December 15, what were you told?

23            MR. ARIAS-MARXUACH:  Objection.

24            THE COURT:  Sustained.

25            You have to be more specific.  It could call

Noemi Rodriguez-Robles - Direct

1   for hearsay depending on who the speaker was, so

2   rephrase the question.

3   BY MR. EFRON:

4   Q.      Who was at that meeting at the Berganzo home

5   on December 15?

6   A.      Three of my sisters were there because one

7   is in Orlando, Ruth Delia, so it was three of my

8   siblings and my husband.

9   Q.      Do you recall signing any documents that

10  day?

11  A.      Yes.  We signed a document there.

12  Q.      What were the documents for?

13  A.      It was a document to sign for 10 percent in

14  case they were not paid at the Center then they could

15  not collect it from there.

16          MR. EFRON:  Very quickly, Joint 11 and 12

17  please.

18  BY MR. EFRON:

19  Q.      Who else signed those documents?

20  A.      My three siblings, Efrain, and I'm not sure

21  if my husband signed it.  He may have.

22  Q.      What happened after you -- first of all, if

23  you can help her locate --

24          THE COURT:  If you want to publish it, you

25  can mark whatever parts --

Noemi Rodriguez-Robles - Direct

1        MR. EFRON:  Yes, your Honor.

2   BY MR. EFRON:

3   Q.      Do you see your initials on the left margin

4   of that paper?

5   A.      Yes.

6   Q.      Which ones are they?  The second ones?

7           MR. ARIAS-MARXUACH:  If counsel, can give us

8   the exhibit number.

9           MR. EFRON:  Of course it's 11, joint.

10          MR. ARIAS-MARXUACH:  Okay, thank you.

11  BY MR. EFRON:

12  Q.      The second one N.R.R.?

13  A.      Yes, N.R.R.

14  Q.      On the second page of this exhibit, are

15  those your initials on top?

16  A.      Yes.

17  Q.      And on the third page do you see your

18  signature and your initials on that page?

19  A.      Yes.

20  Q.      So this is one of the documents you signed

21  that day; is that correct?

22  A.      Yes.

23  Q.      Now, at Joint Exhibit 12, did you sign this

24  document?

25  A.      Yes.

Noemi Rodriguez-Robles - Direct

1  Q.        Do you know what this document was for?

2  A.        It was explained to us but I don't know that

3  well.

4  Q.        Thank you.

5            After that meeting did you ever see or speak

6  to Defendant Ambush again?

7  A.        Never.

8  Q.        Did you receive the compensation for your

9  family from the Libya settlement?

10 A.        Yes.

11 Q.        Do you remember approximately the date?

12 A.        It was in May.

13 Q.        What year?

14 A.        2009.

15 Q.        What amount did your family receive total?

16 A.        It was 7 million but divided in five.

17 Q.        Do you know why it was seven?

18 A.        It was 10 million but they charged us the

19 percentage.

20 Q.        How do you know this?

21 A.        Because they deposited that in the bank.  I

22 don't know.

23 Q.        Do you know an Attorney Javier Lopez?

24 A.        I did get to meet him once or twice.  I

25 don't remember, once or twice.

Noemi Rodriguez-Robles - Direct

1    Q.        Who was he?

2    A.        Efrain called me on the telephone to tell me

3    about something that was in the newspaper and I

4    bought the newspaper and with the number -- the phone

5    number there I called him.

6              MR. EFRON:  Your Honor, we're going into --

7    we need 10 or 15 more minutes with her.

8              THE COURT:  I think this is a good time to

9    recess.

10             Ladies and Gentlemen of the Jury, you

11   have -- it's almost 12, so you have until 2:30.

12   We're going to resume at 2:30.  The witness is under

13   the rules of the court.  Please do not discuss your

14   testimony.  And as I mentioned, Ladies and Gentlemen,

15   when we resume at 2:30, at 2:00 p.m. you'll have some

16   coffee and refreshments in the jury room but once

17   2:30 until 5:00 for two and a half hours nonstop.  We

18   may take a five-minute break for the bathroom, but

19   we're going to go the afternoon.  So eat well now and

20   have your snack and coffee before we come back.

21             THE COURT OFFICER:  All rise.

22             (Jury exits the room.)

23             THE COURT:  The witness is excused.

24             Very briefly before we recess.  Let me note,

25   Mr. Efron, it appears for purposes of this case your

Noemi Rodriguez-Robles - Direct

1  client does not have the actual power of attorney.

2  If by tomorrow or Thursday before this case is

3  admitted to the jury you have those powers of

4  attorney, that should not be an issue.  It is

5  obviously the intent throughout this entire

6  litigation that it has not been raised before.

7      But if she does not have it at the time of

8  the Rule 50s or at the time, you know, the jury goes

9  to deliberate, I might have to dismiss the claims of

10  the siblings and then she would only be entitled to

11  one-fifth or whatever her request.  So --

12      MR. EFRON:  I think that may apply as to the

13  emotional damages that you're entitled under dolo,

14  but certainly if it's proven that the entire -- if

15  it's proven that the entire -- I think it's an

16  all-or-nothing thing here.  So either --

17      THE COURT:  If there's dolo, her own

18  damages, that's her own.

19      MR. EFRON:  Her own damages we would agree.

20      THE COURT:  The thing is, I do have to note

21  the brothers allowed her to join because maybe the

22  siblings don't want to join the --

23      MR. ARIAS-MARXUACH:  Your Honor, if I may.

24      MR. EFRON:  I'm not done.  They were part of

25  the case, they're all plaintiffs on their own behalf,

Noemi Rodriguez-Robles - Direct

1    they were all deposed and they all said exactly what

2    I'm representing to the court now.

3            MR. ARIAS-MARXUACH:  Your Honor, the

4    witness --

5            THE COURT:  The witness is under oath.

6            MR. EFRON:  She doesn't understand.

7            MR. ARIAS-MARXUACH:  But she's listening to

8    all this.

9            THE COURT:  Let's excuse the witness.

10           MR. ARIAS MARXUACH:  If I may address the

11   court, a power of attorney would not cure the fact

12   that if the witnesses do not testify as to what they

13   heard and what they understood at that December 15

14   meeting then they have not met their burden of proof.

15   Because the dolo claim is based on purported deceit:

16   What they understood or didn't understand or what was

17   told to them or was not told to them.  They cannot

18   sit to litigate this case by proxy.

19           Each of them signed the agreements

20   individually, so if they are contesting the consent

21   that they gave individually to Mr. Ambush's retainer

22   agreement, then they all have to testify.  And if

23   they don't testify, the case has to be dismissed.

24           THE COURT:  That's an issue for Rule 50, but

25   what I do want to note is that if -- they're all

1    parties, they're represented by Mr. Efron, so the

2    parties are here.  But if she's going to make any

3    particular claim -- let's assume they come and I do

4    not rule in your favor but there may be several

5    requests that, you know, that she may have to do with

6    the power of attorney.  I don't know -- again, but

7    it's for purposes of this case.  And, again, I'm not

8    making any ruling at this particular time.

9            MR. EFRON:  You know, they can't have it

10   both ways.  They can't have her when Mr. Ambush

11   needed one power of attorney to collect all the money

12   where he could take his share, at that point the

13   power of attorney works.  And now, now, when it's

14   time to maybe give back the money if it was

15   wrongfully taken, he can't now say I'm only going to

16   give it back to the people who came to court.  No.

17           He took money from two estates, both estates

18   are doing the claim.  Every member of the estate does

19   not have to be here for that purpose.  Yes for the --

20           THE COURT:  If you don't sit them, that's an

21   argument for weighing the evidence.

22           MR. EFRON:  That would be only as to their

23   personal claims for, you know, I felt hurt, I felt --

24   you know, that kind of thing.  I felt angry, I

25   felt -- you know, those are the claims that go hand

Noemi Rodriguez-Robles - Direct

1  in hand with dolo that the civil court permits.

2  Those claims are personal claims.

3           THE COURT:  Those would be personal but then

4  you could not purport at any point or infer to the

5  jury that she's representing every member of the

6  estate.

7           And let me say all the parties to the estate

8  are here, they're represented by you.  It's not like

9  one of them is not a party here.  That's not an issue

10  in this case.

11         MR. EFRON:  Everybody signed a retainer

12  agreement with me.

13         MR. ARIAS-MARXUACH:  Your Honor, they all

14  consented individually to the retainer agreement with

15  Mr. Ambush which, by the way, specifies what was the

16  percentage that Mr. Ambush was going to collect.

