1           IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF PUERTO RICO

2

3   :_____:

4  THE ESTATE OF ANGEL BERGANZO COLON   :
   represented by Efrain and Ruben Berganzo;
5  THE ESTATE OF ANTONIO RODRIGUEZ MORALES  :
   represented by Noemi Rodriguez Robles,
6  Eliezer Rodriguez Robles, Angel M.    :
   Rodriguez Robles, Maria M. Rodriguez
7  Robles and Ruth D. Rodriguez Robles,   :

8             Plaintiffs,       :   CIVIL NO:
                              10-1044 (GAG)(MEL)
9       vs.                :

10  JOSHUA M. AMBUSH              :
             Defendant.
11  :_____:

12

13           DAY 3 OF THE JURY TRIAL
               HELD BEFORE
         THE HONORABLE GUSTAVO A. GELPI
14   Wednesday, September 21, 2011, beginning at 9:37 a.m.
  :_____:

15

16

  A P P E A R A N C E S:
17

                 LAW OFFICES OF DAVID EFRON
18              BY DAVID EFRON, ESQUIRE and
              BY JOANNE V. GONZALES-VARON, ESQUIRE
19              P.O. Box 29314
              San Juan, Puerto Rico 00929
20              For the Plaintiffs

21              McCONNELL VALDES, LLC
              BY RAUL M. ARIAS-MARXUACH, ESQUIRE and
22              BY HENRY O. FREESE-SOUFFRONT, ESQUIRE
              270 Munoz Rivera Avenue
23              P.O. Box 364225
              San Juan, Puerto Rico 00936
24              For the Defendant

25

INDEX TO WITNESSES

| PLAINTIFF WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| RUBEN BERGANZO-CRUZ | | | | |
|   By Mr. Efron............350...............370.......... | | | | |
|   By Mr. Freese-Souffront.........354.................... | | | | |
| MICHAEL ENGELBERG, M.D. | | | | |
|   By Mr. Efron............372...............480......... | | | | |
|   By Mr. Arias-Marxuach...........449.................487 | | | | |

INDEX TO EXHIBITS

| PLAINTIFFS' EXHIBIT NO. | | FOR I.D. | IN EVD. |
|---|---|---|---|
| 1...Compilation of Copies of Checks..............417...417 | | | |

---

1          THE COURT:  Good morning, please be seated.

2     Let's call the case.  Day three of trial.

3          THE CLERK:  Yes.  The estate of Angel

4     Berganzo-Colon, et al. versus Joshua M. Ambush.

5     Civil case, 10-1044.  Proceedings for jury trial.

6          On behalf of plaintiffs, Attorneys David

7     Efron and Joanne Gonzalez.  On behalf of defendant,

8     Attorney Henry Freese and Raul Arias.

9          THE COURT:  Good morning, counsel.

10          MR. EFRON:  Good morning, Your Honor.

11          THE COURT:  Let me just go over the

12     remaining housekeeping matters.

13          MR. ARIAS-MARXUACH:  Your Honor, there are

14     witnesses here that have not been placed under the

15     rule.  They should be excused while we discuss the

16     housekeeping.

17          THE COURT:  Who were the witnesses who were

18     not under the rule of the court?

19          MR. ARIAS-MARXUACH:  Dona Maria.

20          MR. EFRON:  She's a party.

21          MR. ARIAS-MARXUACH:  Oh, yes, she's a party.

22          MR. EFRON:  You have Dr. Engelberg.  He went

23     to the bathroom, I'll advise him to stay outside.

24          THE COURT:  Okay.  Now, one thing.  I do

25     have proposed jury instructions I believe, and

1  correct me if I'm wrong, that was submitted by

2  Mr. Arias and Mr. Freese, am I correct?

3          MR. ARIAS-MARXUACH:  Yes.

4          THE COURT:  Okay.  What I expect to do is,

5  by tomorrow -- and I have tried one or two other Dolo

6  cases so I have my own instructions.  What I will do

7  is -- and, Mr. Efron, don't file anything before

8  that -- I will submit -- and I will look at those

9  instructions, but I also have my own instructions.  I

10 will submit a proposed working copy of what I

11 understand should be the jury instructions.  And that

12 way, Mr. Efron, you can object to any of these

13 objections or add additional instructions or same

14 with Mr. Arias.

15          But let me do it this way and if you have

16 any specific ones -- but you should have it sometime

17 hopefully by tomorrow.

18          MR. ARIAS-MARXUACH:  Here's Dr. Engelberg.

19          THE COURT:  Okay.  So let's place under oath

20 and excuse him while we discuss these matters.

21          THE CLERK:  Good morning.  Please raise your

22 right hand, please.

23          DR. MICHAEL ENGELBERG:  I don't swear.

24          THE COURT:  That's not a problem.  What I

25 will do is, I'll place -- I understand it's for

1   religious reasons.  So, Mr. Engelberg, you're under

2   the rules of the Court not to discuss your testimony

3   with anyone until you're called as a witness.  You

4   may sit with Mr. Efron and his clients, but you're

5   not to discuss the case.  You're under orders of the

6   Court.  Do you understand that?

7           THE WITNESS:  Yes.

8           DR. MICHAEL ENGELBERG:  Yes.

9           MR. EFRON:  Once he begins his testimony, he

10  won't be.

11          THE COURT:  I understand that.

12          But you have to be outside of the courtroom,

13  if there's any testimony, but once you've

14  testified -- until you've testified you cannot

15  discuss the case.

16          DR. MICHAEL ENGELBERG:  Okay.

17          THE CLERK:  You're excused for now.

18          MR. ARIAS-MARXUACH:  He can't take an oath,

19  but he has to take an affirmation to tell the truth.

20          THE COURT:  And you affirm that you will --

21  when you're under oath you will state the truth and

22  nothing but the whole truth?

23          DR. MICHAEL Engelberg:  That is correct.

24          THE COURT:  Okay.  So you're excused.  Thank

25  you.

1          Okay.  Now --

2          MR. EFRON:  Is there a witness room that he

3     can wait in or -- is that a problem?  Or should he

4     just wait outside?

5          THE COURT:  There is an attorney room.  It's

6     not really a witness room but usually what attorneys

7     do is have their witnesses there all the time and use

8     that as their own office.  I have no problem if he

9     waits there.  If it gets conglomerated with

10    attorneys, he has to give deference to attorneys, but

11    I don't think there's much going on.  So if you want

12    to wait there and say -- if anybody asks you

13    anything, say Judge Gelpi asked you to wait there.

14    And if there's any problem, they can -- the marshals

15    can ask --

16         MR. EFRON:  Not now, of course, but when we

17    get to the jury instructions, we will want to be

18    heard on the Dolo counts.

19         THE COURT:  Okay.  But wait first to see the

20    instructions I propose, that the court will use, and

21    obviously there will be a charge conference so

22    that's --  Okay.  Now the other matter --

23         MR. EFRON:  Yes, your Honor.  You anticipate

24    that will be tomorrow?

25         THE COURT:  I will probably provide those

1    instructions at some point tomorrow to probably

2    discuss on Friday.  I don't think we're going to

3    conclude the case by Friday.

4              MR. EFRON:  We're hoping to.

5              THE COURT:  Well, you're hoping to but let's

6    see because I -- again, the instructions have to be

7    discussed and I'd like to give the parties an

8    opportunity to prepare for closing.  Let's see how

9    the case moves along.  If we're done tomorrow with

10   everything then probably Friday we will be doing that

11   so...

12             Okay.  The other matter, there was an issue

13   yesterday very brief I want to discuss that Mr. Arias

14   had raised whether Noemi Rodriguez had the power of

15   attorney for this case for all her siblings, but I

16   understand that they are parties to this case, it's

17   not like they are not parties to the case --

18             MR. EFRON:  That was our --

19             THE COURT:  And I think -- being that, I

20   don't think there's any issues as to whether the

21   whole estate is here as a plaintiff, whether they

22   testify or not -- and I think you're going to bring

23   some more of the brothers.

24             MR. EFRON:  They're here, everyone's here.

25             THE COURT:  Everybody who is going to be

1    testifying.

2            MR. EFRON:  There's somebody out of town.

3            THE COURT:  The Orlando one?

4            MR. EFRON:  Yes.  So we don't know that she

5    will be coming.  Everybody else we should have an

6    opportunity to --

7            THE COURT:  Okay, but if that other person

8    doesn't come, then that's a matter that Mr. Arias can

9    argue and something and it goes --

10           MR. ARIAS-MARXUACH:  There may be legal

11   consequence toss that.

12           MR. EFRON:  Well, you know, you can be a

13   plaintiff and not have to testify.

14           MR. ARIAS-MARXUACH:  No, no.  This is not a

15   class action, this is an action that arises out of a

16   contract, which -- but Your Honor --

17           THE COURT:  The thing is, if she doesn't

18   testify, Mr. Arias -- and she was announced as a

19   plaintiff Mr. Arias can then ask for an inference

20   instruction or --

21           MR. ARIAS-MARXUACH:  A directed verdict.

22           THE COURT:  -- but that's something that --

23           MR. EFRON:  The most he can ask for is for

24   the presumption.  That's the most he can ask for.

25           MR. ARIAS-MARXUACH:  If I may be heard on

1    the point?

2           THE COURT:  Yes.

3           MR. ARIAS-MARXUACH:  This is an action that

4    arises out of a contract, a retainer agreement, that

5    each of these plaintiffs individually subscribed.

6    They are alleging that that consent is void.  Since

7    they individually rendered that consent or gave that

8    consent, they have to come and testify as to why that

9    consent is void now.  This is not a class action,

10   they cannot litigate this case by proxy.

11          I do share Your Honor's view that to the

12   extent that most of these people are testifying on

13   their own behalf, the issue is minimized; but if the

14   lady in Orlando does not come, she faces a directed

15   verdict.  And Mr. Efron is on notice.  I cannot speak

16   more clearly.

17          THE COURT:  Again, I'm not saying the

18   Rule 50 will necessarily be granted, but obviously

19   the inference instruction, the presumption may be

20   provided and that could be fatal to -- and, again,

21   before the jury to the other clients.  Again, that's

22   a matter we will face when it happens, but I just

23   want to place the plaintiffs on notice.  I'm not

24   suggesting what I will do or not do, but I just want

25   to place everybody on notice of that.  Okay, then

1   that's that issue.  We'll deal with it at the

2   appropriate time.

3           Then the other matter that was pending was

4   the documents, the invoices that Mr. Efron yesterday

5   noted that he had obtained at the last minute or a

6   couple of days ago, and I want that to be discussed.

7           I want to ask Mr. Arias, have you had an

8   opportunity to review those documents?

9           MR. ARIAS-MARXUACH:  Yes, I have had an

10  opportunity to review those documents.  They are two

11  invoices issued by Mr. Ambush and I want to start by

12  refuting Mr. Efron's allegation that there was

13  something improper in that he didn't get this in

14  discovery.

15          The only documents that we produced to

16  Mr. Efron in discovery were documents that we knew we

17  were going to use as trial exhibits because

18  plaintiffs missed the deadline to submit written

19  discovery demands.  And the only discovery demands

20  that they were allowed in this case were a set of

21  interrogatories.  And that is reflected that that was

22  the decision of Magistrate Judge Marcos Lopez, it's

23  at Docket 48, footnote 1.  Footnote 1 --

24          THE COURT:  Let me print out that --

25          MR. ARIAS-MARXUACH:  Okay.  And Footnote 1

1  reads as follows:  Because at the conference Efron

2  informed that Plaintiffs assert a set of

3  interrogatories, because Plaintiffs failed to meet

4  the deadline originally set by the Court, Docket 15,

5  as amended by Docket 21, Plaintiffs will not be

6  allowed to serve any additional written discovery

7  requests.

8            So that takes out the whole issue of whether

9  we did something improper or not and I wanted to lay

10 that to rest.  They simply have failed to meet a lot

11 of deadlines in this case and that was that.

12           But as to the allegation that this is newly

13 discovered evidence, its not newly discovered

14 evidence because Mr. Efron knows of the Center and

15 has been in contact in the Center -- with the Center

16 since the day he entered his appearances.

17           The witness that has been placed under the

18 rule, testified at oath in his deposition, that he

19 took it upon himself on behalf of the Center to

20 select Counsel Efron as the attorney for these people

21 when Javier Lopez-Perez withdrew his appearances.  So

22 the whole notion that Mr. Efron could not have

23 established an appropriate extra judicial

24 communication with the Center to get these documents

25 and notify them and list them in the proposed

1    pretrial order, when that proposed pretrial order was

2    filed before this Court on July 15 of this year, is

3    silly.

4            And if he had listed those documents in his

5    proposed pretrial order, then we could have made an

6    appropriate counter designation of documents.  But

7    the fact is that this is just one instance of

8    Plaintiffs not meeting deadlines, not paying

9    attention to what is going on.  And we should not be

10   prejudice my client who is here, undergoing a

11   week-long jury trial from Maryland, should not be

12   sandbagged in this fashion.

13           Your Honor, the Center selected Mr. Efron.

14   That is under oath in a deposition.  How can he say

15   that the Center could not get him whatever documents

16   he fancied before the proposed pretrial order was

17   submitted?  So this is not newly discovered evidence,

18   Your Honor.

19           MR. EFRON:  If we could be heard?

20           THE CLERK:  Could you give me the

21   document --

22           MR. EFRON:  Can we be heard, Your Honor?

23           THE COURT:  Yes.  But let me look at Judge

24   Lopez's order at Docket 48.

25           Okay, Mr. Efron, let me hear from you.

1    MR. EFRON:  I'm not sure we're trying the

2    same case.  First of all, I came into the case in

3    October.  The prior lawyer in this case did miss

4    deadlines and it had some consequences, but we were

5    allowed to conduct discovery.  I had their answers,

6    and that's what I'm going to get to in a minute, I

7    just wanted to clarify that the Center might have

8    suggested to these people that they hire me, but I'm

9    not working for the Center.

10    My retainer agreement, as Defendant and

11    their lawyers well know, because they have a copy of

12    it, is with the people I represent here.  I don't

13    work for the Center, I have nothing to do with them

14    in this case.  And the mere suggestion to the people

15    that they obtained -- the mere suggestion of the --

16    by the Center to the people that they feel were

17    victimized by their agent does not mean that -- does

18    not mean that I'm working for them in this case.

19    Now --

20    MR. ARIAS-MARXUACH:  The thing --

21    MR. EFRON:  I'm not done.  I didn't

22    interrupt you.

23    Getting to the interrogatories that were

24    answered by Mr. Ambush that we did send --

25    THE COURT:  And you're saying, Mr. Efron,

1   you came to this case October 2010?

2          MR. EFRON:  I think I made my appearance in

3   October.

4          THE COURT:  And that's after -- who was the

5   previous attorney?

6          MR. EFRON:  Javier Lopez.

7          THE COURT:  Who missed all the deadlines?

8          MR. EFRON:  Yeah.  He was -- he had a

9   medical problem and he missed deadlines, yes.

10         MR. ARIAS-MARXUACH:  But, Your Honor, while

11  Mr. Efron looks for that page he's looking for,

12  discovery in this case closed this year and --

13         THE COURT:  Actually, it was November 29,

14  2010, that was the conclusion of discovery.

15         MR. ARIAS-MARXUACH:  Oh, no, the written

16  discovery for them.  But, again, he could have done

17  extra judicial discovery from the Center, asked the

18  Center for documents.  Mr. Engelberg came to Puerto

19  Rico and was deposed in my office.  There was a

20  myriad of ways in which he could have gotten whatever

21  documents he wanted from the Center.

22         And, again, the Center selected him.  And

23  I'm happy to read you the testimony of Mr. Engelberg

24  before he comes in.

25         THE COURT:  Okay, but my other question,

1  Mr. Efron, the joint proposed pretrial order here was

2  filed July 15, 2011.

3         MR. EFRON:  But that's not the issue, Your

4  Honor, if you'll excuse me.  My Interrogatory No. 7

5  to the defendant was to explain the content of any

6  communication between him and the Center.  I would

7  think that withholding bills that he sent to the

8  Center is withholding copies of communications.  He

9  wasn't talking to them, he was sending them bills and

10 he was receiving checks.

11         So, you know, I don't think we should reward

12 the absconding of relevant evidence that should have

13 been -- it should have come forward.  This is not a

14 *cojeme-si-puedes* game, this is a serious case.  They

15 knew that that existed, they never provided it, never

16 produced it.  Now, when almost by coincidence -- when

17 almost coincidentally they happen to appear, now

18 they're trying to stop it from coming in when they

19 should have submitted it initially.  And Mr. Ambush

20 signed this interrogatory without submitting those

21 documents on November 29 of last year.

22         So based on that and the fact that it's

23 relevant evidence -- and we have here Dr. Engelberg,

24 the president of both the New York Center that paid

25 him and the American Center that received the bill,

1  we can certainly identify those documents and have

2  that evidence brought in.  It would be -- with all

3  respect, Your Honor, it would be error to not allow

4  this admissible evidence.

5  MR. ARIAS-MARXUACH:  Your Honor.

6  THE COURT:  Mr. Arias.

7  MR. ARIAS-MARXUACH:  He just read an

8  interrogatory asking for communications and he's

9  trying to bring in an invoice.  Interrogatories have

10  to be drafted in a way that they can be interpreted

11  by reasonable people.  If he thought that the

12  reasonable interpretation of that interrogatory was

13  to request for invoices, then he could have written a

14  letter saying, Mr. Arias -- you've done this, Your

15  Honor, you know the song and dance.  If he felt that

16  communications meant invoices, hey, I need invoices.

17  If we blew him off, then he could have filed a motion

18  to compel and bring the issue to the Court before the

19  close of discovery.

20  But no, no, no, no, no, they asked for

21  communications and now, after the close of discovery,

22  want to force upon you and upon the defendant an

23  interpretation that "communication" meant invoices.

24  That's an issue that the Court could have resolved if

25  it had been brought to its attention during the

1    course of discovery.

2            And it is -- frankly, again, counsel have a

3    duty of diligence to their clients and to this Court

4    and it has to have consequences.  And, again, forget

5    about Mr. Ambush because the interrogatory asked for

6    communications.  What about the Center?  He could

7    have called the Center.  He could have called

8    Mr. Engelberg.  If he has the connection with the

9    Center, to bring Mr. Engelberg from New York, and

10   Mr. Engelberg is not under the subpoena power of the

11   United States District Court for the District of

12   Puerto Rico, then certainly he has enough

13   communication and relationship with Mr. Engelberg to

14   have asked him for whatever he wanted from the

15   American Center for Civil Justice months before the

16   case closed.

17           In fact, again, back in May, back in May

18   when Mr. Engelberg was deposed here in Puerto Rico,

19   he wasn't under the subpoena power of this court.  He

20   came voluntarily and he met with Mr. Efron at that

21   time because Mr. Efron came with Mr. Engelberg and

22   Mr. Engelberg's New York counsel to the deposition.

23   So, you know, in the lunch break they could have

24   said, Oh, Dr. Engelberg, I need papers for this case

25   and they could have gotten whatever they wanted.

1          And to come in now with those two selected

2     hand-picked, cherry-picked invoices and come to this

3     court and say that this is somehow Defendant's fault,

4     that somehow this is newly discovered evidence, Your

5     Honor, I don't think it's a serious argument.  And I

6     strongly urge you to apply the law and keep these

7     invoices out because he prejudiced our client by

8     withholding --

9          THE COURT:  Let me ask another question,

10     Mr. Efron, do those invoices concur with the checks?

11          MR. ARIAS-MARXUACH:  No.

12          THE COURT:  They're different from those

13     checks?

14          MR. EFRON:  Well, but Dr. Engelberg will

15     explain that.  If we don't have the -- we do not have

16     the checks that paid those invoices, we have checks

17     that paid other invoices and other moneys to

18     defendant.

19          THE COURT:  Okay.  But let me also note,

20     they may have been paying him for some matters, you

21     have those checks, but if -- how do we know then that

22     those invoices were actually paid?  That's the other

23     thing.

24          MR. EFRON:  Well, that's what Dr. Engelberg

25     is here for.

 1          MR. FREESE-SOUFFRONT:  It's hearsay.

 2          THE COURT:  But if they were actually paid,

 3     then he would have to come with -- the best evidence

 4     would have to be the checks that would correspond to

 5     that, that's the other issue.

 6          MR. EFRON:  He was not asked to bring any

 7     documents.  These --

 8          THE COURT:  No, no.  He doesn't have to

 9     bring the documents, but the problem is if -- let's

10     assume I allow you to start referring to those

11     invoices, the problem is that he can say, Oh, yeah,

12     we paid those invoices.  They're going to have a best

13     evidence objection because --

14          MR. EFRON:  I haven't checked -- you know,

15     since he was getting money in advance, and that would

16     be Dr. Engelberg's testimony, he was getting advanced

17     money, I don't know if when he sent the bill that

18     bill was already deducted on Mr. Ambush's side from

19     the advance money he would get.  If he would get a

20     10,000-dollar check and then send a 6,275-dollar

21     bill, I don't know if that was deducted on his end.

22          So it didn't work like that.  It wasn't send

23     me a bill and I'll pay you that exact amount.  You

24     see that the amount -- and, you know, we all know

25     that the billings from lawyers don't come to $10,000

1  exactly or $23,000 exactly.  So these are approximate

2  numbers, they apparently had a very informal

3  relationship between the Center and this lawyer, so

4  it was that kind of -- it was that kind of a

5  situation.  So I don't think that any of the checks

6  are going to match the bill precisely, but

7  Dr. Engelberg will explain that.

8          Now, this is not only newly discovered

9  evidence, it was evidence withheld and absconded by

10  the defendant intentionally.  When he should have --

11  you know, we come in late into the case, we're

12  allowed one last minute -- one last minute brief

13  interrogatory and they don't even comply with that,

14  and then they blame it on our missing deadlines.  We

15  didn't miss any deadlines, we've complied with

16  everything.

17          THE COURT:  Mr. Arias?

18          MR. ARIAS-MARXUACH:  Your Honor, again, he

19  read you the interrogatory, there was no

20  noncompliance by Mr. Ambush.  And if he wanted to

21  force upon us and upon the Court that interpretation

22  of the interrogatory asking for communications, he

23  should have filed a motion to compel.

