IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO


:_____:

THE ESTATE OF ANGEL BERGANZO COLON        :
represented by Efrain and Ruben Berganzo;
THE ESTATE OF ANTONIO RODRIGUEZ MORALES    :
represented by Noemi Rodriguez Robles,
Eliezer Rodriguez Robles, Angel M.         :
Rodriguez Robles, Maria M. Rodriguez
Robles and Ruth D. Rodriguez Robles,       :

                    Plaintiffs,            :    CIVIL NO:
                                                10-1044 (GAG)(MEL)
          vs.                              :

JOSHUA M. AMBUSH                           :
                    Defendant.
:_____:


DAY 4 OF THE JURY TRIAL
HELD BEFORE
THE HONORABLE GUSTAVO A. GELPI
Thursday, September 22, 2011, beginning at 9:54 a.m.
:_____:



A P P E A R A N C E S:

                    LAW OFFICES OF DAVID EFRON
                    BY DAVID EFRON, ESQUIRE and
                    BY JOANNE V. GONZALES-VARON, ESQUIRE
                    P.O. Box 29314
                    San Juan, Puerto Rico 00929
                    For the Plaintiffs

                    McCONNELL VALDES, LLC
                    BY RAUL M. ARIAS-MARXUACH, ESQUIRE and
                    BY HENRY O. FREESE-SOUFFRONT, ESQUIRE
                    270 Munoz Rivera Avenue
                    P.O. Box 364225
                    San Juan, Puerto Rico 00936
                    For the Defendant

INDEX TO WITNESSES

PLAINTIFF WITNESS                              DIRECT    CROSS

MARIA M. ROBLES-RODRIGUEZ

   By Mr. Efron..............................509...........

   By Mr. Freese-Souffront...........................511

JOSHUA M. AMBUSH, ESQUIRE

   By Mr. Efron..............................519...........

   By Mr. Arias-Marxuach.............................628


DEFENDANT WITNESS

JOSHUA M. AMBUSH, ESQUIRE

   By Mr. Arias-Marxuach....................646...........

---

1          THE COURT:  Please be seated.  Before we

2     bring in the jury, I believe counsel informed the

3     courtroom deputy one or two matters that need to be

4     brought.

5          MR. ARIAS-MARXUACH:  I would like to have a

6     side bar on that.

7          THE COURT:  We don't have the jury here.

8          MR. ARIAS-MARXUACH:  But there are other

9     persons who are not jurors, and for that reason we do

10    want --

11         THE COURT:  What I would suggest is that

12    then everybody in the courtroom perhaps step outside

13    because it's easier for everyone to step outside than

14    to do a side bar.

15         MR. EFRON:  I'll ask the two persons that

16    he's referring to, to wait outside.

17         THE COURT:  Is there anybody else?

18         MR. ARIAS-MARXUACH:  No.  The rest are

19    parties or a relative of a party and I don't have an

20    issue.

21         Your Honor, we have a concern with the

22    presence of these two persons that just exited the

23    room.  One is Dr. Michael Engelberg, who was a

24    witness and Lourdes Dominich-Guzman.  Lourdes

25    Dominich-Guzman is a member of the Padilla family;

1　　they're embroiled -- or the Guzman family, sorry.

2　　They are embroiled in litigation amongst the

3　　themselves.  Some of them want to honor their

4　　retainer agreement with Mr. Ambush, some do not.

5　　When I asked Counsel Efron what was the motive for

6　　her presence, he said, I might use her as a prop.

7　　And I am concerned that her presence here will

8　　lead --

9　　　　　　THE COURT:  But the jury doesn't know who

10　　she is.

11　　　　　　MR. ARIAS-MARXUACH:  Well, but if in direct

12　　he says, Mr. Ambush, who is this lady, and starts

13　　there, it will lead to bringing, through the back

14　　door, impermissible character evidence about her

15　　dispute with Mr. Ambush.

16　　　　　　THE COURT:  But I believe I've made a ruling

17　　as to other related cases.  It's -- we're only trying

18　　these cases.  There's no 404(b).

19　　　　　　MR. EFRON:  May I be heard?

20　　　　　　THE COURT:  Let Mr. Arias finish and then

21　　I'll hear from Mr. Efron.

22　　　　　　MR. ARIAS-MARXUACH:  The other thing I am

23　　concerned with is that --

24　　　　　　THE COURT:  As a deponent she's free to be

25　　here.  And this happens in civil and other civil

1    cases, and you probably or attorneys of your firm do

2    it when there's cases that can assist.  Other clients

3    or not, so it's not impermissible for her to be here.

4         MR. ARIAS-MARXUACH:  I am concerned about

5    outbursts or silent movements to the jury when

6    Mr. Ambush is testifying.  This case --

7         THE COURT:  But that I can take care of

8    because I can just give, as I do in many cases, just

9    a general instruction to everybody in the public that

10   anybody who makes a face or remarks or does anything

11   will be escorted outside of the courtroom.  So

12   that -- I don't think that will be an issue and --

13        MR. ARIAS-MARXUACH:  You can deal with it.

14        But, again, I am concerned that if Mr. Efron

15   alludes to her presence here, it will be an attempt

16   to bring in impermissible character evidence alluding

17   to another controversy which pertains to people that

18   were not in the --

19        THE COURT:  Let me say this:  At this time

20   and in the pretrial and from the evidence, and then

21   I'll hear from Mr. Efron, that's going to appear

22   before the jury there's only these two families.  So

23   I think any attempt to, based on my rulings, to bring

24   10, 20, 5, 3, 2, 1 families who have similar issues

25   would be improper.  And I don't think that's going to

1    happen.  Let me hear from Mr. Efron.

2         MR. EFRON:  First of all, just to clarify

3    because I know Mr. Arias is just repeating what he

4    heard but he doesn't know, Lourdes Dominich-Guzman's

5    state court case where she and all of the heirs are

6    being represented by Cuevas-Segara and myself in

7    getting all the probate matters done, all of the

8    heirs, including the ones that originally Mr. Ambush

9    signed, have named her as the *albacea*, as the

10   personal representative of my estate.  So everybody

11   is in agreement -- in that case there's 46 heirs.

12        It was not easy, but Mr. Cuevas has a lot of

13   muscle.  In fact four or five of the seven branches,

14   to begin with, we were able to get everybody to line

15   up, get behind Lourdes Dominich-Guzman.  And that is

16   the status of that case right now, which really--

17        THE COURT:  That case is irrelevant to this

18   case.

19        MR. EFRON:  It's irrelevant to this case but

20   I'm going to ask him some questions regarding this

21   family.  And I'm going to -- and in that sense I can

22   see why Lourdes Dominich would make him nervous

23   after --

24        MR. ARIAS-MARXUACH:  That's the problem,

25   Your Honor.  He's going to --

1          THE COURT:  Yeah, but my question is, are

2     you going to allude to --

3          MR. ARIAS-MARXUACH:  Again, he's trying to

4     interject --

5          THE COURT:  -- Lourdes when asking him

6     questions.

7          MR. EFRON:  I am going to ask him questions

8     about Lourdes Dominich-Guzman in the sense -- I'll --

9          THE COURT:  Let's get a proffer.

10         MR. EFRON:  I'll get a proffer.

11         THE COURT:  You have a ruling from the

12    Court.

13         MR. EFRON:  I'll get a proffer.  Our

14    position and under the civil code Dolo can also be

15    one of the many ways, it's not just by

16    misrepresentations and -- by misrepresentations and

17    by withholding information.  It's also by

18    intimidation, by intimidation.

19         When Lourdes Dominich rejected Ambush's

20    representation, not that he can practice in Puerto

21    Rico and do this anyway, but when she rejected this

22    representation he threatened her to the point that

23    she obtained a protective order from the Bayamon

24    State Court, which we are not producing into

25    evidence.  I'm just going to ask Mr. Ambush about

1   those cases, and she's here to assist.

2         And that's the type of intimidation that him

3   and Leopoldo Garcia, on his behalf, do in order to

4   intimidate these clients to sign the 10 percent.

5   When they don't, this is what happens to them.  So

6   really among other things that I'm also going to ask

7   him about as to what happens to the clients that

8   don't sign on with him, but those are other crimes

9   that we're going to go into.

10        MR. ARIAS-MARXUACH:  There he said it.  404,

11   inadmissible character evidence, Your Honor.

12        THE COURT:  But let me say this:  This

13   sounds, number one, like you're trying to get it

14   through 404(b).

15        MR. EFRON:  No.  I'm sorry, go ahead.

16        THE COURT:  But my other question goes

17   beyond that.  Was this ever an issue or a matter that

18   was brought in discovery.  I don't, see as part of

19   the theory of the case --

20        MR. EFRON:  I think in the depositions he

21   was asked about that.

22        THE COURT:  About this woman?

23        MR. EFRON:  Yeah, of course.

24        MR. ARIAS-MARXUACH:  There is not --

25        MR. EFRON:  The other issue that the

1  defendants had was that Dr. Michael Engelberg

2  couldn't leave last night because of -- you know,

3  flights were gone by then so he's also here.

4  THE COURT:  Well, he can be here and I will

5  put on instructions of the Court that, again, if

6  there's any other witnesses --

7  MR. EFRON:  We do not intend to bring either

8  one of them as rebuttal witness and they have a right

9  to be here.

10  MR. ARIAS-MARXUACH:  On the contrary, they

11  would have to be excluded under Rule 615.  Your

12  Honor, this is an attempt to bring in impermissible

13  character evidence, a witness that is not listed in

14  the pretrial order, Page 25 of Docket 137, and it

15  will lead to a mistrial.  Your Honor, we will have

16  wasted a week of our lives on this case; because he

17  is trying to bring in an irrelevant dispute, another

18  family, to prove that Mr. Ambush is somehow acting in

19  conformity with some type of character.

20  This is irrelevant.  He was not listed in

21  the pretrial order -- she was not listed in the

22  pretrial order.

23  MR. EFRON:  She's not a witness, Your Honor.

24  MR. ARIAS-MARXUACH:  No, she's not a

25  witness, but he's going to delve into matters that

1    are not listed in the pretrial order either.  The

2    First Circuit is very clear, that matters not raised

3    in the pretrial through developed argumentation are

4    waived.  The controlling case is Leyva v. On the

5    Beach.

6              MR. EFRON:  Your Honor.

7              MR. ARIAS-MARXUACH:  I haven't finished.

8              THE COURT:  Let him finish.

9              MR. ARIAS-MARXUACH:  I urge the Court to

10   look in this pretrial for a reference to Lourdes

11   Guzman, a developed claim that they will proffer this

12   evidence.  There is no proffer of that evidence.

13   They are trying to bring in through the kitchen door

14   impermissible character evidence.

15             MR. EFRON:  What was the rule?

16             MR. ARIAS-MARXUACH:  The case is Leyva v. On

17   the Beach.

18             MR. EFRON:  I know the case; what was the

19   rule?

20             MR. ARIAS-MARXUACH:  The rule?  The rule is

21   Rule 16 where you have to prepare a detailed proposed

22   pretrial order, sir.  Okay?

23             MR. EFRON:  Yeah, I know.

24             MR. ARIAS-MARXUACH:  And it will lead to a

25   mistrial, Your Honor.  If Lourdes Guzman has a

1    grievance with Joshua Ambush, then she should file a

2    case, harsh as it sounds --

3            THE COURT:  Well, she does have a case.

4            MR. ARIAS-MARXUACH:  She doesn't have a case

5    here right now.

6            THE COURT:  She has one in state court.

7            MR. ARIAS-MARXUACH:  She has one in state

8    court with her family.

9            MR. EFRON:  What she has, Your Honor, is a

10   protective order against Mr. Ambush.

11           MR. ARIAS-MARXUACH:  No, she doesn't have a

12   protective order because she filed for a protective

13   order and then did not dare to testify against

14   Mr. Ambush; she withdrew the application.  And you

15   are misrepresenting that to the Court.

16           MR. EFRON:  I am still -- I am still able to

17   make reference to her in his testimony even if she

18   weren't here.

19           THE COURT:  Well, let's assume she's got 55

20   protective orders, one from every state and one from

21   every U.S. territory in the District of Columbia,

22   let's assume, what's -- again, that would probably

23   be -- that's 404(b) because the problem is -- you

24   know, the issue is, you know -- and, again, in this

25   case, number one, she's not a plaintiff, she's not --

1          MR. EFRON:  She's not a witness.

2          THE COURT:  Again, she's not a witness, but

3    then you're trying to suggest that because he had any

4    problems with that particular individual that he's

5    also done the same thing with these persons.  And

6    these persons --your clients have already testified

7    as to how he came.  If the jury were to believe them,

8    you know --

9          MR. EFRON:  I think I'm allowed to impeach a

10   defendant even if -- even on direct because he is the

11   defendant, he is the opposing party.  And if I can

12   impeach him based on his other actions, which are

13   relevant to this case, they are relevant to this

14   case, it's the whole --

15         THE COURT:  But you can impeach him, that's

16   the rule of impeachment, but then you still have the

17   404(b) hurdle.  You're trying to impeach based on

18   other crimes, wrongs, or acts.  It -- you know, it

19   has to be one of the exceptions --

20         MR. EFRON:  I can still ask him about other

21   cases that he's handled or not handled even if she

22   wouldn't be here.

23         MR. ARIAS-MARXUACH:  And it would be

24   irrelevant because it will run into the same 404

25   problem.  You see, Your Honor, this is the game

1    that's been going on this week.  First it was the

2    invoices that were not listed in the pretrial order,

3    which he could have gotten that from the American

4    Center for Civil Justice.

5          THE COURT:  Don't go into those issues.

6          MR. ARIAS-MARXUACH:  Well, again, an attempt

7    to bring impermissible character evidence, make

8    reference to a person who was not listed in the

9    proposed pretrial order, inject collateral matters

10   that are irrelevant and highly prejudicial and have

11   no probative value.  It will lead to a mistrial, Your

12   Honor, and we'll have wasted a week of our lives and

13   the resources of the United States and the time of

14   our clients.

15         MR. EFRON:  Your Honor, any question we

16   would ask the defendant on these matters, we've laid

17   the foundation and, Your Honor, would rule of course

18   if it's relevant or not.  You cannot --

19         MR. ARIAS-MARXUACH:  And by the time we get

20   there, the jury --

21         THE COURT:  Let him finish.

22         MR. EFRON:  Whether she's here or not, we

23   can still make reference to her.  And I don't see how

24   he now tells me that under Rule 16, we need to have

25   everybody that we make reference to on the list, on

1    the witness list.

2         THE COURT: Perhaps not unnecessarily on

3    Rule 16 but the problem is there's a proposed

4    pretrial order, it was accepted by the Court. If you

5    intended to suggest or to use 404(b) and show the

6    modus operandi, that is something, I believe, should

7    have been put in the pretrial order. They would have

8    been able to file a motion in in limine but -- and

9    even if I deny it because it could be, but the

10    problem is they're not on notice in the pretrial

11    order that you intend to prove this, again, through

12    in this manner; that is, you know, it's also a due

13    process concern. They're not aware that you intended

14    to do this.

15         You know, I think at least for purposes of

16    your direct -- you know, I believe, you know, 404(b)

17    would preclude any such mention of any such

18    questions, whether Mr. Ambush -- one of his answers

19    opens the door then based on an answer of his you

20    might have that opportunity, you know, if he were to

21    suggest, Oh, I've never done that against them or

22    anybody else, you know, something like that then, you

23    ask, you ask for a side bar. But I think at the

24    outset this is 404(b), this is not announced as part

25    of the theory of the case, that this was a pattern

1   not only of these individuals and other persons.  And

2   the problem is, we also start running into 403 issues

3   because you're bringing a case or matters that --

4   because for you it might be two or three questions

5   but then Mr. Arias or Mr. Freese would perhaps have

6   to be here for a full day to --

7          MR. EFRON:  Rehabilitate.

8          THE COURT:  -- rehabilitate the witness.  So

9   that's the Court's position at this time.

10         MR. EFRON:  We'll be careful, Your Honor.

11  The --

12         THE COURT:  Okay, but you cannot ask about

13  that other person, you have to stick to what happened

14  in regards to these individuals.  That's the Court's

15  ruling on the 404(b), it would also be 403, and also

16  the proposed pretrial order it's not appearing that

17  that was announced.

18         MR. EFRON:  But getting to the bottom of

19  this, because they're not witnesses and they're not

20  going to be used for a rebuttal, they're allowed to

21  stay in court.

22         THE COURT:  They can be here.  And what I

23  will do is, before the jury comes in, I will just

24  give a very general instruction to everybody who's

25  here in the public, we have an interpreter if they

1    need it, that they are just to have a poker face as

2    all times, that they're not in any way -- you know,

3    and if I see anybody reacting to testimony or, you

4    know, doing anything that could prejudice the jury, I

5    will just excuse that particular person from the

6    courtroom.  And that's the way I handle all the

7    cases.

8            MR. EFRON:  Yes, your Honor.

9            THE COURT:  And it works both ways because

10   Mr. Ambush has also had other persons interested in

11   his position on the case who have been here, but

12   they've been poker faced the entire time.  There was

13   an attorney yesterday and he's been there and like

14   nobody knows him.  People see him, but nobody's aware

15   of his presence.

16           So what I would ask is that you tell

17   Mr. Engelberg and the other person, since you know

18   them, that that is what the Court expects of

19   everybody --

20           MR. EFRON:  I will, Your Honor.

21           THE COURT:  -- and I will also give that

22   general instruction before -- or when the jury is

23   here or before the jury comes in.

24           MR. EFRON:  You should do it before the jury

25   comes.

1          THE COURT:  Now, let me ask, who also -- who

2     is your next witness?

3          MR. EFRON:  Maria Rodriguez-Robles.

4          THE COURT:  And after that Mr. Ambush?

5          MR. EFRON:  Yes, sir.

6          THE COURT:  Let me also note that when you

7     call Mr. Ambush, of course he's your witness, you'll

8     examine him as you want, based on my ruling.  What I

9     will do is, because after you're done Mr. Arias will

10    have an opportunity.  I will inform this jury that

11    this is a witness that's going to be called by both

12    parties and that's why I'm allowing Mr. Arias when

13    it's his turn to go beyond the scope and then you're

14    also going to be able to cross-examine.  Of what you

15    asked and also cross examine and redirect.  What is

16    very important, Mr. Arias, because what I proposes

17    that you do, and you take your time when you're doing

18    your examination of your witness, there may be some

19    questions that you're asking him --

20         ARIAS-MARXUACH:  In response.

21         THE COURT:  -- in response to Mr. Efron.  So

22    what I suggest is that when you ask the questions

23    say, you may want to identify for the record this is

24    in response to the questions posed by Mr. Efron.  And

25    when you move to another line, you say now I'm going

1    to move as part of our case to these question.

2    And I'll give you flexibility.  If you go back to

3    some of Mr. Efron's questions, then you have to say

4    these questions I'm posing on Mr. Ambush for the

5    record in response to Mr. Efron's questions.

6          But you have a combination of -- and some of

7    it may overlap, so I will give you -- I will give you

8    extreme leeway the same way I will give leeway to

9    Mr. Efron when he does his redirect.  You know, I

10   just want to give everybody the best opportunity to

11   question Mr. Ambush, so we'll do it that way.

12         So let me take two minutes recess.  Let me

13   bring Mr. Engelberg and the other person here.  Does

14   he speak English or no?

15         MR. EFRON:  Yes.

16         THE COURT:  Okay.  So I will advise

17   everybody and then we'll bring in the jury.

18         (Jury Trial recessed at 10:12 a.m. and

19   resumed at 10:13 a.m.)

20         THE COURT:  Now that everybody here is

21   present, let me just make a general instruction to

22   everybody, including the public, we are now going to

23   continue the jury trial.  We have eight jurors and it

24   is very important -- I know that at some point

25   Mr. Ambush is going to be on the stand, some very

1    sensitive questions are going to be asked.

2           Some of you in the public definitely do not

3    like him or may react in a negative manner, but I ask

4    everybody who's sitting in the public, you need to

5    keep a straight face, do not make any faces, do not

6    react.  If you have to react, go outside and react

7    outside because I do not want anyone in any way

8    influencing the jury.

9           And if you make any faces, either in favor

10   or against what Mr. Efron questions or Mr. Arias's

11   questions or Mr. Ambush would respond, that may

12   influence the jury one way or another, it could cause

13   a mistrial.  And if you're here in support of the

14   plaintiffs, that could cause a mistrial and the

15   plaintiffs could have had a day in court.

16          And, vice versa, it also applies to the

17   defense witnesses -- or not witnesses, but any

18   persons interested in this case.  So that's just a

19   general observation, please keep that in mind.  And

20   my rule is not because of any of you here in

21   particular, but my rule is anybody who violates that

22   norm will be escorted outside of the courtroom.

23          So please keep that in mind, if you want to

24   see the proceedings, it's public.  But, again, I need

25   everybody to keep a straight face.

1      Okay.  Let's take a two-minute recess and

2  then we'll bring in the jury.

3           (Jury Trial recessed at 10:15 a.m. and

4  resumed at 10:23 a.m.)

5           (Jury enters the room.)

6           THE COURT:  Please be seated.

7           Good morning, Ladies and Gentlemen of the

8  Jury, again we were discussing some housekeeping

9  matters with counsel.  We also had some delays, but

10  now we're ready.

11           So, Mr. Efron, call your sixth witness.

12           MR. EFRON:  Yes, your Honor.

13  Ms. Rodriguez-Robles is on the stand but she has not

14  been sworn.

15           THE COURT:  Okay.  Call her name and then

16  we'll place her under oath.

17           MR. EFRON:  Our next witness would be

18  Plaintiff Maria Rodriguez-Robles.

19           THE CLERK:  Would you please raise your

20  right hand?  Do you solemnly swear to tell the truth,

21  the whole truth and nothing but the truth, so help

22  you God?

23           THE WITNESS:  Yes.

24                          ---

25           MARIA M. ROBLES-RODRIGUEZ, a Plaintiff,

1    having been duly sworn by the Clerk, was examined and

2    testified as follows:

3                    DIRECT EXAMINATION

4    BY MR. EFRON:

5    Q.        Witness, please state your name and

6    introduce yourself to the members of the jury.

7    A.        I am Maria M. Rodriguez-Robles.

8    Q.        Your family calls you with another name,

9    correct?

10   A.        Monin.

11   Q.        Who was your father?

12   A.        Antonio Rodriguez.

13   Q.        Did you receive compensation for the death

14   of your father?

15   A.        Yes.

16   Q.        How did this case start?  Did you see a

17   newspaper article?

18            THE COURT:  Rephrase the question.  That's

19   leading.

20   BY MR. EFRON:

21   Q.        How did this case begin?

22   A.        What do you mean?

23   Q.        Did somebody call you about this case?

24   A.        Yes; my sister.

25   Q.        What did she see that made her call you?

Maria M. Rodriguez-Robles - Direct

1    A.        She -- some newspaper, some newspaper that

2    she had that she informed us.

3    Q.        So what is this case about?  Why are you a

4    plaintiff in this case?

5    A.        Because we are owed some money.

6    Q.        Because of what?

7    A.        It's that I don't -- I'm so nervous, I

8    don't...

9    Q.        It's okay.  Who is Joshua Ambush, if you

10   know?

11   A.        I don't recall, I don't recall.

12   Q.        Was he your lawyer in the compensation case?

13   A.        Yes.

14   Q.        Why are you here claiming that he owes you

15   money?

16   A.        Because they didn't give to us -- we did not

17   receive it in full, to me.

18   Q.        Until what grade did you go to school?

19   A.        Until senior year of high school.

20   Q.        What high school did you go to?

21   A.        The Vega Baja High School.

22   Q.        Were you able to graduate?

23   A.        I didn't get to graduate.

24   Q.        How do you feel about the fact that you

25   believe that Mr. Ambush did not pay you in full?

Maria M. Rodriguez-Robles - Direct

1     MR. FREESE-SOUFFRONT: Objection. Leading.

2     THE COURT: Overruled.

3   A.     Imagine. You feel disappointed, sad,

4   because you need it.

5   BY MR. EFRON:

6   Q.     Are all of your brothers and sisters here

7   today?

8   A.     I'm sorry?

9   Q.     Are all of your brothers and sisters here

10  today?

11  A.     No.

12  Q.     Who's here?

13  A.     Noemi and Eliezer.

14  Q.     Who is not here?

15  A.     Ruth and Angel.

16  Q.     Where is Angel?

17  A.     He left on a trip and Ruth is in Florida,

18  she lives in Florida.

19        MR. EFRON: *Muchas gracias*.

20        THE COURT: Mr. Arias or Mr. Freese, cross.

21             CROSS-EXAMINATION

22  BY MR. FREESE-SOUFFRONT:

23  Q.     Good morning, Ms. Rodriguez.

24  A.     Good morning.

25  Q.     Ms. Rodriguez, you retired in 2000, right?

Maria M. Rodriguez-Robles - Cross

1    A.       Yes.

2    Q.       Ms. Rodriguez, you mentioned an individual

3    named Javier Lopez-Perez?

