IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

:_____:

THE ESTATE OF ANGEL BERGANZO COLON          :
represented by Efrain and Ruben Berganzo;
THE ESTATE OF ANTONIO RODRIGUEZ MORALES      :
represented by Noemi Rodriguez Robles,
Eliezer Rodriguez Robles, Angel M.           :
Rodriguez Robles, Maria M. Rodriguez
Robles and Ruth D. Rodriguez Robles,         :

                   Plaintiffs,          :     CIVIL NO:
                                       10-1044 (GAG)(MEL)
        vs.                          :

JOSHUA M. AMBUSH                             :
             Defendant.
:_____:

DAY 5 OF THE JURY TRIAL
HELD BEFORE
THE HONORABLE GUSTAVO A. GELPI
Friday, September 23, 2011, beginning at 9:20 a.m.
:_____:

A P P E A R A N C E S:

               LAW OFFICES OF DAVID EFRON
               BY DAVID EFRON, ESQUIRE and
               BY JOANNE V. GONZALES-VARON, ESQUIRE
               P.O. Box 29314
               San Juan, Puerto Rico 00929
               For the Plaintiffs

               McCONNELL VALDES, LLC
               BY RAUL M. ARIAS-MARXUACH, ESQUIRE and
               BY HENRY O. FREESE-SOUFFRONT, ESQUIRE
               270 Munoz Rivera Avenue
               P.O. Box 364225
               San Juan, Puerto Rico 00936
               For the Defendant

INDEX TO WITNESSES

DEFENDANT WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

JOSHUA M. AMBUSH, ESQUIRE

    By Mr. Arias-Marxuach....683.............765...........

    By Mr. Efron.....................712...................

LEOPOLDO GARCIA-VIERA

    By Mr. Freese-Souffront..815.............842...........

    By Mr. Efron.....................832................844

---

1          THE COURT OFFICER:  All rise for the jury.

2          (Jury enters the room.)

3          THE COURT:  Please be seated.  Ladies and

4    Gentlemen of the Jury, we are now going to continue

5    with Mr. Arias' direct examination of Mr. Ambush, so

6    please proceed.

7          MR. ARIAS-MARXUACH:  Good morning, Ladies

8    and Gentlemen of the Jury.  May it please the Court.

9          I'm appearing on behalf of the defendant,

10   Joshua Ambush.  I'm slightly horse today, so I'll try

11   to speak slowly and please forgive me.

12         THE COURT:  Ladies and gentlemen, just so

13   you know, we hopefully expect to be able to finish

14   with all the witnesses and testimony today.  I'll let

15   you know after lunch how we're doing and how we're

16   going to proceed.  And, but we are moving along very

17   well.

18                         ---

19         JOSHUA M. AMBUSH, ESQUIRE, the Defendant,

20   having affirmed to tell the truth, by the Clerk, was

21   further examined and testified as follows:

22              DIRECT EXAMINATION CONTINUED

23   BY MR. ARIAS-MARXUACH:

24   Q.        Good morning.

25   A.        Good morning.

Joshua M. Ambush, Esquire - Direct

1  Q.        Now yesterday when we broke, you were

2  talking about the Franqui litigation.  And I want to

3  turn your attention to the U.S./Lybia settlement,

4  okay?

5  A.        Sure.

6  Q.        Can you tell us at what stage the Franqui v.

7  Syria litigation was at when the United States

8  government and the Libyan government struck their

9  settlement agreement?

10  A.        We had filed a complaint.  Lybia filed a

11  motion to dismiss, we countered that, and then we

12  filed an amended complaint.  They were in the process

13  of then responding again.  They had to respond again

14  to the motions to dismiss, and then I believe, uhm,

15  we were, uhm, litigating back and forth but not just

16  in the court documents but on the phone.  Counsel

17  were engaging in debates of how we're going to

18  proceed in terms of the settlement.

19         There was information I was aware,

20  obviously, from the State Department that there were

21  negotiations.  Counsel for Libya did not want to stay

22  the litigation pending the outcome of the settlement.

23  So we were fully engaged in litigation up until the

24  point that there was a settlement.  Once there was a

25  settlement then Libya voluntarily, at that point,

Joshua M. Ambush, Esquire - Direct

1  entered a stay on the case.

2  Q.        Now, how much time had the Franqui

3  litigation been pending when the U.S. and Libya

4  entered into the settlement agreement in August

5  of 2008?

6  A.        It was -- it was at least two years.  It was

7  a little over two years.

8           MR. ARIAS-MARXUACH:  Now, can the witness be

9  shown Joint Exhibit 2.

10 BY MR. ARIAS-MARXUACH:

11 Q.        Mr. Ambush, having looked at Joint

12 Exhibit 2, do you recognize it?

13 A.        Yes, I do.

14 Q.        Can you tell me what it is?

15 A.        This is a document titled "Claims Settlement

16 Agreement Between the United States of America and

17 the Great Socialist People's Libyan Arab Jamahiriya."

18 Q.        Can you tell us what impact, if any, did the

19 existence of the Franqui case have on the Lod Airport

20 Massacre victims' ability to participate in this

21 claim settlement agreement?

22 A.        Essentially, without the claim of the

23 Vega-Franqui case versus Libya, had that not existed,

24 there would be no claim for anybody from the Lod

25 Airport Massacre -- any claim whatsoever.  There

Joshua M. Ambush, Esquire - Direct

1    would be no claim.  The only reason there was a

2    payment to these families was because there was a

3    pending claim.  It was still alive at the time Libya

4    entered this agreement with the United States.

5    Q.      And by "pending claim," do you mean the

6    Franqui lawsuit?

7    A.      Yes, I do.

8    Q.      What in the Franqui lawsuit made the

9    plaintiffs therein and here, these two families, the

10   Berganzos and Rodriguezes, eligible for the claim

11   settlement agreement between the United States and

12   Libya?

13   A.      The fact that the claim was filed for

14   victims of terrorism, these are people who were

15   victimized by a terrorist attack, by a

16   state-sponsored terrorism, specifically the

17   Government of Libya, that enabled them to be eligible

18   for the claim.  Had it been a suit against North

19   Korea or Bulgaria, or any other country, there would

20   be no claim.

21   Q.      And, again, who was the lead attorney in the

22   Franqui lawsuit?

23   A.      That was myself.

24   Q.      Now, let's go back to -- or go forward in

25   that sense to the December 15, 2008 meeting with the

Joshua M. Ambush, Esquire - Direct

1  Berganzo and Rodriguez-Robles families that we have

2  heard so much about.

3          What was your purpose in calling that

4  meeting with these two families?

5  A.      There was one purpose initially, which was

6  to explain to them in person where we were in terms

7  of the case being stayed, that there's a settlement.

8  These are things we had discussed on the phone

9  previously.  Now, I wanted to come in person and

10  discuss this with them.  That was one purpose, and

11  that was accomplished.

12          The second purpose was to explain to them

13  the situation that for all this time they knew I was

14  their attorney and I did all the work on the case and

15  I relied on Rabbi Perr, and at the moment it's on the

16  verge of being a successful outcome, there's

17  interference.  Rabbi Perr and Dr. Engelberg were

18  trying to yank the case away from me, essentially

19  fire me from being their attorney and usurp my role

20  as their attorney.

21          So I recognized the fact that I didn't have

22  a written retainer with them, so one purpose was to

23  ensure that there would be a written retainer that

24  officially made me their attorney, that -- leave the

25  fee aside for a minute.  The fact that there was no

Joshua M. Ambush, Esquire - Direct

1    written retainer left open the possibility that

2    potentially another lawyer could come in -- a real

3    estate lawyer from Nebraska can walk in and say I

4    want to be your attorney, and if they signed with

5    that person, technically I would have a potential

6    claim against that attorney, but they would have an

7    attorney and that would usurp my role.

8         So the first thing was to remedy the

9    situation and the fact that I did not have a written

10   retainer prior to that time.  And I explained that to

11   them, and they understood that.  That was the second

12   purpose.

13        The third one was the issue of the fee.  And

14   there, again, my purpose was to explain to them and

15   come to them hat in hand and explain to them that

16   despite the fact that I did this work, I was standing

17   to not get compensated by the Center, the very people

18   I relied on all this time.  And they understood that

19   as well.

20        So these were the three purposes of the

21   visit.

22   Q.     When you say that you came "hat in hand,"

23   what do you mean?

24   A.     I didn't come to demand money from them or

25   demand that they pay me.  I had to explain that I was

Joshua M. Ambush, Esquire - Direct

1  not included in the Center agreement in that I had to

2  ask them to pay me.  I simply asked that I'd like to

3  get paid and would you consider paying me.

4  Q.       And did they agree?

5  A.       Yes.  They -- I heard several of them say

6  *claro*.  They understood exactly, and they did agree

7  without -- without any problem.  They clearly

8  understood and were satisfied with my explanation.

9  Q.       I would like to talk about the mood and the

10 setting in that meeting.  Now, the jury has heard

11 several times that that meeting took place at the

12 Efrain Berganzo house.

13       Can you tell us where in Efrain Berganzo's

14 house that meeting was held?

15 A.       Well, let me explain like this.  I drove up

16 with Leopoldo and the notary.  They have a very big

17 security system where there is a gate.  It's almost

18 like a compound around his house.  They let you in.

19 They have an electronic monitor, video monitor that

20 they can see who's driving up to the house.

21       They open one gate, you drive in; but then

22 you're locked into the second gate.  So they don't

23 open the second gate until the first one closes.

24 It's like a very complex security system.  But when

25 they opened the second gate, you drive in, come up to

Joshua M. Ambush, Esquire - Direct

1  the house, a nice yard.  And everybody came out to

2  greet us.  It was only then -- it was Efrain Berganzo

3  and his family, his wife was there.  His son was not

4  there but his wife was there.

5          And we discussed that we were next going to

6  meet the Rodriguez-Robles family.  And he's, "Why

7  bother?  We'll just bring them all here.  We can do

8  it together."  So apparently he got on the phone -- I

9  don't know how he contacted them, but within minutes

10  they were there.  They all walked over.  So they

11  secured the dining room area.

12          So it's very simple.  You know, at some

13  point I was seated at the table, to my right was the

14  notary.  The second over was Leopoldo, mostly at the

15  head of the end of the table.  Next to him was Efrain

16  Berganzo.  Behind Efrain Berganzo was Efrain

17  Berganzo's wife standing.  Next to him was Ruben

18  Vivas.  Next to Ruben Vivas, was the husband of

19  Noemi.  Noemi was sitting around the table at the

20  other end.  Eliezer was at the head of the other end

21  of the table.  And it was one or two other

22  brothers -- I think it was maybe Angel -- right next

23  to me on my left.

24          So there was maybe other people there,

25  mostly wives of one of the Rodriguez-Robleses -- you

Joshua M. Ambush, Esquire - Direct

1  know, the spouses of the Rodriguez-Robleses.  I'm not

2  sure who those people were, but essentially that was

3  the setting.

4          And it was a discussion.  They came out.

5  They were welcoming me as -- I hate to say the word

6  hero of the case, but they understood that I was the

7  one they're finally meeting that they always heard

8  about as the one who litigated the case for them.

9          And it was an open discussion both in

10  Spanish and English.  I would speak in English.  They

11  would answer -- you know, it would be translated.

12  Sometimes -- Efrain understood English, so they would

13  speak to him, you know, to everybody, but I directed

14  myself to him in some ways.  It was just a candid,

15  open discussion.

16  Q.        Now, yesterday you described the mood at the

17  meeting as "love and kisses"; what do you mean?

18  A.        There was back-slapping and hugs, you know,

19  both before and after the meeting.  They were happy

20  to see me.  They were grateful for what I did for

21  them.  They understood where this was going and that

22  they stood to secure millions of dollars from this

23  case.  I wouldn't say celebratory.  There was no

24  champagne and corks popping, but it was very

25  appreciative and a warm, engaging reunion, so to

Joshua M. Ambush, Esquire - Direct

1  speak.  Even though it was a first-time meeting, it

2  was that type of warmth.

3  Q.      Now, did you open the discussions with the

4  documents on the table?

5  A.      No.  That was basically the last thing on

6  the agenda, that I had on my mind.  The first thing

7  is the case and then explaining and discussing the

8  situation that I was in, and that -- and then, you

9  know, the purpose of the documents -- well, it wasn't

10  even the documents.  It was the situation.  But once

11  we got to an understanding of that, they ultimately

12  agreed to what I was asking of them.  Then it was a

13  discussion of the documents.  So that was the last

14  part of that.

15  Q.      Now, did you explain to them the

16  administrative process?

17  A.      Yes.

18  Q.      Did you explain to them that in order to

19  participate in the administrative claim process the

20  claims against Libya in the Franqui lawsuit would

21  have to be dismissed?

22  A.      Yes.

23  Q.      Did you talk to them about your relationship

24  with the Center?

25  A.      Yes.

Joshua M. Ambush, Esquire - Direct

1  Q.        What did you tell them?

2  A.        I told them essentially how it started.  You

3  know, I told them about Rabbi Perr.  I told them

4  about Michael Engelberg.  I told them how initially

5  the Center had agreed to sponsor the case and that I

6  had gone to them and relied on them all these years.

7  And that despite having very little meager support

8  throughout those years, I was still able to litigate,

9  and it turned into the situation where now we have a

10  an opportunity to accept some funds.

11         I explained that, and they understood that

12  I'm their attorney.  They recognized that.  But they

13  had that power, you know, to make their own decisions

14  on that.  That's something that they understood.  And

15  if -- you know, essentially I explained that the one

16  thing that I think provoked -- besides the fact that

17  I wasn't getting paid and stood to get nothing from

18  the Center, uhm, the most important thing that

19  clearly rang a bell -- an alarm bell, if you will,

20  was the fact that Dr. Engelberg was attempting to

21  gain control of the settlement funds so that it

22  doesn't flow to an escrow account that the attorney

23  would control; rather it would go to an escrow

24  account that Michael Engelberg would control.

25         I said that would be an absolute violation

Joshua M. Ambush, Esquire - Direct

1  of my duty to them, and that's something I couldn't

2  allow.  And I asked them -- you know, we're

3  discussing, what can be done is simply make up your

4  own mind.  You decide if you want me to be your

5  attorney -- continue to be your attorney and continue

6  to protect your interests and represent you and to

7  protect the money, then you can make up your own

8  mind.

9          So they understood my relationship with the

10  Center, how I was very devoted to the Center, but at

11  this moment when it's being threatened with yanking

12  control of the case, then they understood that this

13  was their moment to make their own decision.

14  Q.      Did you tell them what kind of support the

15  Center had provided to the litigation over the years?

16  A.      Yes.  Yes, I told them that.  I explained to

17  them that from the inception of the case, how it

18  started; when I came to Puerto Rico initially in

19  2001, Rabbi Perr had given me some funds to come down

20  and get a plane ticket and so on to just be here.

21  Along the way there were costs that were incurred,

22  some were paid back eventually, some were not paid

23  back eventually.  But they did provide some funding.

24  They did provide some assistance to me.  I didn't

25  have a full staff and a team of lawyers behind me

Joshua M. Ambush, Esquire - Direct

1    working on the case filing briefs and motions, but

2    they provided some support.  And that was discussed.

3    Q.        Okay.  Did you ever tell the members of the

4    Berganzo and Rodriguez-Robles families that their

5    claims would be delayed if they did not sign a

6    retainer agreement with you?

7    A.        No, I did not say that.

8    Q.        Now, did you explain to them the remaining

9    steps in the administrative process going forward

10   from December?

11   A.        Yes, I did.  I -- in the case of Efrain

12   Berganzo, I was speaking to him for the first time,

13   but he had known already through his son the steps

14   that were required.

15            For the Rodriguez-Robleses perhaps they were

16   hearing it for the first time.  Although I did send

17   letters to everybody, they may not have gotten them.

18   But in any event, I did explain the process going

19   forward.  I needed their permission to dismiss the

20   case.  I needed their permission to handle the escrow

21   funds.  We had to ascertain proof that they were the

22   people who are eligible for the claim.

23   Q.        Why is that important?

24   A.        You have to understand that the State

25   Department is a stickler for detail, particularly in

Joshua M. Ambush, Esquire - Direct

1  a case where they're giving out $10 million.  And

2  they needed -- they demanded absolute proof that

3  these people were in fact the heirs, lawful

4  declared -- in other words, not merely stepping

5  forward and saying, It was my father who passed away.

6  They had to prove that legally and lawfully they were

7  the heirs; meaning, if somebody is a son who lived in

8  the house who was never legally adopted, he possibly

9  would not have a claim.

10         If there was a will and it cut out certain

11  people, there would not be -- they would not

12  participate.  No matter if they said, I'm the son, if

13  there was a will, they would be cut out.  So we had

14  to prove that lawfully they were the rightful heirs.

15  And, in addition, I had to prove even that the

16  decedent was in fact the proper person.

17         MR. ARIAS-MARXUACH:  Okay.  Can the witness

18  be shown Joint Exhibit 7.

19  BY MR. ARIAS-MARXUACH:

20  Q.       Having looked at Joint Exhibit 7, do you

21  recognize it?

22  A.       Yes, I do.

23  Q.       Can you tell me what it is?

24  A.       This is a letter from the State Department

25  to me dated November 26, 2008.

Joshua M. Ambush, Esquire - Direct

1  Q.      And who wrote this letter?

2  A.      Linda Jacobson, Assistant Legal Adviser for

3  African and Near Eastern Affairs.

4  Q.      What did this letter tell you?

5  A.      This letter was a followup to an e-mail that

6  came out a little bit earlier than this that gave the

7  instructions to the attorney for the estate of what

8  exactly the State Department was demanding in order

9  to successfully obtain the funds.  These were the

10  prerequisites, if you will, the requirements that

11  must be complied with in order to receive the

12  settlement funds.

13  Q.      Now, did you communicate this letter to the

14  plaintiffs?

15  A.      Yes, I did.

16  Q.      When?

17  A.      This was provided before the meeting by

18  e-mail and also in person.

19  Q.      Okay.  Now, going to the presentation of the

20  retainer agreements and the revocations of the powers

21  of attorney, there has been testimony that those

22  documents were read aloud at the meeting; is that

23  correct?

24  A.      That's correct.

25  Q.      And did the plaintiffs have the opportunity

Joshua M. Ambush, Esquire - Direct

1  to read the documents for themselves?

2  A.      Yes, they did.

3  Q.      Did any of the plaintiffs tell you,

4  Mr. Ambush, this document does not conform to what we

5  have been discussing?

6  A.      Can you say that again?

7          They didn't say that, but are you talking

8  about discussing --

9  Q.      When they had the opportunity to read for

10 themselves and actually sign the retainer agreement,

11 did they say, Mr. Ambush, this does not reflect what

12 we discussed?

13 A.      Are you referring to the --

14 Q.      I'm talking about the retainer agreement.

15 A.      Okay.  My retainer agreement?

16 Q.      Yes, sir.

17 A.      Okay.  No, they did not.  That is not what

18 they said, no.

19 Q.      And they had an opportunity to ask questions

20 of you?

21 A.      Yes.  And they did.

22 Q.      Now, in terms of the administrative claims

23 process, you were asked if you are a Puerto Rico

24 lawyer; do you remember that?

25 A.      I believe I heard that, yes.

Joshua M. Ambush, Esquire - Direct

1  Q.        Did questions of Puerto Rico law arise

2  during the administrative claims process?

3  A.        There were questions of Puerto Rico law, but

4  they were easily answered by a local Puerto Rican

5  attorney who would give me the answer.  But the --

6  that only pertained to who the heirs are and among

7  themselves how they determine that.  But in terms of

8  working with the administrative process, that's

9  something that's federal law with the State

10 Department.

11 Q.        And what's the name of that notary that

12 assisted you with the questions of Puerto Rico law?

13 A.        Orlando Berdecia.

14 Q.        Was there another attorney that helped you

15 with questions of Puerto Rico law, if you recall?

16 A.        Later on there was another attorney, Carlos

17 Gonzalez.

18 Q.        And was Mr. Gonzalez a notary in Puerto

19 Rico?

20 A.        Yes.  He's a notary in Puerto Rico and --

21 Q.        And going back to the meeting, when they

22 were about to sign, did any of the plaintiffs say,

23 Mr. Ambush, this retainer agreement does not say that

24 you will only collect the 10 percent if the Center

25 does not pay you?

Joshua M. Ambush, Esquire - Direct

1   A.        No.  No.

2   Q.        Okay.  Now, going to Joint Exhibit 25 --

3            MR. ARIAS-MARXUACH:  Can the witness be

4   handed Joint Exhibit 25 and Joint Exhibit 13.

5   BY MR. ARIAS-MARXUACH:

6   Q.        A question about the retainer agreement

7   before we go on to these two exhibits.

8            Did you ever tell the members of the

9   Berganzo and Rodriguez-Robles families that you would

10  only collect the 10 percent if the Center didn't pay

11  you?

12  A.        No, I did not say that.

13  Q.        Now let's go to Joint Exhibit 25 and then

14  Exhibit 13.

15  A.        Okay.

16  Q.        Now, you have both exhibits in your

17  possession, no?

18  A.        Yes, I do.

19  Q.        Having looked at these two joint exhibits,

20  do you recognize them?

21  A.        Yes, I do.

22  Q.        Can you tell us what they are?

23  A.        These are documents entitled

24  "Acknowledgment."  They were signed on behalf of each

25  estate.

Joshua M. Ambush, Esquire - Direct

1    Q.        And who signed them on behalf of each

2    estate?

3    A.        Efrain Berganzo on behalf of the Angel

4    Berganzo-Colon estate.

5    Q.        And what about for the Rodriguez-Robles

6    family?

7    A.        It was signed by Noemi Rodriguez-Robles.

8    Q.        Now, why did you request that these two

9    members of these estates sign these acknowledgements?

10   A.        Okay.  These two individuals were made

11   estate representatives by virtue of a duly legally

12   authorized power of attorney in Puerto Rico.  The

13   power of attorney in Puerto Rico, done properly,

14   gives certain rights to the estate representative.

15   The State Department requested an official

16   *administrador*, an administrator selected by a court.

17   I explained to them that that was necessary if there

18   was a duly authorized power of attorney.

19         So these two people were the ones selected

20   and named as official representatives.  In a lawsuit

21   or any type of case an attorney handles, once the

22   case is resolved, there is essentially a settlement

23   and a closure.  And an attorney, just like the United

24   States wanted -- the United States wanted a release

25   that the administrator or the representative would

Joshua M. Ambush, Esquire - Direct

1  sign, and it says, I hereby release the United States

2  government and Libya from any claims and forever and

3  ever they're gonna never be sued by us.  And that was

4  a prerequisite.

5          I didn't do that in this case.  I simply

6  used the same idea, because this is what all

7  attorneys do is, at the end of a case, you have to

8  have some sort of notice that everybody is satisfied.

9  So this acknowledgment says I am acknowledging that

10 the attorney did everything he promised.  He

11 completed the case, he went through the

12 administrative process, the money was received in his

13 escrow account just as we mandated and empowered him

14 to do.  He then disbursed the funds according to the

15 agreements that were in place, and we acknowledge

16 that and we understand that and we know that.  And

17 we're satisfied.

18         And that was the purpose of this document,

19 to acknowledge the fact that they were paid and

20 they're satisfied and happy.

21 Q.      When the moneys from the State Department

22 came in, how did you deliver each estate's share?

23 A.      The funds were transferred to a -- to a

24 special escrow account.  I did not mix this with my

25 regular escrow account where I had my car accident

Joshua M. Ambush, Esquire - Direct

1   cases and other things.  This was a special trust

2   account for this settlement.  The funds were wired by

3   the State Department to that account, and then I, in

4   turn, wired out the funds to the estate

5   representative into an account that I asked them to

6   set up at Banco Popular, which was a bank that was

7   able to receive the funds.  They could not do this at

8   the regular bank -- or a regular local branch could

9   not deal with this situation, with this type of

10  transfer.  But once an account was set up -- I think

11  it's called Popular Securities, which is part of

12  Banco Popular -- the funds were wired directly to

13  that account.

14  Q.      Had the funds been wired into those accounts

15  at the Banco Popular by the time the plaintiffs

16  signed the acknowledgements?

