1      IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF PUERTO RICO

2

3   :_____:

4   THE ESTATE OF ANGEL BERGANZO COLON   :
    represented by Efrain and Ruben Berganzo;
5   THE ESTATE OF ANTONIO RODRIGUEZ MORALES   :
    represented by Noemi Rodriguez Robles,
6   Eliezer Rodriguez Robles, Angel M.   :
    Rodriguez Robles, Maria M. Rodriguez
7   Robles and Ruth D. Rodriguez Robles,   :

8               Plaintiffs,          :     CIVIL NO:
                                            10-1044 (GAG)(MEL)
9          vs.                       :

10  JOSHUA M. AMBUSH                  :
                    Defendant.
11  :_____:

12

13              EXCERPT OF DAY 1 OF THE JURY TRIAL
                         HELD BEFORE
                THE HONORABLE GUSTAVO A. GELPI
14     Monday, September 19, 2011, beginning at 10:41 a.m.
    :_____:

15

16

    A P P E A R A N C E S:
17

                LAW OFFICES OF DAVID EFRON
18              BY DAVID EFRON, ESQUIRE and
                BY JOANNE V. GONZALES-VARON, ESQUIRE
19              P.O. Box 29314
                San Juan, Puerto Rico 00929
20              For the Plaintiffs

21              McCONNELL VALDES, LLC
                BY RAUL M. ARIAS-MARXUACH, ESQUIRE and
22              BY HENRY O. FREESE-SOUFFRONT, ESQUIRE
                270 Munoz Rivera Avenue
23              P.O. Box 364225
                San Juan, Puerto Rico 00936
24              For the Defendant

25

INDEX TO PROCEEDINGS

                                                          PAGE

Preliminary Jury Instructions.......................3

Stipulations of Facts Recited to Jury..............24


OPENING STATEMENTS                                        PAGE

     By Mr. Efron...................................28

     By Mr. Arias-Marxuach.........................42

                          ---

1          THE COURT:  You may be seated.  All of you

2     who were not selected, thank you very much for being

3     here.  I appreciate it.  I will see you in another

4     case as will some of my colleagues.  So thank you

5     very much.  Let's excuse the remaining jurors, and

6     everybody else please be seated.

7          Okay.  Now, Ladies and Gentlemen of the

8     Jury, I'm going to read to you some preliminary jury

9     instructions.  After that we'll take a 10-, 15-minute

10    recess and then we're going come back for the opening

11    statements, and after the opening statements we will

12    recess for lunch.

13         Now, Ladies and Gentlemen of the Jury, now

14    that you have been sworn as jurors, I will give you

15    these preliminary instructions to guide you in your

16    participation throughout this trial.  And at the end

17    of the case I'm going to give you some very detailed

18    jury instructions about the law and other matters and

19    how to deliberate, but those I will give to you at

20    the end of the case.

21         Now, regarding your duty as jurors, it will

22    be your duty as jurors to find from the evidence what

23    the facts of this case are.  You, and you alone, will

24    be the judges of the facts.  I am the judge of the

25    law, I make legal rulings as I have to throughout the

1    case, but you are the judges of the facts.

2          You will then have to apply those facts as

3    they come into evidence to the law that I give to

4    you.  You must always follow the law as I give it to

5    you, whether you agree with it or not.  And that is

6    something you indicated when you were being screened

7    as jurors.

8          Now, let me advise you that nothing that I

9    do or say during this course of trial is intended to

10   indicate or should be taken by you as indicating what

11   your verdict should be.  Also, please do not try to

12   figure out how I would have ruled the case as to

13   plaintiffs or as to defendants, because that is not

14   my job.  What I will do is issue legal rulings, but I

15   will not give any opinions as to what the verdict

16   should be.  So please do not try to infer how I will

17   rule because that is what you have to do

18   collectively, the eight of you, at the end of the

19   case.  And, again, my opinion at no point is

20   indicated -- is indicative of how you should rule.

21   Or anything I do or say.

22         Now, the evidence in this case will

23   consist -- from the evidence from which you will find

24   the facts of the case to deliberate at the end of the

25   case, will consist of the testimony of witnesses who

1    are sworn in and take the witness stand, documents

2    and other exhibits that are admitted into the record,

3    and any facts which the lawyers stipulate to -- and

4    there's some stipulations, I will read them to you

5    when we come back before the opening statements -- or

6    any facts I ask you to find as true and correct.

7         Now, certain things are not evidence and

8    cannot be considered by you.  And this is very

9    important so keep this in mind.  First of all,

10   statements, arguments, and questions by attorneys are

11   not evidence.  At the beginning of the case each

12   attorney for each side will have an opportunity to

13   present an opening statement.  An opening statement,

14   again, it is not evidence.  In the opening statement

15   each attorney has an opportunity to tell you what his

16   theory of the case is and what he intends to prove to

17   you with the evidence he will present.  But, again,

18   that is not evidence.  And the plaintiffs' attorney

19   will give you the version of his clients; the defense

20   attorney will give you the version of his clients.

21   But, again, those versions are not evidence.

22        Now, objections to questions are not

23   evidence.  Throughout the case -- and those of you

24   who have sat in other cases will note that throughout

25   the case there are objections, usually evidentiary

1  objections.  Now, lawyers have an ethical obligation

2  to the client, and more important, to the Court and

3  justice system to make objections, to present

4  objections, when they understand the other party is

5  introducing some evidence improperly.  The evidence

6  might be of form, it maybe of substance, but they

7  have an ethical obligation.

8        Now, you should never be influenced by any

9  objection or by the Court's ruling on it.  If the

10  objection is sustained, that is the objection is

11  granted, you ignore the question.  If the objection

12  is overruled, you consider the evidence.  And, again,

13  the test is not which side makes the most objections.

14  And don't take that in favor or against any side

15  because, again, it is an obligation that the

16  attorneys have towards their clients and towards the

17  Court to make objections when they understand they

18  are necessary.  And that's what I'm here for, to

19  rule upon those objections.

20        Now, at some point I may grant in part an

21  objection, but then say that the evidence or the

22  testimony will be for a limited purpose.  If that

23  should be the case, I will give you a specific

24  instruction at the time; otherwise, you consider all

25  the testimony.

1          If I allow -- now, any testimony that I

2   exclude -- sometimes and I don't foresee that this

3   happens much because of the objection, but let's

4   assume I allow some testimony and then later I

5   reconsider and I ask you to strike that testimony and

6   disregard that testimony, should that be the case,

7   I'll give you a specific instruction and the even

8   though you may have heard that testimony, you are not

9   to consider it.  But, again, I will do everything

10  possible so that doesn't happen.  It has not happened

11  to me before but, just in case, you're forewarned.

12          Now, anything you see or hear outside of the

13  courtroom is not evidence and must be disregarded.

14  You are to decide the case solely on the evidence

15  presented to you here in the courtroom.

16          Now, something I always do, when I recess

17  for lunch I instruct counsel to please give the jury,

18  if you're going to the cafeteria, to go half an hour

19  earlier and then usually my lunch breaks will be an

20  hour, hour and fifteen minutes, that way you can head

21  up to the cafeteria and then when you're heading out

22  counsel can go up.

23          If you happen to see any of the counsel or

24  the plaintiffs in the cafeteria, by the time they

25  will get up, you will probably be sitting down.  But,

1    again, it's not disrespectful but ignore them, they

2    will ignore you.  But that is so there's no

3    impression that anybody is trying to, one way or

4    another, communicate with the jurors from the parties

5    or vise-versa.  So please keep that in mind.  Have

6    your poker faces on but, again, that's my

7    instruction.  It's not that all of you are not -- the

8    attorneys and jurors are not nice persons, but we

9    have to keep a courtroom decorum, a court decorum,

10   while the case is going on.

11         Same thing, I do not meet or discuss matters

12   with the attorneys when the case is going on unless

13   all parties are here, but I do not individually meet

14   with any of the attorneys.  So please keep that in

15   mind.

16         Now, let me advise you also.  That there are

17   two kinds of evidence that you may consider in this

18   case.  First, directed and, second, circumstantial

19   evidence.  Direct evidence is direct proof of a fact

20   such as the testimony of an eyewitness or an exhibit

21   presented into evidence.  Circumstantial evidence, on

22   the other hand, is proof of facts from which you may

23   infer or conclude that other facts exist.  And I will

24   give you an example of circumstantial evidence.

25         Assume that you're babysitting a

1   five-year-old child and he's very hyper and you say,

2   Well, let me calm him down.  And you go to the

3   kitchen, you tell him, sit down and let's bake some

4   delicious chocolate chip Betty Crocker chocolate chip

5   morsel cookies.  And you bake them, they're out of

6   the oven, they're steaming and, of course, you're

7   going to have some also because they're delicious,

8   and you put them on a plate.  And all of a sudden the

9   bell rings and it's the Federal Express gentleman

10  who's got a package to deliver.  And you tell the

11  five-year-old, Stay here, don't touch the cookies,

12  I'll be back in two minutes and then we'll have them

13  together.  You go get the package, you sign it in,

14  lock the door, and then you go back into the kitchen

15  and no cookies, they're all gone.

