IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

:_____:

THE ESTATE OF ANGEL BERGANZO COLON        :
represented by Efrain and Ruben Berganzo;
THE ESTATE OF ANTONIO RODRIGUEZ MORALES    :
represented by Noemi Rodriguez Robles,
Eliezer Rodriguez Robles, Angel M.         :
Rodriguez Robles, Maria M. Rodriguez
Robles and Ruth D. Rodriguez Robles,       :

            Plaintiffs,          :    CIVIL NO:
                                      10-1044 (GAG)(MEL)
        vs.                      :

JOSHUA M. AMBUSH                  :
            Defendant.
:_____:

DAY 7 OF THE JURY TRIAL
HELD BEFORE
THE HONORABLE GUSTAVO A. GELPI
Tuesday, October 4, 2011, beginning at 10:18 p.m.

:_____:

A P P E A R A N C E S:

            LAW OFFICES OF DAVID EFRON
            BY DAVID EFRON, ESQUIRE and
            BY JOANNE V. GONZALES-VARON, ESQUIRE
            P.O. Box 29314
            San Juan, Puerto Rico 00929
            For the Plaintiffs

            McCONNELL VALDES, LLC
            BY RAUL M. ARIAS-MARXUACH, ESQUIRE and
            BY HENRY O. FREESE-SOUFFRONT, ESQUIRE
            270 Munoz Rivera Avenue
            P.O. Box 364225
            San Juan, Puerto Rico 00936
            For the Defendant

ALSO PRESENT:
            Deputy Clerk Carlos J. Rodriguez

1

<u>INDEX TO PROCEEDINGS</u>

2
                                                              <u>PAGE</u>

3   Jury Instructions................................1,002

4   Joint Stipulations of Facts Recited to Jury......1,040

5   Verdict..........................................1,120

6

7   <u>CLOSING ARGUMENTS</u>                                    <u>PAGE</u>

8       By Mr. Efron..........................1,044; 1,110

9       By Mr. Arias-Marxuach.........................1,080

10

11                          ---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE BAILIFF:  All rise.

2          THE COURT:  Please be seated and let's call

3     the case.  We'll bring the jury.

4          THE DEPUTY CLERK:  The Estate of Angel

5     Berganzo-Colon versus Joshua M. Ambush.  Civil Case,

6     10-1044.  Proceedings, further jury trial.

7          On behalf of plaintiffs, Attorney David

8     Efron.  On behalf of the defendant, Attorneys Henry

9     Freese and Raul Arias-Marxuach.

10         THE COURT:  Good morning, Counsel.

11    Yesterday, just for the record, we discussed -- and

12    the parties were able to lodge their objections to

13    the Court's jury instruction package, the ones that

14    the Court would read to the jury.  They've been filed

15    for the record and those are the ones that I'm going

16    to be reading to the jury.

17         There is one additional instruction that

18    defendants proposed pertaining to damages for moral

19    suffering and that is what I have allowed to ask

20    Mr. Efron to ask from the jury.

21         Mr. Efron, have you reviewed that

22    instruction and, if so, are there any objections?

23         MR. EFRON:  Yes, your Honor.  The

24    instruction is inapplicable because that is not the

25    law.  The four cases which I was able to dig up last

1  night -- two of the cases, two of the cases, 80

2  D.T.R. and 91 D.T.R. are cases that are inheritance

3  cases.  There's nothing absolutely to do with this.

4  It's basically who inherits from who.  That's not the

5  case here.  These cases -- I don't know what they

6  were thinking when they cited them.  The other two

7  cases are also not applicable because, although it

8  does have language about how it has to be more than a

9  passing affliction, these cases refer to normal

10  negligence damage cases, not dolo cases.  These are

11  not under Section 3018, which are damages for dolo.

12  These are the damages under 5141, Article 1802.

13  Therefore --

14       THE COURT:  That would be an analogy because

15  there is no dolo instruction as to --

16       MR. EFRON:  Precisely.  Precisely.  Which is

17  my next point.  You know, in this case -- in the

18  other two cases there were Section 5141 cases that

19  occurred to other people.  It occurred to, you know,

20  somebody's aunt or somebody's sister, how that person

21  felt when her niece died and then they would quote

22  her testimony.  And that's something that didn't

23  happen to them directly.

24       In some states, for example in Florida, when

25  there's an impact rule, those plaintiffs would not

1    have even been able to have a claim.  In Puerto Rico

2    it's different, but this case is different.  In this

3    case these plaintiffs that are here suffered directly

4    the affect of the damage.  These are not cases

5    where -- it's almost like there's a higher --

6         THE COURT:  They were plaintiffs who said I

7    felt like garbage, I felt terrible, I felt cheated.

8    There were others that said, I felt really bad.  And

9    that is something for the jury to determine.

10         MR. EFRON:  And that's something for the

11   jury to determine, but it was for them personally.

12   Of course they lost their fathers -- that was not

13   this case, that case was settled.  In this particular

14   case they're not here claiming --

15         THE COURT:  They could get a verdict for

16   dolo, but in order to get those additional damages --

17   because you cannot just go to the jury and say, Well,

18   you know, just award them whatever you understand

19   they should be awarded.  You should have an

20   opportunity to say, you know, my client, for

21   example -- Mr. Berganzo, for example, told you how

22   cheated and how terrible he felt.  You know, and

23   Mr. Arias should be entitled to say, Well, this other

24   plaintiff, for example, did not -- basically said he

25   just felt bad and you should be able to argue that to

1  the jury because it's the jury who is going to

2  compensate them.

3       MR. EFRON:  Yes, your Honor but the cases

4  that were cited cases are cases where it's almost

5  like if there was a higher standard to show that it

6  was more than a passing affliction because it didn't

7  happen to them directly -- it was a relative or

8  somebody that they were claiming on behalf of

9  somebody else.  Over here they suffered the pain

10  themselves.  And Your Honor more than sufficiently

11  explained it already in the -- there's an instruction

12  to that effect.  Your Honor has an instruction to

13  that effect.  Here we go -- you know, we don't want

14  to, again, try to over instruct the jury on

15  something.  Your Honor, has an appropriate

16  instruction to that.  That's the one that's used in

17  every case and I don't see why --

18       THE COURT:  What instruction would that be?

19  That would be the damages instruction?

20       MR. EFRON:  Yes, your Honor, at the end.

21       THE COURT:  Okay.  That's Instruction 31 and

22  I now have them.  So I think it's important, I think

23  Mr. Arias does have a point that, again, just a mere

24  passing sorrow -- if somebody testifies, I felt like

25  garbage for a minute and, you know, that could be

1   compensated perhaps a nominal amount.  But, again,

2   that's something that the parties should be able

3   to -- but I think --

4          MR. EFRON:  I don't think he has a point.

5   Has an argument, but he has no case law to support it

6   because the case law he brings in are cases where the

7   plaintiff was not directly affected.

8          THE COURT:  But it could have been a son, a

9   father, a brother.

10         MR. ARIAS-MARXUACH:  May I be heard?

11         THE COURT:  Okay, Mr. Arias?

12         MR. ARIAS-MARXUACH:  Now, Your Honor, Puerto

13  Rico Law does not allow for punitive damages and that

14  means that a person claiming damages has to prove the

15  Anti-Juridical Act.  Be it dolo, tort, breach of

16  contract has to prove a causal relationship and then

17  has to prove the existence of the damages proven,

18  because under Puerto Rico Law there are no punitive

19  damages via dolo case or a tort claim under

20  Article 1802 of the Civil Code.  Damages have to be

21  proven.

22         And what this instruction that we have

23  proposed, even though that we don't agree that this

24  jury should deliberate on moral damages, what we have

25  sought to provide is a frame work based on case law

1    that is applicable, because the basic point is that a

2    passing sorrow is not sufficient to prove moral

3    damages, that this jury get a frame work under which

4    to judge the testimony that they heard from these

5    plaintiffs as to their purported moral damages.  The

6    cases are applicable because Plaintiffs have the

7    burden of proof of establishing moral damages.

8         And under Puerto Rico Law moral damages are

9    the same concept of recovery if it's a breach of

10   contract case or if it's a tort case or if it's a

11   dolo case.  You have to prove the existence of the

12   damages and you have to define for the jury what

13   those damages are and when are they proven.  And that

14   is what -- what the case law we have cited requires.

15   And it makes all the sense in the world.

16        Let's say that the Court's door was faulty

17   and I pinched my -- it pinches my finger and I shrug

18   it off in ten minutes.  Should I be allowed to bring

19   a tort claim against the United States and recover

20   thousands of dollars because I pinched my finger on a

21   faulty door in the courthouse and I had ten minutes

22   of inconvenience?  Well, of course it has to be a

23   passing sorrow -- more than a pass ing sorrow in

24   order for moral damages to be -- to exist and to be

25   recoverable.  It cannot be simply I felt bad for ten

1     minutes and now I'm entitled to thousands or hundreds

2     of thousands of dollars or whatever it is.

3          So I think our instruction is fair, it is

4     applicable, it reflects the state of the law and it

5     should be given.

6          THE COURT:  Mr. Efron, one last word and

7     then I will --

8          MR. EFRON:  The instruction is not fair

9     because it was not taken out of any -- even if those

10    cases are not applicable, those instructions are not

11    out of any of the cases.  If the Court feels more

12    comfortable giving an additional instruction other

13    than what it's given on damages, then we should

14    prepare what -- the Court should write its own

15    because --

16         THE COURT:  Let me say this:  I am going to

17    add something to the damages instruction.  I will

18    read what I propose.  I'm not going to read this

19    exact instruction.

20         MR. EFRON:  But, Your Honor, my point is,

21    you know, all of the adjectives that -- you know,

22    this is obviously -- and they're not saying --

23    they're not claiming that they're citing it out of

24    any particular case.  They put a citation of

25    authority.  They're not saying it was out of any

1  case.  But, look, first line, moral damages can only

2  be --

3          THE COURT:  But that's --

4          MR. EFRON:  Let me read the instruction.

5  Substantially affected.  The deep moral suffering,

6  profound of the -- you know, it's all of these

7  adjectives that have the effect --

8          THE COURT:  Let me read what I'm going to

9  add to Instruction 31, and this is what I would add

10 and it's just a short two lines.  Here the plaintiffs

11 seek damages for moral pain and suffering.  For you

12 to award such damages, plaintiffs must prove that

13 each was affected in his health, welfare, and/or

14 happiness.  A mere passing sorrow is insufficient for

15 moral damages to be awarded, and that's it.  That's

16 the instruction that I would read to the jury.

17         So, Mr. Efron, if you object, I will note

18 your objection, but that's the final instruction.

19         MR. EFRON:  But the Court will please note

20 Plaintiff's objection.  We're going to take a

21 five-minute recess, we're going to bring the jury,

22 I'm going to read the instructions, and then we'll

23 have the closing arguments.

24         Mr. Arias?

25         MR. ARIAS-MARXUACH:  One housekeeping

1    matter.  We do have two objections, two instructions

2    that are going to be given.  Do we need to lodge

3    those now or after the --

4              MR. EFRON:  You made them yesterday.

5              THE COURT:  You made them yesterday.  Once I

6    give the instructions, in order not to interrupt me,

7    before we have the closing arguments I'll have a side

8    bar and you can lodge very briefly your objections

9    here.

10             And let me do this:  What I will do is, so

11   it's easier, once I give the instructions, I'll give

12   the jury a five-minute break, and we'll lodge the

13   instructions and then we'll come in for the closing

14   arguments.

15             MR. ARIAS-MARXUACH:  Thank you.

16             THE COURT:  Mr. Efron?  And you can do it.

17   It's the same instructions that were lodged for the

18   record yesterday.  You can say, Judge, we

19   reincorporate our objections yesterday and summarize

20   what they are because we've already done them, and

21   you don't have to repeat them for 20, 30 minutes.

22             Mr. Efron, your last housekeeping matter.

23             MR. EFRON:  On Jury Instruction No. 2 -- I

24   think it has to be corrected.  This is apparently a

25   boilerplate that's used normally after opening --

1     after closing argument.  And if you look at the first

2     line --

3          THE COURT:  No.  It will say, now that you

4     will hear the evidence and argument -- now that you

5     have heard the evidence and afterwards we'll hear the

6     closing arguments.  I'll clarify that.

7          MR. EFRON:  There's one other thing that I

8     saw.  Again, on the first sentence of the second

9     paragraph has a similar situation.  I just don't want

10    there to be any confusion with the jury as to what

11    the --

12         THE COURT:  I will say, the lawyers may

13    probably refer to some of the government rules of law

14    as I stated to you in the arguments.  Okay.  And I'll

15    be reading this.  If I notice any other mistakes, I

16    will correct them myself.

17         MR. EFRON:  Yes, your Honor.

18         THE COURT:  So the jury is about to come.

19    Let's wait for that and then we'll proceed.  And,

20    again, please remember during the closings if there

21    are any objections, just stand up, and I will note

22    there's an objection and I will say please approach.

23    But that way the jury will not get an impression

24    that, you know -- I don't want to hear any argument

25    from the jury.

1    General idea, Mr. Efron, how long do you

2    understand your closing will take?

3        MR. EFRON:  Less than an hour.

4        THE COURT:  And Mr. Arias?

5        MR. ARIAS-MARXUACH:  Same here.

6        THE COURT:  Then Mr. Efron you do have the

7    burden of proof but obviously it's clear and

8    convincing so you do get a brief chance for rebuttal,

9    a few minutes.

10        MR. EFRON:  I was hoping I could divide my

11   time between the rebuttal and the argument and not be

12   limited by any time.

13        THE COURT:  No, I'm not setting any time

14   limit for you.  And the defense obviously -- you

15   know, rebuttal is not an opportunity to rehash

16   everything.  So what I suggest, do your closing and

17   depending on what Arias says, which we still don't

18   know, then I will give you a five-minute recess and

19   then you can give your rebuttal.  And if you need to

20   take 20 minutes --

21        MR. EFRON:  No, we don't.

22        MR. ARIAS-MARXUACH:  Yeah, but I think the

23   jury should be advised that they're getting two

24   cracks at the apple.

25        THE COURT:  No, the jury will be advised

1    that because they carry the burden of proof always

2    even as a preponderance or that's a rebuttal.

3          And, Mr. Arias, when I give the instructions

4    you may say, jury I only get one shot, Mr. Efron gets

5    two.  And that's perfectly fine.

6          MR. ARIAS-MARXUACH:  Okay.

7          THE BAILIFF:  All rise for the jury.

8          (The jury enters the room.)

9          THE COURT:  Please be seated, Ladies and

10    Gentlemen of the Jury, Counsel, and the parties.  And

11    Ladies and Gentlemen of the Jury, it's good to have

12    you back.  Now, this morning what I propose to do for

13    the next half hour is to read to you the jury

14    instructions applicable to this case.  They are not

15    very long and I don't believe they're that

16    complicated.  So I will do that.  Once we do that, I

17    will recess for five minutes and then we're going to

18    come back for the parties' closing arguments which

19    will be presented by the attorneys.

20          And since I mentioned to you always that the

21    plaintiffs bear the burden of proof in these cases,

22    the closing arguments -- plaintiff will go first,

23    defendant's -- plaintiffs go first, defendants go

24    next.  And because the burden of proof is on the

25    plaintiff, plaintiff will get a rebuttal turn; the

1  defendants do not get a rebuttal turn.  So that's the

2  way the proceedings are carried out.  So let me

3  begin.

4       Now, just to recap.  This case involves a

5  dolo claim under Puerto Rico Law brought by the two

6  estate members.  There's the Estate of Angel

7  Berganzo-Colon, which is comprised of Efrain Berganzo

8  and Ruben Berganzo; and the second set of plaintiffs

9  in the Estate of Antonio Rodriguez-Morales, which is

10 composed by Noemi Rodriguez-Robles, Eliezer

11 Rodriguez-Robles, Angel Rodriguez-Robles, Maria

12 Rodriguez-Robles, and Ruth Rodriguez-Robles.

13      Now, the Plaintiffs' claim in this case, all

14 of them, is that the defendant engaged in dolo in

15 obtaining their consent.  Mr. Ambush, who is the

16 defendant in this case, denies he engaged in dolo.

17 And that is why you're here today.  That is your

18 mission as a jury, to determine whether Plaintiffs

19 have proven, under the instructions I will give you,

20 whether Mr. Ambush engaged in dolo or not.

21      Now, members of the jury, now that you have

22 heard the evidence and you will soon hear the

23 arguments of counsel, it becomes my duty to give you

24 the instructions of the Court as to the law

25 applicable to this case.  It is your duty as jurors

1    to follow the law as stated in the instructions of

2    the Court and to apply the rules of law so given to

3    the facts as you find them from the evidence in this

4    case.  You are not to single out one instruction

5    alone as stating the law but must consider the

6    instructions as a whole.  Neither are you to be

7    concerned with the wisdom of any rule of law stated

8    by the Court.

9         Regardless of any opinion you may have as to

10   what the law ought to be, it would be a violation of

11   your sworn duty to base a verdict upon any other view

12   of the law than that given in these instructions of

13   the court.  Just as it would be a violation of your

14   duty, as judges of the facts, to base a verdict upon

15   anything but the evidence in this case.

16        Now, let me remind you that nothing I say in

17   these instructions is to be taken as an indication

18   that I may have any opinion about the facts of the

19   case or what that opinion is.  And please do not

20   infer that, based on these instructions, I have a

21   preference as to what your verdict should be either

22   for the plaintiffs or for the defendants.  It is not

23   my function to determine the facts of the case but

24   rather yours.

25        Now, justice through trial by jury must

1  always depend on the willingness upon each individual

2  juror to seek the truth as to the facts from the same

3  evidence presented to all the other jurors, and to

4  arrive at a unanimous verdict by applying the same

5  rules of law as given in the instructions that I give

6  you.

7        Now that you have heard the evidence and

8  will hear closing arguments in a few minutes, it is

9  my duty to instruct you about the applicable law.  It

10 is your duty to always follow the law as I state it

11 to you and then to apply the law to the facts as you

12 find them from the evidence in the case.  Do not

13 single out one instruction as stating the law but

14 consider all my instructions as a whole.  You are not

15 to be concerned about the wisdom of any rule of law

16 stated by me.  You must follow and apply the law.

17       In their closing arguments the lawyers may

18 probably refer to some of the governing rules of law

19 in their arguments because I have already given them

20 to you.  If there is any difference between the law

21 stated by the lawyers and the law as I state it to

22 you, you are governed by my instructions.  Nothing I

23 say in these instructions indicate that I have an

24 opinion about the facts -- I already mentioned

25 that -- you, not I, have the duty to determine the

1  facts.

2         You must perform your duties as jurors

3  without bias or prejudice as to any party.  The law

4  does not permit you to be controlled by sympathy,

5  prejudice, or public opinion.  All parties, the

6  plaintiffs and the defendant, expect that you will

7  carefully and impartially consider all the evidence,

8  follow the law as it is now being given to you and

9  reach a just verdict regardless of the consequences.