17         But in any event, very clearly, they

18  consented individually to the retainer agreement.  If

19  they are saying that the consent that they gave

20  individually is null and void, or whatever legal

21  label they want to pin on it, they have to come to

22  this court and testify.  They cannot litigate this

23  case by proxy.

24         THE COURT:  Well, I agree.  And it may --

25  again, that's something that you're going to raise at

Noemi Rodriguez-Robles - Direct

1    the Rule 50 at some point so let's leave that -- you

2    know, Mr. Efron, you're on notice.  Again, I'm not

3    issuing any ruling.

4         The other matter is, the belated or the

5    recently discovered evidence provided to Mr. Arias

6    and Mr. Freese this afternoon at some point probably

7    at the close of today, we'll discuss any issues

8    pertaining to that.  Okay, I'm recessing until 2:30.

9         MR. FREESE-SOUFFRONT:  Thank you, Your

10   Honor.

11        MR. ARIAS-MARXUACH:  Thank you, Your Honor.

12        MR. EFRON:  Thank you, Your Honor.

13        (Jury Trial recessed for lunch at 12:00 p.m.

14   and resumed at 2:45 p.m.)

15        (Jury enters the room.)

16        THE COURT:  Please be seated.  Ladies and

17   Gentlemen of the Jury, we are now going to continue

18   nonstop perhaps with a five-minute stretch break

19   around 4:00 until 5:00 p.m.

20        So, Mr. Efron, let's continue with your

21   witness.

22        MR. EFRON:  Yes, your Honor.  May it please

23   the Court.

24        THE COURT:  You may proceed.

25             DIRECT EXAMINATION CONTINUED

Noemi Rodriguez-Robles - Direct

1  BY MR. EFRON:

2  Q.      Dona Noemi, I'll repeat my last question;

3  who is Javier Lopez?

4          (Answer given in Spanish.)

5          MR. ARIAS-MARXUACH:  Objection.  Hearsay.

6          THE COURT:  That statement by Javier Lopez

7  is stricken and cannot be considered by the jury.

8          MR. EFRON:  Your Honor, before the

9  translation goes in, she didn't say that he said, she

10  said that she heard him say and if it was explained

11  to her --

12          THE COURT:  That's still hearsay.

13          MR. FREESE-SOUFFRONT:  That's hearsay.

14          MR. ARIAS-MARXUACH:  That's hearsay.

15          THE COURT:  You want to rephrase the

16  question?

17          MR. EFRON:  I'll rephrase.

18  BY MR. EFRON:

19  Q.      But tell me who Javier Lopez was.  Don't

20  tell me what he said, tell me who he was.

21  A.      Well, an attorney, an attorney.  And I saw

22  an ad in the newspaper about the Center, something

23  about the Center.

24  Q.      Did you meet with Javier Lopez?

25  A.      Once, I think once.

Noemi Rodriguez-Robles - Direct

1  Q.        What was the purpose of the meeting?

2  A.        For him to proceed with the case of what was

3  in the newspaper.

4  Q.        This is the case -- this is this case now,

5  the case against Mr. Ambush?

6  A.        Yes.

7  Q.        What did he tell you --

8          MR. EFRON:  No, I'll rephrase.

9  BY MR. EFRON:

10 Q.        What did you learn at the meeting with him?

11         MR. ARIAS-MARXUACH:  Objection.  Hearsay.

12         THE COURT:  She can answer, but you -- the

13 witness is instructed you cannot state what Mr. Lopez

14 may have told you.

15         MR. ARIAS-MARXUACH:  *Pero es que* what she

16 learned at the meeting -- if I may be heard on point.

17 What she learned at the meeting can only be the

18 product of verbal communication by Mr. Lopez, which

19 is hearsay; a statement offered here for the truth of

20 the matter asserted.  And Mr. Lopez is not here for

21 cross-examination.

22         THE COURT:  I will grant the objection.  You

23 can rephrase the question perhaps you can ask what

24 she did as a result of the meeting or --

25         MR. EFRON:  Yes, your Honor.

Noemi Rodriguez-Robles - Direct

1        THE COURT:  Rephrase the question.

2   BY MR. EFRON:

3   Q.      What happened after the meeting as a result

4   of that meeting?

5   A.      With Attorney Javier Lopez?

6   Q.      Yes.

7   A.      He told me --

8        THE COURT:  Don't state anything he may have

9   told you, just state to the jury what you did as a

10  result of that meeting but not what he told you.

11  A.      Well, we signed a paper for him to proceed

12  with the case.

13  BY MR. EFRON:

14  Q.      How did you feel about filing that

15  lawsuit -- this lawsuit?  How did you feel about

16  that?

17  A.      Well, betrayed.

18  Q.      By whom?

19  A.      Well, because of what Javier explained to

20  us.

21  Q.      Yes.  But --

22       MR. EFRON:  How did you translate

23  "*traicionado*"?  I want to be specific.

24       THE COURT:  Betrayed.

25  BY MR. EFRON:

Noemi Rodriguez-Robles - Direct

1    Q.        You felt you were betrayed by whom?  Who

2    betrayed you?

3    A.        Well, according to Ambush, because he

4    explained to us that --

5              MR. ARIAS-MARXUACH:  Objection.

6              THE COURT:  And don't explain what Javier

7    Lopez may have stated.

8              MR. EFRON:  That's not the purpose of the

9    question either.

10             THE COURT:  Okay, continue.

11   BY MR. EFRON:

12   Q.        Besides betrayed, how else did you feel?

13   A.        Well, with anger, upset.

14             MR. EFRON:  That would be the extent of

15   direct examination Your Honor.

16             THE COURT:  Okay.  Cross-examine.

17                     CROSS-EXAMINATION

18   BY MR. ARIAS-MARXUACH:

19   Q.        Good afternoon, Ms. Rodriguez.

20             We're going to show you -- and you were

21   shown this document by your counsel, Mr. Efron.  It's

22   Joint Exhibit 9.

23             MR. ARIAS-MARXUACH:  You can translate.

24   BY MR. ARIAS-MARXUACH:

25   Q.        Now, you told us that you recognize this

Noemi Rodriguez-Robles - Cross

1   document as the document that you signed in 2002 at

2   Casa de Cantres?

3   A.      Yes.

4   Q.      So at that time you also told us that you

5   understood that the 20 percent provided for in this

6   agreement was going to go to the attorney who would

7   work on the claim, correct?

8   A.      Yes.

9   Q.      And you understood that 20 percent would be

10  a reasonable percentage for working on the claim if

11  the claim was successful?

12  A.      Yes.

13  Q.      Now, you also told us during your direct

14  examination that you understood that when you signed

15  Joint Exhibit 11, the retainer agreement with

16  Mr. Ambush, that Mr. Ambush would only collect that

17  20 percent if he was not -- sorry, that 10 percent --

18          MR. ARIAS-MARXUACH:  Thank you, Counselor.

19  BY MR. ARIAS-MARXUACH:

20  Q.      -- if he was not paid by the Center,

21  correct?

22  A.      That's what he said.

23  Q.      And you signed it because you understood

24  that 10 percent would be a reasonable amount to pay

25  Mr. Ambush if the Center did not pay him, correct?

Noemi Rodriguez-Robles - Cross

1    A.        If the Center didn't pay him, yes.

2    Q.        Okay.  Now let's talk about that meeting on

3    December 15 at Don Efrain Berganzo's house where you

4    signed this document, Joint Exhibit 11.

5              You knew before going to that meeting that

6    that was a meeting that you were going to hold with

7    the attorney working on the claim against Libya,

8    correct?

9    A.        Explain, I didn't understand.

10   Q.        That before going to the meeting, *osea*, as

11   you were going to the meeting, I don't know if you

12   walked or you took a car, but as you were going to

13   the meeting you knew that that was a meeting with the

14   lawyer who was working on the claim against Libya?

15   A.        No, because Efrain called me to have a

16   meeting at the home and that's when I found out.

17   Q.        Okay.  So your testimony is that you did not

18   know that that meeting on December 15, 2008 was a

19   meeting with the attorney working on the case against

20   Libya?

21   A.        No.

22   Q.        You remember that you had your deposition

23   taken in this case?

24   A.        Repeat, I didn't understand.

25   Q.        Do you remember that you came to a meeting

Noemi Rodriguez-Robles - Cross

1   with Attorney Freese, Attorney Efron, Attorney

2   Gonzalez-Varon at my office; do you recall that?

3   A.        I don't remember.

4            MR. ARIAS-MARXUACH:  Can the witness be

5   shown a copy of her deposition?

6            THE COURT:  Go ahead.

7            MR. ARIAS-MARXUACH:  Can I go ahead and

8   approach her or the CSO?  (Handing.)