24          THE COURT:  My concern is, in theory a

25  communication can be an invoice but that is something

1    I believe that should have been at some point in the

2    discovery process brought up because now on Monday

3    night quarter backing, going back, I could have said,

4    well, if I were Judge Lopez back in October 26, 2010,

5    you know, my position, the Court's position, is that

6    this involves invoices, as well as and

7    communications.  You know, it's reasonable to

8    interpret as Mr. Efron is saying, it's also to

9    interpret what Mr. Arias is saying.  It would have

10   been a judgment call of the Court.

11            And, again, communications could be written

12   letters or e-mails or, you know, and at the same time

13   the Court could have concluded, yes, in the

14   interrogatories -- I mean invoices also or the Court

15   could have said -- and if the Court said it doesn't

16   cover invoices, Mr. Efron would have had an

17   opposition to that and said, Well, let me amend, give

18   me an opportunity, I want invoices.  So I think the

19   problem is -- and, again --

20            MR. ARIAS-MARXUACH:  You have fingered a

21   best evidence problem, Your Honor.  They are bringing

22   in two invoices which total a whopping $15,000, okay?

23   That's -- and they have just admitted that they don't

24   have the checks that prove that those invoices were

25   paid.  They also have a cavalcade of checks from a

1  payer that is not the New York Center for Civil

2  Justice.  I think Your Honor is inclined to allow the

3  checks, we'll see what foundation they lay.  But,

4  again, their invoices, I don't think, that given the

5  relationship that they had with the New York Center

6  for Civil Justice or the American Center for Civil

7  Justice, which by the way was the entity that gave

8  him the checks --

9         THE COURT:  Let me just review the invoices.

10 And obviously assuming I don't admit them, they will

11 be made part of the record.

12        MR. EFRON:  Remember that these were not The

13 Center's bills, these were the defendant's bills and

14 with he withheld them.  We didn't know that they

15 existed; we can't ask for something that we don't

16 know exists.  And the testimony will justify the

17 invoices.

18        MR. ARIAS-MARXUACH:  Your Honor, may I

19 approach?

20        THE COURT:  Let me review the...

21        MR. EFRON:  We gave a copy to the Court.

22        MR. ARIAS-MARXUACH:  Well, but he doesn't

23 have it right now so I'm lending him my copy.

24        And, Your Honor, I have to say at one point

25 Mr. Ambush was deposed and he wasn't asked for

1    invoices.  And, again --

2           THE COURT:  Let me ask, during the

3    depositions were there any questions pertaining to

4    invoices?

5           MR. ARIAS-MARXUACH:  No.

6           MR. EFRON:  No, because in his -- in the

7    interrogatory that we had before the deposition he

8    never mentioned them when we asked him for

9    communications.

10          MR. ARIAS-MARXUACH:  Your Honor, I want to

11   go back to where the spotlight should be placed.  He

12   has a relationship with the American Center for Civil

13   Justice.  He is in communication with them.  And it

14   is the American Center for Civil Justice or the New

15   York Center for Civil Justice that gave him the

16   checks and gave him the checks in time to present

17   them to Mr. Ambush for deposition, and gave him the

18   checks in time to list them in the proposed pretrial

19   order.  He could have gotten the invoices at the

20   appropriate time.

21          THE COURT:  Let me review the checks again,

22   what the dates of the checks were.  The other thing

23   is, let me note that the checks were provided in

24   discovery.  So it's not been unreasonable to have

25   asked for --

1          MR. ARIAS-MARXUACH:  And he got the checks

2     from the Center, Your Honor.

3          MR. EFRON:  No, Your Honor.  No, Your Honor.

4     Because these checks clearly do not pertain to any

5     bills and Dr. Engelberg's testimony was and is, that

6     he was given advances towards his work.  So -- and

7     this was not the only matter he was handling for

8     them.  So he was being given advances.  How would

9     that -- how would we make a logical inference that

10    bills exist when they're just advancing checks?

11         MR. ARIAS-MARXUACH:  Your Honor, the

12    allegations in the complaint, the original complaint,

13    the reason we're here, is that they claim that

14    Mr. Ambush was fully paid by the Center.  And if the

15    Center was the entity that brought Mr. Efron into the

16    case, then he could have said, What evidence do you

17    have that Ambush was fully paid?  And they could have

18    produced tons of checks, tons of invoices.  And, you

19    know what, they could have gotten a bookkeeper to

20    match them, they could have done tons of things.  And

21    it would be a line of questioning that you would

22    expect as follow-up in the deposition.

23         So, again, the spotlight has to lie on the

24    fact that payment by the Center is allegedly one of

25    the core allegations here, and that they had a

1  relationship with the Center where they could get

2  these documents in time.  And I don't think that

3  lassitude should be rewarded in this fashion.

4          THE COURT:  Okay.  Mr. Efron, any last

5  comments?

6          MR. EFRON:  If we're trying to get to the

7  truth and these documents should have probably been

8  submitted to us in discovery, the Court knows that it

9  should be allowed.  The Court should know that these

10  documents are going to be identified and there's

11  going to be a proper foundation before they go into

12  evidence by Dr. Engelberg.  He will explain the loose

13  relationship between the defendant and the Center and

14  the reason for the laxity in advancing checks and

15  not --

16          THE COURT:  Can't he do that through the

17  checks that, if you laid a foundation, he will be

18  presenting?  Because he's still going to be doing the

19  same thing through the checks?

20          MR. EFRON:  I beg your pardon?

21          THE COURT:  I conditionally allowed you to

22  introduce the foundation the checks.  Let's assume I

23  don't allow you to present the invoices, can you

24  still get a similar evidence to the jury that

25  checks -- these checks date from 2'06, 2'07, 2'08?

1            MR. EFRON:  You're correct.  It can still --

2            THE COURT:  Even assuming I don't allow

3    these invoices, you're not fatally prejudiced.

4            MR. EFRON:  No, it doesn't kill our case but

5    it weakens it somewhat because, you know, it is shows

6    that this was not -- this was not -- they're now

7    inventing the 10 percent deal, that he was going to

8    get 10 percent from the Center.  It shows that he was

9    billing based on his hourly.  So it just takes away

10   more credibility from the defendant, but agree with,

11   Your Honor, it certainly doesn't kill our case.

12           THE COURT:  Okay.  After considering the

13   arguments of the Court, the Court finds that -- the

14   Court's ruling is that the invoices will not be

15   admissible.  This should have at some point -- and,

16   again, it might not -- I'm not saying, Mr. Efron,

17   it's your fault.  I know since you came into the case

18   you tried to compensate for everything that was not

19   done, but I think this should have perhaps been

20   raised before the magistrate judge or during some of

21   the depositions or some of the other discovery.  I

22   think it's unfair at this time for the case in chief

23   to present this.

24           I am not ruling however right now and if you

25   at some point you may be able perhaps to use these

1    for impeachment not as evidence in the case.  And if

2    that was the case, I would ask for a side bar before.

3    And I'm not touching that issue at this point because

4    it's not right, it may not become right.

5            On the other hand, I think through the

6    checks, which I have allowed and they've been in

7    discovery, you can get a very similar result and

8    evidence, if all goes well with the testimony.

9            So that's the Court's ruling.  Your

10   objection is noted and I will make the invoices part

11   of the record, not as an exhibit but for the record.

12   So that's the Court's ruling.

13           Let's take a -- any other issues at this

14   time?

15           MR. EFRON:  No, your Honor.  And we

16   recognize the wisdom of your ruling, Your Honor.

17           THE COURT:  Okay.  So then let's take a

18   five-minute recess, we'll bring in the jury and then

19   we'll continue with the next witness.

20           I assume the testimony of the other brothers

21   is going to take maybe 35 minutes, 40 minutes.

22           MR. EFRON:  Actually, the next one wasn't

23   here because he lives in the States, he came in --

24   he's in Puerto Rico for this -- well, for other

25   things and for this as well.  And because he did

1    everything through his brother's power of attorney,

2    his testimony is going to be five minutes because he

3    signed all documents.

4            THE COURT:  So then let's bring in the jury

5    then in five minutes.

6            THE COURT OFFICER:  All rise.

7            (Jury Trial recessed at 10:07 a.m. and

8    resumed at 10:24 a.m.)

9            (Jury enters the room.)

10           THE COURT:  Please be seated.  Good morning,

11   Ladies and Gentlemen of the Jury.  I, again, as usual

12   apologize for the delay but I was discussing several

13   things with counsel.  And because of the outcome of

14   those discussions the case, again, will continue to

15   move in a quicker manner.

16           So having said that, Mr. Efron, you have

17   your fourth witness, please call him or her.

18           MR. EFRON:  We need to swear him in and

19   swear in the interpreter.  We have a new interpreter

20   today.

21           THE COURT:  Okay, but she's a certified

22   interpreter so --

23           MR. EFRON:  Yes, Your Honor.

24           THE COURT:  Myra Cardona, if I'm not

25   mistaken.

1        MR. EFRON:  You're correct, Your Honor.

2        THE CLERK:  Raise your right hand, please.

3                    ---

4        RUBEN BERGANZO-CRUZ, a witness called on

5    behalf of the Plaintiffs, having been duly sworn by

6    the Clerk, was examined and testified as follows:

7        THE COURT:  You may proceed, Mr. Efron.

8        MR. EFRON:  Thank you, Your Honor.

9                DIRECT EXAMINATION

10   BY MR. EFRON:

11   Q.        Mr. Berganzo, please introduce yourself.

12   State your name and introduce yourself to the Ladies

13   and Gentlemen of the Jury.

14   A.        My name is Ruben Berganzo.

15   Q.        Ruben Berganzo-Cruz?

16   A.        Cruz.

17   Q.        What was your father's name?

18   A.        Angel Berganzo-Colon.

19   Q.        Don Ruben, where do you live?

20   A.        In San Antonio Texas.

21   Q.        Since when?

22   A.        Since 1996.

23   Q.        Are you married?

24   A.        That's correct.

25   Q.        And can ask you how many children you have?

Ruben Berganzo-Cruz - Direct

1    A.        Four.

2    Q.        Are they in Puerto Rico or in Texas?

3    A.        One lives in San Antonio and three live in

4    Puerto Rico.

5    Q.        You know why you're here, correct?

6    A.        That's correct.

7    Q.        Who is Joshua Ambush, Attorney Ambush?

8    A.        Mr. Ambush was the one who tried the case,

9    the litigation of...

10   Q.        Have you ever seen him?

11   A.        I've never seen him.

12   Q.        So he's here in the courtroom but you've

13   never seen him?

14   A.        I've never seen him.

15   Q.        In 2002 some documents were signed, correct?

16   A.        That's correct.

17   Q.        Where were you?

18   A.        San Antonio.

19   Q.        So you didn't sign the documents personally?

20   A.        Never.

21   Q.        Who signed for you?

22             MR. FREESE-SOUFFRONT:  Objection.  Leading.

23             MR. EFRON:  Your Honor.

24             THE COURT:  I will allow the question.

25   BY MR. EFRON:

Ruben Berganzo-Cruz - Direct

1    Q.        Who signed on your behalf?

2    A.        (No response.)

3    Q.        Let me rephrase it.  Did you give anybody a

4    power of attorney, *un poder*, to sign on your behalf?

5              MR. FREESE-SOUFFRONT:  On what year, Your

6    Honor?

7              THE COURT:  Okay.  Specify the year.

8              MR. EFRON:  I said 2002, Your Honor.  I said

9    2002.

10   A.        Yes.

11   BY MR. EFRON:

12   Q.        And who was that?

13   A.        My brother.

14   Q.        And as far as you know, he signed, correct?

15   A.        That's correct.

16             THE COURT:  Just for the record, what's your

17   brother's name.

18             THE WITNESS:  Efrain Berganzo.

19   BY MR. EFRON:

20   Q.        And you know that there were also documents

21   signed in 2008, correct?

22   A.        That's correct.

23   Q.        And, again, your brother signed on your

24   behalf?

25   A.        That's correct.

Ruben Berganzo-Cruz - Direct

1  Q.        Do you remember any other documents that

2  were signed by your brother on your behalf?

3          MR. FREESE-SOUFFRONT:  Vague.  Your Honor.

4  A.        I don't remember.

5          THE COURT:  Overruled.

6  BY MR. EFRON:

7  Q.        In 2009 were there also documents signed on

8  your own behalf?

9  A.        That's correct.

10  Q.        Do you know who Javier Lopez is?

11  A.        Yes.

12  Q.        You've never met him?

13  A.        I've communicated.

14  Q.        On the phone?

15  A.        On the phone.

16  Q.        He's a lawyer?

17  A.        They tell me so.

18  Q.        Is that the lawyer that was hired to sue

19  Mr. Ambush, if you remember?

20  A.        I don't recall.

21  Q.        What did you hear Javier Lopez tell you

22  about this case?

23          MR. FREESE-SOUFFRONT:  Objection.  Leading.

24          THE COURT:  Sustained.

25  BY MR. EFRON:

Ruben Berganzo-Cruz - Direct

1   Q.        What do you know about this case?

2   A.        In this case what I understand is that it

3   had been agreed to pay 20 percent but that Attorney

4   Ambush charged, collected 30 percent.  He charged

5   10 percent more.

6   Q.        How did you feel about that?

7   A.        I felt bad because I was trusting and I was

8   disappointed.

9   Q.        What else did you feel, if you can explain

10  it, I know it's difficult to.

11  A.        Yes.  Betrayed.  Betrayed because we had

12  some trust and he failed us.

13            MR. EFRON:  That would be the extent of the

14  direct examination, Your Honor.

15            THE COURT:  Cross?

16            MR. FREESE-SOUFFRONT:  May it please the

17  Court.

18            THE COURT:  You may proceed, Mr. Freese.

19                      CROSS-EXAMINATION

20  BY MR. FREESE-SOUFFRONT:

21  Q.        Good morning, Mr. Berganzo.

22  A.        Good morning.

23  Q.        Mr. Berganzo, you graduated from high

24  school, right?

25  A.        That's correct.

355

Ruben Berganzo-Cruz - Cross

1  Q.     And, in fact, you took some university level

2  courses, right?

3  A.     No, some courses at the level of typing in

4  college.

5  Q.     Greg College, right?

6  A.     Yes, that's correct.

7  Q.     And you obtained a degree from Greg College?

8  A.     If it's based on that, yes.

9  Q.     And you went to the Army also?

10 A.     No.

11 Q.     But you took some entry exams for the Army?

12 A.     That's correct.

13 Q.     And you passed them?

14 A.     That's correct.

15 Q.     Okay.  You worked in Puerto Rico for several

16 years with the Puerto Rico Power Authority, right?

17 A.     That's correct.

18 Q.     You started as a driver of heavy equipment?

19 A.     That's correct.

20 Q.     And then you moved to buyer for the

21 helicopter division?

22 A.     That's correct.

23 Q.     And then you became a meter reader, right?

24 A.     That's correct.

25 Q.     Inspector and then operations technician?

Ruben Berganzo-Cruz - Cross

1    A.        That's correct.

2    Q.        And you retired from the Puerto Rico Power

3    Authority in 1993, right?

4    A.        That's correct.

5    Q.        And with full pension benefits?

6    A.        Correct.

7    Q.        And approximately three years, in 1996, you

8    moved to San Antonio?

9    A.        That's correct.

10   Q.        And you moved to San Antonio with your wife

11   and your mother?

12   A.        That's correct.

13   Q.        And since retiring from the Puerto Rico

14   Power Authority in 1993 you had not taken any other

15   job, right?

16   A.        No.

17   Q.        Now, let's talk about Javier Lopez-Perez;

18   you have never met Javier Lopez-Perez personally

19   right?

20   A.        No.

21   Q.        You only spoke to him over the phone?

22   A.        That's correct.

23   Q.        And you called him --

24            MR. FREESE-SOUFFRONT:  Strike that.

25   BY MR. FREESE-SOUFFRONT:

Ruben Berganzo-Cruz - Cross

1  Q.         In connection with the conversation with

2  Javier Lopez-Perez, Javier Lopez-Perez called you?

3  A.         I called him.

4  Q.         And Javier Lopez-Perez got your contact

5  information from your brother Efrain?

6          MR. EFRON:  Objection.  He said that.

7  A.         Could you repeat the question?

8          MR. EFRON:  He said that he called Javier,

9  he didn't say that Javier called him.

10 BY MR. FREESE-SOUFFRONT:

11 Q.         Okay.  You called Javier Lopez-Perez?

12 A.         That's correct.

13 Q.         And you learned about Javier Lopez-Perez

14 through a newspaper article?

15 A.         That's correct.

16 Q.         But you do not remember seeing the notice in

17 the newspaper, right?

18 A.         I don't recall having seen it.

19 Q.         And your brother did not call you to inform

20 you about the newspaper article either right?

21 A.         No.

22 Q.         Because, and correct me if I'm wrong, I

23 understand that you do not speak with your brother?

24 A.         No.

25 Q.         But that has nothing to do with this case?

Ruben Berganzo-Cruz - Cross

1    A.        No, it has nothing to do.

2    Q.        And as a result of that conversation with

3    Javier Lopez you decided to agree to a complaint

4    being filed against Mr. Ambush, right?

5    A.        That's correct.

6    Q.        Okay.  And that was based solely on the

7    information from Javier Lopez-Perez, right?

8    A.        That's correct.

9    Q.        Okay.  You did not perform any independent

10   investigation on your own behalf to confirm that

11   information?

12   A.        I trusted that he was telling me the truth.

13   Q.        Okay.  You did not call Mr. Ambush, for

14   example, and ask him if that was the truth?

15   A.        No.

16   Q.        Okay.  And you did not call your brother

17   either to confirm what Javier Lopez-Perez was saying?

18   A.        I have never contacted him.

19   Q.        Okay.  Now, you have talked about certain

20   documents that were signed in 2002 but you were not

21   shown any documents so I'm going to show you some

22   documents and verify with you if this is what you're

23   testifying about.

24            MR. FREESE-SOUFFRONT:  May the witness be

25   shown Joint Exhibit No. 11?

Ruben Berganzo-Cruz - Cross

1  BY MR. FREESE-SOUFFRONT:

2  Q.        Let me know when you have it in front of

3  you.

4  A.        Yes, I have it.

5  Q.        Okay.  Now let me ask you, Mr. Berganzo,

6  this is a document entitled claimant and center

7  agreement and it has a signature on the second page;

8  is that your brother's signature?

9          THE INTERPRETER:  May I -- Your Honor, I

10  don't believe the document that the gentleman has

11  been handed is the same one that has been published.

12          MR. FREESE-SOUFFRONT:  Oh, excuse me, 21,

13  21.

14  BY MR. FREESE-SOUFFRONT:

15  Q.        Sorry for that, Mr. Berganzo.

16          Now, this is a document entitled claimant

17  and center agreement and it has a signature on the

18  second page, and I want you to confirm if you

19  recognize that being your brother's, Efrain

20  Berganzo's, signature?

21  A.        That's correct.

22  Q.        Okay.  And this document is dated June

23  of 2002, correct?

24  A.        That's correct.

25  Q.        Okay.  And I am going to represent to you

1  that there has been testimony that this document was

2  signed in a meeting that took place in Puerto Rico in

3  2002.  You were not at that meeting?

4  A.       No.

5  Q.       Okay.  Let me ask you:  This document does

6  not contain your signature either, right?

7  A.       No.

8  Q.       And in this document your brother Efrain

9  Berganzo is entering into an agreement with an

10 entity, the American Center for Civil Justice; have

11 you ever heard of that entity?

12 A.       I had heard something, I don't recall well.

13 Q.       Okay.  Did you ever sign a claimant and

14 center agreement?

15 A.       I don't recall.

16 Q.       Okay.  Mr. Berganzo, you also talked about

17 some other documents that were signed in 2008.

18          MR. FREESE-SOUFFRONT:  And I want the

19 witness to be shown Joint Exhibit No. 24.

20 BY MR. FREESE-SOUFFRONT:

21 Q.       You have it in front of you?

22 A.       That's correct.

23 Q.       This is a Joint Exhibit.  It's a document

24 entitled retainer agreement and it has some initials

25 in all of the pages, and I want you to note if you

Ruben Berganzo-Cruz - Cross

1    recognize those as being your brother's, Efrain

2    Berganzo's, initials?

3    A.        That's correct.

4    Q.        Okay.  And if we turn to the last page of

5    this document, on the very top of that page you will

6    see a signature; and I want you to let me know if you

7    recognize it as being Efrain Berganzo's signature.

8    A.        That's correct.

9    Q.        Okay.  And let me confirm that this is, in

10   fact, the document that Brother Counsel was asking

11   about, that you said your brother Efrain Berganzo had

12   been empowered by you to sign on your behalf.

13   A.        I don't recall.

14   Q.        Okay.  But if we turn to the last page of

15   this document, and it says December 15, 2008, by that

16   time you had given your brother Efrain Berganzo a

17   power of attorney, right?

18   A.        That's correct.

19   Q.        And that power related to the actions that

20   he undertook in connection with the estate of your

21   deceased father, right?

22   A.        That's correct.

23   Q.        Now, let's turn to the second page of this

24   document.  And although I understand, Mr. Berganzo,

25   that you might speak some English, you have an

1    interpreter so I'm going to read to you in English

2    and the interpreter can read the portion below that's

3    already translated into Spanish.

4    A.        Okay.

5    Q.        Starting from the top, we agree to pay the

6    attorneys fees as follows:  10 percent of whatever

7    may be recovered pursuant to the claims settlement

8    agreement between the United States and The Great

9    Socialist People Libyan Arab Jamahiriya, dated

10   August 14, 2008.  Do you see that?

11   A.        That's correct.

12   Q.        And do you see that your brother Efrain

13   Berganzo has his initials next to that paragraph,

14   right?

15   A.        That's correct.

16   Q.        And this document, if we go to the first

17   page, is a document between Efrain Berganzo-Cruz

18   individually and on behalf of the estate of Angel

19   Berganzo with a person entitled as Joshua Ambush,

20   correct?