4             MR. EFRON:  No, she didn't.

5    BY MR. FREESE-SOUFFRONT:

6    Q.       You did not?

7    A.       I don't recall now.

8    Q.       Did you ever meet an individual called

9    Javier Lopez-Perez?

10   A.       No.

11   Q.       You have never spoken to Javier Lopez-Perez?

12   A.       No.

13   Q.       Do you know if your sister Noemi ever spoke

14   with Javier Lopez-Perez?

15   A.       I don't recall, it's been some time.

16   Q.       And if Noemi had met with Javier

17   Lopez-Perez, you don't recall if she said anything to

18   you about that meeting?

19   A.       I'm so nervous, I don't...

20   Q.       You're okay to continue, right?

21   A.       I'm quite nervous and I feel a little bit

22   dizzy.

23   Q.       I know from your deposition that you take

24   high blood pressure medication; did you take it

25   today?

Maria M. Rodriguez-Robles - Cross

1    A.        Yes.

2              THE COURT:  Okay.  Let me inform the

3    witness, if you need to stand up for one or two

4    minutes break, feel free.  Just inform the Court and

5    we will recess.  I know it is probably -- I know as a

6    witness you're probably nervous, but feel as

7    comfortable as possible.  Nobody here, the jury, the

8    Court, nobody is going to bite you so...

9              THE WITNESS:  Okay.

10   BY MR. FREESE-SOUFFRONT:

11   Q.        Ms. Rodriguez, is it fair to say that what

12   you know about the allegations that are being made

13   against Mr. Ambush in this case came from what Noemi

14   told you?

15   A.        Repeat it because I don't understand very

16   well.

17   Q.        What you know about the allegations that are

18   being made against Mr. Ambush in this case, came from

19   what your sister Noemi told you, right?

20   A.        Yes, yes.

21   Q.        You do not know an entity called the

22   American Center for Civil Justice, right?

23   A.        No.

24   Q.        And you were here yesterday and there was a

25   person sitting in that same chair called Mr. -- or

Maria M. Rodriguez-Robles - Cross

1    Dr. Michael Engelberg, and what I want to know is if

2    you had met that person ever prior to yesterday?

3    A.       No.

4    Q.       Ms. Rodriguez, do you remember if you were

5    at the meeting in December of 2008 at Efrain

6    Berganzo's house?

7    A.       Yes.

8    Q.       Okay.  And do you recall if Joshua Ambush

9    was at that meeting?

10   A.       To me, yes but, I don't recall who he was, I

11   don't recall who he was.

12   Q.       What I want to know is if you recall if he

13   was present at the meeting?

14   A.       Yes.

15   Q.       Okay.  And do you recall signing some

16   documents at that meeting?

17   A.       Yes.

18   Q.       And do you recall signing an agreement to

19   pay Mr. Ambush 10 percent?

20   A.       To me a paper was signed, but -- we signed a

21   paper.

22            MR. FREESE-SOUFFRONT:  I'm going to ask that

23   the witness be shown Joint Exhibit No. 11.

24   BY MR. FREESE-SOUFFRONT:

25   Q.       Let me know when you have the document

Maria M. Rodriguez-Robles - Cross

1    before you.

2           Now, this is a joint exhibit that's entitled

3    retainer agreement; what I want you to tell me, go

4    through the pages of that joint exhibit and let me

5    know if you recognize your initials?

6    A.      Yes.

7    Q.      Your initials are in all pages, correct?

8    A.      Yes.

9    Q.      And if we go to the last page, you also find

10   there your significant, right?

11   A.      Yes.

12   Q.      Okay.  And also in that last page we have

13   the signature of your sister Noemi Rodriguez-Robles,

14   right?

15   A.      Yes.

16   Q.      We also have the signature of your brother

17   Angel Rodriguez-Robles, right?

18   A.      Yes.

19   Q.      And we also see the signature of Eliezer

20   Rodriguez-Robles?

21   A.      Yes.

22   Q.      He's also your brother?

23   A.      Yes.

24   Q.      And we also see the signature of Maria

25   Rodriguez-Robles which is yourself, right?

Maria M. Rodriguez-Robles - Cross

1    A.       Yes.

2    Q.       Do you recall if the individuals that I have

3    mentioned to you signed that agreement at the

4    meeting?

5    A.       Yes.

6    Q.       And they were with you?

7    A.       Yes.

8    Q.       Now, there's another person here called Ruth

9    Rodriguez-Robles?

10   A.       Yes.

11   Q.       She's a sister?

12   A.       Yes.

13   Q.       And she did not sign the agreement there

14   because she was not in Puerto Rico, right?

15   A.       Yes.

16   Q.       She signed the agreement in Florida, right?

17   A.       Yes.

18   Q.       Now, this agreement that you have in front

19   of you is written in Spanish and English, right?

20   A.       Yes.

21   Q.       And now, I know that you said that you did

22   not graduate from high school, you only -- your last

23   year was your senior year, right?

24   A.       Yes.

25   Q.       And I don't know if Brother Counsel asked

Maria M. Rodriguez-Robles - Cross

1    you this, but I understand that you speak a little

2    English, right?

3    A.        I don't know English.

4    Q.        Nada?

5    A.        Nada, nothing.

6    Q.        But you speak Spanish?

7    A.        Yes.

8    Q.        And you read in Spanish, right?

9    A.        Yes.

10           MR. FREESE-SOUFFRONT:  One second, Your

11   Honor.  I don't have any further questions.

12           THE COURT:  Mr. Efron, any redirect?

13           MR. EFRON:  No, Your Honor.

14           THE COURT:  The witness is excused.

15           Now, Mr. Efron, call the next witness.

16           MR. EFRON:  Plaintiffs call Defendant Ambush

17   to the stand, Your Honor.

18           THE COURT:  Now, before Mr. Ambush is sworn

19   in, let me advise, Ladies and Gentlemen of the Jury,

20   in this case Mr. Ambush is going to be called by

21   Mr. Efron as his witness and he will also be called

22   by his attorneys as his own witness.  So this is

23   Mr. Efron's last witness.

24           Correct?

25           MR. EFRON:  Yes, your Honor.

1          THE COURT:  And in your case in chief?

2          MR. EFRON:  Yes, your Honor.

3          THE COURT:  What I have done, I have asked

4    Mr. Efron to call Mr. Ambush, his last witness, so

5    both parties will have Mr. Ambush only one time on

6    the stand.  Otherwise, Mr. Efron would call him and

7    then at some other point he would be called again.

8    So Mr. Efron will ask him his direct examination and

9    then I will give some leeway to Mr. Ambush's

10   attorneys to not only respond or cross-examine

11   Mr. Ambush but also to ask additional questions which

12   they will be posed.

13          So Mr. Ambush will be here as a witness for

14   the plaintiffs and also as a witness for the

15   defendant.  It was just to do it in one block of

16   time.  That's going to expedite the case.  So

17   everybody's in agreement to that.

18          So Mr. Efron -- Mr. Ambush, let's place you

19   on the stand.

20          MR. EFRON:  We won't need Myra.

21          THE COURT:  No, we won't need an

22   interpreter.  Thank you.

23          THE INTERPRETER:  Thank you.  Have a great

24   day.

25          MR. EFRON:  Thank you very much.

1          THE CLERK:  Sir, please raise your right

2   hand.  Do you solemnly swear to tell the truth, the

3   whole truth and nothing but the truth, so help you

4   God?

5          THE WITNESS:  I affirm.

6          THE COURT:  He may sit down.  He answered

7   truthfully.

8          THE CLERK:  You don't want the other oath?

9          THE COURT:  That's okay.

10                         ---

11      JOSHUA M. AMBUSH, ESQUIRE, the Defendant,

12  having affirmed to tell the truth, by the Clerk, was

13  examined and testified as follows:

14           PLAINTIFFS' DIRECT EXAMINATION

15  BY MR. EFRON:

16  Q.      Good morning, witness.

17  A.      Good morning.

18  Q.      Please state your name for the record.

19  A.      Joshua M. Ambush.

20  Q.      Have you ever used any other names?

21  A.      I have a nickname.

22  Q.      Have you specifically gone to the circuit

23  court for Baltimore City for a name change?

24  A.      Yes.

25  Q.      So you have used other names before?

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    A.        My birth name was Maxwell David Ambush.

2    Q.        How many other names have you been known

3    as -- or known with, I'm sorry?

4    A.        I will give you Shea.

5    Q.        I'm talking about legal names, you're using

6    now Joshua Ambush; as an attorney your name is Joshua

7    Ambush?

8    A.        Correct.

9    Q.        Is that your full name?

10   A.        That is my full name.

11   Q.        And before that you were Maxwell Ambush?

12   A.        Maxwell David Ambush.

13   Q.        But now you're Joshua Ambush?

14   A.        Correct.

15   Q.        You have no other legal identities?

16   A.        That's correct.

17             MR. EFRON:  If we could show him Joint

18   Exhibit 24.

19   BY MR. EFRON:

20   Q.        Have you seen that document before?

21   A.        Yes.

22   Q.        Did you redact or draft this document?

23   A.        Yes, I drafted it.

24   Q.        All of it or only the English part?

25   A.        The English part.

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    Q.        Who wrote out the Spanish part?

2    A.        I believe it was Leopoldo Garcia and I may

3    have had help from a staff member.

4    Q.        Who is Leopoldo Garcia?

5    A.        My cousin.

6    Q.        How is he your cousin?

7    A.        He is my mother's first cousin.

8    Q.        So he's like really a relative, a second

9    cousin of yours?

10   A.        If you will.

11   Q.        And who is he besides being your cousin?

12   What does he do?

13   A.        Currently I believe he's retired.

14   Q.        What does is he retired from?

15   A.        He was the chief -- fire chief for the

16   island of Puerto Rico.

17   Q.        He was the fire chief what?

18   A.        He was a fire chief, a fire chief, head of

19   civil defense.

20   Q.        In what city?

21   A.        For the island of Puerto Rico.

22   Q.        He was the chief of civil defense?

23   A.        Essentially the job description of fire

24   chief was a misnomer, so that he never ran on a fire

25   truck or anything like that, but he was in charge of

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    all of the civil defense and hurricane disaster

2    relief, that kind of thing, for the entire island.

3    Q.      When was this document prepared?

4    A.      This was prepared the week of December 15,

5    2008.

6    Q.      Why did you prepare this document?

7    A.      I prepared this document so that I can use

8    it when I spoke to my clients regarding the retainer

9    agreement that I was seeking from them.

10   Q.      As to these particular clients, did you

11   speak to them directly or through an interpreter?

12   A.      Both.

13   Q.      Do you speak any Spanish?  So --

14   A.      No -- a little bit, *un poquito.*

15   Q.      Enough to as a lawyer be able to explain a

16   document?

17   A.      No.

18   Q.      Do any of them speak English?

19   A.      I believe so.

20   Q.      Who?

21   A.      Mr. Efrain Berganzo.

22   Q.      How strong is his English?

23   A.      It seemed strong enough when I spoke to him

24   that he understood what I was speaking about.

25   Q.      Was he doing the talking or the listening?

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    A.       Both.

2    Q.       What is the purpose of this document?

3    A.       The purpose of this document is twofold:

4    One is to ascertain that we're ratifying the fact

5    that I was the attorney for these families since the

6    beginning of the case; and the second was to ratify a

7    fee that I was asking them to pay me, and ratifying

8    their agreement to pay it.

9    Q.       What was the fee for?

10   A.       The fee was for the work that I did for them

11   on their -- and on their behalf in regard to the --

12   what's known as the Vega-Franqui litigation.

13   Q.       But they had signed a document called a

14   center agreement some years before, six years before

15   to be exact, where legal fees were included; is that

16   not correct?

17   A.       That's not correct.

18   Q.       No?  What did they sign when they signed The

19   Center agreement?

20   A.       They signed -- they signed an agreement

21   between themselves and the Center that --

22   Q.       Included legal fees and costs?

23   A.       That's not what I'm saying.

24            The Center agreement was not a legal

25   retainer agreement because the Center is not an

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1  attorney.  It authorized the Center to undertake

2  certain matters and in exchange the Center was

3  expecting a payment from the individuals, but you're

4  confusing it as a legal attorney retainer agreement.

5  So when it says the fees and costs, it's obligating

6  the Center to pay fees and costs.

7  Q.       As far as you know did the Center pay any

8  attorney fees and costs in this case?

9  A.       They paid some fees and they paid some

10 costs.

11 Q.       Who is Paul Gaston?

12 A.       He's a friend of mine.

13 Q.       And Paul Gaston was paid his fees and costs;

14 is that correct?

15 A.       I have no knowledge of that.

16 Q.       Did Mr. Gaston have a written fee agreement

17 with the Center for his work in this case?

18 A.       Okay.

19 Q.       Please answer my question.

20 A.       The answer is, I've learned now that he did

21 have one.

22 Q.       Did you have one?

23 A.       No.

24 Q.       But, nevertheless, although you didn't have

25 one you were paid based on your requests for advanced

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    checks and billings; is that correct?

2    A.        That is incorrect.

3    Q.        On what basis were you paid?  Was it

4    charity?  Gifts?  On what basis were you paid by the

5    Center?

6    A.        For the vast majority of time I was not paid

7    by the Center, it was only at certain times towards

8    the latter years of the case was ongoing that I

9    requested from Rabbi Perr, one of the principals of

10   the Center that, I get paid some money so that I can

11   essentially live and devote more time to this case.

12   Q.        Who is Rabbi Perr?

13   A.        Rabbi Perr is a longtime family friend who

14   was one of the organizers of the Center.

15   Q.        How long have you known him?

16   A.        Since 1973.

17   Q.        So since you were a child?

18   A.        Correct.

19   Q.        What kind of a relationship did you have

20   with him, you personally?

21   A.        One minute, please.

22   Q.        Take your time.  If you need a -- if you

23   need a break --

24   A.        I'm fine, I'm really fine.

25   Q.        -- let the Court know.

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    A.        Thank you, I'm fine.

2              Rabbi Perr -- I'm sorry, can you repeat your

3    question?

4    Q.        Your relationship with Rabbi Perr?

5    A.        I went to back to Rabbi Perr when I was a

6    child.  My family ended up in Baltimore and Rabbi

7    Perr had a congregational.  He was the rabbi.  My

8    father knew him from those days.  That was only for a

9    brief time, about one year.  It was only years later

10   that I moved back to New York City, after spending

11   undergraduate years in Israel, when my father

12   reintroduced me to Rabbi Perr.  And Rabbi Perr at

13   that point had offered me a job and we developed a

14   closer relationship at that time.

15   Q.        What about through the years; did you

16   continue in contact with the Rabbi?

17   A.        Yes, I did.

18   Q.        In what way?

19   A.        A number of ways.  I lived next door to him,

20   he offered me a job at a school he was running.  And

21   regarding these matters, I dealt with him regarding

22   my interests in International Law.  During law school

23   I had approached him and spoke to him about my

24   interest in International Law and he told me about an

25   organization he was in the midst of founding that's

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    focus was to promote civil justice.

2    Q.       You graduated --

3            THE COURT:  Mr. Efron, one of the jurors

4    needs to use the restroom.  We've been here a little

5    while, let's take a five-minute recess and then we'll

6    continue until noontime.

7            THE COURT OFFICER:  All rise for the jury.

8            (Jury exits the room.)

9            (Jury Trial recessed at 10:54 a.m. and

10   resumed at 11:05 a.m.)

11           (Jury enters the room.)

12           THE COURT:  Please be seated.

13           Mr. Efron, let's continue with your direct.

14           MR. EFRON:  Could the witness be handed

15   Joint Exhibit 21.

16   BY MR. EFRON:

17   Q.       Are you familiar with that document

18   Mr. Ambush?

19   A.       Yes, I am.

20   Q.       How so?

21   A.       This was a document that was initially a

22   blank document that I had given to Leopoldo Garcia in

23   the event that we were able to identify or locate

24   additional potential claimants to a lawsuit we

25   intended -- I intend to file.

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    Q.        Did you prepare this document or was it a

form that the Center already had in its files?

2    A.        It was a form the Center already had.

3

4    Q.        Did you review it for legal correctness and

5    any comments before you sent it out?

6    A.        There was nothing to comment on other than

7    the first paragraph perhaps, which was the only

8    difference essentially from other documents that they

9    had.

10   Q.        The -- if we look closely, as we did

11   yesterday, at the faxed header of the -- of the

12   document, we see that, although it's scratched out,

13   it was sent out from your office in 2002 on or about

14   that day; is that correct?

15   A.        I can't read what's scratched out.

16   Q.        You can't read it?

17   A.        I guess it's scratched out for a reason.

18   Q.        Uh-huh.

19            THE COURT:  Mr. Efron, you might try blowing

20   it up.

21            MR. EFRON:  I'm just trying to move it

22   along.  And we did that yesterday and it was pretty

23   clear that it was -- that it was June 11 of 2002,

24   which is the same date it was signed in Puerto Rico.

25   BY MR. EFRON:

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    Q.        When you --

2    A.        It could be.  It could be that it was faxed

3    from me but at that time.

4    Q.        Okay.  On that date, were you in Puerto Rico

5    to obtain all the potential clients' signatures?

6    A.        No, I was not.

7    Q.        Who did that?  Who obtained the signatures,

8    if you know?

9    A.        Leopoldo Garcia.

10   Q.        Leo Garcia went and did that?

11   A.        And --

12   Q.        Went, located them and obtained their

13   signatures on these documents; is that correct?  One

14   per family; is that correct?

15   A.        Correct.

16   Q.        Did you or the Center pay Leopoldo Garcia

17   any money for his time in doing this?

18   A.        Not that I recall.

19   Q.        You don't recall that he had an initial

20   1,500 dollar deposit with him to do these things?

21   A.        No.

22   Q.        Now, in June of 2002 you had just become a

23   lawyer; is that correct?

24   A.        That is incorrect.

25   Q.        When did you become a lawyer?

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    A.        In 2001.

2    Q.        So you became a lawyer; what was your

3    swearing in date in 2001?

4    A.        I don't recall the date.  It was sometime, I

5    believe, January 2001.

6    Q.        So it was a year and a few months since you

7    were an attorney that this document went out; is that

8    correct?  Sir?

9    A.        When you say "this document went out," can

10   you rephrase your question, please?

11   Q.        By June 11 of 2002 you had only been a

12   lawyer since the previous years; is that correct?

13   A.        Correct.

14   Q.        And you stated that you did not review it

15   for legal correctness?

16   A.        It was a form that was used by the Center

17   repeatedly.

18   Q.        Does that make it not correct?

19   A.        No.  That on its face doesn't make it

20   correct.

21   Q.        So the last two lines of that first page

22   indicate that there's a cap on the fees and legal

23   costs that the victim's families would pay?

24   A.        Would you like me to read it?  Would that

25   help?

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1  Q.      You can read it for yourself or you can

2  answer my question.

3  A.      The answer is, no, that is not what it says.

4  Q.      Tell me it says.

5  A.      We're starting from where?

6  Q.      Let's start from the last two lines.

7        THE COURT:  Mr. Efron, you can read it, he

8  can read it, so you can read it to him and ask him if

9  that's what it says.  The document's here it's

10 obvious so --

11 BY MR. EFRON:

12 Q.      The last two lines say the total and the

13 aggregate, including legal fees, expenditures and

14 pledges is not to exceed 20 percent of claimant's

15 recovery from the litigation; is that what it says?

16 A.      That's what it says.  That's what those

17 words say, that's correct.

18 Q.      And on the second page first paragraph it

19 tells us that the invalidity or unenforceability of

20 any part of this agreement does not affect the other

21 parts of the agreement, and it would be construed as

22 valid; is that correct?

23 A.      You did not read that correctly.

24 Q.      The invalidity or unenforceability of any

25 part of this agreement shall not affect the other

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    parts of the agreement, and the agreement shall be

2    construed in all respects as if any invalid or

3    unenforceable part were omitted; is that what it

4    says?

5    A.        You read that correctly.

6    Q.        And you read it as well when you sent it out

7    on June 11, 2002; is that correct?

8    A.        I understood what it said, yes.

9    Q.        And in order to understand what it said you

10   had to read it?

11   A.        I read this document.

12   Q.        Yes.  Is Leopoldo Garcia an attorney?

13   A.        No, he is not.

14   Q.        Let's go back to my original question, Joint

15   Exhibit 24, please.

16          Who set up that meeting with you, this

17   meeting in particular, with the Berganzo family and

18   the Rodriguez-Robles family?  Who set up the meeting

19   for you?  Who organized it?  The time?  The day?

20   Where it was going to be?

21   A.        I believe what happened was that Leo had

22   called Efrain Berganzo and Ruben Vivas, who is

23   Noemi's husband, separately.  And first we went to

24   Efrain Berganzo's house, and at that point he said

25   that he can get the Rodriguez-Robles family as well

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    together in his house.  So that's how the meeting was

2    set up.

3    Q.        How long did you stay in Puerto Rico on that

4    trip, if you remember?

5    A.        A few days.  I'm not sure.

6    Q.        Without mentioning who they were, how many

7    families of victims did you meet with during that

8    trip?  I know you met these two on December 15; how

9    many other families did you meet?

10   A.        I believe three others.

11   Q.        Three others.  And the three others signed

12   the retainer agreement; is that correct?

13   A.        That is correct.

14   Q.        Did any of the families refuse to sign the

15   retainer agreement?

16            THE COURT:  Sustained.  Objection sustained.

17   BY MR. EFRON:

18   Q.        Who was interpreting the legal meaning of

19   this document to these families?  Who was explaining

20   it to them legally?

21   A.        I don't know if it was explained in the

22   sense that you're asking.

23   Q.        Well, the sense I'm --

24   A.        If you're asking who was translating --

25   Q.        No, I'm not asking translating.  You know

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    what I mean.

2    A.      No, I don't know what you mean.

3    Q.      Let me be clear.  One thing is to read a

4    document, a legal document, and one thing is to

5    understand it.  One thing is to have it explained as

6    to what it means and what it comprises and what the

7    consequences are.

8            Who was explaining the legal reasoning and

9    the legal impact of this document to these two

10   families?

11   A.      I was.

12   Q.      In what language?

13   A.      In English.

14   Q.      Did you have an interpreter?

15   A.      The notary interpreted it and so did Leo and

16   so did Mr. Efrain Berganzo, they all added their own

17   flavor to the meeting.  But in terms of explaining

18   what I was saying, it was essentially either Leo or

19   the notary.

20   Q.      Did you understand that what they were

21   translating to this family was correct?

22   A.      To some extent I understood what they were

23   saying, but I believe that any questions that were

24   had were explained and that I understood it and they

25   understood it as well.

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1  Q.        When you say that each one of them gave it

2  "their own flavor," what does that mean?

3  A.        What I mean is, this was a conversation

4  that's being held with about a dozen people, so it

5  wasn't just a recitation and something like that, it

6  was a conversation and a discussion.  So each person

7  in a conversation con tributes somebody has a

8  question this one answers.  So I can't answer you in

9  terms of what this person said to that one and then

10  the sister-in-law said something else.  That's what I

11  mean.  Everybody contributed to the meeting.

12  Q.        Before everybody started giving it "their

13  own flavor," was the document read in its totality or

14  explained to them by you or anybody before they

15  started asking questions and commenting?

16  A.        Yes.

17  Q.        Who?

18  A.        The notary explained it, I explained it,

19  and --

20  Q.        But who read it before the explanation?

21  A.        I believe the notary read it to them in

22  Spanish.

23  Q.        You're not certain?

24  A.        I am fairly certain.

25  Q.        Now, in this document -- and of course

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    there's one for each signatory, a different one,

2    we're not going to go through each one of them.

3    After it identifies your -- after it identifies the

4    claimant and yourself with your Maryland address, it

5    tells you right after your name, and tell me if I'm

6    not reading this correctly, and --

7    A.       Can you tell me where you're reading,

8    please?

9    Q.       Right after your Zip code.

10   A.       Which paragraph?  Which page?

11            THE COURT:  Mr. Efron, if you could publish

12   it -- since you have it there, if you could show

13   everybody the page you're referring to.

14   BY MR. EFRON:

15   Q.       Right here.  Right after your -- if you look

16   at the screen, you can see my -- right after your Zip

17   code.  I just want to save us from reading through

18   everything else and move it along.

19            And it says, to represent us in the pending

20   proceeding with the Government of Libya and others as

21   defendant known as Franqui versus Syria Arab

22   Republic, et al., District of Columbia, 06-Civil-734,

23   R.P.W. and in the pending espousal and settlement

24   process pursuant to the claims settlement agreement

25   between the United States of America and the Great

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1  Socialist People's Libyan Arab Jamahiriya, dated

2  August 14, 2008.

3           Did I read that correctly?

4  A.       I believe so.

5  Q.       So you were representing these people in a

6  suit that you filed against Libya and Syria and other

7  entities in 2006; is that correct?

8  A.       That's correct.

9  Q.       Along with Paul Gaston part of the way; is

10 that correct?

11 A.       Paul Gaston introduced his appearance in

12 2008 towards the end of the case, two months before

13 the case ended.

14 Q.       Why did the case end?  Did it end because of

15 the settlement that you mentioned that I just read,

16 the claims settlement agreement between the United

17 States and Libya?

18 A.       That's not exactly how it ended.  The case

19 ended because during the interim, while the case was

20 being litigated or simultaneous to the litigation,

21 Libya had been in the process of settling with the

22 United States.  The process started approximately

23 since January of 2008.