17  A.      Yes.  The funds were already received in

18  that account prior to them signing these

19  acknowledgements.

20  Q.      Okay.  Now let's talk about the checks that

21  were presented by -- now, let's talk about the checks

22  that were marked as Plaintiffs' Exhibit 1-A.

23          MR. ARIAS-MARXUACH:  Can Exhibit 1 -- it's a

24  block of exhibits.  Can that exhibit be delivered to

25  the witness?

Joshua M. Ambush, Esquire - Direct

1  BY MR. ARIAS-MARXUACH:

2  Q.      Now, having looked -- can you look at the

3  checks and then let me know when you're finished.

4  A.      Okay.  I'm familiar with these.

5  Q.      Okay.  Having looked at these checks within

6  Plaintiffs' Exhibit 1, do you recognize them?

7  A.      Yes, I do.

8  Q.      Can you tell us which of these checks, if

9  any, pertains to payment done on behalf of the

10 Rodriguez-Robles and Berganzo families in the Franqui

11 case?

12 A.      No.

13 Q.      Why not?

14 A.      Because there's no markings on any of them

15 that indicate this is specifically for the

16 Rodriguez-Robles or Berganzo families.

17 Q.      Can you tell us, in total, during the time

18 that you worked on the Franqui case, how much the

19 Center paid you for your work?

20 A.      I could take a guess based on reviewing my

21 information, my records, and I would say at most it

22 was 20-, $25,000 over the entire time.

23 Q.      How much time?

24 A.      Over seven years, at least, since --

25 actually, since 2001.

Joshua M. Ambush, Esquire - Direct

1   Q.        And based on your discussions with

2   Rabbi Perr, what did you consider those funds to be?

3   A.        Those were advances.  And, in fact, on one

4   or two times this was clear that those were on

5   account.  He would say, here's $6,000 or $5,000, and

6   it's on account.  And then at some point in time he

7   would acknowledge that I could take some of those

8   funds and use them.  But it was very -- it was only

9   in 2008 or so where there were funds that were, so to

10  speak, considered expressly for the Franqui case.

11  Q.        Now, you told us that you developed your own

12  law practice, correct?

13  A.        Correct.

14  Q.        And where is that law practice located?

15  A.        In Baltimore, Maryland.

16  Q.        Now, did you handle cases for clients other

17  than the Center?

18  A.        Yes, I did.

19  Q.        Did you work on other matters for the Center

20  besides the Lod Airport case?

21  A.        Yes, I did.

22  Q.        And these checks that are within Plaintiffs'

23  Exhibit 1, do they have to deal with those other

24  matters?

25  A.        Mostly.  In fact, most of these were not

Joshua M. Ambush, Esquire - Direct

1   payments to me at all.  Look at the check, the very

2   first one, Exhibit 1-A, there's a check November 13,

3   2006 for $10,000.  It says "to escrow."  This is not

4   my personal account.

5       This is an escrow account where I deposited

6   money from the New York Center and then paid it out.

7   So if this was November 13, if I would look in my

8   escrow checks, I'll assure you that one or two days

9   later, once this check cleared, I then wrote a check

10  out from my escrow to Paul Gaston for the full amount

11  of $10,000.  So this was not even payment to me at

12  all.

13      Uhm, the November 30, 2006, that was merely

14  a reimbursement to me.  It wasn't payment.  $3,000

15  was a reimbursement of some expenses.  But that,

16  again, was not payment.  And that's the only checks

17  in the entire year of 2006, which I explained was

18  when I was filing the complaint.  So in 2006, when I

19  did hours and hours of work, drafting and redrafting

20  and then finally filing the lawsuit, there was no

21  payment.

22  Q.      Now, there has been testimony here that you

23  have a counterclaim against the Center seeking moneys

24  from the Center's 20 percent share under the claimant

25  and Center agreement.

Joshua M. Ambush, Esquire - Direct

1    Why do you feel that you're entitled to an

2  additional payment from the Center?

3  A.      Well, I was essentially in the position of

4  defending myself.  I was promised by Rabbi Perr to

5  get paid, then he doesn't pay me.  And then they file

6  suit against me.  So in -- when a bully punches you,

7  you have to punch them back.  So I punched them in

8  the nose with a countersuit saying, You had promised

9  me, then you sue me?  In federal court there's a

10  opportunity to bring your claim, but it has to be

11  done as a countersuit at the same time when you're

12  being sued.

13         So in defense of myself as a counterclaim, I

14  brought suit saying, He had promised me, he welshed

15  on the promise, I'm bringing my countersuit.  And

16  that's why I essentially brought that claim.

17         THE COURT:  Well, let me just ask for the

18  record.  I know it's an exhibit, that D.C. suit, but

19  do you know approximately when it was filed, that

20  case?

21         MR. ARIAS-MARXUACH:  It's not an exhibit.

22         THE COURT:  So --

23         MR. EFRON:  The only --

24         THE COURT:  Okay.  There's a document from

25  the D.C. court, but when was that complaint filed, if

708 of 182

Joshua M. Ambush, Esquire - Direct

1   you know.  And this probably -- it would be reflected

2   in the docket because it would say the year.

3          MR. EFRON:  The case that was filed was

4   Franqui versus Syria, not the Center's lawsuit

5   against Mr. Ambush.

6          MR. FREESE-SOUFFRONT:  Exactly, but you

7   can ask --

8   BY MR. ARIAS-MARXUACH:

9   Q.        But to the best of your recollection,

10  Mr. Ambush, when did the Center sue you?

11  A.        I'm not sure of the exact date, but it was

12  relatively soon.  I'm trying to remember if it was

13  March of 2009.  And essentially the Center was trying

14  to interfere with my claim, in particular, for these

15  two families, among the others.  And by -- twofold:

16  They tried to contact the State Department and tell

17  them Ambush should not be trusted, he's not the

18  attorney for these people.  And then they filed suit.

19         So that suit, in addition to that, was right

20  at the time when I was trying to get the settlement

21  funds.  So it was about that time in March.

22  Q.        Okay.  Let's move on to another subject.

23         Now, plaintiffs signed the acknowledgements

24  in April of 2009, correct?

25  A.        Correct.

Joshua M. Ambush, Esquire - Direct

1  Q.        And then in November -- it's already in

2  evidence -- they were ads in *El Nuevo Dia* and placed

3  by the Center and Javier Lopez-Perez; do you remember

4  that?

5  A.        Yes.

6  Q.        And there was also an article in *El Nuevo*

7  *Dia* where Mr. Lopez gave an interview and alleged

8  that you had defrauded these plaintiffs.

9          How did those advertisements and newspaper

10 articles make you feel?

11         MR. EFRON:  Objection.  Irrelevant.

12         MR. ARIAS-MARXUACH:  We heard testimony

13 from --

14         THE COURT:  I'll allow the question.

15 A.        I mean, this was an ultimate insult not just

16 to myself but to these people, because I knew that I

17 had some issues with the Center.  I knew they were

18 difficult.  I knew they were playing a game of king

19 of the hill and trying to grab everything.  But I

20 didn't realize that they would stoop so low as to

21 make these people pawns in their game.

22         And what essentially I realized with those

23 ads, it was not a game.  To them it was a holy war.

24 This is like Jihad.  They were coming after me and

25 they would take no prisoners.  Even if it meant

Joshua M. Ambush, Esquire - Direct

1    interfering with a court process, interfering with

2    the State Department no matter what, they were gonna

3    get me.  And using these people as a weapon against

4    me -- they weren't coming at me with machine guns;

5    but make no mistake, I felt this is a war and instead

6    of firing bullets, they're firing lawyers at me.

7          And then when they're not allowed to 'cause

8    these are my clients and I, as their attorney, have a

9    relationship with them -- but how do you get around

10   that?  Put an ad in the paper and coerce them to

11   contact them.

12         And that's when that came clear, that they

13   would go to that extent.  I realized this is -- it

14   was an outrage and it was -- I could say I'm ashamed

15   that my co-religionists would behave in such a

16   sacrilegious way and go to that extent in their

17   personal vendetta against me, even if it meant using

18   and abusing these people.

19   Q.    And can you tell us what impact, if any, the

20   filing of this lawsuit has had on you?

21   A.    It's put a tremendous strain on me.  But

22   more than that.  I knew how to do the litigation.  I

23   knew how to do these case.  I knew how to bring this

24   case.  But I also knew why.  And the reason was to

25   benefit these people, to improve their life, that one

Joshua M. Ambush, Esquire - Direct

1   day it will work out.  One day they'll have comfort

2   that there's not found money, but that this is a

3   recognition that their memory of their loved one is

4   not forgotten.

5          And everybody would benefit.  The Center

6   benefit and I would benefit and the parties would

7   benefit, the claimants would benefit, and it would

8   improve everybody's life.  And everybody has moved

9   on.  The Center has millions now.  The clients have

10  their money, and I'm still embroiled in this

11  litigation and this unending battle.

12         And it's to the detriment of my family.

13  I've got nine children.  We're still living in the

14  house we had when I was a school teacher.  So I've

15  got nine children in a three-bedroom house.  And my

16  kids are always looking and saying, "Dad, you're a

17  lawyer.  What's up?  What's the problem?"

18         We're ready to benefit from the years of

19  hard work I put into this, and it's still being

20  attempted to be thwarted.  So, in essence, it's been

21  incredibly frustrating.  But ultimately I hope that

22  I'll move on.

23  Q.       Do you have any hard feeling for the

24  Berganzo and Rodriguez-Robles families?

25  A.       No.  No.  In fact, as I mentioned, when a

Joshua M. Ambush, Esquire - Direct

1  bully punches you, you punch them in the nose.  And

2  the Center, I had to -- you know, defend myself.  But

3  with these people, I've not filed a counterclaim on

4  them.  I feel sorry for them.  I feel they're being

5  used and they don't even realize it.  And perhaps

6  they still don't understand how they're being

7  manipulated in this.  And I have no hard feelings

8  against them.  I'm apologetic to them, as I was

9  earlier, that they found themselves in the midst of

10  my legal quandary with the Center.

11        MR. ARIAS-MARXUACH:  I thank you.  I have no

12  further questions at this time.

13        THE COURT:  Okay.  Mr. Efron.

14        MR. EFRON:  Yes, your Honor.

15                    CROSS-EXAMINATION

16        MR. EFRON:  Could the witness be handed

17  Joint Exhibit 8, please.

18  BY MR. EFRON:

19  Q.        Mr. Ambush, that letter was originated in

20  your office in Baltimore, Maryland, was it not?

21  A.        Yes, it was.

22  Q.        You were in Puerto Rico at the time, so this

23  was dictated by you and then typed out and then sent

24  out by your secretary; is that correct?

25  A.        Yes, I believe so.

Joshua M. Ambush, Esquire - Cross

1  Q.       And in that letter, you specifically state

2  that -- in the third paragraph you state that -- in a

3  letter to Dr. Engelberg that you know that he's in

4  Puerto Rico.

5           Yet, when I asked you yesterday, you denied

6  that you knew that he was in Puerto Rico at the same

7  time you were for the December 15 meeting; is that

8  correct?

9  A.       That is absolutely incorrect.

10 Q.       Tell me why.

11 A.       Because you asked me about December 15th --

12 Q.       Uh-huh.

13 A.       -- and this is December 17th.

14 Q.       So when did you find out he was in Puerto

15 Rico?

16 A.       December 17th.

17 Q.       On December 17th, you found out.  And how

18 was that?

19 A.       Because one of my clients called me and said

20 that I just received a call from Michael Engelberg

21 who told me that I'm in Puerto Rico and I have a

22 lawyer and I want to meet you.

23 Q.       And you said to him to not speak to

24 Dr. Engelberg; is that correct?

25 A.       No.

1    Q.        And if Dr. Engelberg -- if you would have

2    known that Dr. Engelberg was in Puerto Rico on

3    December 15th, would you have invited him along to

4    Efrain Berganzo's home to explain the situation from

5    the point of view of the Center that did all the work

6    for them and that signed them on in 2001?  Would you

7    have invited him?

8    A.        That was such a compound question I don't

9    know what part to --

10   Q.        On December 15th, would you have invited

11   Michael Engelberg to the meeting if you would have

12   known he was in Puerto Rico?

13   A.        I would not have invited him, no.  He was

14   not a person, at that point, that I needed to speak

15   to.

16   Q.        Because you thought that he had fired you

17   from representing these people through the Center; is

18   that correct?

19   A.        That is incorrect.

20   Q.        Did he not dispose of your services in the

21   Center?

22   A.        Michael Engelberg had no power or authority

23   to order me to do anything with regard to these

24   families.

25   Q.        De he attempt to?

Joshua M. Ambush, Esquire - Cross

1    A.          He attempted to, but that --

2    Q.          Thank you very much.

3               Now, when you say you explained -- on

4    December 15th, when you say you explained to these

5    families the three points that you came to discuss

6    with them, this was done through interpreters; is

7    that correct?

8    A.          It was done both through interpreters and

9    direct discussion.

10   Q.          And the interpreters were Leopoldo and the

11   lawyer; is that correct?

12   A.          Correct.

13   Q.          And neither of them are certified

14   interpreters.  And you wouldn't know precisely if

15   they were interpreting correctly what you said or

16   what anybody else; is that correct?

17   A.          I don't know that to be true, that Orlando

18   Berdecia is not a certified interpreter.

19   Q.          Do you think they understood all of these

20   complex issues that you were bringing to them and

21   everything that needed to be done and being -- and

22   after what I'd like to call "the dog and pony show,"

23   explaining what it is that you do and what it is that

24   you've done for them --

25               MR. ARIAS-MARXUACH:  Objection.  Facts not

Joshua M. Ambush, Esquire - Cross

1  in evidence and compound.

2          THE COURT:  It's too compound.  Break the

3  question into a simpler questions.

4  BY MR. EFRON:

5  Q.      Did you -- do you think they understood what

6  you were saying to them?

7  A.      They absolutely understood because they had

8  questions, as I explained and discussed.  They

9  understood exactly.  It was very -- no pressure.  It

10 was unrushed.  It was from the heart.  And they

11 understood.

12 Q.      So the same people that you're saying --

13 that are here today and don't understand how they're

14 being used as pawns against you, did understand on

15 December 15th what you were explaining; is that

16 correct?

17 A.      That is correct.  They absolutely

18 understood.

19 Q.      Okay.  You never told them that you had been

20 paid by the Center, did you?

21 A.      That's false.

22 Q.      You told them you had been paid?

23 A.      I had been paid token sums and money along

24 the way --

25 Q.      I'm not talking about the facts, I'm talking

Joshua M. Ambush, Esquire - Cross

1    about what you told them.

2         Did you tell them --

3    A.    That's what I told them.

4    Q.    Did you tell them that you were paid by the

5    Center?

6    A.    I told them that I was paid some funds by

7    the Center, but that was not in any way, shape, or

8    form payment in full.  And they understood that it's

9    absurd to think that paying someone for this amount

10   of work, in light of the fact of everything I've told

11   you, was payment in full.

12   Q.    You were talking about the -- you testified

13   on the mood and the setting in the Berganzo home on

14   that day.  It was, for this question, family, it was

15   almost Christmas; is that not correct?  It was nine

16   days before Christmas Eve; is that correct?

17   A.    I remember as I was driving through San Juan

18   and Puerto Rico at that time there were Christmas

19   decorations and --

20   Q.    What about at the Berganzo home, which is

21   what I'm asking you?  What was the mood?  Was it a

22   Christmas mood nine days before Christmas Eve?

23   A.    I couldn't say that.

24   Q.    Did they have a Christmas tree at home?

25   A.    Not that I recall.

Joshua M. Ambush, Esquire - Cross

1    Q.        Did it have Christmas decorations?

2    A.        Not that I recall.  I don't think they did.

3    Q.        Did they have the typical Christmas -- were

4    you offered any food or any refreshments typical of

5    Christmas?

6    A.        I don't think Christmas was on anybody's

7    mind at that time.

8    Q.        Well, certainly not in your mind, but you

9    don't know what they were thinking.

10   A.        I'm sure they were thinking a lot of things.

11   I'm don't know what they were thinking about

12   Christmas or not.

13   Q.        And the Christmas spirit, it generally --

14   especially in families --

15             (Loudspeaker interruption.)

16             THE COURT:  Let's continue.  That's probably

17   testing the system -- don't worry.  I live with that

18   on a monthly basis five to six times.

19             MR. ARIAS-MARXUACH:  Your Honor, this whole

20   line about the Christmas mood, when both Ambush and

21   Efron are Jewish...

22             THE COURT:  Okay, let's move on.  Let's

23   continue.

24             MR. EFRON:  How is that relevant?

25             MR. ARIAS-MARXUACH:  Because you are --

Joshua M. Ambush, Esquire - Cross

1    THE COURT:  Let's continue.

2    MR. FREESE-SOUFFRONT:  You guys are not

3  testifying.

4    THE COURT:  Let's continue.

5  BY MR. EFRON:

6  Q.    So tell me, in the Christmas mood that we

7  have in Puerto Rico around December 15th, is this not

8  a generous mood especially among people outside of

9  San Juan?

10    MR. ARIAS-MARXUACH:  Your Honor --

11    THE COURT:  I'm going to sustain the

12  objection.  Let's move on.

13  BY MR. EFRON:

14  Q.    Okay.  So you were totally unaware that

15  there was any Christmas spirit or anything going on;

16  is that correct?

17    THE COURT:  Asked and answered.  Let's move

18  on.

19  BY MR. EFRON:

20  Q.    And that was the first time you had met

21  them so -- you did testify that December 15th was the

22  first time you had met them; is that correct?

23  A.    Yes.

24  Q.    Now, if --

25    THE COURT:  And let me say this:  If there's

Joshua M. Ambush, Esquire - Cross

1   a fire alarm.  The marshal's service will immediately

2   come by and make sure we all exit.  There's an

3   emergency plan, so don't be alarmed.  There's

4   construction here and this goes on every once in a

5   while.

6           Okay.  Let's continue.

7   BY MR. EFRON:

8   Q.      What would you have done if any one of these

9   people would have refused to sign your retainer

10  agreement?

11  A.      I would have walked away.  I would have not

12  insisted on it.  It was purely voluntary.

13  Q.      And, of course, you would have withdrawn

14  from their representation in the case; is that

15  correct?

16  A.      That's false.

17  Q.      And then they would not have received an

18  award; is that correct?

19  A.      That is also false.

20  Q.      Why is that?

21  A.      'Cause my duty was to represent them.  I was

22  their attorney and they wanted me to continue as

23  their attorney.  There was no thought or

24  consideration that I would merely abandon them if

25  they refused to pay me.  That's absurd.

Joshua M. Ambush, Esquire - Cross

1  Q.        But you just said that you would just walk

2  away.

3  A.        No.  I would have walked away from

4  demanding -- you know, I wasn't demanding.  So to

5  answer your question, had they said, no, we're not

6  gonna pay you, I would have walked away from the fact

7  that I was asking them to pay me.

8  Q.        But the documents were not just about being

9  paid; it was also about authorizing you to do certain

10 things?

11 A.        That's correct.

12 Q.        So if they would not have authorized you to

13 do certain things besides other than paying you, what

14 would you have done?

15        MR. ARIAS-MARXUACH:  Objection.  Calls for

16 speculation.

17 BY MR. EFRON:

18 Q.        What would you have done if they had not

19 authorized you to go forward in their representation?

20 A.        I would listen to the clients --

21        MR. ARIAS-MARXUACH:  Objection.  Calls for

22 speculation.  Irrelevant.

23        THE COURT:  Overruled.  He answered.

24        MR. EFRON:  It's a legal question.

25        THE COURT:  I allowed the question and he

Joshua M. Ambush, Esquire - Cross

1    answered.

2    BY MR. EFRON:

3    Q.        Now, yesterday you spoke about your

4    relationship with Rabbi Perr.

5             Have you ever asked him for money -- call it

6    an advance, call it charity, call it whatever -- that

7    he has not paid you, has not given you a check?

8             Have you ever asked him for money where he

9    has not come through?

10   A.        Yes, there have been times.

11   Q.        Was it unusual, because of -- he might not

12   have had the money, or did he generally give you the

13   money you asked for?

14   A.        No, he didn't.  There were periods of time

15   when I had a number of paying cases, and then it

16   would drop off precipitously and I needed to carry

17   myself through until I would have another case or

18   another client or some other work that would come in.

19            And there were times where he didn't have

20   the money, and he would say the Center has no work or

21   the Center wouldn't have anything to offer.  And it

22   wasn't just the Center.  It was him personally.

23            But, no, that's not true that he would

24   always come through with money.  That wasn't the

25   case.

Joshua M. Ambush, Esquire - Cross

1  Q.        And so it wasn't always the case.

2          On these funds that you say you laid out and

3  never got paid back, did you ever ask to be paid back

4  on those funds?

5  A.        Yes.

6  Q.        And what was the reason for not being

7  reimbursed?

8  A.        I don't understand or know what the

9  Center's -- how their mindset was of why they didn't

10  pay expenses when they should have.

11  Q.        But these are expenses of a few hundred

12  dollars, like you said yesterday; is that correct?

13  A.        No.

14  Q.        These were more, expenses of more money?

15  A.        Yes.

16  Q.        You mentioned -- I think you testified

17  yesterday that Paul Gaston came into the case in

18  2008; is that correct?

19  A.        That's correct.

20  Q.        And you also mentioned -- and as far as you

21  know, if you know, the Center would pay him directly;

22  is that correct?

23  A.        No.  What I misspoke yesterday and will

24  clarify now --

25  Q.        Oh, you misspoke yesterday?

Joshua M. Ambush, Esquire - Cross

1    A.          That's right.

2    Q.          I don't want you to clarify.  I want you to

3    answer the next question.

4          If he didn't come into the case until 2008,

5    why today do you allege that in 2006, in that -- in

6    that 2006 check, you put it in escrow to give to him

7    where there's no evidence in that check to that

8    effect?  How do you know --

9          THE COURT:  Break the question down,

10   Mr. Efron.

11   A.          I can't answer it.  I don't know what you're

12   asking.

13   BY MR. EFRON:

14   Q.          I'm asking you how -- why do you say that

15   the 2006 check that your lawyer asked you to identify

16   as the escrow check, which you stated was payment to

17   Paul Gaston, would have been made in 2006, when he

18   didn't even show up in the case until 2008?

19   A.          Because Paul Gaston did other work for the

20   Center on numerous other cases and --

21   Q.          Did you consult him on this case before he

22   made an appearance in 2008?

23   A.          I may have consulted him, but that was -- he

24   wasn't paid or had anything to do with the Lod

25   Airport case so I --

Joshua M. Ambush, Esquire - Cross

1    Q.        Why would the Center give you money to put

2    it in your escrow account to pay Paul Gaston and not

3    pay him directly?

4    A.        You're asking a sensitive question that

5    essentially, to my understanding now, was that the

6    Center was hiding from Paul Gaston the fact that they

7    were actually making payments from the New York

8    Center.  I didn't understand the relationship back

9    then of the different entities the Center was

10   running, but if the New York Center paid $10,000 to

11   my escrow and then from that directed me to pay Paul

12   Gaston for the Collet case or another case, Surrette

13   or Buckley or any other case that he worked on --

14   $10,000, the money would flow to me and as soon as

15   the check cleared I would write Paul Gaston a check.

16   Q.        But other than that escrow check, most of

17   those checks were made out to you directly for your

18   account?

19   A.        That is false.

20   Q.        They were all escrow checks?

21   A.        The vast majority of those checks are escrow

22   checks.

23   Q.        How come only one of them indicates escrow

24   on the memo?

25   A.        Apparently Michael Engelberg was sloppy with

Joshua M. Ambush, Esquire - Cross

1   his bookkeeping and he didn't write escrow on this.

2   Q.      Are you sloppy with your bookkeeping?

3   A.      I'm not a nonprofit organization.  I do the

4   best I can.  But I can tell you that with the escrow

5   funds, it's absolutely clear that those went in and

6   went out.  And it's all accounted for.

7   Q.      Did you keep a record of the hours that you

8   spent on this case?

9   A.      It was not a by-the-hour case; so, no, I did

10  not.

11  Q.      It was not a by-the-hour case, but you

12  billed -- there's some billings that you sent out

13  where you were billing the Center for this case at

14  $50 an hour; is that not correct?