16      And you ask the child, What happened?  And

17  the child says, I don't know.  But then you look at

18  the child and there's crumbs all over the plate, all

19  over his shirt, all over his chair, and then you see

20  he's got chocolate chip marks all over his face.  And

21  that is circumstantial evidence that while you left,

22  the child ate those cookies.

23      And, again, that's just, I'm going to say, a

24  ridiculous example of circumstantial evidence, but

25  that is circumstantial evidence and it's something

1    unrelated to the case so that's why I always give

2    that example.

3          Now, at the end of the case it will be up to

4    you as jurors which witnesses to believe, which

5    witnesses not to believe, or which witnesses to

6    believe in part and not in part, and which testimony

7    of a witness to accept or reject in whole or in part.

8    And I will give you further instructions on the

9    credibility and weighing testimony at the end of the

10   case.

11         Now, as to the burden of proof.  This is a

12   civil case, it's not a criminal case.  So the burden

13   of proof in a civil case is on the plaintiff burden.

14   And the plaintiff has the burden of proving -- or the

15   plaintiffs have the burden of proving their cases by

16   what is known as a preponderance of the evidence.

17   This means that each plaintiff or each estate

18   individually -- and, again, we have two estates.  But

19   you have -- in order to find for plaintiffs each of

20   the estates has to produce evidence, which considered

21   in the light of all the facts lead you to believe

22   that what each plaintiff claims is more likely true

23   than not.  To put it in a different way --

24         MR. ARIAS-MARXUACH:  Your Honor.

25         THE COURT:  Yes.

1          MR. ARIAS-MARXUACH:  May we approach?

2          THE COURT:  Okay, please approach.

3          (Side bar discussion begins.)

4          MR. ARIAS-MARXUACH:  Your Honor, we have a

5    concern about the instruction concerning -- let me

6    start by stating my name for the record.  Raul Arias

7    on behalf of the defendant.  Because this is a dolo

8    claim, the appropriate standard for the dolo claim,

9    not for the duress claim, is clear, robust, and

10   convincing evidence, which is a heightened standard

11   than preponderance of the evidence.

12         So we would request that they be advised as

13   to the dolo claim, not the other elements in the

14   case.  The standard would be clear, robust, and

15   convincing evidence.

16         THE COURT:  That's the law for dolo, and I

17   will give an instruction for dolo.

18         MR. EFRON:  I think that once dolo is found

19   regardless of the standard for dolo then what kicks

20   in is the --

21         THE COURT:  Everything is by preponderance,

22   but dolo you have to find by a heightened standard.

23         MR. EFRON:  But once dolo is found then the

24   likelihood that it existed goes to the regular

25   standard and not the heightened standard.

1          THE COURT:  No, but they have to find dolo.

2     If they find dolo, that's a clear, convincing

3     standard, or robust evidence.  Then everything else

4     is by a preponderance.  But what I will do is, I will

5     say that because a dolo claim it raised -- it's a

6     bit -- a higher standard, but I will explain that at

7     the end of the case.

8          MR. EFRON:  Okay, you can do it at the end

9     of the case.

10          THE COURT:  Okay, but I will mention it

11     briefly now.

12          MR. ARIAS-MARXUACH:  But that it requires

13     more than a preponderance.

14          THE COURT:  I will mention that.

15          (Side bar discussion ends.)

16          THE COURT:  Let me just backtrack very

17     briefly.  I mentioned this is a civil case and the

18     burden is always on the plaintiff for proving each

19     estate's claim by a preponderance of the evidence.

20     Now, I mentioned there is a dolo claim, d-o-l-o,

21     under Puerto Rico law and that is the fraud in the

22     inducement of the contractual relationship claim that

23     plaintiffs bring.

24          The dolo claim has a higher standard of

25     proof than mere preponderance.  It is known as a

clear and convincing evidence standard.  I will
explain to you at the end of the case what that
standard is, and that just applies to the dolo part
of the plaintiffs' case.  As to the other facts you
must find, it will always be a preponderance case.
So please keep that in mind.

Now, what is a preponderance?  A
preponderance means that if you put on a scale
plaintiffs' and defendant's evidence, at the end of
the scale for plaintiffs to prevail, the scale must
tip more towards plaintiffs' side.  It may tip a
little bit more or a lot more, but it has to tip more
towards the plaintiffs' side.  That's a
preponderance.

Clear and convincing evidence, the standard
a bit higher and this just, again, for the dolo
claim.  As to all other matters it's preponderance of
the evidence.  And I will explain to you the
difference between preponderance and clear and
convincing evidence at the end of the case when I
give you the more detailed instructions.

Now, if plaintiffs' fail to meet their
burden of proof, you must find for the defendant.
And if, at the end of case, the scales continue to be
equally tipped, you must also find for the defendant.

The plaintiff must always prove his case at least by
a preponderance as to all matters; and especially as
to the dolo, by clear and convincing evidence.

Now, you've heard in criminal cases of proof
beyond a reasonable doubt.  That's a very, very high
standard; that's what the government is expecting
because in those cases a person's life and liberty is
at stake.  But this is not a criminal case, the
standard is not like beyond a reasonable doubt.  But,
again, at the end of the case I will explain to you
exactly what clear and convincing evidence is and
what a preponderance of the evidence is.

Now, I already mentioned to you what the
case was about.  Before we hear the opening
statements, I will read to you some stipulations that
will give you a better idea of what the evidence will
be, and then you'll hear from both parties.

Now, let me give you a few words about your
conduct as jurors.  First, I instruct you that during
the trial you are not to discuss the case with anyone
or permit anyone to discuss it with you.  Until you
retire to the jury room at the end of case to
deliberate on your verdict, simply you are not to
talk about the case, not even amongst yourselves.

When you go back to the jury room, talk

1    about anything else in the entire universe.  You may

2    talk about sports, politics, global economy, climate

3    change, anything you want except this case.  Do not

4    discuss it between yourselves because you have to

5    wait until all the evidence is in and I've given you

6    all the instructions.

7         And note that the importance of this

8    instruction is, you will first hear a witness on

9    direct examination, and let's assume you take a break

10   and you say, Oh, I find that witness to be very

11   convincing.  But you have to wait until you hear the

12   cross-examination, and then you may not find that

13   witness as convincing, or may still find that witness

14   convincing.  But, again, after that you're going to

15   hear other witnesses.  And based on what you hear

16   other witnesses talk about you have to weigh all the

17   testimony and you can't do that individually, you

18   have to weigh it globally, to have all the evidence

19   before you.  So please keep that in mind.

20        Also, when you go home when your friends or

21   family asks you, Oh, you're selected for a jury as a

22   juror, what's the case about?  You can say, it's a

23   civil case, but I cannot talk about it, please

24   understand that; once the case is over, I will tell

25   you what it's about.  But please keep that in mind,

1    you're not to discuss the case with anyone.

2            Second, do not read or listen to anything

3    touching on this case in any way.  And if anybody

4    tries to talk to you about the case, bring it to the

5    Court's attention immediately.

6            Third, and this is very important, in this

7    age of technology, do not try to do any research or

8    make any investigation about the case on your own.

9    So don't Google anything up, Wikipedia anything up.

10   I'm sure if you look you may be able to find through

11   a computer facts about this case but, again, those

12   are not facts, they're not presented in evidence; so

13   that would be improper.  So please keep that in mind.

14           And I also want to mention that because

15   there was one civil case several years ago that one

16   of the jurors e-mailed his significant other, who was

17   studying law, and asked a legal question.  And the

18   attorney who was -- a soon to be attorney e-mailed

19   back some information which was shared.  That was a

20   big issue.  That could even constitute criminal

21   conduct, so please keep that in mind.  I know none of

22   you are going to do that, but that's what should not

23   happen because, again, you have to base your verdict

24   solely on what the evidence here is.

25           Finally, do not form any opinion, as I

mentioned, until all the evidence is in.  And you
have to keep an open mind throughout the entire
proceedings until you start -- and even throughout
your deliberations.

Now, I will allow you to take notes.  When
we recess and you come back, you will be given note
pads.  These notes are for your own personal use, you
cannot take them home at night, you leave them in the
jury room with Mr. Colon, the bailiff.  And they are
for your own personal use.

Now I'm going to recess for about 10,
15 minutes.  Mr. Colon will take you to the jury room
so you can accommodate yourselves.  When we come
back, I will read to you some stipulations and then
each side will make its opening statements.  And,
again, opening statements are not evidence; it is
what counsel intends to do.

It's like when you go to the movie theatres
and you see the previews, the trailers, for the
upcoming movies.  What they're going to do is give
you a trailer or a preview of what this case will be
about from their perspective or what the case will
not be about.  And that's what they're going to
present to you, but that is not evidence.