10        Now, let me also advise you that I am giving

11  you instructions now but if at any point during your

12  deliberations -- you will not take this instruction

13  package to the jury room, but if at any point you

14  want me to re-read any instruction or instructions or

15  want any clarification as to any particular

16  instruction, you will send a note and I will gladly

17  re-read to you any instruction as many times -- or

18  instructions as many times as necessary.

19        Now, the instructions apply to each party so

20  unless otherwise stated you should consider each

21  instruction given to apply separately and

22  individually to each plaintiff and to Mr. Ambush in

23  the case on a claim by claim basis.  And here the

24  plaintiffs individually -- again, I mentioned there's

25  two plaintiffs in the Estate of Angel Berganzo-Colon

1  and five plaintiffs in the Estate of Antonio

2  Rodriguez-Morales.  And when I discuss the verdict

3  form, you will see that you are to consider each

4  plaintiff and Mr. Ambush individually.

5      Now, again, this is just a reminder.  There

6  were multiple plaintiffs in this action.  It does not

7  follow from that fact alone that if one plaintiff is

8  entitled to recover, all the other plaintiffs are

9  automatically entitled to recover.  Mr. Ambush, the

10  defendant, is entitled to a fair consideration as to

11  each plaintiff just as each plaintiff is entitled to

12  a fair consideration of his or her claim against the

13  defendant.  And, again, all the instructions I give

14  you govern the case as to each plaintiff, and you

15  must always do the exercise of your deliberation on a

16  plaintiff by plaintiff basis, as well as considering

17  Mr. Ambush as a defendant.

18      Now, throughout this trial Spanish was used

19  or by many of the witnesses and an interpreter was

20  also used because all the testimony in federal court

21  must go in the record in the English language.  Now,

22  if an interpreter is used, you are to consider only

23  the evidence provided through the official court

24  interpreter in English.  Although all of you speak

25  English and Spanish, it is important that all jurors

1 consider the same evidence presented in the English

2 translation, the interpretation. And you must ignore

3 any different meaning of non-English words, if that

4 is the case.

5 Now, stipulations. There are several

6 stipulations in this case and before the trial of

7 this case the parties agreed to several stipulations.

8 These stipulations are an agreement that certain

9 facts can be taken as true by you without further

10 proof -- and they save time; otherwise, we could have

11 been here one or two extra days presenting evidence.

12 And these stipulations what I will do is I will read

13 them before -- when I finish these instructions

14 before you hear the closing arguments.

15 So, Mr. Rodriguez, if you can get me the

16 stipulations. And I will read those to you.

17 THE DEPUTY CLERK: Yes, Your Honor.

18 THE COURT: Now, evaluation of the evidence.

19 As the sole judges of the facts you must determine

20 which of the witnesses you believe, what portion of

21 their testimony you accept, and what weight to attach

22 to it. And you may believe a witness in whole, you

23 may believe a witness in part. And that is the

24 decision for you when you deliberate.

25 At times during trial I sustained objections

1  to questions and did not permit the witness to

2  answer, or where an answer has been made I instructed

3  that answer be stricken and not considered.  Whenever

4  I did that, do not consider the question nor the

5  answer.  You may not draw any inferences from an

6  unanswered question nor consider testimony which has

7  been stricken in reaching your decision, if I did not

8  allow the party to answer.  The law always requires

9  that your decision be made solely upon the competent

10  evidence before you.  Such items, as I excluded from

11  your consideration, will be excluded because they are

12  not legally admissible.

13      Now, the law does not, however, require you

14  to accept all the evidence that I admitted at trial

15  even though it is competent and admissible.  In

16  determining what evidence you will accept, you must

17  make your own evaluation of the testimony given by

18  each of the witnesses and determine the degree of

19  weight you choose to give to his or her testimony.

20      The testimony of a witness may fail to

21  conform to the facts as they occurred because he or

22  she intentionally is telling a falsehood or because

23  he or she is not -- did not accurately see or hear

24  that about which he or she testified, or because his

25  or her recollection of the event is faulty, or

1 because he or she has not expressed himself clearly

2 in giving his testimony.  There's no magical formula

3 by which one may evaluate testimony.

4          You bring with you to this courtroom all of

5 the experience and background of your collective

6 lives.  In your everyday affairs you determine for

7 yourselves the reliability or unreliability of

8 statements made to you by others.  The same test that

9 you use in your everyday dealings are the test which

10 you apply in your deliberations:  The interest or

11 lack of interest of any witness in the outcome of the

12 case; the bias or prejudice of a witness, if there be

13 any; the age; appearances; the manner in which the

14 witness gives testimony; understand the opportunity

15 that the witness had to observe facts concerning --

16 concerning whatever he or she testifies, the

17 probability or improbability of the witness's

18 testimony, when viewed in light of all the other

19 evidence in the case, are all, for example, items to

20 be taken into your consideration in determining the

21 weight, if any, you will assign to any witness's

22 testimony.

23          If such considerations make it appear that

24 there is a discrepancy in the evidence, you will have

25 to consider whether the apparent discrepancy may not

1 be reconciled by fitting the two together. If,

2 however, that is not possible, you will then have to

3 determine which of the conflicting versions you will

4 accept.

5 Now, let me tell you a little bit about what

6 is evidence. The evidence you are to consider in

7 deciding what the facts are consist of the following:

8 Number one, the sworn testimony of any witness who

9 testified on the witness stand; number two, the

10 exhibits which are received into evidence -- and you

11 will take those exhibits with you -- and any facts

12 which the attorneys stipulate in this case or which

13 the Court may have ordered you to find.

14 Now, what is not evidence? In reaching your

15 verdict, you may consider only the testimony and

16 exhibits received into evidence. Certain things are

17 not evidence and you may not consider them in

18 deciding what the facts are. These are the

19 following: Number one, remember, arguments and

20 statements by lawyers are not evidence. Lawyers are

21 not witnesses. What they have said in their opening

22 statements and will say in their closing arguments

23 and at other times throughout trial is intended to

24 help you interpret the evidence, but it is not

25 evidence. If the facts, as you remember them, differ

1   from what the attorneys have stated or will state to

2   you, your memory of the facts controls.

3        Number two, questions and objections by

4   attorneys are not evidence.  Attorneys have a duty to

5   their clients to object when they believe a question

6   is improper under the rules of evidence, and that is

7   an ethical obligation.  So you cannot be influenced

8   by the objection or by the Court's ruling and you

9   should also not make any decision on the fact that

10  one of the attorneys may have objected more than the

11  other.  That is not the test.

12       Again, attorneys have an objection -- they

13  have a duty to object whenever they believe evidence.

14  Although it might ultimately come in, it seems to

15  have been presented improperly, and that's why

16  there's an objection.  As you saw many times, there

17  were objections on both sides.  I either sustained

18  the objection or I said rephrase the question.  And,

19  again, that is in order for the evidence to come in

20  under the rules of evidence.

21       Number three, testimony that has been

22  excluded or stricken, you may not consider.  Number

23  four, anything you see or anything you saw or heard

24  when the Court was not in session is not evidence.

25  And, finally, you are to decide the case, again I

1       recap, solely on the evidence received at trial.

2              Now, let me talk to you about inferences.

3       You are only to consider the evidence in the case.

4       However, you are not limited to the statements of the

5       witnesses and the exhibits presented.  In other

6       words, you are not limited to what you see and hear

7       as the witnesses testify, and documents are presented

8       into the record.  You may draw from the facts that

9       you find have been proved such reasonable inferences

10      as seem justified in light of your experience.

11             Inferences are deduction or conclusions that

12      reason and common sense and not speculation lead you

13      to draw from facts established by the evidence in the

14      case.  Unless and until outweighed by evidence in the

15      case to the contrary, you may find that official duty

16      has been regularly performed, private transactions

17      have been fair and regular, that the ordinary course

18      of business or employment has been followed, that

19      things have happened according to the ordinary course

20      of nature and the ordinary habits of life and the law

21      has been obeyed.

22             Now, my rulings on objections.  As I

23      mentioned, there are rules of evidence that control

24      what can be received in evidence.  And when lawyers

25      ask questions or offer exhibits into evidence, and

1 the lawyer on the other side understood that that was

2 not done according to the rules of evidence we had

3 objections from that lawyer.  Again, when I overruled

4 any objections the question was answered and the

5 exhibit received, and that maybe is considered as

6 evidence because it went into the record.  If I

7 sustained the objection, the question was not

8 answered, the exhibit was not received; that is not

9 evidence.  And, again, you should not speculate as to

10 what the answer would have been.

11 　　　　　Again, anything that I ordered stricken from

12 the record must be disregarded.  And, again, summing

13 up again -- and I know I'm being repetitive, but I

14 rather be repetitive than miss an instruction.  When

15 deciding the case you must not consider evidence I

16 told you to disregard.

17 　　　　　Now, types of evidence.  Direct and

18 circumstantial evidence.  Direct evidence, easy, it's

19 proof, direct proof, of a fact such as the testimony

20 of an eyewitness about what that witness personally

21 saw, heard, or knew, or did.  Also direct evidence

22 are exhibits that made it into evidence.

23 　　　　　Circumstantial evidence, on the other hand,

24 is proof of one or more facts from which you can find

25 another fact.  And you can consider both kinds of

1 evidence equally. Direct evidence is not entitled to

2 greater weight than circumstantial evidence nor

3 circumstantial evidence the greater weight. You can

4 consider both types of evidence. Both types of

5 evidence can be considered by you and it is up to you

6 to determine how much to weigh any particular bit of

7 evidence. As I mentioned, the law makes no

8 distinction between the weight to be given either to

9 direct or circumstantial evidence. It is for you to

10 decide how much weight to give to any evidence.

11 And, again, let me just give you again the

12 example I gave you about circumstantial evidence.

13 Suppose you're babysitting a five-year-old and you

14 bake some delicious chocolate chip Betty Crocker

15 morsel cookies. The bell rings and you tell the

16 five-year-old, stay in the table, I'll be back in

17 five minutes. I'm just going to open the door, it's

18 the Fed Ex man with a package. When you come back,

19 no more cookies. You ask the child, Where are the

20 cookies? The child says, I have no idea, it must

21 have been the cookie monster. But you see the kid's

22 got chocolate smears all over his face, his shirt,

23 and he's smiling. That is circumstantial evidence.

24 He ate the cookies while you were away those five

25 minutes. And, again, that's just an example

1    unrelated to this case but to show you how

2    circumstantial evidence works.

3          Now, all available evidence need not be

4    produced.  The law does not require any party to call

5    as a witness all persons who may have been present at

6    any time or place involved in the case or may have --

7    may appear to have some knowledge of the matters at

8    issue in this trial.  Nor does the law require any

9    party to produce as exhibits all papers and things

10   mentioned in the evidence in this case.

11         Now, if a party, however, fails to call a

12   person as a witness who has knowledge about the facts

13   at issue and who is reasonably available to the party

14   and who is not equally available to the other party,

15   then you may infer that the testimony of that person

16   is unfavorable to the party who could have called the

17   witness and did not.  And, again, that is an

18   inference and that is something using your discretion

19   and in weighing the evidence and considering the

20   evidence you can presume that the testimony of the

21   person who was unavailable, who -- not unavailable,

22   excuse me, who the parties failed to call would have

23   been unfavorable to that party.

24         Now, the means of knowledge are ordinarily

25   the equivalent in the law to knowledge.  If it

1  appears from the evidence in the case that a person

2  had information that would lead a reasonably prudent

3  person to make inquiry through which that person

4  would surely learn the facts, then this person may be

5  found to have the actual knowledge of those facts.

6  The same as if that person had made such inquiry and

7  had actually or learned such facts.  That is to say,

8  the law charges a person with notice and knowledge of

9  whatever that person would have learned on making

10  such inquiry as it would have been reasonable to

11  expect the person to make under the circumstances.

12      Knowledge or notice may also be established

13  by circumstantial evidence.  If it appears that a

14  certain condition has existed for a substantial

15  period of time and the person had rare opportunities

16  to observe the condition, then you may draw the

17  inference that the person had knowledge of the

18  condition.

19      Now, number of witnesses.  You are not bound

20  to decide any issue of fact in accordance with the

21  testimony of any number of witnesses which does not

22  produce in your minds belief in the likelihood of

23  truth as against the testimony of a lesser number of

24  witnesses or other evidence which does produce such

25  belief in your minds.  The test is not which side

1  brings the greater number of witness or presents the

2  greater quantity of evidence, but rather the test is

3  which witness and which evidence appeals to your

4  minds as being the most accurate and otherwise

5  trustworthy.

6         The testimony of a single witness -- and

7  this can be a single plaintiff or defense witness --

8  regardless of who called that witness to the stand,

9  which produces in your minds belief in the likelihood

10  of truth is sufficient for the proof of any fact and

11  would justify a verdict in accordance with such

12  testimony, even though a number of witnesses -- or a

13  larger number of witnesses may have testified to the

14  contrary, if after consideration of all the evidence

15  in the case, you hold greater belief in the accuracy

16  and the reliability of that one witness.

17         Now, all persons are equal before the law.

18  This case should be considered and decided by you as

19  an action between persons of equal standing in the

20  community, of equal worth, and holding the same or

21  similar stations in life.  The law is no respecter of

22  persons; all persons stand equal before the law and

23  are to be dealt with as equal in the Court of

24  justice.  This includes the plaintiffs from both

25  estates and Mr. Ambush.  You must treat everybody

1  equally in applying these instructions and in

2  applying the law.

3        Now, credibility of witnesses in deciding

4  the facts of this case.  You may have to decide which

5  testimony to believe and which not to believe.  You

6  may believe everything a particular witness says or

7  part of it or none of it.  Proof of a fact does not

8  necessarily depend on the number of witnesses who

9  testified about it.  You may be guided by the

10 appearances and conduct of the witness or by the

11 manner in which he or she testified or by the

12 character of the testimony given or by evidence to

13 the contrary of the testimony given.

14       In considering the testimony of any one

15 witness you may take into account, number one, the

16 opportunity and ability of the witness to see or hear

17 of how -- to hear or know the things he or she

18 testified to; number two, the witness's memory;

19 three, the witness's manner while testifying; four,

20 the witness's interest in the outcome of the case and

21 any bias or prejudice that witness may have; five,

22 whether other evidence contradicted that witness's

23 testimony; six, the reasonableness of the witness's

24 testimony in light all of evidence; and, seven, any

25 other factors that bear on credibility,

1  believability.

2         The weight of the evidence as to a fact does

3  not necessarily depend on the number of witnesses who

4  testified at trial.  After making your own judgment,

5  you will give the testimony of each witness such

6  weight, if any, as you think it deserves.  You may in

7  short accept or reject the testimony of any witness

8  in whole or in part.

9         Next instruction.  Impeachment.  And in

10  Spanish the term for impeachment is impugnacion,

11  i-m-p-u-g-n-a-c-i-o-n.  A witness may be discredited

12  or impeached, impugnado in Spanish, number one, by

13  contradictory evidence; number two, by showing he or

14  she testified falsely concerning a material matter;

15  or, number three, by evidence that at some other time

16  the witness has said or done something or has failed

17  to say or do something which is inconsistent with the

18  witness's present testimony here at trial.  If you

19  believe that any witness has been impeached, then you

20  may give the testimony of that witness such

21  credibility or weight, if any, as you think it

22  deserves.

23         Now, evidence that at some other time while

24  not under oath a witness who is not a party to this

25  action -- and we had some witnesses who are not the

1    plaintiffs or the defendant -- evidence that at some

2    other time while not under oath a witness has said or

3    done something inconsistent with the witness's

4    testimony at trial may be considered for the sole

5    purpose of judging the credibility of that witness.

6    However, such evidence may never be considered as

7    evidence of proof of the truth of any statement.

8            When the witness is a party to the case such

9    as -- and here all the plaintiffs were witnesses and

10   Mr. Ambush, the defendant, was also a witness.  When

11   the witness is a party to the case and by such

12   statement or other conduct admits some fact or facts

13   against his or her own interests, then such statement

14   or other conduct if knowingly made or done may be

15   considered as evidence of the truth of the fact or

16   facts so admitted by such party, as well as for the

17   purpose of judging the credibility of a party as a

18   witness.  An act or omission is knowingly done, if

19   done voluntarily and intentionally, and not because

20   of mistake or accident or any other innocent reason.

21   And we're two-thirds through the instruction.

22           Now, evidence as to any oral statements or

23   admission claims to have been made outside of the

24   court by party to any case should always be

25   considered with caution and weighed with great care.

1    The person making the alleged statement or admission

2    may not have expressed clearly the meaning intended

3    or the witness testifying through omission may have

4    misunderstood or misquoted what was actually said.

5    However when an oral statement or admission made

6    outside of the court is proved by reliable evidence,

7    that statement or admission may be treated as

8    trustworthy and should be considered along with all

9    the evidence in the case.

10        Now, my questions to witness. During the

11   course of trial I occasionally ask questions of

12   witnesses in order to bring out facts not then fully

13   covered in the testimony. Do not assume that I hold

14   any opinion on the matters to which my questions may

15   have related. The reason I made questions from time

16   to time were that I understood that it was important

17   for you to understand something in addition or to

18   have a bit more information.

19        But my questions were not intended to favor

20   or detriment any of the plaintiffs or to favor or

21   detriment Mr. Ambush. Remember, that at all times

22   you, as jurors, are at liberty to disregard all the

23   comments from the Court in arriving as to your own

24   findings of the fact. All you have to do is follow

25   the law as I give it to you; you don't have to follow

1    my questions or my comments.

2         Now, when you go to deliberate, you must

3    elect a foreperson.  And let me explain what you will

4    do when you're deliberating.  In conducting your

5    deliberation and returning your verdict there are

6    certain rules you must follow.  And I said

7    foreperson.  Normally you say foreman, but it's

8    foreperson; it can be a foreman or a forewoman.  In

9    conducting your deliberations and returning your

10   verdict there are certain rules you must follow.

11        First, when you go to the jury room you must

12   select one of you as your foreperson.  That person

13   will preside over the discussions and speak for you

14   here in court through writing, and whenever necessary

15   will communicate on your behalf with the Court.  And,

16   again, the foreperson is just like the judge; I have

17   presided over this proceeding.  When you're

18   deliberating, of course, the eight of you cannot talk

19   at the same time so the fore person is the person who

20   will say Juror No. 1 or No. 2, you go first, you go

21   next, let's hear from you now, and will keep order in

22   all of your discussions.

23        Second, it is your duty as jurors to discuss

24   the case with one another in the jury room.  You

25   should try to reach an agreement if you can do so

1 without violence or individual judgment because

2 verdict in the final court must be unanimous.

3 You have two many duties as jurors.  First,

4 to decide what the facts are from the evidence that

5 you saw and heard here in court.  Deciding what the

6 facts are is your job, not mine.  And again I remind

7 you that nothing I have said or done during trial is

8 intended to influence your decision in any way.

9 Second, your next duty is to take the law as

10 I give it to you and apply it to the facts and decide

11 if under the appropriate burden of proof and the law

12 the plaintiffs have established their claims.  It is

13 my job to instruct you about the law and you are

14 bound by the oath that you took at the beginning of

15 the trial, to follow the instructions that I give

16 you, even if you personally disagree with them.  This

17 includes the instructions that I gave you before and

18 during the trial and these instructions.  All the

19 instructions are always important and you should

20 consider them together as a whole.