9            Can the translator translate within a low

10  voice for the witness the first page of the

11  deposition?

12           THE INTERPRETER:  It has to be loud, though.

13           MR. ARIAS-MARXUACH:  Okay.

14  A.        Oh, yes.

15  BY MR. ARIAS-MARXUACH:

16  Q.        Okay.  So now you do remember that you did a

17  deposition at the office of McConnell Valdes

18  February 2, 2011?

19  A.        Yes.

20  Q.        And that just as today, you had the legal

21  duty to tell the truth?

22  A.        Yes.

23  Q.        And just as today you had the benefit of a

24  translator so that Mr. Freese could pose his

25  questions in English, they were given to you in

Noemi Rodriguez-Robles - Cross

1   Spanish, you would answer in Spanish and they were

2   translated into English; do you recall that?

3   A.      It may have been.

4   Q.      So let's turn to Page 18 of your deposition.

5   And before I start reading, you did tell us that you

6   learned about this meeting with Mr. Ambush because

7   Efrain Berganzo called you on the phone, correct?

8   A.      Yes.

9   Q.      Okay.  So I'm going to start reading from

10  Page 18, Line 11, the translator will translate as I

11  go along and you let me know if I had read this

12  correctly, okay?

13          THE COURT:  Mr. Arias, I proposes you read

14  what you have to read in English and then the

15  interpreter will translate it all for her benefit.

16          MR. ARIAS-MARXUACH:  Okay.  I did want to

17  break it up because it's going to be several lines of

18  text, Your Honor.  So at least just one question and

19  one answer.

20          THE COURT:  Let's do that, one question and

21  one answer.

22  BY MR. ARIAS-MARXUACH:

23  Q.      "So as far as you recall Efrain Berganzo did

24  not tell you who this Mr. Ambush was, he didn't tell

25  you, for example, this is our attorney in connection

Noemi Rodriguez-Robles - Cross

1    with the claims against Libya?

2            "ANSWER:  No, because I hung up the phone

3    very fast so we didn't really speak that much.

4            "QUESTION:  Okay.  And did he ever get into

5    any details as to what this meeting was going to be

6    about?

7            "ANSWER:  No.  What he says was the lawyer,

8    that Leo, that he was going to come here about the

9    claim or the complaint but he did not say anything

10   else."

11           Have I read those two questions and those

12   two answers correctly?

13   A.      Which?

14   Q.      The two questions and two answers that I

15   have just posed to you?

16   A.      Yes.

17   Q.      Okay.  One more question.

18           "QUESTION:  Okay.  So Mr. Efrain Berganzo,

19   did tell you that there was a lawyer that wanted to

20   meet with you in connection with the claim against

21   Libya?

22           "ANSWER:  Yes, yes.

23           Have I read that question and that answer

24   correctly as well?

25   A.      (In English)  Yes.

Noemi Rodriguez-Robles - Cross

1    Q.        Now, talking about Joint Exhibit 11, the

2    retainer agreement, that retainer agreement was read

3    aloud at the meeting at Efrain Berganzo's house,

4    correct?

5    A.        Yes, it was read.

6    Q.        And this document is written in English and

7    Spanish, correct?

8    A.        Yes.

9    Q.        And you read the retainer agreement before

10   signing it?

11   A.        Well, it was read at Efrain's home.

12   Q.        But I'm asking if you read it before signing

13   it?

14   A.        No, because they read it there.

15   Q.        Okay.  Let's turn to Page 32 of your

16   deposition.

17             MR. EFRON:  You're talking about Volume 2,

18   right, Counsel?

19             MR. ARIAS-MARXUACH:  Volume 2.

20   BY MR. ARIAS-MARXUACH:

21   Q.        Actually, let's go to Page 31 first so that

22   there is some context for the question, okay?  And

23   I'm going to read to you one question and one answer

24   and you let me know if I had read this accurately.

25   And then it's Line 11 through Line 13.

Noemi Rodriguez-Robles - Cross

1      "QUESTION:  And do you recognize your

2  initials in the first page of Exhibit No. 5.

3          "ANSWER:  Yes."

4          Have I read this correctly?

5  A.      Which is the --

6  Q.      Line 11 through 13.

7  A.      Uhm, yes.

8  Q.      Now if we go to the index of the deposition

9  at Page 3, Exhibit No. 5 is described as the retainer

10  agreement dated December 15, 2008, correct?

11  A.      Yes.

12  Q.      Okay.  Now let's go to Page 32, okay?

13  Question No. 15.

14          "Okay.  And did you read this document prior

15  to signing the document?

16          "ANSWER:  Yes I read it."

17  A.      I may have read it, but I don't remember.

18  Q.      Now, you signed this document?  If we go to

19  Page 4 of Joint Exhibit 11, you signed this before

20  notary public Luis Orlando Berdecia?

21          THE INTERPRETER:  Page 4?

22          MR. ARIAS-MARXUACH:  It says 3 of 4, sorry.

23  A.      Yes.

24  BY MR. ARIAS-MARXUACH:

25  Q.      And you did not have any questions for the

Noemi Rodriguez-Robles - Cross

1  notary public when you signed the retainer agreement

2  for Mr. Ambush, correct?

3  A.        No, I didn't ask him.

4  Q.        And you did not have any questions for

5  Mr. Ambush when you signed the retainer agreement

6  before the notary public, correct?

7  A.        No, not for him either.

8  Q.        And Joshua Ambush did tell you at that

9  meeting that the amount that was expected to be

10  recovered on the claim to Libya was 10 million,

11  correct?

12  A.        Yes.

13  Q.        And you knew when you signed the retainer

14  agreement that Joshua Ambush's fees would be

15  10 percent of whatever was to be recovered under the

16  claim, correct?

17  A.        Well, we signed because he told us that if

18  the Center didn't pay him then he would charge us

19  that 10 percent, if the Center didn't pay him.

20  Q.        Okay.  Looking at Joint Exhibit 11, can you

21  tell me where it says in the retainer agreement with

22  Mr. Ambush that he would only collect the 10 percent

23  if he was not paid by the Center?

24  A.        No, because that was verbal.

25  Q.        But my question is, is that in the document?

Noemi Rodriguez-Robles - Cross

1    A.        Well, no I don't know.  I haven't read it, I

2    haven't read the whole thing.

3    Q.        You can take your time and look for it.

4              (Pause)

5    A.        If I read -- well, it's not in here.

6    Q.        Now, the retainer agreement, that document,

7    Joint Exhibit 11, reflected what was discussed at the

8    meeting, correct?

9    A.        Yes.  This is what was discussed in the

10   meeting.

11   Q.        And, in fact, the retainer agreement was

12   well explained to you?

13   A.        Yes, it was explained but it was said that

14   it was if the Center didn't pay him.

15   Q.        But, Ms. Rodriguez, you have just looked

16   through Joint Exhibit 11 and you can't find any

17   language saying that the 10 percent would be paid

18   only if the Center didn't pay Mr. Ambush, correct?

19   A.        Yes, because he said it verbally to us.  He

20   explained to us that if he was paid the 20 percent

21   from 2002, if he was paid the 20 percent, then he

22   would not be charging us the 10 percent.

23   Q.        As you sit here today do you know if the

24   American Center for Civil Justice has paid to Joshua

25   Ambush $2 million on your father's estates claim?

Noemi Rodriguez-Robles - Cross

1    A.        I don't remember.  I don't -- I don't

2    remember.

3    Q.        So the answer is you don't know?

4    A.        I don't know.

5    Q.        Now let's look at Joint Exhibit 13, which is

6    a document that Mr. Efron also showed to you; this is

7    the acknowledgment, correct?

8              Do you have it?  Can you see it in the

9    monitor?  And, Ms. Rodriguez, if you cannot read it,

10   sit back in the chair and we'll get you a paper copy.

11   A.        Yes, I can read it.

12             MR. ARIAS-MARXUACH:  Your Honor will show

13   her a paper copy.  (Handing.)

14   BY MR. ARIAS-MARXUACH:

15   Q.        And if we look at the acknowledgment on

16   Page 3 -- 2, sorry, we have some initials here that

17   say N.R.R., correct?

18   A.        Yes.

19   Q.        Okay.  And that's next to Paragraph 3 on

20   Page 2, correct?

21   A.        Yes.

22   Q.        So I'm going to read to you from document

23   Joint Exhibit 13 and at Paragraph 3 and you let me

24   know if I'm reading this correctly.

25             Pursuant to a wire transfer made from the

Noemi Rodriguez-Robles - Cross

1    IOLTA account to the estates bank account on

2    April 16, 2009, the estate received the sum of

3    $7 million, the net settlement proceeds.