21   A.        That's correct.

22   Q.        And Mr. Ambush, as you said, is the attorney

23   who litigated the claim against Libya, correct?

24   A.        That's correct.

25            MR. EFRON:  Objection.  I think that's a

Ruben Berganzo-Cruz - Cross

1    misstatement.  There was never anything litigated

2    against anybody here.

3              MR. FREESE-SOUFFRONT:  That's his testimony,

4    that's his belief.

5    BY MR. FREESE-SOUFFRONT:

6    Q.        And you know, Mr. Berganzo, that attorney

7    Joshua Ambush was also the person that handled the

8    administrative process established by the U.S.

9    government to pay the claim on behalf of your

10   father's estate, right?

11   A.        I'm not sure.

12   Q.        As you sit here today did you have any

13   knowledge back in December of 2'08 that your brother

14   had secured this agreement whereby he was agreeing to

15   pay Joshua Ambush that 10 percent?

16   A.        No.

17   Q.        And you did not have knowledge of that

18   information either when Javier Lopez-Perez spoke with

19   you over the phone, right?

20   A.        Could you repeat the question?

21   Q.        Since you do not speak with your brother --

22             MR. EFRON:  That's a different question.

23             MR. FREESE-SOUFFRONT:  I strike it.

24   BY MR. FREESE-SOUFFRONT:

25   Q.        Since you do not speak with your brother

Ruben Berganzo-Cruz - Cross

1  Efrain, when Javier Lopez-Perez called you --

2          MR. FREESE-SOUFFRONT:  Strike that.

3  BY MR. FREESE-SOUFFRONT:

4  Q.      Since you don't speak with your brother

5  Efrain, when you spoke with Javier Lopez-Perez over

6  the phone you did not know that your brother had

7  executed the retainer agreement?

8  A.      I don't recall.

9  Q.      Okay.  Now, as you sit here today you do not

10 have any personal knowledge of what is the American

11 Center for Civil Justice, right?

12 A.      No.

13 Q.      And you were told at some point in time that

14 Mr. Ambush worked for the American Center for Civil

15 Justice, right?

16 A.      There was some communication.

17 Q.      And, in fact, the person who told you this

18 was Javier Lopez-Perez?

19 A.      No.  I had previously had communication.

20 Q.      Okay.  You know of a person called Michael

21 Engelberg?

22 A.      I've never heard of him.

23 Q.      Do you know a person called Eliezer Perr?

24 A.      No.

25 Q.      At any point in time from 2002 to 2009, did

Ruben Berganzo-Cruz - Cross

1    Mr. Michael Engelberg or Mr. Eliezer Perr ever call

2    you in connection with the claim against Libya?

3    A.        I had never heard those names.

4    Q.        And as you sit here today, you do not know

5    if the American Center for Civil Justice did anything

6    on behalf of your father's estate in connection with

7    the case against Libya, right?

8    A.        Yes.  I eventually knew what it was.  The...

9    Q.        As you sit here today, Mr. Berganzo, I don't

10   want to know about what someone else told you.  Do

11   you have personal knowledge that the American Center

12   for Civil Justice did anything on behalf of your

13   father's estate to further the claim against Libya?

14   A.        I don't recall.

15   Q.        Okay.  And you in fact have no personal

16   knowledge of anything the Center did that would

17   entitle the Center to receive 20 percent from the

18   10 million that your father's estate received in

19   connection with the settlement with Libya, right?

20   A.        Mr. Javier Lopez-Perez told me.

21   Q.        So it's not personal knowledge from you,

22   it's what Javier Lopez-Perez told you?

23   A.        That's correct.

24   Q.        Now, as you sit here today you don't have

25   any personal knowledge either as to whether or not

1  Mr. Ambush in fact was an employee of the American

2  Center for Civil Justice?

3  A.      As of today in some communication I

4  understood that Mr. Ambush worked with the Center.

5  Q.      But this is something that someone else told

6  you, right?

7  A.      That's correct.

8  Q.      Now, as you sit here today you don't have

9  any personal knowledge either if Mr. Ambush was paid

10 any amount by the American Center for Civil Justice

11 in connection with the work done on behalf of your

12 father's estate?

13 A.      Yes.  Mr. Javier Lopez told me that he had

14 been paid 20 percent.

15 Q.      So, again, this is what Javier Lopez-Perez

16 told you?

17 A.      That's correct.

18 Q.      Okay.  Let me show you, Mr. Berganzo, Joint

19 Exhibit No. 25.

20         You have it in front of you, Mr. Berganzo?

21 A.      That's correct.

22 Q.      Mr. Berganzo, this is Joint Exhibit No. 25

23 and this is a document entitled acknowledgment.

24         Now, do you recognize your brother's

25 initials in this document?

Ruben Berganzo-Cruz - Cross

1    A.        Correct.

2    Q.        Okay.  And if we go to the last page of this

3    document or, excuse me, next to last page, Page

4    No. 4, do you recognize your brother Efrain

5    Berganzo's signature?

6    A.        Correct.

7    Q.        And this document is dated April 17, 2009,

8    right?

9    A.        Correct.

10   Q.        And by that time you have testified that

11   Efrain Berganzo was in power to enter into this type

12   of agreement on your behalf?

13   A.        That's correct.

14   Q.        Now, if we go to the second page of this

15   document, Paragraph No. 3, do you see your brother's

16   Efrain Berganzo's signature next to -- your brother's

17   Efrain Berganzo's initials next to Paragraph 3?

18   A.        Correct.

19   Q.        Okay.  I'm going to read Paragraph 3.

20   Pursuant to a wire transfer made from the IOLTA

21   account to the estate bank account on April 16, 2009,

22   the estate received a sum of $7 million the net

23   settlement proceeds, representing the net amount

24   payable to the estate after deductions properly made

25   from the settlement in the amount of $2 million for

Ruben Berganzo-Cruz - Cross

1    attorney fees and costs and pursuant to a certain

2    claimant and center agreement.  The Center agreement

3    between the estate and the American Center for Civil

4    Justice Inc., the Center, and in the amount of

5    $1 million pursuant to a certain retainer agreement

6    with Joshua M. Ambush, Esquire, made on or about

7    December 15, 2008.  If you turn to the next page

8    you'll see the translation.

9            Do you see that this acknowledgment signed

10   by your brother has those terms?

11   A.       Correct.

12   Q.       Okay.  And, again, this is a document that

13   your brother was entitled to execute not only on his

14   behalf but also on your behalf?

15   A.       That's correct.

16   Q.       Okay.  Now, out of the $7 million mentioned

17   in this acknowledgment, did you receive your share?

18   A.       Correct.

19   Q.       You received $3.5 million?

20   A.       Correct.

21   Q.       And the other amount went to your brother

22   Efrain?

23   A.       I assume so.

24   Q.       Because you haven't spoken with your brother

25   about that?

Ruben Berganzo-Cruz - Cross

1    A.        No.

2    Q.        Now, in December 15 of 2008 when your

3    brother Berganzo signed the retainer agreement that I

4    showed you before --

5              MR. EFRON:  Efrain.

6    BY MR. FREESE-SOUFFRONT:

7    Q.        -- Efrain Berganzo signed the retainer

8    agreement that I showed you before, you were not

9    present when that document was signed, right?

10   A.        No.

11   Q.        And you were not in Puerto Rico on

12   December 15 of 2'08?

13   A.        No.

14   Q.        And you were not present at the meeting

15   where Mr. Ambush, your brother, and some members of

16   the Rodriguez family, as well as some other persons

17   was allegedly held in Puerto Rico on December 15,

18   2008?

19   A.        No.

20   Q.        So because you were not present at the

21   meeting you do not know what was said at the meeting?

22   A.        Correct.

23   Q.        Okay.  And would it be fair to say that the

24   claims that you are presenting against Ambush in this

25   case did not come from what happened during that

Ruben Berganzo-Cruz - Cross

1    meeting but rather what Javier Lopez-Perez told you?

2    A.       That's correct.

3            MR. FREESE-SOUFFRONT:  I don't have any

4    further questions.  I do thank you, Mr. Berganzo.

5            THE COURT:  Any further questions,

6    Mr. Efron?

7            MR. EFRON:  Very little, Your Honor.

8            THE COURT:  Please proceed.

9                    REDIRECT EXAMINATION

10   BY MR. EFRON:

11   Q.       Don Ruben, why did your father's estate

12   receive a total sum of $10 million?  Why?  Why did

13   you and your brother receive that money?  What

14   happened?

15   A.       I don't understand the question.

16   Q.       Was somebody killed?

17           MR. FREESE-SOUFFRONT:  Please, Your Honor.

18   A.       Oh, oh.

19           MR. EFRON:  I'll rephrase.

20   BY MR. EFRON:

21   Q.       Why did you and your brother receive that

22   money?

23   A.       Because of my father's death.

24   Q.       Now, when you made the claim against Libya,

25   who was in charge of the decisions regarding the

Ruben Berganzo-Cruz - Redirect

1  estate of your father?  Did you give your brother a

2  power of attorney?

3  A.      That's correct.

4  Q.      So who was in charge of making the

5  decisions?

6  A.      He was.

7  Q.      And although you live in San Antonio and he

8  lives in Manati and you choose to not communicate you

9  trust your brother, do you not?

10 A.      Well, communication -- that's correct, we're

11 family.

12         MR. EFRON:  Thank you very much.

13         THE COURT:  Recross?  Any recross?

14         MR. FREESE-SOUFFRONT:  No.

15         THE COURT:  Okay.  The witness is excused.

16         Mr. Efron, call your next witness.

17         MR. EFRON:  He's in that room.  Could we

18 have a five-minute break?

19         THE COURT:  Let's take a five-minute recess

20 and then let's bring the next witness.

21         THE COURT OFFICER:  All rise.

22         (Jury exits the room.)

23         (Jury Trial recessed at 11:12 a.m. and

24 resumed at 11:26 a.m.)

25

1          (Jury enters the room.)

2          THE COURT:  Please be seated.  Call your

3     next witness.  We're going to go until about 12:00,

4     12:10 and then I'll let you know when we're about to

5     recess.

6          MR. EFRON:  Plaintiffs call Dr. Michael

7     Engelberg and he's already made his affirmation for

8     testimony.

9          THE COURT:  Okay.  You may proceed,

10    Mr. Efron.

11                         ---

12         MICHAEL ENGELBERG, M.D., a witness called on

13    behalf of the Plaintiffs, having been affirmed by the

14    Court to tell the truth, was examined and testified

15    as follows:

16                    DIRECT EXAMINATION

17    BY MR. EFRON:

18    Q.        Witness, please state your name for the

19    record.

20    A.        My name is Michael Engelberg.

21    Q.        And is it Dr. Michael Engelberg?

22    A.        That is correct.  I am a physician.

23    Q.        What's your specialty?

24    A.        In pediatrics.

25    Q.        You're a pediatrician?

1    A.        That is correct.  I take care of children,

2    babies, infants.

3    Q.        Since when?

4    A.        Since 19 -- I became a physician, I

5    graduated medical school in 1979.  I went into

6    practice in 1984.

7    Q.        Where do you reside?

8    A.        I reside in 75 Woodmere Boulevard.

9    Q.        Where is that?

10   A.        That's in Woodmere, New York.

11   Q.        So you've come a long way for this?

12   A.        Yes, I did.

13   Q.        I also note that it was difficult for you to

14   come, we were expecting you yesterday.  Could you

15   tell us what your --

16             MR. ARIAS-MARXUACH:  Objection.  Side bar.

17             MR. EFRON:  Your Honor, it's an

18   introductory --

19             MR. ARIAS-MARXUACH:  I know where he's going

20   with this.

21             THE COURT:  Okay, please approach.

22             (Side bar discussion begins.)

23             MR. ARIAS-MARXUACH:  He wants to put on the

24   record that this man is under cancer treatment as an

25   obvious plea for sympathy.  It is irrelevant.  And

Michael Engelberg, M.D. - Direct

1    this is --

2           THE COURT:  Okay.  Whether he's here

3    yesterday or tomorrow it doesn't matter.  He's your

4    witness and --

5           MR. EFRON:  I just wanted to explain because

6    he might need some water or -- but that's something

7    for the Court to -- if he needs any --

8           MR. ARIAS-MARXUACH:  It's the same thing as

9    the whole schtick about his being a pediatrician.  He

10   devotes 40 hours a week to the Center so I don't know

11   how --

12          THE COURT:  Let's move on to another

13   question.

14          MR. ARIAS-MARXUACH:  But the whole issue

15   about --

16          MR. EFRON:  And Mr. Arias knows this because

17   I anticipated it and I told him this, I want them to

18   know under what difficulties he came to Puerto Rico

19   to testify.

20          MR. ARIAS-MARXUACH:  No, it's irrelevant.

21   It's a play for sympathy.

22          MR. EFRON:  No, it's not a play for

23   sympathy.

24          MR. ARIAS-MARXUACH:  It's a play for

25   sympathy.

Michael Engelberg, M.D. - Direct

1    THE COURT:  But he's here, I'm not going to

2    allow it.  He's here, he's going to testify.  Let's

3    move on.

4         (Side bar discussion ends.)

5    BY MR. EFRON:

6    Q.    Okay.  Do you still practice pediatrics?

7    A.    Only as a consultant.

8    Q.    What do you do that occupies most of your

9    time now?

10   A.    Most of my time is functioning as the

11   president of the American Center for Civil Justice.

12   At this point I volunteer for the American Center for

13   Civil Justice.

14   Q.    What is the American Center for Civil

15   Justice?

16   A.    The American Center for Civil Justice is a

17   not for profit organization that advocates for

18   victims of terrorism and specifically in using the

19   Court system by which we're able to hold governments

20   and organizations responsible for their acts of

21   terrorism.

22   Q.    Since when have you -- since when has the

23   American Center existed?

24   A.    The American Center was originally founded

25   on a different name in 1996 as the Raoul Wallenberg

1 Center For Civil Justice.  That's when it was first

2 incorporated.  It was changed a few years later to

3 the American Center for Civil Justice.

4 Q.      And that was when approximately?

5 A.      I don't recall the timing but probably

6 around 1998, 1999.

7 Q.      And who had been the principals of the

8 American Center?

9 A.      Okay.  Uhm, the original founders were

10 myself and a Rabbi Perr.

11 Q.      Who is Rabbi Perr?

12 A.      Rabbi Perr.

13 Q.      Is he a congregational rabbi?

14 A.      Both.  He's an individual that was a

15 congregational rabbi, he was a dean of a learning

16 institution, he was also -- he had a school for

17 children with disabilities and learning problems.

18 Q.      And of course a rabbi is a Jewish religious

19 leader?

20 A.      That is correct.

21 Q.      He -- so what was your position at the

22 American Center?

23 A.      My position in the American Center was

24 basically doing research, preparing the narratives

25 for the attorneys, making sure that we would be able

Michael Engelberg, M.D. - Direct

1  to bring on the claimants.  We felt that -- that they

2  were victims of these acts of terrorism.  I mean,

3  there are many, many responsibilities in which I had.

4  Q.      How did you decide what cases to give your

5  time and resources to?  When I say "your," I mean The

6  Center's.

7  A.      Well, we had discussed it certainly after

8  the law went into effect.  There was a law that was

9  passed in 1996 that allowed American citizens who had

10  become victims of terrorism, both who were killed or

11  injured, to bring civil action against governments

12  that sponsored terrorism.  There was seven countries

13  that were listed as governments that sponsored

14  terrorism, and there was what's called a waiver of

15  foreign sovereign immunity.

16      Originally governments were not held

17  responsible for any acts of terrorism.  The United

18  States government created through legislation a law

19  that held these governments responsible for these

20  killings, for hostage taking, for causing injuries to

21  American citizens.

22  Q.      I understand that that law had a window of

23  time, do you know what it was?

24  A.      Yes.  Well, there are two components of it.

25  One was in 1996 when it went into effect and then

Michael Engelberg, M.D. - Direct

1  there was an additional bill that was passed a year

2  later that described what those damages were.  There

3  was a ten-year statute of limitations from that point

4  that aims -- the legislation, the law was passed in

5  1996, it gave us ten years by which we could find

6  different claimants that had occurred before, and

7  that would allow us until 2006 to bring these

8  actions, to file a complaint on behalf of different

9  claimants.

10  Q.      How many different cases or -- or give us an

11  idea of the volume of that kind of work that the

12  American Center would undertake.

13  A.      Well, first of all, we had to identify the

14  different cases.  We did have a number of different

15  experts that we had consulted with.  But basically

16  defined who -- the different cases, as well as the

17  different claimants.  We paid some investigative

18  reporters, individuals that were expert in this area,

19  in terms of letting us to know which cases we should

20  undertake or which one of them was the Lod Airport

21  Massacre.

22  Q.      The Lod Airport Massacre in Israel?

23  A.      That is correct.  I mean, a lot of

24  individuals would described this as the Kozo or

25  Okamoto Massacre.  Basically it occurred at Lod

1  Airport --

2  Q.      Before we go into Lod Airport, besides Lod

3  Airport there were other --

4  A.      Yes, there were multiple cases.  In total

5  basically with all the cases at this point in time,

6  rather than to belabor all the different cases, we

7  have judgments in excess of two and a half billion

8  dollars.  The Center through their efforts have been

9  able to collect for a number of the victims in excess

10 of $150 million.

11 Q.      So it was not just the Puerto Ricans -- the

12 Puerto Rican victims in Israel?

13 A.      That is correct.

14 Q.      There were other cases as well?

15 A.      That is correct.

16 Q.      And who would handle -- before we go into

17 Lod, who would handle those other cases?

18 A.      Well, we actually -- first of all, in terms

19 of the investigation, I was involved in the

20 investigation.

21 Q.      By the way, how does a pediatrician get

22 involved with going after terrorists?

23 A.      Well, I always described -- people ask me,

24 how does a pediatrician get involved?  And I always

25 say that I was convinced by two pediatricians that I

Michael Engelberg, M.D. - Direct

1   should get involved.  One was the name of Shikaki.

2   Shikaki was a founder of a Palestinian Jihad.  And

3   the other one was Ranticci.  Ranticci likewise was a

4   pediatrician who founded Hamas.  And of course there

5   are many, many cases of which Hamas was responsible

6   for the killings not only of Israeli citizens and

7   foreign citizens but many American citizens.

8          Uhm, by being a pediatrician it allows me to

9   be able to organize, to be able to deal with the

10   narrative of the cases, to be able to put these cases

11   together for the attorneys.

12          The American Center has only hired the top

13   attorneys to litigate these cases.  If you take a

14   look at the different law firms on which we have

15   engaged, they are very, very experienced, they have

16   the knowledge, they have the skills, they have the

17   resources by which they're able to move these cases

18   along.  We've taken a tremendous risk in most of

19   these cases.

20   Q.     Because you haven't collected most of the

21   money?

22   A.     That is correct.  But even when we --

23   beforehand many attorneys did not want to take these

24   cases.  Why?  Because they never believed it was

25   doable.  Many attorneys turned it down.  We're very

1  fortunate that we're able to obtain attorneys because

2  of the risk.

3  Q.      How would these attorneys be paid?

4  A.      There are different -- there are different

5  agreements.  With some of them, certainly starting

6  off with the American Center, we made sure that

7  everything would be discounted.  We always had an

8  agreement, first of all, with the claimants, the

9  20 percent, and then we would go -- that means

10 20 percent would be the total amount including the

11 litigation fees, unlike most attorneys that request

12 33 and a third percent.

13      We didn't want this to be perceived as an

14 enterprise for attorneys, that this is nothing about

15 just being mercenary and making a lot of money.  A

16 lot of the attorneys will charge 33 and a third

17 percent plus expenses.  It's very important for us to

18 limit the amount that the claimants would be paying

19 to 20 percent, including all attorney fees, including

20 all expenses.

21 Q.      Are there --

22 A.      We -- we --

23 Q.      I'm sorry, I didn't mean to interrupt.

24 A.      Again, we hired the attorneys.  We let them

25 know that it was done because we felt that these

Michael Engelberg, M.D. - Direct

1  individuals deserved to be represented, that they

2  suffered a lot, they were victimized.  And most of

3  these big law firms understood that, they were

4  willing to work with us.

5       And we made -- we had, uhm, -- we had --

6  again, I'll have to explain a little bit later in

7  terms of powers of attorney, that I was able to

8  engage these law firms on different types of

9  agreements.  The Center put out a lot of money -- in

10  many cases the Center put out, in certain cases, over

11  half a million dollars to be able to move these cases

12  forward.  In other cases the attorneys would get paid

13  only at the time that there would be a collection.

14  But, again, the attorneys were willing to work with

15  us because they recognized the importance of

16  representing individuals who were victims of acts of

17  terrorism.

18  Q.       So did you have situations on any of the

19  cases where the Center actually lost money because of

20  their expenses and their legal fees and not

21  collected?

22  A.       I mean, at this point in time we put out for

23  many of these cases close to $2 million which the

24  Center has not collected.

25  Q.       Which is a risk for the Center?

Michael Engelberg, M.D. - Direct

1   A.        Which is a risk, yes.

2   Q.        And when the Center does collect money, what

3   happens to that money?  When you do collect the

4   20 percent, what do you do besides pay the lawyers?

5   A.        Well, it usually goes back in terms of

6   investigating additional cases.  The American Center

7   also contributes to many other organizations that

8   have very similar goals.  The Center has donated to

9   other organizations that are responsible in teaching

10  the intelligence community acts of terrorism, how to

11  deal with first respondents, if there is a terrorist

12  act, exactly how they should respond to it.

13          We've given money to other organizations

14  that are not for profit organizations in addition to

15  the attorneys that are persuing additional claims.

16  Q.        As an executive, as the president of the

17  American Center, do you get paid for your time and

18  for your expenses?

19  A.        Yes, I do.  I'm on a salary.  Well, at this

20  point in time I'm no longer on a salary, it's purely

21  volunteer.  Uhm, I do work for another organization

22  that does research.

23  Q.        And what is the name of that organization?

24  A.        That organization is called the New York

25  Center For Civil Justice.

1 Q.        What is the relationship between that one

2 and the American Center?