24 Q.       Were you involved in those settlement

25 negotiations?

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    A.        No, I was not.

2             MR. ARIAS-MARXUACH:  Let him finish the

3    answer.

4    BY MR. EFRON:

5    Q.        Go ahead.  Finish your previous answer,

6    please.

7    A.        During the litigation Libya and the United

8    States separately were attempting to achieve a

9    settlement of the differences between the two

10   countries, they weren't trying to settle this case.

11            It's essentially they were trying to reach a

12   peace agreement whereby Libya would do certain things

13   that would enable the United States to then say,

14   Okay, we're no longer going to consider you a

15   terrorist sponsoring country and we'll give you

16   certain privileges that we've removed from you in the

17   past; those primarily were economic sanctions that

18   were imposed on Libya.

19            The U.S. Government would say essentially,

20   If you forever and ever promise never to commit

21   terrorism in the future and make amends for all the

22   terrorists acts you've done in the past, we will

23   grant you a new status as a nation in favor and we'll

24   allow trade between our countries and we'll remove

25   you from the terrorism list and provide other means

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    of remedies that would provide, if not a perfect

2    relationship, at least warm the relationship

3    somewhat.

4    Q.      And that was on August 14, 2008 in the claim

5    settlement agreement that you mentioned on that

6    paragraph; is that correct?

7    A.      That -- those settlement agreements or

8    discussions were ratified on that date.

9    Q.      On that date.  And in October, it was pretty

10   much October 31, it was pretty much done and

11   finalized; is that correct?

12   A.      That's when the state department announced

13   to the world that they had achieved a settlement

14   agreement.

15   Q.      So when you came down on December 15 you

16   knew that the case against Libya no longer existed;

17   is that correct?

18   A.      That is not correct.

19   Q.      And why is that?  Was it not one of the

20   requisites to the settlement, that all claimants drop

21   their legal claims against Libya in order to obtain

22   their compensation?

23   A.      You're misconstruing what the agreement

24   says.

25   Q.      What does it say about pending litigation

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    against Libya?

2    A.        In order for there to be a complete

3    settlement between the United States -- before the

4    U.S. Government would remove Libya from the terrorism

5    list, it required Libya to pay compensation to any

6    litigant who may have had a pending claim against

7    Libya.

8          So the settlement agreement did not close

9    the case, people still had pending claims against

10   Libya.  They could have chosen to continue fighting

11   and say no, I want to continue fighting Libya, I want

12   my day in court.  But if they did that, they would

13   not have received the compensation; but also Libya

14   would not have been able to get its full relations

15   with the United States.

16         The United States was encouraging and urging

17   people to close their claim and instead accept the

18   claim that the -- the fund that's being provided for

19   them, but it had no ability to mandate or force that.

20   There was still pending claims.

21         Now, if the Court had at some point answered

22   a motion to dismiss filed by Libya and said, We want

23   to dismiss the case because it's now moot because of

24   the agreement, that could have happened, but that's

25   not what was going on, on December 15, 2008.

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    Q.        On December 15, 2008 you had already made

2    the decision that it was better to follow the

3    Department of State's lead and take the settlement,

4    is that correct, rather than continue litigating?

5    A.        By December 15, 2008 I had already spoken to

6    my clients and advised them of the settlement and we

7    were already in the process of going to that extent

8    of dismissing the case and following the other

9    directions that The State Department wanted.

10           So it wasn't my decision that I had already

11   had decided to close the case and take the

12   settlement, that's the right of the client to decide.

13   And I discussed that with Efrain Berganzo prior to my

14   coming down to Puerto Rico.

15   Q.        How did you discuss it with him prior to

16   your coming to Puerto Rico?  By phone?

17   A.        With a phone call.

18   Q.        Who else was on that phone call?

19   A.        Leo Garcia.

20   Q.        Was Leo translating?

21   A.        Yes, I believe so.

22   Q.        In the lawsuit you filed, which is labeled

23   Defendant Identification G, in the lawsuit you filed

24   in the District of Columbia --

25   A.        I'm sorry can you have that exhibit --

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    Q.       Yes, I'm going to get it to you.

2    A.       Okay.

3             MR. EFRON:  Can we get Defendant's -- that's

4    joint.  Defendant's G.

5             THE COURT:  Mr. Efron, just for the record,

6    again, that's --

7             MR. EFRON:  Defendant's Identification G.

8             THE COURT:  Defendant's G.

9             MR. EFRON:  As in your last name, Your

10   Honor.

11            THE COURT:  And my first name.

12            MR. EFRON:  And your first name.

13   BY MR. EFRON:

14   Q.       Mr. Ambush, do you recognize that document?

15   A.       I sure do.

16   Q.       This is what is known as the Vega-Franqui

17   litigation; is that correct?

18   A.       That's correct.

19   Q.       And in this case you included all of the

20   families of victims of the Lod Massacre that signed

21   on with the Center for this purpose; is that correct?

22   A.       That is correct.

23   Q.       And it's the Vega-Franqui family, the

24   Vega-Moraleses, the Guzman-Rosados, the

25   Rodriguez-Robleses, the Victor Padilla-Ortizes, the

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1   Berganzos, an Israel official, Jesus Cantres, Ruben

2   Vivas?

3   A.          And Rosa Vazquez as well.

4   Q.          And Rosa Vazquez, thank you.

5           The defendants were the Syrian Arab

6   Republic, its president; the Syrian Air Force

7   intelligence, its chief; Syrian Arab Airlines; the

8   PLO; the PLFP; the Japanese Red Army; Republic of

9   Libya and its dictator -- ex-dictator, Muammar

10  Gaddafi, as well as the Libyan external security

11  organization -- whatever that means.

12          So basically --

13  A.          And John Does 1 through 99.  Don't forget

14  that.

15  Q.          Yes.  We lawyers always put those things in.

16          If you could go to Page 17?

17          THE COURT:  Okay, but do you move to admit

18  the document as an exhibit?

19          MR. EFRON:  Yes, your Honor.

20          THE COURT:  It's admitted.  And this would

21  be Defendant's Exhibits 1.

22          MR. EFRON:  No, it would be Plaintiffs'

23  Exhibit now, Your Honor.

24          THE COURT:  Okay, because you moved it.

25          MR. ARIAS-MARXUACH:  Thirty-three is the

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    last one.

2          THE DEPUTY:  Thirty-four.

3          THE COURT:  Okay.  So this would be Joint

4    Exhibit 34 and this is the complaint filed by

5    Mr. Ambush --

6          MR. EFRON:  Well, not by Mr. Ambush.

7          MR. ARIAS-MARXUACH:  Objection.

8          THE COURT:  It's the complaint -- it's going

9    to be public now.  The complaint by the estates

10   against the Libyan and other governments and

11   officials, Joint Exhibit 34.

12         THE CLERK:  Yes, your Honor.

13         MR. EFRON:  May I proceed?

14         THE COURT:  You may.

15   BY MR. EFRON:

16   Q.      By the way, who drafted this complaint?

17   A.      I did.

18   Q.      On your own?

19   A.      Yes.

20   Q.      Nobody --

21   A.      I had staff with me.  From time to time I

22   used law students, law clerks --

23   Q.      Were any other lawyers involved in the

24   drafting of this complaint?

25   A.      There's one other lawyer, Terry Snyder, who

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    was at the time associated with my firm.  She was an

2    attorney.  But that's in terms of drafting from a

3    legal perspective, but if you're asking in terms of

4    the factual basis, that was all my work product.

5    Q.        I'm sorry, it's not -- it's Paragraph 17 at

6    Page 8, not Page 17.  Paragraph 17 at Page 8.

7    A.        Okay.

8    Q.        The first defendant in the case is not the

9    Republic of Libya but the Republic of Syria; is that

10   correct?

11   A.        That's correct.

12   Q.        Did you have any information or intelligence

13   or evidence against the country of Syria?

14   A.        Sure, absolutely.

15   Q.        Did Syria contribute anything towards this

16   claim payment?

17   A.        I'm not sure if I understand you.  Are you

18   asking if Syria had anything to do with the Libyan

19   settlement?  The answer is no.

20   Q.        They did not contribute?

21   A.        It's not the Syrian settlement, it's the

22   Libyan settlement.

23   Q.        But nevertheless you still dismissed the

24   case against Syria?

25   A.        Correct.

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1  Q.        Were you authorized by the clients to do

2  that or were you authorized only to settle the Libya

3  claim?

4  A.        I discussed that with the client.  But the

5  question --

6  Q.        Which client did you discuss it with?

7  A.        Those at the table when I was at Efrain

8  Berganzo's house.

9  Q.        And you specifically told them you were

10 going to drop the case against all the other

11 defendants and let them go scott-free; is that

12 correct?

13 A.        The question on the table was:  Who is going

14 to pay for that litigation?  There's -- there's two

15 things going on here.  You can't get paid twice.  If

16 you're getting paid $10 million per death and that's

17 being paid in full by Libya, Syria could have

18 defended and said we're guilty, we did it, but

19 legally we have no need to pay because they've been

20 paid in full so, therefore, the case could be

21 dismissed.  So it would be a futile litigation to go

22 forward and there's no way to bring it and

23 essentially with no funding to do that.

24        So it was a moot point.  Essentially the

25 understanding was, dismiss the case.

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1   Q.        So the most money that a life is worth is

2   $10 million?  That's the price of a life and you can

3   never get any additional compensation for that; is

4   that correct?  Is that your position?

5   A.        That's not correct.  That would be a

6   position Syria could take in litigation.

7   Q.        Why would you as the Plaintiffs' lawyer

8   adopt the defendant's position?  Was it easier to do

9   that than to continue with the litigation against

10  Syria?

11  A.        No.  The --

12  Q.        So --

13  A.        Do you want an answer or --

14            MR. EFRON:  He answered.  He said no.

15            MR. FREESE-SOUFFRONT:  You asked him.  He

16  was continuing his answer.

17  BY MR. EFRON:

18  Q.        Go ahead?

19  A.        The understanding with these families was

20  this is money from heaven.  They didn't expect a

21  settlement to come in just dropping in like that, but

22  here it is, it's coming from Libya.  There's other

23  cases that are pending.  We could have continued a

24  suit against the P.L.O.  We could have tried to find

25  Muhammad al-Kuli.  We could have done other things,

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1  but the reality is for all intents and purposes and

2  practical considerations, those were futile efforts

3  in light of the fact of here we are with a

4  settlement.

5          As you said, The State Department was

6  encouraging and urging that all claims be settled,

7  that the entire case be dismissed.  I had some back

8  and forth with The State Department and with Libya

9  regarding that case.  In other words, before I

10 dismiss the case, do I have to drop the case against

11 everybody or just against Libya?

12         And ultimately, though, after -- this was

13 briefly discussed with my clients but the point was

14 it's futile to try to continue to sue anybody.  And

15 as a result, they gave me the go-ahead to drop the

16 case.

17 Q.      Now, when you filed the lawsuit in --

18         THE COURT:  Before you go on, let me clarify

19 something and I think it's important for the jury to

20 be aware of this since I'm allowing this line of

21 questioning.

22         Ladies and Gentlemen of the Jury, this case

23 only -- the complaint here and the plaintiffs'

24 allegations are their claim of Dolo under Puerto Rico

25 law that instead of only -- you know, that they gave

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    Mr. Ambush, under Dolo, an additional 10 percent.

2    That is their claim.

3           The plaintiffs in this lawsuit do not claim

4    that the case was wrongfully settled in 2008 or that

5    it should have been settled for 20 million or that

6    Mr. Ambush should have continued litigating that

7    case.  That is not an issue in this case.  I have

8    allowed some questions, but I think -- I don't want

9    you to lose focus of what the real issue in this case

10   is.  And the real issue is whether Mr. Ambush engaged

11   in dolo and fraud in obtaining that retainer for the

12   additional 10 percent, and that is the issue.

13          So having said that, let's continue.

14   BY MR. EFRON:

15   Q.      So, Mr. Ambush, when you filed the lawsuit

16   in 2006 you had no idea that Libya or anybody would

17   ever settle these claims; is that correct?

18   A.      That's correct.

19   Q.      So in 2008 you found out that there was

20   settlement negotiations; is that correct?

21   A.      In January of 2008.

22   Q.      You found out that there was -- and would

23   you say it was unexpected to you?

24   A.      It was unexpected to me, but they didn't

25   settle the case, they litigated the case.

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    Q.        They settled the claims, I misspoke.

2    A.        They didn't settle the claims.  They had a

3    settlement agreement between two countries that

4    stated that in order for Libya to obtain favorable

5    nation status, all lawsuits against Libya would have

6    to be resolved.

7    Q.        And that was not -- you did not expect that

8    to occur, did you?

9    A.        No.

10   Q.        So in early 2009 when the claim settlement

11   commission or the Department of State paid out the

12   claimants, it was "money from heaven" for you but how

13   do you know it was "money from heaven" for your

14   clients?

15   A.        You know, I --

16   Q.        Have you asked them if they thought it was

17   "money from heaven" having received the decimated

18   bodies from of their parents?

19            MR. ARIAS-MARXUACH:  Objection, Your Honor.

20            THE COURT:  I'm going to sustain the

21   objection.

22   BY MR. EFRON:

23   Q.        How is it "money from heaven"?

24   A.        Money from heaven is an expression.

25   Q.        Which means found money, which means you got

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    it for nothing?

2    A.        No, that's not what it means.

3    Q.        Going back to the retainer agreement, which

4    is Joint 24, do you have it, sir?

5    A.        Yes, I have it.

6    Q.        You also found it necessary, both in

7    separate document and in this document, in the second

8    paragraph to ask for authorization to terminate the

9    power of attorney -- the power of attorney of

10   Dr. Michael Engelberg and any counsel or co-counsel

11   retained by him; why would you do that?

12   A.        Because Michael Engelberg was interfering

13   with my client relationship.

14   Q.        In what way?

15   A.        He was trying to usurp their authority to

16   make their own decisions.  He was not the client.

17   And my clients understood that somebody who they

18   never spoke to or heard of or seen was trying to make

19   decisions for them.  And as Efrain Berganzo said,

20   he's alive, he can make his own decisions.

21   Q.        Before December 15 had you personally ever

22   seen your clients?

23   A.        No, I had not.

24   Q.        So let me ask you this:  Did you advise the

25   Center or Rabbi Perr or Dr. Engelberg that you were

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    going to do this before you did it?

2    A.      Did what before I did what?

3    Q.      Revoke -- obtain signatures from the

4    claimants revoking Dr. Engelberg's power of attorney.

5            Did you tell the Center or either of them

6    that you had planned to do this before you did it?

7    A.      No, I had not discussed this with them.

8    Q.      You didn't.

9            Did you have a dispute with them and that's

10   why you decided to go ahead and do this?

11   A.      Do -- I'm sorry, you'll have to --

12   Q.      Every time we're talking about your

13   getting -- your coming to Puerto Rico, meeting the

14   clients for the first time and on December 15 getting

15   them to sign those retainer agreements and those

16   revocation and power of attorney.

17            MR. ARIAS-MARXUACH:  Is that a question?

18            MR. EFRON:  Yes.

19   A.      I don't understand the question.

20   BY MR. EFRON:

21   Q.      Fine.  Before coming down to Puerto Rico,

22   did you have a dispute with the Center, with

23   Dr. Engelberg or with Rabbi Perr?

24   A.      Yes.

25   Q.      And what was this dispute about?

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    A.        The dispute was that for all these years I

2    was working this case as the sole attorney and these

3    were my clients, and they had essentially abandoned

4    the case along the way.  I kept asking them to get

5    involved so that I can have funding to pursue the

6    case.  And at the very last moment when we are on the

7    eve of achieving a monumental success for all

8    concerned, these two individuals were trying to usurp

9    my role as the attorney and yank it away and instead

10   insert themselves or somebody on their behalf to

11   interfere with my agreement and my understanding with

12   my clients.

13   Q.        Somebody on their behalf meaning Paul

14   Gaston?

15   A.        Paul Gaston was not --

16   Q.        Someone on their behalf meaning an attorney?

17   A.        Possibly Paul Gaston.  There were other

18   people they had intended to have control.

19   Q.        Did you have a retainer agreement with these

20   parties, with these claimants, before December 12 --

21   December 15, 2008?

22   A.        I did not have a written retainer agreement

23   with these parties before --

24   Q.        Is there any other type of retainer

25   agreement other than a written one?

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1   A.        I had an understanding with them.  I had

2   been the attorney on the case who filed it and

3   drafted it and litigated it.

4   Q.        Now, the Center agreement was signed in

5   2002, you filed in 2006, and less than two years

6   later the settlement negotiations began and there was

7   not much else to do in the case; is that correct?

8   A.        That's absolutely incorrect.

9   Q.        After December 15 isn't it true that the

10  only other activity in this case was your voluntary

11  dismissal with prejudice of all those claims for

12  these claimants in the Washington, D.C. federal

13  court?

14  A.        That is totally incorrect.

15  Q.        What other -- what --

16            THE COURT:  Slow down a little bit, you're

17  going too fast.

18  BY MR. EFRON:

19  Q.        If we were to look at the docket of the

20  case, what other important or principal document did

21  you file after December 15 of 2008 other than later

22  that month, a few days later, filing the voluntary

23  motion to dismiss once you had the retainer agreement

24  signed in your hand?

25  A.        As anybody knows, when an attorney

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    represents somebody, their job doesn't end the minute

2    the case is dismissed.  The attorney then is

3    responsible to obtain the funds from the settlement

4    and properly disburse it to the clients and to pay

5    all outstanding bills that may be on the case.

6          Take, for example, a car accident case.  If

7    they settle in court, the lawyer goes back to the

8    office, the insurance company sends a check, the

9    lawyer then goes and makes sure the hospital's paid,

10   Blue Cross is paid, any of the other experts in the

11   case that may have been involved were paid, make sure

12   that the client is protected from any outside

13   collateral issues, if the heirs are gonna to fight

14   with each other, make sure that everything is

15   settled.

16         And then when the check comes, it goes to

17   the attorney's escrow account.  And then the attorney

18   is the one who makes sure his clients are happy and

19   satisfied.  So that's why it says in the retainer

20   agreement my duties didn't end with the settlement of

21   the case, it continued.

22   Q.      You still had the administrative

23   responsibility of obtaining the funds from the

24   Department of State; is that correct?

25   A.      That is correct but only partially.  The

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1  most important thing then is to make sure the funds

2  are taken care of properly, that --

3  Q.        And how did you do that?  Are you -- these

4  are all people who live in Puerto Rico; are you a

5  lawyer in Puerto Rico?

6  A.        I didn't think I had to be.

7  Q.        You didn't have to be.

8            Do you know Puerto Rican inheritance law, to

9  be able to determine who gets what?

10 A.        I'm not a Puerto Rico attorney.

11 Q.        Isn't it true that you sent one of the other

12 claimants --

13           MR. ARIAS-MARXUACH:  Objection.

14           MR. EFRON:  I'm just going to ask a

15 question.

16 BY MR. EFRON:

17 Q.        A widower, you sent a widower --

18           THE COURT:  I'll sustain the objection.

19 BY MR. EFRON:

20 Q.        Okay.  You say you don't need to be a lawyer

21 in Puerto Rico to do that.  Let me ask you a very

22 simple question:  Who inherits in Puerto Rico, the

23 widower or the children?

24           MR. ARIAS-MARXUACH:  Objection.  Irrelevant.

25           THE COURT:  Sustained.

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1   BY MR. EFRON:

2   Q.      Do you feel that you are capable as a lawyer

3   in Maryland of distributing an estate in Puerto Rico?

4   A.      I -- I think that's a funny question so I'm

5   not sure how to answer you.

6   Q.      Do you have the expertise, the knowledge?

7   Have you studied sucesiones in our inheritance laws

8   to know how to distribute an inheritance in Puerto

9   Rico?  It's a very simple question.

10  A.      The answer is I knew what I needed to do to

11  settle this case; and what I didn't know, I obtained

12  somebody locally to take care of as local counsel.

13  Q.      And who would that be?

14  A.      In this case there was not the need for a

15  local counsel in the sense you're thinking of because

16  these claims were not settled in court.

17  Q.      What if there would have been minors

18  involved like in other --

19          MR. ARIAS-MARXUACH:  Objection.  Calls for

20  speculation.

21          THE COURT:  Sustained.

22  BY MR. EFRON:

23  Q.      Isn't it true that you have excluded some

24  heirs in some of the other cases?

25          MR. ARIAS-MARXUACH:  Objection.  Irrelevant.

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    Move to strike.

2           MR. EFRON:  Mr. Arias opened the door when

3    he mentioned Mr. Padilla in his opening statement.

4    I'm allowed to ask him --

5           MR. ARIAS-MARXUACH:  I only mentioned that

6    he found him.

7           THE COURT:  Objection.  Sustained.

8    BY MR. EFRON:

9    Q.      Did the Center ever pay you for any work

10   done in this case?

11   A.      The Center paid me small token sums as

12   advances in this case.

13   Q.      Did you send billings in this case to the

14   Center that were paid?

15   A.      The answer is yes and no.

16   Q.      Were there any billings pending with the

17   Center on your behalf for this case when you severed

18   your relationship with the Center?

19   A.      No.

20   Q.      You had not billed them for anything?  You

21   had not billed them, you know, you owe me $2 million

22   for this case and you haven't paid me?  There was no

23   such thing; is that correct?

24   A.      That is correct.

25   Q.      And you didn't have a written agreement

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    regarding your fees with the Center, did you?

2    A.        That is correct.

3    Q.        You did not?

4    A.        I did not.

5    Q.        Tell us about what you had to do -- I'm

6    going to ask you a few questions on what you had to

7    do on these families' behalf at The Department of

8    State to get them paid up to get their compensation.

9             Did you do this yourself or did you delegate

10   on somebody else?

11   A.        I dealt with The State Department myself or

12   with my staff.

13   Q.        Who did you deal with -- who did you or your

14   staff -- by the way, who is your staff?  How many

15   employees do you have?

16   A.        I had at the time one secretary/paralegal.

17   Q.        And that's your staff?

18   A.        On occasion I had perhaps -- during that

19   time I had a law student working as a paralegal

20   associate -- not associate, because they weren't an

21   attorney, but a law student, lake an intern.

22   Q.        So really it was you who was dealing with

23   The State Department?

24   A.        Correct.

25   Q.        That was all I wanted to know.

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    Who did you deal with for The State

2  Department for this claim, if you remember the names?

3  A.    Initially there was a lady named Ona

4  Halas (phonetic) but ultimately the claim was

5  transferred over to the Division of Foreign Claims

6  and International Disputes.

7  Q.    That's Linda Jacobson?

8  A.    Linda Jacobson is just -- no, she was the

9  initial person who sent out the letter.  I don't even

10  know if she's an official.

11  Q.    Is Lisa Grosh?

12  A.    Lisa Grosh is the chief counsel of that -- I

13  don't even -- no, I'm sorry, I misspoke.  I don't

14  know if she's the lead counsel or just a senior

15  counsel in that department.

16  Q.    What department would that be, if you

17  remember?

18  A.    That's International Disputes -- Foreign

19  Claims and International Disputes.

20  Q.    Have you spoken to Lisa Grosh?

21  A.    Yes, I have.

22  Q.    When was the last time you spoke to her?

23  A.    Perhaps six months ago.

24  Q.    Six months ago?

25  A.    Perhaps.

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1  Q.      Do you know her personally?

2  A.      I've met her personally.

3  Q.      Have you spoken to her -- did you speak to

4  her about these cases in order to get compensation?

5  A.      Yes, of course.

6  Q.      Mm-hmm.  Have you spoken to her about other

7  claims in which you are not the lawyer?

8          MR. ARIAS-MARXUACH:  Objection.  Irrelevant.

9          MR. EFRON:  It's very relevant, Your Honor.

10         MR. ARIAS-MARXUACH:  Objection.

11         THE COURT:  I'll allow the question.

12  BY MR. EFRON:

13  Q.      People that had refused to sign the

14  retainer, have you had --

15         MR. ARIAS-MARXUACH:  Objection irrelevant.

16  BY MR. EFRON:

17  Q.      Have you had --

18         THE COURT:  Sustained.  Are you going to ask

19  the original question?  Next question.

20  BY MR. EFRON:

21  Q.      Have you spoken to Lisa Grosh regarding

22  claimants that you do not represent?

23  A.      I've spoken to her about claims I do

24  represent.  There are times disputes in families

25  where one set of people may want to have another

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    lawyer than the first set of clients, but over all

2    those are claimants to one estate.  So when I spoke

3    to her, I'm sure I spoke to her about the claims that

4    were my client's at the time I filed the litigation.

5    Q.        But once you are no longer an attorney for

6    the party, you would not speak to her about those

7    claims; is that correct?

8    A.        That is correct.  Once -- I'm not the

9    party -- if I had no interest speaking to her about

10   either the claimants or the claim itself, then I had

11   no contact with her.

12   Q.        So the way I understand the process, and

13   correct me if I'm wrong, is, her office will tell you

14   what documents you need to send for each claim and

15   once you produce the documents the payment is made;

16   is that correct?