15  A.      That is actually not correct.

16  Q.      That is not correct that you were not

17  billing at $50 an hour?

18  A.      No, I was not.

19  Q.      And you did not bill -- and you did not bill

20  the Center on an hourly basis on those billings for

21  this case -- for the Lod Massacre case, for the

22  Franqui versus Syria case?

23          MR. ARIAS-MARXUACH:  Objection.  Asked and

24  answered.  This was covered yesterday.

25          THE COURT:  I'll allow him to answer.

Joshua M. Ambush, Esquire - Cross

1  A.       If Rabbi Perr would advance and direct that

2  Michael Engelberg send a check for a few thousand

3  dollars and then a year later ask me for an invoice

4  that would cover -- he suggested I make an invoice

5  and go through, as best I can, and try to figure out,

6  so that he would have some sort of record to account

7  for why he advanced me those moneys.

8         So at his request, I went to my daily log or

9  calendar, where I wasn't keeping hours, but I was

10 looking at what I did and tried to figure out to

11 pay -- to list some of the time I had spent, and at

12 his request or his recommendation to use the hourly

13 rate of 50 an hour, to come up with an invoice for

14 his use and benefit.

15 Q.       From the time you filed the Franqui versus

16 Syria case in 2006, until the meeting on December 15,

17 2008, how many hours do you estimate that you spent

18 on the Lod Airport Massacre case?

19 A.       I can't say exactly.

20 Q.       Of course not.

21 A.       I would say it's --

22 Q.       Go ahead.  I know it's an estimate because

23 you don't have your records.

24 A.       This was a contingency case, so I would tell

25 you that it's hundreds of hours of actual time.  And,

Joshua M. Ambush, Esquire - Cross

1   in addition, the value that I provided was beyond

2   hourly rates.  This was not a type of case that

3   was --

4   Q.      In your opinion.

5   A.      This was not a case that was accounted for

6   on an hourly basis.

7   Q.      Were you present at Rabbi Perr's deposition?

8   A.      No, I was not.

9   Q.      Did you read the transcript of Rabbi Perr's

10  deposition?

11  A.      Yes, I have.  I read some of it.  I couldn't

12  read all of it.

13  Q.      Why not?

14  A.      I couldn't stomach it, actually.

15  Q.      You couldn't stomach it.

16          Which part could you not stomach?

17          MR. ARIAS-MARXUACH:  Objection.  Irrelevant.

18  Your Honor, Rabbi Perr is not here.  It's hearsay.

19          THE COURT:  Sustained.

20          MR. EFRON:  He has personal --

21          MR. FREESE-SOUFFRONT:  No, Your Honor.

22          THE COURT:  Let me say this:  It's almost

23  10:30.  Let's take a ten-minute recess and then we'll

24  come back and conclude.

25          (Jury exits the room.)

Joshua M. Ambush, Esquire - Cross

1    (Jury Trial recessed at 10:25 a.m. and

2    resumed at 10:45 a.m.)

3          (Jury enters the room.)

4          THE COURT:  Please be seated.

5          Mr. Efron, you may continue.

6    BY MR. EFRON:

7    Q.      So, Witness, do you have records of your

8    escrow account as far as what comes in and what goes

9    out?

10   A.      Yes, I do.

11   Q.      You know that we had these checks in this

12   case through discovery because you've been active in

13   your own case, in this particular case, have you not?

14   And you were aware that we --

15         THE COURT:  One question.

16         MR. ARIAS-MARXUACH:  Your Honor, sidebar.

17         THE COURT:  Okay.  Let's approach.

18         (Sidebar discussion begins.)

19         MR. ARIAS-MARXUACH:  Your Honor, on the eve

20   of trial, he issued an order saying that no reference

21   to compliance or noncompliance with the rules of

22   civil procedure could be made in the presence of the

23   jury.  And this line of questioning is headed again

24   to trying to intimate a noncompliance to discovery.

25         MR. EFRON:  Your Honor --

Joshua M. Ambush, Esquire - Cross

1    THE COURT:  These documents, I don't know if

2  you have them or not have them, but it was never a

3  discovery issue; so you can ask him if he's got those

4  records, but you cannot ask him why doesn't he have

5  them here or you'd like to see them.  You cannot

6  infer as to that so --

7         MR. ARIAS-MARXUACH:  Yes, your Honor.

8         THE COURT:  Okay.  Let's continue.

9         (Sidebar discussions end.)

10  BY MR. EFRON:

11  Q.      So you do have the record -- you do have

12  those records, but the only thing you brought here

13  today was --

14         MR. ARIAS-MARXUACH:  Your Honor, this was

15  discussed at sidebar.

16         THE COURT:  Rephrase the question.

17  BY MR. EFRON:

18  Q.      The only thing you brought here today --

19         MR. ARIAS-MARXUACH:  Your Honor, same

20  question.

21         MR. EFRON:  Your Honor, I haven't finished

22  the question.

23  BY MR. EFRON:

24  Q.      You're giving us --

25         THE COURT:  Yeah, but you have to be clear

Joshua M. Ambush, Esquire - Cross

1    about it.  That was not requested for him to bring

2    today.  You can ask him --

3             MR. EFRON:  I'm not saying that, I'm not

4    saying that.

5             THE COURT:  Again, I don't want the jury to

6    get the inference --

7             MR. FREESE-SOUFFRONT:  That he had an

8    obligation.

9             THE COURT:  -- inadvertently that he failed

10   to meet an obligation.  So keep that in mind.

11            MR. EFRON:  Of course, of course.

12            THE COURT:  So ask the question.

13   BY MR. EFRON:

14   Q.       And as you sit here today, we have your

15   assurance that those checks were mostly for -- went

16   mostly into your escrow account; is that correct?

17   A.       That's correct.

18   Q.       And that most of them were not used for your

19   own benefit, correct?

20   A.       That's not -- that is correct.

21   Q.       Fine.

22            And did you hear Dr. Engelberg's testimony a

23   couple of days ago?

24   A.       Yes.

25   Q.       And I think -- did he not say something to

Joshua M. Ambush, Esquire - Cross

1  the effect that you had been paid approximately

2  $30,000 on this case, on the LOD massacre case, on

3  the Vega -- on the Franqui versus Syria case?  Do you

4  remember him saying that?

5  A.        I don't remember exactly what he said.

6  Q.        If he would have said that, would that be

7  correct?

8  A.        That was not correct.

9  Q.        Do you think it was 25,000?

10  A.        I think it was even less than that.

11  Q.        And you spent hundred of hours, you

12  testified, on this matter between 2006 and 2008; is

13  that correct?

14  A.        Yes.

15  Q.        Now, the way I figure it, at $50 an hour,

16  $25,000 takes me to 500 hours.

17          Did you spend as much as 500 hours in the

18  case between 2006 and 2008?

19  A.        I'm not following your math.  I don't know

20  what -- how to calculate that because, as I

21  mentioned --

22  Q.        $25,000, divided by $50 an hour is

23  500 hours.

24          Did you spend 500 hours or more on that case

25  between 2006 and 2008?

Joshua M. Ambush, Esquire - Cross

1    A.       I can't answer that because I don't know.

2    Q.       You used a very ugly term here, a Jihad, as

3    far as what Rabbi Perr and the Center are invoking

4    against you; is that correct?

5    A.       I think that's what I said, yes.

6    Q.       Why do you suppose they're so angry at you?

7    A.       This is speculation on my part, but they are

8    apparently engaging in a vicious war with me.

9    Q.       Because?  Why would they do that?

10            Let me rephrase it.  I'll withdraw that one.

11            The lawsuit in Washington, D.C. -- in the

12   federal court in Washington, D.C. between the Center

13   and yourself, or the Center sued you, is it not true

14   that this was an injunction asking that the assets

15   and the moneys of the victims of the claimants that

16   were in your possession be preserved?  Was that not

17   the gist of the injunction?

18   A.       There was no injunction, it was a request

19   for an injunction which they then used to give the

20   State Department -- to say, you see, we have filed an

21   injunction.

22   Q.       Well, you don't know what they were

23   thinking, but did the federal court in

24   Washington, D.C. order you to put millions of dollars

25   in the court registry?

Joshua M. Ambush, Esquire - Cross

1   A.        They didn't -- there was a court order by

2   agreement.  That's how the funds in dispute would be

3   handled.

4   Q.        And those funds in dispute were under your

5   control and in your trust account; is that correct?

6   In your escrow account?

7   A.        There were funds in the Libyan settlement

8   trust account that, when the money flowed from the

9   State Department, I then disbursed to the clients per

10  their agreement.

11  Q.        The money that was left -- the part of that

12  money that was left, is the money that the court

13  ordered -- in Washington, D.C. ordered that be put in

14  the court registry in that court; is that correct?

15  A.        Correct.  There's a --

16  Q.        And how much money would that be?

17           MR. ARIAS-MARXUACH:  Your Honor, we have no

18  objection at this time, but this is well outside the

19  scope of direct.

20           THE COURT:  I believe that's been testified

21  to by Dr. Engelberg.  I believe the amount was close

22  to 1.5 or something like that.

23  BY MR. EFRON:

24  Q.        I think it was more, wasn't it?  Was it not

25  $8 million?

Joshua M. Ambush, Esquire - Cross

1    A.       No.

2    Q.       Was it $6 million?

3    A.       No.

4    Q.       What was the amount, sir?

5    A.       I don't know the amount.  I know for these

6    families -- I believe it was $400,000 per family.

7    Q.       Okay.  But that's just for these families?

8    A.       Mm-hmm.

9    Q.       And that's the money that you're going

10   after, in addition to the million dollars you got

11   from each family and in addition to the hours you

12   were paid for this case; correct?

13           MR. ARIAS-MARXUACH:  Asked and answered.  He

14   covered this in his direct.

15           THE COURT:  That was covered in direct.

16   Sustained.

17   BY MR. EFRON:

18   Q.       You mentioned that the way the rabbi was

19   acting made you -- this Jihad against you, made

20   you -- I wrote it down because I was very surprised

21   by it.

22           THE COURT:  Don't comment on your personal

23   characterization.  Just ask him.

24   BY MR. EFRON:

25   Q.       You said that you were ashamed that someone

Joshua M. Ambush, Esquire - Cross

1  in my religion would act this way; is that what you

2  said?

3  A.      Those are your words, but that was the

4  essence of what I was saying.  It was a sacrilege for

5  a man of the cloth, a religious figure, to act in

6  such a fashion.

7  Q.      You are Jewish, correct?

8  A.      Correct.

9  Q.      Are you an Orthodox Jew?

10  A.      Yes.

11  Q.      And in --

12          THE COURT:  Just since you asked him the

13  question, very briefly, one line or two, explain to

14  the jury what an Orthodox Jew is -- or a person of --

15          MR. EFRON:  Well, I don't think anybody

16  knows yet.

17          THE COURT:  Well, but I think it's important

18  just to again --

19  BY MR. EFRON:

20  Q.      According to orthodox Jews, who is a Jew?

21          MR. ARIAS-MARXUACH:  Your Honor, I think the

22  question that should be answered is the one --

23          THE COURT:  Okay, but I'm posing the

24  question, what is an Orthodox Jew?  Then you can

25  continue, but just --

Joshua M. Ambush, Esquire - Cross

1    THE WITNESS:  Is that for me?

2         THE COURT:  Oh, yes, sorry, it's for you.

3  If can you tell the jury very briefly, in a nutshell,

4  what an Orthodox Jew believes in, or at least you as

5  an --

6         THE WITNESS:  An Orthodox Jew is simply a

7  Jewish person of the Jewish faith who abides by the

8  traditions of the Torah, which is the Old Testament

9  and the Talmud and the Jewish laws that were enacted

10  in the biblical times.

11  BY MR. EFRON:

12  Q.        And we have been ashamed of Jews before,

13  haven't we, of other Jews through history?

14         MR. ARIAS-MARXUACH:  Objection, Your Honor.

15         THE COURT:  Sustained.  Sustained.

16  BY MR. EFRON:

17  Q.        Was your mother's mother -- you called her

18  mami pachi?  And I'm saying this with all respect.

19  Is that what -- because I didn't --

20  A.        Mami pachi was my great grandmother.  My

21  mother's name was Sarah Lucille or Sarah Lou

22  Basci-Viera.  My great grandmother --

23  Q.        So her mother's last name was Viera?

24  A.        Correct.

25  Q.        Okay.  But she was Jewish?

Joshua M. Ambush, Esquire - Cross

1   A.      She was not Jewish when she was born.

2   Q.      Okay, but she converted?

3   A.      Are you speaking of my mother?

4   Q.      Yes.

5   A.      Yes.

6   Q.      Was it an orthodox conversion?

7           MR. ARIAS-MARXUACH:  Objection, Your Honor.

8           THE COURT:  Sustained.

9           MR. ARIAS-MARXUACH:  And beyond the scope of

10  the direct.

11          THE COURT:  Sustained.

12          MR. EFRON:  Do you still have Joint

13  Exhibit 7?  I think we retrieved it.

14  BY MR. EFRON:

15  Q.      Do you recognize that document, sir?

16  A.      Yes.

17  Q.      On what date, approximately, did you receive

18  it?

19  A.      November 26, 2008.

20  Q.      Once you received this, how long did it take

21  you to decide that you were going to go see the

22  claimants in Puerto Rico?

23  A.      I had -- soon after I had received this

24  letter, I had sent this to them.

25  Q.      What do you mean "to them"?

Joshua M. Ambush, Esquire - Cross

1   A.        To Jose Berganzo on behalf of his father.

2   Q.        Jose Berganzo, was he one of your clients?

3   Was he a claimant in this case?

4   A.        No, he's not.  His father is, and he was

5   speaking to me on behalf of his father because he is

6   fluent in English.

7   Q.        Okay.  So my question was not what you did

8   with it, but:  Once you read it, how long did it take

9   you to decide that you needed to go to Puerto Rico or

10  that you were to go to Puerto Rico to meet the

11  claimants?

12  A.        I had made up to go to Puerto Rico at some

13  point in the future, and I conveyed that to Jose

14  Berganzo -- through Efrain Berganzo to Jose Berganzo.

15  Q.        But you're not being responsive.

16            What --

17  A.        You're not letting me finish.

18  Q.        When did you decide to go to Puerto Rico?

19  A.        I ultimately went to Puerto Rico on or about

20  December 15th.

21  Q.        I know when you went to Puerto Rico; when

22  did you decide to go to Puerto Rico?

23  A.        It was --

24  Q.        Did you wake up that morning and go to the

25  airport or was this --

Joshua M. Ambush, Esquire - Cross

1    MR. ARIAS-MARXUACH:  Your Honor, he should

2    let him answer.

3    BY MR. EFRON:

4    Q.      Or was it planned a week or two in advance?

5            THE COURT:  He'll answer now.

6    A.      Okay.  I made up to go to Puerto Rico a few

7    days before I arrived.  But I don't recall if I left

8    on a Sunday and I made up my mind on a Thursday or

9    what have you.  But it was a few days before when I

10   went to Puerto Rico.

11   BY MR. EFRON:

12   Q.      Now, I'd like to take a couple of minutes

13   and go over the letter with you, because sometimes

14   people can be overwhelmed by seeing a letter, and I

15   think it's rather simple.  If --

16           This is what the Department of State

17   establishes as the procedure for distributing the

18   compensation.

19           By now the compensation has been set at

20   $10,000,000 per death; is that correct?

21   A.      Correct.

22   Q.      What's the first requirement?

23           These are the things that you needed to do

24   with this family in order to get them paid up; is

25   that correct?

Joshua M. Ambush, Esquire - Cross

1    A.         That's correct.

2    Q.         Okay.  And the first one is a statement

3    identifying yourself as their lawyer; is that

4    correct?

5    A.         Correct.

6    Q.         Which is why you needed to come down here

7    and get those documents signed; is that correct?

8    A.         They --

9    Q.         Go ahead.  I'm sorry.

10   A.         I was their lawyer, and I did not have a

11   written retainer agreement; so in order to go forward

12   in the sense of establishing -- Question No. 1,

13   establish yourself or identify yourself as a

14   lawyer -- I had to ask them for a written retainer

15   agreement acknowledging the fact that I had been

16   their attorney and continued in that capacity at this

17   time.

18   Q.         Okay.  So once you came down to Puerto Rico

19   and you got their signature, the first requirement

20   was complied with.

21   A.         The --

22   Q.         The second requirement --

23   A.         I'm sorry, was that a question?  I didn't

24   know if you wanted me to respond to that.

25   Q.         No, you did respond.  You said yes.

Joshua M. Ambush, Esquire - Cross

1    A.         Yes.

2    Q.         Do you agree that you did comply once you

3    got them signed up?

4    A.         They were -- it's not signed up, they were

5    simply ratifying the fact that I was their attorney

6    and putting it in writing.

7    Q.         Sir, you didn't have a retainer agreement,

8    you didn't have a letter of authorization, you had

9    nothing from them to indicate that you were

10   authorized to represent them until December 15th; is

11   that correct?

12   A.         That's correct.  They were unrepresented at

13   that time in writing.

14   Q.         No. 2, Attachment A, that's just a copy of

15   the Franqui versus Syria complaint.  That's easy

16   enough.

17            Your secretary can make a copy of that; is

18   that correct?

19   A.         That's correct.

20   Q.         Three, the dismissal of the claim which you

21   did in December of 2008; is that correct?

22   A.         That I did on or about December 31, 2008.

23   Q.         Well, I don't know when you did it, but you

24   filed it on December 31; is that correct?

25   A.         That's correct.

Joshua M. Ambush, Esquire - Cross

1    Q.        So -- and that's just basically filing it

2    and then having your secretary make a copy and put it

3    in the package that you're going to send the State

4    Department; is that correct?  Sir?

5    A.        I --

6    Q.        A copy of the motion for voluntarily

7    dismissal without prejudice; would a copy of that --

8    A.        With prejudice.

9    Q.        With prejudice.  Thank you for correcting

10   me.  With prejudice.

11            Would that comply with No. 3?

12   A.        Attachment B, is that what you're looking

13   at?  No. 3, Attachment B?

14   Q.        Yes.

15   A.        Okay.  Give me a minute to read it.

16            Yes.

17   Q.        Number 4, is Attachment C.  Apparently,

18   these are attachments that -- these are attachments

19   that came with this letter -- or that's an attachment

20   that you're sending them with your letter in

21   compliance with this one?

22   A.        These were exhibits as part of the Franqui

23   case -- Vega-Franqui case, but these were documents

24   that established the settlement between the

25   government of Libya and Syria.  There was not just

Joshua M. Ambush, Esquire - Cross

1  one document, there were several.

2  Q.       Okay.

3  A.       It was the settlement agreement between he

4  government of Libya and the United States.  It was

5  the act of Congress empowering or enacting that into

6  law.

7  Q.       But that's not what I asked you and that's

8  not what you're being required to do here.

9          Over here, you're being required to send

10 your retainer agreement, a copy of the complaint, a

11 copy of the dismissal, a copy of the release -- of

12 their release; and for that you had one member of

13 each family authorized to sign the release and you

14 obtained that release?

15         MR. ARIAS-MARXUACH:  That's not what it says

16 in Paragraph No. 3.  It's taken out of context.

17         THE COURT:  He can go ahead and he can

18 explain.

19 BY MR. EFRON:

20 Q.       Go ahead and tell me what No. 4,

21 Attachment C requires.

22 A.       Can I read it a minute, please?

23 Q.       Yes, please.

24 A.       Okay.

25 Q.       And the release form --

Joshua M. Ambush, Esquire - Cross

1    THE COURT:  Let him explain what it

2  requires.

3  BY MR. EFRON:

4  Q.        Go ahead.

5  A.        In order to get a release from the

6  authorized representative, that person had to be

7  authorized.  If we were to assume that Michael

8  Engelberg can do it as his power of attorney, then

9  the State Department would take that.

10        But that's not what happened.  They needed

11  and required one representative of the family

12  authorized by court or legally in Puerto Rico.  And

13  in order to get that, it could have been achieved in

14  one of two ways:  Either come to court and have a

15  declaratory of debtor and heirs, a declaration of

16  heirs from a court saying these are the heirs; and,

17  in addition, all those heirs, by law, by a court

18  order, authorize not -- it's not just by those

19  individuals, but the court would say one person of

20  those is now empowered to be the *administrador*, the

21  administrator of the estate.  That could have been

22  done, but that would have been a lengthy process.

23        In lieu of that, as an alternative, I

24  recommended that they empower one person, and that's

25  why, you know, Noemi had represented her family on

Joshua M. Ambush, Esquire - Cross

1   the caption of the complaint and Efrain had

2   represented them in the initial caption of the

3   complaint, the official filing of the case.

4           So they were determined to be the

5   representative for the family among themselves, and

6   they then had to give power to her legally through an

7   alternative process called a power of attorney.  A

8   power of attorney in Puerto Rico is not merely

9   filling out a form and signing it and good-bye.  It

10  required knowledge by each party what they are doing.

11  It is essentially they are giving rights to one

12  person.  That person has individual rights, and I'm

13  granting or deeding.

14          It's like a closing of a house.  It's a very

15  formal process.  I'm giving that person my rights and

16  I'm relinquishing my own rights to represent myself.

17  So it's a serious consideration.  That person has to

18  be empowered by that -- by the individual giving the

19  power to the one estate representative.

20          And once that is done in a legal document

21  called a power of attorney, it has to be notarized

22  and then registered in court in Puerto Rico.  And

23  only then is that considered a lawful power of

24  attorney.

25          And that is what ultimately the State

Joshua M. Ambush, Esquire - Cross

1    Department accepted, but not initially because they

2    wanted to be abundantly clear --

3            MR. EFRON:  Your Honor, he's not being

4    responsive.

5            MR. ARIAS-MARXUACH:  Your Honor, he's

6    answering.

7            MR. EFRON:  He's answering the following

8    question, he's not answering this one.  He's just

9    going into a lengthy diatribe.

10           MR. ARIAS-MARXUACH:  Your Honor --

11           THE COURT:  Let him finish.

12           MR. ARIAS-MARXUACH:  Strike the

13   characterization.  If he doesn't like the answer --

14           THE COURT:  Let him finish and then you can

15   ask him another question.

16   A.      The operative word here is that the United

17   States government wanted a release, but the release

18   had to be timed after the dismissal of the case.  So

19   these --

20   BY MR. EFRON:

21   Q.      And you obtained a release?  You got the

22   releases signed by them, did you not?

23   A.      The -- once Noemi Rodriguez-Robles and

24   Efrain Berganzo had duly authorized powers of

25   attorney that were legally sufficient in Puerto Rico,

Joshua M. Ambush, Esquire - Cross

1    and they had the power and authority to sign a

2    release, then I submitted to each of the respective

3    estate representatives the release that the United

4    States required, and it had to be signed after they

5    had the power of attorney and after the suit was

6    dismissed.

7              Had it been done in reverse order, it would

8    be invalid.

9              MR. EFRON:  Your Honor, that's not what I

10   asked him.

11   A.       The question was -- I believe you asked me

12   what role and what had to be done to achieve

13   Attachment C in No. 4.

14             THE COURT:  Mr. Efron, ask exactly the

15   question again.

16   BY MR. EFRON:

17   Q.       I asked you if Attachment C, a copy of the

18   release, was a document that you got them to sign and

19   then sent into the Department of State.  I did not

20   ask you to go through the whole of everything you

21   alleged you did in order to obtain this.

22             MR. FREESE-SOUFFRONT:  That was not your

23   question, Counselor.

24             THE COURT:  Ask another question or pose

25   whatever question you want.

Joshua M. Ambush, Esquire - Cross

1  BY MR. EFRON:

2  Q.       Did you submit releases for each family?

3  A.       To whom?

4  Q.       To the Department of State.

5  A.       Yes.  I was their attorney.  I submitted the

6  documents that were requested from the Department of

7  State to the Department of State.

8  Q.       And in the letter, it indicates that the

9  release form was sent in with this letter.  So you

10  had the release form.  It was just a matter of

11  photocopying it and getting it done; is that correct?

12       MR. ARIAS-MARXUACH:  Objection.  Restates

13  prior testimony, and asked and answered.