Having said that, the only other matter --

1   I'm going to place Mr. Colon under oath.  He's in

2   charge of you.

3        And, Mr. Colon, at all times you are in

4   charge of this jury, so please let the marshals and

5   other court security officers know that I need you

6   7/24 with this jury.

7        The Court OFFICER:  Yes, sir.

8        THE CLERK:  Do you solemnly swear that you

9   will keep this jury together and not permit any

10   person to speak to or communicate with them, not to

11   do so yourself unless by order of the Court, or to

12   ask whether they have agreed on a verdict and to

13   return them into court when they have so agreed and

14   when ordered by the Court, so help you God?

15        The Court OFFICER:  I do.

16        THE COURT:  Okay.  Just two or three more

17   quick matters.  If there's anything you need at any

18   point, inform Mr. Colon.  The only thing he cannot

19   discuss with you and you cannot ask him is, what did

20   the judge say or what did the witness say?  You

21   cannot talk about the merits or the facts of the case

22   with him.  But if you need coffee or you need

23   refreshments or one of you is -- hopefully it won't

24   happen, but one of you feels ill, you have to inform

25   me, talk to him and he will inform me about the other

1  matter.

2        Now, the way I conduct proceedings, I always

3  start at 9:00 in the morning, very early, and then I

4  go until lunchtime.  I will probably recess -- well,

5  I will recess every morning for about ten minutes for

6  a coffee break halfway, around 10:30.  In the

7  afternoon we will resume around 1:30 p.m. and then at

8  3:00, 3:30 we recess for another coffee break, and

9  the we go on to about 5:00, sometimes 5:15, 5:30 at

10  the most.  But usually by 5:00, 5:15 I close for the

11  day, but I use -- I take advantage of the entire day.

12        So bring a jacket, those of you who don't

13  have it, today it's not cold, but sometimes it rains

14  outside or these air ducts are crazy and sometimes

15  it's freezing, it seems like it's an igloo in here.

16  So please keep that in mind.

17        And, Counsel, keep that in mind for your

18  witnesses and the parties because sometimes it's very

19  cold.

20        And I'd also ask -- or if I haven't asked,

21  I'll start -- I tend to talk very fast, but my court

22  reporter has asked me to talk slow.  So I will remind

23  myself of that and I'll also ask Counsel also for her

24  and for the jury to understand everybody, and please

25  ask your witnesses to talk slowly.

1          Okay.  So let's excuse the jury for about

2    ten minutes.  It's 11:00, let's be back here at 11:15

3    and then we'll start with the opening statements.

4          The Court OFFICER:  All rise for the jurors.

5          (Jury exits the room.)

6          THE COURT:  Please be seated briefly.  There

7    were stipulations of facts in the pretrial order,

8    Docket order, that's 137.  I looked at Mr. Efron's

9    tendered description of the case.  I think that from

10    the joint stipulations.  There's sufficient facts for

11    the jury to know what the case is about, and you're

12    going to be able to give your opening statements.

13    Please when you make your openings.  I remind you, as

14    many times as you have to say it, say the evidence

15    will show, the evidence will show because otherwise

16    it looks like you're resuming conclusions for the

17    jury.  So please keep that in mind.

18          I have no problem -- you may move around

19    what the well of the Court, what little well we have

20    here.  Same when you make directs or closings; you

21    may move around as long as it's within courtroom

22    decorum.  If I see anything that I would not accept,

23    I will let you know, but feel comfortable moving

24    around.

25          And, again, Mr. Efron do you want to submit

1  for the record your proposed jury instruction, which

2  I'm not going to read to the jury. You may file it

3  and I will note it so you have it in the record.

4        MR. EFRON: Yes, Your Honor.

5        THE COURT: I will mention -- when I

6  mentioned that there was compensation from the Libyan

7  government, I may mention very briefly that as

8  another example of another terrorist act, which is

9  unrelated, is the Pan Am flight in Scotland, but

10 that's so they get a general idea of what was being

11 compensated. But that -- I will tell them that's not

12 related to this case in any way.

13       MR. EFRON: We intend to as well. And what

14 I did want to do --

15       THE COURT: But, again, please keep in mind

16 that's not evidence. And that's history, and I'm

17 giving them the history of the case so --

18       MR. ARIAS-MARXUACH: And we note a concern,

19 Your Honor, because Plaintiffs' proposed jury

20 instruction intended to have the Court advise the

21 jury or describe to the jury the U.S./Libyan claim

22 settlement as solely the product of the Pan Am 103

23 Lockerbie bombing when it was the product of complex

24 international negotiations, what Libya wanted to come

25 in from the cold into the international community.

1          And, more importantly, plaintiffs have no

2    competent evidence to establish that the sole reason

3    that there was a U.S./Libya claim settlement

4    agreement for the benefit of victims of terrorism is

5    Pan Am 103.  And so we will request an instruction

6    that because there is no competent evidence that that

7    is not going to be part of the opening statement --

8    because otherwise I'm going to have to stand up -- I

9    would like to remain seated during the opening

10   statement -- because there is no competent evidence

11   that that was the reason, the driver, for the

12   U.S./Libya settlement.

13          MR. EFRON:  We agree that there's no mention

14   of Lockerbie and Pan Am 103 and we don't intend to

15   mention it.  However, the joint exhibits, which we

16   agreed, to clearly talks about compensating American

17   citizens that are victims of Libyan terror.

18          MR. ARIAS-MARXUACH:  That's another thing

19   altogether.

20          THE COURT:  Okay, but there's been other

21   instances not only the Pan Am.  There's been the Lod

22   Airport Massacre, there's been other instances.

23          MR. EFRON:  So what we would say is

24   something to the effect that this, as well as other

25   incidents, have been -- that the purpose of the joint

1    exhibit is to show that the victims of terror caused

2    by Libya are to be compensated, without mentioning

3    Lockerbie or anything like that.  It doesn't mention

4    Lod either.

5              MR. ARIAS-MARXUACH:  That's fine.

6              THE COURT:  Okay.  Well, then let's take a

7    short five-minute recess or ten-minute recess.  Be

8    back here before 11:15.

9              And then, Mr. Efron, just an idea, how long

10   is your opening statement?

11             MR. EFRON:  Twenty to thirty minutes.

12             THE COURT:  And Mr. Arias?

13             MR. ARIAS-MARXUACH:  About the same, Your

14   Honor.

15             THE COURT:  Okay.  So then we'll deal with

16   those and then we might recess for lunch or I'll

17   hear -- we'll work on it after that.

18             MR. ARIAS-MARXUACH:  Your Honor.

19             MR. FREESE-SOUFFRONT:  Your Honor, the

20   matters related to the housekeeping matters as to the

21   order and presentation of evidence after the opening

22   statements?

23             THE COURT:  Well, let's do the openings and

24   once we're done with the openings we'll discuss these

25   before or after lunch.

1          MR. EFRON:  After.

2          MR. FREESE-SOUFFRONT:  Okay.

3          (Jury Trial recessed at 11:05 a.m. and

4     resumed at 11:28 a.m.)

5          (Jury enters the room.)

6          THE COURT:  Please be seated.

7          Good morning, again, Ladies and Gentlemen of

8     the Jury.  I am now going to read to you several

9     stipulations that the parties have reached in this

10    case.  Stipulations simply mean that the parties --

11    there is no dispute about these particular facts,

12    some of these are historic facts.  But you there's no

13    dispute, so you may consider all these facts as

14    evidence.  And they need not be questioned, you need

15    not weigh them one way or the other because they are

16    agreed upon by the parties.

17         So these are the joint stipulations, and

18    what I will do -- and the parties should remind me

19    when the case is ready for jury deliberations.  I

20    will photocopy these, these joint stipulations, and I

21    will give them to you so that you have them.

22         These are the stipulations in this case:

23    Number one, the Lod Airport Massacre -- and LOD is

24    spelled capital L-O-D, took place in the State of

25    Israel on May 30, 1972.  Japanese Red Army terrorists

1  opened fire on a group of Puerto Rican Americans,

2  pilgrims, killing and wounding many people.

3          Number two, Angel Berganzo-Colon and Antonio

4  Rodriguez-Morales were among those killed at the Lod

5  Airport Massacre.

6          Number three, the estate -- and in Spanish

7  estate is *sucesion* -- of Angel Berganzo-Colon is

8  comprised by Efrain Berganzo-Colon and Ruben

9  Berganzo-Colon.

10          Number four, the Estate of Antonio

11  Rodriguez-Morales is comprised by Noemi

12  Rodriguez-Robles, Eliezer Rodriguez-Robles, Angel

13  Rodriguez-Robles, and Ruth D. Rodriguez-Robles, as

14  well as Maria M. Rodriguez-Robles.

15          Number five, Mr. Joshua M. Ambush is an

16  attorney and member of the Maryland bar and maintains

17  an office in Baltimore, Maryland.