21 Now, each of you must make your own

22 conscientious decision so long as you have considered

23 all the evidence, discussed it fully with your fellow

24 jurors, and listened to the views of your fellow

25 jurors.  Do not let any bias, sympathy, or prejudice

1  that you may feel towards one side or another

2  influence your decision.  Do not be afraid to change

3  your initial opinion if the discussion persuades you

4  that you should.  But do not come simply to a

5  decision because other jurors think it's right or

6  simply to reach a verdict.

7        Remember, at all times you're not part of

8  this; you are judges of the facts, and your sole

9  interest is to seek the truth from the evidence in

10  the case.  It is important that you attempt to reach

11  a unanimous verdict but of course only if each of you

12  can do so after having made your own conscientious

13  decision.  Do not change an honest belief about the

14  weight and effect of the evidence simply to reach a

15  verdict.

16        And, also, you deliberate when you go to the

17  jury room as long as you have to do deliberate.

18  There is no magic formula.  And I say this in civil

19  and criminal cases.  You take as long as you need to

20  deliberate.  If you need an hour, you can take an

21  hour.  If you need five hours, you take five hours.

22  If you need to recess today and come back tomorrow to

23  further discuss and continue deliberations, you take

24  as long as you have to.  There is no magical formula.

25  And, again, I'm not saying it has to be short, your

1  deliberation, I'm not saying it has to be long.

2  You're the ones who can determine how long you have

3  to deliberate.

4         Third, if you need to communicate with me,

5  you may send a note to me through the bailiff,

6  Mr. Colon, signed by the foreperson.  I will respond

7  as soon as possible either in writing or bring you

8  here in court.  For example, if you say, Judge, read

9  to us again the instruction on dolo, I can bring you

10  here into court or I can write to you the

11  instruction.

12         Now, this is also very important.  You can

13  never, in your communications to the Court, tell

14  anyone, including myself, how you stand to merit.  If

15  you're deciding a particular issue, for example, and

16  you're split five to three or four to four, at that

17  point you continue with your deliberations because

18  how you stand numerically does not matter.  What you

19  have to do is reach a unanimous verdict.  If you can

20  do so at the end of the deliberations.

21         Finally, your verdict must be based solely

22  on the evidence and the law which I will have given

23  to you, and I will give you now the law as to dolo.

24  The verdict, again, must be unanimous and nothing I

25  have said or done in these instructions or throughout

1  the case should suggest what your verdict ought to

2  be; that is entirely for you to decide.

3  Now, when I say in these instructions that a

4  party has the burden of proof on any proposition or

5  use discretion, if you find or if you decide, I mean

6  you must be persuaded considering all the evidence in

7  the case that the plaintiff has met its corresponding

8  burden of proof. As I mentioned, the plaintiffs

9  brought this action, they have the burden of proof

10  which I shall explain now, the burden of proof is on

11  the party who asserts affirmative of an issue to

12  prove his claim or their -- there's several

13  plaintiffs here, who assert their claim on the

14  appropriate burden of proof.

15  This rule of course does not require proof

16  to an absolute certainty, since proof to an absolute

17  certainty is seldom possible in the case. Also, as I

18  mentioned, this is not a criminal case. Plaintiffs

19  do not have to prove their case beyond a reasonable

20  doubt, which is an extremely high burden.

21  Now, the burden that is used in this case,

22  and this is a dolo case -- dolo is deceit under

23  Puerto Rico Law -- it's clear and convincing. I will

24  explain to you what -- let me first say what

25  preponderance of the evidence is. To establish by a

1 preponderance of the evidence, which is the normal

2 standard used in civil cases, means to proof that

3 something is more likely so than not.  In other

4 words, a preponderance of the evidence in a case

5 means such evidence as when considered with that

6 opposed to it has more convincing force and produces

7 in your minds belief what is sought to be proved is

8 more likely true than not.

9      So if you have both scales at the end of the

10 case, in order for a plaintiff under a preponderance

11 standard to prevail the scales must tip towards the

12 end of the case more towards the plaintiffs' side.

13 If the scales are tipped 50-50, then you cannot find

14 for plaintiff.  So plaintiff must always -- each

15 plaintiff move the scale towards his or her side.

16      Now, in this case, as I stated, the standard

17 that I'm giving you for dolo is -- and that's the

18 standard under Puerto Rico Law is clear and

19 convincing evidence.  Now, that is a standard higher

20 than preponderance of the evidence.  Clear and

21 convincing evidence -- and in Spanish the term means

22 *prueba robusta y convincente*.  Evidence that produces

23 in your minds a firm belief or conviction as to the

24 matter at issue.  Clear and convincing evidence

25 involves a greater degree of persuasion that is

1  necessary to meet the preponderance of the evidence

2  standard.  This standard, however, also does not

3  require proof to an absolute certainty or beyond a

4  reasonable doubt since proof to an absolute certainty

5  is seldom possible in any case.  And proof beyond a

6  reasonable doubt, that's a standard in criminal

7  cases.

8  Now, so, again, clear and convincing

9  evidence -- you know, for preponderance, as long as

10  you have -- if the scales are 50-50 for plaintiffs to

11  prove its case, plaintiffs must at least meet the

12  51 percent threshold, move the scale more toward each

13  plaintiffs' side.  Clear and convincing evidence is

14  more than that.  And, again, let me again read

15  because it's an important standard.  It's evidence

16  that produces in your mind a firm belief or

17  conviction as to the matter at issue.  Clear and

18  convincing evidence involves a greater degree of

19  persuasion that is necessary to meet the

20  preponderance of the evidence.  And, again, it is

21  evidence that produces in your mind a firm belief or

22  conviction as to the matter at issue.

23  Now, let me talk to you a little bit about

24  Puerto Rico law and the contract.  When does a

25  contract exist?  And the Civil Code of Puerto Rico,

1     this is Article 1206, provides that a contract exists

2     from the moment one or more persons consent to bind

3     himself or themselves with regard to another or

4     another, to give something or to render some service.

5     The requisite of a contract are as follows.  There is

6     no contract unless the two following requisites are

7     met:  Number one, consent of the contracting parties;

8     two, a definite object which may be the subject of

9     the contract and; three, the cause or the obligation

10     which may be established.

11         The Puerto Rico Civil Code Article 1234 also

12     provides in order to judge as to the intention of the

13     contracting parties attention must personally be paid

14     to their acts contemporaneous and subsequent to the

15     contracts.  Now, let me tell you what dolo is.  Under

16     Puerto Rico Law contract law fraud that effects -- or

17     deceit that affects a contracting party is commonly

18     referred to as dolo or deceit.  Dolo or deceit can be

19     present in the formation of a contract.  If a party

20     obtains the consent of another through deceptive

21     means, and the key word here is deceptive means, dolo

22     like fraud is not to be presumed and must be proved

23     by the evidence presented and considered under the

24     burden of proof required for dolo action, which is

25     clear and convincing evidence.

1    And I'll read to you the definition of dolo

2    from the Puerto Rico Civil Code, Article 1221.  There

3    is dolo when by words or insidious machinations on

4    the part of one or the -- one of the contracting

5    parties, the other contracting party is induced to

6    execute a contract which without those insidious

7    machinations he would not have made.

8    The Civil Code also provides that in order

9    for deceit or dolo to give rise to the nullity of a

10   contract it must be serious and must not have been

11   employed by both of the contracting parties.  The

12   party here, the plaintiffs alleging dolo, have the

13   burden of demonstrating, number one, a false

14   representation by Mr. Ambush, the defendant; number

15   two, the plaintiffs' reasonable and foreseeable

16   reliance thereon; three, injury to the plaintiff as a

17   result of the reliance and; four, an intent to

18   defraud by the defendant.

19   The applicable Puerto Rico contract law

20   regarding dolo has a strong underlying presumption in

21   favor of good faith and honesty.  While during the

22   standard of proof in civil cases the preponderance of

23   the evidence, the party alleging dolo -- again I

24   remind you, has the burden of presenting evidence

25   which is clear, solid, and convincing.  This standard

1    should not, again, be confused with beyond a

2    reasonable doubt, which is a much higher standard.

3            Moreover, in determining whether to permit

4    or if you find dolo, which would lead -- the result

5    would be that the contract, the particular contract,

6    would be invalidated, Puerto Rico courts place --

7    Puerto Rico law places considerable weight on the

8    education, social background, economic status, and

9    relation and type of business experience of the

10   parties seeking to avoid the contract.

11           Now, I'm going to give you some instructions

12   as to damages.  And you can only consider those

13   instructions if you find that there was dolo as to

14   any of the plaintiffs.  If you do not find dolo, you

15   need not go into damages.  The fact that I'm giving

16   you damages instructions, I'm not suggesting that

17   there is dolo or damages, but I'm just giving them in

18   the event that you find dolo.  And you will see from

19   the verdict form that I'm going to ask, if you did

20   find dolo then tell the Court what the damages are.

21           If the plaintiff proves his claim -- if any

22   of the plaintiffs prove his or her claim against the

23   defendant, you must determine the damages to which

24   that plaintiff is entitled.  You should not interpret

25   the fact that I've given instructions about the

1  plaintiff's damages as an indication in any way what
2  I believe that the plaintiff should or should not win
3  in this case.

4          It is your task first to decide whether
5  Mr. Ambush is liable as to any particular plaintiff.
6  And, again, I instruct you on damages solely so you
7  can have guidance in the event you decide that
8  Mr. Ambush is liable to any of the plaintiffs and
9  that each -- any of those plaintiffs may be entitled
10 to recover money or damages from that defendant,
11 Mr. Ambush.

12          Now, damages for dolo.  Under Puerto Rico
13 Law you can only award compensatory damages from
14 dolo.  That is compensatory damages are damages that
15 are meant to put the plaintiff in -- make him whole
16 again, in the position he would have been had the
17 dolo not taken place.  Now, under Puerto Rico Law
18 punitive damages; that is, additional damages to
19 punish the defendant are not allowed under Puerto
20 Rico Law.  So if you award damages, you award damages
21 to make the plaintiff -- any of the plaintiffs whole.
22 You do not award damages simply to punish a
23 defendant.

24          Now, if you were to find in the event that
25 Mr. Ambush acted with dolo or deceit, he is liable

1  for all the damages that derive from dolus or

2  deceitful conduct.  Now, in this particular case the

3  plaintiffs' only damages that they seek, obviously if

4  you find the Mr. Ambush engaged in dolo, the result

5  would be that that contract between Mr. Ambush and

6  the particular plaintiff would be invalidated, but

7  that is not a damage.

8       The damages that the plaintiffs seek in

9  addition to that is for moral pain and suffering.

10  For you to award such damages for moral pain and

11  suffering, plaintiffs must prove to you that

12  individually, and you go plaintiff by plaintiff, each

13  was affected in his or her health, welfare and/or

14  happiness.  Now, it is very important for you to note

15  that a mere passing sorrow is insufficient for moral

16  damages to be awarded.  And any amount of moral

17  damages that you award, you use your own common sense

18  and judgment, there is no magical formula for

19  awarding damages and placing a monetary value on the

20  moral damages.  That is up to you as a jury to

21  determine based on your common reason and experience.

22       Now, as I mentioned, if you find that there

23  was dolo, then the Court will, after you conclude

24  your deliberations and you're excused, the result

25  would be that the contracts would be annulled and the

1 Court will order the restitution of any amounts

2 obtained in the retainer contracts.

3           Now, those are the instructions of the

4 court.  I will now discuss with you the verdict form.

5 It is very, very simple.  Question No. 1:  Do you

6 find by clear and convincing evidence that plaintiffs

7 signed the retainer agreement because Joshua Ambush

8 committed dolo?  And first there's two plaintiffs

9 from the Estate of Angel Berganzo-Colon; Efrain

10 Berganzo and Ruben Berganzo.  And you answer yes or

11 no, whether they signed -- each of them individually

12 signed the retainer agreement because of dolo.

13           Then you go to the Estate of Antonio

14 Rodriguez and there's the five plaintiffs.  You

15 answer yes or no.  If your answer to Question 1 is

16 yes as to any of the plaintiffs, then you proceed to

17 Question 2.  And Question 2 says, indicate the amount

18 of damages, if any, suffered by any of the plaintiffs

19 that you may have found that Mr. Ambush engaged in

20 dolo.  And then you put the award of damages.

21           For the Estate of Angel Berganzo; Efrain

22 Berganzo and Ruben Berganzo.  For the Estate of

23 Antonio Rodriguez; Noemi Rodriguez, Eliezer

24 Rodriguez, and Maria Rodriguez-Robles.  There are two

25 other plaintiffs, but they were not here at trial,

they did not testify as to what their damages were.

So those two plaintiffs who did not come here or were

not present in trial, you do not have to determine,

if you find that there was dolo, any particular

damages, moral damages as to them.  When you complete

the verdict form you sign it, the jury foreperson

signs it, and dates it and then you come back.

Now, Mr. Colon I have placed him under oath

so I'm now ordering Mr. Colon -- again, he is in

charge of you as the bailiff.  He is not to allow

anybody to speak to you.  Whenever you go up to the

cafeteria or for lunch he will accompany you at all

times, and any communication with him will be to send

notes to the Court.  You can ask him, I want

afternoon refreshments, coffee, I need to go out for

a smoke, but you cannot discuss with him or ask him

any questions about the merits of the case.  But he

will assist you in any other matter or communication

with the Court.

Now, having said that, let's take a

five-minute recess.  When you come back I will read

to you the joint stipulation of facts and then we're

going to have the closing statements of the parties.

So let's excuse the jury.  Mr. Colon, bring them back

in five minutes.

1  THE BAILIFF:  All rise for the jury.

2  (The jury exits the room.)

3  (Jury Trial recessed at 11:18 a.m. and

4  resumed at 11:44 a.m.)

5  THE COURT:  Back on the record very briefly

6  before the jury gets back.  And if counsel want to

7  renew any objections as to the jury instructions,

8  please do so now.  You need -- you've already spelled

9  your objections for the record, so if you just want

10  to renew and incorporate your earlier arguments, that

11  is fine with me.

12  MR. EFRON:  Thank you, Your Honor.

13  Plaintiff objects to Instructions 4, 7, 26, 29, 31

14  and 32.  If for the same reasons as were specified

15  yesterday.

16  THE COURT:  Okay.  And then once the verdict

17  is in, you will raise your objections again if you

18  need to.

19  Mr. Arias?

20  MR. ARIAS-MARXUACH:  May it please the

21  Court.  Raul M. Arias on behalf of defendant, Joshua

22  Ambush.

23  Your Honor, we renew the objections that we

24  raised at the charge conference yesterday.  And more

25  specifically as to the instructions already given, we

1   want to object to Instruction No. 31 because, as we

2   posited yesterday, to the extent that the Court

3   dismissed the breach of contract claim by way of a

4   Rule 50 and to the extent that plaintiffs are not

5   claiming incidental dolus, they're only claiming

6   incidental dolo, I mean grave dolo, then moral

7   damages should not be considered by the jury,

8   particularly when they waived that claim at the

9   proposed pretrial order.  So that's our objection as

10  to 31.  Moral damage should not be in play.

11          THE COURT:  Okay.

12          MR. ARIAS-MARXUACH:  As to the verdict form,

13  Your Honor, we have the following objection:  Angel

14  Rodriguez-Robles and Ruth Rodriguez-Robles did not

15  come here to testify.  The Court granted a Rule 50 as

16  to their claims and they should not be on either

17  portions of the verdict form.

18          THE COURT:  Okay.  That objection is noted.

19  And as I mentioned, those arguments that you have are

20  arguments of law and I may revisit them after we have

21  a verdict, if necessary.

22          Okay.  So let's wait for the jury then.  I'm

23  going to read the stipulations.  The jury has asked

24  for lunch.  Once -- I assume we probably have about

25  an lunch.  So if the lunch is here, we'll take a

1  recess once -- I'll probably have Mr. Efron's

2  argument, recess for lunch, and then we'll have

3  Mr. Arias' argument.

4           MR. ARIAS-MARXUACH:  Well, Your Honor, we

5  are concerned that if Mr. Efron gives his argument

6  first and the jury pauses for lunch, then, you know,

7  that information or that argument is lingering in

8  their heads without the benefit of hearing us.  And

9  it only adds to the advantage they already enjoy

10 because they got to go first at opening, they got to

11 go first --

12          THE COURT:  Well, I can recess for an hour

13 and a half and then come back at 1:25 and then have

14 all the closing throughout the afternoon.

15          MR. ARIAS-MARXUACH:  Yes.

16          THE COURT:  I don't think they'll deliberate

17 then today and they could come tomorrow morning at

18 nine and start deliberations.

19          MR. ARIAS-MARXUACH:  Yeah.  I think if Your

20 Honor wants to make use of the available time, why

21 don't you read them the stipulations, they can go to

22 lunch, and we come back and do the openings in one

23 swoop -- I mean, the closings.

24          THE COURT:  Okay, Counsel, one of the jurors

25 is not feeling well so any -- we can probably move

1 everything until then.  I'm going to recess until

2 1:30.  If she needs to go to maybe the infirmary or

3 to the store to buy a pill and a 7-Up, she

4 understands she can continue throughout the day.  But

5 let's do that.  So we'll -- let's see what time it

6 is.

7          MR. ARIAS-MARXUACH:  It's 10 to 12:00.

8          THE COURT:  Let's recess.  Let's have the

9 jury ready at 1:25 by then they could have lunch.

10 The jury will not be going to the cafeteria.  And

11 Mr. Colon can ask for a cafeteria jury upstairs, so

12 please give them maybe ten minutes before anybody

13 goes upstairs.  So you're excused.  I'll see you at

14 1:30.

15          THE BAILIFF:  All rise.

16          (Jury Trial recessed at 11:48 a.m. and

17 resumed at 1:38 p.m.)

18          (The jury enters the room.)

19          THE COURT:  Please be seated.  Good

20 afternoon, Ladies and Gentlemen of the Jury.  Just so

21 Counsel knows, there's an air vent that was freezing

22 one of the jurors, that's why they're out of order.

23 After the verdict, I'll have them sit in their exact

24 positions.

25          But, okay, Ladies and Gentlemen of the Jury,

1   I'm going to read to you the joint stipulations --

2   you're going to have these in the jury room also

3   printed out -- and then Counsel will present their

4   closing arguments. Let me just remind you, again,

5   closing arguments are not evidence. What Counsels

6   will do -- in their openings, Counsel told you what

7   the evidence, in their opinion, what they intended to

8   prove to you or what was not going to be proven to

9   you.

10       In this case, in the closing arguments

11   Counsel will have a final opportunity -- so Mr. Efron

12   will tell you how he understands, how he proves his

13   case; Mr. Arias or Mr. Freese will have an

14   opportunity to tell you how they understand that no

15   dolo took place and why you should find in favor of

16   their client. And then, because the plaintiff

17   carries a burden of proof, he gets a final rebuttal

18   shot. Defendants only get once closing argument.

19   The plaintiffs will get the short rebuttal after the

20   defendant's closing argument.

21       Again, they're not evidence. And the

22   evidence is what came through the witness's testimony

23   and exhibits admitted into evidence, as well as the

24   joint stipulation.