4              MR. ARIAS-MARXUACH:  You can translate up to

5    there.

6    A.       Yes.

7    BY MR. ARIAS-MARXUACH:

8    Q.       So according to this document, the 7 million

9    dollar net settlement proceeds were wired to the

10   account, the bank account controlled by the estate,

11   on April 16 of 2009?

12   A.       They deposited it in the bank.

13   Q.       And according to that document that deposit

14   was made on December 16, 2009?

15   A.       No, no, no, no, no.  It was in May that I

16   was given the money.  I don't understand about this.

17   Q.       Well, your initials are next to Paragraph 3,

18   correct?

19   A.       Yes.

20   Q.       And if we go to Page 3 it says here in

21   Spanish, *Conforme a una transferencia bancaria hecho*

22   *de la cuenta de IOLTA a la cuenta de la sucesion el*

23   *16 de Abril 2009, la asociacion recibio la suma neta*

24   *de $7 millones.*

25             That's what is says?

Noemi Rodriguez-Robles - Cross

1          MR. ARIAS-MARXUACH:  Oh, I read it in

2     Spanish.  Sorry.

3          THE COURT:  Okay.  Let's translate it into

4     English.

5          MR. ARIAS-MARXUACH:  Can you translate it

6     into English?

7          THE COURT:  Mr. Arias, you have the

8     translation provided, just read the English for the

9     record.  She's heard it in Spanish already.

10         MR. ARIAS-MARXUACH:  All right, sorry.

11    BY MR. ARIAS-MARXUACH:

12    Q.       Pursuant to a wire transfer made from the

13    IOLTA account to the estate's bank account on

14    April 16, 2009, the estate received the sum of

15    $7 million, the net settlement proceeds.

16         That's what it says here on Page 2 and

17    Page 3 of the document, correct?

18    A.       Yes.  But I was called -- it was in May that

19    they deposited it into my bank.

20    Q.       Was that a personal account of yours where

21    you're saying that the deposit was being made?

22    A.       Uhm, we got -- we were called -- Efrain

23    called me about the deposit which was done in May.

24    And as far as what this document says, I don't know

25    if the deposit was made in May.

Noemi Rodriguez-Robles - Cross

1 Q.      Ms. Robles-Robles (sic), you also signed

2 this document before a notary public, correct?

3 A.      Yes.

4 Q.      And you signed it in Manati?

5 A.      It was in Efrain's house.

6 Q.      And where is that?

7 A.      At Efrain's house.

8 Q.      And where is Efrain's house?

9 A.      In Manati.

10 Q.      Thank you.  And you also signed this before

11 a notary public?

12 A.      Yes.

13 Q.      Now, when you received the money from Libya

14 you were happy with the money you got, correct?

15 A.      Yes, we were happy.

16 Q.      And you personally received $1.4 million,

17 correct?

18 A.      Yes, because it was divided in five.

19 Q.      And in this document, in the acknowledgment

20 on Page 3, Paragraph 4 it says:  I understand that I

21 have the right to seek the advice of independent

22 counsel in connection with the settlement of the

23 litigation and the disposition of the settlement

24 proceeds and I have knowingly and voluntarily waived

25 that right.

Noemi Rodriguez-Robles - Cross

1    I further understand that it is my

2 responsibility to distribute the net settlement

3 proceeds of the settlement to the beneficiaries of

4 the estate as their interests appear in accordance

5 with the law.

6          Have I read that correctly?

7 A.        It's signed there.

8 Q.        So I read the text correctly?

9 A.        Yes.

10 Q.       Now, you just told us that you were happy

11 when you received the $1.4 million, correct?

12 A.        Yes.

13 Q.        Would it be fair to say that you never

14 consulted an attorney regarding your retainer

15 agreement with Mr. Ambush until you learned of the

16 ads placed by Javier Lopez Perez?

17 A.        Up until now with Javier only.  I have

18 here --

19 Q.        You have the newspaper ad.  That's the

20 newspaper ad that ran in the *Nuevo Dia*, correct?

21 A.        Exactly.  And I called and he explained to

22 me what there was and the procedure.

23 Q.        Okay.  And so until you called Javier --

24 until you called Javier you had never talked to an

25 attorney about your retainer agreement with

Noemi Rodriguez-Robles - Cross

1  Mr. Ambush, correct?

2  A.      Never, that's right.

3  Q.      And you didn't think that Attorney Ambush

4  had done anything wrong in connection with the

5  retainer agreement?

6  A.      No.

7  Q.      So it was when you met with Javier Lopez

8  that you changed your mind about Attorney Ambush?

9  A.      Yes.

10  Q.      And, in fact, your claims in this lawsuit

11  are based on what Javier Lopez told you?

12  A.      Yes.

13  Q.      And what Javier Lopez told you is in turn

14  based on whatever the American Center For Civil

15  Justice told him?

16  A.      Well, what he explained to me.

17  Q.      But you knew that what he explained to you

18  came from the American Center for Civil Justice?

19  A.      From the Center, what it says here in the

20  newspaper, yes.

21  Q.      And you don't know what the American Center

22  for Civil Justice is, correct?

23  A.      No.

24  Q.      And you have not spoken with Rabbi Eliezer

25  Perr, correct, P-e-r-r?

Noemi Rodriguez-Robles - Cross

1    A.        I don't know who that is.

2    Q.        And you have not spoken with Dr. Michael

3    Engelberg?

4    A.        Not with him either, and I don't know him

5    either.   I don't know who that is.

6    Q.        So you decided to sue Joshua Ambush based on

7    what Javier Lopez told you?

8    A.        Exactly.

9    Q.        And do you know exactly what the American

10   Center for Civil Justice did to advance your claim

11   against Libya?

12   A.        I don't know.

13   Q.        And the American Center for Civil Justice

14   received 20 percent of what was recovered from the

15   claim for the death of your father against Libya?

16   A.        Well, what we signed in 2002 about the

17   20 percent because I don't know anything further than

18   that.

19   Q.        But you do know that the American Center for

20   Civil Justice received $2 million from the

21   $10 million that were paid or awarded to your

22   father's estate on the Libyan claim?

23   A.        Yes, because it's written there.

24   Q.        And you're not suing the American Center for

25   Civil Justice?

Noemi Rodriguez-Robles - Cross

1    A.       No.  We're suing what Javier told us.

2    Q.       Now, you told us earlier this morning that

3    your husband's name is Ruben Vivas, correct?

4    A.       Yes.

5    Q.       And he was injured at the Lod Airport

6    Massacre?

7    A.       Yes, he was injured.

8    Q.       And, in fact, Mr. Ambush, he was a plaintiff

9    in the case brought by Mr. Ambush, correct?

10   A.       Yes.  That he signed at the Cantres house in

11   2002.

12   Q.       And he did also -- he was present at the

13   meeting in Efrain's Berganzo's house in December

14   of 2008, correct?

15   A.       At Efrain Berganzo's house.

16            MR. ARIAS-MARXUACH:  Because clarity of the

17   record is important to all of us, you have to let her

18   translate.

19   BY MR. ARIAS-MARXUACH:

20   Q.       And I'm almost finished.

21            And so the record is clear, your husband was

22   there in 2008 at the meeting at Efrain Berganzo's

23   house?

24   A.       Yes.  I think so because he's always with

25   me.

Noemi Rodriguez-Robles - Cross

1   Q.        And your husband signed a retainer agreement

2   with Joshua Ambush?

3   A.        I think so.  I think so.

4   Q.        And your husband received 3.5 million from

5   Libya?

6   A.        Yes.

7   Q.        And your husband paid Joshua Ambush

8   10 percent of what he received?

9   A.        Yes, I think so.

10  Q.        And your husband is not suing Joshua Ambush?

11  A.        No.

12  Q.        And, in fact, your husband has another claim

13  for more compensation for his injuries at the Lod

14  Airport Massacre, correct?

15  A.        I think so.

16  Q.        And, in fact, you go to the doctor's

17  appointments with him?

18  A.        Yes, because he's a kidney transplant

19  patient and he was receiving dialysis and I couldn't

20  leave him alone.

21  Q.        And you know that he's been going to medical

22  appointments in support for his claim for additional

23  compensation?

24  A.        Yes.

25  Q.        And the fact is that Joshua Ambush is the

Noemi Rodriguez-Robles - Cross

1    attorney handling your husband's claim for additional

2    compensation for your injuries at Lod -- for his

3    injuries at Lod?