3 A.        Well, they're two separate organizations

4 that deal with different responsibilities.

5 Q.        Is the New York City also a nonprofit?

6 A.        Yes, it is.  It's a --

7 Q.        And you are also the president?

8 A.        That's correct.

9 Q.        Is Rabbi Perr involved in that one as well?

10 A.        No, he is not.

11 Q.        So what is the relationship between one and

12 the other?

13 A.        Well, originally when the American Center,

14 okay, collected funds from two of our very success --

15 a successful judgment and a collection, we were able

16 to donate to many other organizations.  And

17 originally they were giving money to the New York

18 Center to be able to fulfill its particular goals and

19 missions.

20        The New York Center is responsible for --

21 specifically for doing research on Islamic terrorism.

22 It's also responsible for providing civil rights

23 education on college campuses -- letting the students

24 know what the civil rights are.  It deals with --

25 with questions of religious tolerance on college

                    Michael Engelberg, M.D. - Direct

1    campuses.

2           So even though they're very similar -- also,

3    the New York Center does have a goal of advocating

4    for victims of terrorism.  It actually helps to

5    finance individuals who were victims and donates to

6    them to help them out personally.

7           MR. FREESE-SOUFFRONT:  Your Honor, I move to

8    strike as nonresponsive.  The question was, what was

9    the relationship between the American Center and the

10   New York Center?

11          MR. EFRON:  We're going to get to that.  He

12   had to explain --

13          THE COURT:  I'll allow the question.  Let's

14   continue.

15          MR. EFRON:  It's an introductory question.

16          THE COURT:  Okay.

17   BY MR. EFRON:

18   Q.      That being said, what is the relationship --

19   and thank you for the introduction.

20          What is the relationship and what is the --

21   what economic relationship, if any, is there between

22   the two organizations?

23   A.      Yes.  Well, the American Center over the

24   years from -- certainly from the time that it had its

25   original collection, that was in 2000 basically, over

Michael Engelberg, M.D. - Direct

1   the years, because their expenses were extremely

2   high, really ended up using most of their money.  And

3   certainly by 2005/2006 the American Center, in terms

4   of its own financing, did not have the funds to be

5   able to pay directly the attorneys' other expenses,

6   because there is a similar goal that the both centers

7   do have.  The New York Center was able to help

8   finance many of the bills of the American Center.

9          So, yes, the New York Center paid many of

10  the bills in the later years, okay, on behalf of the

11  American Center.

12  Q.     Was that accounted for as a -- as a --

13         MR. ARIAS-MARXUACH:  Objection.  Leading.

14         MR. EFRON:  I haven't asked the question

15  yet.

16         MR. ARIAS-MARXUACH:  Ask how it was

17  accounted.

18         THE COURT:  Continue, Counsel.

19  BY MR. EFRON:

20  Q.     How was that accounted?

21  A.     It was accounted -- basically it was given

22  as a loan.

23  Q.     As a loan?

24  A.     As a loan to the American Center, yes.

25  Q.     And has the American Center ever -- with

1  what frequency would the American Center help the

2  New York Center?

3  A.        I mean, since --

4  Q.        Financially.

5  A.        From which time?

6  Q.        Since its inception.

7  A.        Well, initially it was helping them.  You

8  know, again, we're not talking about major moneys but

9  probably to the tune of 100,000, $200,000, to see

10 that their goals could be fulfilled.

11 Q.        Before you gave us this explanation you were

12 going to start telling us about the case that most

13 relates to our claim here, the Lod Airport Massacre.

14           Can you give us a background on that?  Who

15 thought of it?  How did it begin?  Who did what?

16 A.        Well, prior to 2000, as I said, we had to

17 create a list of all the different terror attacks

18 that was sponsored by governments that sponsored

19 these attacks.  We listed many different cases.

20 There was a Higgins case, there was a Stethem case,

21 the Khobar Towers case, a Welch case.  There were

22 many cases including the Lod Airport.

23           We had consulted with many experts on this.

24 One was the name of Yosef Bodansky.  He was -- became

25 the director of the congressional task force for

1  uncongressional warfare and counterterrorism.  For

2  about ten years he had been doing investigation on

3  all of these particular attacks that affected

4  Americans.  We had consulted him, he gave us the list

5  of all the different cases out there including the

6  Lod Airport Massacre.

7       We had also consulted with an investigative

8  journalist in Israel by the name of David Haley to be

9  able, to help us in terms of gathering information.

10  Between the two of them they were able to put us in

11  touch with -- it's called the Shim Bet in Israel,

12  that happens to be their intelligence agency, to be

13  able to gather information.

14       On a few occasions I and other attorneys had

15  gone to Israel to gather information specifically on

16  the Lod Airport Massacre.

17  Q.      Since what year had you been considering

18  filing a complaint or a claim for the Lod Airport

19  Massacre?

20  A.      Well, beginning in the year probably 2000,

21  you know, we had discussed that possibility in terms

22  of bringing such an action on behalf of the Puerto

23  Rican claimants who were victimized in these acts of

24  terrorism.

25  Q.      So what did the Center do?

Michael Engelberg, M.D. - Direct

1  A.      Well, at that point in time we had discussed

2  in terms of -- we had been in touch with Mr. Ambush.

3  Q.      How was that?  How do you -- who is Joshua

4  Ambush?

5  A.      Okay.  Well, Joshua Ambush, okay, through

6  his father became a very good friend of Rabbi Perr.

7  Rabbi Perr over the years again had befriended the

8  father, met him many, many years ago while they were

9  living in Baltimore.  Through a congregational rabbi,

10 he met the father.  The father confided in Rabbi Perr

11 the difficulties that he was having with Joshua

12 Ambush in school.  Rabbi Perr --

13         MR. ARIAS-MARXUACH:  Objection.  Hearsay.

14         THE COURT:  Don't -- don't make any

15 statements that third persons may have told you, just

16 based on your own personal knowledge of the facts.

17 BY MR. EFRON:

18 Q.      Based on your personal knowledge, what is

19 the relationship and how did the relationship between

20 Ambush and the Center begin?

21 A.      Okay.  The Center hired Mr. Ambush in 2001

22 to do different works for the Center.  He had just

23 graduated law school.  We had asked him -- because he

24 had told us that he had lived in Puerto Rico and he

25 had a cousin by the name of Leo Garcia that lived in

Michael Engelberg, M.D. - Direct

1    Puerto Rico, he said would we mind if he would be the

2    agent for the Center.  And that was one of his tasks,

3    to be an agent, to go to Puerto Rico -- or through

4    his cousin Leo Garcia, to sign up potential claimants

5    for this particular claim.  And we tasked him to be

6    that -- the agent and to be the liaison on behalf of

7    the Center, to go there and to sign them up for the

8    Center.

9    Q.      You had identified the victims' families

10   already; is that correct?

11   A.      No.

12           MR. ARIAS-MARXUACH:  Objection.  Leading.

13           THE COURT:  Rephrase the question.  Rephrase

14   the question.

15   BY MR. EFRON:

16   Q.      Who was Leo Garcia -- where was Leo Garcia

17   supposed to go?

18   A.      Okay.  Mr. Ambush basically assured us,

19   because of his relationship to Puerto Rico, that he

20   would be able to identify who the claimants were.

21   And, therefore, he said through Leo Garcia, who was

22   very well-known here, he would be able to contact the

23   individuals.  We had a list of all the different

24   claimants because, again, through our investigation

25   there are a number of different newspapers that had

Michael Engelberg, M.D. - Direct

1    already identified who all those claimants were.

2            And Mr. Ambush --

3    Q.      You mean claimants or victims?

4    A.      Well, I should say at that time they were

5    victims.

6    Q.      Exactly.

7    A.      All those that were -- there was an entire

8    list that was reported in the newspapers in 1972,

9    that identified who all of those victims were.  And

10   Mr. Ambush assured us through Leo Garcia likewise

11   would be able to reach out to them and to bring them

12   on board as claimants for this action.

13   Q.      When you say that Ambush was -- I'm trying

14   to think of the word you used.  You said "tasked"?

15   A.      Tasked, that's correct.

16   Q.      In what capacity?

17   A.      To just be a liaison for the Center.  He was

18   not an attorney for these victims.  He was going down

19   there to bring them on board, to -- basically to sign

20   them on for the Center.

21           There were two agreements that we had

22   between the -- these potential claimants and the

23   American Center for Civil Justice.  One was the

24   Center and claimant agreement and the other was a

25   power of attorney.

Michael Engelberg, M.D. - Direct

1    Q.        Where were those redacted, those documents?

2    A.        What do you mean by "redacted"?

3    Q.        Who wrote those documents out?

4    A.        Okay.  They had been used for a number of

5    years and they continue to be used.  They were

6    designed by other attorneys, American attorneys.

7    They told us exactly that we should have two specific

8    agreements:  One was in terms of the American Center

9    For Civil Justice that basically defined the

10   financial terms of the relationship, as well as our

11   responsibilities; and there was a power of attorney

12   that was executed that authorized me as an individual

13   to represent the different claimants directly.  And

14   that was very important because in terms of engaging

15   an attorney, it's the claimants themselves that have

16   to engage the attorney.

17        And through the power of attorney that

18   authorizes me on behalf of many individuals, whether

19   it's two individuals or 45 claimants, to be able to

20   engage the attorney on behalf of all of these

21   individuals.

22   Q.        But when you tasked Mr. Ambush with that

23   job, he was an attorney already?

24   A.        But in 2001 the Center at this point in

25   time, okay, was just about -- just wanted to sign

1    them up.  We had yet to determine who the law firm

2    was going to be in terms of representing these

3    individuals.

4    Q.        Was it not -- it was not the intention of

5    the Center that Mr. Ambush be the lawyer?

6             MR. ARIAS-MARXUACH:  Objection.  Leading.

7             THE COURT:  It's leading.  Rephrase the

8    question.

9             MR. EFRON:  I'll rephrase it.

10   BY MR. EFRON:

11   Q.        Which law firm or which lawyer did the

12   Center intend to have represent the claimants?

13   A.        Initially we had wanted to have a very large

14   law firm, a very prestigious law firm, by the name of

15   Covington, Burling to represent the claimants in

16   this -- in the lawsuit because we needed skilled

17   lawyers who were going to litigate this particular

18   case.

19            Again, this was a very difficult case,

20   there's no assurance that it was going to be

21   successful.  We were willing to work with attorneys

22   but, again, we only hired prominent law firms or

23   prominent attorneys to represent them who were

24   skilled in litigating.

25            These cases against Libya, unlike the

Michael Engelberg, M.D. - Direct

1    Iranian cases, were going to be defended.  We had

2    other cases out there too that were represented by

3    prominent lawyers.  One of the other cases was a

4    Collet, Alec Collet.  Al Collet was abducted by a

5    terrorist organization that was sponsored by Libya --

6    Q.     Could you spell that out, please?

7    A.     Al Collet?

8    Q.     How would you spell that?

9    A.     C-o-l-l-e-t-e.

10   Q.     Is the word before that --

11   A.     I mean, l-e-t.

12   Q.     Is there a word before that?

13   A.     Alec, A-l-e-c.

14   Q.     Like Alec?

15   A.     That is correct.

16   Q.     That's a first name.

17          And the last name?

18   A.     C-o-l-l-e-t.

19   Q.     And what was that about?

20   A.     That was about an individual who was a

21   British citizen, who married an American who was

22   working for the U.N. and he was abducted when he was

23   in Lebanon by Abu Nidal, and that was a terrorist

24   organization that tortured him and eventually killed

25   him.  We brought an action against Libya.  We had

395

MichaelMichael Engelberg, M.D. - Direct

1    done all the investigation regarding him.  We had

2    hired Paul Gaston to represent that particular case

3    and it was against Libya.

4    Q.        Who is Paul Gaston?

5    A.        Paul Gaston is a highly skillful lawyer,

6    he's an attorney that has major credentials.  Paul

7    Gaston graduated from Yale Law School.  People know,

8    in terms of the different universities, Yale is

9    perhaps at the top with Harvard University.  He had

10   25 years of experience.  He actually represented a

11   number of our other cases in litigating antiterrorism

12   cases.  So this is an individual who's very skillful,

13   who, again, was very experienced and also had

14   litigated prior cases on behalf of the Center.

15   Q.        So the lead -- in what measure, if any, do

16   you think that the lead to think of or do the Lod

17   Airport Massacre for the Puerto Rican victims was

18   thought of or designed by Ambush?  In other words,

19   if --

20   A.        It was never thought of by Mr. Ambush.

21   Q.        But when you tasked him with this job he was

22   a lawyer and he was reporting to the Center; is that

23   correct?

24   A.        That is correct.  He was responsible for

25   basically doing research as a paralegal would do in

EVILYSEVILYS E. BRATHWAITE, RPR
COURT REPORTER FOR THE U.S. DISTRICT COURT OF PUERTO RICO
(787)772-3377

Michael Engelberg, M.D. - Direct

1   terms of researching, going to the library of

2   Congress, obtaining the information for us,

3   presenting it to us and for me then to determine

4   whether we had enough information by which the

5   lawyers were able to proceed with this case.

6   Q.      In what way would the Center, the American

7   Center, compensate Mr. Ambush for his work?

8   A.      Well, Mr. Ambush was -- continues being

9   compensated, certainly in the initial stages by the

10  American Center.  From 2001 through 2003, he was

11  employed by the Center, he was paid quite generously

12  during that period of time.  Later on from 2006 and

13  onwards he would submit bills to the American Center

14  by which the American Center paid him for his time.

15  And Mr. Ambush, again, presented it at $50 an hour;

16  he was satisfied with this -- with this compensation.

17  He never showed any disappointment with it.

18          In addition to that, certainly from 2008

19  during that period of time the Center advanced him

20  $20,000 by which he would be able to continue his

21  work and to be able to pay for additional items.  A

22  check was issued to him in June for $10,000 and then

23  again in November for $10,000, which he had never

24  accounted for.

25  Q.      The payments, am I correct in thinking that

Michael Engelberg, M.D. - Direct

1  this case was not the only thing that Ambush was

2  working on for the Center?  Was he doing other work

3  for the Center as well?

4  A.      Yes, he was.

5  Q.      So how did you know what was being paid by

6  what and for what?

7  A.      Mr. Ambush would basically send us an

8  invoice by -- or call Rabbi Perr in terms of that he

9  needed so much money and, of course, Rabbi Perr would

10  tell me to issue a check to Mr. Ambush.

11  Q.      Now, this was prior to the billing; is that

12  correct?

13  A.      This is prior to this.  Well, even during

14  that period of time he would submit additional bills.

15  Q.      Fine.  But when Rabbi Perr would tell you,

16  make out a 10,000 dollar check to Joshua, you would

17  consider that an advance?

18  A.      Yes, we would.

19       THE COURT:  Okay.  Mr. Efron, I don't want

20  to cut your line of thought, but it's about 12:06.

21  Whenever you're going to move on or you think it's

22  appropriate to --

23       MR. EFRON:  Okay.  We can stop now, Your

24  Honor.

25       THE COURT:  Then the witness is under the

Michael Engelberg, M.D. - Direct

1    rules of the Court.  Please do not discuss your

2    testimony with anyone until you finish testifying

3    today or tomorrow.  It's 1:06.  Let's be back here --

4    12:06.  Let's be back here at 1:20.

5              MR. EFRON:  Thank you, Your Honor.

6              THE COURT OFFICER:  All rise.

7              (Jury exits the room.)

8              THE COURT:  Everybody please be back here at

9    1:20.

10             (Jury Trial recessed for lunch at 12:04 p.m.

11   and resumed at 1:50 p.m.)

12             (Jury enters the room.)

13             THE COURT:  Please be seated.

14             And, Mr. Efron, you may continue your direct

15   examination.

16                  DIRECT EXAMINATION CONTINUED

17   BY MR. EFRON:

18   Q.        I don't know, but I think my last question

19   to you and your last answer was related to advances

20   that the Center would give Joshua ambush; is that

21   correct?

22   A.        That is correct.

23   Q.        And what about those advances?  How would he

24   justify them or request them?

25   A.        Basically he would basically say that he

Michael Engelberg, M.D. - Direct

1    needed so much money for -- to be able to carry on,

2    to pay other individuals.  And basically I signed a

3    check and sent it to Mr. Ambush.

4    Q.      And, but was it only to pay other

5    individuals and other expenses or was it also for his

6    own use?

7            MR. ARIAS-MARXUACH:  Objection.  Leading.

8            THE COURT:  Sustained.

9            Rephrase.  You have to rephrase the

10   question.

11   BY MR. EFRON:

12   Q.      What was that money used for, if you know?

13   A.      Well, it had yet to be determined.

14   Q.      Okay.  Now, what did he ask -- who at the

15   Center did he ask for the advances?

16   A.      He would ask Rabbi Perr.

17   Q.      And then what would Rabbi Perr do?

18   A.      He would basically say to me that we needed

19   to pay Mr. Ambush.

20   Q.      On what grounds?

21   A.      Well, that was the relationship that Rabbi

22   Perr had with Joshua Ambush.

23   Q.      So was this a salary or was it charity?

24   What was this?

25   A.      Well, in a way if you want to say it was a

Michael Engelberg, M.D. - Direct

1  combination.  Throughout all the years Rabbi Perr

2  felt a certain personal obligation to Mr. Ambush that

3  he expressed to me in terms of how he helped to

4  support him over the years.  And basically it was

5  built on a certain trust and loyalty that existed

6  between the two of them.

7  Q.      Was the -- in your opinion was that trust

8  reciprocal among both sides?

9  A.      Yes, it was.  Well, at least we thought so.

10  Q.      Who prepared -- no -- as 2006 what you said

11  was the statute of limitations was approaching, what

12  measures did the Center take in order to preserve the

13  rights of the Berganzo and the Rodriguez families?

14  A.      I'd like to back up a little bit.  As I had

15  mentioned --

16         MR. ARIAS-MARXUACH:  Objection.  Not

17  responsive.

18         THE COURT:  Sustained.

19         You have to answer the question posed.

20  A.      Okay.

21         MR. EFRON:  I'll go back.  I think I know

22  what he wants to say.

23  BY MR. EFRON:

24  Q.      At what point did Paul Gaston get involved

25  in this litigation?  And when I say "this

1    litigation," I mean in the Lod Airport Massacre.

2    A.        Well, that was much later.  Other than that

3    at the time -- well --

4    Q.        So let's go back to my --

5              MR. ARIAS-MARXUACH:  Asked and answered.

6    BY MR. EFRON:

7    Q.        Let's go back to my original question.

8              What measures did the Center take in order

9    to protect the rights of these two families?

10   A.        In 2006 as the time frame by which we were

11   allowed to bring this complaint -- as I had mentioned

12   earlier, there's what's called a statute of

13   limitation of ten years.  It was now 2006.

14   Covington, Burling had -- basically did not have

15   enough evidence by which they were willing to take on

16   this case, and we had to preserve and protect this

17   claim.

18             We asked basically the Center; that is,

19   Joshua Ambush, to -- basically to file this in order

20   to preserve it and to protect the case.  The

21   complaint at that point in time had been prepared not

22   only by Joshua Ambush himself but with the assistance

23   of another attorney by the name of Danny Scher.  And

24   in 2006 we asked Mr. Ambush to file the complaint

25   that now was on record as being filed.

1    It was through my power of attorney okay,

2  that authorized me to engage Mr. Ambush to do this.

3  This is the only time in which, again, Mr. Ambush --

4  or the first time in which he actually became the

5  attorney for the claimants.

6         As I said previously, he was only an agent

7  in terms of signing them up previously to this, but

8  at this point, okay, the Center is responsible for

9  engaging attorneys.  We used the power of attorney by

10 which we do that just so basically the claimants --

11 so at this point in time -- they did become claimants

12 at this point in time -- or the victims became

13 claimants, and we hired Mr. Ambush to file the

14 complaint.  Now, it was on record and we were able to

15 preserve this particular -- all of their claims.

16 Q.      Did Ambush participate in drafting the

17 complaint?

18         MR. ARIAS-MARXUACH:  Asked and answered.

19         THE COURT:  Rephrase the question.  That's a

20 leading question.  I'll allow the question but

21 rephrase.

22 BY MR. EFRON:

23 Q.      Who participated in the drafting -- what

24 attorneys, name all of them, participated in the

25 drafting of the complaint?

Michael Engelberg, M.D. - Direct

1       MR. ARIAS-MARXUACH:  Asked and answered.

2       THE COURT:  I'll allow the question.

3   A.       I stated this before.  Basically Ambush had

4   the help of Danny Scher, who was also counsel for the

5   Center at that point in time, he was willing to help,

6   again, to help Mr. Ambush prepare it.

7       Also, Paul Gaston had assisted him.  As I

8   mentioned, Paul Gaston was the attorney for another

9   case, the Alec Collet case.  They were also bringing

10  a lawsuit against Libya.  So because he was already

11  involved in this particular types of case, he was

12  able to assist Mr. Ambush in his particular case.

13  Q.       In your previous answer you said that this

14  was the only time where Ambush was rather than an

15  agent an attorney in the case; why do you say the

16  only time?  What happened subsequently?  What

17  happened afterwards that he would not have been?

18  A.       Well, Mr. Ambush, again -- we have to take a

19  look in terms of going toward litigation.  Mr. Ambush

20  does not have the skills to be able to litigate.  As

21  a matter of fact, in all the other cases where the

22  attorneys would ask me does he have the skills to

23  interview the claimants, I would say he does not have

24  the skills to do that either.

25      MR. ARIAS-MARXUACH:  Objection.

Michael Engelberg, M.D. - Direct

1          THE COURT:  You cannot refer to anything any

2     third party may have told you.

3          So that last statement about other attorneys

4     talking about Mr. Ambush is stricken at this time.

5          MR. ARIAS-MARXUACH:  And the same as the

6     testimony as to whether Mr. Ambush has litigation

7     skills is an opinion by a lay witness about a

8     professional from a different field.  He has no

9     personal knowledge.

10         THE COURT:  I won't strike that.

11         Mr. Efron, you can lay a background as to

12    Mr. Ambush's professional skills, otherwise I'll

13    revisit the objection.