17   A.        I'm not sure if it came from her office or

18   this, but what you're talking about is The State

19   Department, whether it's her office or another

20   office.  The State Department mandated the protocol

21   for resolving the claim.  If you follow everything

22   they ask, they would then pay the claim.

23   Q.        And in that protocol there are documents

24   that they request, documents in particular?

25   A.        That's correct.

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    Q.        How much time do you think you spent on

2    these claims administratively once the case was

3    dismissed?  A few days after you met with them and

4    got their retainers signed?

5    A.        I can't quantify the time in terms of hours,

6    but I can describe the actions that took place.  It

7    was not just myself, it was my staff speaking to the

8    clients, or -- their family members who spoke

9    English, or through Leo, trying to get everything

10   required together so that we can finalize the claim.

11   And that included -- for example, one of the

12   prerequisites is each individual had to prove they

13   were a United States citizen.  Very simple.  Go get a

14   passport.  Well, do you have a passport?  Well, some

15   of them do, some of them don't.

16   Q.        Could that not have been proven with a birth

17   certificate?

18   A.        No.

19   Q.        No?  A birth certificate indicating you were

20   born in Puerto Rico is not enough evidence that

21   you're a U.S. citizen?

22   A.        When you're talking $10 million, the United

23   States wants to be abundantly clear.  Very often you

24   have a document such as a birth certificate that is a

25   different name than the person currently has.  If

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    somebody gets married, they change their name.  So a

2    birth certificate proves that the person born was a

3    United States citizen at the time they were born;

4    that doesn't prove that the person coming forward

5    60 years later is the same person or that they are

6    still a U.S. citizen.

7         So the government wanted to be sure.  And if

8    there's any discrepancy, they said go back, we're not

9    accepting this, send us proof that this person is in

10   fact the same person today and that they are moreover

11   legal heirs to the estate in question.

12   Q.      That process took how many months between

13   January and March, would you say?

14   A.      No.  It took ultimately five months from

15   December 15 to approximately mid-April 2009.

16   Q.      So that would be four months?  Three months?

17   A.      Five months.  And it took five months

18   because of the interference of the Center.  It would

19   have gone much quicker but for the supervisor's

20   interference with that process.

21        MR. EFRON:  Your Honor, I need to go into a

22   long area which I would not want to split up.

23        THE COURT:  Okay, if you're done with this

24   line of questioning then, Mr. Ambush, you're placed

25   under the rules of the Court.  You may have lunch

                    Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    with your attorneys, but you're not to discuss your

2    testimony until you continue testifying in the

3    afternoon.

4              Ladies and Gentlemen of the Jury, it's

5    twelve o'clock, let's be back here at 1:20.

6              THE COURT OFFICER:  All rise for the jury.

7              (Jury exits the room.)

8              THE COURT:  Before we recess, how long do

9    you think your direct will continue?  Maybe another

10   hour?  Half hour?

11             MR. EFRON:  It depends on him.

12             THE COURT:  Or are you like halfway through

13   your questions?

14             MR. EFRON:  Halfway.

15             THE COURT:  Then, Mr. Arias, be prepared

16   probably, I would assume, the afternoon break at some

17   point for your Rule 50 once Mr. Efron -- that's his

18   evidence in this case, so --

19             MR. ARIAS-MARXUACH:  Yes.  I will have a

20   chance to do a direct of Mr. Ambush in the normal

21   fashion?

22             THE COURT:  Oh, in the normal fashion ou

23   will, but since this is Mr. Efron's case in chief for

24   all purposes, even though in front of the eyes of the

25   jury -- this is the case in chief, they already know

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    this is the last witness; but be prepared at that

2    point to do Rule 50 because once you start asking

3    questions, if they do overlap.  Okay, you're excused.

4           MR. EFRON:  Thank you, Judge.

5           (Jury Trial recessed for lunch at 12:01 p.m.

6    and resumed at 1:30 p.m.)

7           (Jury enters the room.)

8           THE COURT:  Please be seated.  Good

9    afternoon, Ladies and Gentlemen of the Jury.  We are

10   now going to continue with the direct examination by

11   Mr. Efron, so let's proceed.

12          MR. EFRON:  Yes, your Honor.

13              DIRECT EXAMINATION CONTINUED

14   BY MR. EFRON:

15   Q.      Good afternoon, Mr. Ambush.

16          Before we had the lunch break you mentioned

17   that the Center interfered with your relationship

18   with your clients; is that correct?

19   A.      Correct.

20   Q.      You did say that?

21   A.      I believe I said that.

22   Q.      How is it that the Center interfered with

23   your relationship with clients you've never met?

24   What did they do?

25   A.      An attorney can have an attorney-client

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1   relationship without meeting a client.  The issue is

2   if an attorney has a relationship with a client who

3   acknowledges them as the attorney who brought a case

4   and litigated on their behalf --

5   Q.        Who told them that you were their attorney?

6   A.        I believe Leopoldo Garcia had spoken to them

7   over the years.

8   Q.        And you were there attorney through a power

9   of attorney that they gave the Center, Michael

10  Engelberg; is that right?

11  A.        No, that's actually false.

12  Q.        Did they not sign a center agreement in 2002

13  that went out of your office where they gave Michael

14  Engelberg a power of attorney?

15  A.        You'll have to -- I'm sorry, I don't follow

16  that.

17  Q.        We had looked at a document earlier, the

18  Center agreement which was faxed from your office in

19  June of 2002 where the header was sort of scratched

20  out, and you said you had reviewed that document and

21  you sent it down for Leopoldo Garcia to come an get

22  their signatures.

23           Did that document not give Dr. Engelberg

24  power of attorney on these claims for these victims?

25  A.        I don't believe so.  You'll have to show me

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1   the document again.  I believe you're speaking of two

2   different documents.

3   Q.         You have it in front of you.

4   A.         I don't have it in front of me.

5              MR. EFRON:  Can we get him Joint Exhibit 21

6   or you can see it on the screen.

7   BY MR. EFRON:

8   Q.         Do you remember this document?

9   A.         Yes, I do.

10  Q.         You'll get the hard copy now.

11             With this document was there a separate

12  power of attorney given to Michael Engelberg?

13  A.         Are you now referring to a different

14  document?

15  Q.         Yes.  So it's the one that you had them

16  revoke on December 15?  I'm just trying to move this

17  along quicker.  If you remember.  If you don't

18  remember, you don't remember.

19  A.         No, I remember clearly.  I just think you're

20  trying to confuse me.

21  Q.         No, I'm not trying to confuse you.

22  A.         I think you're -- you were talking about

23  this document and you asked me if this was a power of

24  attorney, and it is not.  This binds the Center to be

25  responsible for certain activities.  This is not a

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    power of attorney and it is not a legal retainer

2    agreement.

3    Q.      Let's look at the next document, Joint

4    Exhibit 22; is that the power of attorney that you're

5    referring to?

6    A.      Can I see the hard copy?

7    Q.      Yes.

8            MR. EFRON:  22, please jointly.

9    BY MR. EFRON:

10   Q.      Now, you're familiar with that document?

11   A.      Yes.

12   Q.      Because that's -- you on December 15, 2008,

13   you asked those same clients to revoke that power of

14   attorney; so you're familiar with that document, are

15   you not?

16   A.      I'm familiar with this document.

17   Q.      Isn't it true this power of attorney that

18   the Center gave you the authority to represent these

19   people in the case?

20   A.      No, it is not.

21   Q.      No?  Under what premise was it that you were

22   representing them?  Did you have a retainer agreement

23   with them prior to 2008?

24   A.      No, I did not.

25   Q.      So on what premise are you representing

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1   them?

2   A.      I'm sorry, can you restate that?  I

3   misspoke.

4   Q.      Go ahead.  You can correct your answer.

5   A.      Okay.  I did not have a written retainer

6   agreement with them.

7   Q.      You didn't have a written retainer --

8   A.      Right.

9   Q.      -- is there any other type of retainer

10  agreement other than written?

11  A.      No -- well --

12  Q.      No?

13  A.      Well, you're asking me if I had a written

14  retainer agreement.  No, I did not.

15  Q.      On the day you were in Puerto Rico the only

16  time you ever saw these clients was on December 15;

17  on that day was Michael Engelberg not at the meeting

18  but in Puerto Rico at the time, if you know?

19  A.      I don't know.

20  Q.      You don't know?

21  A.      I don't know.

22  Q.      You don't remember or you don't know?

23  A.      No.  I did not know that he was in Puerto

24  Rico.  I don't know to this date that he was there

25  the day I was meeting my clients.

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1  Q.        Did you tell those clients to not speak to

2  him again?

3  A.        No.

4  Q.        Did anybody in your group, Leo or the lawyer

5  or anybody, come and say to them now that you've

6  revoked Dr. Engelberg's power of attorney, do not

7  speak to him again?

8  A.        No.

9  Q.        So these clients that you say are your

10 clients -- or that you say were your clients, how did

11 you get them?  How did you get these clients?  Did

12 they call you?  Did they come to you?  Did they call

13 you and ask you to represent them?

14 A.        No, they did not.

15 Q.        Now, you said that you had nothing to do

16 with the settlement negotiations because that's

17 diplomacy; is that correct?

18 A.        That is correct.

19 Q.        So really all that was left for you to do as

20 far as obtaining the settlement proceeds and getting

21 them paid with the money they were entitled to was go

22 through the administrative paperwork of submitting

23 their passports, as you said, and submitting evidence

24 of who they were, that kind of thing; is that

25 correct?

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    A.        There was an administrative process.

2    Q.        Okay.

3    A.        That may have taken years, if it's litigated

4    or contested, or if it could goes smoothly.  It

5    depends on the situation.

6    Q.        And in this situation it went very smoothly,

7    it just took three and a half months; is that

8    correct?

9    A.        It took five months and there was quite a

10   number of things that had to be done still.

11   Q.        When did the process start, on what day?  In

12   January?

13   A.        The process started before I came to Puerto

14   Rico.  It started when the U.S. Government announced

15   that they were settling and then it said to the

16   clients, stay tuned, we're gonna have additional

17   information coming.

18   Q.        So you just --

19   A.        And I had forwarded the letters from The

20   State Department to my clients and had spoke to them

21   on the phone and they were in the middle already of

22   gathering their information prior to my coming to

23   Puerto Rico in December of 2008.

24   Q.        So prior to your coming to Puerto Rico to

25   allegedly explain the situation to the clients you

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1  had already started the administrative process for

2  them?

3  A.      We had started getting -- informing them of

4  what steps needed to be taken.  That there was

5  requests for a list of information, documents,

6  et cetera that --

7  Q.      At that time were you authorized to enter

8  into an agreement by these two families?

9  A.      I was already their attorney.  I was already

10  engaged actively in work on their behalf.

11  Q.      But you said you had nothing to do with the

12  settlement negotiations between Libya and the United

13  States?

14  A.      I think if you're trying to parse down if a

15  client chooses an attorney for one particular piece

16  of work and then it manifests into something else,

17  that he's no longer the attorney.  I mean, that's

18  false.  So I deny what you're saying.

19  Q.      Well, how did they happen to choose you as

20  an attorney when it was actually the Center that

21  asked you to help?

22  A.      That's false.  That's one of those questions

23  that's false.  I was the attorney that --

24  Q.      Did they choose you as an attorney?  They

25  chose you voluntarily as an attorney?  They knew who

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    Joshua Ambush was --

2    A.        They knew --

3    Q.        -- and went up and found you?

4    A.        They knew who I was from the moment Leopoldo

5    spoke to them.

6    Q.        And when was that?  2002?

7    A.        Correct.

8    Q.        Now, while you were on good terms with the

9    Center and they were advancing you funds and

10   everything was on good terms, you never needed a

11   separate agreement or a separate retainer from the

12   clients; is that correct?

13   A.        I never sought one because I relied on Rabbi

14   Perr.

15   Q.        When did you stop relying on Rabbi Perr?

16   A.        When he started threatening me in November

17   of 2008.

18   Q.        Uh-huh.

19             You said that when you came here on

20   December 15, 2008 to sign the retainer -- and we'll

21   go back to Joint 24 for a sample of it.  This is the

22   document I mean.

23   A.        I'm sorry, I have two other documents.  Can

24   you provide me like --

25             MR. EFRON:  Can you please provide him 24 if

1   he doesn't have it?

2   BY MR. EFRON:

3   Q.      Or you can see it on the screen.

4           You said that prior to these families

5   signing that agreement you had an understanding; is

6   that what you said this morning in your earlier

7   testimony?

8   A.      The clients knew who I was, they knew me to

9   be their attorney; I knew them to be my clients, I

10  did work on their behalf.

11  Q.      So what did they understand?  Do you know

12  what they really understood?  You've heard them on

13  the witness stand; how much of what you've said here

14  do you think they've understood?

15  A.      They understood clearly that I was their

16  attorney, that I filed a case on their behalf and

17  litigated on their behalf.  So they did understand

18  that.

19  Q.      Do you think these people were in any way

20  uncomfortable or intimidated by you and Leo and the

21  notary coming to their house and forcing them to sign

22  right on the spot, because that's what a notary is,

23  and not giving them a chance to consult or think

24  about it?  Do you think they were intimidated?

25          MR. ARIAS-MARXUACH:  Objection.  Assumes

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    facts not evidence.

2          THE COURT:  Rephrase the question.  Also,

3    it's sort of compound.

4    BY MR. EFRON:

5    Q.        Do you believe that at the December 15

6    Berganzo home situation, given that setting and given

7    the people that you were representing, do you believe

8    that they were intimidated by the situation?

9    A.        Absolutely not.  This was love and kisses

10   all around.  They were absolutely pleased to see me.

11   Q.        But they are very nice, humble, giving,

12   giving people, are they not?

13   A.        I'm sure they are.

14   Q.        You said that your interest wasn't in

15   receiving the compensation from The State Department,

16   to put it in your trust account, that your purpose

17   was to make sure, and I wrote down what you said,

18   that the money be properly taken care of.

19          Is that what you said?

20   A.        I don't know.  You'd have to show me

21   verbatim, but I can rephrase it if you'd like.

22   Q.        Would that be correct that your interest

23   wasn't making sure that the money went to where it

24   should have gone?

25   A.        An attorney's responsibility is to make sure

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    that the client funds are protected.

2    Q.        And you were representing five families

3    correct, five claims, five death claims, five

4    $10 million-dollar claims?

5    A.        Five death claims.

6    Q.        And then five additional death claims for --

7    A.        There was another five injury claims that I

8    represented.

9    Q.        So that's a total of $65 million?

10   A.        That's correct.

11   Q.        Of those $65 million you kept as a fee

12   $6.5 million; is that correct?

13            MR. ARIAS-MARXUACH:  Objection.

14            THE COURT:  I'll allow the question.

15   BY MR. EFRON:

16   Q.        Did you keep 10 percent of the money that

17   you collected from The State Department for these

18   victims?

19   A.        In regard to these two families?

20   Q.        In regard to these two families --

21   A.        Ten percent of what they received per their

22   agreement with me, I was able to pay myself.

23   Q.        So you were properly taken care of; is that

24   correct?

25   A.        I was taken care of because that is the role

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    of the attorney, to make sure the fees are segregated

2    and paid.  That was --

3    Q.      No, the rule of the attorney is not to make

4    sure the attorney is take care of.

5    A.      No, no, no.  So rephrase your question.

6    Q.      So for these millions of dollars that you

7    received from The State Department, tell us exactly

8    what is it that you did since December 15 of '08?

9           THE COURT:  As to these two estates.

10          MR. EFRON:  That's all I asked, Your Honor.

11          THE COURT:  For the purposes of the

12   questions, the question was limited to these two

13   estates here in court.

14   A.      Can you rephrase what you're asking?

15   BY MR. EFRON:

16   Q.      Let me be a little more specific.

17          After you signed the retainer agreement in

18   Puerto Rico, other than filing a few days later the

19   motion to dismiss the entire case, and other than

20   continuing the administrative proceeding with the

21   State Department for their compensation, which is an

22   administrative proceeding and a documentary

23   proceeding, other than doing that, what else did you

24   do in order to earn those millions of dollars, if you

25   can answer the question?

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1   A.        The answer -- I'm going to try to answer

2   what, I think, is a compound question or a trick

3   question.  I can't keep track of -- you start off

4   okay with the beginning and then you flip something

5   at the end so, I'll do the best I can to answer your

6   question.

7          The fee isn't merely earned just because an

8   attorney does the last piece of work, filing the

9   claim or the administrative work, the fee essentially

10  pays the attorney for his work that encompassed the

11  entire time the case started.

12         In this case the case started even prior to

13  meeting these families, but in terms of the research

14  and I did and so on.  Starting from 2002 I did

15  everything for this case, I did everything for these

16  families.  And years of litigation and then at the

17  moment that it's settling or litigating the

18  intervention of the United States Government

19  essentially a settlement imposed by the government,

20  represent the claim throughout the entire process

21  from thereon in.  That is what my expectation was to

22  be paid for.

23  Q.        You know, I'm a little disturbed that --

24         THE COURT:  Counsel, don't make any

25  comments, just ask questions.

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1  BY MR. EFRON:

2  Q.      You just said that it was imposed by the

3  Federal Government and this morning you told us that

4  either you or the clients had to make a determination

5  whether to continue with the case or drop the case

6  and go into the settlement.  Now you're telling us

7  that the Federal Government imposed a settlement on

8  these victims.  Which one is it?

9  A.      It's the first -- perhaps I misspoke using

10 the word "imposed."  But --

11 Q.      Well, but it was imposed in the sense that

12 it was money that came in from heaven, isn't it, in

13 that sense?  Is it not?  It was easy money that --

14 A.      It was not easy money.  It was --

15 Q.      -- that no one had to do anything else, that

16 no substantial additional work had to be done for all

17 that money; is that correct?

18 A.      That's not correct.

19 Q.      In your years as a lawyer so far, I'm not

20 talking about 2002, I'm not talking about 2008, how

21 many cases have you tried?

22 A.      Hundreds.

23 Q.      Hundreds.

24         How many jury trials have you had?

25 A.      A few.

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1  Q.      How many is a few?  Two or ten?

2  A.      I can't say offhand.  Let's say two or

3  three, four.

4  Q.      Two, three, four.

5          Were you lead counsel or second or third

6  chair?

7  A.      Both.

8  Q.      And in how many were you lead counsel?

9  A.      I can't say.  A couple.

10  Q.      Were any of them in federal court, anywhere

11  in U.S. District Court other than Syria versus

12  Franqui, which never went to trial -- I'm sorry,

13  Franqui versus Syria, which never went to trial?

14  A.      No, none of those were in federal court.

15  Q.      And I looked at the docket -- have you

16  looked at the docket in Franqui versus Syria?

17  A.      Maybe you can show it to me so I can see it.

18  Q.      Would it be correct that there were about 50

19  docket entries in that case over two years?

20  A.      That may be correct, but I'd have to see it

21  to confirm it.

22  Q.      Okay.

23          MR. EFRON:  It's Defendant's I.D. I.

24  BY MR. EFRON:

25  Q.      Could you verify how many docket entries?

Joshua M. Ambush, Esquire - Plaintiffs' Direct

 1          THE COURT:  It's not in evidence yet.

 2          MR. EFRON:  No, I'm just asking him a

 3     question.  I'm not --

 4          MR. ARIAS-MARXUACH:  Because you can't --

 5          THE COURT:  If you don't move the document

 6     into evidence, you can't --

 7          MR. EFRON:  I will move for it as Joint

 8     Exhibit.

 9          MR. ARIAS-MARXUACH:  Thirty-five.

10          MR. EFRON:  -- Joint 35.

11          THE COURT:  Joint Exhibit 35, that would be

12     the docket sheet for the Franqui versus Syria case.

13     And just for the benefit of the jury, a docket

14     sheet -- the way the docket sheets come out -- in

15     federal court everything's electronic, every motion,

16     every order of the Court, every ruling, every event,

17     it's one docket.  So you start with the complaint,

18     Docket No. 1.  Docket No. 2 can be an order for the

19     judge.  No. 3 can be a separate event.  That's what

20     docket sheets are.

21     A.     It's actually 51 docket entries, but there

22     were a number of other things that have no numbers.

23     Q.     So 51 docket entries in a two-year period of

24     time; in your experience as a lawyer, is that a

25     heavily litigated case?

1          THE COURT:  Don't answer the question.

2          Counsel please approach.

3          (Side bar discussions begin.)

4          THE COURT:  Let me note, Mr. Efron, that

5    that question -- I just want to bring up from my

6    experience, that question could be right but could be

7    wrong.  I've had extremely litigated cases that could

8    have 20, 30 docket numbers.  Litigations throughout

9    depositions, a magistrate judge intervenes -- you

10   will have to rephrase it.

11         MR. EFRON:  I'll withdraw it and go to the

12   next one.

13         THE COURT:  Okay.

14         (Side bar discussions end.)

15   BY MR. EFRON:

16   Q.       In this present case here, the one we're

17   trying now, this case known as Berganzo versus

18   Ambush, do you know how many docket entries we have

19   in this case?

20   A.       No, I don't.

21   Q.       Would you believe that it's about 200?

22   A.       I guess I'll take it at face value, but I

23   don't have any information of that.

24   Q.       If you don't know, you don't know.

25         What were you billing the Center per hour

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1   for your time spent on this case?  And when I say

2   "this case," I mean Franqui versus Syria.

3   A.        I wasn't billing them time per se, per hour.

4   For years I worked for nothing on the case because it

5   was a contingency case.

6   Q.        What was the nature of the contingency?

7   What percentage were you supposed to get?

8   A.        I didn't have that in writing, I didn't have

9   it clarified in advance.  But I did have an

10  expectation of getting paid on a percentage basis.

11  Q.        Now, Mr. Gaston was -- when the case was

12  dismissed and settled, Mr. Gaston was paid in

13  addition to his fees, he was paid an additional

14  amount as a -- we can call it a bonus or a success

15  fee, whatever it was, of $250,000; is that correct?

16  A.        I don't have any direct information

17  regarding what he was paid as a bonus.

18  Q.        Whatever he was paid, do you know if he had

19  a written agreement with the Center for his

20  employment and his attorneys' fees?

21  A.        I would not know that, no, I did not.  But I

22  do know he did not have a written retainer with the

23  clients.  That I know.

24  Q.        Did you bill any invoices to the Center for

25  a case called Lod Airport Franqui?

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1   A.        Rabbi Perr had agreed to send me advances

2   from time to time.

3   Q.        And additionally you also billed; is that

4   correct?

5   A.        In addition, after I had gotten some

6   compensation in the form of stipends that were

7   advances, Rabbi Perr would, a year or so later, then

8   ask me for a bill of some kind to account for the

9   money he advanced.  But those bills were not in any

10  way full compensation for the work I did.

11  Q.        They were periodic bills, were they not?

12  A.        They were periodic and they were not for my

13  time in full, and they were also not required every

14  time I was provided an advance from Rabbi Perr.

15            THE COURT:  Your Honor, I would like to

16  submit into evidence the invoices that we have.

17            MR. ARIAS-MARXUACH:  Your Honor, this is the

18  evidence that was previously --

19            THE COURT:  Please approach.

20            (Side bar discussions begin.)

21            MR. ARIAS-MARXUACH:  This is the evidence

22  that was previously excluded.

23            THE COURT:  The evidence was excluded.

24            MR. EFRON:  I don't think it was excluded.

25            MR. ARIAS-MARXUACH:  It was excluded.

THE COURT: I made a ruling not allowing that evidence. I told you that you could bring in evidence that he had received payments, he had received checks. He's already testified to that.

MR. EFRON: Counsel, I'll get to the next one and see if he --

MR. ARIAS-MARXUACH: He's trying to deny an order in limine.

THE COURT: The checks are there. He can testify that he did invoice the Center for some things.

MR. EFRON: I understood, and I think you did too, that I was able to proffer it at the time I needed it.

THE COURT: I mentioned it was excluded and if necessary to impeach you can bring it up to the Court's attention. It's not necessary to bring that in. Okay, let's continue.

(Side bar discussions end.)

BY MR. EFRON:

Q. In those invoices you were billing the Center at your rate of $50 an hour; is that correct?

A. That was a rate that Rabbi Perr suggested that I put on an invoice.

Q. And you did?

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1   A.          And I asked him to pay me that.

2   Q.          And it was more than one invoice, was it

3   not?

4   A.          There were one or two invoices in maybe the

5   year 2008 where I actually -- was asked to produce an

6   invoice but in prior years, in 2006 when the case was

7   filed and where the heavy-duty pretrial litigation

8   took place, where you -- drafting a complaint, that's

9   pretrial, it's not filed yet.  But months of time

10  have to go into that.  There was no billing

11  whatsoever.

12  Q.          So who asked you to produce these invoices?

13  A.          It was Rabbi Perr and I believe he did so

14  because he in turn was asked by Michael Engelberg.

15  Q.          And you were billing at $50 an hour in those

16  bills, right?

17  A.          No, I was not billing 50 an hour in those

18  bills.

19  Q.          Okay.  And, now, he asked you to produce

20  them but, you know, you didn't produce them to us in

21  discovery, did you?

22          MR. ARIAS-MARXUACH:  Objection.

23          THE COURT:  Counsel, that's -- rephrase the

24  question.