14       THE COURT:  Sustained.

15  BY MR. EFRON:

16  Q.       On No. 5, which is what I believe you

17  answered, was Attachment D legal proof of each

18  co-representative's, co-executor or administrator's

19  authority to act on behalf of the estate of the named

20  decedent?

21       Would this be the power of attorney that you

22  referred to previously?

23  A.       Partially.

24  Q.       Would the power of attorney satisfy that

25  requirement?

Joshua M. Ambush, Esquire - Cross

1  A.        No.  Not merely on its face, because the

2  United States government did not understand or know

3  Puerto Rico law, and it required a legal opinion in a

4  memorandum form explaining exactly how *administrador*

5  works, declaratory of the *herederos* works, and how

6  the power of attorney works in Puerto Rico.

7  Q.        Number 6, Attachment E.  That would

8  basically be the death certificate, a certified copy

9  of the birth certificate, wouldn't that be for each

10  member -- for each family?

11  A.        A death certificate?

12  Q.        Yes.  A certified copy of the death

13  certificate of each person that was killed in Lod.

14  A.        No, that's incorrect.

15  Q.        What does that mean for you?  What does

16  Attachment E mean?  Are they not asking for a death

17  certificate?

18  A.        They are asking for a death certificate

19  plus.

20  Q.        Okay.  And you obtained those, not just for

21  these two families but for everybody you represented;

22  is that correct?

23  A.        I found the documents that satisfied

24  Attachment E in the national archives.

25  Q.        Number 7, Attachment F, a list of the

Joshua M. Ambush, Esquire - Cross

1  beneficiaries and proof that they are the named

2  beneficiaries of the estate.

3          And that is achieved with birth certificates

4  that indicate who the father or the mother that died

5  was; is that correct?

6  A.       That is incorrect.

7  Q.       How did you go about it?

8  A.       It's not merely getting a death certificate

9  and if you have a birth certificate and it says who

10  are the --

11  Q.       Parents?

12  A.       -- the children of the decedent, that would

13  still not satisfy this.

14          They still required legal proof that they

15  were, in fact, the heirs.  It's not merely that you

16  were the children.  You have to have proof there is

17  no will.  It has to go to court in Puerto Rico, and

18  when there's a declaratory -- or there's a

19  declaration of who are the heirs, that satisfies the

20  requirement.

21  Q.       How do you know this?  Do you know Puerto

22  Rico estate law?

23  A.       I learned what I needed to know to make

24  these claims and had attorneys here explain this to

25  me and to the clients and to the State Department.

Joshua M. Ambush, Esquire - Cross

1    Q.        Your lawyer asked you on direct examination,

2    about an hour ago on this point and you said

3    something to the effect that some people can be cut

4    out of a will in Puerto Rico; do you believe that to

5    be correct?

6              MR. ARIAS-MARXUACH:  Objection, Your Honor.

7    Irrelevant.

8              THE COURT:  Sustained.

9    BY MR. EFRON:

10   Q.        Do you know what forced heirship is,

11   *herederos forzosos*?

12             MR. ARIAS-MARXUACH:  Your Honor, objection.

13             THE COURT:  All the heirs are here as to

14   both estates, so that's not an issue in this case.

15   BY MR. EFRON:

16   Q.        Number 8, proof of nationality.  That can

17   also be achieved with a birth certificate showing

18   that a person was born in Puerto Rico; is that

19   correct?

20   A.        That is false.

21   Q.        A birth certificate showing you were born in

22   Puerto Rico is not sufficient to show that you are a

23   U.S. citizen by birth?

24             MR. ARIAS-MARXUACH:  This was asked and

25   answered in direct yesterday.

Joshua M. Ambush, Esquire - Cross

1    THE COURT:  I'll allow the answer.

2    A.        Very simple.  You're misquoting what

3    Attachment G asks for.  It's asking for proof of

4    nationality from the date of death of the decedent to

5    the present.  That means a birth certificate will

6    prove that they were born a United States citizen,

7    but it would not prove that they are currently a U.S.

8    citizen.

9    BY MR. EFRON:

10   Q.        So why would it not say that instead of

11   saying birth certificate, naturalization document,

12   comma, or passport?  You're an attorney, if --

13           MR. ARIAS-MARXUACH:  Objection, Your Honor.

14   The document speaks for itself.

15           THE COURT:  Sustained.  Rephrase.

16   BY MR. EFRON:

17   Q.        What does the word "or" mean to you, any one

18   of these or all of them?

19           MR. ARIAS-MARXUACH:  Your Honor, the

20   document speaks for itself and the witness explained

21   the process.

22           THE COURT:  I'll sustain the objection.

23   BY MR. EFRON:

24   Q.        Did you obtain proof of nationality for the

25   members of these two families?

Joshua M. Ambush, Esquire - Cross

1   A.        Yes, I did.

2             MR. ARIAS-MARXUACH:  Asked and answered.

3             THE COURT:  Let's continue.

4   BY MR. EFRON:

5   Q.        The last requirement is you're sending in

6   your wiring instructions for your account, for you to

7   receive the money and then pay it out to them; is

8   that correct?

9   A.        No, it's not correct.

10  Q.        Okay.  What does it say?  "Payment

11  instructions for the transfer of $10 million for the

12  estate listed in Paragraph 1."

13            And they send you a form for it.  So once

14  you filled out that form, you complied with that

15  requirement, did you not?

16  A.        They also required a -- as part of No. 1,

17  verification that the attorney was authorized to

18  represent the families under oath.  So the estate

19  representative had to authorize the attorney to fill

20  out the wiring instructions.

21            In other words, the form from the government

22  requests either payment instructions from the

23  individual or from the attorney, as the case may be.

24  If they are represented, then the attorney is thereby

25  authorized to fill out that form.  So the payment

Joshua M. Ambush, Esquire - Cross

1    instructions by the estate representative authorizes

2    the attorney to receive the funds on their behalf.

3            And then Attachment H could be completed

4    that says that the attorney's IOLTA escrow account

5    that was established for the purposes of receiving

6    funds for this estate is such and such a bank and

7    such and such a bank account number.

8    Q.      Now, at what point were you required to

9    obtain local counsel, a local lawyer in Puerto Rico,

10   to help you through this?

11   A.      Once I met the clients and understood and

12   explained to them the process going forward, that we

13   had to get duly authorized powers of attorney from

14   each member of the estate to their selected

15   representative, that's when I engaged, on their

16   behalf, local counsel to do that process.

17   Q.      And you sent an attorney by the name of

18   Carlos Gonzalez; are you sure it was not Carlos

19   Lopez?

20   A.      I'm sure.

21   Q.      It's Carlos Gonzalez?

22   A.      Carlos Gonzalez.

23   Q.      And how much did Carlos Gonzalez charge you

24   for doing this?

25           MR. ARIAS-MARXUACH:  Objection.  Irrelevant.

Joshua M. Ambush, Esquire - Cross

1          THE COURT:  I'll allow the question.

2          MR. ARIAS-MARXUACH:  Beyond the scope.

3          THE COURT:  I'll allow the question.

4   A.      The --

5   BY MR. EFRON:

6   Q.      First of all, what did he do?  What did

7   Carlos Gonzalez do for you?

8   A.      He didn't do it for me.  He did it for the

9   benefit of the clients.  He drafted the notary,

10  the --

11  Q.      Powers of attorney.

12  A.      -- the powers of attorney and brought it to

13  them, and they executed it in his presence.  And then

14  he as the notary, as the *licensiado* who was the

15  notary, notarized the documents and then registered

16  it in court, as is the procedure and the process, and

17  he paid the local tax stamps that the Court mandates.

18  The fees for the work of a notary in Puerto Rico for

19  obtaining signatures is -- I believe it's fixed by

20  law or it's a standard fee that an attorney can

21  charge in Puerto Rico.

22  Q.      What was the total expense to you from

23  Mr. -- from Attorney Gonzalez?

24  A.      Again, it wasn't an expense to me.  It's an

25  expense for the benefit of the estates.

Joshua M. Ambush, Esquire - Cross

1  Q.        Did the estates pay for it?  Did they pay?

2  Who paid Attorney Gonzalez?

3  A.        I paid him.

4  Q.        How much did you pay him?

5  A.        I believe each notary signature is $50 an

6  hour, and there may have been a fee in addition for

7  his work drafting the agreement, the power of

8  attorney, and perhaps some time for the meeting.

9  Q.        Did you send him one check or more than one

10  check?

11  A.        I don't recall if it was done in -- by

12  individual estates or not.

13  Q.        Give me a ballpark figure of how much the

14  check was for?

15  A.        Again, I don't recall offhand what that

16  check was for, if it was one check or checks.

17  Q.        What was the total payment that you think

18  you paid, approximately, to Attorney Gonzalez?

19  A.        I think I mentioned the other day that it

20  was a few hundred dollars, but I don't recall

21  offhand.

22  Q.        You mentioned when I questioned you

23  yesterday on --

24          MR. ARIAS-MARXUACH:  Objection.  Asked and

25  answered.  And he's --

Joshua M. Ambush, Esquire - Cross

1    MR. FREESE-SOUFFRONT:  He's going over the

2  scope of the direct, Your Honor.

3    THE COURT:  Let's see what the question is.

4  BY MR. EFRON:

5  Q.    You mentioned that you were lead counsel in

6  one jury trial in Maryland; is that correct?

7    MR. ARIAS-MARXUACH:  Objection.  Beyond the

8  scope of direct.  He's trying to do his direct in his

9  redirect.

10    MR. EFRON:  Your Honor, I never got a

11  redirect because of the way we --

12    THE COURT:  I'll allow the question, let's

13  continue.

14  BY MR. EFRON:

15  Q.    Do you remember the jury trial where you

16  were the lead counsel in that case in Maryland?

17  A.    Yes.

18  Q.    What kind of a case was it?  Was it a

19  terrorist case?

20  A.    No, it was not.

21  Q.    What kind of a case?  Was it an automobile

22  accident case?

23  A.    No, it was not.

24  Q.    What was it?

25  A.    It was a civil litigation.

Joshua M. Ambush, Esquire - Cross

1    Q.        A contractual matter?

2    A.        No.  It was a dispute amongst two parties,

3    one a church and one a minister of the church.

4    Q.        How long have you been in Puerto Rico to

5    prepare and to be present at this trial?

6              MR. ARIAS-MARXUACH:  Irrelevant.

7              THE COURT:  Sustained.

8              MR. EFRON:  Just one minute, Your Honor.

9    I'm trying to --

10             THE COURT:  Go ahead and take your time.

11             MR. EFRON:  I'm trying to eliminate a few

12   areas.

13   BY MR. EFRON:

14   Q.        When you came to Puerto Rico in 2001, other

15   than Leopoldo Garcia, who did you see?

16             First of all, did you come to Puerto Rico in

17   2001?

18   A.        Yes, I did.

19   Q.        Who did you see?

20   A.        Can you be more specific?

21   Q.        Did you see any of the claimants in the

22   Franqui litigation?

23   A.        Yes.

24   Q.        Who did you see?

25   A.        I saw Reverend Vega-Franqui and his family

Joshua M. Ambush, Esquire - Cross

1    and members of the Padilla family.

2              THE COURT:  What's the objection?

3              MR. ARIAS-MARXUACH:  I'm waiting to see

4    where he's going with this.

5              THE COURT:  Okay.

6    BY MR. EFRON:

7    Q.        Now, the Berganzos and the Rodriguezes you

8    didn't meet until December 15th of 2008, as you have

9    previously said; is that correct?

10   A.        I did not meet them until 2008.

11   Q.        December 15th, correct?

12   A.        Correct.

13   Q.        By what date had you complied with all of

14   the requirements of the November 26th communication

15   to you from the Department of State?

16             MR. FREESE-SOUFFRONT:  For these two

17   families?

18             MR. EFRON:  For these two families.  Thank

19   you.

20             Well, actually, it's for all the families.

21   BY MR. EFRON:

22   Q.        Did you submit everybody --

23             MR. ARIAS-MARXUACH:  No, no, no, Your Honor.

24   This case is limited to these two families.

25             THE COURT:  Limit it to these families.

Joshua M. Ambush, Esquire - Cross

1   BY MR. EFRON:

2   Q.        Did you do each family individually, or did

3   you do them together?

4            MR. FREESE-SOUFFRONT:  Are you withdrawing

5   your question?

6            THE COURT:  Limit it to these two families.

7   BY MR. EFRON:

8   Q.        Let's us limit it to these two families.

9            Did you submit the documents for these two

10  families together or in separate mailings?

11  A.        There were several communications between my

12  office and the State Department submitting documents.

13  There were documents submitted as soon as we received

14  them, and then there was supplemental documents that

15  were sent.  There was also communication back and

16  forth between myself and my staff and the State

17  Department providing additional information that they

18  requested.

19            So it was a process.  It wasn't merely,

20  here's the documents and they were satisfied.  It was

21  a process whereby we went about getting the

22  documentation; and as we received it, we were able to

23  gather it and lay it out to the State Department in

24  terms of what we're submitting and how it satisfies

25  their requirements.  Then they had time to review it

Joshua M. Ambush, Esquire - Cross

1    and then they stopped the process.

2            So we -- we had tried to submit it as quick

3    as we can.  Some documents were submitted in January

4    and then supplemental documents in February, and I

5    believe even in March there were even more actual

6    documents submitted.

7    Q.      But by March you had completed what was

8    required of you in this letter; is that correct?

9    A.      I don't recall the exact date when all the

10   documents were finally given to the State Department,

11   but it's fair to say between March and April.

12   Q.      Because after that you got paid?

13   A.      No.

14   Q.      April 17th, was it not?

15   A.      At some point after the State Department was

16   satisfied that I, in fact, was the attorney, because

17   one of the documents, in addition to these that they

18   asked me for, was for my retainer agreement, for the

19   revocation of power of attorney of Michael Engelberg,

20   and of the powers of attorney that the estates had

21   signed amongst themselves, and an explanation of why,

22   in fact, I was the attorney and not anybody that

23   Michael Engelberg had suggested.

24            That was required in addition to these, and

25   that was submitted to the State Department to satisfy

Joshua M. Ambush, Esquire - Cross

1   their separate inquiries beyond this letter.

2   Q.      But at the time that you went to Puerto Rico

3   on December 15th, they had not at that point required

4   that you get a revocation of power of attorney of

5   Dr. Engelberg, is that correct, because at that time

6   until after that date, you didn't even begin to

7   comply with these requirements because you had not --

8          MR. ARIAS-MARXUACH:  Objection.

9          MR. EFRON:  That was his testimony.

10         MR. ARIAS-MARXUACH:  It misstates prior

11  testimony, Your Honor.

12         THE COURT:  Rephrase the question.

13  BY MR. EFRON:

14  Q.      Were you in a position to comply with these

15  requirements before you went to Puerto Rico on

16  December 15th?

17  A.      I was able to because I was their attorney.

18  In order to satisfy Requirement No. 1, I needed and

19  they needed to have a attorney.

20  Q.      Which is why you went to Puerto Rico?

21  A.      They had an attorney, but they did not

22  have --

23  Q.      A retainer agreement?

24  A.      -- a written acknowledgment of who their

25  attorney is.

Joshua M. Ambush, Esquire - Cross

1  Q.        At what point -- is it true or not true that

2  when you went to Puerto Rico on December 15th, there

3  was no requirement and nobody had requested that you

4  get Dr. Engelberg's power of attorney revoked by

5  these families?

6  A.        I -- I can't answer that because

7  Dr. Engelberg's power of attorney would not have

8  satisfied the State Department, so it had no legal

9  effect.

10  Q.        So it's really -- so it's your opinion,

11  then, that Dr. Engelberg's power of attorney had to

12  be revoked; it wasn't a requirement by the State

13  Department?

14  A.        Dr. Engelberg's power of attorney had no

15  legal effect.

16  Q.        In your opinion.

17            Did the State Department require you to have

18  that power of attorney revoked?

19  A.        The State Department did not require that.

20  What they did require was --

21  Q.        Thank you.

22  A.        -- a lawful representative of the estate.

23  Q.        But they did not require that you revoke

24  anything, correct?

25            THE COURT:  That's been asked and answered.

Joshua M. Ambush, Esquire - Cross

1    MR. EFRON:  You're right, Your Honor, that

2    was asked and answered.

3         MR. FREESE-SOUFFRONT:  Yes, it was.

4         MR. EFRON:  That would be the extent of our

5    cross.

6         THE COURT:  Mr. Arias, your turn.

7         MR. ARIAS-MARXUACH:  Very briefly.

8                   REDIRECT EXAMINATION

9    BY MR. ARIAS-MARXUACH:

10   Q.        Mr. Ambush, when you came to Puerto Rico on

11   December 15, 2007, you had delivered a copy of this

12   to the Berganzo and Rodriguez-Robles family --

13   A.        Yes.

14   Q.        -- Joint Exhibit 7?  And you explained to

15   them this letter at the December 15, 2008 meeting?

16   A.        Correct.

17   Q.        And they understood what the process would

18   entail?

19   A.        Yes.

20   Q.        So they knew what the administrative process

21   was when they signed your retainer agreement?

22   A.        Yes.

23   Q.        Now, did you need Yale graduate Paul Gaston,

24   to complete the requirements and satisfy the State

25   Department that these claims could be paid?

Joshua M. Ambush, Esquire - Redirect

1    A.        No.

2    Q.        Now, did you need white shoe Puerto Rico law

3    firm O'Neill & Borges to satisfy the requirements in

4    this letter so that these claims could be paid?

5    A.        No.

6    Q.        You handled that by yourself?

7    A.        Yes.

8    Q.        With the assistance of local attorneys?

9    A.        Correct.

10             MR. ARIAS-MARXUACH:  Okay.

11             THE COURT:  Mr. Ambush, you are excused.

12             Okay.  Mr. Arias, do you have your other

13   witness available?

14             MR. ARIAS-MARXUACH:  We have another witness

15   available.

16             THE COURT:  Let me say this:  It's 11 --

17   almost 11:35.  What I'm going to do is, let me excuse

18   the jury so they can have their lunch, and let's be

19   back here at 1:00 p.m.  You have an hour and a half.

20             This is the final witness.  Let me meet with

21   counsel, discuss a few things, and then I'll see you

22   at 1:00 p.m.

23             THE COURT OFFICER:  All rise, please.

24             (Jury exits the room.)

25             THE COURT:  Mr. Ambush, you're excused

1    you're no longer under the rules of the court.

2          Mr. Arias just a good faith estimate, how

3    long do you think your direct of this witness would

4    last?

5          Mr. Freese?

6          MR. FREESE-SOUFFRONT:  My direct is going to

7    last 10, 15 minutes.

8          THE COURT:  What we will do, given that we

9    will hopefully finish by 3:00 p.m. with that witness,

10    then I have some proposed jury instructions, what I'm

11    going to do is I'll give them to you after we're

12    finished with that witness and try to have the charge

13    conference today so that way you can prepare the

14    weekend for the closings.  So then let's meet back

15    here at 1:00 p.m.

16          MR. ARIAS-MARXUACH:  Your Honor, before we

17    have the -- can we have at least an hour?

18          THE COURT:  Yeah, you're going to have time.

19    When we finish and you have to raise your Rule 50

20    again, after that you'll have about an hour to sit

21    here, you've probably seen most of these draft

22    instructions and I assume -- I am almost --

23          MR. ARIAS-MARXUACH:  *Si*, Your Honor --

24          THE COURT:  I'm almost convinced that the

25    issues will be as to perhaps the Dolo one and the

1 particular ones for this case, because I would say

2 that 90 percent of the instructions are very

3 standard.

4       MR. ARIAS-MARXUACH: Your Honor, if I may be

5 so bold, I would prefer to have the charge conference

6 on Monday --

7       MR. EFRON: No, Your Honor.

8       MR. ARIAS-MARXUACH: Let me finish sir.

9       -- because the case got significantly cut

10 down to size by the Rule 50 that we have already put

11 on the record and Your Honor decided. The verdict

12 form also has suffered significant alterations. And

13 I think that we would like to have the benefit of

14 examining the proposed instructions and be ready to

15 have the charge conference on Monday. It should be

16 very easy, but we would like to have the time.

17       THE COURT: But let me say this: The thing

18 is, my experience is no charge conference is easy.

19 It usually takes about an hour. I go one by one just

20 in case, and then the nitty picky ones sometimes we

21 can be there for an hour. And my concern is if we

22 have it on Monday then the jury should come here on

23 Tuesday and then we'll have the conference Monday.

24 That's my only concern.

25       MR. EFRON: Your Honor, in order to preserve

1  the resources of the Court and everybody's time -- I

2  mean, typically we could have finished with all of

3  their witnesses, this last witness, this morning

4  before lunch, done the charge conference at one

5  'clock and even maybe closings today.  Now they want

6  to move everything back to Tuesday.  It seems like --

7       MR. FREESE-SOUFFRONT:  No, no, no, you were

8  the one that suggested Tuesday.

9       MR. EFRON:  But what, Your Honor, is saying

10  is that the closing arguments would be on Tuesday.

11       THE COURT:  Let's see what -- we'll be back

12  at 1:00.  If we're done by 2:00, I can recess until

13  maybe 4:00 p.m., give everybody enough time.  Let's

14  play it by ear.  Let's have lunch and we'll be back

15  here at 1:00.

16       MR. EFRON:  There's one other thing, Your

17  Honor.  The documents that we were going to submit

18  that the Court did not allow, we'd like to have them

19  on the record as evidence offered and not --

20       THE COURT:  You can file those

21  electronically.  I have no problem with that.

22       MR. EFRON:  Okay.

23       MR. ARIAS-MARXUACH:  And we have to make

24  sure that they are vetted from the binders that --

25       THE COURT:  What we will do this afternoon

1    at some point, we will check the binders, and

2    everybody just double-check what's in those binders

3    that will be going to the jury.  So you have an

4    opportunity.  Okay, let's recess.

5              (Jury Trial recessed for lunch at 11:34 a.m.

6    and resumed at 1:13 p.m.)

7              THE COURT:  I know the parties wanted to see

8    me before we bring in the last witness.  Mr. Arias, I

9    believe it was you.

10             MR. ARIAS-MARXUACH:  Yes.  You know, Your

11   Honor, maybe we are the same thing, but in the

12   exercise of our duty of conduct to the Court and to

13   opposing counsel --

14             THE COURT:  And opposing parties.

15             MR. ARIAS-MARXUACH:  -- and opposing parties

16   too, it came to our attention that the First Circuit

17   issued an opinion on Dolo on September --

18             THE COURT:  I guess great minds think alike.

19   And Mr. Efron's also thinking -- that's what I wanted

20   to discuss.

21             MR. EFRON:  I've been trying to tell you for

22   two days, but you haven't had time.

23             THE COURT:  No, on September 22, it just

24   came out now.  And I have a copy for Mr. Efron.  And

25   let me -- in a nutshell let me say -- this is a case

1  I tried -- I think I mentioned I tried -- a Dolo case

2  I tried maybe about two years ago.  It went on

3  appeal.  One of the issues in that case was the

4  standard of proof for Dolo because most of Puerto

5  Rico case law says more clear and convincing.

6          In that case the plaintiffs brought some new

7  case law from the Supreme Court and what I did was I

8  gave the jury an instruction of preponderance but I

9  also mentioned the clear, robust standard within the

10  preponderance.  The Circuit has just come down, this

11  is about an hour ago, and the Circuit confirms that

12  decision but says it's a preponderance of the

13  evidence standard.  So obviously that favors

14  Mr. Efron's clients in this case and the jury has not

15  been given the final instruction.

16          But I think in an abundance of caution two

17  things:  First of all, I think it's very important,

18  and you may be ready to have this jury decide the

19  case Monday, Mr. Efron, but even I think in an

20  abundance of caution for your clients you have to

21  familiarize yourself with the case, so do

22  defendants -- I'm sure they've read it already -- but

23  it may change a little bit instruction-wise.

24  Argument-wise you were probably thinking clear and

25  convincing now you probably don't have to think clear

1   and convincing and you may have to restructure your

2   argument somehow obviously to your favor.

3            MR. EFRON:  We will defer to the Court's

4   attention that there is a case that was decided last

5   week, but this was at the district court level, by

6   Judge Casellas, although -- and it's -- although it's

7   a federal supplement rather than an appellate

8   decision.