18          Number six, on April 21, 2006 Mr. Ambush

19  filed a case captioned Franqui, F-r-a-n-q-u-i, et

20  al., et al. means and others -- versus Syria,

21  S-y-r-i-a, et al.  This case is 06-734.  This will be

22  referred to by the parties as the Franqui complaint,

23  and that case was filed before the United States

24  District Court for the District of Columbia and it

25  sought damages for multiple wrongful deaths and

1  personal injuries arising out of the Lod Airport

2  Massacre.

3          Number seven, Mr. Ambush filed the Franqui

4  complaint on behalf of, among others, the Estate of

5  Angel Berganzo-Colon, Efrain Berganzo-Cruz, Ruben

6  Berganzo-Cruz, as well as the Estate of Antonio

7  Rodriguez-Morales, Noemi Rodriguez-Robles, Eliezer

8  Rodriguez-Robles, Maria Rodriguez-Robles, Angel

9  Rodriguez-Robles, and Ruth D. Rodriguez-Robles.

10          Number eight, The Great Socialist People

11  Libyan Arab Jamahiriya; that is, Libya, was a

12  defendant in the Franqui complaint.

13          Number nine, on July 31, 2008 the United

14  States Congress passed and on August 4, 2008 the

15  United States president -- that was President Bush

16  back then -- signed the Libyan Claims Resolution Act.

17  This is Public Law No. 110-301.

18          The purpose of this act or law, because it

19  came to -- it is a law, was to provide fair

20  compensation to all nationals of the United States,

21  including those nationals of the United States who

22  were from Puerto Rico, who had terrorism related

23  claim against Libya.  And this was through a

24  comprehensive settlement of claims pursuant to an

25  international agreement reached between the United

States and Libya.

Number ten, on August 14, 2008 the United
States and Libya executed a claims settlement
agreement.  On October 13 --

Eleven, on October 13, 2008 the United
States Secretary of State issued the certification
required under Section 5(a)(2) of the Libyan Claims
Resolution Act to the effect that the United States
had received funds from Libya sufficient to ensure
their compensation of claims of nationals of the
United States in cases pending on the date of the
enactment of said act.

Number twelve, on October 13, 2008 President
Bush issued an executive order regarding the
settlement of claims against Libya.  On
December 31 --

Number thirteen, on December 31, 2008 the
plaintiffs in the Franqui litigation voluntarily
dismissed their claims against Libya with prejudice
as a result of the Libyan Claims Resolution Act.

Number fourteen, on April 17, 2009, after
receipt of payment in Puerto Rico in the amount of
$7 million, Efrain Berganzo-Cruz, individually and as
authorized representative of the Estate of Angel
Berganzo-Colon, executed a document entitled

1   "Acknowledgment" before Notary Public Carlos

2   Gonzalez-Alonzo.  The acknowledgement was written in

3   Spanish and English.

4         Number fifteen, Efrain Berganzo-Cruz had a

5   power of attorney and was authorized to execute the

6   April 29, 2009 acknowledgment on Ruben Berganzo's

7   behalf.

8         Number sixteen, Noemi Rodriguez-Robles had a

9   power of attorney and was authorized to execute the

10   April 29, 2009 acknowledgment on behalf of Eliezer

11   Rodriguez-Robles, Maria Rodriguez-Robles, Angel

12   Rodriguez-Robles, and Ruth Rodriguez-Robles.

13         And these are the stipulation that the

14   parties have reached at this time.  You already know

15   the general nature of the claim, why we're here in

16   court, and now each party represented by counsel is

17   going to have an opportunity to tell you in their

18   opening statements what they understand their clients

19   will prove or what will not be proven in this case.

20         So beginning with Mr. Efron, you may

21   proceed.

22         MR. EFRON:  Yes, your Honor, may it please

23   the court.

24         THE COURT:  You may.

25         MR. EFRON:  First of all, Ladies and

1   Gentlemen of the Jury, thank you for serving on this

2   jury and helping the administration of justice in

3   this court.  We believe that this is a very clear

4   case.  It's an interesting case, and I will try to

5   make it as quickly and as efficient as possible for

6   you.

7           MR. ARIAS-MARXUACH:  Objection, Your Honor.

8   Move to strike.  Counsel cannot express his personal

9   opinion.

10          THE COURT:  Tell them what your

11  understanding will be proven.  That's it.

12          MR. EFRON:  As the court said, the facts in

13  this case originated almost 408 years ago.  It was an

14  act of terror.  It was not the first time that

15  American citizens were pointed out as victims of

16  terror.  It brings to mind that last week we

17  celebrated the 10th anniversary of 9/11 and really

18  ten years ago there was already a lot of terrorism.

19  It was the first time that it was done inside the

20  United States.  And, of course, with the magnitude

21  and the tremendous loss it became, you know, a very

22  big -- a very big event in the historic memory of

23  America.

24          But there's always been terrorism against

25  Americans.  They hate -- they hate our freedom, they

1    hate that we believe or choose to not believe

2    whatever we want.  And because -- because they feel

3    that we are not like them and we have freedoms,

4    they target American citizens as victims of terror.

5              MR. ARIAS-MARXUACH:  Objection, Your Honor.

6    This is irrelevant.  This case is not against the

7    states' sponsor of terrorism.

8              THE COURT:  You can discuss that in your

9    opening.

10             But, Mr. Efron, proceed with your opening

11   statements.

12             MR. EFRON:  My brother counsel is right.

13   This is not what this case is about now.  What this

14   case is about now is a lawyer's greed, greed and

15   deceit, and what he did to his former clients.  The

16   evidence in this case will prove, as you heard the

17   judge say, the facts leading to this case.

18             I'm proud to represent the two families

19   here.  Efrain Berganzo-Cruz, he's here representing

20   his brother Ruben as well, and they are the heirs of

21   their dad, Angel Berganzo, who did 39 and a half

22   years ago, almost 40 years ago at Lod Airport.  They

23   were -- you will hear that they were Christian

24   evangelical pilgrims going to the Holy Land.

25             And as well as the Estate of Antonio

1    Rodriguez, the person who has been empowered with

2    representing them is Dona Noemi right here, and her

3    brother Eliezer is here also.  There are three other

4    siblings that are part of the case, and their father

5    also died.

6            I'm proud to represent them because they're

7    honest, ethical, good human beings --

8            MR. ARIAS-MARXUACH:  Objection, Your Honor.

9    These are irrelevant assertions meant to produce --

10           THE COURT:  Rephrase.  Rephrase your

11   characterization.

12           MR. EFRON:  Yes, your Honor.

13           You will see from their testimony that

14   they're people from humble beginnings.  You will see

15   that they're from the north part of the island; Vega

16   Baja, Manati.  That will be their testimony.  And you

17   will hear them on this stand right here testifying in

18   front of you and you will be able to perceive that

19   they are not highly sophisticated or educated people.

20           Their testimony will show that they trusted

21   the lawyer that was representing them on behalf of

22   the American Center For Civil Justice.  This lawyer

23   at the time worked and was sent as an agent in 2002

24   by the Center to try get some kind of compensation

25   for the murder of their fathers.

1           That was in 2002.  The suit was not filed

2    until 2006.  They will testify that they never heard

3    from the lawyer again until December of 2008.  They

4    never heard what was happening to the case nor what

5    diplomatic negotiations were going on between Libya

6    and the United States.  They didn't know about the

7    compensation of U.S. citizens that were victims of

8    Libyan terrorism like themselves.  No information, no

9    communication, no contact from the lawyer for over

10   six years.

11          What happens in 2008?  You will -- when

12   you -- at the end of this case you will take certain

13   documents with you to deliberate.  These documents

14   will definitely be in because these are joint

15   exhibits that both sides agreed the jury should

16   examine, just as the judge earlier mentioned

17   stipulations that we both agree you should know.

18   These are documents that you will be able to see in

19   the jury room when the case is over.  And it shows

20   you -- it shows you and the way it's organized, what

21   happened in 2008.

22          Something must have happened where their

23   long-lost absent lawyer, who they hadn't heard from

24   in six years, shows up at the end of that year.  What

25   happened was in January -- you will see this

1   document, which is joint Exhibit 1, you will see an

2   act of Congress.  The United States Congress passed a

3   Libyan Claims Resolution Act pursuant to the

4   negotiations between the United States Department of

5   State and the Republic of Libya.

6          The next document, Document 2, takes us to

7   August of 2008.  In August of 2008 the United States

8   Department of State and the Republic of Libya -- I

9   don't want to -- I can't pronounce that long name

10  that the judge attempted to either -- and they signed

11  a claims settlement agreement based on the fact that

12  all lawsuits against Libya were to be dismissed.  So

13  Defendant Ambush knew that the case was going

14  nowhere; he was obligated to dismiss it.