25       Okay. Now let me read to you the joint

1  stipulation.  Number one, the Lod Airport Massacre

2  took place in the State of Israel on May 30, 1972.

3  Japanese Red Army terrorists opened fire on a group

4  of Puerto Rican American pilgrims, killing them and

5  wounding many people.

6       Number two, Angel Berganzo-Colon and Antonio

7  Rodriguez-Morales were among those killed in the Lod

8  Airport Massacre.

9       Number three, the Estate of Angel

10  Berganzo-Colon is comprised by Efrain Berganzo-Cruz

11  and Ruben Berganzo-Cruz.

12       Number four, the Estate of Antonio

13  Rodriguez-Morales is comprised by Noemi

14  Rodriguez-Robles, Eliezer Rodriguez-Robles, Angel

15  Rodriguez-Robles, Ruth Rodriguez-Robles, and Maria

16  Rodriguez-Robles.

17       Number five, Joshua M. Ambush is an attorney

18  and member of the Maryland Bar and maintains an

19  office in Baltimore, Maryland.

20       Number six, on April 21, 2006 Mr. Ambush

21  filed the case styled Franqui, et al. versus Syria,

22  et al., that's before the United States District

23  Court for the District of Columbia, seeking damages

24  for multiple wrongful deaths and personal injuries

25  arising out of the Lod Airport Massacre.

1  Number seven, Mr. Ambush filed the Franqui

2  complaint on behalf of, among others, the Estate of

3  Angel Berganzo-Colon and the Estate of Angel

4  Rodriguez-Morales, and the estate members.

5  Number eight, the Great Socialist People's

6  Army Jamahiriya, Libya -- that's the name of Libya --

7  was a defendant in the Franqui complaint.

8  Number nine, July 31, 2008 the Congress of

9  the United States of America passed and on August 4,

10 2008 President George Bush signed the Libyan Claims

11 Resolution Act.  The purpose of this act was to

12 provide fair compensation to all nationals of the

13 United States who have terrorism related claims

14 against Libya through a comprehensive settlement for

15 claims pursuant to an international agreement between

16 the United States of America and Libya.

17 Number ten, on August 14, 2'08 the United

18 States of America and Libya executed a claim

19 settlement agreement.

20 Eleven, on October 13, 2008 the U.S.

21 secretary of state, at the time Secretary of State

22 Condoleezza Rice -- if I'm not -- correct?

23 MR. EFRON:  Yes, your Honor.

24 THE COURT:  -- issued the certification

25 required under Section 5(a)(2) of the Libyan Claims

1  Resolution Act to the effect that the United States

2  had received funds from Libya sufficient to ensure

3  fair compensation of claims of nationals of the

4  United States in cases pending on the date of the

5  enactment of said act.

6        Twelve, on October 13, 2'08 President Bush

7  signed an executive order in regards to the

8  settlement of claims against Libya.

9        Thirteen, on December 31, 2008 the

10 plaintiffs in the Franqui litigation voluntarily

11 dismissed their claims against Libya with prejudice

12 as a result of the Libyan Claims Resolution Act.

13        Fourteen, on April 17, 2'09 after receipt of

14 payment to Puerto Rico in the amount of $7,000,000,

15 Efrain Berganzo-Cruz individually and as an

16 authorized respective of the Estate of Angel

17 Berganzo-Colon executed a document entitled

18 acknowledgment before Notary Public Carlos

19 Gonzalez-Alonzo.  The acknowledgment is written in

20 Spanish and in English.

21        Fifteen, Efrain Berganzo-Cruz had a power of

22 attorney and was authorized to execute the April 29,

23 acknowledgment, 2009 acknowledgment, on Ruben

24 Berganzo's behalf; that is, his brother's behalf.

25        Sixteen, Noemi Rodriguez-Robles had a power

1  of attorney and was authorized to execute the

2  April 29, 2'09 acknowledgment on behalf of Eliezer

3  Rodriguez-Robles, Maria Rodriguez-Robles, Angel

4  Rodriguez-Robles, and Ruth Rodriguez-Robles.

5       And these are the stipulations that we have

6  in this case.

7       Now, Mr. Efron, I'll leave it to you.  And

8  as my court report has told me please slow it down,

9  if I see that any of you are going too fast, I will

10  ask you to please slow down.

11       THE COURT REPORTER:  That was for you.

12       THE COURT:  Oh, that's for me, okay.

13       But it's important.  So keep it slow and

14  take your time.  So, Mr. Efron, you may proceed.

15            PLAINTIFFS' CLOSING ARGUMENT

16       MR. EFRON:  May it please the Court.

17       First of all, I want to thank you on behalf

18  of the Berganzo and the Rodriguez-Robles family for

19  serving as jurors.  It is -- this case is very

20  important to them.  I hope that you remember -- you

21  know, because we have the burden of proof, I'm always

22  concerned when there's a ten-day break in between

23  because you heard our testimony, our side, first so

24  it's a little more remote than what you heard from

25  the other side.  So I'd like you to please, amongst

1  all of you, try to remember when you discuss the case

2  the testimony which I will discuss here and which is

3  the testimony that you did hear during that -- two

4  weeks ago, that period two weeks ago.

5       I promised you at the opening that this was

6  a simple case and I also warned you that the

7  defendant's job is going to be to try to confuse you,

8  to try to create doubt, to try to bring in extraneous

9  items to the thing.  But it's really a simple case,

10  and you will see now from the evidence.  I think we

11  met our burden and I think we proved -- we proved

12  what we had to prove with a clear and convincing

13  proof.  You will see as we discuss this that that's

14  how it goes.

15       I thought a lot about this case because on

16  this weekend I came back -- this weekend I came back

17  from Israel; I went to visit my youngest daughter who

18  was -- who just moved there.  And as I was walking

19  through the Airport at Lod I thought about what that

20  meant to this family and how -- you know, what they

21  had to go through, how what happened there almost

22  40 years ago affected them, how they had this

23  life-long scar from receiving in Puerto Rico their

24  fathers' decimated bodies from grenades.  You know,

25  and then I thought, you know, --

1       THE COURT:  Mr. Efron, it's not what you

2  think, it's what the facts of the case show.

3       MR. EFRON:  I'll move on, Your Honor.

4       And they did get compensated for that

5  situation.  The Rodriguez family received at the end

6  about $1.4 million each.  It's the least that they

7  could have received.  It's -- they deserved every

8  penny of it.  They did not deserve for their lawyer

9  to come and steal a million dollars of their money

10  which was supposed to compensate for the loss of a

11  father.

12       You'll remember and we had a few moments

13  during the trial, and I hope you remember, where --

14  there were small things, but I'm hoping that between

15  all of you, you picked some of them it up.  Efrain

16  Berganzo, a grown man, he was an adult but to this

17  day when he thinks about what happened to his father,

18  he still chokes up.  So these are life-long scars

19  that never go away.

20       THE COURT:  Again, Mr. Efron, what happened

21  in the past, that's in the past.

22       MR. EFRON:  I'm just doing an introduction,

23  Your Honor.  Thank you.

24       Then you heard testimony from -- if I can

25  just finish that thought, Your Honor, because it will

1    lead me into the evidence.

2         THE COURT: Okay, go ahead.

3         MR. EFRON: Part of the pain was their never

4    seeing their fathers again, their never seeing --

5    their never their children. And one of them has 16

6    children.

7         THE COURT: Okay, let me note that that is

8    not the claim in this case. This is just background

9    that you're giving us. I just want to clarify that

10    to the jury.

11         MR. EFRON: But it has to do with the

12    damages.

13         THE COURT: Okay, go ahead.

14         MR. EFRON: And then we have their lawyer

15    who came here and very articulately -- and in that

16    situation I am at a big disadvantage because you

17    heard my clients. My clients are simple, honest

18    people, salt of the earth, I'm proud to represent

19    them. But they're not articulate enough to really

20    tell their story as well as they should unlike the

21    defendant, Mr. Ambush, who is a professional lawyer,

22    who came here and testified about how he follows the

23    laws of the Talmud. That was his testimony on direct

24    that his lawyers extracted from him.

25         THE COURT: Okay, please approach.

1    (Side bar discussions end.)

2    MR. ARIAS-MARXUACH:  Your Honor.

3    THE COURT:  Mr. Arias.

4    MR. ARIAS-MARXUACH:  Mr. Arias on behalf of

5    Defendant Joshua Ambush.  Plaintiff has begun this

6    opening argument making purely emotional appeals to

7    the jury designed to stain the character of

8    Mr. Ambush, designed to play for sympathy nakedly,

9    that their fathers died at Lod.  The reason we talked

10   about the Talmud was because he cross-examined him on

11   what an Orthodox Jew was.  We didn't elicit that

12   testimony.  And now he's misrepresenting to the jury

13   that we were the ones that brought in the Talmud.  We

14   didn't bring in the Talmud, he did.

15   THE COURT:  That was part of the testimony.

16   MR. ARIAS-MARXUACH:  But he's making a

17   purely emotional appeal that their fathers died at

18   Lod.

19   THE COURT:  Again, I will instruct the jury

20   that Mr. Efron has the burden of proving dolo and

21   anything that happened is not --

22   MR. ARIAS-MARXUACH:  Just so the record is

23   clear, we object to the on the First Circuit's ruling

24   Smith v. Kmart Corp., 177 F.3d 19, 26; First

25   Circuit, 1999.

1    THE COURT:  Okay, let's continue.

2    (Side bar discussion end.)

3    MR. EFRON:  So you heard Defendant Joshua

4  Ambush, you know, -- we've heard that his name was

5  Maxwell, David, Joshua.  And then he told us about

6  how Ambush -- because he kept -- he changed his name.

7  And then he told us how Ambush really means Amen and

8  how it's a perfect faith and -- you know, he's trying

9  to appeal to you to make it seem like he's a

10  religious, honest person.  And that's not necessarily

11  the case.  Both in our civil justice system, as well

12  as in Jewish religious law there is --

13    THE COURT:  Okay.  This case involves our

14  legal system not --

15    MR. EFRON:  Yes, your Honor.

16    This is a person that although he claims to

17  be religious and although he claims to follow the law

18  as a lawyer, he did certain things that we would not

19  have expected him to do if he were who he said he

20  was.

21    He came to Puerto Rico on December 15 in

22  order to deceive these honest, trusting people.  He

23  received a letter November 26 telling him there's

24  money for these families.  He came to Puerto Rico --

25  by the way, before doing that, he betrayed his mentor

1    and his supporter for many years, Rabbi Perr.  You

2    heard Mr. Engelberg say that -- Dr. Engelberg.  And

3    he himself, Mr. Ambush, said that he was ashamed of

4    Rabbi Perr, he was sacrilegious.  And this was the

5    type of person that we're dealing with.

6         He came -- when he came to Puerto Rico, he

7    didn't tell them that the case was over, that he

8    had -- that later that month he was going to file the

9    motion to dismiss and the case would be over.  He

10   never told them that he had already been paid his

11   legal fees, according to his billings and to advances

12   he got from The Center, The Center being -- and you

13   will see all the documents The Center for Civil

14   Justice that set forward this claim for them and

15   hired the lawyers to file the lawsuits.

16        And so he shows up -- he shows up with an

17   investigator, the former fire chief, Leopoldo Garcia,

18   who's related to him, and a notary, to have these

19   families sign on the spot, deceiving them and

20   insinuating that if you don't sign, if you don't sign

21   the revocation of the power of attorney to The

22   Center, to Dr. Engelberg again, and if you don't hire

23   me and give me an additional 10 percent for doing

24   what, that if you don't do that, you don't have a

25   lawyer.

1        So what was they going to do?  You heard

2    their testimony.  It's going to delay the claim, we

3    may never get the money.  So believing what he said

4    and not knowing what he deceitfully withheld from

5    them, they signed -- they signed that retainer

6    agreement, which is what we're trying to set aside

7    today.

8        With the millions that he stole in this case

9    and what he got paid, he has the gall, the *descaro*,

10   the chutzpah sometimes people say, to claim poverty.

11   He says that some of his nine kids ask him why they

12   still live in a three-bedroom unit when he's a rich

13   lawyer.  And, you know, I don't know why.  And it

14   doesn't matter.  People have their priorities and

15   people spend money as they see fit.  Some people

16   don't like to spend money.

17       He certainly has his priorities.  He gave

18   $800,000 to Leopoldo Garcia who was surprised.  He

19   testified and he said, I had no agreement with him,

20   he had no obligation to give me $800,000.  He gave me

21   $800,000, I didn't expect it.  That's what Leo Garcia

22   says.  Leo Garcia who was sort of his alter ego,

23   getting everything signed in Puerto Rico and locating

24   the victims and the families that were the claimants

25   in this case.

1    They also hired -- they also hired -- he

2  hired McConnell Valdes, the biggest law firm in

3  Puerto Rico.

4    THE COURT:  That's not in evidence.

5    MR. EFRON:  He also hired a Washington law

6  firm.  Dr. Engelberg saw and identified one of those

7  Washington lawyers here in court in Puerto Rico that

8  day.  So he has his priorities as to what he's going

9  do with the millions that he took.

10    I'm going to go into the testimony of each

11  plaintiff but keep in mind that more than one

12  plaintiff has stated something to the effect that

13  just because you may be able to read the words

14  doesn't mean you understand it.  And that's

15  particularly true when it comes to legal language.

16  They all did say that if they knew that he had been

17  paid by The Center, they would not have agreed to

18  sign.  And we'll review that testimony.

19    The first witness was Efrain Berganzo who is

20  here with us again today.  Now, Defendant will try to

21  make him seem like a super competent person, like a

22  successful person, like a highly educated

23  sophisticated person.  Why?  Because otherwise

24  they're going to have a problem showing that he knew

25  what he was doing and what he was being deceived into

1 doing.

2 So who is Efrain?  Efrain is like many of

3 us.  Our pride sometimes hurts us in that way because

4 we feel guilty.  He's always -- I think it's natural

5 for all of us to try to have as good an image as

6 possible, but that's not totally accurate.  He's a

7 retired Puerto Rico energy -- Autoridad de Energia

8 Electrica lineman.  He took some Army courses.  In

9 the Army he took some Army courses which did not

10 require testing -- that was 45 years ago -- and then

11 he took some flying lessons at Isla Grande.  That

12 doesn't mean he was not deceived and lied to and

13 should have known better.

14 He didn't know Ambush; he met him that day

15 at his home on December 15.  Leo arranged the

16 meeting.  He can -- when he was asked does he read

17 Spanish and English, he said more or less, *mas o*

18 *menos.*  He said *mas o menos* he reads Spanish and

19 English.  He didn't really understand.  He

20 certainly -- and he certainly doesn't understand a

21 complicated legal documents with all its legal

22 finesse and all its legal meaning.  And that's what

23 we had here.

24 To prove -- to show this, he testified and

25 he was asked on cross-examination about this because

1    he would have his son call first Dr. Engelberg and

2    then afterwards Mr. Ambush, in order to find out

3    about how the case was going.  He didn't make the

4    calls himself; he would have his son, who is somewhat

5    a little better educated and speaks English, make the

6    phone calls.

7          MR. ARIAS-MARXUACH:  Objection, Your Honor.

8    Side bar.

9          THE COURT:  I believe there's no evidence as

10   to his son's education.

11         MR. ARIAS-MARXUACH:  And there's another

12   issue.

13         THE COURT:  Please approach.

14         (Side bar discussion begin.)

15         MR. FREESE-SOUFFRONT:  I believe his

16   testimony was to the effect that he was never in

17   communication with Mr. Engelberg at any time prior to

18   the December 15, 2008 meeting.  And Dr. Engelberg

19   testified here that he's never talked to or met these

20   people.  So I don't know how he can be alluding to

21   communications between Berganzo's son and

22   Mr. Engelberg when that testimony is not in evidence.

23   That is not in evidence.

24         MR. EFRON:  I'll move on to the next one.

25         THE COURT:  But then you have to clarify

1    that.

2              MR. EFRON:  Okay.

3              (Side bar discussions end.)

4              MR. EFRON:  I'm not certain exactly what

5    happened with Efrain Berganzo's son or what.  And

6    there's not -- there wasn't any direct evidence as to

7    what, if any, participation he had, so let's go on to

8    the next topic.

9              THE COURT:  Okay.  But let me clarify, there

10   was no evidence that he had contacted --

11             MR. EFRON:  Engelberg.

12             THE COURT:  -- Engelberg.  And also as to

13   his precise education, that's not in the record.

14   Okay, let's continue.

15             MR. EFRON:  Yes, your Honor.

16             When Efrain Berganzo was confronted with the

17   deposition, every plaintiff in this case was deposed

18   by Mr. Ambush's lawyers before we came to trial

19   probably earlier this year.  And when he was

20   confronted with the transcript of his deposition, he

21   had to embarrassingly admit that he was confused with

22   the question that was being posed, that he was

23   confused at the deposition which is why he answered

24   the way he answered at the deposition.

25             He said specifically, that he wouldn't have

1 signed the retainer or the revocation if he was told

2 all of the facts in the case. He was -- he was the

3 one, if you remember, in Spanish he said that

4 Mr. Ambush's acts -- actions hurt him. He felt

5 *dolido*, which the translation is hurt. The

6 translation that we had at that moment wasn't that

7 precise, but he said -- he used the word "*dolido.*"

8 He was hurt about what his lawyer had done to him.

9      He also signed on behalf of his brother

10 Ruben Berganzo who lives in Texas, whom you heard

11 testify. Ruben Berganzo, his education beyond high

12 school consists of a typing class in the Army. He

13 also testified that he felt sold out and betrayed.

14      Then came the Rodriguez-Robles family --

15 Dona Noemi, the head of the family, with a power of

16 attorney for the rest of her siblings. And in her

17 cross-examination she stated that she understood only

18 that the 10 percent kicked in only if The Center

19 would not have paid Mr. Ambush his professional fees.

20 In other words, only if The Center would not have

21 paid Ambush, that's when she understood that

22 10 percent would kick in, otherwise there was no

23 10 percent. What she didn't know, and it was not

24 divulged to her -- that's part of the deceit -- is

25 that he had been paid. He had been paid everything

1   he asked for and he had been paid everything he had

2   billed.  There was no money outstanding for this

3   case.

4           And of course she had no questions for the

5   notary and of course she didn't consult with

6   independent counsel.  I doubt that she would even

7   know what that means.  She did use one word.  She

8   said she was confused.  She said she was *confundida*

9   with the whole situation.  And that was Ambush's

10  purpose, to confuse them and pressure them into

11  signing.  And she also testified as to her moral

12  damages as well and how she felt.  You'll remember

13  that collectively.

14          Her brother Eliezer.  He's the one that we

15  all thought it was funny that he had 16 kids.  He

16  realized for the first time on cross-examination in

17  front of you that every other line of Ambush's

18  retainer agreement of December 15 was in Spanish.  He

19  hadn't realized it when he signed it two years

20  earlier.  And he realized it not because he

21  understood the words but because he recognized some

22  of the words in Spanish.

23          Their sister Maria, Dona Moni, who is also

24  here, said that she can read some words in Spanish

25  but she doesn't really understand what they mean.