4    A.        Yes.

5    Q.        And if the Center has not paid to Joshua

6    Ambush an amount equaling 10 percent of the

7    10 million awarded to your father's estate, you would

8    agree that he's entitled to receive the 10 percent?

9    A.        That about the 10 percent?

10   Q.        Yes.

11   A.        I didn't understand.

12   Q.        Okay.  If the Center has not paid 10 percent

13   to Joshua Ambush, you would understand that it is

14   reasonable that he is entitled to the 10 percent that

15   you agreed upon in the retainer agreement?

16   A.        You mean paying that to him?  To pay it to

17   him, no.

18   Q.        No?  So if the Center has not paid him

19   10 percent, you would still want your 10 percent

20   back?

21   A.        Well, that it be returned to us, yes.

22             MR. ARIAS-MARXUACH:  I have no further

23   questions.

24             THE COURT:  Mr. Efron any redirect briefly?

25             MR. EFRON:  Very little, Your Honor.

Noemi Rodriguez-Robles
REDIRECT EXAMINATION

1

2    BY MR. EFRON:

3    Q.        Do you know who, if anybody, called your

4    house on behalf of Mr. Ambush last week to go to

5    McConnell Valdes -- for Ruben to go to their office,

6    if you remember?

7    A.        I think Leo is the one who calls him.

8    Q.        Do you know what Leo said regarding visiting

9    McConnell Valdes?

10            MR. ARIAS-MARXUACH:  Objection.  Hearsay.

11            THE COURT:  Sustained.

12    BY MR. EFRON:

13    Q.        Do you know what the purpose of that

14    conversation was?

15            MR. ARIAS-MARXUACH:  Objection.  Hearsay.

16    She wasn't on the call.

17            MR. EFRON:  She was on the call.

18    BY MR. EFRON:

19    Q.        Did you --

20            THE COURT:  Ask the question.

21            MR. EFRON:  I'm going to lay a foundation,

22    Your Honor.

23    BY MR. EFRON:

24    Q.        Who spoke to Leo on the phone when he

25    called?

Noemi Rodriguez-Robles - Redirect

1    A.        I didn't understand.

2    Q.        When Leo called your home recently who spoke

3    to him on the telephone?

4    A.        Well, because he barely ever answers the

5    phone so I pick up.  I always say, God bless you,

6    because that's how I answer the phone, and then I

7    give the phone to him and I don't have communication

8    with him.

9    Q.        When you signed the acknowledgment for you

10   to have the money distributed, that was in front of a

11   notary public, correct?

12   A.        I think so.

13   Q.        So because there was a notary present you

14   were expected to sign on the spot, correct?

15             MR. ARIAS-MARXUACH:  Objection.  Leading.

16             THE COURT:  Sustained.

17             Rephrase.

18   BY MR. EFRON:

19   Q.        What was the notary public there for?

20   A.        Well, they gave it to me so that I would

21   sign it for when they deposited the money in the

22   bank, once the money was deposited in the bank, so

23   that the bank would then divide it in equal parts.

24   Q.        And what was the roll -- what was the

25   purpose of having a notary there?

Noemi Rodriguez-Robles - Redirect

1   MR. ARIAS-MARXUACH:  Objection.  Asks for an

2  opinion from a lay witness.

3   MR. EFRON:  What was her impression.

4   THE COURT:  I'll allow the question, if she

5  knows.

6  BY MR. EFRON:

7  Q.   Why do you think the notary public --

8   THE COURT:  Not what does she think, does

9  she know why.

10 BY MR. EFRON:

11 Q.   Why was the notary public there, if you

12 know?

13 A.   No.  At Efrain's house, that everything was

14 signed and then they gave me authorization to take

15 care of everything and so when the money would be

16 deposited in the bank then I would have to -- then I

17 would deposit it.  I would have to open an account

18 and then divide the money in equal parts.  Because I

19 was the one put in charge -- I was the one in charge

20 of this.  And what do you call that?  The executrix.

21 Q.   Do you speak English?

22 A.   No.

23 Q.   Does Mr. Ambush speak Spanish that you know

24 of?

25 A.   I don't know.

Noemi Rodriguez-Robles - Redirect

1    Q.        Have you ever spoken to him directly?

2    A.        Never.

3    Q.        So on December 15, 2008 at Efrain Berganzo's

4    home Joshua Ambush did not tell you that there was a

5    claim for $10 million?

6              MR. ARIAS-MARXUACH:  Objection.  Leading.

7              THE COURT:  Rephrase the question.

8              MR. EFRON:  Fine.

9    BY MR. EFRON:

10   Q.        Did Mr. Ambush tell you how much the

11   claim -- how much your compensation was going to be

12   for the death of your father?

13             MR. ARIAS-MARXUACH:  Objection.  Asked and

14   answered.

15             THE COURT:  Sustained.

16   BY MR. EFRON:

17   Q.        Did anybody say at that meeting how much the

18   compensation would be?

19             MR. ARIAS-MARXUACH:  Objection.  Asked and

20   answered.

21             MR. EFRON:  No, Your Honor.

22             THE COURT:  I will allow the question.

23   A.        I don't remember.  I don't remember.

24             MR. EFRON:  Thank you very much.  That would

25   be our redirect, Your Honor.

1        THE COURT:  Any recross?  After this we'll

2   take a five-, ten-minute break.

3                   RECROSS EXAMINATION

4   BY MR. ARIAS-MARXUACH:

5   Q.        Now, you told us that you signed the

6   retainer agreement under the belief that you would

7   only pay Joshua Ambush the 10 percent if the Center

8   did not pay him, correct?

9   A.        That's what was agreed and discussed there,

10  that if the Center didn't pay him the 20 percent then

11  he would charge us the 10 percent if the Center

12  didn't pay him.

13  Q.        And as you sit here today you don't know

14  what, if anything, the Center has paid Joshua Ambush?

15  A.        I don't know.

16        MR. ARIAS-MARXUACH:  Thank you.

17        THE COURT:  Okay.  The witness is excused.

18  Then let's take -- Ladies and Gentlemen of the Jury,

19  let's take -- it's 3:44.  Let's be back here at 3:55.

20  This is just a quick bathroom, stretch back then

21  we'll go to 5:00 p.m.

22        THE COURT OFFICER:  All rise.

23        (Jury exits the room.)

24        THE COURT:  Mr. Efron, have your next

25  witness on the stand for when we come back.

1          MR. EFRON:  Yes, your Honor.

2          (Jury Trial recessed at 3:44 p.m. and

3   resumed at 4:00 p.m.)

4          (Jury enters the room.)

5          THE COURT:  Please be seated.

6          Mr. Efron, call your next witness and we'll

7   place him under oath.

8          THE CLERK:  Raise your right hand, please.

9          MR. EFRON:  I should call him.  Plaintiffs'

10  next witness is Eliezer Rodriguez-Robles.

11         THE CLERK:  Do you solemnly swear that the

12  testimony you're about to give is the truth, the

13  whole truth, and nothing but the truth, so help you

14  God?

15         THE WITNESS:  Amen.

16         THE CLERK:  You may have a seat.

17                    DIRECT EXAMINATION

18  BY MR. EFRON:

19  Q.       Witness, please state your name for the

20  jury.

21  A.       Eliezer Rodriguez-Robles.

22  Q.       Who was your father?

23  A.       Antonio Rodriguez-Morales.

24  Q.       Where do you live?

25  A.       In Dorado.

Eliezer Rodriguez-Robles - Direct

1    Q.        How long have you lived there?

2    A.        About 35 to 40 years.

3    Q.        What is the extent of your education?  How

4    far did you go in school?

5    A.        Ninth grade.

6    Q.        Do you have any children?

7    A.        I do, I do.

8    Q.        How many?

9    A.        Sixteen.

10        THE COURT:  Since he answered that; do you

11   know how many grandchildren you may have?

12   BY MR. EFRON:

13   Q.        That was the next question.

14   A.        About 40.

15        THE COURT:  Well, that's -- this is just a

16   side.  It's not part of the case but one of the

17   judges from the central district of Pennsylvania near

18   Harrisburg had 12 children.  And last time I saw him,

19   late nineties, he had about 73 grandchildren.  So

20   some people are blessed with children and

21   grandchildren.

22   BY MR. EFRON:

23   Q.        Congratulations on your large family?

24        THE COURT:  And, Counsel and myself have two

25   or three and it's plenty.

Eliezer Rodriguez-Robles - Direct

1    MR. EFRON:  Two is more than enough.

2    THE COURT:  I don't think any of us want to

3    imagine.  Let's continue.