14    BY MR. EFRON:

15    Q.        Why did the Center hire Paul Gaston for this

16    case?

17    A.        Paul Gaston was engaged by the Center in

18    2008.  I have to give credit to Mr. Ambush that he

19    recognized that he was no longer capable of moving

20    this case forward and he basically asked that Paul

21    Gaston should come on and to assume the case.

22         As I mentioned earlier that Paul Gaston had

23    litigated many of the other cases on behalf of the

24    Center or for the Center, litigated for the

25    claimants, and he had 25 years of experience.  He

Michael Engelberg, M.D. - Direct

1   knew exactly what to do.  And at this point in time

2   we felt that he was the superior attorney to be able

3   to move this forward and the Center did indeed,

4   through the power of attorney, engage Mr. Gaston.

5   We --

6   Q.      I'm sorry, go ahead.  I didn't mean to

7   interrupt you.  Finish.

8   A.      We actually created an agreement with

9   Mr. Gaston and it was with his -- on his

10  recommendation also, it was a mutually acceptable

11  agreement, in which he would be paid $250 an hour

12  plus it would be a five percent contingency fee with

13  a cap at 250,000.  Ultimately Paul Gaston was paid by

14  the Center over $300,000 for representing and being

15  the attorney for all the different claimants on this

16  case.

17          At this point in time there was really no --

18  we were not -- we were doubtful whether we would ever

19  get a payment.  The Center was willing to pay out

20  Mr. Gaston and, of course, he wanted this particular

21  type of fee arrangement because we had assumed that

22  we were going to go to litigation, and the amount of

23  time that he would be putting into it would be

24  substantial.

25  Q.      As it turns out, the case was over fairly

Michael Engelberg, M.D. - Direct

1   quickly was it not?

2           MR. ARIAS-MARXUACH:  Objection.  Leading.

3           THE COURT:  Rephrase the question.

4   BY MR. EFRON:

5   Q.      After your fee agreement with Mr. Gaston,

6   how much time transpired between that point and the

7   settlement or the end of the case?

8   A.      Well, it's very interesting because we

9   engaged Mr. Gaston through the power of attorney in

10  June of 2008.  Unexpectedly to all of us, including

11  to Mr. Gaston, Mr. Ambush, that in August

12  unexpectedly Libya basically came to a settlement and

13  was willing to put in, with the United States

14  government, a certain amount of money to be able to

15  settle all outstanding claims.

16          One of the particular claims was the Pan Am

17  103 -- I don't know if people remember that, but it

18  became certainly an issue in the press --

19  Q.      That's the Lockerbie Massacre?

20  A.      With the Lockerbie Massacre, exactly.  That

21  was the Pan Am 103 that the -- there was an explosion

22  on board the Pan Am 103 and all those aboard that

23  particular flight were killed.

24          And as a result of that Libya wanted to

25  settle that claim, as well as all the other

Michael Engelberg, M.D. - Direct

1  outstanding claims and wanted to continue to do

2  business with the United States government, as well

3  as with the oil companies.  They wanted to be taken

4  off the terrorist list.  So they were willing to put

5  in a certain amount of money into the United States

6  government, and now there was a definite amount of

7  money.

8          And the U.S. government basically set up a

9  program in which the moneys would be distributed by

10 the Federal Government.  It would be administered by

11 the Federal Government.

12 Q.       And that was in August of '08, correct?

13 A.       That is correct.

14 Q.       We have all the documents to show that, but

15 I want to move this along.  I know you came in for

16 this, so let me try to move this along.

17         THE COURT:  And let me note for purposes of

18 the jury, that agreement between the Government of

19 Libya and the United States, that was one of the

20 stipulated facts.  I gave that to you and you're

21 going to have that at the end of the case so --

22         MR. EFRON:  I just don't think it's

23 necessary for him to identify that right now.

24         THE COURT:  You need not go into that.

25         MR. EFRON:  Yes, Your Honor.

Michael Engelberg, M.D. - Direct

1    THE COURT:  The witnesses is advised the

2    jury knows about that agreement, they've been

3    informed.  Okay.

4    BY MR. EFRON:

5    Q.       If you know, what were the requirements to

6    the claimants or the plaintiffs against Libya based

7    on the August '08 settlement between United States

8    Department of State and Libya?

9    A.       Well, the instructions first came down in

10   November.  Certainly there were discussions,

11   everybody knew there was going to be moneys being put

12   into the U.S. government.  But we didn't -- no

13   instructions were given in terms of what were going

14   to be done, what had to be done.

15        In November the instructions came down that

16   all claims against Libya had to be dismissed prior to

17   them being part of this program by which the Federal

18   Government would be giving out the money,

19   distributing the money.

20   Q.       But you certainly knew by August of '08 that

21   the claims were going to be settled?

22   A.       Well --

23        MR. ARIAS-MARXUACH:  Objection.  Assumes

24   facts not evidence.

25        THE COURT:  Sustained.

Michael Engelberg, M.D. - Direct

1    MR. EFRON:  I'll rephrase it, Your Honor.

2  BY MR. EFRON:

3  Q.      What exactly did you learn in August of '08?

4  A.      That -- in August of '08 that there was

5  negotiations that were taking place between Libya and

6  the U.S. government.  Again, it wasn't determined how

7  much money was going to be put in.  That had yet to

8  be determined.  Only by November did we know that

9  $1.6 billion were going to be given over to

10 compensate all outstanding claims.  And it wasn't

11 determined how it was going to be distributed,

12 whether it was going to be through the claimants or

13 the states.  Only in November did we know how that

14 program was going to be administered.

15 Q.      Now, your fee agreement with Paul Gaston,

16 was that in writing?

17 A.      Yes, that was.

18 Q.      Did you have a -- and of course when I say

19 "you," I mean the Center.  Did the Center have a fee

20 agreement with Ambush?

21 A.      No, it did not.

22 Q.      What do you understand was the fee agreement

23 relationship between the Center and Ambush, as

24 president of the Center?

25      MR. ARIAS-MARXUACH:  Objection.  Asked and

Michael Engelberg, M.D. - Direct

1   answered.  He said no fee agreement.

2          THE COURT:  Sustained.  You can rephrase or

3   expand.

4   BY MR. EFRON:

5   Q.        Was there any agreement with Mr. Ambush

6   other than what you said before regarding the

7   advanced checks?

8   A.        There was -- basically Mr. Ambush submitted

9   bills according to his -- basically in terms of what

10  he was charging in all other cases in terms of

11  what -- aside from the Center.  Because, as I said,

12  that his billable hours were at $50 an hour.  We paid

13  all of his bills.  Every bill that he submitted, the

14  Center paid.  There was no outstanding bills owed to

15  Mr. Ambush.  Anything aside from that, whether there

16  was an oral agreement, I really don't -- I personally

17  don't know.

18          In terms of my understanding, there may have

19  been, but it would have been a bonus.  I mean, that

20  was something that Mr. Ambush --

21          MR. ARIAS-MARXUACH:  Objection.  Lack of

22  personal knowledge.  Move to strike.

23          THE COURT:  Sustained.  The bonus matter is

24  stricken and let's continue.  It has to be based your

25  answers on your own personal knowledge.

Michael Engelberg, M.D. - Direct

1   A.        Okay, then I can't answer that.  I can't

2   answer that.  I can answer that there was no --

3             MR. EFRON:  I'm going to rephrase it.

4   BY MR. EFRON:

5   Q.        In your own personal knowledge, did you ever

6   hear anybody, and tell us whom, state that there

7   might have been a bonus for Mr. Ambush at the end of

8   this case?

9   A.        Rabbi Perr mentioned to me that --

10            MR. ARIAS-MARXUACH:  Objection.  Hearsay.

11  BY MR. EFRON:

12  Q.        No, no, no.  What did yo hear Rabbi Perr --

13            THE COURT:  Sustained.  That's hearsay.

14  BY MR. EFRON:

15  Q.        What you perceived, not what he said.

16            What do you understand from what he told

17  you?

18  A.        All I can say is that I'm the only one,

19  okay, that's capable of signing off on any additional

20  payment that goes to any of the attorneys.  I mean,

21  whether there were discussions of any oral additional

22  compensation, I can't answer for that, but it would

23  have to be approved by me in writing that there would

24  be additional compensation to Mr. Ambush.

25  Q.        How would that be determined?

1  A.        Well, unfortunately it was never determined.

2            MR. ARIAS-MARXUACH:  Objection.

3  BY MR. EFRON:

4  Q.        How would a bonus or additional compensation

5  be determined by you?

6            MR. ARIAS-MARXUACH:  Objection.  Calls

7  for --

8            THE COURT:  Overruled.

9            MR. EFRON:  He was the president of the

10 Center, your Honor.

11           THE COURT:  I'll allow the question.

12 BY MR. EFRON:

13 Q.        Did you hear the question?

14 A.        No, I did not.

15           THE COURT:  How did you determine any bonus

16 or addition compensation, if any were to be provided

17 to Mr. Ambush or anybody else?

18 A.        Well, Mr. Ambush had the ability to come to

19 the Center and to sit down with us and basically so

20 to speak to plead his case.  Say, look, I helped

21 spear the case, I was the one who preserved it, you

22 know, I would like additional -- you know, additional

23 moneys because of my involvement.  And at no point

24 did Mr. Ambush ever come to the Center asking for

25 additional money.  He never sat down with us, he

Michael Engelberg, M.D. - Direct

1    never spoke to us about it.

2    Q.       What would have determined any additional

3    compensation?

4    A.       Ultimately it would have been I.

5    Q.       And how would you do that?

6    A.       We would sit down because, again, it would

7    be coming from the American Center.

8    Q.       Why was there no agreement -- why was there

9    no fee agreement with Mr. Ambush as compared to other

10   lawyers that worked for the Center?

11           In other words, you had a fee agreement with

12   Mr. Gaston but you did not have one with Mr. Ambush,

13   why was that?

14   A.       Because we assumed that when we start the

15   case we have to prepare for litigation.  As I said,

16   I'm a pediatrician, I have to deal with facts.  We

17   have to have all the information beforehand.  We

18   don't want to go to litigation not having the

19   knowledge, not having these facts.  And we need

20   attorneys that are skillful, that know how to prepare

21   the briefs properly, that know how to litigate.  And,

22   therefore, all the attorneys in which we hired in

23   terms of going to litigation were attorneys with

24   credentials that were qualified to move the case

25   forward.

Michael Engelberg, M.D. - Direct

1    Mr. Ambush under any of these cases had

2    never litigated one case.  And, therefore, in terms

3    of our relationship with him was more in terms of one

4    of trust, of helping the Center out as more or less

5    in terms of doing paralegal work rather than actually

6    litigation work.

7    Q.        So as you sit there today, and regarding

8    only to the representation of these two families, how

9    much money did the Center wind up owing Mr. Ambush

10   for his services?

11   A.        The Center did not owe Mr. Ambush anything.

12   They basically -- whatever Mr. Ambush requested from

13   the Center we paid him.  He was paid in full.  Not

14   only was he paid in full, he was given advanced

15   moneys.

16   Q.        And how were these payments forwarded to

17   him?

18   A.        I signed the checks.

19   Q.        We'd like to have Plaintiff's Exhibit 7

20   shown --

21           THE COURT:  For identification.

22           MR. EFRON:  For identification, sorry, shown

23   to the witness, please.

24   BY MR. EFRON:

25   Q.        Now, before you look at them,

1  Dr. Engelberg --

2  A.       Yes.

3  Q.       -- were you able to locate any checks that

4  was paid by the Center -- on behalf of the Center to

5  Mr. Ambush?

6  A.       Well, I think that these are the checks that

7  were submitted.

8  Q.       How did you locate them?  Where were they

9  stored or put away?

10 A.       Well, basically I kept -- you know, I kept

11 the records, you know, for the New York Center and

12 basically I went back over all the checks, okay, that

13 I had signed over, you know, that -- to Mr. Ambush on

14 behalf of the American Center.

15 Q.       And what were you handed?

16 A.       Here was the check --

17          THE COURT:  Copies of.

18 A.       A copy of a check dated November 13.

19 BY MR. EFRON:

20 Q.       Before you go into them, are these the

21 checks that you were making reference to earlier?

22          MR. ARIAS-MARXUACH:  Objection.  Vague.

23 BY MR. EFRON:

24 Q.       Are these the checks that you located and

25 sent to me?

Michael Engelberg, M.D. - Direct

1    A.         Yes, they were.

2    Q.         And who signed these checks?

3    A.         I signed these checks.

4    Q.         And who did you issue these checks to?

5    A.         I issued them to Mr. Ambush.

6    Q.         Is that your handwriting?

7    A.         Yes, it is.

8    Q.         And is that your signature?

9    A.         Yes, it is.

10             MR. EFRON:  We'll move that they be admitted

11   into evidence as Exhibit number -- an exhibit, Your

12   Honor.

13             THE COURT:  Admitted.  Exhibit 7.

14   BY MR. EFRON:

15   Q.         I'd like -- if I can impose on you for a

16   couple of more minutes, Dr. Engelberg, I'd like to --

17   I'd like you to review the checks with me.  They're

18   not that many of them.  I'd like to review them one

19   by one but in reverse chronological order.

20             THE COURT:  It's admitted as an exhibit.

21   Let me mark it as an exhibit and then what I will

22   do --

23             MR. EFRON:  Because it's in block anyway.

24   It's one exhibit in block.

25             THE COURT:  But let's mark each individual

EVILYS E. BRATHWAITE, RPR
COURT REPORTER FOR THE U.S. DISTRICT COURT OF PUERTO RICO
(787)772-3377

Michael Engelberg, M.D. - Direct

1  check like 7-A, 7-B, 7-C so whenever there's cross,

2  each one will be -- let's just take a few minutes for

3  that.  This will be Plaintiffs' Exhibit 1.  So for

4  purposes of the record identification 7 is admitted

5  in evidence as Plaintiffs' Exhibit 1 and then each

6  check individually and I know it's got -- both sides

7  will be great check beginning 7-A, 7-B, 7-C, 7-D.  I

8  believe there's 10, 12 checks there.

9          MR. EFRON:  Yes, your Honor.

10         THE COURT:  Okay.  The witness needs to take

11 a short break so the jury can stay here.  Let's

12 excuse the witness for a few minutes and we'll resume

13 in two or three minutes.

14         (Jury Trial recessed at 2:18 p.m. and

15 resumed at 2:20 p.m.)

16         (Compilation of Copies of Checks were marked

17 for identification by the Clerk as Plaintiffs'

18 Exhibit Nos. 1-A through 1-CC.)

19         THE COURT:  Just so counsel knows, the way

20 we're going, what Exhibit 1 is referred to, the first

21 check will be 1-A, the back of that check will be

22 1-B.  So each sheet of paper will -- so they're

23 numbered 1-A, 1-B, the next check is 1-C, the back is

24 1-D and it goes all the way.  When we get to the

25 letter Z, we got on beyond Z, and it's 1 double A,

Michael Engelberg, M.D. - Direct

1  the back of that check 1 double B the next check and

2  then we end with 1 double C which is the last.

3          MR. EFRON:  Okay.  And the Court lined it up

4  in regular chronological order?

5          THE CLERK:  Well, in the order that --

6          THE COURT:  In the order in which --

7          MR. EFRON:  That's fine because we need to

8  do it the other way.  That's fine.

9          THE COURT:  Okay, but if you're referring to

10  the last check, you're probably referring to 1 double

11  D.

12          MR. EFRON:  Okay, thank you.

13          THE COURT:  Let me just show it very briefly

14  to defense and plaintiffs' counsel just so they see

15  how it's been numbered.

16          And perhaps you very quickly want to do the

17  same exercise.

18          MR. ARIAS-MARXUACH:  I want a copy of the

19  sequence.  Thank you.

20          THE COURT:  Let me do this, let's very

21  briefly -- I'll have them photocopied so you have the

22  sequence the Court has.  That's okay?  Okay.  So you

23  know.

24          What we will do is, Mr. Efron, whenever you

25  refer to a particular check also, even though you

Michael Engelberg, M.D. - Direct

1  have the number -- or the witness -- refer to the

2  back of that check.  Let's wait one minute.

3          MR. EFRON:  Okay.  When you do we're going

4  to start with Exhibit 1 double B which is going to be

5  the August 8, 2008 check front and back and we're

6  going to identify them one by one as quickly as

7  possible.

8          THE COURT:  And all the checks have been

9  admitted as Exhibit 1 -- 1-A all the way to 1 double

10  D or 1 double C.  So you don't need to identify them

11  again, you can go directly and show the check and you

12  can ask him any questions about any particular check.

13          MR. EFRON:  Can I go to another line of

14  questioning while that's done?

15          THE COURT:  If you want to ask some and you

16  can come back if you want to.

17          MR. EFRON:  Yeah, I'll come back to it.

18  BY MR. EFRON:

19  Q.      In order to save time, Dr. Engelberg, in

20  December sometime in the middle of December of '08

21  you received a letter from Joshua Ambush, did you

22  not?

23  A.      Yes, we did.

24  Q.      And when was the -- what was the -- what did

25  that letter contain?  I'm sorry, let me rephrase it.

Michael Engelberg, M.D. - Direct

1    Besides the letter, did you receive any

2  other documents and anything else?

3  A.      Mr. Ambush somewhere in mid-December --

4  sometime after about December 16, December 17,

5  Mr. Ambush basically sent a letter myself, the

6  American Center revoking my power of attorney.

7  Q.      And who was that signed by?

8  A.      Basically he had signed it -- he had -- all

9  the claimants had signed this document revoking my

10  power of attorney.

11  Q.      And I'll show you the letter in a minute

12  when we get the Court officer back.  But in the

13  meantime, what was the gist of the letter?  What do

14  you remember about that letter?  What did the letter

15  tell you besides receiving the document revoking your

16  power of attorney to represent these people in your

17  capacity as the Center?  What else -- what did the

18  letter tell you?

19  A.      I don't recall at this point in time.  If I

20  could see the letter it would refresh my mind.

21      MR. EFRON:  Could we have Joint Exhibit 8,

22  please.

23  BY MR. EFRON:

24  Q.      I'll get back to the checks after that.  I

25  don't want to lose --

Michael Engelberg, M.D. - Direct

1    A.        Oh, okay.

2    Q.        You were handed Joint Exhibit 8; is that a

3    copy or a document that reflects the contents of the

4    letter you received?

5    A.        Yes, it is.

6    Q.        Did you also receive the actual document

7    revoking your power of attorney or The Center's power

8    of attorney?

9    A.        Yes, we did.

10   Q.        How do you feel about that?

11   A.        Well, we were really shocked by this

12   particular letter, as well as the revocation.  The

13   Center had always been there for the interest of

14   every one of these claimants.  The Center had made

15   attempts to serve them in the best -- their best

16   interest.  That everything should be done properly.

17   We were shocked that here he was -- each of the

18   estate representatives has retained him directly to

19   represent them.

20           The case had already been concluded.  At

21   this point in time we were dealing with estates.  It

22   was very important that we had qualified individuals

23   to deal with the estates.  First of all, it was

24   federally administered funds.  These were estates.

25           Just prior to this I had come down to Puerto

1  Rico to engage another prominent law firm, O'Neill &

2  Borges, who does deal with estates.  Again, neither I

3  nor Mr. Ambush -- and certainly Mr. Ambush, who is an

4  attorney, is not an attorney in Puerto Rico, he does

5  not know estate law neither in the states or in

6  Puerto Rico --

7         MR. ARIAS-MARXUACH:  Objection.  Lack of

8  personal knowledge.  How does he know what

9  substantive fields of law Ambush knows or doesn't

10  know?

11         THE COURT:  I will allow the answer.  He

12  stated that Mr. Ambush is not an attorney admitted in

13  Puerto Rico.  Let's move on.

14  A.      And it was important for us to hire a law

15  firm that could handle all of these estates.  And I

16  came down here attempting to engage O'Neill &

17  Borges --

18  Q.      Approximately what month was that?

19  A.      This was literally just a few days prior to

20  this letter, I was down here approximately at this

21  exact same time.  I was down in Puerto Rico December

22  the 15th, the 16th, the 17th.

23  Q.      When you say you were "shocked," you had no

24  indication or no prior heads-up that this was going

25  to happen?

Michael Engelberg, M.D. - Direct

1    A.        Absolutely not.

2    Q.        You had no indication that Ambush was

3    uncomfortable that you were interviewing other law

4    firms?

5    A.        Well, Mr. Ambush had hidden a lot of this

6    information from the Center.  Both I and Rabbi Perr

7    had requested Mr. Ambush provide us with agreements

8    that he had the claimants sign up with him, but -- or

9    not with him, on behalf of the Center when he was

10   acting as an agent.

11             Rabbi Perr had a request from a year

12   previously to please forward us, to send us all

13   center and claimants agreements, as well as all

14   powers of attorney.

15             MR. ARIAS-MARXUACH:  Objection.  Lack of

16   personal knowledge.  He hasn't laid a foundation as

17   to what he knows, what Rabbi Perr may have done.

18             THE COURT:  Sustained.

19             Rephrase the question or lay a foundation.

20   A.        Okay.  In the beginning of December --

21             THE COURT:  Wait until Mr. Efron asks you.

22   BY MR. EFRON:

23   Q.        It's my turn.

24   A.        Okay.

25   Q.        What did you do after you received this

Michael Engelberg, M.D. - Direct

1    letter?

2    A.        Again, we were puzzled exactly what type of

3    relationship that he had.  Again, we didn't know

4    what -- whether this was regarding compensation, we

5    thought at this point in time he's trying to keep the

6    American Center at hostage to be able to negotiate

7    additional compensations.

8    Q.        Had he requested any additional compensation

9    before he sent this letter?

10   A.        Prior to this time, no.

11   Q.        So what did the Center do?  What did you as

12   the executor as the president of the Center?  What

13   did you do regarding this situation?

14   A.        Well, we were very, very concerned.  We

15   tried to be able to reach out to Mr. Ambush to sit

16   down with him, be able to discuss what this was all

17   about.