25          MR. EFRON:  I'll withdraw it.

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1      MR. ARIAS-MARXUACH:  Your Honor, this is a

2  defiance of an order in limine, and we move to

3  strike --

4      THE COURT:  The statement by Counsel that he

5  did not receive documents in discovery should not be

6  considered by the jury in any way.  The Court has

7  made a ruling and has determined that there has been

8  no wrongdoing throughout discovery.  Let's continue.

9      MR. ARIAS-MARXUACH:  Your Honor, we would

10  like a side bar.

11      THE COURT:  Okay.

12      (Side bar discussions begin.)

13      MR. ARIAS-MARXUACH:  Your Honor, this is a

14  defiance of an order in limine by the Court.  This is

15  a contempt of Court and I am afraid that the curative

16  instruction is not sufficient.  And I move for the

17  mistrial.

18      THE COURT:  Denied.  Move to another area.

19      MR. ARIAS-MARXUACH:  And I move that he be

20  held in contempt of Court.

21      THE COURT:  Please continue.

22      (Side bar discussions end.)

23      THE COURT:  Let's excuse the witness one

24  second to go to the restroom.

25      (Mr. Ambush leaves the room.)

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1      THE COURT:  Side bar one second since we're

2   not doing anything right now.

3      (Side bar discussions begin.)

4      MR. EFRON:  Yes.  Both on in keeping with

5   the Court's order.  We have not been able to use the

6   invoices, as well as the documents regarding to a

7   Mr. Padilla, which the Court ruled I should not use.

8   We would still like to have them marked as --

9      THE COURT:  You can mark them.

10     MR. EFRON:  As evidence.  Not admitted.

11     THE COURT:  That will not be a problem.  And

12  let me mention this, Mr. Efron, if you mention --

13  again, I've been very lenient, but if you mention it,

14  I'm going to be forced to give an instruction to the

15  jury that you have misstated the statement and that's

16  not going to look good for you.

17     MR. FREESE-SOUFFRONT:  And, Brother Counsel,

18  I'm not saying that you did anything, but next time

19  when we come out to this type of conference, avoid

20  looking to the jury.

21     THE COURT:  Let's continue.

22     MR. EFRON:  That's, you know --

23     THE COURT:  Lets continue.

24     Ambush is here, let's continue.

25     (Mr. Ambush enters the room.)

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1        (Side bar discussions end.)

2        THE COURT:  Let's move on to another area.

3   BY MR. EFRON:

4   Q.        Now, you testified earlier that there were

5   no outstanding bills for your services in this case;

6   is that correct?

7   A.        I'm not sure what I testified, you'll have

8   to rephrase it or show me or ask me again.

9   Q.        I'll ask you again.

10        Are there any unpaid outstanding bills from

11  your office to the clients or the Center or anybody

12  related with this case?  And "with this case" I mean

13  Franqui versus Syria.

14        MR. ARIAS-MARXUACH:  Your Honor, the case is

15  about two families, the Rodriguezes and the

16  Berganzos.

17        MR. EFRON:  I'll take the clarification.

18        THE COURT:  Regarding these two estates.

19        MR. EFRON:  That's what I meant, of course.

20  A.        Okay.  If I said this differently before, I

21  misspoke and I'll rephrase it --

22  BY MR. EFRON:

23  Q.        I don't know if --

24  A.        -- to your question.  So I'll answer this

25  question.  There are unpaid bills that I've laid out

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1    funds for, for the benefit of these families that

2    have not been repaid to me.

3    Q.         By whom?  By the Center?

4              THE COURT:  Let him finish, please.

5    A.         By anybody, either the client or the Center

6    or anybody.

7    Q.         And who did you bill?

8    A.         I have not billed anybody at this point.

9    This is --

10   Q.         Go ahead, I didn't mean to interrupt you.

11   A.         Essentially, as you know, this is part of

12   the dispute in D.C., but there are outstanding bills

13   that are pending, that I've not billed the client or

14   asked them to repay me for the money that I've laid

15   out-of-pocket.  Notwithstanding the Center's

16   obligation to pay all the bills and all the attorney

17   fees I, in fact, have laid out money for these two

18   families that I've not been repaid.

19   Q.         How much money would -- I'm sorry, go ahead,

20   finish.

21   A.         That's it.

22   Q.         How much money would that come out to?

23   A.         I don't know offhand for these two families.

24   Q.         Are we talking about hundreds or thousands

25   of dollars?

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1  A.         I'm not sure what we're talking about for

2  these two families.  It may be one or the other,

3  hundreds or thousands.

4  Q.         So it could be thousands of dollars?

5  A.         It wouldn't be tens of thousands of dollars.

6  It's certainly more than a few dollars.

7  Q.         So it's less than tens of thousands of

8  dollars but it's a few dollars, that's your answer?

9  Is that what you said?

10  A.         If you're trying to ask me to quantify what

11  the fees are and so on --

12  Q.         Ballpark figure, if you can.

13  A.         Ballpark, hundreds of dollars for these two

14  families.

15  Q.         Hundreds of dollars?  Okay.

16            Now, you mentioned the D.C. case, that's the

17  case that you have -- or these two families are not

18  involved, correct?  It's a case between the American

19  Center and yourself; is that correct?

20  A.         That is correct.

21  Q.         Did you hear Dr. Engelberg's testimony

22  yesterday regarding the money that was deposited in

23  the registry of the court in D.C.?

24  A.         Yes, I did.

25  Q.         What amount is deposited in the registry

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1   right now?

2           MR. ARIAS-MARXUACH:  For these two families?

3           MR. EFRON:  No, not for these two

4   families --

5           MR. FREESE-SOUFFRONT:  For these two

6   families.

7           MR. EFRON:  For these two families, thank

8   you very much.

9   BY MR. EFRON:

10  Q.        For these two families how much is in the

11  court docket -- in the court registry, I'm sorry?

12  A.        I'm not sure what dollar amount.  I believe

13  it would come to approximately 4 percent of their --

14  of the Center's 20 percent.

15  Q.        So that would be about $400,000 per family;

16  is that correct?

17  A.        I believe that may be accurate.

18  Q.        So that's -- for these two families that

19  would be $800,000; is that correct?

20  A.        That's correct.

21  Q.        And that money is in a dispute because both

22  you and the Center are claiming a right to it; is

23  that correct?

24  A.        That is not correct.

25  Q.        Okay.  Why is the money in the court

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1  registry and what is the dispute about?

2  A.        The dispute is about a promise that Rabbi

3  Perr made to me for all the work I did, that he would

4  pay me on behalf of the Center for these two

5  families.  In other words, the pro rata share of that

6  amount.  The dispute is, the faltering and the

7  Center's reneging on that agreement to me.  That's

8  why it's in the registry; it's money that's in

9  dispute.

10  Q.        So you believe that you're entitled -- for

11  these two families that you're entitled to A, the

12  money that you collected in advances, and for the

13  billings during the time that the case was ongoing,

14  between 2002 and -- actually ongoing to from 2006 to

15  2008; number two, the $2 million you took from them

16  and in addition --

17         THE COURT:  Counsel, it's a compound

18  question so you have to break it down.

19         MR. EFRON:  Yes.

20  BY MR. EFRON:

21  Q.        You mean to tell me that in addition to what

22  you have already collected you're also claiming

23  you're owed an additional $800,000 from the Center,

24  from these families for these cases?

25  A.        Are you asking about the advances or the

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1   money that the clients paid?

2   Q.      No.  I'm asking about the money that's in

3   the registry in D.C.  There's $800,000 that came from

4   this case to the American Center for Justice that are

5   now in the court registry in a dispute with you.  My

6   question to you is, if you intend -- is it your

7   position that you're entitled to those $800,000 as

8   well?

9   A.      Yes.

10  Q.      Yes.  And how long did you work on this case

11  after you signed the retainer agreement again?  Three

12  and a half months?

13          THE COURT:  That's been asked and answered.

14  Move on.

15  BY MR. EFRON:

16  Q.      Do you think it's fair that you received

17  more money for your attorneys fees than most of the

18  claimants in the case did for losing their parents?

19  A.      I -- I don't understand your math on that

20  question.

21  Q.      Well, most of these people that lost their

22  parents received about $1.4 million, a lot of people

23  by bigger families received a lot less.  And you

24  stand to make millions of dollars in each case.

25          Is that fair?

Joshua M. Ambush, Esquire - Plaintiffs' Direct

1   A.        I -- I -- I don't claim to understand how

2   the each individual family's money is worked out in

3   that, so I -- I deny your allegation that it's not

4   fair; that the attorney -- if you look at it from the

5   perspective of this was a 65 million dollar case, the

6   Center received $13 million or they stood to receive

7   from these cases.

8   Q.        And you received 6.5, you received half of

9   that have, did you not?

10  A.        I stood to receive that if all the claims

11  were paid to me.

12  Q.        In addition you're claiming an additional

13  amount from the Center, is that correct, in the

14  Washington, D.C. case; is that correct?

15  A.        That is correct.

16  Q.        In addition to the 6.5?

17  A.        That is correct.

18           MR. EFRON:  If you'll bear with me one

19  minute, Your Honor, I may be almost done or done.

20  Just one minute.  That would be the extent of our

21  direct examination, Your Honor.

22           THE COURT:  And I understand with him as

23  your witness, that's your last witness, you would

24  rest your case?

25           MR. EFRON:  Plaintiffs rest, Your Honor.

1          THE COURT:  Okay.  Now, Ladies and Gentlemen

2     of the Jury, I need Mr. Ambush to continue being

3     examined now by his attorneys.  But before that,

4     because that would be for all purposes the

5     commencement of presentation of evidence by the

6     defense, I need to discuss some matters with the

7     attorneys.

8          So I'm going to excuse you for a few

9     minutes.  If this extends a little more perhaps what

10    we will do is -- what I'm going to ask -- let me do

11    this.  It's 2:30 almost.  I'm going to ask you to go

12    back to your room, Mr. Colon to give you your

13    afternoon refreshments, it's maybe a little earlier,

14    and then we'll try to resume sometimes --I would say

15    let's try to do it ten minutes to 3:00 and then we'll

16    proceed until 5:00 p.m.  So we'll do it that way so

17    we can discuss all matters with counsel.

18          THE COURT OFFICER:  All rise for the jury.

19          (Jury exits the room.)

20          THE COURT:  Let's take a five-minute break,

21    organize, and then Mr. Arias will do Rule 50 and then

22    we'll be back.

23          MR. EFRON:  We're going to do Rule 50 now?

24          THE COURT:  Yes.  Unless Mr. Arias wants to

25    waive it or not.

1        MR. ARIAS-MARXUACH:  No.  That's not in my

2    nature and --

3        THE COURT:  Let's take a five minute break

4    and then we'll come back and do the Rule 50.

5        MR. ARIAS-MARXUACH:  And I don't think my

6    insurance carrier will appreciate it.

7        (Jury Trial recessed at 2:16 p.m. and

8    resumed at 2:49 p.m.)

9        THE COURT:  Okay.  Mr. Arias, so your

10    insurance carrier -- malpractice carrier doesn't --

11        MR. ARIAS-MARXUACH:  It doesn't bulk.

12        THE COURT:  Okay.  Present your Rule 50.

13        MR. ARIAS-MARXUACH:  Okay.  Well, now in all

14    seriousness --

15        THE COURT:  Let's proceed.

16        MR. ARIAS-MARXUACH:  Yes.  May it please the

17    Court, Raul M. Arias on behalf of Joshua M. Ambush,

18    defendant in this case.  At this time Defendant moves

19    towards a judgement as a matter of law under Rule 50

20    A of the Federal Rules of Civil Procedure because

21    plaintiffs cannot establish a sufficient evidentiary

22    basis for this case to go to the jury on either their

23    dolus or duress claims or any claim of breach in the

24    performance of the retainer agreement.

25        As Your Honor aptly put it in one of your

1    evidentiary rulings, this case is about the validity

2    of the retainer agreements that the plaintiffs signed

3    with Joshua M. Ambush on December 15, 2008.

4         As the evidence has shown, these retainers

5    are clear, they're written in both Spanish and

6    English, the retainers were read to them, explained

7    to them, they all agreed and signed them before a

8    notary public.  All the plaintiffs have admitted that

9    they agreed that 10 percent was a reasonable

10   compensation in light of the services that Mr. Ambush

11   had rendered in the past and was about to render.

12   The agreement is clear that it was meant to

13   compensate for services rendered as far back as 2001

14   and that it would also cover the administrative

15   claims process that was enacted in the wake of the

16   U.S./Libya claims settlement agreement.

17        What plaintiffs have tried to allege in

18   their testimony is that there was a verbal

19   representation in the meeting leading to the

20   signature of these agreements, that Mr. Ambush would

21   not collect if the Center paid him 10 percent of the

22   eventual recovery that was to be secured on these two

23   estates.  Now, that testimony, because the retainer

24   agreements are clear, is inadmissible under

25   Article 1233 of the Puerto Rico Civil Code to prove

1  the party's intent.

2      As the Court well knows under Article 1233

3  and its interpretive case law from the First Circuit

4  and from this Court, where the terms of a contract

5  are clear, intrinsic evidence is inadmissible to

6  prove the party's intent.

7      But let's say for purposes of argument that

8  the Court would consider that evidence.  Even so,

9  that evidence does not establish by clear, robust,

10  and convincing evidence that these people were

11  deceived and that Mr. Ambush committed Dolo, because

12  there is no evidence that the Center paid to

13  Mr. Ambush 10 percent of the awards that he secured

14  for these families.

15      In fact, the Center came here represented by

16  Dr. Engelberg and could not establish that he was an

17  employee of the Center.  The Center, reputedly a

18  501(c)(3) tax exempt nonprofit corporation, which

19  enjoys the privilege of not paying taxes to the

20  Federal Government, could not provide an accounting

21  of what it paid Mr. Ambush, if anything, specifically

22  on the Franqui case and more specifically even for

23  the benefit of these two families.

24      Consequently because the testimony and the

25  evidence that has come before the Court does not

1    establish in any way that Mr. Ambush deceived these

2    people, their consent to the retainer agreement was

3    valid and enforceable.

4         And as Your Honor well knows, there are two

5    legal hurdles that govern the landscape here.  First,

6    all contracts are presumed valid; that's the first

7    hurdle.  These contract, because of the their

8    existence, by the mere fact that they exist, they are

9    presumed valid.  So moreover, to the extent that

10   plaintiffs are arguing Dolo, they have to face the

11   clear, convincing, robust evidence standard.

12        Plaintiffs have not even -- an alternative

13   to the duress claim, plaintiffs have not proven

14   duress, they have not claimed any intimidation,

15   threat, there was no testimony.  The record is devoid

16   of any threats or intimidations.  If Plaintiffs did

17   not like the retainer agreement, they were not in

18   agreement with the terms, they simply could have said

19   no.  And, again, there's no evidence -- there's no

20   evidence of duress.

21        Now, also, turning with respect to the

22   performance of the contract, Mr. Ambush did what he

23   said he would do going forward after December 15 of

24   2008.  He gathered the documentation necessary to put

25   these people in a position to have their claim

1    approved by the U.S. Department of State and the

2    funds disbursed into his IOLTA account.

3         Once the funds were disbursed into the IOLTA

4    account he distributed them per the retainer

5    agreement.  He sent 7 million to each of these

6    families, to accounts that they controlled and that

7    is recognized by them in the acknowledgements, and

8    they have all testified that indeed each family

9    received $7 million.  Mr. Ambush also transmitted to

10   the Center 1.6 million per estate.  And the disputed

11   difference, the $800,000, for these two families were

12   paid into the registry of the Court.

13        This case is not about Mr. Ambush's dispute

14   with the Center, even though that dispute lurks in

15   the background in terms of why these people who were

16   happy with paying him 10 percent, who ratified that

17   consent in the acknowledgment in April, would

18   suddenly file suit against him.

19        They have, again, failed to meet their

20   burden of proof in challenging the consent that they

21   gave to retainer agreement, the consent that they

22   ratified in the acknowledgements, and they have not

23   proven any breach by Mr. Ambush.  They have their

24   7 million.  Mr. Ambush took only for himself

25   1 million, as per the retainer agreement, and the

1    dispute in D.C. is a dispute between him and the

2    Center.  If he wins or loses that dispute, the

3    Plaintiffs are not going to be either impoverished or

4    enriched by that dispute because that is a dispute

5    regarding the portions of the funds due to the

6    Center.

7            So in recapping, plaintiffs had the burden

8    of proof on the breach of the contract, duress -- I

9    mean, on the dolo or dolus duress and breach of

10   contract claims and they have failed to meet the

11   burden of proof on the duress claims by clear,

12   convincing evidence.  They have simply tried to amend

13   the terms of the contract through impermissible

14   extrinsic evidence barred by the Article 1233 of the

15   Puerto Rico Civil Code.  Duress, they haven't

16   presented any evidence of duress and there is no

17   evidence of a breach of contract.

18           Now, this argument the preceding argument

19   covers all of the plaintiffs in this case, but I have

20   to mention separately Angel Rodriguez-Robles and Ruth

21   Rodriguez-Robles.  These plaintiffs individually

22   consented to the retainer agreement.  They are

23   represented by Mr. Efron.  I am sure that they were

24   on notice that this trial was set.  This trial has

25   been set for at least two to three months.  And that

1  was sufficient --

2          THE COURT:  Probably longer, I believe.

3          MR. ARIAS-MARXUACH:  I believe so too, Your

4  Honor, but I think more than 30 days is sufficient

5  for the argument I'm making.

6          They could have made the arrangements to be

7  here and they were not.  And the Court is entitled to

8  make an adverse inference that their testimony would

9  have been adverse to all the plaintiffs, but that's

10 not all that the Court is entitled to do.  The Court

11 is also entitled to dismiss their claims or more on

12 separate and independent grounds from the preceding.

13 Why?  Because if they consented individually, as they

14 did to the retainer agreements, they had to come to

15 court and prove exactly in what way that consent was

16 vitiated, if any.

17         Having chosen not to appear, they have not

18 met their burden of proof and that is a second and

19 independent ground for dismissal of those two

20 plaintiffs' claims.

21         I thank you for your attention.

22         THE COURT:  Let me then hear from Mr. Efron.

23 And before I hear from you, let me just pose a few

24 concerns that I have, particularly let's leave the

25 Dolo claim apart for one second because I may ask a

1    few questions about that from Mr. Arias, but as to --

2    there's a duress and there's a breach of contract.

3         I haven't seen any evidence -- I know you

4    wanted to bring some evidence that I did not allow of

5    another person who apparently -- you know, I take

6    your proffer as being true and correct, there was

7    duress against that person -- and that could have

8    been perhaps suggested it was duress.  But that

9    evidence not being allowed, I don't think I have any

10   evidence of duress here and also as to breach of

11   contract because the contract was for 10 percent, 20

12   to the Center, they got the 7 million, each estate.

13        I think what you would have here left is

14   just a Dolo claim because even if there was no duress

15   and no breach of contract, your theory would be

16   that -- and the way I take it -- and, again, that

17   Mr. Ambush knowing that the settlement was still

18   going to go on anyway, and I believe that's what

19   you've spelled in the pretrial order and also in your

20   motion, that nonetheless he kept that to himself and

21   obtained their consent on the Dolo by not adequately

22   perhaps informing them.

23        But as to the duress and the breach of

24   contract claims, what is your position because I --

25        MR. EFRON:  The Court's analysis is probably

correct. We'd have to wait a little bit longer for that, but keep in mind, please keep in mind you've heard testimony from the victims, from the plaintiffs in this case, and they all told you that they signed because, number one, he told them that he was not paid. And it's the *ay bendito*.

THE COURT: But *ay bendito* is not duress, they feel bad for him, but that's not duress.

MR. EFRON: But he defrauded them by saying that.

THE COURT: That would be Dolo, not duress.

MR. EFRON: But they agreed to give him the 10 percent if he had not been paid, number one. Number two, there was an economic threat. And what was the economic threat? They believed that if they didn't pay him, if they didn't sign this document, there was going to be -- he was not going to process or he was not going to process the claim or the claim would certainly be delayed. All of them said that.

MR. FREESE-SOUFFRONT: None of them have said that.

MR. EFRON: That's not true.

MR. FREESE-SOUFFRONT: None of them.

MR. EFRON: Mr. Berganzo clearly said that, Your Honor.

1          As Mr. Arias said in his opening, Mr. Ambush

2     was in a predicament and so he came to Puerto Rico to

3     speak to them.  And what did he tell them?  He lied

4     to them.  He told them he hadn't been paid.  He told

5     them, pay me 10 percent or I won't process the claim

6     or it's going to take a long time.  We have enough --

7     we have enough issues here -- we have enough issues

8     here to go to the jury.

9          The standard on a Rule 50 should be the same

10    as in a motion for summary judgment.  We have enough

11    evidence, enough issues here to go to the jury.

12         THE COURT:  I was looking at my notes and at

13    least looking at the testimony of Leopoldo Garcia --

14         MR. EFRON:  No, no, Leopoldo Garcia hasn't

15    testified yet.

16         THE COURT:  Not Leopoldo Garcia.  Efrain

17    Berganzo, excuse me.

18         MR. EFRON:  Yes, Your Honor.

19         THE COURT:  Mr. Berganzo testified, who was

20    the first witness, when you asked him, What happens

21    if you didn't sign the contract, he was informed that

22    the case would not proceed any further and he would

23    not receive any money.  That was his testimony.

24         MR. EFRON:  So that's an economic duress.

25         THE COURT:  That might be economic duress.

1    As to breach of contract, where is the breach?

2    Because let's forget the duress and Dolo --

3             MR. EFRON:  Defraud and inducement.

4             THE COURT:  But that would be Dolo.  But

5    there would be no breech because -- let's assume the

6    contract -- if the contract was obtained with Dolo,

7    it was fraudulently induced, but that's not a breach

8    of contract.  So where is the breach the contract?

9             MR. EFRON:  I think if we show that there

10   was fraud in the inducement --

11            THE COURT:  There's no contract.  But

12   there's no breach because --

13            MR. EFRON:  Because if there's no contract,

14   there's no breach.

15            THE COURT:  If there's no contract, there's

16   no breach.  But you cannot -- if there's no Dolo and

17   there's no duress then the 10 percent and the

18   20 percent -- or at least the 10 percent would be

19   valid between Mr. Ambush and the estates.  There

20   would be no breach of contract because they got the

21   7 million, he got the 10 million and the other

22   entity, the Center, got the 20, and that's what the

23   contract says.  So I don't think there's been an

24   issue of breach.  You know, I don't want to waste

25   anybody's time, but I think at least the breach of

1   contract, I'm Rule 50ing it, dismissing that claim.

2         MR. EFRON:  Your Honor, can we be heard on

3   the other matter?

4         THE COURT:  Let me leave Angel and Ruth

5   because their inference outside for a second.  I want

6   to hear from Mr. Arias.  But I do have -- again, I

7   just read Mr. Berganzo's testimony.  He does appear,

8   at least in the light most favorable to him, it would

9   appear that he felt obligated to sign because he was

10  informed the case could not be processed and that

11  they would not be receiving the money that would be

12  due.  Isn't that, Mr. Arias, economic duress?

13        MR. ARIAS-MARXUACH:  No, it's not economic

14  duress because there has been no evidence as to

15  Mr. Berganzo's economic condition.  And even if he

16  were in a disadvantage economic condition, the cases

17  that we cited in the pretrial have said that the fact

18  that you may be in a disadvantage economic condition

19  by itself does not mean duress.  We have to bear in

20  mind that this is --

21        THE COURT:  I note that you asked him some

22  questions on cross.  He's not starving obviously.

23  Everybody's getting Social Security --

24        MR. ARIAS-MARXUACH:  And they were all

25  living according to how they had been living for

1  years.  There was no acute economic crises that they

2  were facing that they could not simply say, you know

3  what, I'm not going to sign, I'm going to take a time

4  out and think about whether I want to consent to this

5  contract.  Remember, the standard for duress is a

6  threat of imminent economic harm.  Now, if their

7  financial condition had been do dire, they were

8  facing *ejecucion de hipoteca*, you know, an eviction

9  or that type of situation maybe we could be talking

10  about --

11        THE COURT:  Had they not received the

12  estates the $7 million or $8 million or the amounts

13  that would have been due, they would have still not

14  faced an economic duress because they continued to

15  earn and make whatever they were making up to that

16  point.

17        MR. ARIAS-MARXUACH:  And --

18        MR. EFRON:  I hadn't finished.

19        THE COURT:  Well, I interrupted you then

20  so --

21        MR. ARIAS-MARXUACH:  The Court asked me to

22  speak.

23        THE COURT:  I had Mr. Arias to respond to

24  that, but I know you haven't finished.

25        MR. ARIAS-MARXUACH:  Your Honor, again, the

1    standard for duress is imminent economic harm.  And

2    if the process had been delayed they would have been

3    continuing to live the same way as they had lived for

4    decades.  Mr. Berganzo in particular, he's a full

5    pensioned beneficiary of the Puerto Rico Electric

6    Power Authority, and his wife as well.  And those

7    testimonies are in evidence, so they were living very

8    well.  He's the only way who may have a little delay

9    and that's not sufficient.