9            THE COURT:  But this is a First Circuit

10  case.

11           MR. EFRON:  But it does exactly the same

12  thing that your case does but it more than that it

13  gives an analysis of what the Court has to really

14  see, which is the Supreme Court of Puerto Rico

15  standard for this.  And it goes to --

16           THE COURT:  This is what the Circuit is

17  doing.

18           MR. ARIAS-MARXUACH:  *Si pero*, Your Honor,

19  I brought the issue to the Court's attention and I

20  need to be heard on it.

21           THE COURT:  This just came out about, I

22  would say, half an hour ago, 40 minutes ago.

23           MR. ARIAS-MARXUACH:  *Por eso*.  Our concern

24  is this:  If Mr. Efron's position is that the

25  standard for Dolo should be preponderance of the

1   evidence --

2          THE COURT:  But let me say that that's not

3   his position.  That's the position --

4          MR. ARIAS-MARXUACH:  *Pues entonces* we have a

5   big problem, Your Honor, our client has a big

6   problem.  This case -- when this case started.

7   Neither Judge Casellas' opinion nor the first

8   circuit's opinion of September 22 are final.  And the

9   problem we have, our client has and we have, is that

10  this jury in the opening instructions which Mr. Efron

11  at the time was in agreement with, was told that this

12  case, the Dolo claim -- we were very specific -- the

13  could Dolo claim --

14         THE COURT:  That's the only surviving claim.

15         MR. ARIAS-MARXUACH:  -- which is the only

16  surviving claim right now, will be judged under the

17  clear, convincing, and robust standard.  We have

18  almost wrapped up this case and the jury has been

19  watching the Dolo claim with that prism, the prism of

20  the clear, convincing, and robust standard.  So to

21  now tell that jury, look, it's actually not clear,

22  convincing, and robust standard, it's a lower

23  centered prejudices --

24         THE COURT:  But the jury has not been

25  deliberating yet.

1          MR. ARIAS-MARXUACH:  *Bueno,* but I believe it

2     would prejudice our client irremediably.  And,

3     frankly, we understand that the solution is to

4     declare a mistrial because this jury has been looking

5     at this issue, the sole surviving issue after the

6     Rule 50 -- at the close of Plaintiffs' case.  The

7     sole remaining case is Dolo and they were

8     specifically instructed that all other issues in the

9     case were to be ruled upon the preponderance of the

10    evidence standard.

11         THE COURT:  Let me say also, I have

12    dismissed all the other claims, the jury knows

13    there's other claims, and I'm going to tell them at

14    the time of the instructions they're not to be

15    concerned with these other claims.  But it's sort of

16    the same situation, there's been intervening court

17    rulings in between.

18         Let me let Mr. Arias finish and then you'll

19    have all the time in the world.

20         MR. ARIAS-MARXUACH:  So our position is, you

21    know, Your Honor, and it is the position that was

22    documented in our proposed jury instructions, that

23    the standard that applies to Dolo is the clear,

24    convincing, and robust standard that is based on,

25    among other cases, the Puerto Rico Electric Authority

1   case:  The action, refund; 472 F.2d 133, District of

2   Puerto Rico, 206; confirmed by the First Circuit in

3   515 F.3d 57, by the Puerto Rico Supreme Court opinion

4   in Re, Sigfredo Fontanez-Fontanez, 211 TSPR 63,

5   *Comentarios al Codigo Civil Espanol* -- Commentaries

6   to the Spanish Civil Code, Title 8, Volume 2 at Pages

7   585, 586; and the Puerto Rico Supreme Court opinion's

8   in Gonzalez v. Rivera, 422 DPR 313, 931; that the

9   problem we have here is that the jury was advised to

10  look at this claim, the sole surviving claim in this

11  case, under the clear, robust, and convincing

12  standard.

13          And I made my opening argument remarking to

14  them that that was the applicable standard.  Now, if

15  they're instructed on a lower standard of proof,

16  they're going to get the impression first that we

17  deceived them; two, that somehow the case got easier

18  for plaintiffs mid stream.  And that is why we

19  understand that in this situation there are only two

20  options.  Either the case goes to the jury under the

21  clear, convincing, and robust standard which --

22          MR. FREESE-SOUFFRONT:  Which is the standard

23  that applies until that is --

24          MR. ARIAS-MARXUACH:  Until these opinions

25  are final or --

1      THE COURT:  Let me ask you a question:

2  Can't I, in an abundance of caution, have the jury

3  determine, have you established Dolo by clear and

4  convincing evidence; and in the alternative would

5  Dolo still be established by a preponderance?  And

6  that's another alternative.

7      MR. ARIAS-MARXUACH:  *Bueno*, that's not an

8  option to him.  And I think it's very difficult to

9  have them apply the lower standard.  I think it just

10  sends a message that somehow the evidence involved in

11  a fashion that now Plaintiffs' case is easier.

12      It is a significant issue that I think leads

13  to mistrial unless, unless -- that we contend leads

14  to mistrial unless the case is submitted to the jury

15  on the basis of the clear, convincing, and robust

16  standard, which is the standard that was the law at

17  the time that the case began, the standard under

18  which the Court advised them correctly and with

19  Mr. Efron's agreement at that moment in time, and the

20  standard that I alluded to in my opening argument.

21  And, again, these cases that have switched the

22  standard are not final and firm options.

23      So we understand that the -- there are only

24  two options here:  Either we go with the clear and

25  convincing evidence standard or there is a mistrial.

1     And that's our position, Your Honor.

2              THE COURT:  Mr. Efron.

3              MR. EFRON:  First of all, it would operate

4     equally negatively against both of us because we both

5     talked about the same standard.  I promised that we

6     would prove it beyond the clear and convincing

7     standard and he said that.  So it operates equally as

8     to both of us.  And as Your Honor very correctly

9     instructed them at the beginning, you know what,

10    argument of counsel is not evidence.

11             So in other words, you know, I don't know

12    how much weight they're going to give to our argument

13    and anything that we proposed during the argument.

14    That's number one.

15             Number two, there's really no way that this

16    could create a mistrial because all that the Court

17    has to do is when they get their instructions,

18    they'll get the correct instructions, which would not

19    include the clear and convincing standard.  And they

20    don't have any information from the Court as to

21    anything different.  The Court has not instructed

22    them otherwise.  The Court has not set the standard

23    yet.  The Court has yet to tell them what the

24    standard is.  There's no reason that should happen.

25             And, by the way, at the beginning of this

1     case, this -- the -- this opinion changes nothing.

2     The law was always the same.  What the district court

3     did and the appellate court affirmed was Puerto Rican

4     law way before this trial started.

5          And even -- we were prepared to argue that

6     today even without knowing that this case came down,

7     because if you look at all of the Supreme Court

8     cases -- Supreme Court of Puerto Rico cases, the

9     DeJesus versus Carrero -- and I have copies for

10    everybody, if we need them.

11         All of these cases tell us specifically that

12    the Supreme Court of Puerto Rico does not want to do

13    a different standard because then it would be almost

14    like rewarding the tortfeasor, rewarding the person

15    that acted wrongly by doing a higher standard.  And

16    that -- those are the more recent Supreme Court

17    opinions.

18         The old Piedras case that everybody was

19    following as to the standard incorrectly, and I

20    include myself in it, had to do with cases that were

21    decided in the fifties and sixties.  That is not the

22    law anymore.  So, you know, even -- all we have to do

23    is follow the Supreme Court of Puerto Rico decisions.

24    I have all the cases here for the Court to review.  I

25    don't want to take up your time now, but I'll give

1    you, as well as brother counsel a packet.

2         THE COURT:  I reviewed this opinion.  I

3    recalled that I had done that analysis.  I did not

4    remember, you know, when I started this case, but

5    this is what the Circuit has ruled the law would be.

6    And I have to predict what the Circuit will continue

7    to do --

8         MR. EFRON:  Of course.

9         THE COURT:  And I will predict that the

10   Circuit will probably enter judgment or mandate

11   within whatever the mandate rule is.  And I don't,

12   you know --

13        MR. EFRON:  I don't think a curative

14   instruction is necessary because the Court never gave

15   them an instruction on that issue, number one.  And

16   number two --

17        THE COURT:  But the Court I assume I would

18   have to tell them that I instructed them that it was

19   clear and convincing evidence, but the parties --

20        MR. EFRON:  You did not.

21        MR. FREESE-SOUFFRONT:  He did.  He did.

22        THE COURT:  I mentioned it at the beginning

23   of the case that the standard for Dolo is somewhat

24   higher.

25        MR. EFRON:  I didn't remember that.

1          THE COURT:  I did mention that at the

2    beginning of the case that both parties mentioned it.

3    I believe I'd probably have to tell them that even

4    though I told them it was the standard and the

5    parties relied on the Court's standard, that the

6    standard in fact is preponderance of the evidence and

7    then given them the standard in this case.

8          MR. EFRON:  Based on the law.

9          On my end I'm not even going to mention the

10   higher standard in closing as I don't think the

11   defense would because it would probably prejudice

12   them.  So my --

13         THE COURT:  It would probably not prejudice

14   them, the higher standard.

15         MR. EFRON:  No, no, no.  I would not mention

16   the higher standard -- the previous higher standard.

17         THE COURT:  Let me also say this, Mr. Efron,

18   because it is not one thing -- and, again, I'm not

19   saying I'm going to declare a mistrial.  And what I

20   intend to do today, I want to -- there's only a very

21   short witness.  I want to sit that witness and have

22   all the testimony ready, then I'll have to decide

23   what I'm going to do with the case.  But I don't want

24   to -- it's not going to take days to conclude all the

25   testimony and a further Rule 50.  Because even if I

1 declare a mistrial, there may be ways for you to

2 appeal that at some point. Again, I don't know

3 exactly.

4 But the other thing is, the other concern

5 is, at all times everybody since day one has relied

6 on that higher standard. Up to now there was nothing

7 because I have to say this decision I had made about

8 a higher standard, that was a decision I took in the

9 middle of a case. I believe the jury at the

10 beginning I had mentioned clear and convincing but

11 counsel for jury instruction convinced me that this

12 was the proper standard. So it's not that there's a

13 published opinion for me out there talking about this

14 that would have put Defendant on notice that the

15 standard would be preponderance.

16 MR. EFRON: No, no, we understand.

17 THE COURT: And what I did was sort of a

18 hybrid instruction, I did both. But absent this and

19 if Judge Casellas' came out -- opinion came out two

20 days ago, every attorney in Puerto Rico, except the

21 recumbent attorneys in that case from the Circuit

22 have been relying on the clear and convincing

23 standard.

24 My only concern -- and, again, I'm not

25 saying what I will do at this point. My inclination

1   would be to finish the trial, note this -- but I can

2   always after a jury verdict -- you know, I can always

3   vacate the verdict, you know --

4           MR. EFRON:  And give us a new trial date.

5           THE COURT:  Or give a new trial date rather

6   than stopping right now, you know, nine-tenths of the

7   way.  That would be my inclination.

8           But my concern is, Mr. Ambush is represented

9   by competent attorneys who competently told them what

10  the law was all of a sudden find themselves with a

11  changed law.  Had the standard been preponderance,

12  you know, maybe eight months ago or when we had all

13  these settlement conferences, this could have been

14  settled.

15          The other thing is I want to communicate to

16  everybody this -- assuming I conclude the trial and

17  we have a verdict in Plaintiffs' favor, that's not

18  going to be the end of the story.  And I think it is

19  also -- this is something -- this intervening event

20  is something that perhaps everybody should go after I

21  finish with the evidence this afternoon, rather than

22  discuss the instructions today, go back and

23  perhaps -- it's a unique circumstance because there

24  may be other plaintiffs who in the future may want to

25  sue Mr. Ambush, but they're going to have the benefit

1 of this right away. They're in a different position.

2 In this case, the case is almost tried and

3 all of a sudden something happens. And I don't know

4 what the Circuit would say, Well, when there's

5 intervening cause or -- you know, you could very well

6 prevail on this case on a preponderance standard, but

7 then again there's a very good chance that verdict

8 could be reversed two years from now. And it is

9 something perhaps everybody, after we've finished the

10 evidence, should go back to the discussion table and

11 in good faith perhaps try to resolve this case to the

12 benefit of Mr. Ambush, to the benefit of the

13 plaintiffs.

14 Because, again, trying this case again, and

15 then of course there's going to be an appeal at some

16 point, it's going to take more time. And I know your

17 clients are probably in their seventies. And if I've

18 said somebody's older -- but I assume they're

19 anywhere from their mid sixties to their seventies.

20 MR. EFRON: You're correct, Your Honor.

21 THE COURT: And, again, time -- hopefully

22 they'll live a very long time but then again, it's

23 not like we're talking about a 21-year old. And a

24 year from now or two years from now you could have

25 somebody dies and there's more of an estate problem,

1    there's more of an issue.  We have this case right

2    now which perhaps could be settled.

3         Let me -- have said that, let me take a

4    five-minute recess.  What I want to do is conclude

5    with the testimony of the last witness -- it's not

6    going to be long -- and what I proposes that we do is

7    I'll excuse the jury until Tuesday.  I want to give

8    everybody an opportunity -- first of all, Mr. Arias

9    has to raise his Rule 50 argument again and renew it

10   and then what I would like is for everybody to think

11   about this, be able to read the opinion carefully.

12   We have the jury instructions but I can give you the

13   draft ones.  But it's something perhaps on Monday we

14   can meet if I decide to send the case to the jury or

15   we could meet later in the afternoon --

16        MR. EFRON:  I think we were all counting on

17   having the closing argument on Monday.

18        THE COURT:  We were all counting but that

19   was before this came out.  I want to think about it

20   also because -- you know, I think Mr. Arias does have

21   a point and if you were in his position -- or let's

22   assume it was preponderance and the standard went up

23   to clear and convincing you'd be in the same boat as

24   Mr. Arias.  So -- and, again, I think it's something

25   I want to think carefully what I have to do.  And if

1   I do send the case to the jury, I have to have Plan

2   A, Plan B and make sure every safeguard is given to

3   every party.  And then, again, even with that it

4   might not be enough.  I don't know.

5         MR. EFRON:  I don't think -- and of course

6   in your position if you'd tried many more cases than

7   I have, but it doesn't seem to me that if we just

8   don't mention the higher standard, us the attorneys

9   in closing, it doesn't seem to me that it's going to

10   affect the jury's decision, number one.

11         Number two, like Your Honor said, we're

12   nine-tenths of the way done.  It would probably not

13   be the best use of -- it would be a waste of the

14   Court's resources.

15         THE COURT:  My inclination is to go all the

16   way because I can always vacate the judgment or

17   revert it.  But at the same time if whatever I do

18   let's assume -- because, again, you could very well

19   have a judgment verdict for your clients but then

20   again you also run the risk, even on a preponderance,

21   a verdict against your client.

22         That's why I also suggest this may be a good

23   time to perhaps revisit any possible settlement

24   options.  And, again, I did not participate in those

25   conversations so I'm not -- let me hear from

1  Mr. Freese briefly.

2          MR. FREESE-SOUFFRONT:  Your Honor, yes, just

3  two points.  First of all, I don't think that there's

4  any question that if anybody wants to have this case

5  tried it's Mr. Ambush.  Also, he has been here for

6  five days.  We're not making a motion for a mistrial

7  because we fear the outcome of this case based on the

8  evidence --

9          THE COURT:  I understand that.

10         MR. FREESE-SOUFFRONT:  -- it's -- Your

11 Honor, the initial instructions are there for a

12 reason.  They're for the jury to frame the case and

13 the context of the case.  And the instructions that

14 were provided to the jury at the beginning of this

15 case in connection with the Dolo claim were and still

16 are the instructions that apply as per the law of the

17 case and the law as it stands until those decisions

18 are final and unappealable.  Being that the case --

19         THE COURT:  If that were to be the case,

20 then let's say I give them the clear and convincing

21 standard --

22         MR. FREESE-SOUFFRONT:  It can be reversed.

23         THE COURT:  But then if it goes on appeal

24 again --

25         MR. FREESE-SOUFFRONT:  It can be reversed.

1    It can be reversed.

2         THE COURT:  But that is something, as a

3    judge trying the case, I want to try to do anything

4    possible to allow the parties to try in a way that if

5    it goes on appeal, not to affirm it for my own sake,

6    but to give alternatives to everybody under what

7    would seem to be the law or the other alternative.

8         MR. FREESE-SOUFFRONT:  That's precisely the

9    point, Your Honor.  The issue in this case is these

10   people have framed the case based on a standard and

11   they have heard all this evidence based on a standard

12   that was provided to them at the beginning of the

13   case.  And now at the end of the case after seeing

14   the evidence and framing the issues based on the

15   standard of what's instructed at the beginning of the

16   case, they are going to be told that the standard is

17   different.  It's the equivalent of saying the

18   standard is that you have to see the person with the

19   gun in the hand if you're going to fire against this

20   person and then saying at the end of the case now the

21   standard is that if you see the guy pointing without

22   the gun that's sufficient for a ruling against him or

23   a judgment against him.

24        Now, of course, Plaintiffs are not going to

25   argue the issue of the standard because it's to their

1 benefit; but the issue of the standard is completely

2 prejudicial to the defendant in this case, because

3 now the case has turned 360 degrees.  It's not clear

4 and convincing now it's a mere preponderance of the

5 evidence, and at the beginning of the trial they were

6 instructed that was a lower standard and that the

7 Dolo claim had this higher standard of law of clear

8 and convincing evidence.

9         So now the issue is that, I understand --

10 and we certainly do not move for a mistrial based on

11 a desire to end the proceedings, but because our

12 client is severely prejudiced by this and is severely

13 concerned that now he has not been able to frame and

14 present the case because the standard applicable to

15 the Dolo claim, which is the only one that remains in

16 this case up to today, was clear and convincing

17 evidence.

18         MR. EFRON:  That --

19         THE COURT:  Let me ask just one question,

20 Mr. Efron, because you were prepared to prove this

21 case by clear and convincing evidence.

22         MR. EFRON:  I was.

23         THE COURT:  Are you still prepared to prove

24 it by clear and convincing evidence?  Because the

25 parties stipulate that if that would be the

1  instruction give to the jury, that would clear the

2  whole problem.

3         MR. FREESE-SOUFFRONT:  That would be no

4  problem, Your Honor.

5         MR. EFRON:  But, you know, it the wouldn't

6  be fair to the plaintiffs.  The law is evolving all

7  the time and we have to -- and by the way, by the

8  way, as I said before, each absent this case we were

9  going to try to persuade the Court and show to the

10  Court that that is not the law in Puerto Rico.  The

11  Supreme Court of Puerto Rico in all of its recent

12  cases have not applied that standard.  So we were

13  hoping and we were arguing towards the fact that that

14  not being the law in Puerto Rico, that the Court

15  should not impose that standard on us to begin with.

16         So now that it's clear even in the federal

17  system -- unless it gets reversed at the U.S. Supreme

18  Court, now that it's clear under the federal system

19  as well, I don't think it would be fair for the

20  plaintiffs to have to -- to have the higher standard

21  when it's not necessary and when it's not the law,

22  just in that sense.

23         I think a precautionary instruction and our

24  commitment to not make reference to the higher

25  standard, which they should not either because it's

1  not to their benefit to do that either --

2          THE COURT:  Well, it is to their benefit.

3          MR. EFRON:  No, no -- well, it's to their

4  benefit if that would be the applicable law.  But

5  assuming that we're going to use what the law says,

6  you know, if neither of us mentioned the higher

7  standard, I don't think the jury is even going to

8  remember anything to that effect.  And I think the

9  jury will rule that -- most probably would rule the

10  same way either way, but I'm not ready to -- you

11  know, I have a malpractice insurance also, Mr. Arias.

12  So I also need to make sure that I can advocate

13  zealously the best possible position for our clients.

14          MR. FREESE-SOUFFRONT:  Precisely, Your

15  Honor.  I think Mr. Ambush proved the point.  He

16  won't agree --

17          THE COURT:  Mr. Efron.

18          MR. FREESE-SOUFFRONT:  Efron.  He won't

19  agree to accept the standard that was instructed to

20  the jury at the beginning of this case, which is

21  still the standard which is the law of the case and

22  in which he agreed to when we had the meeting with

23  this Honorable Court prior to giving that instruction

24  to the jury, and he won't accept to continue having

25  this case be ruled under the same standard that was

1  given to the jurors because that would be prejudicial

2  to their clients.

3          That's our same position, your Honor.  We

4  agree to disagree on that point.  It would be

5  prejudicial to continue under the same standard we

6  had since the beginning of this case and it would be

7  prejudicial to change the standard at the end of the

8  case.

9          MR. EFRON:  Yeah, but the difference is that

10 Your Honor has not yet instructed the jury.  We have

11 yet to make a closing argument to the jury.  There's

12 been no damage done, it was not a done deal.  We were

13 prepared to show to the Court, again, that the law in

14 Puerto Rico is not the higher standard.

15         THE COURT:  Let me say this, I'm going to --

16 I want to take a recess and I want to do some quick

17 research to see if this has happened in the middle of

18 other trials.  I know it's -- I know at one time it

19 happened and it dealt with magistrate judges during

20 jury selection in criminal cases without consent, and

21 there was a Supreme Court decision saying that

22 magistrate judges couldn't doing it unless there was

23 consent.  And that was in the middle of a very long

24 case, 20 years ago, but that was obviously a

25 constitutional issue, that there was no authority to

1   pick and choose the jury.  I want to check if there's

2   anything else within the next 10, 15, 20 minutes

3   about that.

4        The other thing is, and I think obviously --

5   and if I were to declare a mistrial or perhaps hold

6   this in abeyance, I think it is something that

7   perhaps all of you should go to the settlement table

8   because regardless of the standard, we've seen the

9   evidence that's going to go before the jury.  If the

10   case goes again before another jury, it's basically

11   going to be the same evidence.  And that is something

12   that Mr. Ambush knows.  It's one thing to defend the

13   case by clear and convincing versus a preponderance

14   of the evidence.

15        This is something that had Mr. Ambush known

16   the standard, you know, six months ago, this -- I

17   might not have even tried this case.  And it's

18   something that obviously I ought to -- and, again,

19   you have more of a bargaining chip advantage now and

20   that is something the attorneys, I think I have to

21   give them an opportunity to discuss that with

22   Mr. Ambush.  And perhaps it is something that an

23   agreement might be reached.

24        I think the -- you know, if I were in

25   Mr. Ambush's or counsel's position, I think the

1    biggest problem in this case is if there's a jury

2    verdict or anything is then that the other persons

3    who are similarly situated or not plaintiffs in this

4    case are just going to try to follow everything

5    that's been done in this case and start suing him and

6    he's going to be here every -- you know, for the next

7    10, 15, 20 years.  But perhaps that is something that

8    perhaps we may be able to reach some sort of a

9    settlement between the parties.

10           But let me explore this.  Let me see if

11   there's anything mandating that I declare immediately

12   a mistrial.  Or if there isn't anything I would

13   probably be inclined to sit that last witness.  But

14   let me take maybe a 15, 20-minute break.  Perhaps you

15   can do some research here on your own.  Let's say,

16   it's 20 to 2:00.  Let's be back here at 2 p.m. and

17   I'll see if I've found anything.  So let's take a

18   recess.

19           THE COURT OFFICER:  All rise.

20           THE COURT:  And will you just inform the

21   jury that counsel are discussing things.  Don't say

22   anything, just say that --

23           THE COURT OFFICER:  Yes, sir.

24           MR. EFRON:  Your Honor, may we give you a

25   couple of cases that are the Supreme Court law in

1    Puerto Rico?

2          THE COURT:  No, but I have them here in this

3    opinion so I've done the research.

4          MR. EFRON:  They're a little different.

5          (Jury Trial recessed at 1:41 p.m. and

6    resumed at 2:14 p.m.)

7          THE COURT:  Okay.  Please be seated.  And

8    your client?

9          MR. ARIAS-MARXUACH:  Mr. Ambush is in the

10   rest room.