15         This document was signed in Tripoli, Libya,

16  the capitol of Libya at the time.  Now we don't know

17  what the capitol will be with everything going on in

18  Libya, but that was what was signed in August

19  of 2008.

20         In October of 2008 Secretary of State -- and

21  you'll see this document also.  In October of 2008

22  Secretary of State Condoleezza Rice certified that

23  the Department of State had received 1.5 billion --

24  not million, billion dollars from Libya, and on that

25  same day President Bush signed the required executive

1   order, which you will also see with the president's

2   at the time signature.

3          On or about December 9 -- and on this you

4   will see both documentary evidence and testimonial

5   evidence.  On December 9 more or less, give or take a

6   day, the Center, the American Center For Civil

7   Justice dispenses of defendant's services.  By now

8   the case was going to be dismissed, they knew the

9   case wasn't going anywhere.

10         And they had an experienced litigator as

11  lead counsel, his name was Paul Gaston.  You will

12  hear this name throughout this case.  This defendant

13  had no trial experience, never been to court.  This

14  was a big case and he had recently graduated law

15  school just before he signed up these victims.  So

16  the Center saw no need to pay two lawyers on a dead

17  case.

18         You will hear testimony that plaintiffs had

19  no way, by the way, of knowing any of the above.

20  They had no way of knowing what was going on with

21  Congress, with the Department of State.  None of this

22  was public knowledge, none of this was in the news.

23  I don't know what they read, but it doesn't seem like

24  they had any knowledge or notice of what was going

25  on.  Their lawyer certainly didn't tell them.

1    And now that he was dismissed from the

2    Center, Defendant Ambush called his relative Leo

3    Garcia, who is an investigator, and asked Leo, who

4    speaks Spanish of course, to set up meetings for the

5    first time in over six years with families of the

6    victims that he was representing.  One of these

7    meetings included two families, the two families that

8    I'm representing today.  The two families met at Don

9    Efrain Berganzo's home in Manati on December 15,

10    2008.

11    The evidence will show and the testimony

12    will show that defendant came with his investigator,

13    Leo, and a lawyer from a -- a Puerto Rican lawyer, a

14    lawyer from here, that could notarize the documents.

15    He can't, he's not a lawyer here, doesn't speak

16    Spanish.  So he brought another lawyer who would

17    serve as a notary and notarize documents on the spot.

18    And I say "on the spot" because the clients

19    when they testify will say that they had no time to

20    think about it, they had no time to sleep on it, they

21    had no time to consult anybody, not even their

22    pillow.  And it was just -- the documents that they

23    had to sign and notarize were just crammed down their

24    throats for them to sign on the spot, by deceiving

25    them and not giving them the information that the

1 lawyer knew and threatening to withhold or delay

2 their compensation.  That's going to be the nature of

3 the testimony of the plaintiffs in this case.

4          Now this is part of what the judge said was

5 Dolo, which is fraud, intrinsic fraud.  Now, we will

6 prove this with a standard of clear, convincing

7 evidence.  Now, clear and convincing evidence is more

8 than what is normally required in a civil case,

9 because in a civil case it's normally burden of

10 proof.

11          The burden of proof is going to be the

12 preponderance of the evidence.  It's something more

13 likely than not, 51 percent to 49 percent, and that's

14 normally enough.  Because Dolo is a very serious

15 allegation and a very serious situation, the law

16 requires that we go a step beyond.  And I'm certain

17 that we will find with clear and convincing evidence

18 that Dolo was -- that fraud, this type of fraud, was

19 committed here.

20          Now, I also have to tell you that the clear

21 and convincing evidence is also not as high as in a

22 criminal case.  This is not beyond a reasonable

23 doubt.  It's higher than the normal civil standard

24 but nowhere near the beyond a reasonable doubt

25 standard that criminal cases have when you're -- when

1 one of the parties may lose their liberty.  So, and

2 you will hear testimony as to this.

3          You will see in Exhibits, I think it's 11 to

4 24 of the joint exhibits, that when the lawyer came

5 with his two other cronies to Don Efrain's house, you

6 will see that they came with forms that were prepared

7 for them to sign and be notarized.  All they had to

8 do was fill in their name and where they lived and

9 sign these documents in order for them to be

10 notarized.

11          These forms, as you will see in the

12 evidence, have the intention and the purpose of

13 revoking the power of attorney that was given to the

14 Center, to Defendant Ambush's employer, revoking

15 their power of attorney to represent them and

16 giving -- another document giving this authority to

17 Ambush, and giving him an additional 10 percent

18 compensation.  That's $1 million per claim because

19 that was compensated by Libya in the amount of

20 $10 million.  So 10 percent additional means that he

21 took $1 million from each family.

22          And these people were never told of the

23 claims settlement agreement nor that the money was

24 paid to the Department of State already, nor that the

25 case was over and he had nothing else to do, of

1    course except the motion to voluntarily dismiss the

2    case against Libya.

3            That's also an exhibit here.  I think it's

4    Exhibit -- bear with me for a second because this is

5    important.  It's going to be Exhibit 5.  And when you

6    see Exhibit 5 you will see that's what he did in the

7    case, other than request the Department of State to

8    pay these people.

9            And we will -- what the defendant did was

10   what in Puerto Rico we call *una emboscada,* an ambush.

11   If our clients know English, they would know better

12   than to -- they would be more careful with a guy

13   named Ambush.

14           We will prove --

15           MR. ARIAS-MARXUACH:  Your Honor, objection.

16   Irrelevant.  It's meant to inflame the passions and

17   prejudices of the jury.

18           THE COURT:  Sustained.

19           Continue.

20           MR. EFRON:  We will prove with testimony

21   from the witness stand, clear and convincing again,

22   that plaintiffs were deceived.  Our civil code calls

23   it dolo or fraud by the nondisclosure or

24   misrepresentation, and of course the threats that

25   they will testify to, of not collecting their

1  compensation.

2       Again, you will see from the witness stand

3  that these are not young, highly sophisticated

4  people.  You will see that when I ask them the extent

5  of their education.  You will see that from the way

6  they answer the questions.  And you will be able to

7  see what kind of people they are and I trust you will

8  see what I see.

9       Ambush took advantage of their trust and

10  their lack of sophistication or education and forced

11  them to -- induced them to sign those documents.

12       You'll hear also testimony from a

13  Dr. Michael Engelberg.  Dr. Engelberg is a principal

14  at the Center; he's one of the people who started the

15  Center.  And he is the person whose power of attorney

16  was revoked.  He has no interest in this case.  He

17  has graciously agreed to come to Puerto Rico at his

18  own expense to testify.

19       Although he has no interest other than to

20  help the plaintiffs be reimbursed what he believes

21  was stolen from them -- and he will so testify from

22  the stand -- this witness will explain how the Center

23  paid Ambush over the years hundreds of thousands of

24  dollars, and how the Center had already paid his fees

25  and expenses in this case on behalf of the

1    plaintiffs.  When the plaintiffs signed the original

2    document in 2002, the 20 percent that the Center was

3    going to get, including all legal fees and expenses,

4    those were reimbursed to Defendant Ambush in this

5    case.

6              And, of course, you will also hear from

7    Defendant Ambush himself who will try to convince you

8    that he did nothing wrong and that he earned the

9    $2 million from these two families in just a few days

10   of work.

11             There are two issues here:  Liability and

12   damages.  The liability is how you apply the law, as

13   the judge will instruct you what the law is.  I think

14   that after hearing the evidence you'll know what to

15   do.  If you find liability, the responsibility -- if

16   you find liability the responsibility is the other

17   issue, damages.  There are two types of damages here.

18             That's not -- also not difficult.  Ambush

19   admits that he took $2 million.  That's one part of

20   the damages.  You may add to that plaintiffs' other

21   damages; the morale damages and the suffering that

22   they went through.  You will hear that testimony.

23             MR. ARIAS-MARXUACH:  Objection, Your Honor.

24   May we approach?

25             THE COURT:  Okay.  Let's --

1           MR. EFRON:  I'll go on to the next issue.

2           THE COURT:  Go on to the next issue.  Jury

3     is in the courtroom.  I will give specific damages

4     instructions at the end of the case, if you should

5     find for plaintiffs.

6           MR. EFRON:  In closing, I'd like to tell you

7     that I hope and I believe, I truly believe --

8           MR. ARIAS-MARXUACH:  Objection, Your Honor.

9     He may not state his personal opinion.

10          THE COURT:  Granted.

11          Rephrase.

12          MR. EFRON:  Okay, Your Honor.

13          You will hear testimony from the plaintiffs

14    that one of the reasons they trusted the lawyer was

15    because they believe most lawyers are honest.  And

16    there's 99 percent of lawyers are honest and work

17    hard on behalf of their client and this is what earns

18    us their trust and even creates a legal privilege in

19    the law.  But Defendant Ambush abused this trust and

20    took advantage of these families.  He's one of those

21    lawyers that gives us a bad name.