1    They both testified as to their damages.

2          The other two Rodriguez-Robles siblings,

3    Ruth and Angel, are not in Puerto Rico and did not

4    testify.

5          Ambush took their money like he took

6    everybody else's, and this was through the power of

7    attorney that they gave their sister Noemi.  The

8    power of attorney made them parties to the case and

9    affected parties to the case -- enough to get them

10   their share of the compensation of getting their

11   money back.  They never met Ambush to this day and --

12         MR. ARIAS-MARXUACH:  Your Honor --

13         THE COURT:  That's not in evidence.

14         MR. EFRON:  What's not in evidence?

15         THE COURT:  Let's just approach.

16         (Side bar discussion begin.)

17         MR. ARIAS-MARXUACH:  The testimony at the

18   December 15 meeting by everybody was that Angel was

19   at the meeting.

20         MR. EFRON:  Then I wasn't clear.  I'll

21   correct it.

22         (Side bar discussion end.)

23         MR. EFRON:  Just to clarify, Ruth was the

24   only one of the Rodriguez-Robles that was not at the

25   meeting.  Angel was at the meeting but he's not in

1   Puerto Rico in order to come at this point to come to

2   court to testify.  And that shouldn't change

3   anything.  If you go to Instruction -- if you go to

4   the Court's instructions --

5           THE COURT:  And the jury is not going to

6   have the instructions but --

7           MR. EFRON:  Am I allowed to make reference

8   to them?

9           THE COURT:  Yes.  You can recall whatever

10  instructions I may have given.

11          MR. EFRON:  Think -- when you go back to

12  deliberate, and you need to ask for Jury Instructions

13  No. 13 and 14.  No. 13 tells us that the law does not

14  require any party to call as witnesses all persons

15  who may have been present at any time or place

16  involving the case or who may appear to have some

17  knowledge of the matters in this issue.  Nor does the

18  law require any party to produce as exhibits all

19  papers and things mentioned in the evidence in this

20  case here.

21          Fourteen.  If a party fails to call a person

22  as a witness who has knowledge about the facts at

23  issue and who is reasonably available to the party

24  and who is not equally available to the other party,

25  then you may infer that the testimony of that person

1 is unfavorable to the parties who could have called

2 the witness and did not.

3      However, the testimony of these two

4 siblings, who are parties to this case, who are

5 plaintiffs, their testimony would have been

6 cumulative to their siblings.  So how do they get

7 affected by not coming?  They get affected by not

8 coming because they did not testify about the

9 damages.  You don't know if they had any damages, so

10 they are not to be -- those two siblings who did not

11 come here to testify are not allowed to receive

12 compensation for defraud, for dolo, for the

13 deception.  They are entitled to receive the money

14 that was taken from them, they're just not -- they

15 didn't testify for the additional compensation such

16 as the moral damages and how they felt, that kind of

17 thing.

18      Defendant will ask you not to award him

19 anything because they couldn't come.  You may still

20 find that they were affected and taken advantage of

21 to the same deceit.  You will not be able to

22 compensate them, as I said, because that would have

23 required testimony.  But I think -- I would ask you

24 to not punish them any further than this, than their

25 not getting the additional compensation and to allow

1   them to get back what was taken from them.  Give them

2   back what they lost.

3        After the plaintiffs testified -- or

4   actually in between the plaintiffs, because he was

5   only here for a short while, Dr. Michael Engelberg

6   testified.  He's a pediatrician by profession, and he

7   is the president of The Center of the American Center

8   for Civil Justice that puts all these claims in order

9   to sue the countries that sponsor terrorism.

10       He explained what they do.  And he explained

11  how Rabbi Perr would protect Ambush almost as a

12  charity case.  How when Ambush would ask Rabbi Perr

13  for money, he would advance checks, he would sign the

14  checks.  The defendant testified he was the signatory

15  of the checks.  Mr. Ambush admitted receiving the

16  checks.  And when there were billings, he was paid.

17  And when he asked for advances informally, they were

18  also advanced, he was also paid.  So -- by the way,

19  when he billed -- and Mr. Ambush admitted this on the

20  stand -- he was billing at his rate of $50 an hour.

21       And when we go over the exhibits and you

22  take the exhibits with you, you'll see in Exhibit 25

23  that The Center for the 20 percent fee that they were

24  charging, they were supposed to run with the case --

25  all of the expenses, including all of the lawyers

1  they gave hundreds of thousands of dollars to, the

2  knowledgeable lawyer in the case to Paul Gaston.

3  They paid Mr. Ambush what he admitted that he was

4  worth in the case -- also ran with all the expenses

5  and legal fees.

6         Michael Engelberg -- Dr. Engelberg estimated

7  that for his work in this case he had paid Mr. Ambush

8  $30,000.  He thinks it's more like 25,000.  So, close

9  enough.  There's -- you know, there's no certainty

10  particularly in a situation where it's such a loose

11  and informal relationship where -- send me an advance

12  and I'll bill you later.  That kind of thing.  It

13  happens, but it's close enough.

14         So why did Michael Engelberg come to Puerto

15  Rico?  I asked him.  And his testimony is important

16  enough that I asked the court reporter to transcribe

17  only his testimony because I wanted to be very

18  precise as to what he said on these two pages.

19         He was asked, "Why did you decide to come to

20  Puerto Rico to testify here today?"

21         Dr. Engelberg's answer, "The Center felt

22  both a moral and ethical obligation to come down here

23  to set the record straight."  You'll remember that

24  testimony.  "The Center was always here for the

25  benefit of the claimants.  Every decision that we

1  made was for their benefit.  I was very upset and

2  sickened by the fact that Mr. Ambush, who is an

3  attorney, who has an obligation to uphold the laws,

4  to be able to represent their clients and their

5  interests and not his interests, I was upset that he

6  took advantage of individuals who did not understand

7  what The Center did, hid information from them

8  regarding" -- and then of course the objections.

9      And then he continued.  "The Center had an

10  agreement with these claimants that they were not to

11  pay more than 20 percent.  We had evidence that was

12  provided us regarding this agreement.  He signed the

13  agreement with them in December of 2008.  The

14  American Center did not know about this agreement,

15  was not provided this agreement until October

16  of 2009.  We saw that he was asking for an additional

17  10 percent, another million dollars after the case

18  had already been dismissed.  To ask for a million

19  dollars from each one of them, we felt that this was

20  unscrupulous.  We felt that he swindled an additional

21  million dollars from each one of them."

22      Then he goes on.  He said a lot of

23  interesting things, and I don't want to bore you with

24  it.  But the only other thing is, on

25  cross-examination Mr. Arias asked him -- Mr. Arias

asked him -- and you'll remember that it's also one

of the things we picked up during the trial -- at

Page 110, "Why do you smirk?"  Apparently

Dr. Engelberg made like a nervous facial expression

or something.

And he said at Page 111, "You asked me why

do I smirk.  Because doesn't it bother you that

you're getting paid from money that was stolen from

these claimants?"

Next question:  "And so if you have this

moral obligation, why haven't you chosen to reimburse

the 2 million and then litigate with him in D.C.?"

His answer:  The Center has done nothing

to -- has not done anything illegal.  "Mr. Ambush has

done something illegal."

Then he was asked, "There's a, you said,

$1.9 million of undistributed money that's in

litigation in Washington, D.C. between The Center and

Mr. Ambush, correct? "

"That is correct."

"And of that there's about $800,000,

$400,000 from each of these families, that The Center

was not paid to come up to the 20 percent that The

Center was supposed to receive; is that correct?"

"That's correct."

1    "So there's $800,000 that The Center is

2    requesting it get paid regarding this case and that

3    Mr. Ambush is basically opposing; is that correct?"

4    So basically what -- Joshua Ambush got paid

5    for his work.  Handsomely.  Whether it was $25,000 it

6    was -- it was -- I asked him, how many hours did you

7    work on this case?  By the way, all of the work was

8    after the -- you know, there was no work -- all of

9    the work was before pretty much the retainer

10   agreement was signed.  After the retainer agreement

11   was signed it was just a motion to dismiss, to get

12   rid of the case, and a motion -- and a proceeding,

13   administrative proceeding, with the Department of

14   State to get their compensation.

15   So I asked him, how many hours have you

16   spent on this case before you signed the retainer

17   agreement.  And he said hundreds of hours.  Well,

18   500?  Why did I use 500?  Because he had claimed that

19   he had worked -- that he had -- he had claimed that

20   he had worked -- that he was charging $50 an hour and

21   he admitted to have been paid $25,000.  So in my math

22   I would -- I thought 500 hours.  He said 200 hours.

23   So two hundred dollars at 50 hours is $10,000.  He

24   got overpaid for doing his work in this case.

25   He didn't -- he wasn't a party to this case,

1  he didn't lose his father in the case.  This is -- he

2  was a lawyer that was billing by the hour.  So he got

3  paid for his services.  After that he then goes and

4  takes $1 million from each family -- $2 million.  And

5  now he's trying to get another $800,000 in Washington

6  from the money that belongs to The Center.  So, I

7  mean, there's no end to this greed.

8        Then we go into Defendant Ambush.  He

9  testified.  You heard him on the stand.  I questioned

10  him first then Mr. Arias questioned then I questioned

11  him again.  He was hired by The Center to file this

12  complaint.

13        Was he capable of representing these people?

14  The Center must have thought not, they -- once the

15  case was moving, they hired Paul Gaston and paid him

16  real money because he was an experienced lawyer.

17  Mr. Ambush testified and admitted that in his ten

18  years as a lawyer -- by the way, ten years as a

19  lawyer is nothing for most lawyers.  In ten years as

20  a lawyer he had tried one jury trial against a church

21  in Maryland.  That's basically -- other than as first

22  chair.  He had tried other cases sitting in with the

23  main lawyer and helping out, but as the main lawyer

24  he had tried one jury trial.  He's not -- could he

25  have handled this case?  He's not an attorney in

1   Puerto Rico, he doesn't speak Spanish.  I'm sure

2   without Leo he couldn't get around because he doesn't

3   know *en el campo,* the countryside -- he doesn't know

4   what is a *buzon* or a *barrio* or --

5              MR. ARIAS-MARXUACH:  Your Honor.

6              MR. EFRON:  I'll move on.

7              THE COURT:  Move on, Counsel.

8              MR. EFRON:  I'll move on.

9              But worst of all, he doesn't know Puerto

10  Rico Law.  He's only admitted as a lawyer in

11  Maryland.  So what he tried to do here, being very

12  articulate, was to tell you how religious he is and

13  how God fearing he is and how you should trust him

14  because of this and how he did nothing wrong.

15             And let's analyze what it is that he did.

16  He also said -- I asked him, what is the value of

17  your services.

18             And he says, you know, if you have a plumber

19  he said, a plumber could be worth five cents or his

20  value could be priceless, depending on how urgent

21  your plumbing problem is.  So I don't think his

22  services were priceless.

23             MR. ARIAS-MARXUACH:  Your Honor.

24             THE COURT:  You cannot inject your opinion

25  into your closings, so the statement is stricken.

1    And again, Ladies and Gentlemen, whatever

2  Mr. Efron feels, that is totally irrelevant.  You

3  cannot even consider it.

4         MR. EFRON:  Yes, your Honor.

5         THE COURT:  Go on.

6         MR. EFRON:  The main event that made

7  Mr. Ambush arrange to come to Puerto Rico to defraud

8  these people is a letter that he received on

9  November 26, which you will see as Exhibit 7.  And of

10  course one of the things that my Brother Counsel very

11  ably tried to do, knowing that none of you are

12  lawyers, is to try to show you --

13         MR. ARIAS-MARXUACH:  Your Honor, this is

14  beyond the pain.  Now he's imputing that we're trying

15  to deceive the jury, and that is unacceptable.

16         THE COURT:  The objection is sustained.  Do

17  not characterize Counsel's strategy; they're not

18  going to do the same to you.  Stick to the evidence.

19         MR. EFRON:  They tried to tell you what

20  great work he did in writing a 44 page complaint.  As

21  not being lawyers, you might be impressed -- a 44

22  page complaint, that's almost like a small book or a

23  booklet, you know.

24         Let's use as an analogy the November 26

25  letter.  On the November 26 letter, a two-page

1 letter, they tried -- and you'll have this when you

2 go in to deliberate. In the November 26 letter,

3 which is really what started the whole thing -- of

4 course before that you'll have the other documents

5 that will indicate -- and of course he knew that

6 there were negotiations going on between the two

7 countries to resolve these matters. And he received

8 the letter. And I had to do everything in this

9 letter. If you look -- and we went through it when I

10 cross-examined him. He was not as cooperative as he

11 could have be, but he did -- so I went over the list

12 of items that he had to produce in order to get not

13 just these but all the other families compensated.

14 He received, for people he was representing,

15 $65 million in compensation benefits of which he kept

16 10 percent; $2 million belonged to this family.

17 MR. ARIAS-MARXUACH: Your Honor, this

18 misstates the evidence. He did not receive $65

19 million.

20 THE COURT: No, he personally did not

21 receive $65 million.

22 MR. EFRON: I said he obtained.

23 MR. ARIAS-MARXUACH: No, you said he

24 received. As if he was taking the money for himself.

25 MR. EFRON: I'll clarify. Of course he

1    didn't receive the $65 million for himself.  He was

2    doing so in representation of his clients.  His deal

3    with them was, at least with these families -- we're

4    not going to talk about the other ones.  His deal

5    with these families is what you saw in his retainer

6    agreement, 10 percent.

7            So what did he do for the 10 percent?  Well,

8    he had to send a retainer agreement.  Because number

9    one says that you have to identify yourself as

10   representing whoever clients you have.  Okay, that's

11   number one.  That's really secretarial work.

12           Then, number two, a copy of the complaint

13   that he filed that was still pending at this time in

14   November and which was voluntarily dismissed with

15   prejudice in December.  A copy of the complaint,

16   again, secretarial work.

17           MR. ARIAS-MARXUACH:  Your Honor, he's again

18   injecting his opinions, calling it secretarial work.

19   And that is not evidence.

20           THE COURT:  Okay.  Rephrase.

21           The jury should not consider that as

22   secretarial work.

23           Rephrase.

24           MR. EFRON:  All that that required was

25   making a copy of the complaint in order to comply

1 with that second requirement.

2     The third requirement is a copy of the court

3 order dismissing the claims. That was making the

4 copy and sending it of his motion to dismiss, which

5 he filed in December.

6     Then we go to the fourth one, the release.

7 He got powers of attorney for Mr. Berganzo and

8 Ms. Rodriguez-Robles on behalf of their estates of

9 their families, releasing Libya from any further

10 claim. And once you send a copy to the Department of

11 State, you're good. And, of course, this was done,

12 as you heard from the testimony -- and you'll see the

13 document here anyway, which is Joint Exhibit -- which

14 has been stipulated. This was done after the case

15 was dismissed.

16     Then legal proof of the administrator's

17 authority on behalf of the estate. That, again, is a

18 copy of the *poder*, of the power of attorney.

19     Then proof of date and cause of death of the

20 named decedent in the form of a death certificate.

21 So it meant getting a copy from wherever, I don't

22 even know from where, probably from the *dicto*

23 *demografico*, of a copy of the death certificate for

24 each one of their fathers. Then death certificate.

25 Three more, three more things that they had to

1  submit:  A list of the beneficiaries and proof that

2  they are the named beneficiaries.  Sounds to me like

3  those are the -- and Mr. Ambush says --

4        THE COURT:  Please don't say how it sounds

5  to you.  Stick to what Mr. Ambush testified.

6        MR. EFRON:  Mr. Ambush testified that this

7  was their birth certificate, which, you know, we know

8  that it indicates who the parents are; so that would

9  show that he is the child of the decedent, or she.

10       Number eight, proof of nationality such as

11  birth certificate, nationalization document, if they

12  were not born in the United States, or a passport for

13  the beneficiaries because only U.S. citizens were to

14  be compensated.  So you prove with a birth

15  certificate or with a passport, if you have one, that

16  you're a U.S. citizen, and that's complied.

17       And then finally, wiring instructions as to

18  where the money is going.  And, of course, in this

19  case it was to Mr. Ambush's trust account.  He kept

20  $3 million and --

21       MR. ARIAS-MARXUACH:  Objection, Your Honor.

22       MR. EFRON:  I haven't finished my statement.

23       MR. ARIAS-MARXUACH:  He's misstating the

24  evidence.  He didn't keep $3 million.

25       THE COURT:  Finish Mr. Efron and then I will

1    note the objection.

2          MR. EFRON:  Of every $10 million he would

3    send $7 million to the beneficiaries; $2 million to

4    The Center, based on the 20 percent; and the other

5    million dollars was the $1 million per estate that he

6    would retain for himself.  So that is the extent of

7    what he did after he signed the retainer agreements

8    and got them to agree, by deception, to give them

9    $2 million.

10         Now, after the December 15 meeting the only

11   thing that was filed in court was the prearranged

12   motion for dismissal with prejudice that same month

13   in December.  Now, although the case was only settled

14   against Libya, he dismissed the case with prejudice

15   against Libya and against Syria.  Why didn't he do

16   the case against Syria for 10 percent?  Was he even

17   authorized to dismiss against Syria and let them off

18   scott-free absent a settlement?

19         MR. ARIAS-MARXUACH:  Your Honor, you had

20   already said that this was not relevant to the case

21   in a prior ruling.

22         THE COURT:  Sustained.  Move on.

23         MR. EFRON:  In my opening I anticipated to

24   you what this case was about.  It's about deceit and

25   a lawyer's greed.  And this is what the evidence in

1  this case has shown.

2        Mr. Arias, in his opening, told you that

3  Ambush was in Puerto Rico in '72, when the Lod

4  Massacre attack occurred in Israel to the Puerto

5  Rican victims, and since then he was interested in

6  the case.  He must have been eight years old.  The

7  case wasn't even filed until 2006.

8        He also told us that his client, that

9  Mr. Ambush, found himself -- in December of 2008,

10  that he found himself in a "predicament."  That's the

11  word he used; I noted it down very carefully.  And we

12  know what the predicament was -- he couldn't ask The

13  Center that hired him for additional money so he

14  decided to take it from his clients.  He couldn't ask

15  The Center for the money because he wasn't entitled;

16  he had already been paid.  He took it from the

17  weakest link -- the clients, the unsuspecting,

18  unsophisticated clients in the mountains of Puerto

19  Rico.

20        They also claimed that one of the reasons

21  the case had not been filed although they signed the

22  original center agreement in 2002 and didn't file

23  until 2006 was because they had to translate it to

24  Arabic.

25        MR. ARIAS-MARXUACH:  Also mistakes the

1  testimony.

2          THE COURT:  Overruled.  Move on.

3          MR. EFRON:  You know, nowadays we can get

4  any language translated on an iPhone.  So it's

5  impossible -- it's impossible -- you have to use your

6  common sense.

7          THE COURT:  Okay, Counsel, but that's not in

8  evidence.  Move on.

9          MR. EFRON:  Fine, I'll move on.

10          The deceit was proven here.  There's more

11  than sufficient proof to comply with the clear and

12  convincing standard.  If you look at Instructions 25

13  and 26, 25 tells you that although the burden is on

14  the party, that's us, who asserts the affirmative of

15  an issue to prove its claim under the burden of

16  proof, this rule does not of course require proof to

17  an absolute certainty since proof to an absolute

18  certainly is seldom possible in any case.