4    MR. EFRON:  Yes, your Honor.

5    BY MR. EFRON:

6    Q.    Who is Joshua Ambush?

7    A.    Well, I'm knowing him personally -- in

8    person now.  If I had seen him, you know, -- I'm

9    knowing him personally now.

10    Q.    Did you see him at the meeting at Efrain

11    Berganzo's home in December of '08?

12    A.    Yes.

13    Q.    Since between then and now, have you ever

14    seen him -- had you ever seen him?

15    A.    No.  And if I had seen him somewhere else, I

16    wouldn't have known it was him because we were there

17    for about a half hour.

18    Q.    Do you know Leopoldo Garcia?

19    A.    Well, I've seen him, yes.

20    Q.    Do you know who he is?

21    A.    Yes.

22    Q.    Who is he?  What does he have to do with

23    this case?

24    A.    At the meeting, one of the last meetings we

25    had, I met him.

Eliezer Rodriguez-Robles - Direct

1   Q.      In 2002 did you sign some documents?

2   A.      Yes, yes.

3   Q.      Was Leopoldo Garcia there when you signed

4   the documents?

5   A.      Yes.  I remember now, yes.

6   Q.      If you remember, was he the one that brought

7   the documents?

8   A.      Yes.

9   Q.      What were those documents about?

10  A.      A claim there was.

11  Q.      What did that claim have to do with you?

12  A.      Well, with the -- about the Tel Aviv case.

13  Q.      Did you sign those documents in 2002?

14  A.      Yes.

15  Q.      What happened afterwards?

16  A.      After that was done we didn't -- I didn't

17  learn of anything else.

18  Q.      Do you remember signing any documents at

19  Efrain Berganzo's house on December 15, 2008?

20  A.      Yes.

21  Q.      Who brought those documents for you to sign,

22  if you know?

23  A.      I don't remember right now.

24  Q.      Did you sign documents in 2008?

25  A.      Yes.  I think we signed some, yes.

Eliezer Rodriguez-Robles - Direct

1   Q.      Do you know what those documents were for?

2   A.      Well, for the compensation there was.

3   Q.      Who was there that day at Efrain Berganzo's

4   house?

5   A.      My siblings and I were there at the meeting.

6   Noemita was there.

7   Q.      Who else?

8   A.      Ruth -- no, Ruth -- that's not true, she was

9   not here.  There was Angel Manuel-Rodriguez.

10  Q.      Outside of the family who was there?  Was

11  Leo Garcia, Leopoldo Garcia, there?

12  A.      Oh, yes, yes, yes.

13  Q.      Was Mr. Ambush there?

14  A.      Yes.  Also, yes.

15  Q.      Was there another lawyer there?

16  A.      Yes, there was another lawyer there.

17  Q.      Did you sign those documents in 2008?

18  A.      Yes.

19  Q.      Do you know today what you were signing --

20  did you know then what you were signing?

21  A.      Well, it was for the compensation there was

22  at the time.

23  Q.      What happened after you signed those

24  documents?  What happened with the case?

25  A.      What do you mean what happened?

Eliezer Rodriguez-Robles - Direct

1   Q.      Do you know what happened afterwards?

2   A.      After we signed?  I don't remember.  I'm a

3   little -- I don't remember right now.

4   Q.      Who told you to sign the documents?

5   A.      The attorney that came with them that they

6   came.

7   Q.      Yes.

8           THE COURT:  If you can identify just for the

9   record, you said the attorney and you were

10  pointing --

11          MR. EFRON:  He said the one that came with

12  them, is what he said.

13  A.      Yes.

14          THE COURT:  So you're not referring to

15  Mr. Ambush, you're referring to the attorney that

16  came with Mr. Ambush?

17          MR. EFRON:  He didn't say lawyer.

18          THE COURT:  So the person who came with

19  Mr. Ambush.

20          THE WITNESS:  For the last time he came,

21  yes.

22          MR. EFRON:  He's not very responsive.  I'm

23  sorry, I'll do my best.

24  A.      I can't remember right now.

25          THE COURT:  Let me just -- just to the

Eliezer Rodriguez-Robles - Direct

1    clarify because you were pointing that way.  Did

2    Mr. Ambush tell you to sign the documents?  Yes or

3    no?

4    A.       Right, I don't remember.  I don't want to --

5    I just don't remember.

6              THE COURT:  Okay, continue.

7    BY MR. EFRON:

8    Q.       You heard your sister testify, correct?

9    A.       Yes.

10   Q.       Do you remember her testimony about a

11   newspaper article and Attorney Javier Lopez?

12   A.       Yes, I heard her.

13   Q.       Did you go with her to see Javier Lopez?

14   A.       No, negative.

15   Q.       Who is Javier Lopez, if you know?

16   A.       I don't know him.

17   Q.       When you signed the documents in 2008 at

18   Efrain Berganzo's house, do you remember signing a

19   document that gave 10 percent of the compensation to

20   Attorney Ambush?

21             MR. ARIAS-MARXUACH:  Objection.  Leading.

22             THE COURT:  I will allow this question.

23   A.       Yes.

24   BY MR. EFRON:

25   Q.       Why do you think he was going to get

Eliezer Rodriguez-Robles - Direct

1  10 percent of the compensation?

2           THE COURT:  Rephrase the question.  It's not

3  what he believes, it's if he knows why.

4           MR. EFRON:  Yes.

5  BY MR. EFRON:

6  Q.       Do you know why Mr. Ambush had asked for

7  10 percent of the compensation?

8  A.       Well, he asked for 10 percent in case the

9  Center didn't pay him the 20 percent, something like

10  that.

11  Q.       Has anybody told you whether he has or has

12  not been paid by the Center?

13           THE COURT:  The objection is sustained.

14  That's hearsay, you need to rephrase or move it

15  along.

16           Let me just note for the record that I

17  sustained objections because I see one of the counsel

18  from the other side sometimes standing up.  I know

19  what the objection's going to be and I'm sustaining

20  it on whatever grounds, even though for the record

21  counsel did not object because I --

22           MR. ARIAS-MARXUACH:  Because you were too

23  quick on your effect.

24           THE COURT:  I move a little quicker than

25  counsel when I know where he's going.

Eliezer Rodriguez-Robles - Direct

1    MR. EFRON:  Well, you try more cases than we

2    do.  This is not a very responsive witness.

3        THE COURT:  I'm allowing you to lead a

4    little bit, but it cannot call for hearsay so

5    rephrase the question or --

6        MR. EFRON:  Yes, Your Honor.

7        MR. ARIAS-MARXUACH:  The witness has been

8    responsive.  And I have allowed him to lead on many

9    matters, but I'm going to object as to hearsay.

10       THE COURT:  And that's why it was sustained.

11   I knew the objection was going to be hearsay.

12       So rephrase.

13   BY MR. EFRON:

14   Q.       Do you know if Mr. Ambush was paid his fees

15   for the case by the Center?

16   A.       I imagine they paid him.

17       MR. ARIAS-MARXUACH:  Objection.  Lack of

18   personal knowledge.

19       THE COURT:  Sustained.  The answer is

20   stricken.  It cannot be considered as an answer by

21   the jury.

22   BY MR. EFRON:

23   Q.       What amount of compensation did you receive

24   for your father's death in Tel Aviv?

25   A.       One million four hundred thousand, I think,

Eliezer Rodriguez-Robles - Direct

1    more or less.

2    Q.       Do you know what amounts were deducted to

3    get to that number?

4    A.       Or 600, I can't remember very well.  I can't

5    remember right now.

6    BY MR. EFRON:

7    Q.       I'm going to ask the interpreter to

8    translate one or two questions of your deposition.

9            MR. ARIAS-MARXUACH:  Objection.  Your Honor.

10   He cannot use the deposition to bring in testimony

11   that he hasn't been able to elicit on direct.

12           THE COURT:  I'm going to agree, unless

13   you're trying to impeach your own witness.

14           MR. EFRON:  No, I'm not trying to impeach.

15   I'll just go into the questions.

16           THE COURT:  Okay.  But you can't use the

17   deposition if you're not going to impeach him.

18           MR. EFRON:  Joint Exhibit 11.

19           THE CLERK:  Joint?

20           MR. EFRON:  11.

21           THE CLERK:  I think Joint 11 is there.

22           THE INTERPRETER:  Yes.

23           THE CLERK:  He has it, Counselor.

24   BY MR. EFRON:

25   Q.       Don Eliezer, do you see your initials on the

Eliezer Rodriguez-Robles - Direct

1  left margin of this piece of paper?

2  A.      Yes.

3  Q.      And on the second page, do you see your

4  initials?

5  A.      Yes.

6  Q.      And do you see your signature on the third

7  page?