18   Q.        What amounts of funds in compensation, if

19   any, was Mr. Ambush holding for victims of the Lod

20   Massacre?

21            MR. ARIAS-MARXUACH:  Objection.  Assumes

22   facts not evidence.

23            THE COURT:  Sustained.

24            Rephrase.

25   BY MR. EFRON:

Michael Engelberg, M.D. - Direct

1    Q.        What was your main concern after you

2    received this letter?

3    A.        Okay.  Our main concern was that the money

4    would be distributed appropriately, that as per

5    estate law -- as I said, the claims were already

6    dismissed.  According to state law, as we had similar

7    experience with the Collet case, we had to have the

8    approval of the courts, how the money would be

9    distributed.  Even though there was an administrator

10   of the estate at that point in time, there were only

11   four parties to the estate --

12        MR. ARIAS-MARXUACH:  Objection.  Your Honor,

13   he's giving a legal opinion that a lay witness --

14   he's not an attorney admitted in Puerto Rico.  How is

15   this relevant?

16        THE WITNESS:  This is very relevant.

17        MR. ARIAS-MARXUACH:  Don't argue with the

18   lawyer.

19        MR. EFRON:  You're not to argue with the

20   lawyer.

21        THE COURT:  I'll sustain the objection.

22        Mr. Efron, you need to lay a foundation or

23   explain.

24   BY MR. EFRON:

25   Q.        How did the Center know how many claims were

1  pending in Puerto Rico?

2  A.      Well, the Center knew that there would have

3  been five estates that would have been compensated.

4  Each estate, as per this particular program, would be

5  receiving $10 million per estate.  There would be

6  $50 million come to those that were killed and then

7  there would be estates.

8  Q.      Ten million?

9  A.      $10 million for each one, but in total there

10  would be $50 million.

11  Q.      I thought you said 15, I'm sorry.

12  A.      No, $50 million.

13  Q.      Fifty, 5, 0?

14  A.      5, 0, yes.  There are an additional five

15  injured parties and for the injured parties each

16  individual would be entitled to $3 million.  In total

17  that would be $15 million.  And in total including

18  with the estates, as well as the injured party, in

19  total it would be $65 million.  We --

20  Q.      Go ahead, I don't want to interrupt.

21  A.      We wanted to assure that the claimants would

22  not be paying more than the 20 percent to the

23  American Center as per the original agreement.  And

24  we were uncomfortable exactly what Mr. Ambush's

25  agreement was between him and the different claimants

Michael Engelberg, M.D. - Direct

1   or administrators of the estate.

2   Q.       When did you find out what the compensation

3   was going to be per death or per injury?  When did

4   you find that out?

5   A.       We find that -- well, in terms of the -- in

6   November it had already been -- it was determined

7   that it would be $10 million per estate.

8   Q.       That's when you received the instructions

9   for the negotiation that was approved in August that

10  you mentioned earlier; is that correct?

11  A.       That is correct.

12  Q.       What other instructions did the November

13  document inform you as far as the requirements to

14  apply for those moneys?

15  A.       We had to determine who all the heirs of

16  that particular estate would be, even individuals

17  whose names were not on the original complaint.

18  Whatever happened before basically was no longer

19  going to be executed at this time.  So even an

20  individual whose name did not appear on the original

21  complaint as an heir to the estate, they were now

22  entitled to compensation.  And we had to identify

23  every single heir of that particular estate.  Nobody

24  could be left out.

25  Q.       And was this a window or statute of

Michael Engelberg, M.D. - Direct

1  limitations to do that from August or November

2  of 2008 on?

3  A.        I believe regarding the estates they said

4  they had until July to be able to produce the

5  documents, so at least to begin, you know, providing

6  that information.

7  Q.        When you say "July," of the following year?

8  A.        I believe so.

9  Q.        So if it would have been November --

10 actually, I thought our document was October 31, but

11 you say November, they would have had until July of

12 '09, of 2009, in order to --

13 A.        Yes.  That is correct, yes.

14 Q.        As president of the Center, what else did

15 you do to find out or try to investigate what

16 Mr. Ambush had done with the claimants in Puerto

17 Rico, if anything?

18 A.        Well, we kept on requesting -- again, we had

19 tried to be in contact with the claimants to find

20 out.

21 Q.        But the letter sort of warned you against

22 doing that; is that correct?

23 A.        That is correct.

24 Q.        Did you call Mr. Ambush?

25 A.        Yes, we did.

Michael Engelberg, M.D. - Direct

1  Q.        And what was the result of that phone call

2  or communication?

3  A.        He refused to speak to us.

4  Q.        I understand that in order to protect the

5  rights of victims or of claimants of other claimants,

6  the Center filed a legal action?

7        MR. ARIAS-MARXUACH:  Objection.  Assumes

8  facts not in evidence.  Mr. Efron is not on the

9  witness stand to ask open-ended questions.

10        THE COURT:  You have to rephrase it.

11  BY MR. EFRON:

12  Q.        What, if anything, did the Center do in

13  order to protect the rights and the compensation of

14  these victims, of these claimants?

15  A.        Because Mr. Ambush refused to communicate

16  with the Center, we were totally kept in the dark of

17  his conversations, his communications, his agreements

18  with the different claimants.  And we didn't know in

19  terms of his intentions towards the claimants; we

20  didn't know his intentions towards the Center.  We

21  were totally in the dark.

22        We were out to protect the interests of the

23  claimants, as well as the interests of the Center.

24  And in February we filed an action against

25  Mr. Ambush.

Michael Engelberg, M.D. - Direct

1   Q.       What kind of an action?

2            THE COURT:  February of what year?

3   A.       I'm sorry, in February of 2009.

4   BY MR. EFRON:

5   Q.       What kind of an action?

6   A.       Well, it was an action --

7   Q.       Was it a --

8   A.       An action to make sure that the money would

9   be distributed properly, that --

10  Q.       And what was the name of that action?

11           THE COURT:  Let the witness finish.

12           MR. EFRON:  Sorry.

13  BY MR. EFRON:

14  Q.       Go ahead.  What was the purpose of that

15  action?

16  A.       The purpose was an action to make sure that

17  the claimants, okay, would be getting 80 percent that

18  would be come together them.  As per the Center and

19  claimant agreement, it was determined that they would

20  be making a pledge to the Center of 20 percent and

21  that would be the total of which they would have to

22  pay.  And we wanted to make sure that their best

23  interest was served.

24           And, in addition, we filed -- we tried to

25  file an injunction that all the money that would be

1   coming through Mr. Ambush, that the entire 65 and at

2   that point in time -- again -- that all the moneys

3   that would be coming to all of the different

4   claimants would be put into a court registry in the

5   United States and that they will determine that the

6   money is distributed properly; that even the Center

7   would not be getting their fee; and that all the

8   moneys would be protected until it was assured that

9   all those who were entitled to money would be getting

10  it and it would be distributed appropriately.

11  Q.      Is that case still going on?

12  A.      Yes, it is.

13  Q.      And who are the parties in that case?  Is

14  it -- who against who?

15  A.      Okay.  It's the American Center that brought

16  the action against Mr. Ambush and Mr. Ambush in turn

17  filed an action against the Center.

18  Q.      Are any of the lawyers representing

19  Mr. Ambush in that case here today?

20  A.      Yes, he is.

21  Q.      And that would be Mr. Edwards?

22  A.      That is correct.

23          THE COURT:  Let me just ask one other quick

24  question.  In what court is this case --

25          MR. EFRON:  I was getting to that, yes.

Michael Engelberg, M.D. - Direct

1  BY MR. EFRON:

2  Q.      What court is it?

3  A.      That is in the District Court of

4  Washington, D.C.

5  Q.      That's U.S. District Court?

6  A.      That's the U.S. District Court, that's

7  correct.

8  Q.      How much of the money was put into the Court

9  registry in the Washington, D.C. case, if you

10 remember?

11 A.      I believe there was 1 million --

12 Q.      The total originally?  What was the original

13 total that was in that account?

14 A.      Well, eventually that was put into registry

15 was because of the action that Mr. Ambush brought

16 against the Center.

17 Q.      What was the amount?  You already told us

18 that.  What was the amount?

19 A.      I believe it was $1.9 million.

20 Q.      That's what's there now?

21 A.      That's what's there now.

22 Q.      How much was already disbursed to the

23 claimants or was there no money that was already

24 disbursed to the claimants?

25 A.      No.  All the other moneys were disbursed to

Michael Engelberg, M.D. - Direct

1  the claimants.

2  Q.      And how much would that be, if you know?

3  A.      Well, at this point in time we do know that

4  basically $7 million were disbursed to the

5  individuals that are here, to the estates that are

6  here now.

7  Q.      Mm-hmm.

8  A.      And certainly that was not the intention of

9  the Center.  They should have received $8 million.

10 Q.      Each?

11 A.      Each.

12      THE COURT:  Let me ask just one question.

13 If you know, the 1.9 that is in the registry of the

14 U.S. District Court in D.C., was that 1.9 taken out

15 of an IOLTA account or where was it taken out from?

16      THE WITNESS:  It was taken out of the

17 20 percent of the America Center's fee.

18 BY MR. EFRON:

19 Q.      And that's still -- that amount is still in

20 litigation?

21 A.      That is correct.

22 Q.      Let's go back to the checks, if you would.

23      If you can find Plaintiffs' Exhibit 1-BB,

24 which is the check and the endorsed part of the check

25 of August 8, 2008, Check 1265 --

Michael Engelberg, M.D. - Direct

1    A.        Yes.

2    Q.        -- did you write that check?

3    A.        Yes, I did.

4    Q.        And that would be Check 1 --

5             THE COURT:  The back of the check 1-BB and

6    1-CC.  This is the last one, right?

7             MR. EFRON:  Yes.

8    BY MR. EFRON:

9    Q.        What does it say on the endorsement?  What

10   letters does it say?

11   A.        Advanced.

12   Q.        No, no, no.  It has to say Exhibit --

13   there's an exhibit tag there.  Does the exhibit tag

14   have a number?  It should say one.

15            THE COURT:  Yes.  The bottom one is 1-BB and

16   then 1265 is 1-AA.

17            MR. EFRON:  Yes, your Honor.

18   BY MR. EFRON:

19   Q.        So Check 1-AA that has the 1-BB

20   endorsement --

21            MR. FREESE-SOUFFRONT:  *Es que el endorsement*

22   *del 1-AA* --

23            MR. ARIAS-MARXUACH:  1-BB is Check 1273 and

24   you have 1265.

25            THE COURT:  Let's do this, it's ten minutes

Michael Engelberg, M.D. - Direct

1    to three.  The afternoon refreshments are here.

2    Let's take a ten-, fifteen-minute recess.  Be back at

3    three and we'll make sure everybody's on the same

4    page.

5              THE COURT OFFICER:  All rise.

6              (Jury Trial recessed at 2:47 p.m. and

7    resumed at 3:10 p.m.)

8              THE COURT:  Okay.  Please be seated.

9              Good afternoon ladies and gentlemen of the

10   jury.  That was quicker than I expected.  Good, we

11   have more time so Mr. Efron, let's --

12   BY MR. EFRON:

13   Q.       Witness, please lock at Exhibits 1-BB and

14   1-CC.  Locate them on -- in your original, please.

15   It's towards the end -- it's the last check and the

16   last endorsement.

17   A.       Yes.

18   Q.       Do you recognize that check?

19   A.       Yes, I do.

20   Q.       Did you write that check?

21   A.       Yes, I did.

22   Q.       Why?  Why did you write that check?

23   A.       Mr. Ambush requested that we give an

24   advancement.  It was at this point in time we wanted

25   to make sure that he would be able to -- make sure

Michael Engelberg, M.D. - Direct

1    that the moneys would be taken properly.  He claimed

2    that he had to go down to Puerto Rico, he had to let

3    them know that they were going to be a disbursements

4    to them.

5              And, again, at this point in time that he

6    was working for the Center, the Center was paying him

7    for all his work that he was doing.  And we knew that

8    he was going to be assisting Paul Gaston in terms of

9    providing him information.

10   Q.        By this date, November 7 of 2008, you

11   already knew about the settlement claims?

12   A.        That is correct.

13             MR. ARIAS-MARXUACH:  Objection.  Leading.

14             THE COURT:  I'll allow the testimony.  But

15   please no leading questions.

16             MR. EFRON:  Yes, Your Honor.

17   BY MR. EFRON:

18   Q.        How come although you knew that the case was

19   over you still gave him a check?

20   A.        Again, this was out of trust, you know, he

21   said that he needed money advancement --

22   Q.        At this time what other matters was he

23   handling for the Center besides representing the

24   Puerto Rican victims of the Lod Massacre?

25             THE COURT:  And this is November 2'08?

Michael Engelberg, M.D. - Direct

1    MR. EFRON:  November 7, 2008.  I think it's

2  seven.

3  BY MR. EFRON:

4  Q.      Is that the way you write a seven or a two?

5  That's a seven, right?

6  A.      Yes.

7  Q.      And do you know if this check was cashed?

8  A.      Well, apparently it was cashed because we do

9  have the endorsement from Joshua Ambush.

10  Q.      Okay.  And what is the amount of that check

11  please for the record?

12  A.      $10,000.

13  Q.      Okay.

14          THE COURT:  The question that you had posed,

15  and I think it was left on the platter, what other

16  matters was Joshua Ambush handling at the time that

17  check was issued?  That was the question.

18  BY MR. EFRON:

19  Q.      Besides the Lod Massacre matter, what other

20  cases or businesses or matters was Mr. Ambush

21  handling for the Center, if you know, if you

22  remember?

23  A.      I don't recall any other cases that he was

24  handling for the Center.

25  Q.      So if we go to -- please go now to

Michael Engelberg, M.D. - Direct

1   Exhibit 1Z as in zebra and one double A.

2   A.        Z, okay.

3   Q.        Do you recognize that check?

4   A.        Yes, I do.

5   Q.        You wrote it?

6   A.        Yes, I did.

7   Q.        Now, this check is from the New York Center

8   for Civil Justice.  Is that pursuant to the

9   explanation you gave earlier, where the New York

10  Center for Civil Justice would sometimes lend and pay

11  some of the expenses of the American Center?

12  A.        That is correct.

13  Q.        And, again, you recognize the endorsement?

14  A.        Yes, I do.

15  Q.        And two days earlier Mr. Ambush received

16  another check from you; is that correct?

17  A.        That is correct.

18            MR. ARIAS-MARXUACH:  Objection.

19  BY MR. EFRON:

20  Q.        On what date?

21  A.        That's August 6, 2008.

22  Q.        And what amount?

23  A.        In the amount of $10,000.

24  Q.        And you wrote this check as well?

25  A.        That is correct.

Michael Engelberg, M.D. - Direct

1  Q.        For the same amount for $10,000 again?

2  A.        That is correct.

3  Q.        Thank you.

4            What is the date on this check, if you

5  recognize it?

6            THE COURT:  Identify the letter, please.

7            MR. EFRON:  I'm sorry, 1-T and 1-U.

8  Exhibit 1-T and Exhibit 1-U.

9  A.        Okay, this is 1-T.

10 BY MR. EFRON:

11 Q.        Okay.  Did you write that check?

12 A.        Yes, I did.

13 Q.        And what amount?

14 A.        $23,000.

15 Q.        To Mr. Ambush again?

16 A.        That is correct.

17 Q.        On April 11?

18 A.        That is correct.

19 Q.        And it's endorsed by the defendant, correct?

20 A.        Yes.  Joshua Ambush did endorse that.

21 Q.        Okay.  Thank you.

22            Please go to 1-R and 1-S, same situation?

23 A.        Yes.

24 Q.        You wrote it -- just tell us the date and

25 the amount.  We know you wrote it and we know it's

Michael Engelberg, M.D. - Direct

1  your signature.

2  A.       March 24, 2008.  The check in the amount of

3  $10,000 was issued to Mr. Ambush.  And as we see, it

4  was deposited by Mr. Ambush, Joshua Ambush.

5  Q.       Yes.

6           Again, what amount is this check for?

7           THE COURT:  That's 1-F and 1-G, correct.

8           MR. EFRON:  1-F and 1-G yes, your Honor.

9           MS. GONZALES-VARON:  It's cut off, Your

10 Honor.

11 A.       1-F, okay, and 1-G.

12 BY MR. EFRON:

13 Q.       1-G is the endorsement.

14 A.       I assume that's for --

15 Q.       Now, this is the first -- do you see the

16 check?

17 A.       I'm having difficulties.

18 Q.       It's Check No. 1320, it's 1-F.

19 A.       I have 1-F.  The 1-F has -- that's the

20 endorsement.  I have here as an endorsement on mine.

21          THE COURT:  If you look at the screen you

22 probably have what Mr. Efrain's referring to.

23 A.       Oh, it's 1-G apparently.  The numbers are

24 different.

25 BY MR. EFRON:

Michael Engelberg, M.D. - Direct

1    Q.        Okay.  The check -- the check --

2    A.        The one that I see on the screen is for

3    January the 28, 2008.

4             THE COURT:  That's 1-F?

5             THE WITNESS:  That's 1-F, according to this.

6             THE COURT:  Or it could be 1-H.  I don't

7    know if it's 1-F or 1-H.

8    A.        My 1-F on here is very different from his

9    1-F.

10            THE COURT:  So that's probably 1-H.  Just

11   check.

12   BY MR. EFRON:

13   Q.        Okay.  Dr. Engelberg, what letter appears

14   for Check 1320?

15            MR. ARIAS-MARXUACH:  Your Honor.  Just so

16   the record is clear, the checks on the screen are P

17   and Q.  They're just --

18            THE COURT:  Okay.  So it's P and Q.

19   A.        Oh.

20   BY MR. EFRON:

21   Q.        So let's go to P for the check and Q for the

22   endorsement.

23   A.        Okay.

24   Q.        Oh, did you sign that check?

25   A.        The 1-P, okay, that's January 28, 2008.  The

1  check was issued to Mr. Ambush for $1500, $1,500.  It

2  was signed by me.

3  Q.      It was the only one that has on the memo a

4  note; what does the note say?

5  A.      Cost of service.

6  Q.      So it's -- was he being reimbursed?  What is

7  the -- what do you suppose that is, if you remember?

8  A.      It probably was in terms of -- probably for

9  one of our other cases and serving in the state

10  department some of the papers.

11  Q.      And then on that same day you issued Check

12  1317 and that --

13  A.      Which check are you referring to?

14  Q.      Now we're going to 1-N.

15  A.      Okay.

16  Q.      For 5875; is that correct?

17  A.      That is correct.

18          THE COURT:  And it's not 5875, it's five

19  thousand --

20  BY MR. EFRON:

21  Q.      $5,875.

22          MR. EFRON:  We don't count pennies anymore.

23  A.      That's correct.

24  BY MR. EFRON:

25  Q.      It's Check 1340; what is the amount on that

Michael Engelberg, M.D. - Direct

1    check?

2    A.        Excuse me, in which number is that?

3    Q.        That's 1-L.

4    A.        Oh, okay.  Okay 1-L.  That's June 17, 2007

5    for $5,000.

6    Q.        Okay.  And has the memo say?

7    A.        It says advanced legal fees.

8    Q.        Do you know for what matters or for what

9    matter?

10   A.        I would assume that Mr. Ambush would have

11   kept a record in terms of where those moneys were

12   going to be distributed.

13   Q.        On that same date you wrote another check

14   for $4,000 which would be 1-J.

15   A.        That was June 17, 2007 for $4,000.

16   Q.        Can you make out what the memo means or

17   refers to on the check?

18   A.        My feeling is that Mr. Ambush was paying

19   basically through the Center these were legal fees

20   that were going to Paul Gaston.  And what I gather is

21   that was $3,971.04 going to Paul.

22   Q.        So you were --

23   A.        Excuse me?

24   Q.        So you rounded it off to 4,000?

25   A.        Probably, yes.

Michael Engelberg, M.D. - Direct

1   Q.       What was the amount on this check, on 1-I?

2   A.       That was April, 27, 2007 for $2,000.

3   Q.       And what does the memo say?

4   A.       It says legal fees.

5   Q.       We're almost done.  If you can go to 1-G.

6   A.       Yes.

7   Q.       The dated and amount, please.

8   A.       Okay, that was for February the 13th, 2007.

9   Q.       And, by the way, all of these checks have

10  been endorsed by Mr. Ambush or deposited in his

11  account?

12  A.       That is correct.

13  Q.       If you can go to 1-E --

14  A.       Yes.  That was dated January the 27th -- 29,

15  2007 in the amount of $5,000.  And it was signed by

16  me.

17  Q.       And what does the memo say?

18  A.       It says the money was to go into his escrow.

19  Q.       Do you know for what purpose?

20  A.       I don't recall.  I would assume that

21  Mr. Ambush would be keeping records of that how that

22  money would be distributed.

23  Q.       Now, we have 1-C, date and amount, please.

24  A.       C, yes.  And that was for November the 30th,

25  2006 in the amount of $3,000.  It was signed by me.

Michael Engelberg, M.D. - Direct

1   Q.        And lastly 1-A and 1-B for the endorsement.

2   A.        Okay.  1-A was November the 13th, 2006 in

3   the amount of $10,000.  That was to be put into his

4   escrow.  It was signed by me.

5   Q.        And endorsed by him?

6   A.        And endorsed by Joshua Ambush.

7   Q.        Thank you.  For your patience of going

8   through this.

9           Why did you decide to come to Puerto Rico to

10  testify here today?

11  A.        Well, I would assume that, at the time that

12  we had been deposed, that it was important that I do

13  come down to testify.

14  Q.        Why is that?

15          MR. ARIAS-MARXUACH:  Objection.  Irrelevant.

16          THE COURT:  Overruled.

17  BY MR. EFRON:

18  Q.        Go ahead.

19  A.        The Center felt both a moral and ethical

20  obligation to come down here to set the record

21  straight.  The Center was always here for the benefit

22  of the claimants.  Every decision that we made was

23  for their benefit.  I was very upset and sickened by

24  the fact that Mr. Ambush, who is an attorney, who has

25  an obligation to uphold the laws, to be able to

Michael Engelberg, M.D. - Direct

1   represent their clients and their interests and not

2   in his interest, I was upset that he took advantage

3   of individuals who did not understand what the Center

4   did, hid information from them regarding --

5              MR. ARIAS-MARXUACH:  Objection.  Move to

6   strike.  Lack of personal knowledge.  He has never

7   met the individuals.