10          I think the case that we cited in our

11   pretrial, Your Honor, and the case that we cited in

12   our brief, we cite several cases from the First

13   Circuit and the bankruptcy court here that show this

14   is not economic duress.  Moreover, let's not forget

15   that December 15 came and went and these people had

16   time to think about this.  They money did not come in

17   until April of 2'09.  They had all those months.

18   They had, January, February, March, April to think

19   whether they had been threatened, coerced, somehow

20   led astray.  And what they chose to do instead was to

21   sign an acknowledgment where they recognized that the

22   funds had been distributed properly and where they

23   knowingly and voluntarily waived their right to legal

24   counsel.

25          THE COURT:  Let me here, again, as to

1    duress.

2         MR. ARIAS-MARXUACH:  And, again, it happens

3    to be that the person who signed the acknowledgment

4    was precisely Ruben Berganzo, the only one who

5    testified about duress and the one who was certainly

6    in very good economic condition.

7         THE COURT:  Let me hear as to the duress

8    issue, Mr. Efron.  Not as to Dolo, leave Dolo aside.

9         MR. EFRON:  The reason they didn't do

10   anything about it until later is because they didn't

11   have the information.  They were --

12        THE COURT:  Okay, but then that wouldn't be

13   duress, that would be Dolo.  That's what I'm trying

14   to get at.  Because economic duress, they're not

15   going to lose -- they would not be able to pay for

16   their mortgage, not be able to pay for their existing

17   debts.  This is money like --

18        MR. EFRON:  I think their condition of

19   elderly, not highly sophisticated country folk put

20   them in a situation that put them in a disadvantage.

21   Even if the duress is not as clear, they're worried

22   about what's going to happen, what if they don't

23   receive the money before they die --

24        THE COURT:  That would be something going

25   into Dolo, it wouldn't be duress.  And, again, at

1    least Mr. -- the first witness here, Mr. Efrain

2    Berganzo, he might be of humble origins, but he does

3    have education.  He was in the Army, he worked at

4    PREPA for many years, he went up all the way.  He's a

5    smart person.

6          So I have to say -- and I believe that,

7    Mr. Efron, what you do have, and I'll hear in this

8    respect from Mr. Arias before I will further address

9    this, but I believe that what you have here is a Dolo

10   claim, not a duress or a breach of contract.

11         So I am going to grant the Rule 50 as to

12   duress and as to breach of contract.  As to Dolo, I

13   am not inclined to grant the Rule 50, but I will hear

14   again from Mr. Arias.

15         Then let me address from you, Mr. Efron, as

16   to Angel and Cruz-Rodriguez.  Obviously yesterday or

17   the day before you, yourself, discussed that if they

18   weren't here obviously the procedure is to inform the

19   jury that there's an adverse inference --

20         MR. EFRON:  But that's all that can happen,

21   Your Honor.

22         THE COURT:  But that could be -- I am not

23   going to dismiss their claims.

24         MR. EFRON:  They're plaintiffs in the

25   case --

1          THE COURT:  But let me say, they do have

2     individual claims.  We don't have evidence of what

3     their claims --

4          MR. EFRON:  Pain and suffering from Dolo

5     would constitute.

6          THE COURT:  -- some sequential damages for

7     Dolo --

8          MR. EFRON:  We agree with Your Honor.

9          THE COURT:  -- they have no -- as individual

10    members.  As members of the estates, the estate is

11    the actual member, the plaintiff, there's an adverse

12    inference and that adverse inference can carry on to

13    the others, but at the same time it goes to the

14    weight of the evidence and --

15         MR. EFRON:  That's exactly what it is, it's

16    the weight of the evidence.

17         THE COURT:  But there's no evidence as to

18    why they're not here.  So you can't tell the jury

19    that I'm sorry they're not here, they were --

20         MR. EFRON:  I don't think we can dismiss

21    their claims as to their portion of the estate simply

22    because they're --

23         THE COURT:  To me the estate --

24         MR. EFRON:  The estate and they are

25    plaintiffs in the case.

1          THE COURT:  -- 7 or $8 million --

2          MR. EFRON:  That they participated in the

3     case, that they were deposited.

4          THE COURT:  No, but they're plaintiffs, they

5     are plaintiff.  But, again, they don't have any

6     individual claims, I have to dismiss them --

7          MR. EFRON:  We agree with that, Your Honor.

8          THE COURT:  -- they are just as -- you know,

9     they are parties because they're representatives of

10    the estates.  If they weren't representatives of the

11    estates, the whole estate probably couldn't go

12    forward.  But, again, and there's going to be an

13    adverse inference instructions on that.

14         MR. EFRON:  There's to other arguments on

15    that point, if that's the Court's ruling.

16         THE COURT:  But that would be the Court's

17    ruling.

18         Then as to Dolo, let me then hear from

19    Mr. Arias.

20         MR. EFRON:  He did argue Dolo.

21         THE COURT:  No, no, but what I'm saying is,

22    at this time I'm inclined not to dismiss the Dolo.

23    And I'll here from him next, then I'll hear from you

24    again.

25         Now, let me ask Mr. Arias, my only concern

1    as to Dolo, contrary to the other claims I have where

2    I granted the Rule 50 is, again, your theory or what

3    you argue if I were judging the case and the case

4    were submitted to me, I may very well rule in your

5    favor but that would require me perhaps to weigh a

6    little bit of the evidence, going some credibility

7    matters.

8         And, again, your position in theory might be

9    more likely true than not that you might have the

10   preponderance.  But that, I think, we have a jury

11   here, we're not in superior court or in the local

12   court where there's no jury, and that is my concern.

13   I feel that I am usurping the role of the jury in

14   this matter.  And, again, you very well may --you

15   know, let me hear from you.

16        MR. ARIAS-MARXUACH:  *Bueno*, Your Honor, I

17   don't think that it would be usurping the role of the

18   jury, and let meet tell you why; because it is our

19   contention that even if you credit their statement

20   that they signed under a verbal representation that

21   if the Center paid Mr. Ambush 10 percent -- that they

22   signed only because -- well, that they signed -- that

23   they thought that the 10 percent was reasonable to

24   him and that he would not collect from them, if the

25   Center paid him 10 percent, the fact is that the

1   Center has not paid him 10 percent.  There is no

2   evidence that the Center has paid him anything.  The

3   Center came and couldn't prove what they had paid

4   him.  And after December 15, 2008 it is certain that

5   he has not been paid anything by the Center.

6        So even if you credit their testimony, they

7   have not met their burden of proof of showing that

8   that representation was false.

9        THE COURT:  Okay, but let me say this --

10       MR. ARIAS-MARXUACH:  And even if you took,

11  Your Honor, the cavalcade of checks that were

12  admitted into evidence, those checks, which, again,

13  there is no competent areas that they pertain to the

14  Franqui case, those checks total $108,000, not the

15  $2 million that Mr. Ambush was given by these

16  plaintiffs through the retainer agreement.

17       So even if you credit their testimony that

18  Mr. Ambush would only collect from them if the Center

19  did not pay him, well, guess what, the Center has not

20  paid him; because the only evidence on the record is

21  that the Center paid him $108,000.  And he was not a

22  party to the claimant and center agreement.  That has

23  been abundantly clear from the face of the document.

24       THE COURT:  Let me -- before I hear from

25  Mr. Efron, let me say this:  And I know this is

1    perhaps part of Mr. Efron's argument and the way I've

2    seen him present the evidence, the issue here -- and,

3    again, I think it would go to Dolo -- is, we have --

4    these claims, the U.S./Libyan agreement is reached

5    and the work has been done already.  I agree that

6    Mr. Ambush has performed work and the work -- and

7    I've looked at the complaint.  He's the one who filed

8    the complaint, he signed it, it's not the Center,

9    it's the attorney who's been doing the work.  But

10   under that original retainer agreement, whether, you

11   know, the plaintiffs were no matter what at some

12   point -- and, again, I think -- and, again, this is

13   perhaps something that the jury is not going to be

14   explained, but he's still the attorney.

15           If he doesn't get a penny, he's still -- as

16   he said, I'm their attorney.  He's still their

17   attorney.  And I see this happen all the time here in

18   court.  We have -- and I'm sure both of you,

19   Mr. Freese and Mr. Arias, and same as Mr. Efron,

20   you've had clients who haven't paid you and you still

21   have an ethical obligation you have to go on.

22           MR. EFRON:  I do contingency.

23           THE COURT:  But the problem is, he's

24   still -- you know, he has to do whatever's best for

25   these plaintiffs.  He has -- if they're going to get

1   $8 million and the work is done, whether -- let's

2   assume the Center never pays him, he still has to go

3   on forward and do that work.

4          And the problem is, he's coming back and

5   asking for additional 10 percent.  It may be an ay

6   bendito on behalf of the plaintiffs, but the problem

7   is the work still has to be done and they could still

8   be getting the $8 million.

9          I'm not saying I'm finding against him if I

10  were the one ruling, but in the light most favorable

11  to the plaintiffs, under Rule 5010, I think this

12  matter should go to a jury.  It might very well be

13  that the jury agrees with Mr. Ambush.  But I think

14  that's what Mr. -- and let me hear from Mr. Efron.  I

15  believe that's what Mr. Efron is claiming in the

16  pretrial --

17          MR. EFRON:  In part, in part.

18          MR. ARIAS-MARXUACH:  *Bueno*, Your Honor --

19          THE COURT:  Let me hear from Mr. Efron and

20  the I'll hear from you, Mr. Arias.

21          MR. EFRON:  I know it's hard to leave the

22  podium, but, look, first of all the defendant's story

23  has changed completely here, actually through his

24  attorneys, because now it's 10 percent he was

25  entitled to.  Sure, they wanted to give him

1    10 percent, but he never had a 10 percent agreement

2    with anybody.  He testified a few minutes ago that he

3    was supposed to be at a contingency.  When I asked

4    him how much, he said -- he honestly said, It was not

5    the determined.  Now --

6         THE COURT:  But after he signs the

7    agreement, then it becomes a 10 percent.

8         MR. EFRON:  No, no, no, no.  He's talking

9    about his agreement with the Center, not with them.

10   When I asked him what were you supposed to get from

11   the Center that you have to go to these people and --

12        THE COURT:  I remember.  He did mention he

13   was expecting a contingency.

14        MR. EFRON:  But he didn't say how much

15   because he didn't know.  Because it's not true.  So

16   he goes to these people --

17        THE COURT:  Okay, but for Rule 50, I don't

18   decide if it's true or not.

19        MR. EFRON:  I know, but there is an issue.

20   So what happens next?  He goes to these people and he

21   says -- he goes to these people and he says, it's --

22   it's not -- he didn't tell them, They said they were

23   going to pay me 10 percent.  He said to them, They're

24   not paying me anything; if they don't pay me

25   anything, I can't continue representing you, I

1    can't -- I can't -- the claim is going to be delayed.

2          THE COURT:  Mr. Berganzo testified that they

3    will not be able to get the money.

4          MR. EFRON:  Only because they thought that

5    he was not being paid for anything.  We're not

6    talking about 10 percent.  Did they agree to sign the

7    10 percent -- that 10 percent contract?

8          (Mr. Ambush steps out.)

9          MR. EFRON:  So the -- so, anyway, that was

10   the economic threat.  They're telling them that --

11   now, he told us that they was no contingency that was

12   determined.  He testified that he gave the Center no

13   invoices, that there was nothing pending.  It seems

14   to me that if anybody owes him money, it's the

15   Center, which he hasn't billed.  And he's actually

16   claiming money from the Center's assets in the D.C.

17   case.

18          In this particular case, with these two

19   families, he's claiming $800,000 in addition to what

20   he has already collected for no work.  Everything was

21   already done.  He came to them after the fact when he

22   saw the money coming from the heavens, like he said.

23   I think we have enough -- we have enough issues of

24   fact here, Your Honor, to go forward on the Dolo

25   claim, and this is a question for the jury.

1          THE COURT:  Okay.  Mr. Arias, you get the

2    last say.  And before that, let me say, Mr. Efron

3    just made a comment but I think that it's something

4    that I tend to agree, that everything was all done.

5    I note some administrative work and some other

6    matters were still done afterwards and, again, an

7    attorney still has the responsibility.

8          But this -- and I have to say this, from my

9    perspective, and I'm not saying there's been anti

10   ethical -- unethical act, because, you know, the

11   parties understand what they're doing, but that

12   really goes to the jury's determination because it's

13   kind of strange that, you know, at that stage an

14   attorney will ask for a retainer or a 10 percent when

15   it's never been -- it hasn't been done before and

16   there's already a 20 percent going to the Center and

17   it all adds to a million dollars versus two estates.

18   Again, I'm not concerning the other estate, for all

19   purposes, but, again, this is something I think the

20   jury is entitled to weigh that evidence.

21          I think the arguments you're making to me,

22   you should make them to a jury.  They very well may

23   agree with you.  But, again, I think it's a jury

24   issue.  I don't know if you have anything else to

25   add, but I'm very inclined to deny the motion even

1   though it's preserved for the record.

2          MR. ARIAS-MARXUACH: *Bueno*, Your Honor, I

3   have to say that I disagree respectfully with you

4   that the fact that the litigation was an advanced

5   stage and it was dismissed because of the settlement,

6   no constitutes dolo.  The agreement was clear.  The

7   agreement says that it was covering the services

8   rendered before.

9          It was a retroactive retainer agreement, it

10  says it specifically, and it would cover then all

11  that work that he did in the Franqui case, both

12  preparing it and then when it became an actual case,

13  all the work that he did.  So the fact that the case

14  was at an advanced stage actually weighs in favor of

15  holding a retainer agreement because it specifically

16  addresses that it's going to cover that time frame

17  and then cover the subsequent work.

18         And, again, they haven't proved what is the

19  falsehood.  They all testified that they all thought

20  10 percent to Mr. Ambush was reasonable.  And all

21  they've said is, if the Center did not pay him the

22  10 percent, we would pay him -- something that is not

23  in the agreement.  They are trying to amend a clear,

24  written agreement and call it Dolo.

25         And that is why we believe there is no jury

1    question, because even if you credit their testimony

2    that there is a verbal representation, that verbal

3    representation is not false because the Center has

4    not paid Mr. Ambush $2 million.  The Center has not

5    proven what they paid Mr. Ambush.

6          Dr. Engelberg sat there and he couldn't say

7    what they paid Mr. Ambush.  He worked on other

8    matters for them.  He recognized that the checks did

9    not specifically reference Berganzo, did not

10   specifically reference Rodriguez-Robles.  They did

11   not even specifically reference Lod or Franqui.  The

12   checks don't prove anything.  They have no probative

13   value.  And even if credited, they're a hundred

14   thousand dollars versus seven years of work,

15   $7 million per estate.

16          And, again, I think if this case goes to the

17   jury based on those flimsy allegations, then the

18   security and stability of commercial relationships

19   are very threatened, because Dolo requires clear,

20   convincing and robust evidence and they haven't

21   proven anything.

22          MR. EFRON:  Just for the record, Your Honor,

23   please, first of all, there was no testimony from any

24   of the plaintiffs that if the Center would not pay

25   him the 10 percent, they would.  It was whether if

1  the Center paid him nothing for his services then

2  they would give him the 10 percent.  That was the

3  testimony.  That is the gist of the case.  *Y* -- in

4  the meantime --

5          THE COURT:  What happens here is they get --

6  each estate gets 7 million, but there's --

7          MR. EFRON:  Instead of eight.

8          THE COURT:  I know some money is being

9  litigated between the Center and Mr. Ambush, but the

10  problem is this is a case where the plaintiffs should

11  have gotten 8 million in theory and they're getting

12  7 million.

13          MR. EFRON:  While he litigates the other --

14  the rest of the money in Washington, including

15  $800,000 from these two families.  So he would stand

16  to get $2.8 million plus what he was already paid,

17  based on his billings.

18          THE COURT:  Let me hear from Mr. Arias.

19          MR. ARIAS-MARXUACH:  *Bueno*, Your Honor, you

20  see, this is the problem.  If you boil down

21  plaintiffs' argument to its essence, if the Center

22  paid Mr. Ambush $500, then he's not entitled to

23  anything from them for seven years of work.

24          MR. EFRON:  It has to be reasonable.

25          MR. ARIAS-MARXUACH:  These people were not

1    looking to sue Libya, not looking for additional

2    compensation from the Lod Airport Massacre.  Joshua

3    Ambush came and found them and they signed a clear,

4    written agreement.  We have to focus on the

5    December 15 meeting and the document, and the

6    document is clear and there's been no evidence of a

7    falsehood.

8              THE COURT:  Thank you.  We need to move on.

9    At this time I am going to deny the Rule 50 as to the

10   Dolo claim and I'm not saying it shouldn't be

11   granted.  I think Mr. Arias has made some very good

12   arguments.  I feel I would be weighing the evidence

13   and the testimony, the credibility, nonetheless it is

14   something that I want to give to the jury.

15             The jury may very well find in Mr. Ambush's

16   favor.  If it doesn't, then Mr. Arias can submit it

17   in writing post trial again, preserve it, and I will

18   revisit it again.  But, again, at this time I am

19   going to proceed and take the case to the jury.

20             Okay.  Let me take a five-minute recess,

21   we'll bring in the jury and then Mr. Ambush will

22   continue with his testimony.

23             THE COURT OFFICER:  All rise.

24             (Jury Trial recessed at 3:26 p.m. and

25   resumed at 3:42 p.m.)

1          (Jury enters the room.)

2          THE COURT:  Let me have counsel approach

3     briefly.  Please be seated.

4          (Side bar discussions begin.)

5          THE COURT:  Mr. Arias, I note you have your

6     direct, you're also going -- I understand that

7     probably all or most of your cross is going to be

8     part of your direct, am I correct, or you have some

9     particular cross --

10          MR. ARIAS-MARXUACH:  A lot of the areas will

11     be on the direct, but I think I would like to cover

12     some areas in the cross and then start my direct in

13     those areas on the cross.

14          THE COURT:  You can do leading questions,

15     and when you're going to start, ask for another side

16     bar and then --

17          MR. EFRON:  We were just talking about that

18     before.

19          THE COURT:  Okay.  Let's do it that way.

20          Ladies and Gentlemen of the Jury, the

21     plaintiffs have presented all their evidence.  Now

22     the -- Mr. Ambush will present evidence on his

23     behalf.

24          So, Mr. Arias, your first witness for the

25     jury obviously is Mr. Ambush whom you're calling.

1          MR. ARIAS-MARXUACH:  Yes.

2          THE COURT:  And you're going to cross

3  examine him first because he was a witness of

4  Mr. Efron, but then you're going to continue with

5  your presentation of your case.  So let's proceed.

6          DEFENDANT'S CROSS EXAMINATION

7  BY MR. ARIAS-MARXUACH:

8  Q.        Mr. Ambush, during direct examination you

9  were asked about your name and during the opening

10  statement there was also reference to your name; can

11  you tell us what the name Ambush means?

12  A.        Yes.  Ambush is actually a Hebrew word,

13  'cause the Hebrew letter spelled out.  It's just an

14  acronym.  For example, in English FBI is an acronym.

15  So in Hebrew the letters that make up the name

16  Ambush, translated it stands for, I believe with a

17  perfect faith.  It's essentially related to the word

18  Amen; the first two letters are I believe.  So it's

19  the same word -- Amen, Ambash, Ambush.

20  Q.        So despite your religious heritage, it's not

21  a mode of attack, correct?

22  A.        Correct.

23          THE COURT:  Let me also state -- and

24  Mr. Arias, sorry to interrupt.  Let me just advise

25  the jury, you probably have noticed yesterday when

James M. Ambush, Esquire - Cross

1    Mr. -- Dr. Engelberg was asked to take the oath, as

2    well as Mr. Ambush, that they don't take the oath,

3    they attest.  That is because of religious reasons.

4         Maybe one of you or you know somebody who is

5    a Jehovah's Witness and for religious reason also

6    would come here and not attest and that is something

7    that is respected by the Courts.  And for all

8    purposes he is under oath, but the way he attests is

9    a bit differently, but you treat it exactly the same

10   way.

11        And that's important that none of you have

12   the impression that, oh, he didn't take the oath.  He

13   is under oath that he's telling the truth and nothing

14   but the truth, as well as any other witness who's

15   testified.  You will weigh those testimonies at the

16   end of the case.

17        But, again, the oath is meant to respect his

18   religious -- just like any of you were to testify and

19   have any a religious preference, I would have to

20   respect that.

21        MR. EFRON:  And it would have the same

22   effect on perjury --

23        THE COURT:  No, the jury will consider and

24   weigh all the evidence, whether they believe it or

25   not, but for purposes of the Court, all the witnesses

James M. Ambush, Esquire - Cross

1   have been sworn in whether they attested or accepted

2   as a swearing in.  So let's continue.

3   BY MR. ARIAS-MARXUACH:

4   Q.      Now, during Mr. Efron's direct you indicated

5   that the reason that you did not have a written

6   retainer agreement with the American Center for Civil

7   Justice is that you had an expectation of

8   participating on a percentage basis in the recovery,

9   correct?

10  A.      Correct.

11  Q.      Can you tell us what was the basis of that

12  expectation?

13  A.      The expectation was based on my relationship

14  with Rabbi Perr and my discussion with him, that this

15  is the case I brought to him.  This isn't the Center

16  referring an attorney a case; I brought this case to

17  them, and he agreed to sponsor the case as he did in

18  other cases.  And that's why there's an expectation

19  and an understanding that at the end of this case

20  there would be a recovery for me, the attorney, and

21  there would be a payment that I could rely on.

22  Q.      And why would you rely on a verbal

23  representation from Rabbi Perr?

24  A.      Rabbi Perr, you have to understand the

25  relationship, was essentially a father figure to me.

James M. Ambush, Esquire - Cross

1   This was not a case of, okay, somebody off the

2   street.  I've known him as a child as we've heard,

3   but moreover he was --I'll give a couple examples.

4   He was one of the officiating ministers or rabbis at

5   my wedding, okay?  He was at my father's death bed,

6   okay, we were that close.  We grew up -- his kids

7   were in school with me.  I knew him and relied on him

8   and it was a-mentor-and-a-protege relationship, but

9   it was more than that.  And that's why I realized on

10  him.

11  Q.      When did he make these representations?

12  A.      When I first brought the information to him

13  about the Lod Airport case in 2001.

14  Q.      Did he make this representation only once?

15  A.      No.  This was reassurance I had ongoing.

16  When I first started the case, he reassured me, arm

17  around my shoulder, walking in front of his house,

18  that I would be paid and I shouldn't worry, and

19  "Don't worry," 'cause he knew, he heard my concern,

20  and we discussed it at that time in detail.

21          In fact he almost teased me later in 2008

22  that -- the fact that I didn't have a retainer

23  agreement with him but not to -- you know, because he

24  was saying, "Even God requires something written in

25  writing."

James M. Ambush, Esquire - Cross

1          MR. EFRON:  Objection.  It's hearsay.  We've

2     been very patient.

3          MR. ARIAS-MARXUACH:  Your Honor, the Center

4     was an agent of the plaintiffs under the claimant and

5     center agreement because the Center took the duty to

6     compensate the attorneys.  And as we heard from

7     Mr. Engelberg, the decisions as to how to pay

8     Mr. Ambush at the Center were taken by Rabbi Perr.

9     And we've also heard from Mr. Engelberg that Rabbi

10    Perr is a principal of the Center.

11         And so it is not hearsay, it is -- first of

12    all it, is a verbal act.  What is important is that

13    the words were said, they're not offered necessarily

14    for the truth of the matter is asserted, they have

15    independent, legal significance; and if they were to

16    be considered hearsay, they would be also admissible

17    under 801(d) as an admission by an agent, because

18    they had entrusted the Center to compensate the

19    claimants, entrusted the Center to compensation the

20    attorneys.

21         And whatever representations Mr. Perr, the

22    Rabbi Perr, made to Mr. Ambush are imputable to the

23    plaintiffs under the claimant and center agreements.

24         MR. EFRON:  They took his deposition.  If

25    he's out of the jurisdiction, they could have read

James M. Ambush, Esquire - Cross

1   his deposition here as his testimony and not have the

2   defendant self-servingly allege what Rabbi Perr told

3   him, which is contradictory to the deposition, of

4   course, which is why they don't want to use it.  But

5   it is hearsay.

6           MR. ARIAS-MARXUACH:  I disagree with you.

7           THE COURT:  I disagree with you.  I

8   understand for the purpose it's being used it's not

9   hearsay, so let's move on.

10  BY MR. ARIAS-MARXUACH:

11  Q.      So you were telling us that Rabbi Perr gave

12  you assurances.

13  A.      Absolutely.

14  Q.      And what did you understand those assurances

15  to mean?

16  A.      I understood it to mean a percent of the

17  case, you know, a substantial percentage of the case.

18  Q.      And did you have any parameters to weigh

19  that expectation?

20  A.      I had parameters of what other cases had

21  recovered, other attorneys had recovered in other

22  cases, and what -- the law of the land in other

23  cases.  In typical fashion, in Washington, D.C., for

24  example, on a contingency matter, attorneys can

25  expect a recovery of 50 percent.