11         THE COURT:  Okay, let's wait for him because

12   I think it's important for everybody to hear this.

13         MR. EFRON:  We have a -- we found two things

14   on point regarding the Court's concern before.  In a

15   First Circuit opinion, Sheehan versus The City of

16   Gloucester -- that's in Massachusetts.

17         THE COURT:  Gloucester.

18         MR. EFRON:  Gloucester, sorry, you know,

19   I've never been there.

20         THE COURT:  My lawyer clerk happens to be

21   from Gloucester so be careful what you say.

22         MR. EFRON:  Okay, I won't forget -- 321

23   Federal Third 21, that case tells us that the Court

24   is to apply the law in effect at the time it renders

25   its decision unless doing so would result in manifest

1    injustice or there is statutory direction or

2    legislative history in the country.

3           It was a case on point where during the

4    trial in a First Circuit Federal Court the law

5    changed.  And they -- and it's a Judge Torruella

6    decision and it makes reference to a U.S. Supreme

7    Court decision, Bradley vs. Richmond School Board,

8    416 U.S. 696, where it tells you that, "A party

9    simply does not suffer any legally cognizable injury

10   when a Court applies the intervening president of a

11   higher court which decides an issue against that

12   party.  After all, it is axiomatic that a court is to

13   apply the law in effect at the time it renders its

14   decision, unless doing so will result in manifest

15   injustice."

16          THE COURT:  Well, that's what Mr. Arias and

17   Mr. Freese are claiming.

18          MR. EFRON:  Basically, you know --

19          MR. FREESE-SOUFFRONT:  Thank you.

20          THE COURT:  I am convinced that the

21   writing's on the wall and you've all -- you've

22   probably practiced for almost 30 years, Mr. Arias

23   for -- getting to 20 and Mr. Freese going on 15.

24          MR. EFRON:  Are you saying I'm old?

25          THE COURT:  But you all know that the odds

1    are that I don't think that this is going to change.

2    You know, this is going to be the law of the Circuit.

3    I have to follow what I understand is going to be the

4    law of the Circuit.

5              As a matter of fact, this is an issue that I

6    raised and it made it all the way to appeal.  Because

7    of this I don't think I'm in a position right now to

8    certify to the Supreme Court what would be the

9    standard because I do have a higher court telling me

10   what to do and saying it's clear.  This would be --

11   the Court would have to probably certify the court

12   appeal in that other case.

13             My concern -- and, again, what I'm going to

14   do is, first of all, I want to hear that last

15   witness, have that testimony for the record and also

16   in an abundance of caution if I were to order a new

17   trial because for some reason if that witness is

18   later unavailable for any reason, we already have

19   them here and I want to preserve that testimony.  And

20   then I'll hear the Rule 50s.

21             But my concern, what I'm going to do is, I'm

22   not going to rule on this matter now.  I think in all

23   fairness why I try -- I consider myself a very

24   effective researching on Westlaw, but it's not easy

25   to find something on point, state law cases or

1    federal cases that would yield some -- I think what I

2    opt to do is allow defense counsel, as well as you

3    over the weekend to submit perhaps a memorandum of

4    law by Monday morning as to what I should do.

5         Now, some of my concerns are as follows:

6    And this is just an analogy, but I'm quoting from

7    criminal cases but -- and let me just read -- again,

8    I'm not going to cite any particular case.  This is

9    just sort of generic language used in criminal cases.

10   And this has to do with ineffective assistance cases

11   again but I'm just using it as an analogy.  And I'll

12   just sort of read a little bit.

13        "A trial cannot be fair unless the nature of

14   the charges against the defendant are adequately made

15   known to him or her in a timely fashion."  And this

16   is the Strickland versus Washington case that deals

17   with ineffective assistance, which is not the case

18   here, because Counsel, the minute this opinion came

19   out, knows that it's the law.

20        Now, this is a case I'm citing and it's --

21   and, again, I don't want to -- but it says:  "In this

22   particular case, the prosecutor ambushed the defense

23   with a new theory of culpability after the evidence

24   was already in, after both sides had rested and after

25   jury instructions are settled."

1       That has not happened here.  But in this

2  case what this says is, "This new theory then

3  appeared in the form of an unexpected jury

4  instruction permitting the jury to convict on a

5  theory that was neither the subject to adversarial

6  testing nor defying in advanced of the proceeding."

7       And I think that is what has happened here.

8  This is obviously not a criminal case, but the due

9  process clause is still out there.  And I understand

10 the Court has to -- everybody's entitled to due

11 process.  This is.  And, again, I'll give you the

12 case where I've cited -- I'm not saying it exactly

13 the same, but I'm just using an analogy, it's

14 Sheppard, S-h-e-p-p-a-r-d versus Rees, R-e-e-s, 909

15 F.2d 1234.  And this would be at key cite number,

16 No. 5.  I don't know the particular page.  That's a

17 9th Circuit case from 1989.  But, again, I'm using

18 this as an analogy.

19      Then the case goes on, the criminal case,

20 "Moreover, the right to counsel is directly

21 implicated.  That right is next to meaningless unless

22 counsel knows and has a satisfactory opportunity to

23 respond to the charges against which he or she must

24 defend.  Counsel in that case had no occasion to

25 defense against the felony murder theory during the

1  evidentiary phase of the trial.  The error affected

2  the composition of the record.  Defense counsel would

3  have added an evidentiary dimension to his defense to

4  meet the felony murder theory had he known at the

5  outset what he was against."

6          Obviously the Dolo -- it's a Dolo case and

7  we know what the case is about.  But the problem

8  is -- and, again, I don't want to rule in favor of

9  Mr. Arias at this time but, as I mentioned earlier,

10  this may very well effect how, you know, how the

11  trial was defended because -- and, again, it is

12  something that I think counsel need additional time,

13  as well as Mr. Ambush and the parties, to discuss.

14  Because with a standard of preponderance of the

15  evidence, it is obviously much more easier for

16  Mr. Efron to prove the plaintiffs' case.  So that's

17  just one case I'm using an analogy.

18          I also -- and, again, these are not cases on

19  point, but I'm just using it to raise some of the

20  issues that over the weekend you may all come up

21  with.

22          This is another case and I think it's -- I

23  think I deleted the citation, but I'll just quote

24  from that case.  I do have the case but I deleted the

25  citation.  It's SEB versus Montgomery Ward & Company,

1 and I believe it's a patent case. But that case I

2 don't know if right now it's Federal Supplement

3 Second or F.3d. But what it says -- and I'll quote

4 from that case, "Given this change in the law, then

5 the court's instruction to the jury which were given

6 prior to the change in the law are erroneous."

7 So if I were to decide -- and let's assume I

8 decided on a clear and convincing standard, and the

9 jury found for Mr. Ambush and this case came three

10 days later, Mr. Efron, let's just say while the case

11 was on the appeal or after trial, if jury

12 instructions were erroneous, you'd be entitled to a

13 new trial if I had given the other instructions.

14 Now, to quote more from the case, "A jury

15 instruction is erroneous if it misleads the jury as

16 to the correct legal standard or does not adequately

17 inform the jury on the law." So I have to apply what

18 I understand the law is.

19 "And erroneous jury instruction is subject

20 to harm or lesser error and it is deemed harmless if

21 the Court is convinced that the error did not

22 influence the jury's verdict. Moreover, where jury

23 instructions create an erroneous impression regarding

24 the standard of liability, it is not harmless because

25 it goes directly to the claim."

1       And that is what can happen here.  If I were

2   to give another standard or tell them what the law is

3   not, it's not a harmless error.  So I do have to

4   instruct the jury what the law is.

5       Having said that -- unless the parties were

6   to stipulate otherwise, which Mr. Efron I believe

7   you're going to do so -- but that being the case, the

8   issue becomes one of due process.  And that is

9   something I think I need further briefing.  I don't

10  want to rule at this moment that I have a mistrial.

11      But, again, what I -- and, again, I'm sorry

12  for making everybody work over the weekend, but what

13  I propose -- or what I'm going to do is, we'll meet

14  here on Monday.  I have some sentencing hearings in

15  the morning so we don't need to meet at 9:00 a.m.,

16  but what I would ask is that perhaps we meet here at

17  11:00 a.m.  I'll hear from this probably by then, you

18  know, that parties -- I think it would be important

19  for everybody to submit a brief to the Court on the

20  issue, and I'm going to have to decide that day.  And

21  if I decide not to grant the mistrial or to go on

22  forward with the instructions that they should be,

23  then we'll do the charge conference that day.

24          MR. EFRON:  Your Honor?

25          THE COURT:  Yes.

1      MR. EFRON:  You know, we don't want to rush

2  Your Honor on having to decide that day and really --

3      THE COURT:  And let me tell you, I may very

4  well decide in your favor.  I don't know.  Rushing me

5  is not going to help you, it's not going to help.

6  And a day of -- and, again, we've had jurors here who

7  have to wait a week or two tweaks to continue a case.

8  So it's not --

9      MR. EFRON:  And we're not looking forward to

10  having to work on the weekend for the second weekend

11  in a row.  I would propose, and I think Brother

12  Counsel agrees, that the jury be sent home for a week

13  and during that week we can work this out somehow and

14  then reconvene.  If we were to continue with the jury

15  and if we were to do our instructions and closing

16  arguments and the verdict, do that ten days from now.

17  You know, not next week, but early the following

18  week.  I think we both -- we would both agree with

19  that and it would take a lot of pressure off of us

20  and off of the Court as far as making the correct

21  decision.

22      THE COURT:  What I do want is, I want to

23  complete the record, allow Mr. Arias to do Rule 50.

24  I don't care if we meet Monday or Tuesday.  Again,

25  but I don't want to wait two weeks because the longer

1    the jury is out there, assuming I have to have the

2    jury deliberate, it's bad for your clients, it's bad

3    for Mr. Ambush.

4         But, again, if you want to do it on perhaps

5    brief this by Monday, but I think it needs prompt

6    attention because the longer I have a jury not

7    deliberating after they heard a case it's -- you

8    know, that to me also is -- I know it's been done, it

9    does occur, but at least -- I've tried criminal and

10   civil cases here, and there's nothing worse -- you

11   know, maybe a weekend is good in between

12   deliberations to rest and have an open mind to hear

13   arguments.  But to wait such a long time, it's

14   counterproductive to everybody.

15        MR. EFRON:  But they haven't heard the

16   argument and they haven't been instructed, so all

17   that would happen immediately --

18        THE COURT:  No, no, I understand that, but

19   they have the evidence fresh and they're going to get

20   two days rest.  So let me hear from Mr. Arias.

21        MR. ARIAS-MARXUACH:  *Bueno*, Your Honor, I

22   think that the issue deserves a time-out, as you have

23   said, so that both parties can ponder both the legal

24   implications and, frankly, whether there are other

25   alternatives that they can come to a meeting of the

1    minds --

2         THE COURT:  And let me say this very

3    frankly, I think having tried the case, and if

4    anybody were to try it twice, it's counter productive

5    for everybody.  You had a theory of defense.  You had

6    defense questions when Mr. Efron was not expecting.

7    He had a theory of prosecution in this case.  And now

8    everybody knows how everybody thinks.  And that's --

9    plus we have another record.  And if we're going to

10   impeach any -- Mr. Ambush, for example, if plaintiffs

11   come back here, you'd only have the depositions but

12   you have the record here.  And I do want to note, at

13   least from my perspective, I think Mr. -- some of the

14   plaintiffs have had some difficulty now.  It's going

15   to be worse the next time.  At the same time it could

16   be worse for Mr. Ambush.  I don't know what's in the

17   record.

18        So what I want to send the message is, I

19   think -- and let's assume I try this case, whatever

20   happens now, this case, regardless of whatever

21   verdict, it's probably going to take two more years

22   to go up, come down perhaps again for another trial.

23   And I think in the interest of everybody, everybody,

24   the plaintiffs and Mr. Ambush should try to reach

25   some sort of agreement.  You all know more now about

1　　the case than before.

2　　　　　And there's been some in limines, it doesn't

3　　mean that the next time I'm going to actually grant

4　　the same in limines because Mr. Efron has time to

5　　prepare and the other arguments -- you know, whatever

6　　rulings I had made one way or another I can change

7　　them because everybody's on notice now.  So I would

8　　urge everybody to also consider that.

9　　　　　But I think time is of the essence.  I am in

10　　no extreme rush.  But at the same time -- and, again,

11　　if I finish the evidence here, to me just picking out

12　　one day to instruct the jury -- and my jury

13　　instructions go before the opening -- I mean, the

14　　closings, because that way when you make your

15　　closings you can refer to my instructions.

16　　　　　But I do not want to continue putting it off

17　　and off 10 days, 20 days.  I think it is something

18　　that perhaps by, you know, maybe Tuesday or Wednesday

19　　I should meet with everybody to know everybody's

20　　positions.

21　　　　　MR. ARIAS-MARXUACH:  *Bueno*, Your Honor, we

22　　have not made these arguments lightly.

23　　　　　THE COURT:  And that's why I don't want to

24　　decide this right now one way or another.

25　　　　　MR. ARIAS-MARXUACH:  Because we appreciate

1  this. Our client would like time to ponder this with

2  deliberation. There may -- there may -- there may be

3  alternatives. I'm a little tired, sorry. There may

4  be alternatives that we can present to our client and

5  to Mr. Efron which would allow the case to be

6  submitted for decision, but they need to be thought

7  about and he has to ponder it, and they have to

8  ponder it.

9          One option could be to turn this into a

10  bench trial and, if my client feels comfortable,

11  submit it with the lower standard. That could be an

12  option, if may he'll consider that.

13          MR. EFRON: No, no.

14          MR. ARIAS-MARXUACH: But he won't consider

15  that.

16          MR. EFRON: And we trust the Court, but we

17  believe in the jury system, Your Honor.

18          MR. ARIAS-MARXUACH: Okay. Well, so much

19  for that idea. But in any event, we believe at least

20  until Tuesday to submit the memoranda.

21          THE COURT: Well, I have no problem and

22  perhaps give you until Tuesday to submit simultaneous

23  memoranda. And, again, Tuesday in the afternoon or

24  evening. I think you can both do probably do

25  simultaneous research, but I would like to have then

1  those by Wednesday so I can work on that.

2          MR. ARIAS-MARXUACH:  And when would we

3  reconvene if we reconvene?

4          THE COURT:  Perhaps reconvene -- whatever

5  the outcome, I would like to make a ruling sometime

6  next week because, again, I don't think -- it's very

7  counter productive keeping that jury out there, you

8  know, for, you know, eight, ten days.  The longer --

9          MR. EFRON:  Excuse me, for a second.  When

10  you say "ruling," you mean a ruling from the bench as

11  to which way we're going?

12          THE COURT:  Yeah, because I could very

13  well -- what I would like to have is, you know, those

14  memorandum filed by Tuesday.  I can look at them

15  Wednesday and I will have a quick decision probably

16  Wednesday.  And if it's a mistrial, it's --

17          MR. EFRON:  And I would ask for some

18  personal privilege in the sense that I intended to be

19  on a trip Thursday and Friday and I don't need to be

20  here for whatever's going to go on.  But if we could

21  have until the following Monday, which is what we had

22  pretty much discussed and agreed to, to reconvene and

23  then either finish the case with a closing or do

24  whatever the Court deems is necessary.

25          THE COURT:  Let me check the calender for

1    that week.

2         MR. ARIAS-MARXUACH:  And, Your Honor, to add

3    this into your hopper for decision, Mr. Freese will

4    also be away on Thursday and Wednesday of this week

5    and my client would like to observe Rosh Hashanah

6    properly.

7         THE COURT:  As would Mr. Efron probably.

8         MR. EFRON:  Well, I'm going to observe it in

9    Israel, so I will definitely observe it properly.

10        THE COURT:  Okay, let's do this:  File these

11   simultaneous briefs by Tuesday.  If after reading the

12   briefs I see there are any issues or I need to hear

13   them -- but usually it's going to be case law.  And,

14   again, I think I do at this time because the case has

15   not been submitted or there's no verdict, I do have

16   discretion.

17        But, again, I am concerned, you know,

18   because I do know we've been relying -- and, you

19   know, I said it at the beginning of the case and the

20   parties have relied on the clear and convincing

21   evidence.  But, again, there may be case law allowing

22   me to.  And I believe I can give them the right

23   instruction, that's not going to be an issue.  But

24   the issue I think -- and I'm saying this more for

25   plaintiffs, is the law of the entire case -- there

1    was a theory of defense based on a higher standard,

2    and --

3           MR. EFRON: But that should not affect them

4    negatively. If they were shooting for a higher

5    standard --

6           MR. FREESE-SOUFFRONT: The higher standard

7    is yours, not mine.

8           THE COURT: The problem is on a

9    preponderance. And, again, let me say this, I think

10    from the way I have seen the case, I think -- and I

11    have to be very honest, this is not what a jury would

12    rule, but conceivably it might have been difficult

13    for you to convince a jury. I'm not suggesting you

14    can't on clear and convincing evidence, but on

15    preponderance you may very well, you know, have the

16    evidence there for a preponderance. And that is

17    something that the standard being different -- and,

18    again, Dolo damages it's not like breach of contract.

19    It goes beyond.

20           And, again, Dolo has other equitable

21    remedies as precision. And the problem is it's

22    perhaps not the evidentiary standard jury

23    instructions but it's changing the standard on which

24    defense counsel prepared to the defend the Dolo case.

25    And that is what I'm concerned: Have they been

1  afforded due process?

2          And I would suggest, if this were a criminal

3  case right now, I would in all likelihood be

4  declaring a mistrial.  You know, it's still not a

5  criminal case but the due process clause applies

6  equally to everybody.  And let's assume this were a

7  different type of case, that -- it's one of these

8  civil cases where the defense raised a defense that

9  they carry the burden of proof.  And let's assume

10  that burden of proof was much higher on the defense

11  or even a counterclaim, let's assume, and all of a

12  sudden it changes and goes down, you'd be in that

13  same position.

14          And it's something -- and, again, what's

15  happened to them could have happened to you.  It

16  didn't happen to your client.  So it's something I do

17  have to ponder.  I think that is -- I do have what I

18  understand are the right instructions -- that is not

19  an issue -- and the jury could hear those

20  instructions.  And I could give them the instruction

21  not to prejudice anybody.  Well, you know, it's --

22  the Court at the beginning of the case told you it

23  was a clear and convincing evidence and the standard

24  actually -- the Court after deliberating and

25  pondering analysis it's a much lower standard, it's

1    just preponderance of the evidence.  I gave you that

2    standard, you have to apply that but at the same

3    time, you know, it could be an unfair and violate due

4    process for the defendant in this case.  So that's

5    what we have to look at.

6         And what I would urge is, let's file those

7    memoranda by Tuesday.  Let's reconvene here on

8    Monday, the 3rd and let's do that.  I have criminal

9    matters all day in the morning so I have another jury

10   trial starting then, which I guess for -- if that

11   case goes to trial, let's have a magistrate judge do

12   the jury selection.  And then what I'll do is, let's

13   meet at 1:00 p.m. on Monday the 3rd.

14        What I want you to be prepared is -- if I

15   read the memoranda, I may very well before that day

16   say, I'm declaring a mistrial and that's it.  Then we

17   come here to set another trial date or to discuss

18   possible settlement, but I will still urge everybody

19   over the weekend -- and, again, we'll probably be

20   here for another hour.  I just want to hear that last

21   witness but I would urge everyone to consider, again

22   before I make any ruling, a possible settlement.  Or

23   if the parties agree for me to hold on my ruling, if

24   there's a good possibility of settlement -- if

25   there's a good possibility of a settlement, to

1     discuss that.

2           The other thing I do want to have the

3     parties know is, this is not a case involving the

4     government of Puerto Rico or -- it's a private

5     controversy.  So if the parties were able to reach

6     any type of settlement, it would of course be --

7     there's no problem if that were to be sealed or there

8     were to be an agreement that there would be no

9     disclosure or if there's disclosure, it's revoked.

10    That type of agreement, I'm also open to that.

11          And I think that -- and, again, I think

12    Plaintiffs don't have anything to lose; they could

13    try the case again.  But, again, I don't think time

14    is on their side.  You could perhaps bring another

15    plaintiff who didn't show up this time for

16    Plaintiffs' case, but the thing is there's too many

17    plaintiffs and you're going to have inconsistencies

18    before the jury at any point.  I don't think -- and

19    it's been difficult, Mr. Efron, with the plaintiffs,

20    not that they're doing it deliberately.

21          On Mr. Ambush's side, you know, if I were

22    him, Mr. Ambush, I think you have to think you want

23    to put finality to this; it's something you have to

24    consider.  And I know you have children, you have a

25    lot of other things, and the problem is that if

1    there's a verdict here, you're going to get three or

2    four more lawsuits no matter what, here or in state

3    court or I don't what.  And so you want to try

4    probably to avoid that.

5          So that's just my perceptions based on my

6    ten years on the bench.  I think the parties ought to

7    try to reach some sort of agreement.  You know, I'm

8    not suggesting how it has to be.  And if you need to

9    meet with the magistrate judge again for that, I have

10   no problem.  I don't want to meet individually unless

11   it's very close to settlement because obviously I may

12   be trying the case again and I don't want to be

13   prejudiced against either side or -- but that's the

14   other possibility.

15         So I would suggest, even over the weekend --

16   I don't know when Mr. Ambush is flying out -- but

17   that is something -- the minute we recess today you

18   should perhaps in good faith -- or, you know, counsel

19   may want to meet.  And maybe I'll meet with counsel

20   just for a few minutes just to -- okay, so let me

21   then -- let me see what time it is.

22         Mr. Arias, how long do you think the witness

23   is going to take, your last witness?

24         MR. FREESE-SOUFFRONT:  Fifteen,

25   twenty minutes.

1           MR. EFRON:  And we'll be brief as well.

2           THE COURT:  Okay.  So then let's have the

3    witness ready.  Let's bring in the jury, and then

4    we'll probably excuse the jury by 3:15.  Okay,

5    everybody let's take a two-minute recess and then

6    we'll bring in the jury.

7           (Jury Trial recessed at 2:38 p.m. and

8    resumed at 2:45 p.m.)

9           (Jury enters the room.)

10          THE COURT:  Please be seated.

11          Good afternoon, Ladies and Gentlemen of the

12   Jury.  I apologize for the delay.  I was in

13   discussion several minutes with counsel.

14          The good news is we have one last witness to

15   call.  It will be a very short witness, so I'm going

16   to be excusing you probably within the next half hour

17   or so.

18          So having said that, Mr. Freese, call your

19   last witness.

20          MR. FREESE-SOUFFRONT:  May it please the

21   Court.  The defendants called Leopoldo Garcia to the

22   stand.

23          THE COURT:  Does he need an interpreter or

24   no?

25          MR. FREESE-SOUFFRONT:  No.

1         THE COURT:  Great.

2         THE CLERK:  Raise your right hand, please.

3    Do you solemnly swear that the testimony you're about

4    to give is the truth, the whole truth, and nothing

5    but the truth, so help you God?

6         THE WITNESS:  I do.

7         THE COURT:  Please be seated.

8                                    ---

9         LEOPOLDO GARCIA-VIERA, a witness for the

10   Defense, having been duly sworn by the Clerk, was

11   examined and testified as follows:

12                    DIRECT EXAMINATION

13   BY MR. FREESE-SOUFFRONT:

14   Q.        Good afternoon, Mr. Garcia.  Could you

15   please introduce yourself to the jury and give your

16   full name for the record.

17   A.        Yes.  Good afternoon.

18             My name is Leopoldo Garcia-Viera.

19   Q.        Mr. Garcia, how old are you?

20   A.        Sixty-nine years old.

21   Q.        And where were you born?

22   A.        I was born in Fajardo, Puerto Rico.

23   Q.        And where do you currently reside?

24   A.        *Villas de Parana, Calle 4, Numero S137 en*

25   *Rio Piedras.  Cerca del Senorial.*

Leopoldo Garcia-Viera - Direct

1    THE COURT:  English.  Near Senorial.

2    THE WITNESS:  Yes, sir.  Near Senorial.

3    BY MR. FREESE-SOUFFRONT:

4    Q.    And for how many years have you lived there?

5    A.    Thirteen years.

6    Q.    Are you married?

7    A.    Yes, I am.

8    Q.    What's the name of your current wife?

9    A.    My current wife is Belen Milagros

10    Ferrer-Curbina.

11    Q.    This is your second wife?

12    A.    Yes, this is my second marriage.

13    Q.    Do you have children from this second

14    marriage?