22          Thank you for your attention.  I did my

23    duty, I now leave you to do yours.  Thank you very

24    much.

25          THE COURT:  Mr. Arias or Mr. Freese.

1     MR. ARIAS-MARXUACH:  Good morning, Ladies
2  and Gentlemen of the Jury.  The central question that
3  you have to answer in this case is whether two
4  retainer agreements signed on December 15, 2008 by
5  members of the Rodriguez-Robles and Berganzo families
6  are valid.  And the evidence will show that the
7  answer to our question is yes.
8        The members of the Rodriguez-Robles and
9  Berganzo families signed these agreements when Joshua
10  Ambush came to Puerto Rico on December 15, 2008 and
11  explained his predicament.
12        What was Mr. Ambush's predicament?  He had
13  been working on their behalf for several years in
14  litigation before the United States District Court
15  for the District of Columbia since 2006, preparing
16  the case that became that litigation before the
17  District of Columbia since 2001.  So he had been
18  working for them for years when he came in December
19  of 2008 to explain his predicament.
20        And the evidence will show that Mr. Ambush's
21  predicament was that after seven years of hard work
22  the entity that had obligated itself to pay for the
23  attorney's fees and other expenses necessary to bring
24  the claims of these members of the Berganzo and
25  Rodriguez-Robles families against the state sponsors

1    of terrorism had reneged, had gone back on its

2    promise to pay Mr. Ambush substantial compensation if

3    the case was successful.

4            And as of December 15 of 2008 the case

5    indeed was going to be successful.  As of December 15

6    of 2008, the case was poised, was on the brink of

7    producing $10 million for each of these families.

8    And Mr. Ambush told them that was the case, a case

9    that they could participate because Mr. Ambush had

10   brought this lawsuit before the District of Columbia

11   claiming that Libya was one of the promoters of the

12   Lod Airport Attack.

13           Because Mr. Ambush brought that complaint, a

14   44-page complaint where -- he is the attorney, his

15   law firm is the only law firm that defended that case

16   for two years.  Because it brought that case and he

17   pinned Libya, he pinned the responsibility for

18   promoting the Lod Airport Massacre on Libya, then

19   their claims qualified for the Libyan claims

20   agreement.

21           So when they signed that document they knew

22   that 10 million was coming their way.  And they knew

23   that the reason that Mr. Ambush was asking for

24   compensation was because the Center, who in 2002 had

25   promised to them to advance the expenses necessary to

1    litigate their claims, had reneged on their promise.

2          You will have the opportunity to review

3    those retainer agreements; they're one per family.

4    Those agreements are in English and Spanish.  And a

5    retainer agreement is simply a document where an

6    attorney says, I will provide you these services and

7    you will pay me this money.  That's all -- as simple

8    as a retainer agreement can be.

9          So he explained his predicament, he

10   explained that $10 million could be coming their way.

11   He presented them the retainer in English and

12   Spanish.  There was a notary public in the room and

13   other attorneys.  They asked questions, they had the

14   opportunity to read the document, and they signed it.

15          Now to understand how Mr. Ambush came to be

16   in that position of working on a case for seven years

17   and having to come to Puerto Rico to beg his clients

18   to pay him, we have to go back to 2001.  In 2001

19   Joshua Ambush was a relatively recent law graduate,

20   but he had already identified since law school an

21   interest in pursuing cases that dealt with

22   International Law.  And he had already worked as a

23   law student on cases that dealt with International

24   Law but, more specifically, the subject matter of the

25   Franqui v. Syria case in the District of Columbia,

cases on behalf of victims of terrorism so that
governments that promote terrorism compensate those
victims.  So he already had that interest and he was
thinking of what case he could bring.

And the evidence will show that Joshua
Ambush had a preexisting connection to Puerto Rico.
His mother is half Puerto Rican and Joshua lived here
in 1972 went the Lod Airport Massacre attack
occurred.  So as he was looking for a terrorism
attack that he could build that case around, he
settled upon the Lod Airport Massacre.

Now, he was a relatively recent law graduate
building his law practice, like anyone else who is
starting out, so he knew that he needed resources to
bring these claims about.  And there is an entity
called the American Center For Civil Justice.  Its
principals are two persons:  Rabbi Eliezer Perr and
Dr. Michael Engelberg.  Mr. Ambush knew Rabbi Perr
since childhood.  And Mr. Perr gave Mr. Ambush his
first job in Mr. Ambush's first career, which was a
special education teacher.

So naturally and moreover, as Mr. Ambush was
building his law practice, he did collaborate with
the Center on cases involving terrorism because that
is one of the addresses of activity that the Center

1  pursues.  But he was building his own private

2  practice, working with another law firm, building his

3  own law firm.  He collaborated in their center, but

4  the evidence will show that he was not the Center's

5  employee.  He simply, like many others have, had

6  relationships that are long-going with certain

7  clients or certain organizations.  He had an ongoing

8  collaboration with the Center.

9          So when in 2001 Mr. Ambush settles upon the

10  Lod Airport Massacre as an incident around which to

11  build the case, he brings the idea to Rabbi Perr --

12  Rabbi Perr, again, long standing relationship, a

13  friend of Mr. Ambush's father.  And he asked Mr. Perr

14  whether they would promote a case or sponsor a case

15  arising out of the Lod Massacre matter, and the Rabbi

16  said yes.

17          Mr. Ambush then came to Puerto Rico, he met

18  with the Reverend Jose Vega-Franqui in 2001.  And who

19  is the Reverend Jose Vega-Franqui?  Jose Vega-Franqui

20  is a minister of a protestant faith who indeed was

21  one of the organizers who was escorting those Puerto

22  Rican American pilgrims to the Holy Land on a

23  pilgrimage when unfortunately just when they were

24  getting their luggage they suffered this hideous

25  attack.

1            And Mr. Ambush met with Reverend

2   Vega-Franqui, with his current wife, and he also met

3   with members of another family -- they're not here in

4   this case -- the Padillas.  The Padillas also lost a

5   loved one at Lod.  Mr. Vega-Franqui actually had been

6   very involved in the attack or affected by the attack

7   because he was personally injured, he lost his first

8   wife.  And his current wife, the lady that met with

9   Mr. Ambush and Vega-Franqui that summer, had been

10  injured.  She was a young pilgrim as well.

11           So when Mr. Ambush met with the

12  Vega-Franquis and the Padillas they signed a claimant

13  center agreement that Mr. Perr, Rabbi Perr, gave

14  Mr. Ambush to bring to Puerto Rico.  And that

15  document -- you're going to see in evidence the

16  claimant center agreement for the Berganzo family and

17  the Rodriguez family, that document obligated the

18  Center to -- to sponsor the litigation as I have

19  said:  Pay the attorney fees, pay the expenses.  And

20  in exchange, because the Center's not doing this for

21  free, the Center will take 20 percent of whatever the

22  claimant's would recover.

23           Now, having identified Vega-Franqui, because

24  the evidence will show it was Joshua Ambush who

25  selected the Lod Airport Massacre to build the case

1    around, it was Joshua Ambush who found these

2    claimants that became plaintiffs in the Franqui case.

3    He went back to the States, continued developing his

4    theories about who to sue and who else to bring on

5    board, who else was damaged by the Lod Airport

6    Massacre.  And that's how he came across the

7    Berganzos and the Rodriguez-Robleses.

8        And in the summer of 2002, Leo Garcia, who

9    is Mr. Ambush's cousin on his mother's side, because

10   Leopoldo is Leopoldo Garcia-Viera, and Joshua

11   Ambush's mother is Sarah Borski-Viera, well, cousin

12   Leo went and presented the Berganzos and the

13   Rodriguez-Robleses with claimant and center

14   agreements.  So in the summer of 2002, they signed

15   claimant and center agreements and so they signed up

16   for the case.

17       Now, the Franqui case, the complaint that

18   Mr. Ambush filed in 2006 in the United States

19   District Court for the District of Columbia is a

20   44-page complaint listing all the injured individuals

21   that were Mr. Ambush's clients, listing the foreign

22   governments that Mr. Ambush was charging promoted

23   this horrific attack, and the agents of those

24   governments that collaborated in the attack.

25       You might ask yourself, if Mr. Ambush signed

1  Vega-Franquis in 2001 and if Mr. Ambush signed the

2  Berganzos through Leo Garcia -- or the Center signed

3  the Berganzos and Rodriguez-Robleses in 2002, why did

4  it take four years to file the Franqui complaint in

5  the United States District Court for the District of

6  Columbia?

7          It is called the Franqui complaint because

8  if it were here in Puerto Rico it would have said the

9  Vega complaint or the Vega-Franqui complaint, but you

10 know how the English speakers switch the last names.

11         But anyway four years elapsed.  Why did four

12 years elapse?  Because the Center's going back on the

13 promise to pay Mr. Ambush as they did in 2008 was not

14 the first time that the Center went back on a

15 promise.