19          Next instruction, clear and convincing

20  evidence is evidence that produces in your mind a

21  firm belief or conviction of the matter at issue.

22  Clear and convincing evidence involves a greater

23  degree of persuasion than is necessary to meet the

24  preponderance of evidence standard.  This standard

25  does not require proof to an absolute certainty since

1   proof to an absolute certainly is seldom possible in

2   any case.  To establish by a preponderance of the

3   evidence means to prove that something is more likely

4   so than not so.  In other words, a preponderance of

5   the evidence in the case means such evidence that

6   when considered to that opposed to it has more

7   convincing force and produces in your mind a belief

8   that what is sought to be proved is more likely true

9   than not true.

10          I think we went above the standard, that

11   standard.  This does not have to be beyond a

12   reasonable doubt.  This is not a criminal case.

13   We're not -- this is not a criminal case where a

14   person's liberty is at issue, which is why in those

15   cases there's a higher standard of beyond a

16   reasonable doubt.  This is a standard of clear and

17   convincing.  You have to feel that the plaintiffs had

18   complied with that standard in order to rule in our

19   favor.

20          Each of you, and certainly all of you

21   collectively, have enough common sense to figure out

22   this case.  It's no mystery.  What happened here is

23   no mystery.  You heard the evidence.  You have to

24   evaluate people, as you heard from them from that

25   witness stand, and as you saw through their

1       testimony.

2              If you go to Instruction 17, it tells you

3       that this case should be considered and decided by

4       you as an action between persons of equal standing in

5       the community, of equal worth, and holding the same

6       or similar stations in life.  The law is no respecter

7       of persons; all persons stand equal before the law

8       and are to be dealt with as equal in a court of

9       justice.  This includes a corporation which, under

10      the law, is a person.  So just because they're not as

11      sophisticated or as articulate as Defendant does not

12      mean that we should treat them differently.  You have

13      the common sense to know what you heard on the stand,

14      what testimony was elicited.

15             And, you know, unfortunately they trusted

16      their lawyer, a lawyer that -- he promised them

17      millions of dollars if they resigned, because they

18      already had a contract with The Center.  And they

19      believed that not signing would delay their claim or

20      eliminate their claim.

21             They called -- this particular case

22      initially started when there was an ad in the paper,

23      which is Exhibit 6, which you will see when you go to

24      deliberate.  It's also translated into English for

25      the record -- I'm getting to it -- in which -- there

1    was an ad in the paper, you will see it's

2    Exhibit 6 -- there was an ad in the paper which

3    indicated that they might have a claim against

4    Mr. Ambush, and that's why they proceeded to call,

5    when they realized what was happening.  They moved on

6    this as soon as -- just as in other families, they

7    moved on this as soon as they could.  There's enough

8    opportunity for you to see these exhibits when you're

9    deliberating.

10          I'm trying to skip over the things we've

11   already mentioned because I didn't really follow a

12   specific order, so bear with me briefly and I'll be

13   done very quickly.

14          They did this -- they called that lawyer and

15   they started this case because, as they testified,

16   they felt betrayed, cheated, hurt, dolido, like

17   Efrain said.

18          And if you decide in the first question in

19   the jury verdict form that the defendant took

20   advantage and defrauded, committed dolo on

21   plaintiffs, the contract is revoked by virtue of

22   dolo, of the fraud, and the defendant is not entitled

23   to keep that money that he took from them.

24          If you decide that this case has deceit,

25   dolo present, you may award damages to plaintiffs in

1    an amount that it's up to you to determine, if you

2    think they suffered the damages.  These damages are

3    moral damages for pain, suffering, mental anguish,

4    being upset, due to the fraud and the inducement that

5    they incurred.  We hope that when you get to that

6    question you'll come to a fair number.  This is the

7    only time that -- ever that they will be able to be

8    compensated against Mr. Ambush in addition to what

9    they already lost to him.

10           The -- I want to again ask you to look at

11   the joint exhibits very carefully.  This is all you

12   need in order to determine what happened in this

13   case:  The Libyan claim resolution, the claim

14   settlement between the states.  Now, it's not in

15   chronological order so you may have to fix that a

16   little bit.  The secretary of state's, and at this

17   time it is Condoleezza Rice, certification that they

18   received the funds.  The presidential order of

19   President Bush ordering the settlement against Libya.

20   The notice of dismissal against Libya and Syria by

21   Mr. Ambush.  The newspaper advertisements.  The

22   letter requesting the eight items that they needed in

23   order to pay out.  And the claimant and center

24   agreement, which Mr. Ambush asked them to revoke.

25   It's all here.  It's all here.

1    I trust that at the end of this case you

2  will analyze the evidence and you will find that

3  these families were fraudulently induced by dolo into

4  signing these documents.  I'm going to have another

5  opportunity to speak to you after Mr. Arias does his

6  closing statement.  I'll have another opportunity to

7  speak to you.

8    And on behalf of the Berganzo and the

9  Rodriguez families, I want to thank you in advance

10  for your attention.

11    Thank you very much.

12    THE COURT:  Before Mr. Arias presents his

13  openings (sic), is there any of the jurors who wants

14  to take a five-minute recess?  I figured so.  So

15  five-minute recess for the restroom and then anyone

16  who has to stretch for five minutes.  So let's be

17  back in five minutes.

18    THE BAILIFF:  All rise for the jury.

19    (The jury exits the room.)

20    (Jury Trial recessed at 2:40 p.m. and

21  resumed at 2:50 p.m.)

22    (The jury enters the room.)

23    THE COURT:  Okay, Mr. Arias, you may

24  proceed.

25           DEFENDANT'S CLOSING ARGUMENT

1    MR. ARIAS-MARXUACH:  May it please the

2 Court.  Raul Arias on behalf of Joshua M. Ambush.

3    Good afternoon, Ladies and Gentlemen of the

4 Jury.  Like Mr. Efron did, I would like to thank you

5 for your jury service.  The jury is a very important

6 institution because it brings the community in to

7 serve in the administration of justice.  So it is a

8 very important function that you are present here and

9 that you are fulfilling here.  I know it's an

10 inconvenience to your professional and personal lives

11 to be here, and we appreciate it.  And I would also

12 say that I am proud to represent Joshua Ambush as

13 well.

14    Now, when this case started two weeks ago

15 there were three claims for you to decide:  There was

16 a claim that the retainer agreement was invalid due

17 to *intimidacion*, intimidation or duress.  There was a

18 claim that the retainer agreements were invalid

19 because of dolo or deceit.  And there was a claim

20 purportedly that Mr. Ambush had breached, *incumplido*,

21 his obligations under the retainer agreements.

22    The case has been simplified for you because

23 the Court dismissed two of the claims.  And so, as

24 the judge said, the only claim that is here for your

25 consideration today is whether the retainer

1  agreements, those two retainer agreements of

2  December 15, 2008, are invalid due to dolo.

3       And the evidence has shown that plaintiffs

4  have not proven dolo through clear and convincing

5  evidence, the higher standard that Puerto Rico Law

6  requires for these claims.  Under Puerto Rico Law

7  dolo requires several elements; they are in the jury

8  instructions that the Court gave you, but I am going

9  to talk about two because they are fundamental and

10 they have to prove all the elements.  And if they

11 don't prove these two, they haven't proven dolo.

12      The first is false representations and the

13 second is intent to deceive.  And let's talk about

14 the multitude of false representations that have been

15 presented to you that plaintiffs have failed to prove

16 by clear and convincing evidence.  There was an

17 allegation that Mr. Ambush was The Center's employee.

18 There was an allegation that Mr. Ambush was paid in

19 full.  And there was another allegation as to a false

20 representation that Mr. Ambush said that he would

21 only collect the 10 percent if The Center did not pay

22 him.

23      As we're going to talk about in this

24 opportunity that I have to talk with you, the

25 evidence did not prove any of those purported false

1 representations through clear and convincing

2 evidence.

3       What did the evidence establish?  The

4 evidence established that when Joshua Ambush came to

5 Puerto Rico on December 15, 2008, plaintiffs knew,

6 plaintiffs knew that there was a settlement agreement

7 between the United States and Libya, and because the

8 Franqui v. Syria case was a case against Libya as

9 well, they could participate in that settlement

10 agreement.  And they knew that because Joshua Ambush

11 had sent them -- and he testified to this effect.  He

12 had sent them the November 26, 2008 letter from the

13 Department of State.  He had had a three-way

14 telephone conference between Leopoldo Garcia, Joshua

15 Ambush and Efrain Berganzo where they told him that

16 the settlement -- the U.S.-Libya claims settlement

17 could produce 10 million per family for wrongful

18 death.  So when they came to Efrain Berganzo's house,

19 they knew that they were there to talk about a

20 settlement, a settlement which could produce $10,000

21 (sic).

22       The evidence has also shown that Mr. Ambush

23 explained to them his situation with The Center.  He

24 explained to them that The Center had provided some

25 support over the years, they had paid him some sums

1  for his work, but that those sums were not payment in

2  full.  He told them that, you heard him on the stand.

3  He told them that he had not been paid in full and he

4  explained his predicament.  His predicament being

5  that Rabbi Eliezer Perr, the founder of The Center,

6  the man that Michael Engelberg admitted was the man

7  at The Center who took decisions as to how much to

8  pay Joshua Ambush, that man went back on his repeated

9  promises that if the Franqui case was successful

10  Joshua Ambush would be substantially compensated for

11  the results of the case.

12       And there can be no doubt, there can't be a

13  more serious issue in this case, that the Franqui

14  case was wildly successful.  And it was wildly

15  successful because Joshua Ambush prepared the

16  complaint in that case, did the research -- and you

17  heard him explain it very lucidly.  He did the

18  research that tied Libya to the Lod Airport Massacre.

19       And the U.S.-Libya claims settlement

20  agreement is in evidence, and when you read it you

21  will note -- and Mr. Ambush explained it to you from

22  the stand -- that the reason that these two families

23  were able to participate in the U.S.-Libya claims

24  settlement process is because they had a pending

25  lawsuit against Libya where Libya was being charged

1  with sponsoring the Lod Airport Massacre.

2  So the argument or the contention that

3  Mr. Ambush did not do anything valuable for these

4  people and that he was fully paid by $25,000 is

5  ridiculous.  And he did not deceive Plaintiffs

6  because he told them that he had been paid some

7  amounts.

8  Now, Mr. Ambush also told them at the

9  December 15, 2008 meeting that he would like to be

10  compensated for this work that was going to produce

11  millions of dollars for each of these two families,

12  and he asked for 10 percent.  And he told you from

13  the stand why he asked for 10 percent -- because he

14  understood that in Puerto Rico there's not a case

15  like this one where the plaintiffs do not pay any

16  fees along the way, and they only pay fees if the

17  case is successful.

18  There is a maximum cap of 33 percent on the

19  fees that the attorney can collect.  And since The

20  Center was taking 20 percent, it seemed reasonable

21  that Mr. Ambush, the lawyer who was in the trenches,

22  take only 10.  They agreed it was reasonable, they

23  were happy with the results that he got for them, and

24  they signed.  They signed those retainer agreements

25  that are written in Spanish and English, and they

1    signed them before a notary public.

2          Now, Plaintiffs -- let's talk about the

3    purported false representations.  Plaintiffs want you

4    to believe that Joshua Ambush promised them verbally

5    that he would only collect the 10 percent if The

6    Center did not pay him 10 percent.  That is nowhere

7    in the retainer agreements.  Look at the retainer

8    agreements; that is nowhere to be found.  And because

9    this case was instigated by The Center, the

10   plaintiff's testimony on this issue does not fit.  It

11   does not fit.

12         Efrain Berganzo told you that Mr. Ambush

13   supposedly represented that he would not collect the

14   10 percent if The Center did not pay him the

15   10 percent.  Noemi Rodriguez-Robles and Eliezer

16   Rodriguez-Robles told you something altogether

17   different.  They told you that when they signed the

18   claimant and center agreement they understood that

19   the 20 percent provided for in the claimant center

20   agreement was for the lawyer -- the lawyer being

21   Joshua Ambush -- and that they understood that

22   Mr. Ambush would not collect the 10 percent if The

23   Center paid him the 20 percent.

24         So the testimonies do not fit.

25   Mr. Berganzo's testimony and the Rodriguez-Robles'

1  testimony, it does not match.  And the reason it does

2  not match is because this case is an afterthought

3  instigated by the American Center for Civil Justice

4  for its own purposes, which we will talk about.

5          Now, even if you chose to believe that

6  testimony, it wouldn't matter.  You know why, because

7  The Center came here and testified.  And the only

8  competent evidence of what The Center paid Mr. Ambush

9  was Mr. Ambush's testimony that in seven years The

10  Center paid him $25,000.  Now, do you believe for a

11  second that it is reasonable to contend that a lawyer

12  whose work produced $10 million gross per family,

13  $7 million net per family, was justly compensated by

14  $25,000?

15          And, again, The Center did not prove that it

16  paid 10 or 20 percent per family to The Center.  So

17  even if you believe that purported false

18  representation by Mr. Ambush, that is absent from the

19  retainer agreements.  It wouldn't matter because they

20  have not proven that The Center paid him 10 percent

21  or 20 percent per family.

22          Now.  It is worthwhile to note that

23  Mr. Ambush denied ever making such representation

24  when he took the stand, and the same goes for

25  Leopoldo Garcia who was also present at the

1  December 15, 2008 meeting.

2        Now, if making the payment of the 10 percent

3  to Mr. Ambush was so important to Plaintiffs that

4  they would not have signed the retainer agreements

5  unless the payment was dependent upon payment by a

6  center, then when they were before the notary public

7  and they had the document there they could have said,

8  you know what, you told us something else, put it in

9  here so that this is complete, so that this matches

10  what we talked about.  And you -- and, again, that is

11  absent from the agreement.  They were trying to

12  rewrite the agreement.

13        Now, Mr. Efron would like you to believe

14  that these plaintiffs are unintelligent people, and

15  that because they're here in a lawsuit trying to

16  collect money, they have to sit silently there and

17  accept it, they cannot protest because it would be

18  against their interest.  So they have to sit there

19  and be called unsophisticated, be called country

20  folk, whatever.  But the evidence tells us something

21  different and their demeanor on the witness stand

22  tells us something different.

23        Let's talk about the plaintiffs and their

24  life experiences.  Efrain Berganzo.  Efrain Berganzo

25  has three years of college education; he went to the

1  American University's affiliate in Manati.  And he

2  told you that from the stand.  And he also took

3  private flying lessons and has a pilot's license.

4  And he worked in PREPA for a long time under the

5  Puerto Rico Electric Power Authority -- which we all

6  remember very fondly every time we get our electric

7  bill -- and retired with a full pension.

8          Ruben Berganzo, his brother.  Ruben Berganzo

9  also has some college level education courses.  He

10  was in his career at the Puerto Rico Electric Power

11  Authority, he was a helicopter buyer.  So Mr. Efron

12  would have you believe that someone that the Puerto

13  Rico Electric Power Authority authorized to work in

14  the process of buying helicopters, an expensive and

15  complex piece of machinery, could not understand a

16  three-page retainer agreement, could not understand

17  the deal that his brother struck with Joshua Ambush.

18  Again, the evidence doesn't fit.

19          Let's talk about the Rodriguez-Robleses,

20  Dona Noemi.  Dona Noemi has three years of high

21  school, okay?  And you saw her on the stand.  And she

22  may not be bilingual, but you saw her, that she's

23  intelligent, that she paused and pondered her

24  answers.  This is someone who is intelligent.  The

25  same goes Don Efrain, although he has his health

1    issues.  He also has one year of high school.

2          TH COURT:  I believe it's Don Eliezer.

3          MR. ARIAS-MARXUACH:  Sorry, Don Eliezer.  I

4    apologize.  Don Eliezer also has one year of high

5    school and he also, despite his challenges had

6    some -- you know, he seemed intelligent enough to

7    understand what was going on and think through his

8    answers.

9          Dona Maria Rodriguez-Robles.  She is the one

10   who has the most formal education.  She told us that

11   she was a senior in high school when she stopped

12   studying, so she has almost four years of high

13   school.  But you know what, more importantly, more

14   importantly than how many years they were in high

15   school, is the fact that they seemed intelligent here

16   and that they certainly were intelligent enough to

17   know what's fair.  And they understood that it was

18   fair -- on December 15, 2008 they understood that it

19   was fair that an attorney who produced millions of

20   dollars for their families be compensated.

21          And the retainer agreements are not

22   complicated.  You have seen them.  They are no more

23   complicated than your cell phone contract.  They are

24   no more complicated than your cable TV contract.

25   They are no more complicated than your bank account

1  contract.  In fact, they're simpler, they're simpler.

2  And they understood that was fair and they agreed to

3  it.

4       Now, Plaintiffs have not shown that

5  Mr. Ambush had the intent to defraud.  The evidence

6  has shown that Joshua Ambush rendered, provided,

7  *hizo*, valuable, legal services for these families

8  before and after the retainer agreement was signed.

9  He was the attorney who did the research and tied

10  them to -- tied Libya to the Lod Airport Massacre.

11  He's the attorney who prepared that complaint and

12  filed it.  And he's the attorney who *solito*, alone,

13  kept that case going for two years without any help

14  from The Center, other than the meager sums that they

15  provided him from time to time -- $25,000 in seven

16  years.

17       And Plaintiffs would have you believe that

18  there was no meaningful work to be done once the U.S.

19  and Libya reached their settlement agreement, but the

20  evidence has shown you otherwise.  And in fact their

21  own evidence was contradictory because Plaintiffs

22  brought Michael Engelberg, the president of the

23  American Center for Civil Justice, who said that he

24  wanted Yale law graduate Paul Gaston to handle the

25  administrative claims process.  He wanted a Puerto

1  Rico law firm by the name of O'Neill & Borges --

2  they're not far from here -- to assist or advise

3  Mr. Gaston and the plaintiffs and The Center in the

4  administrative claims process as to the issues of

5  Puerto Rico Law.

6       On the one hand Plaintiffs are telling you

7  that, you know, it was over, the administrative

8  process is very simple and there's no value to that,

9  but on the other their own witness is telling you,

10  oh, no, we need a Yale law graduate to handle the

11  administrative claims process and we need a big

12  Puerto Rico law firm to handle the administrative

13  claims process.

14       And what the evidence has shown is that

15  Joshua Ambush, with his Maryland -- University of

16  Maryland law degree, put together the documents and

17  obtained the advice necessary so that these families

18  could complete their administrative claims and

19  collect.

20       And it is not only what Mr. Engelberg did;

21  it was also Plaintiffs' own cross-examination of

22  Mr. Ambush.  Mr. Efron went chapter by chapter of the

23  November 26, 2008 letter and he didn't like the

24  answers that he got.  That is why he's calling

25  Mr. Ambush uncooperative, because when he went

1 chapter by chapter Mr. Ambush explained to you the

2 legal significance of each of the steps in that

3 November 26, 2008 letter from The State Department

4 and of course that's not what the lawyer wanted on

5 cross-examination.