8  A.      Yes.

9  Q.      Can you read the paragraph in Spanish that

10  says 10 percent, which is the first full paragraph of

11  this page of Page 2?

12        THE COURT:  I suggest you read it for the

13  record in English and then the interpreter can read

14  it in Spanish and then you can ask him the questions.

15  It's probably quicker that way.

16        MR. EFRON:  Okay.  The interpreter has it

17  already translated into English.

18  BY MR. EFRON:

19  Q.      We agree to pay the attorney fees as

20  follows:  Ten percent of whatever may be recovered

21  pursuant to the claims settlement agreement between

22  the United States and The Great Socialist People's

23  Libyan Arab Jamahiriya, dated August 14, 2008.

24        Do you remember ever reading that?

25  A.      (No response.)

Eliezer Rodriguez-Robles - Direct

1 Q.        Why did you sign the --

2 A.        Well, maybe we did review that there, but

3 the thing is that we didn't -- I mean, I -- you know,

4 I signed it.  We didn't have -- I signed those papers

5 because we didn't have anybody there to counsel us on

6 our part, you know, in our favor.  And they are the

7 ones who came and brought these papers for us to sign

8 and we signed them.

9 Q.        What were you told?  What were you told

10 would happen if you did not sign it?

11         MR. ARIAS-MARXUACH:  Objection.  Leading.

12         THE COURT:  Sustained.  You have to

13 rephrase.

14 BY MR. EFRON:

15 Q.        Why did you sign the document?

16 A.        Well, we signed because if we didn't sign

17 for the 10 percent then the case could be settled

18 or -- or in other words, the 10 percent was for us to

19 be compensated.

20         MR. EFRON:  *Atrasado no transar*.

21         THE INTERPRETER:  *Se pudo transar*.

22         MR. EFRON:  *Dijo atrasar*.

23         THE INTERPRETER:  *Transar*.

24 BY MR. EFRON:

25 Q.        I'll ask you again, did you mean to say --

Eliezer Rodriguez-Robles - Direct

1          MR. ARIAS-MARXUACH:  Objection.  Leading.

2          MR. EFRON:  Your Honor, I heard something

3    very different from what they now want to hear.

4          THE COURT:  Okay.  The issue is whether he

5    said *atrasado* or *transado*?

6          MR. EFRON:  Correct.

7          THE COURT:  Okay, let me ask the witness.

8    When you responded to Mr. Efron's question, and I'll

9    use the Spanish word, did you mean *atrasado*, which is

10   delayed or *transado*, which means settled?  What was

11   it you said?

12         THE WITNESS:  Well, he told us the

13   10 percent was for him to deal with the case, with

14   the compensation.

15   BY MR. EFRON:

16   Q.     And what would happen if you would refuse to

17   sign that document?

18         MR. ARIAS-MARXUACH:  Objection.  Leading.

19         THE COURT:  Sustained.

20         Rephrase or move along.

21   BY MR. EFRON:

22   Q.     Why did you sign the document?

23         MR. ARIAS-MARXUACH:  Asked and answered.

24         THE COURT:  Sustained.

25   BY MR. EFRON:

Eliezer Rodriguez-Robles - Direct

1  Q.        Of the people who were there, of the people

2  who were there, did anybody explain to you what you

3  were signing?

4  A.        Yes.  They explained, they explained.

5  Q.        What did you understand?

6  A.        Well, we signed.  They explained to me -- to

7  those of us who were there, they explained to us --

8  I -- I can't remember -- now I don't know.

9  Q.        What do you understand would have happened

10  if you would not have signed the document?

11          MR. ARIAS-MARXUACH:  Objection.  Calls for

12  speculation.

13          THE COURT:  I'll allow the question.

14  A.        Well, if I didn't sign, if I didn't sign it

15  then maybe I wouldn't have received the compensation.

16          MR. EFRON:  I think we'll leave it there,

17  Your Honor.

18          THE COURT:  Okay, cross?

19                    CROSS-EXAMINATION

20  BY MR. ARIAS-MARXUACH:

21  Q.        Good afternoon, Don Eliezer.

22  A.        Good afternoon.

23  Q.        Now, Mr. Efron showed you this document,

24  Joint Exhibit 11, the agreement with Mr. Ambush,

25  correct?

Eliezer Rodriguez-Robles - Cross

1    A.        Yes.

2    Q.        And you recognized your initials in that

3    document, correct?

4    A.        Yes.

5    Q.        And your signature is on the page labeled

6    304 where I'm pointing in the TV screen?

7    A.        Yes.

8    Q.        Okay.  And this document is in English and

9    Spanish, correct?

10   A.        Yes.

11   Q.        And you can read and understand Spanish?

12   A.        Yes.

13   Q.        And you read this document before signing

14   it?

15   A.        Well, we went over it -- I went over it like

16   that but not...

17   Q.        You remember that you had your deposition

18   taken in this case?

19   A.        Yes, yes.

20   Q.        And you remember that your deposition was

21   taken by Mr. Freese?

22   A.        Yes.

23   Q.        The one with hair.

24             And then Joanne Gonzales, the lady next to

25   Mr. Efron was also there, correct?

Eliezer Rodriguez-Robles - Cross

1  A.      Which?

2  Q.      In the deposition.

3  A.      She was there where?

4  Q.      In the deposition.

5  A.      I don't understand that.  I don't understand

6  that very well.

7  Q.      Okay.  You went to a meeting where

8  Mr. Freese was present, correct?

9  A.      Yes, yes, yes.

10  Q.      And just like today you were asked questions

11  and you answered at that time, correct?

12  A.      Yes, yes.

13  Q.      And at that meeting -- today you have your

14  attorney present, correct?

15  A.      Yes.

16  Q.      And at that deposition, that meeting with

17  Mr. Freese, you also had an attorney working for you

18  present?

19  A.      Yes.

20  Q.      And like today the questions were posed in

21  English and translated for you to answer in Spanish?

22  A.      Yes.

23  Q.      And like today, you were under oath?

24  A.      Yes.

25  Q.      And so you had the duty to tell the truth?

Eliezer Rodriguez-Robles - Cross

1    A.        Yes.

2    Q.        Okay.

3              MR. ARIAS-MARXUACH:  Can the witness be

4    given a copy of his deposition?

5    BY MR. ARIAS-MARXUACH:

6    Q.        Now, Don Eliezer, we're going to go to

7    Page 60 of your deposition and I'm going to read from

8    the deposition and Ms. Terry is going to translate

9    and you let me know if I read it correctly.  Okay?

10             "QUESTION:  Exhibit 5 contains signatures

11   and initials and I want you to let me know if you

12   identify your initials and your signature in the

13   document.

14             "ANSWER:  Yes sir."

15             Have I read the question and the answer

16   correctly?

17   A.        In English.

18   Q.        Okay.  Now, if we go to Page 4 of the

19   deposition -- no, wait, let's go back to Page 60, I'm

20   sorry.  The immediately preceding question is:

21             "Okay.  Now Exhibit 5 is a document entitled

22   retainer agreement?

23             "ANSWER:  Yes."

24             Have I read this correctly based on the

25   translation?

Eliezer Rodriguez-Robles - Cross

1  A.        It's in English, I don't know English.

2  Q.        You don't know English, okay.

3          Do you recall if at your deposition you

4  testified that you did read the retainer agreement,

5  Exhibit 5?

6  A.        I don't remember.

7  Q.        And your testimony today is that you do

8  believe having read it?

9  A.        Well, it says I read it but since that's in

10  English and I don't know English...

11  Q.        What's in English?

12  A.        Where I signed it's in English.

13  Q.        Are you referring to the deposition or to

14  the retainer agreement?

15  A.        This deposition.

16  Q.        Oh, the deposition is in English.

17          THE COURT:  So when he's referring to this

18  deposition -- let me see the document he's referring

19  to.  That's Exhibit 11, the agreement.

20  BY MR. ARIAS-MARXUACH:

21  Q.        You're saying that Joint Exhibit 11 is in

22  English?

23  A.        Yes.

24  Q.        Can we look at the first page?  It has a

25  title, the second line, the title, isn't that in

Eliezer Rodriguez-Robles - Cross

1    Spanish?  *Y dice* -- and it says, *contrato de*

2    *representacion legal*?

3    A.        Yes.

4    Q.        And if we go to the first paragraph, every

5    second line in that document is in Spanish.

6    A.        Yes.

7    Q.        And that is all throughout the page,

8    correct?

9    A.        Yes.

10   Q.        And if we go to the second page, again it

11   has portions in English and portions in Spanish?