8              THE COURT:  I'm not striking it.

9              Mr. Efron lay a foundation or if you have

10  something more specific.

11  BY MR. EFRON:

12  Q.        Without saying what you think the victims

13  perceived or didn't perceive, why did you think that

14  you should have come to Puerto Rico to help them?

15  A.        We believed that Mr. Ambush deceived these

16  individuals.

17             MR. ARIAS-MARXUACH:  Objection.  Lack of

18  personal knowledge.  Speculation.

19             THE COURT:  I'll allow him to explain.

20  A.        The Center had an agreement with these

21  claimants that they were not to pay more than

22  20 percent.  We had evidence that was provided us

23  regarding his agreement.  He signed an agreement with

24  them in December of 2008.  The American Center did

25  not know about this agreement, was not provided this

Michael Engelberg, M.D. - Direct

1  agreement until October of 2009.  We saw that he was

2  asking for an additional 10 percent, another million

3  dollars after the case had already been dismissed.

4  To ask for a million dollars from each one of them,

5  we felt that this was unscrupulous; we felt that he

6  swindled an additional million dollars from each one

7  of them.

8         MR. ARIAS-MARXUACH:  Objection.

9         THE COURT:  Overruled.  That's his opinion.

10  A.       We were disturbed to -- as per our

11  particular agreement.  We were embarrassed that this

12  was our attorney that was supposed to be representing

13  our interests, who had seen hundreds of center and

14  claimants agreements, who had seen hundreds of powers

15  of attorney, who understood that this was not about

16  enriching attorneys, we felt that we had a moral

17  obligation to them.

18         These are individuals who suffered from the

19  original attack that had to deal with the dead

20  bodies, bringing them back, that were victimized by a

21  terrorist group.  And now we felt that they were

22  being victimized by an attorney.  And to us not only

23  was it an embarrassment for the Center, we felt that

24  he did not serve the claimants in their best

25  interest.  He did not follow the wording of the

Michael Engelberg, M.D. - Direct

1  Center in claimant agreement.  We felt that it was an

2  insult to those who had died.  And everything that

3  the Center stands for was just the opposite of what

4  Mr. Ambush was doing.

5          And we felt we had a moral and ethical

6  obligation, and certainly myself, to be here, to be

7  able to show the evidence and be able to show both in

8  terms of what the Center and claimant agreement meant

9  to us, how we intended to carry it out.  I was able

10  to utilize my power of attorney to be able to show

11  every decision that was made by me was in the best

12  interest of these individuals.

13          That when we hired Paul Gaston, Paul Gaston

14  is a Yale graduate, it was disturbing why these

15  individuals would allow themselves to have Mr. Ambush

16  continue to represent them --

17          MR. ARIAS-MARXUACH:  Objection.  Your Honor,

18  Mr. Gaston's opinions are hearsay.

19          THE COURT:  I don't think -- he's not giving

20  Mr. Gaston's opinion, he's giving his own opinion.

21  He just said that Mr. Gaston is a Yale graduate,

22  that's what he said.

23  A.       Mr. Gaston was hired by us to continue to

24  represent them.  It's flabbergasting why they would

25  want Mr. Ambush to continue to represent them when we

Michael Engelberg, M.D. - Direct

1  have chosen Gaston to do so, who is so much more

2  qualified.

3          And, again, the Center was always there

4  throughout the entire case, after the case was

5  dismissed, to ensure that they would get their

6  $8 million.  And in spite of our efforts Mr. Ambush

7  was able to succeed in gaining this additional

8  million dollars from each one of these claimants.

9  And I truly believe that Mr. Ambush hoodwinked them,

10  he duked them, he deceived them, and he swindled an

11  additional $1,000,000 from each of these estates.

12  BY MR. EFRON:

13  Q.      On behalf of the plaintiffs I thank you for

14  coming down for your testimony.  Thank you,

15  Dr. Engelberg.

16          THE COURT:  Okay.  Cross examination?

17          Okay.  Let's take a five-minute recess.

18  Anybody who needs restroom and then we'll come back

19  with the cross-examination.

20          THE COURT OFFICER:  All rise.

21          (Jury Trial recessed at 3:35 p.m. and

22  resumed at 3:47 p.m.)

23          THE COURT:  Please be seated.

24          You may proceed, Mr. Arias.

25                  CROSS-EXAMINATION

                    Michael Engelberg, M.D. - Cross
1   BY MR. ARIAS-MARXUACH:

2   Q.      Good afternoon, Dr. Berg.

3   A.      Good afternoon.

4   Q.      You are currently the president of the

5   American Center For Civil Justice?

6           MR. EFRON:  It's Dr. Engelberg, not Berg.

7           THE COURT:  Engelberg, not Berg.

8           MR. ARIAS-MARXUACH:  Ah, sorry.

9           MR. EFRON:  I didn't mean to interrupt you.

10  BY MR. ARIAS-MARXUACH:

11  Q.      Dr. Engelberg, you are currently the

12  president of the American Center For Civil Justice?

13  A.      That is correct.

14  Q.      And you are also the president of the New

15  York Center for Civil Justice, correct?

16  A.      That is correct.

17  Q.      Now, let's talk about the American Center

18  for Civil Justice and we might intersperse some

19  questions about the New York Center as well, okay?

20          I understand that you and Rabbi Perr are

21  among the founders of the American Center for Civil

22  Justice; is that correct?

23  A.      That is correct.

24  Q.      And, in fact, your association to the

25  American Center for Civil Justice dates back to

Michael Engelberg, M.D. - Cross

1  before 2001?

2  A.      Could you please repeat that?

3  Q.      That you have been associated with the

4  American Center for Civil Justice, and maybe it's a

5  fancy way for saying that you have had roles in the

6  Center, since before 2001?

7  A.      That is correct.

8  Q.      And, in fact, you've been -- at different

9  times you may have been the executive director of the

10 Center at others the vice president at others the

11 director, correct?

12 A.      That's correct.

13 Q.      And that's since the center's inception?

14 A.      That is correct.

15 Q.      Okay.  Now, the Center, both the American

16 Center for Civil Justice and the New York Center for

17 Civil Justice are 501(C)(3) tax exempt corporations?

18 A.      That is correct.

19 Q.      And that is just a fancy way of saying that

20 they are both nonprofit corporations that enjoy a tax

21 exception from the Internal Revenue Service of the

22 United States?

23 A.      That is correct.

24 Q.      And that means that they do not pay taxes on

25 their income; is that correct?

1  A.        That is correct.

2  Q.        But it does mean that they have to file tax

3  returns with the Internal Revenue Service of the

4  United States; is that correct?

5  A.        That is correct.

6  Q.        And those tax returns have to list their

7  income and expenses; is that correct?

8  A.        That is correct.

9  Q.        And it also means that both the New York

10  Center for Civil Justice and the American Center for

11  Civil Justice are subject to audit or investigation

12  by the Internal Revenue Service of the United States;

13  is that correct?

14  A.        That is correct.

15  Q.        And for that reason, for all those reasons,

16  the Center has to be meticulous about its bookkeeping

17  because you don't know when uncle Sam might be

18  calling; is that correct?

19  A.        That is correct.

20  Q.        Now, you have told the jury that Mr. Ambush

21  was paid in full for any work that he did in

22  connection with the Franqui litigation, correct?

23  A.        That is correct.

24  Q.        But you have not shown to this jury an

25  accounting listing exactly what work Mr. Ambush did

Michael Engelberg, M.D. - Cross

1  on the Franqui case and how much the Center paid for

2  that work; such a document is not in evidence,

3  correct?

4  A.        That is correct.

5  Q.        Okay.  And, in fact, we went through

6  Plaintiffs' Exhibit 1 -- or Mr. Efron did and we were

7  just sitting along -- and that is a series of checks

8  from the New York Center for Civil Justice made out

9  to Mr. Ambush covering the time period between

10 November 13, 2006 and November 7, 2008, correct?

11 A.        That is correct.

12 Q.        And you would agree with me that if we go

13 through all of these checks, none of these checks say

14 Lod Airport litigation, correct?

15 A.        That is correct.

16 Q.        And you would agree with me that none of

17 these checks say work on behalf of the Berganzo

18 family, correct?

19 A.        Excuse me?

20 Q.        None of these checks say work on behalf of

21 the Berganzo family, correct?

22 A.        That is correct.

23 Q.        And none of these checks say work on behalf

24 of the Rodriguez-Robles family, correct?

25 A.        That is correct.

Michael Engelberg, M.D. - Cross

1  Q.        And we went through these checks and some of

2  these checks say escrow; and an escrow account is an

3  account that a lawyer has to keep to receive money

4  that comes from the clients or a court and then make

5  disbursements from that account to third parties,

6  correct?

7  A.        That is correct.

8  Q.        So the fact that a check may be deposited in

9  an escrow account of an attorney does not mean that

10 that check went to the attorney's pocket, correct,

11 because it could be used for other purposes?

12 A.        That is correct.

13 Q.        That account, the escrow account, is simply

14 a holding place, correct?

15 A.        That is correct.

16 Q.        We're not recording gestures so if you're in

17 agreement, in addition to nodding your head, just say

18 yes.  Thank you.

19 A.        Okay.

20 Q.        And some of these checks that we have here,

21 in addition to saying escrow, some of them don't even

22 say the concept; on some the part that says memo are

23 empty, correct?

24 A.        That's correct.

25 Q.        Okay.  And one of these checks actually says

Michael Engelberg, M.D. - Cross

1   specifically that it's for funds due to Paul Gaston,

2   correct?

3   A.      That is correct.

4   Q.      So these checks do not establish in any form

5   or fashion how much if anything Joshua Ambush was

6   paid for work on the LOD case, correct?

7   A.      That is correct.

8   Q.      And, in fact, when asked about what some of

9   these checks were for you said you have to ask

10  Mr. Ambush, correct?

11  A.      That is correct.

12  Q.      Okay.  Now let's talk about Joshua Ambush's

13  relationship with the Center, all right?

14          Joshua Ambush was not an employee of the

15  Center, correct?

16  A.      Incorrect.

17  Q.      Did the Center deduct payroll taxes -- well,

18  let me go back to your testimony.

19          I think you testified that Joshua Ambush was

20  an employee of the Center in the time period between

21  2001 and 2003, correct?

22  A.      I believe 2001 to 2004.

23  Q.      So which is it?

24  A.      I -- I don't recall.

25  Q.      So it could be between 2001 and 2004 or 2001

1    and 2003, you're just not sure right now?

2    A.        I'm not sure.

3    Q.        But in any event, whatever it is, did the

4    Center deduct payroll taxes on payments to Mr. Ambush

5    during that time period?

6    A.        Mr. Ambush claimed that because he was an

7    attorney that we didn't have to deduct, he was

8    considered as an outside agent so to speak.

9    Q.        An independent contractor?

10   A.        Yes, that's correct.

11   Q.        So I'm going to asking about a series of

12   obligations that an employer has with an employee

13   versus and independent contractor and you'll tell me

14   if in fact the Center complied with those

15   obligations.

16            Did the Center, deduct -- and for everybody.

17            THE COURT:  Mr. Arias go a little a slower

18   for everyone and for the Court reporter.

19            MR. ARIAS-MARXUACH:  I know.

20            THE COURT:  We all go very fast but we need

21   to go slow.

22            MR. ARIAS-MARXUACH:  I'm glad you empathize.

23   BY MR. ARIAS-MARXUACH:

24   Q.        Did the Center deduct payroll taxes from

25   payments to Mr. Ambush?

Michael Engelberg, M.D. - Cross

1    A.        I don't recall.

2    Q.        Did the Center pay Social Security or

3    withhold Social Security on payments to Mr. Ambush?

4    A.        I don't recall.

5    Q.        You don't recall.

6              Did the Center provide Mr. Ambush with

7    medical insurance?

8    A.        No, we did not.

9    Q.        Did the Center provide Mr. Ambush with

10   disability insurance?

11   A.        I don't believe so.

12   Q.        In fact, you just told us that Mr. Ambush

13   told you that he was an independent contractor,

14   correct?

15   A.        That is correct.

16   Q.        And that is how you handled that

17   relationship, he was an independent contractor?

18   A.        That is correct.

19   Q.        Now, you mentioned that between Mr. Ambush

20   and Rabbi Perr there was a relationship of trust,

21   correct?

22   A.        That's correct.

23   Q.        And because there was a relationship of

24   trust, that meant that -- it meant several things,

25   but let's start with some of them.

Michael Engelberg, M.D. - Cross

1    Mr. Ambush worked on many matters for the

2    Center, correct?

3    A.        That's correct.

4    Q.        He worked on other terrorist cases besides

5    Lod Airport, correct?

6    A.        That's right.

7    Q.        He worked on, for example, the Stethem case?

8    A.        No, he did not.

9    Q.        Are you sure?

10   A.        Yes, I am.

11   Q.        But he did work on other terrorist cases,

12   correct?

13   A.        He did not.

14   Q.        He did not work on other terrorist cases

15   force the Center?

16   A.        Could you please rephrase that?

17   Q.        Did Mr. Ambush render services to the Center

18   in connection with other terrorist cases?

19   A.        He never represented any of those victims.

20   Q.        Did Mr. Ambush assist attorneys hired by the

21   Center in other terrorist cases?

22   A.        I don't recall.

23   Q.        You don't recall, okay.

24            And, in fact -- but the fact is that he was

25   doing other work for the Center and he would be paid

Michael Engelberg, M.D. - Cross

1   by the Center for that work, correct?

2   A.      That is correct.

3   Q.      And you were telling us that this was based

4   on a relationship of trust between him and the Rabbi?

5   A.      That is correct.

6   Q.      And it would be fair to say that it was a

7   flexible arrangement because of that trust?

8   A.      That is correct.

9   Q.      And, in fact, because of that relationship

10  between Mr. Ambush and the Rabbi, the decision maker

11  at the American Center for Civil Justice as to what

12  to pay Joshua Ambush was Rabbi Eliezer Perr?

13  A.      That is correct.

14  Q.      Thank you.

15          Now, has the Center provided either the

16  members of the Rodriguez-Robles or the Berganzos an

17  accounting of how much the Center spent on

18  prosecuting the Lod Airport case, the Franqui case?

19  A.      No, we did not.

20  Q.      In fact, you have never met with the

21  Berganzo family, correct?

22  A.      That is correct.

23  Q.      And you have never met with the

24  Rodriguez-Robles family?

25  A.      That is correct.

Michael Engelberg, M.D. - Cross

1    Q.        And you never communicated with these

2    families while the Franqui case was ongoing, correct?

3    A.        That is correct.

4    Q.        All right.  But you did take decisions on

5    their behalf based on the power of attorney?

6    A.        It's first based on the Center and claimant

7    agreements.

8    Q.        And the power of attorney, those two

9    documents?

10   A.        That is correct.

11   Q.        Now, Joshua Ambush was the sole attorney

12   that filed the Franqui complaint on April of 2006,

13   correct?

14   A.        That is correct.

15   Q.        And no other attorney joined plaintiffs'

16   representation until Paul Gaston entered his

17   appearance on June of 2008, correct?

18   A.        That is correct.

19   Q.        Now, Covington & Burling said no to the

20   Franqui case, correct?

21   A.        That is correct.

22   Q.        And no major law firm appeared on behalf of

23   the Puerto Ricans injured at Lod Airport in the

24   Franqui case, correct?

25   A.        That is correct.

Michael Engelberg, M.D. - Cross

1  Q.      And LOD -- and Paul Gaston didn't come until

2  the case was two years having been filed, correct?

3  A.      That is correct.

4  Q.      All right.  But the Center did have major

5  law firms in the case of the British worker who was

6  tortured and killed, correct?

7  A.      Paul Gaston represented that case.

8  Q.      Which you have labeled as a prominent

9  attorney, correct?

10 A.      That is correct.

11 Q.      And in the Khobar Towers case, the case of

12 the 17 Americans killed in Saudi Arabia, the Center

13 worked with Piper Rudnick, correct?

14 A.      DLA Piper.

15 Q.      Well, at the time it was called Piper

16 Rudnick, correct?

17 A.      Uhm, at that point in time it was called

18 Piper Rudnick at that time, yes.

19 Q.      And now it's called DLA Piper because

20 technically it is the biggest law firm in the world,

21 correct?

22 A.      That is correct.

23 Q.      And you worked with Piper Rudnick twice,

24 right?

25 A.      That is correct.

Michael Engelberg, M.D. - Cross

1  Q.        But Piper Rudnick did not enter an

2  appearance in the Lod Airport case?

3  A.        That is correct.

4  Q.        So no major law firm worked on behalf of

5  these plaintiffs in the Lod Airport case?

6  A.        That is correct.

7  Q.        And the case had been going on for two years

8  before Gaston entered?

9  A.        That is correct.

10 Q.        And you knew before filing that case that

11 Libya would put up a fight, correct?

12 A.        That is correct.

13 Q.        And so the fact is that for two years you

14 didn't see fit to invest in recruiting a major law

15 firm to work on the Franqui case?

16 A.        We had approached numerous law firms during

17 that period of time and they declined.

18 Q.        They all declined, okay.

19           Okay.  So if all these major law firms

20 declined it is because they did not want to risk

21 either their time or their fees on the Franqui case,

22 correct?

23 A.        At that point in time we still did not have

24 enough evidence to convince law firms to take on the

25 case.

Michael Engelberg, M.D. - Cross

1    Q.         But lawyers do things based on either

2    conviction or money or a combination; the fact is

3    that these major law firms did not sign on, correct?

4    A.         They did not sign on.

5    Q.         And they didn't sign on because the

6    information that the Center provided was not to their

7    satisfaction, correct?

8    A.         That is correct.

9    Q.         And you're the one who prepares the

10   narratives and tells the lawyers what to do; that is

11   your testimony here in court today, no?

12   A.         That is correct.

13   Q.         Now, in November of 2008 you did try to

14   remove Joshua Ambush as attorney for the

15   Rodriguez-Robles and Berganzo families, correct?

16   A.         We were considering at that time that Paul

17   Gaston, I think, was saying that he was already the

18   attorney of record.

19   Q.         Well, in fact you sent communication to

20   Joshua Ambush telling him to deliver the file to Paul

21   Gaston who would take over, correct?

22   A.         That was -- it was a letter of December the

23   10th that you are referring to.

24   Q.         So on December the 10th you decided to

25   remove Joshua Ambush from the case, correct?

Michael Engelberg, M.D. - Cross

1   A.        That's correct.

2   Q.        And as of December of 2008 you already knew

3   that because of the Libyan claims settlement process

4   each wrongful death estate would get 10 million,

5   correct?

6   A.        That is correct.

7   Q.        So you had that knowledge when you took that

8   decision?

9   A.        That is correct.

10  Q.        And you did not consult with the Berganzo

11  family before trying to remove Mr. Ambush from the

12  case, correct?

13  A.        I would like to -- could I please have the

14  claimant/center agreement?

15  Q.        It's a yes-or-no question whether you

16  consulted these families or not.

17           THE COURT:  Please answer yes or no.

18  Mr. Efron will have an opportunity to ask you

19  additional questions.

20  A.        No, we did not.

21  BY MR. ARIAS-MARXUACH:

22  Q.        And so to break it down, the record is clear

23  you did not consult the Berganzos, correct?

24  A.        That is correct.

25  Q.        And you did not consult the

Michael Engelberg, M.D. - Cross

1  Rodriguez-Robleses, correct?

2  A.        That is correct.

3  Q.        Now, you did not meet with these people

4  while the Franqui case was ongoing, correct?

5  A.        That is correct.

6  Q.        But you did have the time to come to Puerto

7  Rico to meet with O'Neill & Borges in 2008?

8            You met with a major law firm here in Puerto

9  Rico here in December of 2008, correct?

10 A.        That is correct.

11 Q.        But you did not look these people up to meet

12 with them?

13 A.        No, we did not.

14 Q.        Okay.

15           Now, you have alluded to the lawsuit that

16 the American Center for Civil Justice filed against

17 Mr. Ambush in Washington, D.C., correct?

18 A.        That is correct.

19 Q.        And that case is called the American Center

20 for Civil Justice v. Joshua Ambush in the United

21 States District Court for the District of Columbia,

22 correct?

23 A.        That's correct.

24 Q.        And one of the things that the Center asked

25 the Court in the District of Columbia was to prevent

1    that the funds from the estates in the Franqui case

2    be delivered to Joshua Ambush, correct?

3    A.        Could you repeat that?

4    Q.        That you requested an injunction from the

5    Court in the D.C. case so that the moneys would flow

6    from the state department to the Court instead of

7    from the state department to Joshua Ambush, correct?

8    A.        That is correct.

9    Q.        That is relief that you requested from the

10   D.C. court, correct?

11   A.        That is correct.

12   Q.        And the D.C. court denied that request?

13   A.        That is correct.

14   Q.        Now, going back to November of 2008, and

15   we'll get back to the injunction, you knew that each

16   estate would receive -- each wrongful death estate

17   would receive $10 million, correct?

18   A.        That is correct.

19   Q.        And you didn't communicate that to the

20   Rodriguez-Robleses, correct?

21   A.        We were unable to.  Mr. Ambush had all of

22   the addresses for all of the claimants and he refused

23   to provide that to the Center.

24   Q.        Mr. -- Dr. Engelberg, aren't you the one who

25   writes the narrative in these cases; you had the

Michael Engelberg, M.D. - Cross

1   names, you could not get their addresses?

2           In this age of the Internet you could not

3   get the names and the phone numbers of these persons

4   assuming that Joshua Ambush was denying to give you

5   the information?

6           You had the Franqui complaint, correct?

7   A.      We had the Franqui complaint --

8   Q.      So you had the names, correct?

9   A.      Mr. Ambush --

10  Q.      It's a yes-or-no question, sir.

11          Did you have the Franqui complaint?

12  A.      Yes, we did.

13  Q.      And if you had the Franqui complaint, you

14  had the names of these claimants, correct?