James M. Ambush, Esquire - Cross

1    In Maryland the custom is 40 percent, if it

2    goes trial.  In other words, if a case is filed, once

3    it's filed and then it's defended, it could be up to

4    40 percent.  In Puerto Rico I understand the custom

5    or the fee that an attorney can assume is reasonable

6    and the cap, if you will, that the Court essentially

7    says or the law here says is customary and reasonable

8    is 33 and a third percent.

9            MR. EFRON:  That's not true.

10           THE COURT:  Mr. Efron, let him testify.

11   A.        That is my understanding, a third -- let's

12   call it a third of the recovery.  So in a case like

13   this, I understood that I could, as an attorney,

14   expect that, but in a reasonable way it would be

15   something less than that.

16   BY MR. ARIAS-MARXUACH:

17   Q.        Now let's talk about the December 15, 2010

18   meeting.  That meeting was held --

19   A.        2008.

20   Q.        Sorry, 2008.  It's the witching hour of

21   four o'clock.

22           Now, the December 15, 2008 meeting at Efrain

23   Berganzo's house, did the plaintiffs know that the

24   expected recovery for wrongful death, if they

25   submitted a claim to The State Department could be

James M. Ambush, Esquire - Cross

1    10 million per estate?

2    A.        Yes.

3    Q.        Why did they know that?

4    A.        Because I told them.

5    Q.        When did you tell them?

6    A.        I told them through a phone call from myself

7    and Leopoldo Garcia to Efrain Berganzo prior to the

8    2008 meeting.  I told them in an e-mail to the son of

9    Efrain Berganzo, Jose Berganzo.  And that's how I

10   know they knew in advance.

11   Q.        What about at the meeting?  Did you cover

12   that subject in the meeting?

13   A.        We did, absolutely.

14   Q.        So is it fair to say that when they signed

15   the retainer agreement that we have seen so many

16   times in this trial, and we can just refer to Joint

17   Exhibit -- Joint Exhibit 11.  Would it be fair to say

18   that, for example, the Rodriguez-Robles family signed

19   this, they knew that the administrative claim, if

20   approved, could produce $10 million?

21   A.        Yes.

22   Q.        And they knew through elemental math that

23   you would be taking $1 million from those

24   $10 million?

25   A.        When I met them and after we discussed it,

James M. Ambush, Esquire - Cross

1    yes.

2    Q.        Now, at that December 15, 2008 meeting, did

3    you tell the members of the Berganzo or

4    Rodriguez-Robles families that you would stop working

5    on their behalf if they did not sign the retainer

6    agreements?

7    A.        No, never.

8    Q.        Did you ever tell the members of the

9    Berganzo or Rodriguez-Robles families that the

10   handling of their claims would be delayed if they did

11   not sign the retainer agreements?

12   A.        No.

13   Q.        Okay.  Did you ever tell them that you

14   would --

15            MR. ARIAS-MARXUACH:  Strike that.

16   BY MR. ARIAS-MARXUACH:

17   Q.        Did you ever tell them that this 10 percent

18   fee that they were granting you under the Joint

19   Exhibit 11 would be contingent on the Center not

20   paying you?

21   A.        No, absolutely not.

22   Q.        Did you tell them if the Center afterward

23   pays me something, I will return it?

24   A.        No.

25   Q.        Is that anywhere in Joint Exhibit 11?

James M. Ambush, Esquire - Cross

1  A.       No, it is not.

2  Q.       Now, after the plaintiffs signed the

3  retainer agreement, what work did you undertake on

4  their behalf?

5  A.       After the retainer was signed and I went

6  back home to Maryland, I had to continue the process

7  of putting together all the documents that the State

8  Department had requested and had required for the

9  claim to be paid.  That entailed working with some of

10 the family members to have each of them submit to me

11 the various documents that were required, for

12 example, birth certificates, proof of U.S.

13 citizenship, often with a passport, photo I.D., and

14 there was interaction among them throughout that.

15       What this process is called is espousal,

16 where you're espousing a claim.  It's a fancy word

17 for saying you're processing a claim before not a

18 court, but before administrative body of the U.S.

19 Government.  So I did all the things that were

20 necessary in order to do that.

21       In addition, I was still attorney on the

22 case; it was a live case.  I was in consultation with

23 The State Department and the Justice Department

24 attorneys and the Libyan attorneys on the outcome and

25 the disposition of the case even prior to going.

James M. Ambush, Esquire - Cross

1     It's not merely formulating a simple one

2  paragraph dismissal of the case.  The question is the

3  timing of it.  When is it appropriate to dismiss the

4  case?  If the case was dismissed prematurely, that

5  could have blown the claim completely.  And I was

6  cautioned by The State Department to keep the case

7  alive, whatever I to do, do not settle prematurely.

8  Although I'm litigating with Libya and although

9  they're settling with the U.S. Government, ignore the

10 settlement for a moment, you have to keep the case

11 alive.

12     So even after the settlement was

13 acknowledged by the U.S. Government, and then you

14 have to wait, the president of the United States had

15 to sign it.  So first were several steps.  Congress

16 hadn't approved -- first the State Department

17 negotiated it with Libya -- premature, don't do

18 anything.  Then it goes from The State Department in

19 Libya to Congress, they have to vote on it -- don't

20 dismiss the case yet, it's premature.  Then once

21 Congress votes on it, it still has to go to the

22 president for signature -- don't dismiss the case,

23 premature.  Finally once the president signed it, I

24 still waited.  It's still premature because I have

25 one task left, to go talk to the client.

1    So I went and I spoke to the client and once

2 I spoke to the client in person and explained what I

3 had been discussing previously on the telephone and

4 through e-mails, then it was safe to dismiss the

5 case.  But even so, the timing of that was debatable

6 because I had some dispute with attorneys for Libya

7 where there's going to be a joint motion to dismiss

8 or it's going to be a motion on our part that they

9 would then oppose because they were debating how to

10 proceed with it.

11    Ultimately it -- we were the ones who

12 filed -- I filed it, I drafted and filed the motion

13 to dismiss.  And then it was ultimately ruled upon by

14 the judge and that's how the case was dismissed.

15 Q.    Going back to the December 15, 2008 meeting,

16 did you tell the members of the Berganzo and

17 Rodriguez Robles family that the Center had not paid

18 you any money for your work on the Franqui case?

19 A.    No.

20 Q.    What did you tell them at the meeting about

21 your relationship with the Center?

22 A.    I mean, essentially I can go back a little

23 bit and explain it to you.

24    I had come to the families and explained

25 that the Center had paid me some money along the way,

James M. Ambush, Esquire - Cross

1    I needed money to pay some expenses.  I needed to

2    file the case, which I did on my own expense, and

3    then sought to be reimbursed by the Center.  There

4    were other expenses along the way that I needed to

5    and requested that they reimburse me.  For example,

6    translation fees.  There were other fees along the

7    way that I incurred that I wanted to be reimbursed,

8    which I had to wait over a year to get finally

9    reimbursed from.  So I explained it, they did

10   something.

11          They also, when I came down to Puerto Rico

12   initially in 2001, the Center paid for the plane

13   ticket.  So they had done things for me and for them

14   that were for their benefit.  There were expenses

15   that were reimbursed and then there were also some

16   sums of money which were not to be considered in any

17   way, shape, or form as payment in full; these were

18   advancements.

19          For example, I have a large family and I'm

20   starting -- I'm working on other case matters.  And

21   then on -- in a situation where I've got a case like

22   this that requires significant time and attention,

23   it's taking away time that I could be making money on

24   other cases, you know, to live on, to feed my family

25   and so on, to keep my practice going.

James M. Ambush, Esquire - Cross

1    Rabbi Perr agreed to pay me some stipends

2    towards that and he called them advances.  And that's

3    what I explained to the families, that the Center had

4    paid.  I did not come and say they paid me nothing.

5    I said, they have paid me small sums along the way,

6    sporadically but that is not to be confused with or

7    to be considered in any way, shape, or form the

8    expectation I had or that the Center had promised to

9    be payment in full, that is absurd.

10    And that's what I explained to the families

11    and that's what they understood.

12    Q.    Okay.  Were they aware what was the work

13    that you would undertake from the retainer agreement

14    forward?

15    A.    Yes, because I had not only explained it

16    there but even prior to coming down, but they were

17    aware what we have to do.  I needed their

18    cooperation, I needed their approval, and I needed

19    their ultimate satisfaction in order for the case to

20    be finalized.

21    Q.    And now, was the 10 percent fee that was

22    granted to you in the retainer agreement meant to

23    compensate solely the work that was going to be done

24    from December 15 onward?

25    A.    No.  What you have to think about and

James M. Ambush, Esquire - Cross

1  consider is that it's the old situation of a plumber.

2  He knows how to turn a wrench that might cost 5

3  cents, but when your sink doesn't work, that's

4  priceless.  This was a situation where it's not just

5  quantified by the amount of hours, this is not an

6  hourly case.  This is not the type of thing where

7  somebody says write a letter for me and I'll pay you

8  a hundred.

9      This was something that I conceived of and

10  brought for the benefit of these families that was

11  incalculable in terms of the benefit I gave them.  I

12  gave them a sense of justice.  I gave them a sense of

13  finally somebody is going to remember their loved one

14  and that they'll have their day in court at some

15  point in time where a judge, a jury, or whatever the

16  case may have been would be able to hear their plight

17  and hear their story and remember their loved one and

18  it would not have been lost.  And I provided that to

19  them.

20      And they knew that I was the who did the

21  work, who thought of the case and brought the case.

22  And, therefore, they knew that this was not the

23  situation that's been spoken of as just merely, okay,

24  you did two pieces of paper, let's charge it by the

25  pound, that's 20 cents.  That's not at all what

James M. Ambush, Esquire - Cross

1    anybody understood was happening here.

2    Q.        Okay.

3              MR. ARIAS-MARXUACH:  Now, can the witness be

4    shown Joint Exhibit 5.

5    BY MR. ARIAS-MARXUACH:

6    Q.        Now, you were talking about the case not

7    being only about money but about remembrance and a

8    sense of being heard, correct?

9    A.        Correct.

10   Q.        I'm going to show you Joint Exhibit 5; can

11   you tell me what Joint Exhibit 5 is?

12   A.        Joint Exhibit 5 is captioned, plaintiffs

13   notice of dismissal with prejudice.

14   Q.        When was this document filed?

15   A.        It was filed on December 31, 2008.

16   Q.        So this was after the December 15, 2008

17   meeting, correct?

18   A.        Correct.

19   Q.        You had already met with the

20   Rodriguez-Robleses and the Berganzos?

21   A.        Correct.

22   Q.        Now, is there anywhere in this document

23   where you expressed that sentiment, that the case was

24   also about remembering the people who were killed or

25   hurt at LOD?

James M. Ambush, Esquire - Cross

1    A.        Yes.  In Paragraph 9 on Page 2.

2    Q.        Can you read it for the record?

3    A.        Notwithstanding their inability to have

4    their case heard in open court, the plaintiffs derive

5    a measure of solace from the fact that through the

6    filing of this case the memories of their loved ones

7    and the other victims of the May 31, 1972 Lod Airport

8    Massacre will not be forgotten.

9    Q.        Now, let's go to Page 3 of Joint Exhibit 5.

10   Now, Mr. Ambush, who signed and submitted this

11   document to the Court?

12   A.        I did, as an attorney, the first attorney.

13   And then underneath it is Paul Gaston.

14   Q.        Can you explain to the Ladies and Gentlemen

15   of the Jury what does it mean in the legal profession

16   when an attorney's name and signature are on top of

17   another attorney's name and signature?

18   A.        It signifies that the lead attorney on the

19   case is always at the top.  The second attorney's,

20   it's an honorarium essentially that it could be that

21   they did some work on that motion or it could be that

22   they did nothing on that motion.  It's merely that

23   they were named in the case, so if they had entered

24   an appearance on the case, both attorneys are

25   essentially filing the motion jointly.  But always,

James M. Ambush, Esquire - Cross

1    to my understanding, the lead attorney's name goes to

2    the top and the second attorney, or in many cases

3    it's three-dozen attorneys could have been on the

4    case, that the lead attorney was on top.

5    Q.        But the legal custom is that the lead

6    attorney signs first?

7    A.        Correct.

8    Q.        Now, at the December 15, 2008 meeting there

9    was a document signed entitled revocation of power of

10   attorney and the Ladies and Gentlemen of the Jury

11   know that that revoked Dr. Michael Engelberg's

12   document entitled power of attorney.

13            Upon the revocation of that power of

14   attorney who had the authority to make decisions for

15   the plaintiffs?

16   A.        The family members themselves.

17   Q.        And in fact when they subsequently issued a

18   power of attorney, the members of the Rodriguez and

19   Berganzo families issued a subsequent power of

20   attorney; to whom did they grant that power of

21   attorney?

22   A.        In the respective cases they named one of

23   their own members.  In the case of the Rodriguez

24   family it's Noemi Rodriguez-Robles and in the other

25   case it was Efrain Berganzo.

James M. Ambush, Esquire - Cross

1    MR. ARIAS-MARXUACH:  Okay.  Well, I would

2    like to go now into the other mode of interrogation,

3    Your Honor.

4    THE COURT:  Okay.  So this is your cross.

5    Now you're going to move into your direct

6    examination?  Let's proceed.  You're going to move to

7    new areas that were not discussed in Mr. Efron's

8    direct examination, which you're entitled with this

9    witness.  Let's proceed.

10    DEFENDANT'S DIRECT EXAMINATION

11    BY MR. ARIAS-MARXUACH:

12    Q.    Let's start at the beginning.

13         Mr. Ambush, are you married?

14    A.    Yes, I am.

15    Q.    How many kids do you have?

16    A.    Nine.

17    Q.    So you have in common with Eliezer

18    Rodriguez-Robles not only a biblical name, but a

19    biblical size family?

20    A.    Correct, that's true.

21    Q.    Okay.  Now, where do you live?

22    A.    Baltimore, Maryland.

23    Q.    Have you lived in other places besides

24    Maryland?

25    A.    Yes, I have.

James M. Ambush, Esquire - Defendant's Direct

1    Q.      Where?

2    A.      I -- I was born in Denver, Colorado.  I

3    lived there until I was ten years old.  When I was

4    ten years old my father, who worked for the

5    government as an administrative law judge, applied

6    for and was given a transfer and a promotion to

7    become the administrative law judge here in San Juan,

8    Puerto Rico.  He worked for the -- at the time it was

9    called the Department of H.E.W., Health, Education &

10   Welfare, which is what was in existence before Social

11   Security administration.

12          So essentially he was an administrative law

13   judge working to decide cases for the hearing -- it

14   was called the Bureau of Hearings and Appeals.  He

15   heard cases, Social Security claims.  And --

16   Q.      And did you live anywhere else besides

17   Colorado?

18   A.      Yeah.  So once my father had that job

19   transfer we moved to Puerto Rico.  In the middle of

20   the winter here I am coming to San Juan, Puerto Rico.

21   Q.      And why was your father transferred to

22   Puerto Rico?

23          MR. EFRON:  Asked and answered.

24          MR. ARIAS-MARXUACH:  No, I said why.

25          MR. EFRON:  Asked and answered.

James M. Ambush, Esquire - Defendant's Direct

1    THE COURT:  He can answer.

2    A.      The reason was -- the reason he applied for

3    the position and received it was because he was

4    fluent in Spanish and my mother was from Puerto Rican

5    descent.  My grandmother and my great grandmother all

6    live here -- my grandmother is *mami pachi*, from

7    Ponce.  My grandmother Rose Viera, she followed us

8    wherever we went.  So she moved from here to Denver

9    and then she moved back here when we moved here.  So

10   it was family.

11          We came to Puerto Rico because my father had

12   Spanish language skills, he had the legal skills, and

13   my mother had the family close relationships that

14   were -- helped facilitate his transfer to San Juan.

15   Q.      And in what years did you live in Puerto

16   Rico?

17   A.      From 19970 until late '72 or early '73.

18   Q.      Let's talk briefly about your education

19   starting with college; where did you go to college?

20   A.      I went to Israel; Jerusalem, Israel, to a

21   religious school seminary.  The name was Ohr

22   Somayach.

23   Q.      And did you graduate?

24   A.      Yes, I did.

25   Q.      What year?

James M. Ambush, Esquire - Defendant's Direct

1  A.       1984, I believe.

2  Q.       And did you undertake further studies after

3  graduating from Ohr Somayach?

4  A.       Yes, I did.  I obtained a master's degree in

5  special education about 1987.

6  Q.       Okay.  Now, did you work in the field of

7  special education before going for a masters in that

8  field?

9  A.       Yes.  For a time I did.

10  Q.       Can you tell us what special education is?

11  A.       Special education is education but for

12  children with special needs.  There's a variety,

13  whether it's for minor learning disabilities all the

14  way to children with profound disabilities.  And

15  that's what I specialized in.

16  Q.       How did you begin to work in the field of

17  special education?

18  A.       Well, initially I received my first job when

19  I came back from Israel with Rabbi Perr.  My father

20  had reintroduced me so to speak with Rabbi Perr, met

21  as a child briefly for that one year he was in

22  Baltimore in '73.  Ultimately he ended up in New York

23  running a school and I was out of college looking for

24  a job, and that's how I met him again and was

25  introduced to him once again.

James M. Ambush, Esquire - Defendant's Direct

1 Q.     And how long did you work as a special

2 education teacher?

3 A.     For about 15 years.

4 Q.     And now you are by profession a lawyer?

5 A.     Correct.

6 Q.     Where did you go to law school?

7 A.     University of Maryland School of Law.

8 Q.     And when did you graduate from law school?

9 A.     In 1999.

10 Q.     Now, I believe you told us previously that

11 even in law school you had an interest in

12 International Law, correct?

13 A.     Correct.

14 Q.     Can you tell us about that?

15 A.     Basically I initially thought I would get

16 into import/export law, dealing with contracts and

17 things of that nature, but very early in my law

18 school year I was introduced to the field of

19 international terrorism and I basically devoted my

20 entire career and life to that cause.

21     I spent -- throughout law school instead of

22 applying to get on one of the law journals, I was

23 focusing on international terrorism cases.  All my

24 internships were based on the fact that I had that

25 connection to international terrorism as a

James M. Ambush, Esquire - Defendant's Direct

1   concentration.  Even when I interned for a federal

2   judge in Maryland, it was because of that connection

3   that he found -- he found me suitable to be an intern

4   for him.  So I really spent over four years of law

5   school researching and concentrating on international

6   terrorism.

7   Q.      While you were a law student, did you intern

8   with any lawyers practicing in the field of lawsuits

9   against state sponsors of terrorism?

10  A.      Yes, I did.  I interned with Steve Perles

11  who is a famed attorney in Washington, D.C., who has

12  also made a career of litigating cases against

13  foreign sovereigns for victims of terrorism.  In

14  fact, he was the first one to take the very first

15  case for a victim of terrorism, to bring it to trial.

16  Q.      And who was that victim of terrorism?

17  A.      That victim was Alisa Flatow.  In fact, the

18  law that's -- every case since that was used was

19  known as the Flatow amendment.  And it was based on

20  Steve Perles' first client, Alisa Flatow.

21  Q.      Can you tell us what kind of work you did

22  with Steven Perles?

23  A.      Yes.  He essentially asked me to help him

24  with the research.  He was at the tail end of the

25  lobbying process, essentially he had a client that

James M. Ambush, Esquire - Defendant's Direct

1    was in line to file suit once Congress passed the

2    law.  So he was lobbying Congress for that client,

3    and once the law was passed he merely filed suit.  So

4    I was involved with the research and assistance of

5    the tail end of the lobbying process and then

6    continued to work on the litigation once it

7    commenced.

8    Q.        Now, did you have any kind of relationship

9    with the American Center For Civil Justice prior to

10   graduating from law school?

11   A.        Yes.  Well, during that time that we're

12   speaking of I interned for Steve Perles, it was in

13   fact Rabbi who introduced me to Steve Perles.  At

14   that time there was no American Center, it was known

15   as the Raoul Wallenberg Center.  And Rabbi Perr had

16   introduced me to Steve Perles.

17            And because of my interest in working for

18   Steve Perles I applied for a law school internship

19   and a grant for the purpose of working on

20   international terrorism cases.  And it was a triangle

21   so to speak where the law school paid the funding,

22   but they paid it to the nonprofit group which was at

23   that The Raoul Wallenberg Center who then granted me

24   the money so that I could work for Steve Perles on

25   behalf of the Flatow family.

James M. Ambush, Esquire - Defendant's Direct

1  Q.        Now, let's talk about the development of

2  your law practice once you graduated from law school.

3  A.        Okay.

4  Q.        Upon graduating from law school, what did

5  you do?

6  A.        Essentially I, uhm, realized I couldn't find

7  a job per se.  I tried and I had a couple of jobs

8  early on, but I was trying to develop my law practice

9  because to find a job with a significant salary for

10  someone with five children at an age of 35, coming

11  out of law school at that age, the big firms weren't

12  looking for someone of that -- with that situation,

13  okay?  In addition, I had this concentration of

14  international terrorism, but there were other matters

15  that I didn't have experience in.  So I didn't fit

16  into the niche so to speak of what a law firm was

17  looking for.

18        So I did what anybody else would do is,

19  start a practice on my own.  But to do that I had to

20  develop.  So first I associated with a labor union.

21  And then from there I was able to find a friend who

22  had his own law practice and I worked of counsel to

23  that firm.  Later I was able to find an attorney who

24  was seeking to retire and I essentially bought into

25  his practice; whereas, I absorbed all his bills and

James M. Ambush, Esquire - Defendant's Direct

1    all his cases as well.  We had a fee sharing

2    agreement for his cases, but I was free to continue

3    and build my own practice without any responsibility

4    to him from any of my cases.  So that's how I ended

5    up becoming a sole practitioner virtually from the

6    start of my career.

7    Q.       Now, did you continue to have an interest in

8    terrorism related cases?

9    A.       Yes.

10   Q.       How did you pursue that interest?

11   A.       Well, I had been involved with Steve Perles

12   during the time he did the Flatow case.  There was

13   another case I was involved in as a non attorney

14   where I essentially brought a case to Rabbi Perr and

15   that was the Stethem case.  But I was not an attorney

16   per se at that time; I was still a law student when

17   initially it was conceived of.  But when --

18   afterwards when I became an attorney that's when I

19   wanted to think about finding a case that I could

20   bring on my own.

21   Q.       Now, the Stethem case, what was the law firm

22   working on that case?

23   A.       That case was DLA Piper's, is what it's

24   known as now.  At time it was called Piper Rudnick.

25   Q.       Now, aside from the Stethem case, did you

James M. Ambush, Esquire - Defendant's Direct

1   work on other terrorism related cases prior to the

2   Lod case?

3   A.      I was involved -- essentially some of the

4   work I did prior to law school -- I'm sorry, during

5   law school was I continued for two summers working

6   for Steve Perles.  So he had other cases that we

7   worked on besides the Flatow case.  There was the

8   Duker case, the Eisenfeld case, and some of my

9   research went towards those cases as well.

10  Q.      Now, let's talk briefly about your

11  relationship with the American Center for Civil

12  Justice.

13          Have you ever been employee of the American

14  Center for Civil Justice?

15  A.      No, I have not.

16  Q.      Have you ever had a written employment

17  agreement with the American Center for Civil Justice?

18  A.      No.

19  Q.      Have you ever had an oral employment

20  agreement with the American Center for Civil Justice?

21  A.      No, I did not.

22  Q.      Did the American Center for Civil Justice

23  ever deduct payroll taxes of any kind or any payment

24  to you?

25  A.      No, they did not.

James M. Ambush, Esquire - Defendant's Direct

1  Q.        Did they ever provide you with medical

2  insurance?

3  A.        No, they did not.

4  Q.        Now, let's talk about the Lod Airport

5  Massacre.  There's been evidence about what the

6  attack was, so let's talk about how did you first

7  hear about the Lod Airport Massacre?

8  A.        I first heard about it when it happened.  I

9  was here in San Juan.  I was at the kitchen table the

10  next day after it happened.  My father's reading the

11  paper, he was reading the San Juan Star, and it had

12  right there a full page header, large headlines and

13  photographs of terror attack in Israel.  And that was

14  the first moment I heard of the attack.  And it was

15  riveting.  It was one of those events in your life

16  that are totally absorbing and memorable.  And even

17  though I was young, it was an impression that stayed

18  with me.

19          Years later when I was working in terrorism

20  cases the first thing out of law school, once I

21  graduated -- I'm sorry, when I passed the bar and I

22  became my own attorney, you know, was a full-fledged

23  attorney, I was thinking to myself, I can do that.  I

24  know what Steve Perles does, I know what the other

25  firms do, I can do that; but I didn't have a case or

James M. Ambush, Esquire - Defendant's Direct

1    a client.  And that's when it came to me when I was

2    thinking about it -- I know about the Lod Airport

3    case, and I believe that I can make a case for the

4    Lod Airport victims.

5    Q.       When you first thought about bringing your

6    own terrorism related case or building a case around

7    the Lod Airport Massacre, aside from the fact that

8    you had lived in Puerto Rico and it resonated with

9    your childhood, was there any other reason why you

10   identified the Lod Airport Massacre as an incident

11   that you wanted to pursue state sponsors of terrorism

12   for?

13   A.       I knew that this was a unique case.  You

14   have to understand the time frame.  This is in a time

15   when there were in the 1980s numerous terror attacks.