15    A.    From the second marriage, no.

16    Q.    Do you have children from a prior marriage?

17    A.    I have two sons -- they're 40 and 41 years

18    old -- from the first marriage.

19    Q.    Mr. Garcia, could you give us a brief

20    summary of your educational background.

21    A.    Well, I graduated in 1964 from the

22    University of Puerto Rico, the college of business

23    administration.

24    Q.    Any other form of education after that?

25    A.    Yes.  Well, I was in the -- I received a

Leopoldo Garcia-Viera - Direct

1   commission as a second lieutenant when I graduated

2   from the university, and I served in the Army.  When

3   I went -- and I went afterwards to different courses,

4   different levels.

5   Q.      So you served in the U.S. Army, correct?

6   A.      Yes.

7   Q.      For how many years did you serve?

8   A.      For 28 years.  From 1964 to 19 -- 1992.

9   Q.      You're not a member of the armed forces

10  right now?

11  A.      No, I'm not.

12  Q.      Give us a brief summary of your working

13  background.  Apart from the military, did you do any

14  type of work?

15  A.      Yes.  I was the fire commissioner -- or the

16  fire chief of Puerto Rico for seven years.  And the

17  fire department of Puerto Rico is different from a

18  lot of the fire departments in the United States.  It

19  is one of the largest ones in the U.S. because it's

20  centralized.  Here we have 94 fire stations with

21  1,200 firemen and now fire women, and they cover the

22  entire area -- the entire island.  And also for fire

23  prevention we take on a major role.  The -- we have

24  various departments.  There's -- they cover the

25  island, but there's only one chief, and I was the

Leopoldo Garcia-Viera - Direct

1   chief.

2   Q.      And for how many years?

3   A.      For seven years.

4   Q.      From what time?

5   A.      1977 to '84.

6   Q.      And after that, any other type of work

7   outside of the armed forces?

8   A.      Yes.  I was in private enterprises on

9   several occasions, but I decided to retire.

10  Q.      Now, you do know Mr. Joshua Ambush, right?

11  A.      I know Mr. Ambush, yes.

12  Q.      How do you know him?

13  A.      He's a relative of mine.  He's a cousin.

14  Q.      On what side of the family?

15  A.      On my mother's side.

16  Q.      And I ask you, does the fact that you have a

17  family relationship with Mr. Ambush affect in any way

18  your duty to provide testimony truthfully today?

19  A.      I don't think so.

20  Q.      Do you know the Rodriguez and the Berganzo

21  families?

22  A.      Yes, I do.

23  Q.      And we're going to -- this is a case only

24  about the Rodriguez and the Berganzo family.

25          As to the Rodriguez and Berganzo families,

Leopoldo Garcia-Viera - Direct

1  how do you know them?

2  A.       Well, I met Mr. Berganzo in the post -- at

3  the post office in Rio Ondo some years ago in 2001 --

4  in the summer of 2001.  And then subsequently, after

5  I explained to him that I wanted to meet with him, he

6  organized -- or he coordinated so I could meet the

7  Rodriguez family.

8  Q.       And what did you say to Mr. Efrain Berganzo

9  that was the purpose of your wanting to meet him?

10  A.       Well, it was to introduce him to an idea

11  that Mr. Ambush had whereas he was going to -- as a

12  result of the Tel Aviv massacre, he was going to --

13  he was considering initiating a lawsuit for the

14  relatives of those people who had died in the

15  massacre.  And he was looking for these people

16  specifically because they were claimants -- they

17  were -- both of their fathers had died in that

18  massacre.

19  Q.       Now, you said that after speaking with

20  Mr. Berganzo there was a meeting that was arranged,

21  correct?

22  A.       Afterwards he managed to get a meeting with

23  the -- with the family of all Rodriguezes, Noemi and

24  company, Eliezer.  And this was in the summer of

25  2001, and it was in a family residence between Vega

Leopoldo Garcia-Viera - Direct

1    Baja and Manati.

2    Q.        That meeting actually took place?

3    A.        Yes.

4    Q.        And you were at the meeting?

5    A.        Yes.

6    Q.        And who else was at that meeting?

7    A.        It was Noemi, Eliezer, and several others of

8    the Rodriguez clan.

9    Q.        How about the Berganzo side?  Was anybody

10   from the Berganzo side present?

11   A.        I don't think so.  I don't remember.

12   Q.        And what happened during that meeting?

13   A.        Well, I introduced him to this concept that

14   Mr. Ambush had which was to have them submit claims

15   or consider possibly submitting a claim through the

16   Center for Civil -- or American Civil Center for

17   Justice, something like that.  Whereas, they were

18   willing to pay for any expenses for this claim that

19   was -- he was preparing, and they would -- the Center

20   only requested that they be given 20 percent of what

21   was recuperated, of what was gotten back, and they

22   would take care of all the expenses.

23            In other words, the Rodriguezes would not

24   have to invest any money up front, and they would

25   return -- they would give the Center 20 percent for

Leopoldo Garcia-Viera - Direct

1    whatever was recuperated, what was recovered.

2            I'm sorry, if I -- if you can't understand

3    me.  My voice is not too clear.  I went to treatment

4    for cancer, throat cancer, not too long ago; so if

5    you don't understand me, let me know and I'll

6    clarify.

7            THE COURT:  I can understand it, so I'm sure

8    they can.  If you need water, there's water here.

9            THE WITNESS:  Yes, please.

10   BY MR. FREESE-SOUFFRONT:

11   Q.      Do you recall if there were any documents

12   executed?

13   A.      Yes.  Excuse me.

14           MR. FREESE-SOUFFRONT:  I want the Court to

15   show him a copy of Joint Exhibit No. 15.

16   A.      Yes.  I had received some --

17   BY MR. FREESE-SOUFFRONT:

18   Q.      Before you answer anything, I want them to

19   show you a document.

20           Okay.  You have the document in front of

21   you, sir?

22   A.      Yes.

23   Q.      This is a joint document from both parties,

24   the claimant and the Center agreement.  And if we go

25   to the second page of this document, we see two

Leopoldo Garcia-Viera - Direct

1  signatures there.

2          Do you recognize the signature on the left?

3  A.      Yes.

4  Q.      Whose signature is that?

5  A.      That is mine.

6  Q.      Now, the date of this document is the 23rd

7  of July 2002.

8          Do you recall if this is the document that

9  you mentioned had been signed in the meeting that you

10 were testifying about?

11 A.      Yes.

12 Q.      And in what capacity did you sign this

13 document?

14 A.      As a witness.

15         MR. FREESE-SOUFFRONT:  I'm going to ask the

16 Court that you be shown Joint Exhibit No. 29.

17 BY MR. FREESE-SOUFFRONT:

18 Q.      Mr. Garcia, you have the document in front

19 of you?

20 A.      Yes.

21 Q.      This is another joint exhibit, Joint Exhibit

22 No. 29.  This is also a claimant and center

23 agreement, and I want you to see that document and

24 let me know if that document is essentially the same

25 as the other document that I showed you.

Leopoldo Garcia-Viera - Direct

1    A.        Yes.

2    Q.        Now, does this document also have your

3    signature?

4    A.        Correct.

5    Q.        Was this document executed at the meeting?

6    A.        Yes.

7              MR. FREESE-SOUFFRONT:  Now I'm going to ask

8    that you be shown Joint Exhibit No. 21.

9    BY MR. FREESE-SOUFFRONT:

10   Q.        You have the document in front of you?

11   A.        Yes.

12   Q.        Is this the same document as the other two

13   documents that I've shown you?

14   A.        Yes.

15   Q.        All right.  If you go to the first page,

16   you'll see that this document mentions an individual

17   called Efrain Berganzo-Cruz; do you see that?

18   A.        Yes.

19   Q.        Now, on the second page of this document,

20   there is a signature on the left.

21             Is that your signature?

22   A.        That is correct.

23   Q.        And the signature on the right, do you

24   recognize that signature?

25   A.        The right?

Leopoldo Garcia-Viera - Direct

1    Q.       Yes.

2    A.       Efrain Berganzo, yes.

3    Q.       Efrain Berganzo.

4             So let me ask you again, was Efrain Berganzo

5    present in that meeting?

6    A.       The dates are not the same.

7    Q.       So you remember signing this document with

8    Efrain Berganzo at another meeting?

9    A.       At another -- yes, on another occasion.

10   Q.       And as you sit here today, you do not recall

11   if the Rodriguezes were also at that meeting?  If you

12   recall.

13   A.       No, I don't recall.

14   Q.       Now, what happened after these documents

15   that I've shown you were signed?

16   A.       Well, I -- I sent them to Mr. Ambush.

17   Q.       And after sending the documents to

18   Mr. Ambush, what happened, if anything, in connection

19   with the Rodriguez and Berganzo family?

20   A.       Well, I stayed in touch with -- whenever I

21   received any information from Mr. Ambush, I would

22   relay that information to Mr. Berganzo.  The

23   arrangement was that I would relay it to Mr. Berganzo

24   so that then he would pass the information on to the

25   Rodriguez family, and that was -- because I knew -- I

Leopoldo Garcia-Viera - Direct

1  knew I had already met Berganzo, and that was what we

2  had established as a means of communication.

3  Q.      All right.  Now, these communications with

4  Mr. Berganzo that you mentioned, for how long do they

5  span?

6  A.      Until about 2008.

7  Q.      Starting from when?

8  A.      From that first meeting at the post office

9  in Puerto -- Rio Ondo post office.

10  Q.      And what happened in 2008?

11  A.      Well, in 2008, I received a phone call from

12  Mr. Ambush that he wanted to relay some very

13  important matters to Mr. Berganzo and the Rodriguez

14  family, so we made -- a phone conference call to set

15  up a meeting in -- for December of 2008 with these

16  two families.

17  Q.      And you mentioned a conference call; who was

18  participating in the conference call?

19  A.      Myself and Ambush and Berganzo.

20  Q.      And what was said, if you recall, at that

21  conference call?

22  A.      Well, what we discussed -- Mr. Ambush said,

23  hey, I've got some new information that is of vital

24  interest to your people.  He gave me a specific

25  number of what the compensation was going to be for

Leopoldo Garcia-Viera - Direct

1  each family, and then he wanted to meet with the

2  families in Puerto Rico.  So I arranged for a meeting

3  at Berganzo's home with both families.

4  Q.      All right.  And did that meeting take place

5  at Berganzo's home?

6  A.      I'm sorry?

7  Q.      Did the meeting that you're mentioning take

8  place?

9  A.      Yes.  Yes, it did.

10  Q.      Now, you already said that it was at

11  Berganzo's home; do you recall who was present at the

12  meeting?

13  A.      Well, both families with the exception of

14  Ruth, which I have not met, and Ruben Berganzo who

15  was not there.  But I believe Ruben Vivas was there;

16  Ruben is Noemi's husband.  And I took -- I had a

17  notary with me.  And Mr. Ambush and myself.

18  Q.      All right.  Do you recall what was said

19  during that meeting?

20  A.      Well, what it was, Mr. Ambush told them

21  that they were each going to receive $10 million --

22  each family, the Berganzo and the Rodriguez family --

23  and that it was forthcoming in the future.  He did

24  not know exactly when.

25          MR. EFRON:  Objection.  Hearsay.

Leopoldo Garcia-Viera - Direct

1        MR. FREESE-SOUFFRONT:  He was at the

2   meeting.

3        MR. EFRON:  He's testifying on what

4   Mr. Ambush said.

5        MR. FREESE-SOUFFRONT:  Mr. Ambush has

6   already been a witness.

7        THE COURT:  Overruled.

8   A.        But then that he had -- Mr. Ambush, like I

9   indicated, he said they was going to be receiving

10  $10 million; but that Mr. Ambush, he had found out

11  that the Center was going to change their plans

12  insofar as how they were gonna -- to remunerate him,

13  how they were going to compensate him, in spite of

14  the fact that he had done all the arrangements and

15  had been doing all the work at the different levels

16  to be able to get the compensation; i.e., at the

17  Department of State level, I believe, at that time --

18  Q.        All right.

19  A.        And that --

20        MR. EFRON:  Let him finish his answer.

21  BY MR. FREESE-SOUFFRONT:

22  Q.        Continue.

23  A.        And that he wanted to make sure -- to see if

24  these claimants, per family, could -- were willing to

25  give him 10 percent of what they received to

Leopoldo Garcia-Viera - Direct

1    compensate for this change.  And these families

2    agreed to do it.

3    Q.        Now, after these families agreed to do what

4    you said they agreed to do, do you remember if there

5    were documents signed at --

6    A.        Yes.  There were another set of documents

7    that were brought forth.

8    Q.        I'm going to show you --

9              MR. FREESE-SOUFFRONT:  I ask that you be

10   shown Joint Exhibit No. 11 and Joint Exhibit No. 24.

11   BY MR. FREESE-SOUFFRONT:

12   Q.        You have in front of you Joint Exhibit 11

13   and 24.  Let's go with Joint Exhibit 11 first.

14             Let me ask you:  Do you recognize that

15   document?

16   A.        Yes.

17   Q.        Was that the document that was signed at

18   that meeting at Berganzo's house?

19   A.        Yes.

20   Q.        All right.  Now, were you present when this

21   document was signed?

22   A.        I was present, yes.

23   Q.        Do you recall if the Berganzo --

24             MR. FREESE-SOUFFRONT:  This document

25   pertains to the Rodriguez family, so I'm going to

Leopoldo Garcia-Viera - Direct

1  strike my question and pose it again.

2  BY MR. FREESE-SOUFFRONT:

3  Q.      Do you recall if any of the Rodriguez family

4  members that were present at that meeting had any

5  objection in connection with signing this Joint

6  Exhibit No. 11?

7  A.      There were no objections.

8  Q.      Now, let's look at Joint Exhibit No. 24 that

9  you have in front of you; do you recognize this

10  document?

11  A.      Do I recognize the what?

12  Q.      The document.

13  A.      Yes.

14  Q.      Is that the document that was signed at

15  Berganzo's house in 2008?

16  A.      Yes.

17  Q.      And you were also present when Efrain

18  Berganzo signed this document?

19  A.      Right.

20  Q.      And did Mr. Efrain Berganzo pose or raise

21  any objections prior to signing this document?

22  A.      No.

23  Q.      Let me ask you:  Did, at any point in time

24  during that meeting, Mr. Ambush advise the Rodriguez

25  or Berganzo family members that he would only collect

Leopoldo Garcia-Viera - Direct

1    the 10 percent provided in the retainer agreements if

2    the Center did not pay him?

3    A.        Did he advise --

4    Q.        Did he ever tell them at the meeting, I will

5    only collect the 10 percent from you if the Center

6    does not pay me?

7    A.        No.

8    Q.        Let me show you Joint Exhibit No. 25 --

9              MR. FREESE-SOUFFRONT:  Sorry.  Strike that.

10   Joint Exhibit No. 25, no.  It's Joint Exhibit 12.

11   BY MR. FREESE-SOUFFRONT:

12   Q.        You have before you Joint Exhibit No. 12,

13   and I want you to look at this document and let me

14   know if you recognize the signature that appears in

15   this document on the left side.

16   A.        Yes, that is my signature.

17   Q.        And this document, was this document also

18   executed at that meeting at the Berganzo house?

19   A.        At that meeting, that's correct.

20   Q.        In what capacity did you sign?

21   A.        As a witness.

22   Q.        All right.  When Noemi Rodriguez-Robles

23   executed this revocation of power of attorney, do you

24   remember her or any other member of the Rodriguez

25   family raising any objections to its execution?

Leopoldo Garcia-Viera - Direct

1    A.       No.

2             MR. FREESE-SOUFFRONT:  May the witness be

3    shown Joint Exhibit No. 23.

4    BY MR. FREESE-SOUFFRONT:

5    Q.       Now you have Joint Exhibit No. 23 in front

6    of you; and, again, I ask you if you recognize the

7    signature on the bottom of that first page.

8    A.       That is correct.

9    Q.       What signature is that?

10   A.       That's mine.

11   Q.       And was that a document executed by Efrain

12   Berganzo-Cruz on that December 15, 2008 meeting?

13   A.       Yes.

14   Q.       Did Mr. Efrain Berganzo-Cruz or any other

15   member of the Berganzo family that was there ever

16   raise any objection in connection with executing this

17   document?

18   A.       No.

19   Q.       Now, after that December 2008 meeting, did

20   you maintain any contact with the Rodriguez or

21   Berganzo family members?

22   A.       Well, I maintained up to present with the

23   Berganzo family -- with the Rodriguez family, with

24   Noemi's family, Ruben and also with her, because I

25   arranged for him to get -- he's still our client, and

Leopoldo Garcia-Viera - Direct

1    I arranged for him to get some special medical

2    evaluations for more compensation than what he's

3    already got.

4    Q.        And he's a client of whom?

5    A.        Of Ambush.

6    Q.        And this is in connection with what type of

7    case, if you know?

8    A.        Yes.  Well, he had a kidney transplant,

9    Ruben, and we haven't had him checked out because he

10   was still having some side effects or what have you.

11   And he found out that they transplanted him but they

12   did not remove the old kidneys, so he's -- now he's

13   got three kidneys.

14            And so after he went to Iowa, we checked him

15   back here in Puerto Rico and now we find we can work

16   on that to see if he can be compensated.

17            MR. FREESE-SOUFFRONT:  I don't have any

18   further questions for you, sir.

19            THE COURT:  Mr. Efron, cross?

20            MR. EFRON:  Yes, Your Honor.

21                    CROSS-EXAMINATION

22   BY MR. EFRON:

23   Q.        Good afternoon, Mr. Garcia.

24   A.        Good afternoon.

25   Q.        First of all, thank you very much for your

Leopoldo Garcia-Viera - Cross

1  help in assisting the victims of terror for these

2  families.  I think without you it would have been

3  much more difficult to get this done.

4  A.      Mm-hmm.

5  Q.      Now, you dedicated substantial time and

6  important time and valuable time to this, did you

7  not?

8  A.      Right.

9  Q.      Were you compensated or reimbursed for your

10  time in any way by anybody?

11  A.      Yes.

12  Q.      What was the fee arrangement?

13  A.      There was no fee arrangement.

14  Q.      You would ask for checks, and they would

15  give you money?

16  A.      No, no.  I never signed an agreement or an

17  arrangement or anything that would -- I undertook

18  this task many years ago because I thought that I

19  could be of assistance, okay?

20  Q.      Yes, and you were.

21  A.      And I never asked -- and I never, you

22  know...

23  Q.      The first payment, you received was $1,500,

24  correct, if you remember?

25  A.      I don't remember.

Leopoldo Garcia-Viera - Cross

1    Q.       Do you remember any payments that you

2    received from anybody?

3    A.       Yes.

4    Q.       Who were these payments from?

5    A.       From -- they were not payments.  They were

6    wire transfers from Mr. Ambush.

7    Q.       From Mr. Ambush --

8    A.       Yes.

9    Q.       -- or from the Center?

10   A.       No, I don't recall any -- I don't recall any

11   checks from the Center.

12   Q.       Did you know that Mr. Ambush would -- or did

13   you know if Mr. Ambush would bill the Center for the

14   wire transfers to you?

15   A.       No.

16   Q.       Over the years, particularly in 2008 or

17   since 2008 to today, what would you say the amount of

18   the wire transfers to you were?

19   A.       $800,000.

20   Q.       So he sent you $800,000 so far?

21   A.       Yes.

22            THE COURT:  Let me clarify that.

23            Those $800,000 wire transfers, that's money

24   you received for your work in this case overall for

25   all the years?

Leopoldo Garcia-Viera - Cross

1    THE WITNESS:  Yes.  I never received -- we

2    started work on this in 2001, and I never received

3    any compensation.  There could be some, you know,

4    small amounts, but I don't recall.  But they were

5    from Ambush.  They were never from the Center.

6         And then on -- and last on 2008 or 2009, I

7    started receiving some wire transfers from

8    Mr. Ambush.  They were for $200,000 each.  I received

9    four.

10   BY MR. EFRON:

11   Q.    Did you have any agreement with him as to

12   sharing or getting part of his legal fee for your

13   help in the case?

14   A.    No.

15   Q.    He never told you, I'll give you 5 percent

16   or 4 percent or 10 percent of what I make?

17   A.    No.

18   Q.    That was never the case?

19   A.    Never discussed.

20   Q.    Who would determine these wire transfers of

21   $200,000?  Who would determine how much you would

22   get?  Was this pre-agreed?

23   A.    No, it was never.

24   Q.    He did it at his discretion?

25   A.    Yes.

Leopoldo Garcia-Viera - Cross

1    Q.       It was at his discretion?

2    A.       Yes.

3    Q.       Have you lived in the United States --

4    A.       Yes.

5    Q.       -- before?

6    A.       Sure.

7    Q.       Because you have a perfect American accent.

8    Where did you live?  In New York?

9    A.       No.  I lived in Boston, yeah.  My father was

10   specializing in psychiatry and we moved there.

11   Q.       Mm-hmm.

12           THE COURT:  Let me also -- just as to your

13   question, you said you received $800,000 in wire

14   transfers from Mr. Ambush.

15           My question is:  Out of the Berganzo and

16   Rodriguez families, how much, if you know, is that

17   for those two families?  Or this would account --

18           THE WITNESS:  That was for the entire -- all

19   the work that we've been doing.

20           THE COURT:  Not only these two families?

21           THE WITNESS:  That's correct.

22           THE COURT:  Okay.  Please continue.

23   BY MR. EFRON:

24   Q.       Now, Mr. Garcia, you mentioned that as to

25   starting up the litigation for the victims -- for the

Leopoldo Garcia-Viera - Cross

1   Puerto Rican victims at the Lod Massacre, you

2   mentioned that you believed it was Mr. Ambush's idea;

3   how do you know it was his idea?

4   A.      My assumption.

5   Q.      You assume, okay.

6           And he told you it was his idea?

7   A.      Well, from what conversations that we had

8   working on -- he had been working on this for years

9   and -- not for this, but looking for circumstances

10  that could lead to this.

11  Q.      Yes.

12          Now, in the first document that my colleague

13  showed you, which are the documents where you first

14  got the original signatures in 2002, who did you go

15  to Mr. Berganzo's home with to get those documents

16  signed?

17  A.      Well, we had called him, Berganzo and I --

18  oh, who did I go with?  The lawyer?

19  Q.      You went with the lawyer?

20  A.      No, no.  Your question is whether I went

21  with a lawyer?

22  Q.      I'm asking you who you went with, if you

23  remember?

24  A.      (No response.)

25  Q.      Did Mr. Ambush go with you?

Leopoldo Garcia-Viera - Cross

1   A.        No, not for that 2002 -- no.

2   Q.        It's okay if you don't remember, but do you

3   remember if a notary went with you to take their

4   signatures or if you just got the signatures?

5   A.        I just -- on those first ones, I just got

6   the signature.

7   Q.        Yourself?

8   A.        Yes.

9   Q.        Now, where did you get the documents to go

10  to their house?

11  A.        Mr. Ambush e-mailed.

12  Q.        And they came out of Mr. Ambush's office,

13  and you went over there and got their signatures?

14  A.        Yes.

15  Q.        Now, did you read those documents?

16  A.        Somewhat.

17  Q.        And in those documents these families were

18  giving certain authority to the Center, the American

19  Center for --

20  A.        Right.

21  Q.        Right?

22            So you were really -- were you bringing

23  these documents on behalf of the Center or on behalf

24  of Mr. Ambush?

25  A.        Well, I got -- I received these instructions

Leopoldo Garcia-Viera - Cross

1  from Mr. Ambush.  I never had anything to do with the

2  Center, if you will.

3  Q.      But you did take the documents giving the

4  Center authority to their home, and those documents

5  didn't have Mr. Ambush's name on it.  It was -- this

6  was an agreement between the Center and these

7  families, correct?

8          MR. FREESE-SOUFFRONT:  Your Honor, the

9  documents are a joint exhibit and they speak for

10  themselves.

11          MR. EFRON:  I'd like to know.

12          THE COURT:  If you know, respond.  If you

13  don't know, say you don't know.