16         Mr. Ambush, the evidence will show, again,

17 knew that if you were going after a foreign

18 government who promoted terrorism, then that

19 government or governments could bring in law firms

20 with substantial resources to defend that lawsuit.

21 In other words, if you sue a state sponsor of

22 terrorism, a foreign government who sponsors

23 terrorism, they're not going to simply say, okay,

24 where do I pay up.  They're going to defend the case.

25         And the Center had undertaken, as requested

1   by Mr. Ambush and as the Center had done in other

2   terrorism cases, to bring in a major U.S. law firm to

3   collaborate on the case.  And the evidence will show

4   that there's a big U.S. law firm by the name of

5   Covington & Burling, and the Center tried to bring

6   Covington & Burling on board and it took two years

7   for Covington & Burling to say, no, I don't want this

8   case.  And that is how Joshua Ambush ends up being

9   the lonely Don Quixote who sues the government of

10  Syria and the government of Libya on behalf of this

11  family and other families of Puerto Ricans who were

12  injured or killed at Lod.

13         Another reason for the delay is that

14  attorneys have ethical obligations, and attorneys who

15  take ethical obligations seriously have to research

16  their cases.  They have to research their cases as to

17  the facts and as to the law.  You cannot simply say,

18  Oh, I'm a recent law graduate, I'll file a complaint

19  and let's see how it goes.  That would be a gross

20  violation of ethical duties.

21         So part of the delay was also that

22  Mr. Ambush had to do his homework.  He had to go to

23  the National Archives in Washington, D.C. and dig up

24  documentation on the Lod Airport Massacre, on the

25  victims, on how he was going to connect Libya and

1  Syria to this attack, and that was part of the delay.

2  So in any event, in 2006 here comes Don Quixote,

3  Mr. Ambush, to charge Libya and Syria.

4        Now, why 2006?  Why am I mentioning 2006,

5  apart from the fact that there is some delay

6  attributable to Covington & Burling and some delay to

7  simply getting the job done -- and we have to

8  remember that Joshua Ambush was working other cases

9  at that time, so it was a challenging endeavor, and a

10  lot of homework, a lot of sitting down in a library

11  getting documents together.

12        Well, 2006 has an independent significance.

13  There's a concept in the law called a statute of

14  limitations.  And the statute of limitations is

15  simply a law that says if you want to bring X type of

16  claim, you have to do it by a certain date; because

17  if not, your client, the plaintiff, in whatever case

18  it maybe, is out of luck.  The court is going to say,

19  Hmm, you had ten years and you came here year in

20  2011.  That's pretty easy.  Throw this case away.

21        So on the case that became the Franqui v.

22  Syria case, the clock was ticking.  The clock was

23  ticking because the special federal law that allows

24  these suits, suits against state sponsors of

25  terrorism, had a ten-year statute of limitations

1    which Mr. Ambush understood -- and the evidence will

2    show this and was later confirmed and clarified.

3    Mr. Ambush understood that that was a ten-year

4    statute of limitations and that he had to be in court

5    by 2006 or these clients, their claims would be out

6    of luck.  It would be dismissed as untimely.  And so

7    with no major law firm to help him in this endeavor,

8    Joshua Ambush was the sole attorney who filed the

9    case in 2006.

10           Now, you file a complaint and that doesn't

11   mean that the case is over.  The evidence will show

12   that for two years Mr. Ambush was the lawyer and sole

13   lawyer, defending the -- you know, prosecuting,

14   bringing -- moving that case forward on behalf of the

15   plaintiffs in that case, which were members of the

16   Vega-Franqui family, members of the Berganzos,

17   members of the Rodriguez-Robleses, members of the

18   Padillas and others.

19           And once you file the complaint you have to

20   bring the defendant into court.  And bringing a

21   foreign defendant, a foreign government, into trial

22   court in the U.S. is a complicated endeavor.  You

23   have to translate that 44-page complaint into Arabic

24   and into Farsi, which are the languages at issue

25   here, and find a way in the law that allows you to

1  get those documents over to a foreign government and

2  that they cannot say no, no, no, this is

3  insufficient, I will not accept this notice.  So once

4  the case got filed, the first order of business is

5  bring those defendants into court.

6          Again, defendants foreign governments with a

7  lot of money don't roll over and die, they defend

8  their cases.  Libya entered an appearance on the case

9  when Mr. Ambush finally brought them into court.  And

10  they hired a big law firm.  A big law firm was not

11  available to help these people, but a big law firm

12  was available to help Libya.  Libya hired a law firm

13  called Eckert Seamans, which has offices throughout

14  several states in the U.S., and that was the law firm

15  that defended the case, the Franqui case, against

16  Mr. Ambush and against these families.  And

17  Mr. Ambush faced lawyers from two offices in two

18  separate states in the Franqui case.

19          Now, Libya filed a motion to dismiss -- a

20  first motion to dismiss.  A motion to dismiss is

21  simply a petition by the defendant claiming, this

22  case is frivolous, I shouldn't be forced to spend any

23  more money.  Your Honor, please throw this case out

24  of court.  So Mr. Ambush had to defend the first

25  motion to dismiss to keep that case alive.

1         Then came a second motion to dismiss after

2 Mr. Ambush amended the complaint and filed another

3 44-page complaint *solito*, alone, and he had to defend

4 that motion to dismiss. He understood that this was

5 a significant challenge. And he finally prevailed

6 upon the Center to bring another lawyer on board and

7 the Center, they brought Paul Gaston, who Mr. Ambush

8 knew and said, Well, why don't we bring Mr. Paul

9 Gaston on board? Mr. Ambush and Gaston were to

10 oppose that motion to dismiss. And they were, what

11 lawyers call, briefing; they were briefing the motion

12 to dismiss, which is simply a fancy word for saying

13 they were writing their arguments on paper and

14 submitting them to the Court. So Libya and the

15 plaintiffs, represented by Mr. Ambush and Mr. Gaston,

16 were locked in that battle.

17         As luck would have it, as luck would have it

18 for the families injured by the Lod Airport

19 Massacre -- for the Center, because the Center

20 collected 4 million out of these families' award.

21 These families got 20 million total and the Center

22 took 4 million. And for Mr. Ambush, yes, because

23 they signed the retainer agreements and he was able

24 to collect. While that second motion to dismiss was

25 pending, the United States and Libya entered into a

1    claims settlement agreement.  And it is in evidence.

2          Now, the evidence will show that plaintiffs

3    were able to profit from the U.S./Libya settlement

4    agreement because they had the Franqui case pending,

5    because the Franqui case was a case against Libya and

6    Syria for promoting terrorism.  And the whole point

7    of the U.S./Libya settlement agreement was to have

8    those cases dismissed in favor of administrative

9    proceedings where the former plaintiffs, now

10   administrative claimants, could claim compensation.

11   Now, when Mr. Ambush came to Puerto Rico on December

12   15, 2008 he knew that the case, the best outcome for

13   his clients was to dismiss the case in favor of the

14   administrative proceedings.

15         Now, going back to his predicament.  The

16   predicament is that once the settlement agreement was

17   reached the Center woke up.  The Center, the entity

18   that didn't get a major law firm to work on the case,

19   that only brought Mr. Gaston in after two years of

20   litigation, the Center, the entity that said that it

21   would foot all the expenses for the Franqui

22   litigation, woke up and said, Mr. Ambush, give your

23   file to Paul Gaston, we don't need you anymore.  And

24   by the way, Rabbi Perr's promises throughout the

25   years that you will be substantially compensated for

1    your work in this case, those promises, forget about

2    them.  You have an ultimatum, take this minimal

3    amount we're willing to offer compared to the

4    settlement reached for all the plaintiffs or take

5    nothing.

6          And that was when Mr. Ambush said, They're

7    throwing me out of the case, they don't want to pay

8    me, what can I do?  I can go to my clients, explain

9    to them what I've been doing for them for seven

10   years, explain to them what I can still do for them

11   and see if they will pay me.  And that is what Joshua

12   Ambush did.

13         Now, the evidence will show that the

14   U.S./Libya claims settlement indeed, it was a

15   momentous development.  Because it turned this case

16   that was this uphill battle that Mr. Ambush started

17   into a case that could be dismissed in favor of an

18   administrative claim.  And we're going to talk about

19   that now.

20         The second -- and the evidence will show

21   that there was substantial work to be done after they

22   signed the retainer agreement.  One of the issues you

23   have to decide in this case, and we have talked about

24   the first issue, is whether the retainer agreements

25   were valid.  And the evidence will show that the

retainer agreements were valid because they knew that

Mr. Ambush had worked for them, that he was at risk

of not being paid, and that they were in line to get

10 million from the Libyan claims settlement if they

submitted their administrative claims and dismissed

the Franqui case.

Now, the second question you're going to

have to decide in this case is whether Mr. Ambush

breached any of his obligations, *no cumplio* with his

obligations under those retainer agreements. And

those retainer agreements, again, they were meant to

compensate him for the work that he had done for

seven years -- and they say so in writing -- and they

were meant to compensate him for the work that

remained to be done.