6        So Mr. Efron's cross-examination of Joshua

7 Ambush as to that letter only served to highlight, to

8 *subrayar*, that there was meaningful work to be done

9 and that it was not simply a matter of submitting

10 birth certificate and saying to The State Department,

11 give me the money. It had -- there was more to be

12 done.

13        Now, there's two plaintiffs that merit

14 special attention, and they are Angel

15 Rodriguez-Robles and Ruth Rodriguez-Robles. They

16 were plaintiffs in this case, they're in the caption

17 of the case, but they didn't come here to testify and

18 you didn't listen to them. You didn't get a chance

19 to hear their testimony, and they chose not to come.

20 And the judge has told you that when a party offers a

21 witness and the witness does not show up, you are

22 entitled to make an inference that that testimony

23 would be adverse to the party that offered the

24 witness.

25        In this case it's even worse because it's

1  not a simple witness, it is two parties that chose

2  not to come here and testify.  And so, under the

3  judge's instruction, Instruction No. 14, you are

4  entitled to take as a given that the testimony of

5  Angel Rodriguez-Robles and the testimony of Ruth

6  Rodriguez-Robles would have been damaging to their

7  siblings who did bother to show up.

8        But it is more than that.  They, Angel

9  Rodriguez-Robles and Ruth Rodriguez-Robles, as

10  plaintiffs, they had their own burden of proof.  The

11  judge has told you that the verdict form is plaintiff

12  by plaintiff.  Each plaintiff has to prove dolo.  And

13  they didn't come here to testify as to the purported

14  dolo.  So you are also entitled to simply, when you

15  get that verdict form, these two are easy, no and no;

16  because they didn't take the time to come here and

17  testify before you.

18        Now, speaking of people that didn't show up.

19  There's a gentleman called Ruben Vivas.  Noemi

20  Rodriguez-Robles' husband.  He was present.  The

21  evidence showed that he was present at the

22  December 15, 2008 meeting.

23        THE COURT:  Please approach.

24        (Side bar discussion begin.)

25        MR. EFRON:  We have no obligation to provide

1   any witness and he has -- any particular witness.

2   This was not a witness on pretrial.  Mr. Arias never

3   deposed him, he could have deposed him.  He chose not

4   to depose him, more so when there was even a question

5   as to whether he was or he wasn't a plaintiff in this

6   case.  And, additionally, he's certainly not allowed

7   to make an inference as to a witness that was not

8   announced and is not a party here.

9        MR. ARIAS-MARXUACH:  The jury can give it

10  the weight that it wants.  But the fact is that the

11  evidence showed that he was there at the meeting and

12  he didn't come.

13       MR. EFRON:  And he's not a plaintiff --

14       THE COURT:  He's not a plaintiff and

15  nobody --

16       MR. EFRON:  And he wasn't called as a

17  witness, so you're not allowed --

18       MR. ARIAS-MARXUACH:  But it came into

19  evidence.  It came into evidence.

20       THE COURT:  It came into evidence but no one

21  called him as a witness so you have to --

22       MR. ARIAS-MARXUACH:  I'm not asking them for

23  an inference.

24       THE COURT:  Then you need to clarify that

25  because it sounds like an inference.  So you need to

1     clarify that.

2          (Side bar discussions end.)

3          MR. ARIAS-MARXUACH:  In any event, the point

4     is there were other people at that meeting.

5          Now, let's talk about the plaintiffs'

6     opening statement.  A parties opening statement can

7     be understood as a series of promises to you, the

8     Ladies and Gentlemen of the Jury.  And here there

9     were several promises that were not kept, several

10    promises where they did not deliver.  Plaintiffs told

11    you in their opening statement that they would prove

12    to you that they did not know when they signed the

13    retainer agreement about the U.S.-Libya claims

14    settlement process.  And they did not keep that

15    promise.

16         Efrain Berganzo had to admit, when

17    confronted with his deposition and when Mr. Freese

18    refreshed his recollection as to the communications

19    between Mr. Berganzo's son and Mr. Ambush, that he

20    knew before the meeting of the U.S.-Libya claims

21    settlement process and that claim could produce

22    $10 million.  And so by contradicting on the witness

23    stand testimony that he gave at deposition,

24    Mr. Berganzo has been impeached, *impugnado*.

25         And that entitles you, it's solely within

1 your discretion as the sole judges of the facts,

2 because he contradicted his prior testimony under

3 oath, you are free to disregard other parts of his

4 testimony.  And I would suggest that you use that

5 discretion to disregard his testimony as to purported

6 false representations at the December 15, 2008

7 meeting.  Because, again, he flip-flopped on the

8 issue and he contradicted his prior testimony, and

9 the testimony under oath is serious testimony;

10 because a testimony at a deposition is testimony

11 under oath.  You cannot take a deposition lightly.

12          Now, Noemi Rodriguez-Robles contradicted her

13 prior testimony at deposition.  She told us on the

14 stand that she didn't know that the meeting at the

15 Efrain Berganzo house was a meeting with the lawyer

16 to talk about the claim against Libya.  And then,

17 when confronted with her deposition testimony, she

18 likewise had to say that she had testified previously

19 under oath that when she went to the December 15,

20 2008 meeting at Efrain Berganzo's house she knew what

21 the meeting was about -- that it was a meeting to

22 discuss the claim against Libya, a meeting with the

23 attorney.  Why?  Because Efrain Berganzo told her so

24 prior to the meeting.

25          So, again, she has also been impeached and

1    that means by contradicting her prior testimony under

2    oath, you're also free to disregard other parts of

3    her testimony.

4         Now let's talk about another promise that

5    the plaintiffs made in their opening statement and

6    that they failed to deliver.  They promised to you

7    that they would prove that Mr. Ambush was paid

8    hundreds of thousands of dollars for his work in the

9    Franqui v. Syria case.  And you have just heard from

10   Mr. Efron admitting that the evidence showed maybe

11   25, if you believe Joshua Ambush, or maybe 30 if you

12   want to believe Michael Engelberg.  But I will tell

13   you why you should not believe Michael Engelberg.

14        The American Center for Civil Justice,

15   Mr. Engelberg admitted on that stand, is a tax exempt

16   corporation.  It enjoys the privilege that we do not

17   enjoy of not paying taxes to the Federal Government

18   in its income.  And that means because Mr. Engelberg

19   also admitted that its records have to be in order.

20   Okay?  And you heard Michael Engelberg admitting that

21   he could not tell you how much really they had paid

22   for work in the Franqui v. Syria case generally or as

23   to these two families specifically.

24        Dr. Engelberg, I went through the checks

25   with him, and he had to admit that those checks that

1  are in evidence as a Plaintiffs' Exhibit, none of

2  those checks are checks that say Franqui v. Syria,

3  none of those checks are checks that say Lod Airport

4  Massacre, none of those checks say Berganzo family,

5  none of those checks say Rodriguez-Robles family.

6  Those checks are not competent evidence of payment to

7  Mr. Ambush for work on behalf of these families or

8  for work in the Franqui v. Syria case.  Dr. Engelberg

9  was candid enough to say that at the end of the day

10  the only person who could tell us what those checks

11  were for was Joshua Ambush.  He said that on that

12  very stand.

13        Now, Dr. Engelberg -- and therefore the only

14  credible evidence as to how much Mr. Ambush was paid

15  is his own testimony because those checks are

16  meaningless, they're worthless.  Now, Dr. Engelberg

17  also tried to tell you that Joshua Ambush was The

18  Center's employee, but when cross-examined as to the

19  normal obligations of an employer vis-a-vis the

20  employee he had to recant.  He had to take it back.

21  He had to say no, he's an independent contractor.

22  Just like David Efron handles a case for the

23  Rodriguez and Berganzo families and he's not their

24  employee, and Mr. Freese and I are representing

25  Mr. Ambush and we're not his employees.  We are

1  independent contractors.  And Joshua Ambush, the

2  evidence has shown, was not The Center's employee.

3  He was an independent contractor.

4          Now, the evidence has shown breach of trust

5  and manipulation.  But it is not by Joshua Ambush, it

6  is by the American Center for Civil Justice -- the

7  persons who are not here as defendants.  Why?  I'll

8  tell you why.  The Center breached the trust that

9  Joshua Ambush and these two families deposited in The

10 Center when it did not come through and hire a major

11 law firm to defend these families in the Franqui v.

12 Syria case.

13         Remember that Ambush told you that he wanted

14 from day one to work alongside a major law firm just

15 as The Center had done in other cases where The

16 Center -- and Mr. Engelberg told you that The Center

17 only works with the most prominent attorneys and the

18 most prominent law firms.  And Mr. Engelberg also

19 told you that they have worked twice on behalf of

20 other people, other plaintiffs with the world's

21 largest law firms.  But for these folks, for these

22 people from Manati, The Center didn't hire a big law

23 firm.

24         The Center left Joshua Ambush to handle the

25 case because it was his idea and because they did not

1    believe in the case.  Because if The Center had

2    believed in the case, it would have put its money in

3    the pocket and said to Covington & Burling, the big

4    law firm that they tried to persuade for two years to

5    take the Franqui v. Syria case, *mira* Covington,

6    here's some money, I believe in this case and I want

7    you to put in the time.

8           But that's not what they did.  They let

9    Joshua Ambush, who they came here to insult, to

10   bully, to deride, *hablar despectivamente de el*,

11   that's the man who worked on this case alone for two

12   years.

13          Now, The Center also breached this family's

14   trust and Joshua Ambush's trust when they failed to

15   support him.  Twenty five thousand dollars in seven

16   years for a case that has a 44-page complaint, that

17   had two motions to dismiss, that required serving

18   foreign governments.  They want you to believe that

19   $25,000 is enough for that, and that $25,000 is

20   enough for that when that case produced millions.

21          Now, The Center also manipulated -- *digo*,

22   also deceived, also breached the trust that Joshua

23   Ambush deposited in them when they went back on Rabbi

24   Perr's promises to him.  They had told him that --

25   Rabbi Perr had told him that they would pay him

1  substantially.  And when the case turned out to be a

2  winner, turned out to be a winner because it was a

3  case against Libya at the time that the U.S. and

4  Libya were entering into a settlement agreement, then

5  they said, you know what, Mr. Ambush, you're not good

6  enough, let's take you out from the case.  And they

7  breached that trust by trying to fire him.

8        And the evidence has also shown that The

9  Center has manipulated these families.  Joshua Ambush

10  worked for these families for seven years; he got

11  them $7 million net.  For seven months, after they

12  signed the acknowledgements in April of 2009, they

13  were happy with their lives.  They were happy with

14  the money they got.  They were happy with the deal

15  that they struck with Joshua Ambush.  But along came

16  The Center, in November of 2009, and got Javier

17  Lopez-Perez to publish those ads in the paper to give

18  that defamatory, inflammatory interview to El Nuevo

19  Dia and this case ensued.

20        Plaintiffs had no issue with Mr. Ambush, no

21  issue with the retainer agreement, no issue with

22  anything until Javier Lopez came along.  And there

23  can be no doubt that the evidence has shown that

24  these people were manipulated by Javier Lopez-Perez

25  on behalf of The Center.

1    Efrain Berganzo told you that once he talked

2 with Javier Lopez-Perez he didn't seek to verify

3 information; he simply signed on for a lawsuit

4 against Mr. Ambush.  Noemi Rodriguez-Robles was more

5 candid.  Noemi Rodriguez-Robles admitted that her

6 claims are based on what Javier Lopez-Perez told her.

7 She admitted that on the witness stand.  And Maria

8 Rodriguez-Robles admitted that her claims are based

9 on what Noemi told her.

10    So there can be no doubt that this case was

11 the product of the manipulation and the instigation

12 by the American Center for Civil Justice.  It was a

13 case fabricated by the American Center for Civil

14 Justice.  And that is why they cannot get their

15 stories straight as to what happened in the

16 December 15, 2008 meeting, a meeting in which all of

17 them were present; because the case was made up by

18 The Center.

19    Now, when you took the oath as jurors, you

20 did not leave your common sense at the door.  And the

21 evidence that has been presented here allows you to

22 infer that The Center breached its commitments to

23 these plaintiffs and to Mr. Ambush out of pure

24 old-fashioned greed.  If they removed Mr. Ambush from

25 The Center in December of 2008, as they tried to do,

1  and if they had obtained the injunction that The

2  Center asked from the D.C. Court, that would have

3  forced the money to come their way, then they would

4  have ensured that Mr. Ambush got nothing.  And to

5  this day they're still trying to ensure that Joshua

6  Ambush gets nothing.  And that's why Mr. Michael

7  Engelberg came here.

8         And it was out of greed that they put their

9  hands in their pockets and they didn't get a big law

10 firm to work for the Puerto Ricans.  They left Joshua

11 Ambush to work for the case when they came here,

12 Michael Engelberg, the president of The Center, and

13 called my client a paralegal, which is an assistant,

14 not a full-blown lawyer, a lawyer who's not fit

15 enough to interview a witness.

16        But you heard Mr. Ambush on the stand and he

17 explained to you how he did the research that

18 factually tied Libya to the Lod Airport Massacre.  He

19 told you what the case took once it was filed; he was

20 very lucid and very detailed.  And yet he had to sit

21 here passively and suffer the indignity of being

22 insulted by Michael Engelberg.

23        Mr. Engelberg came to Puerto Rico because

24 they are trying that Ambush get nothing to this day.

25 And he came to Puerto Rico and he literally came out

1 of his way physically and figuratively.  He came out

2 of his way because he came from New York to testify

3 here and figuratively because he spared no expense in

4 insulting my client and trying to belittle him.

5 But the evidence has shown and you have

6 heard what was Joshua Ambush's real role in this

7 case.  He was the person who conceived the case, tied

8 it to Lod, and defended these people admirably for

9 two years and successfully prosecuted their

10 administrative claim.

11 The evidence also allows you to infer that

12 the reason that The Center instigated this lawsuit

13 and Dr. Engelberg came here is because they're trying

14 to improve their position in the case that they have

15 in the District of Columbia.  If you will recall,

16 there is a case in the District of Columbia where The

17 Center is suing Mr. Ambush.  And Mr. Ambush, he put

18 it very nicely:  Since they sued him, he punched them

19 back with a counterclaim, *una contrademanda*.

20 Well, Mr. Engelberg came here to put on the

21 record testimony that is damaging to Mr. Ambush so

22 that he can use that in the D.C. case.  He didn't

23 come here out of a high moral obligation.  He came

24 here because he lodged these people and he

25 manipulated these people to Javier Lopez-Perez into

1    filing this lawsuit and because it is his fabrication

2    that Joshua had been fully paid, that Joshua was his

3    employee.  He had to come here and try to prove it,

4    but he failed.  He failed miserably.

5            Now, because you were not asked to leave

6    your common sense at the door when you took the oath

7    to be jurors, there are some questions that you

8    should ask yourselves.  Does it make sense that these

9    families are suing Joshua Ambush when Joshua Ambush

10   is the attorney who represented them, the attorney

11   who gave them a document in Spanish and English and

12   explained why he wanted that document?  But they are

13   not suing The Center.  And they're not suing The

14   Center even though they don't know what The Center

15   is, because no one says I know what The Center is and

16   I know what The Center does.  None of them know what

17   The Center did for them.  And we had this trial and

18   they still don't know.  And you know why?  Because

19   Michael Engelberg cannot give them an accounting of

20   what The Center spent on this case or what The Center

21   did for them.

22           In fact, one of the most arrogant pieces of

23   testimony from Dr. Engelberg was the sanctimonious

24   testimony that everything I have done is for the

25   benefit of these people.  How can he say that with a

1 straight face when the evidence is that he has never

2 met these people?  In six years that the case was

3 pending, he never reached out to these two families.

4 And he comes here under oath and tells you,

5 everything I did was for the benefit of these people.

6 Everything that he did?  He didn't get a big law firm

7 to help Mr. Ambush.  They paid Mr. Ambush a pittance

8 for the work he was doing, but everything he did was

9 for the benefit of people he's never met until this

10 trial.  Again, you were not asked to leave your

11 common sense at the door and I urge you to use it.

12 It simply does not make sense that they are

13 questioning the retainer agreement -- simple, written

14 in Spanish and English -- and they are not

15 questioning the contract by which they forked over

16 $4 million to an entity that they don't know.  It

17 simply does not make sense.

18 Now, the Court will give you the verdict

19 form and, again, the verdict form is plaintiff by

20 plaintiff.  And the first question we will ask you to

21 determine is whether these plaintiffs entered into

22 the retainer agreements because of deceit or dolo.

23 And the evidence has shown that they have not proven

24 any false representations by clear and convincing

25 evidence.  And the evidence has shown that they

1  cannot prove, they have not proven any intent to

2  deceive.  And this is why we're asking you to answer

3  the first question no dolo, no dolo, no dolo.  Seven

4  times.

5       Now, I have to address -- and I thank

6  Mr. Freese for bringing it up.  You heard in

7  Mr. Efron's closing argument a reference to delay,

8  that they believe that if they didn't sign that there

9  would be delay.  You know what, that is irrelevant;

10  because that goes to the issue of the duress claim

11  that was dismissed.  So even if you chose to believe

12  that testimony -- and, again, you can disregard it

13  because the witnesses were impeached -- it still

14  doesn't matter.

15       Now, to wrap it up -- well, before I do, I

16  also want to talk about the issue of moral damages.

17  You heard the evidence.  Mr. Efron had to pull teeth,

18  had to make great exertions to have these folks say

19  they've been deceived or betrayed or *resentido*,

20  resentful.  You also heard the judge explain to you

21  that under Puerto Rico Law a passing sorrow, you

22  know, some passing discomfort, is not sufficient for

23  you to award monetary damages for mental anguish or

24  suffering.  And there was no evidence other than a

25  few words pulled by the lawyer to try to check off a

1      box.

2              And, moreover, if plaintiffs had given

3      Mr. Ambush the benefit of the doubt and had called

4      him and given him a chance to tell his side of the

5      story, perhaps they would have more quickly come to

6      the conclusion that they have nothing to do -- to be

7      resentful for, and that they were being manipulated

8      by Javier Lopez-Perez.

9              Now in sum, Mr. Ambush did not deceive any

10     of the plaintiffs, he simply asked to be fairly in

11     proportion to the result of his work.  Plaintiffs

12     were happy with those results.  They believed it was

13     fair; they were intelligent enough to understand that

14     it was fair.  And, Ladies and Gentlemen of the Jury,

15     I pose it to you that it was fair on December 15,

16     2008 and it is still fair today.  They were happy

17     with the deal that they struck with Mr. Ambush until

18     The Center came along.  And that is why, for all

19     these reasons, we ask that you return a verdict in

20     favor of Joshua Ambush.

21             Again, I thank you for your time and for

22     your attentiveness.  Again, this is the last time you

23     will hear from me, so have a good afternoon.