12   A.        Yes.

13   Q.        And if we go to the third page, we have the

14   same situation, there is language in English and in

15   Spanish.

16   A.        Yes.

17   Q.        So this Joint Exhibit 11 is written in

18   English and Spanish?

19   A.        Yes.

20   Q.        Okay.

21           MR. ARIAS-MARXUACH:  Just a second.

22   BY MR. ARIAS-MARXUACH:

23   Q.        Mr. Eliezer, the fact is that you don't have

24   a good recollection of what was discussed at the

25   December 2008 meeting, correct?

Eliezer Rodriguez-Robles - Cross

1    A.        It's just that I forget a lot.  I forget

2    things because of my condition.  I -- everything that

3    was spoken that was discussed here today, many times

4    I've already forgotten.  I remember very little.

5    Q.        So, in fact, you don't remember very well

6    what was discussed at the December 2008 meeting,

7    correct?

8    A.        Well, at least this, because I'm seeing it

9    here, I remember about that; but, you know, from

10   talking like that, I don't remember a lot.

11   Q.        *Por eso*.  So you remember the document, but

12   you don't remember what was said?

13   A.        Yes.  By now I don't remember very well.

14   Q.        And the fact is that you don't have any

15   personal knowledge of any wrongdoing by Joshua

16   Ambush?

17   A.        No.

18   Q.        So to be clear, because this is important,

19   is it correct to say that you do not have any

20   personal knowledge of wrongdoing by Joshua Ambush?

21   A.        How could I say -- I don't know how to

22   explain myself more or less.

23   Q.        So let me try it another way --

24           MR. ARIAS-MARXUACH:  You can translate that.

25   BY MR. ARIAS-MARXUACH:

Eliezer Rodriguez-Robles - Cross

1  Q.          Would it be fair to say that your belief as

2  to any wrongdoing by Mr. Ambush would be based on

3  what other people told you?

4  A.          No, no, no.  This question about the

5  20 percent and that -- and the fact that it was

6  supposed to be collected from the compensation and

7  then this 10 percent coming up, that's not right.  To

8  me that's not right.  No, because he was supposed to

9  get the 20 percent.  That's what was expected because

10  of what it says on the -- you know, that's what it

11  was supposed to be.  And then 10 percent if he wasn't

12  paid.  Well, that -- that's not right.

13  Q.          So you understood that the 20 percent that

14  was originally signed was going to the attorney, to

15  Mr. Ambush?

16          THE INTERPRETER:  That you legally signed?

17          MR. ARIAS-MARXUACH:  No.

18  BY MR. ARIAS-MARXUACH:

19  Q.          That you understood that the 20 percent that

20  was originally agreed upon, that 20 percent was to be

21  paid to Mr. Ambush?

22  A.          Yes.

23  Q.          And you agreed to pay the additional

24  10 percent if he was not paid by the Center?

25  A.          Exactly.

Eliezer Rodriguez-Robles - Cross

1   Q.      Do you know if Mr. Ambush has been paid any

2   amount by the Center?

3   A.      They must have paid him because -- I think

4   so.

5   Q.      Have you seen any documents that establish

6   that the Center has paid Mr. Ambush?

7   A.      Well, I mean, that since we received the

8   amount, I imagine he must have collected, I don't

9   know.

10  Q.      But you don't know?

11  A.      Yes.  Yes, he was supposed to have gotten

12  paid because otherwise they wouldn't have given us

13  the money.

14  Q.      Do you believe that Joshua Ambush has

15  collected more than 10 percent from your family?

16  A.      I don't know.

17  Q.      So you don't know how much he has collected,

18  if anything, beyond the 10 percent?

19          THE COURT:  That's asked and answered.

20          MR. EFRON:  Asked and answered.

21  BY MR. ARIAS-MARXUACH:

22  Q.      Okay.  Now, you got $1.4 million from the

23  Libyan claim, correct?

24  A.      Yes.

25  Q.      And you were happy to receive that money?

Eliezer Rodriguez-Robles - Cross

1    A.        Yes.

2    Q.        Would it be fair to say that you were happy

3    with that money until the issue of the advertisement

4    in El Nuevo Dia came up?

5    A.        What did you -- I'm sorry?

6    Q.        Would it be fair to say that you were happy

7    with the $1.4 million that you got from the Libyan

8    claim until the advertisement by Javier Lopez-Perez

9    and the American Center for Civil Justice in El Nuevo

10   Dia came out?

11   A.        I was at ease and I was very well, I felt

12   good.  I had a family and so it was -- I was happy to

13   receive that at the time.

14   Q.        Do you know how much the American Center for

15   Civil Justice took from the $10 million that were

16   awarded to your family?  And by "family" I mean your

17   siblings, your brothers, and sisters.

18             MR. EFRON:  Asked and answered.

19             THE COURT:  I'll allow the question.

20   A.        What?  I don't understand.

21   BY MR. ARIAS-MARXUACH:

22   Q.        Do you know -- you know that your family was

23   awarded $10 million on the Libyan claim, correct?

24   A.        Yes.

25   Q.        Do you know what amount the American Center

Eliezer Rodriguez-Robles - Cross

1   for Civil Justice took from the $10 million?

2   A.        I don't understand that part very well.

3   Q.        Do you know what the Center is?  If you

4   don't know, it's okay to say you don't know.

5   A.        Yes, that's fine.  The Center is -- I'm

6   confused about that part.

7   Q.        Have you discussed with your sister the

8   possibility of suing the American Center for Civil

9   Justice?

10  A.        No.

11  Q.        And by "your sister" I mean Noemi, so we're

12  clear.

13            Have you sued the American Center for Civil

14  Justice?

15  A.        No, no, no.

16            MR. ARIAS-MARXUACH:  Let me check.  Thank

17  you.

18            THE COURT:  Okay.  Mr. Efron, very briefly,

19  any brief redirect?

20            MR. EFRON:  I don't know if I want to do

21  that.  I think we'll rest.

22            THE COURT:  Okay.

23            MR. EFRON:  On this witness, of course.

24            THE COURT:  Okay.  This witness is excused.

25            Ladies and Gentlemen of the Jury, I'm going

1    to excuse you for the day.  Tomorrow what I'm going

2    to do is, let's meet -- let's be here -- I'll give

3    you an extra half hour at 9:30 because probably from

4    9:00 to 9:30 I'll be discussing several matters with

5    counsel, so we'll start at 9:30.  And then tomorrow

6    it's a full day.  We'll recess very briefly in the

7    morning, at mid-morning, lunch break for an hour and

8    15 minutes, mid afternoon break, and then until about

9    5:00, 5:30.

10         But the case is moving along.  At the

11   beginning it always moves a little slower but, as you

12   can see, it's starting to move along.

13         So you're excused.  Please keep an open

14   mind.  Do not discuss the case with anyone, not even

15   amongst yourselves, and I will see you tomorrow.

16   Have a safe trip home.

17             THE COURT OFFICER:  All rise.

18             (Jury exits the room.)

19             THE COURT:  Before we recess for today, I

20   know there's a couple of things we might need to talk

21   about.  I don't think it's an emergency.  Let's do it

22   at 9:00 a.m. tomorrow, I think we're all tired.

23             Then, Mr. Efron, who are your next

24   witnesses?

25             MR. EFRON:  Our next witness would be

1    Dr. Engelberg.

2          THE COURT:  And after that you'll be calling

3    Mr. Ambush.

4          MR. EFRON:  No.  We promised we'd leave him

5    as our last witness.

6          THE COURT:  Okay.  You have additional

7    witnesses?

8          MR. EFRON:  We have the other claimants

9    coming in.

10          THE COURT:  Okay.  I just want to make sure

11    that we have enough witnesses for the entire day.

12          MR. EFRON:  Yes.

13          THE COURT:  Okay.  Then I will see you

14    tomorrow, we'll meet at nine and discuss other

15    matters.

16          (Jury Trial adjourned at 4:52 p.m.)

17                           ---

18

19

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT    )

2                OF                 )ss.

3       PUERTO RICO                 )

4

5

6

7                        CERTIFICATE

8

9

10        I, EVILYS E. BRATHWAITE, hereby certify that

11   the proceedings and evidence are contained fully and

12   accurately, to the best of my ability, in the notes

13   recorded stenographically by me, at the jury trial in

14   the above matter; and that the foregoing is a true

15   and accurate transcript of the same.

16

17                    _____/s/ Evilys E. Brathwaite____

18                    EVILYS E. BRATHWAITE, RPR
                       Official Court Reporter
19                    United States District Court
                       Federal Building, Room 200
20                    San Juan, Puerto Rico 00918
                       787-772-3377
21

22

23

24

25