15  A.      Yes, we did.

16  Q.      And you could have searched the Internet for

17  their contact information or hired a private

18  investigator, you could have gotten in touch with

19  them if you wanted to, correct?

20  A.      Not true.

21  Q.      Not true?

22  A.      We attempted.  We actually had an

23  investigative reporter -- or an individual

24  investigative service, as well as looking on the

25  Internet.

Michael Engelberg, M.D. - Cross

1    Q.        Mm-hmm, okay.

2              Now, let's go back to the injunction.  And,

3    again, the injunction you sought was so that the

4    state department delivered the funds from the Libyan

5    claims that had been approved to the Court in D.C.

6    rather than to Mr. Ambush, right, that was the

7    petition in the injunction request?

8    A.        That is correct.

9    Q.        And the Court in D.C. denied that request,

10   correct?

11   A.        Yes, they did.

12   Q.        Okay.  And these claimants were not a party

13   in the case in D.C., correct?

14   A.        That is correct.

15   Q.        So the Center was requesting this relief

16   without their knowledge, correct?

17   A.        That is correct.

18   Q.        Okay.  Now, you would agree that because the

19   state -- the Court in D.C. denied the center's

20   request Mr. Ambush did receive into his escrow

21   account the funds that were approved by the state

22   department on the claims, correct?

23   A.        That is correct.

24   Q.        And Mr. Ambush delivered -- as to these two

25   families delivered 1.6 million per family to the

Michael Engelberg, M.D. - Cross

1    Center -- so that's 3.2 million, correct?

2    A.        That is correct, yes.

3    Q.        -- and then the balance, the 800,000 --

4    A.        No, excuse me.  Could you -- $1.6 million to

5    where?

6    Q.        He delivered $1.6 million to the Center?

7    A.        Yes.  That's correct, yes.

8    Q.        And that's 1.6 million for the Berganzos and

9    1.6 million for the Rodriguez-Robleses that went to

10   the Center?

11   A.        That is correct.

12   Q.        And when you add that up that is

13   $3.2 million, right?

14   A.        That is correct.

15   Q.        Okay.  Because the Center had an agreement

16   to take 20 percent from the awards, that meant that

17   the total amount due to the Center under the

18   claimant/center agreements from these two families'

19   claims is $4 million, right?

20   A.        That is correct, yes.

21   Q.        Thank you.

22             And so we're talking about 3.2 million going

23   directly to the Center, we have an 800,000 dollar

24   difference, right?

25   A.        Yes.

Michael Engelberg, M.D. - Cross

1  Q.        Four million minus 3.2 --

2  A.        Yes.

3  Q.        Thank you.

4            And that $800,000 Mr. Ambush paid into the

5  registry of the D.C. court; is that correct?

6  A.        That is correct.

7  Q.        Thank you.

8            Okay.  And it is The Center's position in

9  the D.C. litigation that it is entitled those

10 $800,000, not Mr. Ambush, so that if the Center

11 approves -- the Court approves that petition, the

12 Center would receive its $2 million per family,

13 correct?

14 A.        That's correct.

15 Q.        And another petition that the Center is

16 making in the D.C. litigation is that whatever is

17 paid to Mr. Ambush for the Franqui case he should

18 give back; is that correct?

19 A.        Could you please repeat that?

20 Q.        That the Center is also asking the Court to

21 make him give back whatever he paid on -- whatever

22 the Center paid to him in the Franqui case?

23 A.        I'm not -- I don't recall.

24 Q.        You don't recall.

25            You are the president of the American Center

Michael Engelberg, M.D. - Cross

1    for Civil Justice and you don't recall what the

2    relief is that you're asking in court in D.C.?

3    A.        No, I don't recall.

4    Q.        And you're the one who writes narratives for

5    the lawyers and hires all these big, fancy lawyers

6    but you don't remember what your relief is or what

7    your request for relief is in the D.C. case?

8    A.        I don't recall.

9    Q.        You don't recall.

10             Now, let's talk about the claimant/center

11   agreement.  And in the interest of economy of time,

12   would you agree with me that the claimant/center

13   agreement is a standard form that the Center uses?

14   A.        That is correct.

15   Q.        That was drafted by U.S. attorneys?

16   A.        American attorneys.

17   Q.        Well, America spans from Alaska to Tierra

18   del Fuego.  We're talking about U.S. citizens.

19             MR. EFRON:  Not prosecutors.

20   BY MR. ARIAS-MARXUACH:

21   Q.        Ah, you didn't mean -- sorry.

22             Attorneys in the United States?

23   A.        Yes.

24   Q.        As opposed to United States attorneys?

25   A.        Yes.

1  Q.        All right.  But in any event the

2  claimant/center agreements were drafted by attorneys

3  in the mainland United States?

4  A.        Yes.

5  Q.        Now we're in the same song.

6           Okay.  I'm going to show you two of them and

7  I'm going represent to you these are the ones for

8  Efrain Berganzo-Cruz and Noemi Rodriguez-Robles, and

9  we'll work off of those two only, okay?

10 A.        Okay.

11 Q.        But I will represent to you that they are in

12 evidence all the claimant/center agreements signed by

13 members of these two families and they're all the

14 standard form; are you willing to accept the

15 representation?

16 A.        I don't understand the question.

17 Q.        Instead of showing you all the

18 claimant/center agreements that are in evidence, I am

19 asking you to kindly accept my representation that if

20 these good people signed claimant/center agreements

21 they're in the same form as these two examples that

22 I'm showing that are from two of them; could you

23 accept that representation?

24 A.        Yes.

25 Q.        And that is meant simply to avoid a parade

Michael Engelberg, M.D. - Cross

1   of needless paper.

2           All right.  The first one is Joint

3   Exhibit 21.

4   A.      Excuse me, could I have the -- I have

5   difficulty reading from the screen.

6           MR. ARIAS-MARXUACH:  Can he be provided

7   Joint Exhibit 21 and Joint 9?

8   BY MR. ARIAS-MARXUACH:

9   Q.      Let me know when you have finished examining

10  the documents, okay?

11  A.      Yes.

12  Q.      Are you finished?

13  A.      Yes, go ahead.

14  Q.      Now, if we look at the claimant/center

15  agreements on Joint Exhibit 21, that is the

16  claimant/center agreement between Efrain

17  Berganzo-Cruz and the American Center for Civil

18  Justice, correct?

19  A.      That is correct.

20  Q.      And it's signed by claimant Efrain

21  Berganzo-Cruz executed June 2002, correct?

22  A.      Yes, that is correct.

23  Q.      Now, you have seen hundreds of these

24  claimant/center agreements, correct?

25  A.      Yes, I have.

Michael Engelberg, M.D. - Cross

1   Q.        And you're examining this one, Joint

2   Exhibit 21, correct?

3   A.        Correct.

4   Q.        Can you tell me where does this agreement

5   have the name Joshua Ambush?

6   A.        It does not.

7   Q.        Can you tell me where in this agreement does

8   the attorney bind itself to do anything?

9   A.        It does not.  This is directly between the

10  Center and claimant -- between the American Center

11  and the individuals -- the individual claimants.

12  Q.        So Joshua Ambush was not a party to the

13  claimant/center agreement, correct?

14  A.        That is correct.

15  Q.        You were not present at the December 2'08

16  meeting where the Berganzos and Rodriguez families

17  signed retainer agreements with Mr. Ambush, correct?

18  A.        That is correct.

19  Q.        And because you have never met these people,

20  you have never discussed with them the circumstances

21  in which the retainer agreements with Mr. Ambush were

22  executed, correct?

23  A.        That is correct.

24  Q.        So the truth is that you don't have any

25  personal knowledge of what transpired at the meeting

Michael Engelberg, M.D. - Cross

1    between Joshua Ambush and the members of the

2    Rodriguez-Robles and Berganzo families, correct?

3    A.        That is correct.

4    Q.        Okay.  Now, Mr. Engelberg, in November of --

5              MR. EFRON:  Doctor.

6    A.        Excuse me, that's Dr. --

7    BY MR. ARIAS-MARXUACH:

8    Q.        Oh, sorry, Doctor.  It's just a personal

9    thing.  I don't like people calling me *Licensiado*,

10   which is a common address of an attorney.

11   A.        You can call me Michael Engelberg.

12   Q.        Okay.  Well, I will go with Doctor, but

13   thank you for offering Michael.

14             Dr. Engelberg, in November of 2009 the

15   Center hired an attorney by the name of Javier

16   Lopez-Perez to run some advertisements in the press

17   in Puerto Rico, correct?

18   A.        That is correct.

19   Q.        And the Center obtained Javier Lopez-Perez's

20   name from a local Rabbi in the community in Puerto

21   Rico, correct?

22   A.        That is correct.

23   Q.        That is a Rabbi Zarchi?

24   A.        That is correct.

25   Q.        Okay.  And I'm glad I pronounced it

1    correctly apparently.

2             And at the time that the Center commissioned

3    Mr. Lopez-Perez, Javier Lopez-Perez, to run those

4    ads, the purpose of the ads was so that those persons

5    targeted by the ad would contact Attorney

6    Lopez-Perez, correct?

7    A.       It was to let them know that -- the Center

8    was afraid that because Mr. Ambush should have been

9    representing the Center, that the claimants should

10   know --

11   Q.       Let me rephrase the question, sir.

12   A.       Yes.

13   Q.       The ads meant for victims of the Lod Airport

14   Massacre to call Javier Lopez-Perez, right, that's

15   what the ad stated?

16   A.       To verify what The Center's position was as

17   per these claimant and center agreements.

18            MR. EFRON:  Your Honor, it's a Joint

19   Exhibit.  Why don't we just show it to him because

20   he's only reading part of it.

21   BY MR. ARIAS-MARXUACH:

22   Q.       Okay.  But in any event, Mr. Lopez Perez was

23   hired by the Center, correct?

24   A.       To place an ad in the paper in Puerto Rico,

25   yes.

Michael Engelberg, M.D. - Cross

1  Q.        And prior to that, to November of 2009,

2  Attorney Lopez-Perez had no prior involvement with

3  the Center, correct?

4  A.        That is correct.

5  Q.        And he also had no prior involvement with

6  the Franqui litigation, correct?

7  A.        That is correct.

8  Q.        Now, you are aware that Attorney Lopez-Perez

9  was the attorney who filed this lawsuit that brings

10 us here today, correct?

11 A.        That is correct.

12 Q.        And under the -- as a result of the ad, the

13 claimants contacted Javier Lopez-Perez directly,

14 correct?

15 A.        That is correct.

16 Q.        They did not contact the Center?

17 A.        No, they did not.

18 Q.        Now, when the time -- there came a time when

19 Attorney Lopez-Perez withdrew from this case; you

20 know that, right?

21 A.        Yes.

22 Q.        And at that time the Center found David

23 Efron to take Lopez-Perez's place, correct?

24 A.        Again, the name was provided to the Center

25 again by Rabbi Zarchi.

Michael Engelberg, M.D. - Cross

1  Q.        So Rabbi Zarchi gave you the name of

2  Mr. Efron and he came to represent the plaintiffs

3  after Lopez-Perez withdrew, correct?

4  A.        That's correct.

5  Q.        Okay.  Now, you have told us that you came

6  here because you understand that the Center has a

7  moral obligation to these claimants, correct?

8  A.        That is correct.

9  Q.        And that moral obligation stems from the

10  fact that you believe Joshua Ambush took $2 million

11  from them wrongfully?

12  A.        That is correct.

13  Q.        And now has the Center reimbursed these

14  claimants those $2 million based on that moral

15  obligation?  Shall I repeat it?

16  A.        Yes, please repeat that.

17  Q.        As a result of its moral obligation, has the

18  Center returned to these claimants their $2 million?

19  A.        No, it has not.

20  Q.        Okay.  As a result of this moral obligation,

21  has the Center paid these claimants their attorneys'

22  fees in this case?

23  A.        Could you please repeat that?

24  Q.        Very simple question.

25            The Center, you understand, has a moral

1  obligation to these claimants, correct?

2  A.       Mm-hmm.

3  Q.       And I'm asking you if as a practical

4  consequence of that obligation, if the Center has

5  paid their attorneys' fees in this case?

6  A.       Doesn't it bother you that --

7  Q.       Please answer yes or no.

8  A.       No, no.  Doesn't it bother you that you're

9  taking stolen money?

10         MR. ARIAS-MARXUACH:  I ask that --

11         THE COURT:  You need to answer yes or no.

12  Mr. Efron can ask you additional questions.

13         THE WITNESS:  Okay.

14  A.       Could you please repeat that?

15  BY MR. ARIAS-MARXUACH:

16  Q.       As a result of that moral obligation that

17  you have alluded to, has the Center paid for these

18  claimants' attorneys' fees?

19  A.       No, it has not.

20  Q.       Why do you smirk?

21  A.       Because I find it quite obscene -- you asked

22  me why do I smirk.

23         THE WITNESS:  Do I have a right to answer

24  that?

25         THE COURT:  Okay.  Answer the question.

Michael Engelberg, M.D. - Cross

1  A.        You asked me why do I smirk.  Because

2  doesn't it bother you that you're getting paid from

3  money that was stolen from these claimants?

4  Q.        Well, if it bothers you so much why not

5  reimburse it to them by the Center?  Because you have

6  labeled Mr. Ambush an agent, a paralegal, all these

7  things.

8          And so if you have this moral obligation,

9  why haven't you chosen to reimburse the 2 million and

10  then litigate with him in D.C.?

11  A.        The Center has not done anything illegal.

12  Mr. Ambush has done something illegal.

13          THE COURT:  Mr. Efron, any redirect?

14          MR. EFRON:  Is he done?

15          THE COURT:  Mr. Arias?

16          MR. ARIAS-MARXUACH:  I'm done.

17          MR. EFRON:  Redirect.  Very briefly.

18                  REDIRECT EXAMINATION

19  BY MR. EFRON:

20  Q.        Can we go to Exhibit 21, Joint Exhibit 21,

21  please?  I think you still have it.  Joint 21 on the

22  right-hand side on top?

23  A.        Oh, yes, yes.

24  Q.        Can we zoom in?

25          THE CLERK:  Yes.

Michael Engelberg, M.D. - Redirect

1    A.          Excuse me, can I take a quick break?

2                THE COURT:  Let's excuse him for two to

3    three minutes and we'll come back with redirect, and

4    everybody can stay here.

5                (Jury Trial recessed at 4:27 p.m. and

6    resumed at 4:28 p.m.)

7                THE COURT:  Okay.  Efron, let's briefly

8    conclude your redirect.

9                MR. EFRON:  I just have two or three --

10   the --

11               THE COURT:  I believe it's Joint Exhibit 21

12   you're referring to.

13   BY MR. EFRON:

14   Q.          Joint Exhibit 21.  I think Dr. Engelberg

15   that both you and Mr. Arias misspoke when you said

16   that --

17               THE COURT:  Don't -- ask the question,

18   don't --

19   BY MR. EFRON:

20   Q.          Do you see -- you mentioned that

21   Mr. Ambush -- Mr. Ambush's name was not on that

22   agreement; can you see the header on the fax machine,

23   on the top -- no, no, no, the name.  Can you make out

24   the name that's scratched out on the top of the -- on

25   the top of the document, on the top of the document?

Michael Engelberg, M.D. - Redirect

1   Do you see the fax header that indicates a

2   name that's scratched out; can you see that?

3   A.      I recognize it as a 4-1-1 number.

4   Q.      Does yours have that?

5          MR. EFRON:  May I approach for a second?

6   BY MR. EFRON:

7   Q.      Can you make out a name?  Does that not say

8   Joshua Ambush, Esquire?

9   A.      Yes, it does.

10  Q.      And it's scratched out, right?

11  A.      Yes.

12  Q.      So Mr. Ambush was a party or involved with

13  the claimant/center agreement, was he not?

14  A.      He was involved in terms of presenting the

15  Center and claimant agreement --

16  Q.      As an agent, as you have just said.

17  A.      -- as an agent for the Center, yes.

18  Q.      Thank you very much.

19         You stated you were asked -- you were asked

20  about trying to find -- by the way, who do I

21  represent in this case?  Am I representing the Center

22  in this case?

23  A.      No, you are not.

24  Q.      Who do I represent in this case?

25  A.      I assume that you're representing the

Michael Engelberg, M.D. - Redirect

1   Berganzo family, as well as the Antonio

2   Rodriguez-Morales family.

3   Q.        And the Center is not representing them?

4   A.        That is correct.

5   Q.        So would you have any authority to contact

6   my clients -- regardless of the fact that you

7   suggested to them that they retain me, did you have

8   any authority to talk to them without my -- without

9   my approving it?

10  A.        Absolutely not.

11  Q.        Now, in the municipalities in Puerto Rico

12  there are certain ways of getting around; do you know

13  what a *buzon* is?  *Buzon*?  *Buzon*?

14  A.        No, I do not.

15  Q.        Do you know what a *barrio* is?

16  A.        No, I do not.

17  Q.        Do you know what a *parcela* or a ward means?

18  A.        No, I do not.

19  Q.        And would you expect those to be found on

20  Google if you're trying to find somebody's address in

21  Puerto Rico?

22  A.        I don't believe so.

23  Q.        Okay.  Now of the --

24            MR. EFRON:  I'm just going over my notes,

25  because I want to do this very quickly, Your Honor.

Michael Engelberg, M.D. - Redirect

1  BY MR. EFRON:

2  Q.       You were asked if you knew exactly how much

3  the Center had spent on these cases; does it really

4  matter?  How does it matter how much the Center spent

5  on these cases?

6  A.       It doesn't make a difference because the

7  total amount is 20 percent; that includes all

8  expenses and all fees.

9  Q.       And that's whether the amount spent by the

10 Center was more or less than the 20 percent; is that

11 correct?

12 A.       That is correct.

13 Q.       At the time that the Center terminated

14 Mr. Ambush's representation of these families, was

15 there anything pending, anything left to do that you

16 know of in the Franqui litigation against Libya?

17 A.       There was no further --

18 Q.       Proceedings?

19 A.       -- proceedings that were necessary.

20 Q.       Now, you mentioned that you came here, very

21 eloquently, with a moral obligation, yourself or the

22 Center; is there any legal obligation to make these

23 people whole under The Center's part?

24          MR. ARIAS-MARXUACH:  Objection.  Calls for a

25 legal opinion.

Michael Engelberg, M.D. - Redirect

1    THE COURT: Sustained. Sustained.

2          MR. EFRON: I'll rephrase it.

3    BY MR. EFRON:

4    Q.        There's a, you said, $1.9 million of

5    undistributed money that's in litigation in

6    Washington, D.C. between the Center and Mr. Ambush,

7    correct?

8    A.        That is correct.

9    Q.        And of that there's about $800,000, $400,000

10   from each of these families, that the Center was not

11   paid to come up to the 20 percent that the Center was

12   supposed to receive; is that correct?

13   A.        That is correct.

14   Q.        So there's $800,000 that the Center is

15   requesting it get paid regarding this case and that

16   Mr. Ambush is basically opposing; is that correct?

17   A.        That is correct.

18   Q.        Now, and of course we never know what's

19   going to happen in court, but is it possible, could

20   that court determine that some of that money belongs

21   to Ambush?

22          MR. ARIAS-MARXUACH: Objection. Calls for

23   speculation.

24          THE COURT: I'll sustain the objection.

25   I'll sustain the objection. The Court has not ruled

Michael Engelberg, M.D. - Redirect

1   one way or another.

2           MR. EFRON:  No, I'm not -- but it is

3   pending.

4           THE COURT:  The matter is pending, but

5   whatever can happen -- you might expect it --

6           MR. EFRON:  I'll rephrase it.

7           THE COURT:  -- but it's not what the Court

8   can do or not.  You can ask what the Center is

9   soliciting the Court.

10          MR. EFRON:  I'll ask him what the defendant

11  is soliciting.

12  BY MR. EFRON:

13  Q.      What is Mr. Ambush requesting of the Court

14  that they do with that money?

15  A.      He's requesting that $400,000 of the

16  Berganzos' fee to the Center should be paid to him.

17  Q.      That's per family?  400,000 each family?

18  A.      That is correct.

19  Q.      So he took a million dollars from each

20  family here and he's requesting an extra $400,000

21  from each family in Washington; is that correct?

22  A.      That is correct.

23  Q.      Thank you again for coming to Puerto Rico.

24          THE COURT:  Mr. Arias, any recross briefly?

25          MR. ARIAS-MARXUACH:  Very briefly.

                   Michael Engelberg, M.D. - Redirect
1              THE COURT:  Mr. Efron, have your next

2      witness ready.

3                        RECROSS EXAMINATION

4      BY MR. ARIAS-MARXUACH:

5      Q.         Now, Dr. Engelberg, going back to Joint

6      Exhibit 21 --

7      A.         Yes.

8      Q.         -- are you saying that because Joshua

9      Ambush's name is here on the fax stamp that he's a

10     party to the claim/center agreement?

11     A.         Excuse me?

12     Q.         Does the fact that a fax stamp from Joshua

13     Ambush is here crossed out in Joint Exhibit 21, does

14     that make Joshua Ambush a party to the

15     claimant/center agreement?

16     A.         No, he is not.

17              MR. ARIAS-MARXUACH:  That's it.

18              THE COURT:  You're excused, Doctor.  Thank

19     you very much, you're excused.

20              (Jury trial adjourned at 4:27 p.m.)

21                            ---

22

23

24

25

1    UNITED STATES DISTRICT COURT    )

2                    OF                    )ss.

3          PUERTO RICO                )

4

5

6

7                        CERTIFICATE

8

9

10          I, EVILYS E. BRATHWAITE, hereby certify that

11    the proceedings and evidence are contained fully and

12    accurately, to the best of my ability, in the notes

13    recorded stenographically by me, at the jury trial in

14    the above matter; and that the foregoing is a true

15    and accurate transcript of the same.

16

17                        _____/s/ Evilys E. Brathwaite____

18                        EVILYS E. BRATHWAITE, RPR
                         Official Court Reporter
19                        United States District Court
                         Federal Building, Room 200
20                        San Juan, Puerto Rico 00918
                         787-772-3377
21

22

23

24

25