16   This was only a few months before September 11, but

17   attorneys were catching on to the fact that they can

18   sue foreign governments for victims of terrorism.

19   And there were victims even that were getting aware

20   of that and they were looking for attorneys.

21          And I'd seen how Steve Perles was able to

22   get clients.  I saw how the Center was embarking

23   barking on finding clients.  What I had was something

24   that was very unique because nobody remembered a case

25   dating back to 1972.  Nobody was thinking -- of all

James M. Ambush, Esquire - Defendant's Direct

1    the community of attorneys that were dealing with

2    litigation for victims of terrorism, they were

3    thinking who -- you know, reading the newspaper,

4    victims of today, sign them up.  They weren't

5    thinking to remember cases from 1972.  And that's

6    essentially how I conceived of the case and thought

7    that I could do it.

8    Q.        Who came up with the idea of suing Libya

9    specifically as a state sponsor of the Lod Airport

10   Massacre?

11   A.        I did.  And that derived from my research

12   into terrorism and understanding who was the state

13   sponsor behind the Lod Airport attack.  All the cases

14   that are recent, meaning all the way from the Flatow

15   case, which was against Iran -- because modern day,

16   modern times today Iran is the foremost state sponsor

17   of terrorism in the world that's known.  But in 1972

18   Libya and Syria were the foremost state sponsors of

19   terrorism in the world.  Iran wasn't a state sponsor

20   of terrorism in those days, it was Libya and Syria.

21   Those were the two countries that I was able to

22   identify through my research as being the sponsors of

23   the perpetrators of the Lod Airport attack.

24   Q.        And how did you tie the Lod Airport Massacre

25   to Libya?

James M. Ambush, Esquire - Defendant's Direct

1  A.         In order to bring a suit such as this, one

2  has to find the evidence.  In all other cases the

3  evidence was through expert witnesses or through

4  legal -- through government documents.  One of the

5  documents that exists nowadays was a document called

6  the Patterns of Global Terrorism, which is a document

7  drafted by or prepared by The State Department that

8  is essentially giving Congress notice, that is what

9  the U.S. Government knows about state sponsors of

10  terrorism in all terror attacks that happen in a

11  particular year.

12         For example, if you in the look in the 2001

13  Patterns of Global Terrorism or 2002 -- I'm sorry,

14  2001 it will say that al-Qaeda was behind 9/11

15  attack, but there was no such document that existed

16  regarding 1972.  So I had to research and find the

17  information through the national archives, through

18  congressional testimony.

19         And to be more specific to your question,

20  the Lod case was filed pursuant to a law called the

21  Foreign Sovereign Immunities Act that the 1996

22  amendment to that act said essentially this:  That

23  state sponsors have immunity -- I'm sorry, states.

24  If a person wants to sue a foreign government, they

25  cannot because that state has immunity just like a

James M. Ambush, Esquire - Defendant's Direct

1  king used to have immunity.  You cannot sue a state

2  unless there's an exception.

3  So Congress has enacted over the years

4  certain narrow exceptions.  For example, if a state

5  acts in a commercial capacity.  The state may say --

6  be a state hospital.  So in that case, if they break

7  a contract, somebody can sue the foreign sovereign

8  because they broke a contract.  But until is 1996

9  nobody could sue a foreign government that sponsored

10  terrorism.  If they commit mass murder, you cannot

11  sue them.  But in 1996 Congress passed a law called

12  the Flatow Amendment that enabled victims to file

13  suit.

14  But as all government contracts are, the

15  acts, they're very obscure.  And the act doesn't say

16  you can go sue Syria, Libya, Iran, Iraq, Sudan, North

17  Korea, Cuba; it doesn't itemize seven countries.  It

18  says, if you want to sue a foreign government, you

19  can provided that government is one of the countries

20  that are listed on a prior act.  And that prior act

21  was an Export Administration Control Act of 1979, so

22  you have to look at that act.  And that act lists

23  seven countries that the government of the United

24  States sought to impose sanctions on because they

25  committed acts of terrorism, they were sponsors of

James M. Ambush, Esquire - Defendant's Direct

1  terrorism.

2  So early on in 1979 Congress enacted to say

3  that for these seven countries that commit acts of

4  terrorism we're hereby imposing economic sanctions.

5  So those seven countries were the only countries that

6  one can now sue starting from this 1996 law; those

7  were the only countries that could be sued.  So I had

8  to then connect the dots.  Once that, you know, if

9  that's the law now, you have to go find who was

10  behind that specific terror act that you're looking

11  for.

12  So in the Flatow case for example, Flatow

13  case was brought in 1996, it named Iran.  But in 1972

14  I had to go find who was responsible for Lod Airport,

15  and that did not exists on the government document.

16  And it was only after digging up congressional

17  testimony was I able to find out why.  And I'll be

18  brief as I can with this, but bear with me.

19  In 1972 when the Lod Airport attack occurred

20  President Nixon ordered an investigation and he

21  empowered a cabinet committee.  And the committee's

22  job was to find out who was responsible for the Lod

23  Airport attack and going forward what can we do about

24  it.  And it was not just the Lod Airport attack, it

25  was -- the inception that happened from the Lod

James M. Ambush, Esquire - Defendant's Direct

1    Airport, but this committee was working since Lod

2    Airport and continued thereafter.  And the question

3    is, what to do about it?  And ultimately over the

4    years from 1972 to 1979 the U.S. Government was

5    rationing up sanctions, but the congressional record

6    was not clear.

7           If you -- I read the testimony, the

8    testimony is:  Witness, tell Congress -- or tell the

9    Senate here, the Senate committee who was responsible

10   for Lod Airport.

11          Can't say, it's classified.

12          Well, which countries are the proponents of

13   terrorism?

14          Libya and Syria.

15          And tell us why.

16          They do sponsorship, they aid, abet, et

17   cetera, they give money, they have training camps,

18   they facilitate.

19          Which acts of terror did they commit?

20          Classified, we can't say.

21          So you what I did was, I found the witness.

22   Since there's no government witness, I found

23   ambassador Anthony Quainton, whose testimony was on

24   the record, and I called him.  I said, Ambassador

25   Quainton, I have the congressional testimony, what

James M. Ambush, Esquire - Defendant's Direct

1    can you tell us?  What can you tell me?  Was Libya

2    responsible?

3              Yes.

4              Was Syria responsible?

5              Yes.

6              Why wasn't it in your testimony then?

7              Answer:  Because if the United States had

8    committed in writing that these countries were

9    sponsoring acts of murder against its U.S. citizens,

10   that would be an act of war, which would have

11   provoked, necessitated the U.S. Government taken

12   action against a foreign sovereign in response to an

13   act of war.  And that's something the government was

14   deathly afraid of.  They did not want in writing, The

15   U.S. Government finds that Libya or Syria were the

16   sponsors of this Lod Airport attack.  But I had his

17   testimony, now I had a witness.  So that's how I

18   found initially that piece of information.

19             Later on I found a second witness, and I

20   found as a result of the cabinet committee that

21   President Nixon put together, one of the documents

22   that -- one of the -- how did it work?  Once the

23   cabinet committee was convened, they hired an outside

24   consultant, the RAND Corporation.  And the RAND

25   Corporation did a study and an investigation and the

James M. Ambush, Esquire - Defendant's Direct

1   person who wrote that document was named -- his name

2   is Adkins, Bryan Adkins, who still to this day works

3   for the RAND Corporation.

4       So I tracked him down and I spoke to him,

5   and I discovered even further that his document that

6   he initially prepared, which was classified, that did

7   in fact say Libya and Syria were sponsors of

8   terrorism of every terror attack starting from

9   1969 -- in 1969 that's when Gaddafi came to power, he

10  ousted King Idris at that time.  And from the moment

11  he was in power he sponsored every single terror

12  attack thereafter, including the Lod Airport.

13      And the document that he published, that was

14  initially the RAND Corporation study, became the

15  precursor of what later became known as the Patterns

16  of Global Terrorism.  So although, as we spoke about

17  earlier, that the Patterns of Global Terrorism is the

18  document that the government relies on, it didn't

19  exist in 1972, but the earlier document from the RAND

20  Corporation was what the government relied on.

21  Q.      Did this information come from Rabbi Perr or

22  the Center?

23  A.      No.

24  Q.      Did this information come from Michael

25  Engelberg?

James M. Ambush, Esquire - Defendant's Direct

1    A.        No, absolutely not.  No.  This was

2    something -- this was my work product over years of

3    development.  Everything in the complaint, all the

4    facts, the nuances, the information came from my

5    spending hours of study in the archives, in the

6    libraries, in the Library of Congress, talking to

7    experts or witnesses.

8    Q.        Now, it's already in evidence that in 2002

9    the members of the Rodriguez and Berganzo families

10   signed claimant and center agreements, correct?

11   A.        Correct.

12   Q.        You're aware of that?

13   A.        Yes.

14   Q.        But it is also in evidence that the

15   complaint in the case known as Franqui v. Syria, the

16   Lod Airport case, was not filed until April of 2006,

17   correct?

18   A.        Correct.

19   Q.        Can you tell us why it took four years

20   between the time that these two families signed

21   claimant and center agreements and the lawsuit was in

22   fact filed?

23   A.        It's very simple.  There was no funding

24   available to me in a meaningful fashion to pursue

25   this case vigorously and instantly.  I had to, on my

James M. Ambush, Esquire - Defendant's Direct

1  own, go and research the case and continue to

2  development the theories, and make the theory and the

3  concept of bringing a suit.  In the early days it was

4  a concept of, I can bring a suit for these families.

5  But then once I had evidence of who the potential

6  defendants would be, I needed some assistance and it

7  wasn't there.

8       The Center had at one point in time promised

9  that I would have the backing and assistance of a

10 large law firm of stature that would be able to

11 assist me with bringing a case like this.  They also

12 promised support in the form of paying all expenses

13 and whatever the costs are involved with

14 litigation -- that would be there and it would be

15 provided, but in fact it wasn't.  I had to

16 continuously go back and pull out of them a few bucks

17 here, a few dollars there as needed.  As I went,

18 reluctantly they were able to give me some money.

19      And for a period of two years the Center did

20 in fact try to speak with a firm called Covington,

21 Burling about this case and try to interest them in

22 the case.  And, in fact, they looked to me as the

23 expert on this case; and as the attorney on the case,

24 explained to them why it is I believed they should

25 join the case as co-counsel.

James M. Ambush, Esquire - Defendant's Direct

1           And at that meeting held in

2    Washington, D.C., headquarters of Covington, Burling,

3    they had a partner from New York come in, a partner

4    from Washington was there, Michael Engelberg was

5    there, Terror Expert Yosef Bodansky was there. Tell

6    us about your case. Sitting like that (motioning)

7    with arms akimbo, not believing I can package a case

8    in the sense of -- explain to them the legal basis

9    for such a case, to convince them to engage in such a

10   case.

11          I did my best, but they ultimately took two

12   years to sit on the case and rejected it. They said,

13   This is not a case we're going to take on. And

14   that's why it took that many years to, in essence,

15   not get filed.

16   Q.      So why was the case filed until 2'06?

17   A.      The Flatow case, as I mentioned earlier,

18   came merely after the act -- the Flatow Amendment was

19   passed. It was passed and signed by the president

20   April 24, 1996. And the statute of limitations is a

21   period of time that one can file a suit. In local

22   jurisdictions it typically is two or three years.

23   For example, a car accident. If a car accident

24   happens today, three years from now if somebody

25   didn't file suit, they lose their right forever. In

James M. Ambush, Esquire - Defendant's Direct

1   the Flatow law I believe the statute of limitations,

2   from the reading of the words, was ten years from the

3   date the law was enacted which would give us until

4   April 24, 2006.

5          After waiting and waiting for the support to

6   come from the Center and waiting and pleading for

7   Covington, Burling and that didn't materialize, and I

8   asked other lawyers along the way, nobody was

9   interested, nobody believed A, that they could make

10  such a claim, substantiate such a claim, litigate

11  such a claim, and do it on the bear bones fee

12  agreement arrangements that were being set in place

13  by the Center.

14         So nevertheless I had a responsibility to my

15  clients, I had to take action.  So for the -- almost

16  immediately Covington, Burling rejected the case, I

17  fully engaged in preparing the draft of the

18  complaint, one draft after another, numerous drafts,

19  adding information as it developed, as I researched

20  it.  As new plaintiffs were -- I guess, you know, I

21  knew that the names of the -- the claimants and the

22  plaintiffs, but I needed additional information from

23  them, so I had to research that.

24         And basically at the final deadline, the

25  deadline was Monday, so I filed it Friday -- it was

James M. Ambush, Esquire - Defendant's Direct

1    Friday evening, April 21, 2006, which was the very

2    last moment it could be filed before the statute of

3    limitations ran out.  And that's why it took that

4    many years.

5    Q.        Okay.

6              MR. ARIAS-MARXUACH:  Can the witness be

7    shown Joint Exhibit 34 and Joint 35.

8    A.        I'm sorry, there's two documents?

9    BY MR. ARIAS-MARXUACH:

10   Q.        Yeah, Joint 34 and Joint 35.  Okay, I'm

11   showing you what the Court has marked as Joint

12   Exhibit 35; can you tell us what this is?  Let me

13   zoom out.

14   A.        Are we speaking of 35?

15   Q.        Yeah.  It's Defendant's A.D.G. because it

16   became a Joint Exhibit, but it's Joint 34.

17   A.        This is the docket entry sheet.  It's

18   called --

19   Q.        Look at the --

20   A.        Civil docket for case number.

21   Q.        I may have the wrong number.  Look on the

22   monitor.

23             THE CLERK:  You do, that's 34.

24   A.        No, this is not the same as what's on the

25   screen.  Neither of those are the correct document.

James M. Ambush, Esquire - Defendant's Direct

1    I understand what -- you can go ahead, I have the

2    screen.  I'll work with that.

3    BY MR. ARIAS-MARXUACH:

4    Q.        Can you tell us what this is?

5    A.        This is the complaint I filed on behalf of

6    the plaintiffs in this case and the case that's known

7    as the Vega-Franqui case versus Syria and Libya.

8    Q.        And what is this?

9    A.        This is a caption.  There's a court system

10   whereby nowadays all court documents in federal court

11   are filed electronically.  The initial case is filed

12   in the clerk's office but then one gives the clerk a

13   disk of the complaint and that -- then thereafter all

14   documents in the case are filed electronically.

15        And if one goes online, for example, to a

16   Web site, the Court's Web site, called Pacer,

17   P-a-c-e-r, it will have each document posted but in

18   addition at the very top line it identifies the case

19   and the document number, so that it correspond with

20   the basic information that the clerk stamps on the

21   document, to make sure it's legal.  If it's stamped,

22   you could be sure that's the legal document filed in

23   the clerk's office.

24   Q.        And going to Page 43 of the original

25   complaint, again, who is the attorney who signs

James M. Ambush, Esquire - Defendant's Direct

1    first?

2    A.        It is Joshua Ambush.

3    Q.        And there is a Terry Snyder; who is she?

4    A.        Right.  She was an associate I had at that

5    time.

6    Q.        Did any other attorney join the Franqui --

7    the Syria case before it was ultimately resolved?

8    A.        Ultimately it was resolved and then two

9    months before it was resolved Paul Gaston entered his

10   appearance.

11   Q.        So let's talk about the evolution of the

12   case once it was filed.

13             Once you filed the Franqui complaint, what

14   work did you have to do?

15   A.        Everything, I did everything.  I had to --

16   let me explain what steps need to be taken and then

17   it will clarify what I did on the case.  From a

18   physical standpoint of what I did physically, when a

19   case is filed it has to be -- the defendants or the

20   parties have to be summoned to court.  To do that

21   against a foreign sovereign government is complex and

22   it's -- it's tedious and it's complex as well.  One

23   has to go to the court clerk and get a summons.  The

24   summons then has to be translated to the language of

25   the foreign sovereign.  In this case we're dealing

James M. Ambush, Esquire - Defendant's Direct

1    with Libya and Syria and their language is Arabic.

2    So the complaint had to be translated, the summonses

3    had to be translated -- prepared and translated.

4         In addition, there's another document called

5    the notice of suit that had to be prepared.  And

6    ultimately, though, once you have the documents you

7    then have to serve it, that means hand deliver it, on

8    the defendants and serve them.  That gives them

9    formal notice that they have to appear in court by a

10   certain amount of time.

11        So my job, as the attorney, was to do all of

12   those tasks.  However, I was on a shoe string.  In

13   fact, I had no funding beyond filing it.  I paid the

14   initial filing fee and then I had to wait and wait

15   until I could get this translation.  Ultimately I was

16   able to get some money from the Center to translate

17   the complaint.  By that time the summonses I had were

18   stale, they only last for 60 days; I had to go back

19   and get new summonses, get those translated, had them

20   redone.  That process of doing those summonses kept

21   lapsing; I had to redo it a few times.

22        Ultimately, though, I got the summonses

23   together, the translation, notice of suit, and a copy

24   of the Flatow on the Foreign Sovereign Immunities Act

25   with the enabling legislation called the Flatow

James M. Ambush, Esquire - Defendant's Direct

1    Amendment, the whole package of it, and I was able to

2    serve it on Libya and Syria.

3    Q.       Once you served Libya, did Libya enter an

4    appearance in the Franqui case?

5    A.       Yes, it did.

6    Q.       And did Libya try to defend the case?

7    A.       Yes, it did.

8    Q.       How did it try to defend the case?

9    A.       It hired a law firm called Eckert Seamans,

10   which is a large Washington law firm.  It's -- it has

11   offices both in -- in several states.  The attorneys

12   I dealt with were from a Pennsylvania office, I

13   believe it's Pittsburgh, and the Washington office.

14        So Libya took this seriously.  They defended

15   the case.  But they didn't do it -- they did it in

16   ways that I expected and anticipated, and as

17   litigators would expect.

18        You know, there's two ways to answer a

19   complaint, you either answer it or you file what's

20   called motions, you file a motion to dismiss.

21   There's several motions in court that one can say

22   essentially you have no jurisdiction over me, meaning

23   the party who's being sued, and without proving

24   jurisdiction the case cannot go forward.

25        So instead of filing an answer to the

James M. Ambush, Esquire - Defendant's Direct

1    allegations that no, we didn't do this, they instead

2    were saying you have no jurisdiction.  So I had to go

3    and reprove in some of the motions that I was dealing

4    with from Libya, to defend themselves, some of the

5    allegations that I made in the initial part of the

6    complaint, because in the initial -- for example

7    Page 4 of the complaint, it speaks of jurisdiction

8    and venue.  And those are classically the first

9    motions the defendant states, that you failed to

10   bring this case properly because you have no

11   jurisdiction over us.  And those are the type of

12   things I had to answer against Libya.

13       Just by way of illustration of the point I

14   made earlier, Libya denied that the statute of

15   limitations ran until April 24, 2006.  They said, No,

16   you don't have ten years to sue us.  The act says you

17   have ten years.  But it's vague about whether that

18   ten years is from the time the act was enacted, when

19   it became law, or was it from the time of the terror

20   attack.  So if the terror attack came about in 1972,

21   you only have ten years from 1972.  So I had to rebut

22   that and say no, there's totaling.  Totaling means

23   the bell chimes and the clock stops.

24       In 1972 there was no law for these people to

25   make a suit against Libya.  So even if one were to

James M. Ambush, Esquire - Defendant's Direct

1    argue that you have ten years from the terror attack,

2    that clock stops the second that the terror attack

3    occurs.  So technically even if that were the case,

4    the clock doesn't start from then, and it only

5    restarted once the law was passed and then you've got

6    your time period.  Libya said no to that also -- Even

7    if you like that argument, you only have a reasonable

8    amount of time.

9         So essentially those are the type of motions

10   I had to defend against with Libya.

11        THE COURT:  Let me just very briefly -- and

12   I know that the attorneys here and myself know how to

13   do this, but you mentioned to the jury that you

14   served the summons -- in Spanish that's *emplazar* --

15   on the Government of Libya.  You didn't fly to Libya

16   and take a plane, but can you explain very briefly in

17   a nutshell how you summon because that's --

18        THE WITNESS:  Yes.  In this case you try to

19   do it personally.  Obviously no one wants to fly to

20   Syria or Libya.  In a nutshell, this summons was

21   served on Libya through DHL Courier.  Certain

22   countries DHL operates in.  Libya and Syria are two

23   countries where they operate, and essentially they

24   accepted service that way.

25        THE COURT:  Mr. Arias, I know it's almost

James M. Ambush, Esquire - Defendant's Direct

1  5 p.m. and I know that everybody's a little tired.

2  If you have this same line of questioning or a few

3  more questions -- or if you want to stop now and then

4  we'll continue tomorrow --

5       MR. ARIAS-MARXUACH:  I think out of

6  consideration for the Ladies and Gentlemen of the

7  Jury and the fact that they've been hearing --

8       THE COURT:  And the judge.

9       MR. ARIAS-MARXUACH:  -- and the judge, and

10  they've been hearing about law for 20 minutes now at

11  least, let's give them a break.

12       THE COURT:  Let's take a recess.  Let's be

13  back here at 9 a.m. tomorrow.  We are moving along.

14  We may finish the case presentation of evidence

15  tomorrow.  If not, I expect by Monday, but we are

16  indeed moving along as planned.  So keep an open

17  mind, do not discuss the case with anybody, I will

18  see you tomorrow at 9:00.  And tomorrow, again, is a

19  full day, 9:00 to 5:00.  Perhaps expect to stay a

20  little bit after 5:00 because if we can finish with

21  all the evidence tomorrow, I would like to do it

22  tomorrow.  So we'll see how it plays out.  So let's

23  excuse the jury.

24       THE COURT OFFICER:  All rise for the jury.

25       And, Mr. Ambush, you're under the rules of

James M. Ambush, Esquire

1    the Court, do not discuss your testimony.

2           (Jury exits the room.)

3           THE COURT:  Very briefly, Mr. Arias, again,

4    you have all the time in the world.  I'm not -- I

5    don't want to speed you up, but do you expect that

6    you'll be done with Mr. Ambush tomorrow or its

7    probably going to take longer?

8           MR. ARIAS-MARXUACH:  Oh, certainly I will be

9    done with him tomorrow.  I would say --

10          THE COURT:  How long would expect?  Maybe

11   two or three more hours or less?

12          MR. ARIAS-MARXUACH:  Well, let's say I

13   take from -- if we start at 9:00, I'd say to 12:00.

14          THE COURT:  And then there's

15   cross-examination from Mr. Efron and then you

16   redirect, so we can be done probably sometime in the

17   afternoon with him.

18          MR. ARIAS-MARXUACH:  I think simply put we

19   could be, depending on the length of Mr. Efron's

20   cross, we probably could be done with Ambush and

21   Garcia tomorrow.

22          THE COURT:  And those would be the last two

23   witness?

24          MR. ARIAS-MARXUACH:  Yes, Your Honor.

25          THE COURT:  Okay.  So let me do this:  What

1    I expect to do tomorrow is, I'm not even going to

2    expect you to do closings tomorrow or jury

3    instructions.  So we will try to hopefully finish

4    with the witnesses tomorrow.  And once we're done, I

5    plan to have some proposed jury instructions.  I

6    may -- you know, we'll see when we finish because

7    then we could probably do that Monday at some point.

8    But that's -- let's finish with the witnesses

9    tomorrow hopefully.

10           Anything else?

11           MR. ARIAS-MARXUACH:  No.

12           THE COURT:  Okay.  Then I will see you

13   tomorrow at 9:00 a.m.

14           MR. EFRON:  So when will be the -- we would

15   close on Monday?

16           THE COURT:  I assume -- let's play it by

17   ear.  Again, I don't want to rush anyone.  What I

18   would like to do is, if we're done tomorrow and we

19   cannot discuss the instructions tomorrow, I will

20   follow Judge Cerezo's example and then Monday at some

21   point we'll do the instructions and that could take

22   two or three hours, I don't know.  And then perhaps

23   on Tuesday we have closings and jury instructions.

24   Again, I don't want to rush the jury, I don't want to

25   rush counsel, and I think -- we've been here for a

1   week so I think let's see how we finish tomorrow and

2   then we'll set the deadlines tomorrow.  But it could

3   be, if we're able to do everything tomorrow, it could

4   be on Monday, but I don't like having a jury on

5   Monday if we're going to be discussing instructions

6   for most of the day, because the closings here could

7   take an hour and a half two hours.

8           Okay, so I'll see you tomorrow then.

9           (Jury trial adjourned at 5:02 p.m.)

10                          ---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT    )

2              OF                     )ss.

3         PUERTO RICO                 )

4

5

6

7                        CERTIFICATE

8

9

10         I, EVILYS E. BRATHWAITE, hereby certify that

11    the proceedings and evidence are contained fully and

12    accurately, to the best of my ability, in the notes

13    recorded stenographically by me, at the jury trial in

14    the above matter; and that the foregoing is a true

15    and accurate transcript of the same.

16

17                    _____/s/ Evilys E. Brathwaite____

18                    EVILYS E. BRATHWAITE, RPR
                      Official Court Reporter
19                    United States District Court
                      Federal Building, Room 200
20                    San Juan, Puerto Rico 00918
                      787-772-3377
21

22

23

24

25