14  A.      I don't know.

15  BY MR. EFRON:

16  Q.      Now, you mentioned before, and I objected

17  because I thought it was hearsay, was that meeting on

18  December 15, 2008 the only meeting where Mr. Ambush

19  was present at the Berganzos?  Because you had been

20  there before, but the only meeting where Mr. Ambush

21  was at the Berganzos was on December 15th.

22          You said you were -- you said that he said

23  something to them; what language was he using when he

24  was saying that?

25  A.      He was saying it; I was translating it.

Leopoldo Garcia-Viera - Cross

1  Q.      You were the interpreter?

2  A.      Right.

3  Q.      Okay.  Were some of the terms that he was

4  using English legal terms?

5  A.      No.  No.

6  Q.      You were speaking to them in --

7  A.      Right.  Yes.

8  Q.      And one of the things he said was that he

9  was asking for the retainer because -- and I wrote

10  down exactly what you said -- because the Center was

11  going to change its plans as to his remuneration; is

12  that correct?

13  A.      As they had agreed with him before.  In

14  other words -- I don't have anything in -- of what

15  they had agreed with him before.

16  Q.      And do you know what that agreement before

17  was?

18  A.      No.  No.  I was just translating.

19  Q.      Then go ahead.  I don't want to interrupt

20  you.

21          Did he tell you that -- I'm sorry -- did he

22  tell them how much he had already been paid by the

23  Center for representing them?

24  A.      No.  No.  He never mentioned anything.

25  Q.      Okay.  Let's talk for one minute about Ruben

Leopoldo Garcia-Viera - Cross

1  Vivas, and then we'll let you go.

2          I'm not going to use that.

3          Ruben Vivas is the husband --

4  A.      Noemi.

5  Q.      -- of Noemi Rodriguez-Robles?

6  A.      Right.

7  Q.      Noemi's father, Don Antonio Rodriguez, was

8  killed in Lod; is that correct?

9  A.      Right.

10  Q.     And now Noemi's husband, Ruben Vivas, was

11  shot at that terrorism attack?

12  A.     Right.

13  Q.     So he had already received compensation,

14  correct?

15  A.     Right.

16  Q.     Do you know what the people who were injured

17  but survived were compensated by the State Department

18  claim -- by the Libya claim?

19  A.     I know what they supposedly were going to

20  get is 3 million -- $3 million.

21  Q.     You're correct.

22          Are you aware what it is that he's going to

23  have medical evaluations for?

24  A.     Well, because of the fact that they -- he's

25  got a series of conditions -- of wounds that -- he

Leopoldo Garcia-Viera - Cross

1   has six bullet wounds and some other things that we

2   were trying to -- we were trying to see if they could

3   be compensated.  But thus far nothing has been done.

4   Q.       And that's -- tell me if this is what you

5   understand.

6           Do you understand that this is on a

7   posttraumatic stress syndrome claim?

8   A.       I don't know.  I wouldn't -- I couldn't -- I

9   don't have the slightest idea.

10  Q.       And who would this additional compensation

11  come from, if you know?

12  A.       No.

13  Q.       Do you know if you can be -- if you're

14  allowed to be compensated on this program more than

15  once?

16          In other words, if you've already been

17  compensated for an injury because you were shot and

18  you get $3 million, are you excluded from further

19  compensation, if you know?

20  A.       I don't know.

21          MR. EFRON:  Thank you very much.  That would

22  be the extent of our cross.

23          THE COURT:  Mr. Freese, very briefly and

24  then final redirect.

25                  REDIRECT EXAMINATION

Leopoldo Garcia-Viera - Redirect

1   BY MR. FREESE-SOUFFRONT:

2   Q.        Mr. Garcia, you mentioned to Brother Counsel

3   Efron that you had received some payments from

4   Mr. Ambush in late 2008, 2009, right?

5           THE COURT:  Okay, one of the jurors needs to

6   step outside.  Let's have the juror go to the

7   restroom and then everybody else can wait here.

8           And you can re-ask your question.

9           (Jury Trial recessed at 3:28 p.m. and

10  resumed at 3:31 p.m.)

11          THE COURT:  Okay, you may proceed now that

12  we have all the jurors back.  Mr. Freese, restart

13  your redirect.

14  BY MR. FREESE-SOUFFRONT:

15  Q.        Mr. Garcia, I believe -- and I have written

16  this down that I believe you said that at some point

17  in 2009 you received four wire transfers from

18  Mr. Ambush totaling $800,000.

19  A.        Right.  Correct.

20  Q.        Do you recall when specifically in 2009?

21  A.        No, not -- no, I couldn't give you the date

22  certain.

23  Q.        Did you ever bill Mr. Ambush?

24  A.        No.

25          MR. EFRON:  Asked and answered.

Leopoldo Garcia-Viera - Redirect

1   BY MR. FREESE-SOUFFRONT:

2   Q.      Why did Mr. Ambush pay that money to you, if

3   you know?

4   A.      I don't know.

5   Q.      Did you receive payment from -- other than

6   Mr. Ambush, did you receive payment from any member

7   of these two families in connection with the work you

8   performed in this case?

9   A.      Yes.

10  Q.      From whom?

11  A.      I received $5,000 from Ruben Vivas.

12  Q.      And did you bill Ruben Vivas for those

13  services?

14  A.      No.

15  Q.      Do you know why?

16  A.      I tried to get for him not to pay me, but he

17  insisted that I want you to take this check.  And

18  Noemi was with him.

19         MR. FREESE-SOUFFRONT:  Okay.  Okay.  I don't

20  have any further questions.

21         THE COURT:  Mr. Efron, one or two last

22  questions?

23         MR. EFRON:  Yes, your Honor.

24                    RECROSS-EXAMINATION

25  BY MR. EFRON:

Leopoldo Garcia-Viera - Recross

1    Q.       Are you an attorney?

2    A.       No.

3    Q.       As fire chief, were you required to --

4             MR. FREESE-SOUFFRONT:  I have an objection

5    because this goes beyond the scope of my redirect.

6             MR. EFRON:  Actually, it doesn't.  He was

7    asking him about how he was receiving money and why

8    he was receiving money.

9             THE COURT:  If it's related to that, I'll

10   allow him to proceed and see what the questions are.

11   BY MR. EFRON:

12   Q.       Your duties as fire chief did not require

13   you to be an attorney; is that correct?

14   A.       That is correct.

15   Q.       When you came to speak to these families,

16   you were doing so on behalf of Mr. Ambush who is an

17   attorney, correct?

18            MR. FREESE-SOUFFRONT:  Your Honor, beyond

19   the scope of the redirect.  If he wanted to ask it,

20   he could have asked it during his cross.

21            THE COURT:  I'll allow the question.

22   A.       I'm sorry, can you --

23            MR. EFRON:  Could you read it back?

24            (The following question was read by the

25   reporter:  "Q.  When you came to speak to these

Leopoldo Garcia-Viera - Recross

1  families, you were doing so on behalf of Mr. Ambush

2  who is an attorney, correct?")

3  BY MR. EFRON:

4  Q.       When you visited these families without

5  Mr. Ambush, you were doing it on his behalf and he is

6  an attorney; is that correct?

7  A.       Yes.

8        MR. EFRON:  Thank you very much.  That would

9  be the extent of our recross.

10        THE COURT:  All right.  Thank you.

11        MR. ARIAS-MARXUACH:  Your Honor, before we

12  rest, we would like the Court to take notice -- we

13  want to request that the Court take notice of a

14  judicial notice of an adjudicative fact.  And I can

15  make the proffer from here or I can make the proffer

16  from the bench.

17        THE COURT:  Let's have a side bar.  But I

18  can excuse this witness, correct?

19        MR. FREESE-SOUFFRONT:  Yes.

20        (Sidebar discussions begin.)

21        THE COURT:  What's the proposed adjudicative

22  fact?

23        MR. ARIAS-MARXUACH:  Yes, your Honor.

24  Pursuant to Fair Rule of Evidence 201, we would like

25  the Court to take notice of the following:  That

1  during the year ended December 31, 2008 of all the

2  cases pending in the federal judicial system --

3        MR. EFRON:  Lower.

4        MR. ARIAS-MARXUACH:  -- that of all the

5  cases pending in the federal judicial system that

6  year that were resolved where the matter was a

7  federal question, for other personal injury, the

8  percentage of the cases that reached trial was

9  1.1 percent.

10        THE COURT:  And what's the purpose of that?

11        MR. ARIAS-MARXUACH:  The purpose of that is

12  that there has been extensive cross-examination

13  questioning Mr. Ambush's legal proficiency because he

14  has two or three or four jury trials under his belt

15  and somehow that is a stain on his profession.

16        Also, the federal judicial system has shown

17  that jury trials are a vanishing animal.  It gives

18  the jury the impression that because he has three or

19  four jury trials under his belt that reflects upon

20  his inability to try the Franqui case.

21        MR. EFRON:  Three points.  Number one, he

22  said he tried one case as lead counsel.

23        THE COURT:  He said he had been in five jury

24  trials.

25        MR. EFRON:  Secondly, these are -- he hasn't

1   tried any in federal court.  They were all state

2   court cases and so this would be inapplicable.  And,

3   thirdly, there's no probative value here.  There is

4   no probative value, but there is a negative value in

5   the way that the jury can interpret this kind of

6   instruction or this kind of comment coming from the

7   Court.  Think that information should not be passed

8   onto the jury and there's really no purpose for it.

9        MR. ARIAS-MARXUACH:  It is relevant because

10  the Franqui case was a case pending before the United

11  States for the District of Columbia and these are

12  statistics from the federal judicial system, showing

13  that jury trials are a vanishing animal.  And,

14  therefore, all this cross-examination regarding how

15  many trials he has under his belt, this is what

16  negates it.  And it is relevant --

17       THE COURT:  But this case could have gone to

18  trial against Libya.

19       MR. ARIAS-MARXUACH:  For he is owe but the

20  point is the fact that the case -- well, two things:

21  The fact that the case has not reached trial doesn't

22  mean that he didn't earn his fee.  And the fact that

23  the case did not reach trial does not mean that he's

24  not a competent attorney as was the inference that

25  they want to do.

1      THE COURT:  He's been admitted 10, 11 years,

2  he's tried five-case he has a lot of other --

3      MR. ARIAS-MARXUACH:  Federal judicial, Your

4  Honor, they come from a source whose reliability

5  cannot reasonably be questioned.  They are relevant

6  and you can take notice of this.

7      MR. EFRON:  Your Honor, Mr. Ambush did not

8  say that when he was on the stand.  Mr. Ambush just

9  said I did one case as lead counsel.  All he had to

10  say was he did one case as lead counsel but I have

11  300 cases in the last ten years and it just so

12  happens that most cases don't get tried.

13      THE COURT:  I'm going to deny this without

14  prejudice.  And then when we have closing arguments,

15  Mr. Efron, you can comment on that, because I can

16  always instruct the jury before it goes to

17  deliberate.

18      I don't think that this was a major issue.

19  I know Mr. Efron tried to downplay him, but I think

20  you rehabilitated him.  And in that respect, you

21  know, I think he made it clear that he tried cases.

22  I believe he said he tried large cases and on some he

23  was non lead counsel and, you know, I don't think, at

24  least from my perspective, that's not a -- it goes

25  one way or the other right now.  Depending on what

1    the closing, you can bring the issue up.

2              MR. FREESE-SOUFFRONT:  Rule 50 --

3              THE COURT:  I'll excuse the jury for the

4    Rule 50.

5              (Side bar discussions end.)

6              THE COURT:  Mr. Arias, that's your last

7    witness?  The defense rests?

8              MR. ARIAS-MARXUACH:  Well, we have to make

9    the motion --

10             THE COURT:  Okay, but for any evidence to be

11   presented, the defense rests?

12             MR. FREESE-SOUFFRONT:  Yes.

13             MR. ARIAS-MARXUACH:  Yes.

14             THE COURT:  Okay.  Now, Ladies and Gentlemen

15   of the Jury, all the witnesses have testified, the

16   evidence is in.  Now, I have to tell you, I was

17   hoping to bring you back on Monday to give you jury

18   instructions, closing arguments, and then your

19   deliberations but there are some matters that have

20   intervened and I am not going to be able to see you

21   next week.  So I am summoning you for the following

22   week, for Tuesday, the --

23             MR. EFRON:  The 4th of October.

24             THE COURT:  -- the 4th of October.  So next

25   week you won't be here, the following Monday you

1 won't be here, it will be Tuesday the 4th of October.

2 You will receive followup reminders to come here.

3 What I ask you is very important. Keep an open mind.

4 Do not start thinking about the case. Do not discuss

5 the case with anyone. You still have to hear my

6 instructions. You have to hear the closing

7 arguments. And then once you go deliberate, it is a

8 process for all of you collectively, discuss the

9 case, review the exhibits, and take as long as it

10 takes to reach a verdict.

11 So, again, at this time please keep those

12 instructions in mind. When you come back I'm going

13 to ask all of you, have you followed my instructions

14 because it has been a week or more in between. I

15 apologize for the delay, but there are some matters

16 that I have to take care of that have some priority.

17 So please keep that in mind. I will see you then on

18 Tuesday, the 4th of October, at 9:00 a.m. and until

19 then you're excused. And please leave your notebooks

20 here.

21 THE COURT OFFICER: All rise.

22 (Jury exits the room.)

23 THE COURT: Please be seated. And then,

24 Mr. Arias, if you want to argue or renew your

25 Rule 50, if you want to incorporate the same grounds

1    you raised before, please do so.  I will incorporate

2    them and then add any additional arguments you may

3    want to present.

4         MR. ARIAS-MARXUACH:  Well, Your Honor,

5    before we do this and before we move for renewing our

6    motion for judgment as a matter of law, we want to

7    make clear that we're not waiving our argument that

8    the issue as to the appropriate standard for dolo may

9    be a ground for mistrial.  And we are raising this

10   motion at your request without waiving that argument.

11        THE COURT:  And for purposes of the motion,

12   I believe the writing is on the wall, but if you want

13   to argue it in the case is clear and convincing

14   evidence or if it's preponderance, you may do so.

15   And, again, you're not waiving any arguments --

16        MR. ARIAS-MARXUACH:  All right.  Well, then,

17   Your Honor, at this time Defendant Joshua Ambush

18   renews his motion for judgment as a matter of the law

19   on the dolo claim --

20        THE COURT:  Under Rule 50.

21        MR. ARIAS-MARXUACH:  -- Under Rule 50 and

22   seeking enter judgement as a matter of law on the

23   dolo or dolus claim, which is the only remaining

24   claim before the Court after the first Rule 50.  We

25   renew the arguments we made in that motion and note

1   the following at this time.  Whether the standard is

2   the preponderance of evidence or clear and convincing

3   standard, we understand that our client is entitled

4   to judgment as a matter of law because plaintiffs

5   have not established the elements of a claim for dolo

6   under Puerto Rico law.

7        The first element of a claim for dolo under

8   Puerto Rico law or dolus is that the defendant had

9   the intent to defraud them.  There has been no

10   evidence of intent to defraud.  Mr. Ambush had served

11   them as their counsel in litigation before the United

12   States District Court for the District of the

13   Columbia, litigation that was the cause for them to

14   qualify for participation in the U.S. Libya claims

15   settlement.  And because they were able to

16   participate in that settlement each of these families

17   received $7 million a piece.  There's no evidence of

18   intent to defraud.  He was their counsel.  He simply

19   asked to be paid in the wake of his dispute with the

20   Center.

21        There's also no real evidence of false

22   representations to consummate the fact.  What these

23   plaintiffs in their disjointed way have -- some of

24   them have said is, that purportedly Mr. Ambush told

25   them that if the Center did not pay him then he would

1    not collect the 10 percent that was provided in the

2    retainer agreements.  The retainer agreements were

3    clear, written in English and Spanish.  They had time

4    to consider them, they did not raise any objections.

5    This was a meeting at one of the plaintiff's houses.

6    And there's no language in that agreement that

7    conditions payment of the 10 percent retainer fee to

8    any payment to Mr. Ambush from the Center.  So the

9    first two elements of the dolus claim are not met and

10   therefore we did not consider the others.

11          The fact is that what they're trying to do

12   now is rewrite the contract through oral extrinsic

13   evidence.  As the Court knows, under Puerto Rico law,

14   under Article 1233 of the Puerto Rico Civil Code,

15   when the terms of the contract are clear, extrinsic

16   evidence of the party's intent is not admissible.

17   The intrinsic evidence is not admissible to prove the

18   party's intent.  That is what they are trying to do.

19   They're trying to amend the contact --

20          THE COURT:  But they're doing it through the

21   dolo.

22          MR. ARIAS-MARXUACH:  They're cloaking it as

23   a dolo claim, but the fact is that if they had -- if

24   they wanted that to be a condition of the agreement,

25   they simply had to say wait, wait, wait, wait, let's

put that in Spanish and English in the contract.  And

they didn't.  They had -- none of them made

objections, they simply signed.  If the contract did

not conform to what was discussed at the meeting

and -- then simply they had to say, you have to

incorporate this or I will not sign.  And they

didn't.

Moreover, the contracts were signed after

appropriate disclosure.  Mr. Ambush explained that he

was embroiled in a dispute with the Center and that

he wanted to be compensated for the valuable services

he rendered.  Plaintiffs knew before the meeting

because even Efrain Berganzo under cross-examination

had to admit that before the meeting he had

participated in a three-way conference wall with

Leopoldo Garcia and Mr. Ambush where Mr. Ambush told

them that the expected compensation on a wrongful

death claim that was successful before the State

Department would be 10 million per wrongful death.

So when they signed these retainer agreements, they

knew that they were giving to Mr. Ambush 10 percent

of $10 million.

Mr. Ambush also explained to them adequately

what the administrative process would entail.  He did

so by sending them a copy of the November 2'08 letter

1    from Linda Jacobsen of the U.S. State Department.  He

2    also did that by going through the requirements at

3    the meeting.  So -- and he also told them that he had

4    received some payments from the Center.  The fact is

5    that there is no evidence on the record, competent

6    evidence, that Mr. Ambush was paid for his work on

7    the Franqui case more than the $25,000 approximately

8    that he estimated.

9            The Center, a 501(c)(3) tax exempt

10   corporation subject to audit by the Internal Revenue

11   Service of the United States, brought their president

12   and that testimony, aside from simply defaming

13   Mr. Ambush, was incapable -- he wasn't capable, after

14   admitting that they had a legal duty to keep

15   meticulous records, to prove what amount, if any,

16   they paid Mr. Ambush for his work over seven years.

17   The work that delivered the $7 million net to each of

18   these families, the Center could not tell us.

19           Mr. -- Dr. Engelberg, for all his

20   sanctimonious testimony about their good purposes and

21   nonprofit mission and duty to comply with the law,

22   could not provide an accounting of what, if anything,

23   they paid to Mr. Ambush and admitted that they had

24   not provided an accounting to these people as to how

25   much they spent on the case.  The Center has not

1    proven -- and so if -- he simply showed us a

2    cavalcade of checks that at the end of the day he had

3    to admit he could not tie to the Franqui case or to

4    these families in particular.  So there's no evidence

5    that Mr. Ambush made any false presentations to these

6    families.

7        And for that reason, Your Honor, we

8    understand that he remains entitled to judgment as a

9    matter of law under the clear, robust, and convincing

10   evidence that we maintain should be applied in this

11   case and that the jury was originally instructed

12   upon, and under the lesser preponderance of the

13   evidence standard.  For that reason, Your Honor, we

14   renew our motion.

15       THE COURT:  Okay, thank you.  At this time

16   the Court denies the motion on the same grounds.  I

17   understand there's testimony of the plaintiffs, if

18   believed by a jury, that -- it's a matter of

19   credibility and weight of the evidence.  Judging the

20   case, what a jury would do or a judge, if this were a

21   bench trial would be different, but for purposes of

22   Rule 50 I have to send the matter to the jury.

23       Mr. Efron, I don't know if you want to note

24   anything or --

25       MR. EFRON:  If you --

1          MR. ARIAS-MARXUACH:  You have nothing to

2     say?

3          MR. EFRON:  Only that --

4          THE COURT:  I ruled in your client's favor

5     so...

6          MR. EFRON:  I know.  That's why I don't want

7     to mess it up.  But I do think that after the

8     testimony we heard today from Mr. Ambush and

9     Mr. Garcia, the plaintiffs' case is strengthened even

10    more particularly as to Rule 50 and the Court has

11    already ruled so we'll leave that as it is.  Thank

12    you.

13         THE COURT:  I would disagree with that, but

14    I can't go into matters of credibility.  Maybe you

15    shouldn't talk anymore.

16         So, okay, let me then -- what I'm going do

17    is -- okay, that -- then I expect then the memorandum

18    to be filed by Tuesday.  I will hopefully by

19    Wednesday or Thursday have a ruling.  If I were to

20    grant a mistrial be prepared on that following Monday

21    to come here and we'll discuss.  If I don't grant a

22    mistrial, we'll work on jury instructions and then

23    the jury will have instructions the following

24    Tuesday.

25         Then the only other matter I want to bring

1  forward is, I know that there may be an issue as to

2  possible prejudice if I were to continue with the

3  case and change the standard.  What I would like is,

4  because some of this may be attorney-client

5  privilege -- obviously the law is the law and there's

6  a discussion of case law, but I think it might be

7  important at some point to have a record, depending

8  on what I do or I'm about to do for the defense, to

9  make a proffer of how it would be prejudiced in its

10 preparation of the evidence.  You may do so in a

11 general matter.

12      If there are any items that would be

13 attorney-client privilege, you can supplement your

14 motion ex parte by informing me about those

15 attorney-client privilege matters to the extent that

16 would be necessary.  Or you may have to -- at some

17 point you may have to make the proffer, but keep that

18 in mind that that may be another possibility if that

19 is the case.  Because I think in the event I deny

20 your motion, you need to have it on the record.

21      And that's why I'm giving you the

22 opportunity if you need to make any on the record ex

23 parte attorney confidential matters that for any

24 reason this goes on appeal, you need to preserve for

25 the record and you need for the Court to consider,

1   you may -- aside from the motion, you may want to

2   supplement that.

3            Mr. Efron, the same thing.  There may be

4   some, you know, attorney-client matters that -- but

5   you need to put them for the record.

6            MR. EFRON:  There are none.

7            THE COURT:  For the record, I think this has

8   benefited your client.  So aside from that, is there

9   anything else at this time?  So then I expect those

10  motions.  And, again, focus -- again, I think the law

11  as I have to give it to the jury, unless you find

12  anything else -- but, again, nobody has weighed

13  anything.  If I gave the jury clear, convincing and

14  then somebody files a post trial motion, we would

15  probably have to order a new trial or the circuit

16  would do the same thing.  So I think the issue is --

17  the focus on the issue is now knowing what the proper

18  standard would probably be, do I have to send the

19  case to the jury this way?

20           You know, I would love to certify this to

21  the Puerto Rico Supreme Court.  I don't know if it

22  goes to a verdict.  It is something that I would like

23  to do, but since the circuit has pronounced itself

24  and I guess it was Judge Dick who wrote the

25  opinion -- and there's a panel, it's an opinion

1    there.  So I don't know if I have the authority to

2    circumvent that -- or not circumvent but ask for

3    another opinion from the Court -- the Supreme Court.

4              So court is adjourned.  I will see you then

5    the following Monday on the 3rd and we will continue

6    with the case.

7              MR. EFRON:  Thank you very much, Your Honor.

8              THE COURT OFFICER:  All rise.

9              (Jury trial adjourned at 3:54 p.m.)

10                        ---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    UNITED STATES DISTRICT COURT    )

2              OF                     )ss.

3         PUERTO RICO                 )

4

5

6

7                        CERTIFICATE

8

9

10          I, EVILYS E. BRATHWAITE, hereby certify that

11   the proceedings and evidence are contained fully and

12   accurately, to the best of my ability, in the notes

13   recorded stenographically by me, at the jury trial in

14   the above matter; and that the foregoing is a true

15   and accurate transcript of the same.

16

17                        _____/s/ Evilys E. Brathwaite____

18                        EVILYS E. BRATHWAITE, RPR
                          Official Court Reporter
19                        United States District Court
                          Federal Building, Room 200
20                        San Juan, Puerto Rico 00918
                          787-772-3377
21

22

23

24

25
```