And in terms of the work that remained to be

done, Mr. Ambush undertook two obligations: First,

to prosecute the administrative claim and second to,

once he received the money, distribute it according

to the claimant and center agreement and, yes, the

retainer agreement. And that is exactly what

Mr. Ambush did.

Between December of 2008 and December

of 2009, Mr. Ambush had submitted documentation to

the U.S. Department of State to prove that these

1    persons were indeed the members of the Rodriguez and

2    Berganzo families that we have here and were indeed

3    the heirs, *los herederos*, of the persons killed at

4    Lod.  As you can imagine, the government is not going

5    to hand out a million dollars to someone who cannot

6    prove that they are who they should be.

7            And the second thing that Mr. Ambush had to

8    do was assure the government that these were indeed

9    the heirs of two persons killed at Lod, killed in

10   1972, was to assure the U.S. Department of State that

11   they could issue a release.

12           Now, what's a release?  A release is a

13   document where a claimant or a plaintiff says, If you

14   give me the money that we have agreed to in the

15   settlement agreement, I will not sue you again for

16   the claims that are the subject of the agreement.

17           And Mr. Ambush had to prepare, and costly

18   prepare, the legal documents necessary to assure the

19   U.S. Department of State that they were in a position

20   to grant that release.  Because if they did not put

21   themselves in a position to grant that release

22   quickly, then they would not collect until they could

23   give that assurance to the government.  So between

24   December of 2008 and March of 2009, Mr. Ambush was

25   gathering and presenting that documentation.

1        In April the money came in.  And Mr. Ambush

2   then complied with his second obligation under the

3   retainer agreement.  He received the money, he wired

4   7 million to an account opened by Efrain Berganzo.

5   He wired $7 million to an account opened by Noemi

6   Rodriguez-Robles.  So we have to account for 10

7   million per family; what happened to that?  Two

8   million from the 10 million awarded to the Berganzo

9   family was sent to the Center and a little bit of

10  that 2 million was sent to the court in

11  Washington, D.C.

12       Why?  Because by that time the Center was

13  suing, and to this day is suing, Mr. Ambush.  So when

14  you listen to the testimony of Dr. Engelberg, you

15  have to take that into account.

16       Now, so Mr. Ambush took the 2 million due to

17  the Center and distributed it according to the

18  claimant and center agreement.  He fulfilled his

19  obligation to the Center and to the Court, because if

20  you're under a court order, you have to do what the

21  Court tells you.

22       Same thing with the Rodriguez-Robles family.

23  A portion of the 2 million due to the Center from the

24  Rodriguez-Robles award was paid into court and the

25  rest paid to the Center.  So the Center was paid

1 except for that part that the court controls. And,

2 yes, Mr. Ambush took his 10 percent.

3            Now, having done those distributions both

4 Efrain Berganzo and Noemi Rodriguez-Robles, as the

5 state representatives and representatives of their

6 siblings, *sus hermanos y hermanas*, signed a document

7 called an acknowledgment. And that is a document

8 where it says, Ambush has distributed the money in

9 this fashion, I agree and, by the way, I recognize

10 that I have a right to consult an independent

11 attorney. I have been advised of that. And they

12 signed that before another notary public in Puerto

13 Rico.

14            Now, this should have been a very

15 satisfactory ending for everyone. The plaintiffs got

16 $7 million per family, the Center got their sums due

17 under the claimant and center agreement, and

18 Mr. Ambush was compensated for seven years of work.

19 But the evidence will show that this outcome, this

20 outcome that was there in April of 2009, was not good

21 enough for the Center.

22            In November of 2009 the Center caused an

23 attorney by the name of Javier Lopez-Perez to publish

24 in *El Nuevo Dia* provocative ads claiming that a

25 lawyer from Maryland had deceived and taken advantage

1    of Lod Airport Massacre victims.  But that's not all

2    he did.  He gave an interview to *El Nuevo Dia* and

3    there he defamed Mr. Ambush and said that Mr. Ambush

4    had stolen from these people.

5           Now, intrigued -- because I imagine it's a

6    natural reaction.  Intrigued by those ads, intrigued

7    by that article, members of the Berganzo and

8    Rodriguez family met with Javier Lopez-Perez and this

9    case followed.  They met with Javier Lopez-Perez and

10   they didn't give Mr. Ambush, the lawyer who had

11   worked on their behalf for seven years and had gotten

12   them $10 million gross, 7 million net per family, the

13   chance to explain his side of the story.  And this

14   lawsuit ensued and that's why we're here today.

15          Now, a word that will proceed here.  You are

16   the sole judges of the facts.  And you have noticed

17   and you have been told by the Court, and Mr. Efron

18   has reminded you, that plaintiffs have the burden of

19   proof.  But because they have the burden of proof,

20   they have a certain advantage; they get to go first.

21          And so I will ask you that you give my

22   client the chance to heard and that you keep an open

23   mind throughout the proceedings so that you allow my

24   client the opportunity to be heard, to give his

25   testimony and present his evidence.

1    In sum, the evidence will show that the

2    members of the Berganzo and Rodriguez-Robles family

3    were given the facts that they needed to make a

4    decision on whether to compensate Mr. Ambush.  They

5    were explained what the retainer agreement meant.

6    They had the opportunity to present questions.  They

7    had a Puerto Rican attorney in the room, a notary

8    public -- because in Puerto Rico in the States.  In

9    the States a corporation can have a lot of its staff

10   be notaries for any affidavit they may need.  In

11   Puerto Rico you have to be a lawyer to be a notary

12   public.  So when they signed on November 15 -- I

13   mean, on December 15, 2008, they had another attorney

14   in the room.  And if they didn't like what Mr. Ambush

15   had to say, they simply could have said no.  But

16   knowing that $10 million was coming their way if they

17   continued, they chose to say yes.

18   I do want to address before I conclude the

19   issue of what the Center may or may not have paid

20   Mr. Ambush.  The evidence will show that Mr. Ambush

21   was an independent attorney working on the case.  And

22   there is not in evidence, and there will not be in

23   evidence, an accounting where the Center can tell you

24   we paid Ambush X amount of dollars to the dime on any

25   given case.

1      He had many cases with the Center that they

2  collaborated and, yes, they gave him money.  But they

3  will not show you, because it's not in evidence, an

4  accounting saying that we paid Ambush X for Franqui

5  v. Syria; and they cannot show you an accounting

6  saying we spent this amount of money on Franqui v.

7  Syria.

8      And, in fact, since we're talking about the

9  Center, plaintiffs never met Michael Engelberg.

10  Plaintiffs never met Rabbi Perr.  The only person

11  that was working in the trenches for them was Joshua

12  Ambush.

13      So to wrap up, we sustain that the evidence

14  will show that the retainer agreements are valid,

15  that Mr. Ambush complied with all of his obligations.

16  And we will ask you to return a verdict at the close

17  of the case for Joshua Ambush.

18      I thank you for your attention.  My name is

19  Raul Arias.  The gentleman with the striped blue tie

20  is Attorney Freese, and gentleman with the burgundy

21  tie is Joshua Ambush.  Again, thank you for your

22  attention and for your jury service.

23      THE COURT:  Thank you, Ladies and Gentlemen

24  of the Jury.

25      Thank you Mr. Arias, first of all, and Mr.

1    Efron for your opening statements.  We will now

2    recess for lunch.  It's 12:30.  Please be back in the

3    jury room at 1:30.  I have to discuss certain things

4    with counsel so we may come back to court a little

5    after 1:30, but if I haven't called you in it's for

6    attorneys to resolve some matters so that the case

7    will expedite in presentation.

8          So remember my instructions:  Do not discuss

9    this is case.  Continue to keep an open mind and

10   remember that opening arguments, they're only

11   arguments of counsel, they are not evidence, it's

12   just presentation of what each attorney understands

13   will be proven or not proven on behalf of his

14   representative clients.  So you're excused.  Thank

15   you very much.

16          THE COURT OFFICER:  All rise.

17          (Jury exits the room.)

18          (Excerpt of jury trial ends at 12:30 p.m.)

19                        ---

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT    )

2              OF                     )ss.

3         PUERTO RICO                 )

4

5

6

7                        CERTIFICATE

8

9

10        I, EVILYS E. BRATHWAITE, hereby certify that

11   the proceedings and evidence are contained fully and

12   accurately, to the best of my ability, in the notes

13   recorded stenographically by me, at the jury trial in

14   the above matter; and that the foregoing is a true

15   and accurate transcript of the same.

16

17                    _____/s/ Evilys E. Brathwaite____

18                    EVILYS E. BRATHWAITE, RPR
                      Official Court Reporter
19                    United States District Court
                      Federal Building, Room 200
20                    San Juan, Puerto Rico 00918
                      787-772-3377
21

22

23

24

25