24             THE COURT:  Thank you, Mr. Arias.

25             Mr. Efron, your rebuttal turn.

1               PLAINTIFFS' CLOSING REBUTTAL

2        MR. EFRON:  The defendant would like you to

3 think that there was an agreement between Mr. Ambush

4 and The Center.  There was no agreement.  They had an

5 agreement with the other lawyers, with Paul Gaston,

6 who received a success fee plus his hourly, made half

7 a million dollars on the case, because -- and he

8 had -- and, by the way, that was for a short but very

9 valuable participation.  Mr. Ambush got paid per hour

10 more than -- he got paid more than he was entitled

11 to.  He had no agreement.  He said it from the stand

12 he had no agreement.  If you don't have an agreement,

13 you don't have a right to require or request

14 anything.

15       So if he thought that The Center owed him

16 money, then he should have taken the money from The

17 Center.  He should have sued the Center.  He should

18 have said, you had an agreement with me, verbal or

19 otherwise, you owe me 10 percent.  But he didn't do

20 that.  He went to these victims and he went to the

21 victims in order to -- because they were easy prey.

22 They were easy prey, so he came in and did what he

23 had to do.

24       So if he wants to be compensated fairly so

25 for -- by the way, Michael Engelberg hadn't met them

1 in seven years but neither had Joshua Ambush. And

2 Joshua Ambush did not work on the case for seven

3 years because the case was filed in 2006. Then in

4 2008 when it was getting hot Paul Gaston worked on

5 the case. And then when no one was required, there

6 was nothing else going on because the case was

7 settled, he filed a motion to dismiss in 2008. So

8 this is not a long case, it's a short case. He

9 billed by the hour, he got paid. If The Center owed

10 him money, he should not have taken it from these

11 victims. He should have gone to The Center and tried

12 to collect it from The Center.

13       So what they're trying to do now is to tell

14 you that -- he's trying to benefit from the familiar,

15 loose relationship. He's trying to take advantage of

16 the familiar, loose relationship that he had with The

17 Center where, I need $15,000; I need $10,000. He got

18 paid hundreds of thousands of dollars. Of course it

19 didn't say this is for the Lod Airport Massacre case.

20 Why? Because it was a loose relationship.

21       There was an advance, he was handling other

22 matters for them. He was not an employee, he was

23 their agent; and he was their agent in every way.

24 When The Center agreements were signed in 2002 by

25 these families, he was their agent. And in that

1   sense, in that sense, he was an agent of The Center,

2   which he betrayed.  So now he, because of the loose

3   relationship -- this is how Ambush goes and takes

4   facts and then uses them for his benefit.  Because of

5   the loose relationship and because there was no

6   accounting, supposedly, and we know why, now he wants

7   to take a benefit from that.

8        So what is his being paid fairly for

9   200 hours of work which he did on this case, which he

10  admitted to?  $2 million dollars?  Is it a million

11  dollars from each family plus his hourly from The

12  Center, plus 400,000 -- $800,000 more that he's

13  trying to get back from The Center in Washington,

14  D.C. case?  How much is enough for 200 lawyer hours?

15  Again, if The Center had owed him money, he should

16  have gone after The Center, not after these people.

17       Then they tried to tell you to disregard all

18  the testimony because two of the witnesses, which

19  they very candidly and very honestly admitted, *estoy*

20  *confundida*, said Dona Noemi at the deposition.

21  Imagine the setting, use your common sense, just like

22  my colleagues asked you to do.  Use your common

23  sense.  You're at McConnell Valdes in a deposition in

24  a room with lawyers, in a very strange environment

25  for you, you're being asked questions in English

1 translated by a translator in Spanish, you're trying

2 to see what's going on.  After a few hours of that,

3 any normal person can get confused and make one

4 mistake on one answer.  So that is enough for them to

5 say, oh, they've been impeached so therefore let's

6 disregard their testimony?  That's not how this

7 works.

8         The Center is a tax free institution because

9 it's a charitable organization, not for profit, that

10 helps victims of terror like these families and other

11 families.  Dr. Engelberg doesn't have to talk to them

12 on the phone every day to be able to help them

13 because they're helping with the lobbying, with

14 settlement negotiations, hiring the lawyers, covering

15 expenses, doing the research, spending money on the

16 research.  It's not a matter of Joshua Ambush read

17 something and did the investigation.  He explained

18 from the stand how they would pay the reporters and

19 they would pay people who would know, to give them

20 the information.

21         The two plaintiffs that didn't come, now

22 they're asking you, not only are they not entitled to

23 their moral pain and suffering because -- of course

24 they didn't testify as to that so we're the first

25 ones to say they do not, but now they're supposed to

1    also lose the money that they were supposed to get

2    because they couldn't come to Puerto Rico or they

3    were not in Puerto Rico for this trial.

4          MR. ARIAS-MARXUACH:  Your Honor, there is no

5    explanation or evidence on the record as to why they

6    were not here.

7          THE COURT:  Again, Mr. Efron, we don't

8    know -- on the record there's no evidence as to why

9    they're not here.

10         MR. EFRON:  Fine.  But, you know, when

11   Ambush asked all those families to sign over powers

12   of attorney to one member of each family -- Don

13   Efrain for the Berganzo family and Dona Noemi for the

14   Rodriguez family -- for all of the things that had to

15   be done in order to get their money -- the money that

16   he took partly -- including the acknowledgment and

17   the settlement documents that had to go to

18   Washington, for that the powers of attorney were

19   okay.  But now, now, when those powers of attorney

20   that they used were taken advantage of and they were

21   taking money from them, now, oh, they had to come

22   here personally.  The powers of attorney are only

23   good if it's for their benefit, not for theirs.

24   That's not how this works either.  What's good for

25   one side should be good for the other.

1    If you rely on a power of attorney to get

2    $10 million per family, you should certainly be

3    allowed to rely on that power of attorney to

4    compensate the individuals under that power of

5    attorney that lost their money.

6    You know, this stuff about Javier Lopez, I'm

7    trying to find my notes on Javier Lopez.  Javier

8    Lopez got them to sign without doing too much

9    research by just selling himself.  The same way that

10   Ambush got them to sign without any questions.  The

11   difference is that Ambush did not tell them the

12   truth.  Ambush did not tell them that he was paid.

13   Ambush did not tell them that he didn't have an

14   agreement.  Ambush didn't tell them that there was

15   nothing else to do in the case.

16   And one of the things -- if you look at Jury

17   Instruction No. 27, Jury Instruction No. 27 tells us

18   when a contract exists.  There is no contract unless

19   the following requisites exist.  Number one, the

20   consent of the contracting party.  Their consent was

21   vitiated by the fraud, by the deceit.  Number two, a

22   definite object which may be the subject of the

23   contract.  And three, the cause of obligation which

24   may be established, those two being consideration.

25   What are you getting for the contract?  What were

1  they getting for their 10 percent?  A motion to

2  dismiss and responding to a November 26 letter

3  sending in some documents?  Is that worth $2 million?

4  Lack of consideration, vitiated consent.  That's what

5  this case is about.

6        If you go -- if we go to Jury Instruction 29

7  on the definition of dolo, it tells us that we had

8  the burden, and we feel we demonstrated -- with clear

9  and convincing evidence we demonstrated that there

10  was a false representation by defendant that was

11  actually intended.

12        Number two, that the plaintiffs, their

13  reasonable and foreseeable reliance on that.  They

14  detrimentally relied on what they were told.

15        Number three, injury to the plaintiffs.

16  They lost a million dollars per family.

17        And, four, an intent to fraud.  I feel

18  that's been clear here in every aspect.

19        If Mrs. Rodriguez misspoke and said that she

20  thought that 20 percent worth was for the attorney,

21  we can use our common sense to know that what this

22  means is that the 20 percent for The Center included

23  all fees and attorney's fees and they should not have

24  been required to pay that additional 10 percent.  To

25  now change the intent of her testimony to say that

1  the lawyer's supposed to get 20 percent as if the

2  lawyer was not included in The Center agreement, is

3  just unsustainable.

4        Again, look at the exhibit of the

5  November 26 letter, the two-page letter -- a page and

6  a half letter, and see what's required.  That's all

7  he had to do.  How much is that worth?

8        The document -- the case is more simplified

9  for you now because this is not a regular breach of

10  contract case; this is a fraud case, a dolo case.  By

11  only having to make that decision in one -- as to

12  this one matter, it simplifies the case for you as

13  far as the decisions you have to make in this case.

14        I think when you look at all the documents

15  you will realize that this was an abuse, that this

16  was a deception, and that these people were unfairly

17  taken advantage of.  And we feel we've done our job

18  and we leave you to do yours.

19        Thank you very much for your attention.

20        THE COURT:  Okay.  Ladies and Gentlemen of

21  the Jury, the case is now submitted to you for your

22  consideration.  Just remember that arguments of

23  counsel are not evidence; the evidence, again, is the

24  testimony and the exhibits admitted into evidence and

25  also the stipulations that will be taken to you for

1    the jury room, to commence your deliberations.

2         Now, it's a quarter to four.  What I suggest

3    is, when you get to the jury room, the evidence will

4    be sent there, select your foreperson and you're free

5    to start your deliberations.  You take as long as you

6    have to.  And if you want to recess at any point

7    until tomorrow, let me know.

8         If you do recess today -- you can only

9    deliberate when all of you are together in the jury

10   room.  So if you decide to recess, my instructions

11   are that you're not to discuss the case with anyone.

12   Continue following the instructions I have given you

13   for the last couple of days when we had the case, we

14   had the one-week break.  And if you do that, then you

15   come back tomorrow.  You'll send me a note that you

16   want to recess for the day, I will authorize you, and

17   then you come back tomorrow at 9 a.m. and resume your

18   deliberations, if you need to come back tomorrow.

19        If you want to stay today and go past 5 or

20   6, it's fine.  You decide how long you want to

21   deliberate.  And if you decide to do deliberations

22   until tonight, let me know and the Court will order

23   pizza or some other meal for you.  You decide when

24   and how to deliberate, so that is up to you.

25        So having said that, I have nothing else to

1    say.  I want to thank you for all being here.  I also

2    want to thank all counsel on both sides.  They've

3    done, in my opinion, an equally good job of

4    presenting this case in a manner that the case has

5    flowed.  I apologize that we were not able to have

6    deliberations last week as I would have liked to, but

7    at the same time the case was presented to you in

8    five days of trial; so I think counsel were prepared

9    on both sides.

10        And, again, it's up to you to decide if the

11   plaintiffs have proven their case by a preponderance

12   and by clear and convincing evidence as to the dolo.

13   Remember, clear and convincing evidence as to the

14   dolo claim; that is the only claim before you at this

15   time.  And you have the verdict form.  Thank you very

16   much.

17        Let's excuse the jury and I will hear from

18   you at some other time.

19        THE BAILIFF:  All rise for the jury.

20        (The jury exits the room.)

21        THE COURT:  Then counsel what I would

22   suggest is that you stay around the courthouse, or

23   the attorney lounge within two-minute notice.  If the

24   jury sends me a note, I want to see you immediately.

25        MR. EFRON:  How long do you figure we'll

1  wait?

2  　　　　　　THE COURT:  I assume before 5 p.m.  If the

3  jury wants to recess, I expect we'll know very soon.

4  If they want to start deliberations, that means they

5  won't send me a note within the next --

6  　　　　　　MR. EFRON:  Are they going to advise you if

7  they're going to start discussing --

8  　　　　　　THE COURT:  Yes.  If they want to -- if

9  they're going to recess, they're going to let me

10  know.  If they don't recess, that means they're going

11  to start deliberations.  Okay.

12  　　　　　　(Jury Trial recessed at 3:49 p.m. and

13  resumed at 4:52 p.m.)

14  　　　　　　THE COURT:  Please be seated again.  Good

15  afternoon, Ladies and Gentlemen of the Jury.  I

16  understand there is a verdict, so please have

17  Mr. Colon provide me with the verdict form.

18  　　　　　　THE BAILIFF:  (Handing.)

19  　　　　　　THE COURT:  Let's read the verdict.

20  　　　　　　THE DEPUTY CLERK:  The verdict in this case

21  reads as follows:  In the United States District

22  Court for the District of Puerto Rico, the case of

23  the Estate of Angel Berganzo-Colon, et al.,

24  Plaintiffs, versus Joshua M. Ambush, Defendant.

25  Civil case, 10-1044.  Verdict form.

1    Question No. 1:  Do you find by clear and

2  convincing evidence that Plaintiffs signed the

3  retainer agreement because Joshua M. Ambush committed

4  dolo?

5    As to the Estate of Angel Berganzo-Colon,

6  composed of Efrain Berganzo and Ruben Berganzo, the

7  answer is yes.

8    As to the Estate of Antonio

9  Rodriguez-Morales, composed of Noemi

10  Rodriguez-Robles, Eliezer Rodriguez-Robles, Angel M.

11  Rodriguez-Roles, Maria M. Rodriguez-Robles, and Ruth

12  D. Rodriguez-Robles the answer is yes as to all of

13  them.

14    Question No. 2:  Please indicate the amount

15  of damages, if any, suffered by each of the

16  plaintiffs.

17    As to the Estate of Angel Berganzo-Colon:

18  As to Efrain Berganzo, $100,000.  As to Ruben

19  Berganzo, $100,000.

20    As to the Estate of Antonio

21  Rodriguez-Robles:  As to Noemi Rodriguez-Robles,

22  $100,000.  As to Eliezer Rodriguez-Robles, $100,000.

23  And as to Maria M. Rodriguez-Robles, $100,000.

24    Signed by the foreperson of the jury on

25  October 4, 2011.

1    THE COURT:  Okay.  Now, let me ask -- I'm

2  going to individually poll the eight jurors.  I would

3  like to know if this is your verdict in this case.

4  Beginning with the first juror.  Juror No. 1?

5    JUROR NO. 1:  Yes, sir.

6    THE COURT:  Juror No. 2?

7    JUROR NO. 2:  Yes, Your Honor.

8    THE COURT:  Juror No. 3?

9    JUROR NO. 3:  Yes, Your Honor.

10    THE COURT:  Juror No. 4?

11    JUROR NO. 4:  Yes, your Honor.

12    THE COURT:  Juror No. 5?

13    JUROR NO. 5:  Yes, your Honor.

14    THE COURT:  Juror No. 6?

15    JUROR NO. 6:  Yes, your Honor.

16    THE COURT:  Juror No. 7?

17    JUROR NO. 7:  Yes, your Honor.

18    THE COURT:  Juror No. 8?

19    JUROR NO. 8:  Yes, your Honor.

20    THE COURT:  Okay.  Let me just -- before I

21  excuse the jury, let me just have counsel approach

22  very briefly.

23    (Side Bar discussions begin.)

24    THE COURT:  Because of the verdict, at this

25  point I'm going to excuse the jury then I'll hear

1   from counsel as to any matters that we need to

2   discuss.

3           Counsel, I just want to note for the record

4   that since the jury found liability based on clear

5   and convincing evidence as to dolo, which is the much

6   higher standard than preponderance, I am not going to

7   have them return to deliberate under a preponderance

8   of the evidence standard; because if they did reach

9   clear and convincing --

10          MR. EFRON:  I was hoping for those results,

11  but if they would have said no to anybody, just one

12  of them, we could have done that exercise.

13          THE COURT:  But that does not have to be

14  done here.  This jury at least has understood that

15  you've met that higher standard, so it's a non-issue.

16  So I'm going to be excusing the jury and I'll hear

17  some additional matters.  And I'll set some deadlines

18  for motions to be filed.

19          (Side Bar discussions end.)

20          THE COURT:  Ladies and Gentlemen of the

21  Jury, now I want to thank you very much for your duty

22  in this case.  I do note that one of you, Mr. Mario

23  Rivera, is completing his jury duty.  I will excuse

24  him.  So I have a certificate that is given to all

25  jurors along with a pin for jury duty that will be

1    provided.

2           (Handing.)  Thank you very much.

3           And then let's excuse the jury.

4           THE BAILIFF:  All rise for the jury.

5           (Jury exits the room.)

6           THE COURT:  Please be seated.  We do have a

7    verdict now and let me note what my procedure is.  So

8    I know there's going to be some -- certainly some

9    motions filed by the defense in this case.  But what

10   I will do is, I'm going to enter a judgment based on

11   the verdict.  Because there is dolo as part of the

12   judgment, I will order that the amounts provided to

13   Mr. Ambush be restituted to the plaintiffs.  That is

14   going to be the judgment.

15          However, there is going to be definitely

16   some post judgment motions, but what I do want is to

17   enter the judgment and then Defendants -- I don't

18   think Mr. Efron is going to be filing any post

19   judgment motions at this time.  You're going to be

20   responding, I assume, to the motions filed by the

21   defense.

22          We do have the verdict.  Let me do -- I do

23   want to note -- and, again, I am not prejudging --

24   and I would have to carefully review the briefs and

25   any transcript, but my initial impression is that the

1  individual damages may be subject to a remitter.

2  But, again, I am not saying I will do it or not.  But

3  I just want to note that, you know, if -- that is my

4  gut feeling, that they may be at least subject to the

5  consideration.

6         MR. EFRON:  We may retry the case.

7         THE COURT:  But, again, that is something

8  that I would like to hear from the parties.  I am not

9  suggesting any particular amount but obviously that

10  is something that -- you know, and it's the same

11  amount as to everybody.  So but, again, it -- I could

12  be wrong, I don't want to prejudge the issue, but I

13  think I should hear.  And if Defense does not raise

14  any issues, I will not consider that.

15         But I will -- again, I will be entering the

16  judgment consistent with the jury verdict, and then

17  you have whatever days the Federal Rules of Civil

18  Procedure provide from post verdict, post judgment

19  motions.  And if you need an extension, please -- I

20  do note that, again, this is a considerable amount of

21  money.  So, you know, if you need a reasonable

22  extension, I will consider that.

23         Anything further, Mr. Efron?

24         MR. EFRON:  No, Your Honor.  Thank you very

25  much.

1    THE COURT:  Mr. Arias, anything further?

2    MR. ARIAS-MARXUACH:  No.  We will post, post

3  trial motions.

4    THE COURT:  And, again, before closing, and

5  I know Mr. Ambush is here, let me note -- and, again,

6  I need not say this to Plaintiffs' attorney because

7  he has prevailed at this time.

8    But, Mr. Ambush, I understand your attorneys

9  have done an extremely competent job.  I know you're

10  not satisfied with the verdict.  There's going to be

11  some motions to be filed, but I think at least from

12  the Court's perspective your attorneys have handled

13  this case in a very professional and zealous manner

14  all throughout the litigation.  So I want you to be

15  aware of that.

16    Okay, you're excused.  Thank you.

17    THE BAILIFF:  All rise.

18    (Jury Trial concluded at 5:00 p.m.)

19                        ---

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT    )

2            OF                      )ss.

3        PUERTO RICO                 )

4

5

6

7                        CERTIFICATE

8

9

10          I, EVILYS E. BRATHWAITE, hereby certify that

11    the proceedings and evidence are contained fully and

12    accurately, to the best of my ability, in the notes

13    recorded stenographically by me, at the jury trial in

14    the above matter; and that the foregoing is a true

15    and accurate transcript of the same.

16

17                    _____/s/ Evilys E. Brathwaite____

18                    EVILYS E. BRATHWAITE, RPR
                      Official Court Reporter
19                    United States District Court
                      Federal Building, Room 200
20                    San Juan, Puerto Rico 00918
                      787-772-3377
21

22

23

24

25